## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THOMAS E. PEREZ, SECRETARY OF )
LABOR, UNITED STATES DEPARTMENT )
OF LABOR, )
 )
       **Plaintiff,** )
 )     **Civil Action No. 14-1494**
       **v.** )
 )
WPN CORPORATION, RONALD LABOW; )
SEVERSTAL WHEELING, INC. )
RETIREMENT COMMITTEE; MICHAEL )
DICLEMENTE; DENNIS HALPIN; )
WHEELING CORRUGATING COMPANY )
RETIREMENT SECURITY PLAN; AND) )
SALARIED EMPLOYEES' PENSION )
PLAN OF SEVERSTAL WHEELING, INC., )
 )
       **Defendants.**

## Memorandum Opinion

### I.    Introduction

The Secretary of Labor of the United States Department of Labor ("DOL") brings this action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA") alleging that the fiduciaries and investment managers of two related pension plans violated ERISA causing a loss of the pension plans' value of approximately $7,000,000.00. Defendant fiduciary body, the Severstal Wheeling, Inc. Retirement Committee (the "Retirement Committee") and its two individual members, Michael DiClemente ("DiClemente") and Dennis Halpin ("Halpin") appointed Ronald Labow ("Labow") and WPN Corporation ("WPN") to manage the assets of the two pension plans, the Wheeling Corrugating Company Retirement Security Plan and the Salaried Employees' Pension Plan of Severstal Wheeling, Inc. ("the

Plans").[1]  In its Amended Complaint the DOL alleges that Labow, the sole officer and principal owner of WPN, and WPN are directly responsible under ERISA for the loss in value of the Plans' assets from approximately December 5, 2008 through May 19, 2009.  The DOL alleges that Retirement Committee, DiClemente, and Halpin (collectively, "Defendants") are liable under ERISA for failing to invest the Plans' assets from November 3, 2008 to December, 5, 2008; for failing to monitor Labow and WPN's conduct from December 5, 2008 to May 19, 2009; and for co-fiduciary liability for Labow and WPN's violations.

Presently before the Court is Defendants' Motion to Dismiss and, in the alternative, Motion for Summary Judgment.  (Docket No. 124).  The DOL has filed a Response to the Motion (Docket No. 130) and Defendants have filed a Reply (Docket No. 134).  The Court heard oral argument on the Motion on February 7, 2017 (Docket No. 135), after which both parties filed Supplement Briefs (Docket Nos. 139 and 140).  After careful consideration of the parties' positions, and for the following reasons, Defendants' Motion to Dismiss is granted, in part and denied in part.  Defendants' alternative Motion for Summary Judgment is denied.

## II.    Procedural History and Factual Background

### A.  Procedural History

The DOL filed a Complaint in this Court on October 14, 2014.  (Docket No. 1).  An Amended Complaint was filed on March 27, 2015.  (Docket No. 28).  On April 10, 2015, the Court issued a Consent Order on Stay granting the Retirement Committee, DiClemente, and Halpin's unopposed Motion for Stay of Proceedings.  (Docket No. 37).  The Stay was requested

---

[1] By Order dated September 20, 2016, the pension plan Defendants, Wheeling Corrugating Company Retirement Security Plan and the Salaried Employees' Pension Plan of Severstal Wheeling, Inc. were denominated as nominal parties that were not required to respond to the Amended Complaint or otherwise actively participate in this litigation.  (Docket No. 112).

to await the issuance of a decision on the merits in a lawsuit filed by the Retirement Committee and its members (and the Plans) against Labow and WPN in the United States District Court for the Southern District of New York. (Docket No. 37, at ¶ 1; *Severstal Wheeling, Inc. v. WPN Corp.*, No. 1:10-cv-954). Following a bench trial, District Judge Laura Taylor Swain issued a decision dated August 10, 2015, finding that WPN and Labow breached their fiduciary duties under ERISA and entered judgment for approximately $15,000,000.00. *Severstal Wheeling, Inc. Ret. Comm. v. WPN Corp.*, 119 F. Supp. 3d 240, 242 (S.D.N.Y. 2015). The decision was affirmed by the United States Court of Appeals for the Second Circuit on August 30, 2016. *Severstal Wheeling, Inc. v. WPN Corp.*, 659 F. App'x 24 (2d Cir. 2016). The Stay in this Court was lifted on the same day. (Docket No. 97). Defendants' Motion to Dismiss and, in the alternative, Motion for Summary Judgment was filed on October 31, 2016. (Docket No. 124).

### B. Factual Background

From approximately June 2008 to approximately May 2009, the Plans' sponsor was Severstal Wheeling, Inc., which is no longer in business. (Am. Compl. ¶ 12, Docket No. 28). The Plans were established to provide retirement benefits to employees. Pursuant to the Plans' documents, Severstal Wheeling, Inc. Retirement Committee is the Plan Administrator and a Named Fiduciary for each of the Plans. (Am. Compl. ¶ 8). DiClemente was a member of the Retirement Committee from June, 2008, through February 2009, and is a Named Fiduciary pursuant to the Plans' documents. (Am. Compl. ¶ 9). Halpin was a member of the Retirement Committee from June, 2008, through April, 2009, and is a Named Fiduciary pursuant to the Plans' documents. (Am. Compl. ¶ 10).

The Plans' assets were part of a large trust, the WHX Trust, holding the assets of several pension plans managed by Labow and WPN. (Am. Compl. ¶ 14). The Trustee of the WHX Trust was Citibank, N.A. (Am. Compl. ¶ 15). In June, 2008, Citibank announced that it was discontinuing its trust services by the end of 2008. (Am. Compl. ¶ 15.) As a result, the Plans' assets were to be separated from the unrelated pension plan assets held in the WHX Trust and deposited into a new standalone trust holding only the Plans' assets. (Am. Compl. ¶ 16.) The new standalone trust was "subsequently renamed" the Severstal Wheeling, Inc. Pension Plan Master Trust ("Severstal Trust"). (Am. Compl. ¶ 16.) National City Bank became the Trustee of the Severstal Trust on December 31, 2008.[2] (Am. Compl. ¶ 15).

The allegations supporting the DOL's claims that Defendants violated ERISA fall into two definable time periods. The first period begins on November 3, 2008, with the transfer of the Plans' Assets from the WHX Trust to a standalone trust, and ends on December 5, 2008, when a written investment management agreement was entered into between the Retirement Committee and Labow and WPN.

The majority of the Plans' assets (valued at approximately $31,446,845) were held in an undiversified account with Neuberger Berman, LLC. (Am. Compl. ¶¶ 19, 21). The Neuberger Berman account had approximately 97% of its value invested in eleven large cap energy stocks, and remained in this undiversified state during the period from November 3, 2008 through December 5, 2008. (Am. Compl. ¶¶ 21, 22).

---

[2] National City Bank did not become Trustee of the Severstal Trust until December 31, 2008, which is consistent with Citibank's announcement that it was discontinuing its trust services by the end of 2008. However, there is no allegation in the Amended Complaint that Citibank ever acted as Trustee for the newly formed Severstal Trust at any time since its formation. Thus, it appears that there was no trustee of the Plans' assets from November 3, 2008 to December 30, 2008.

The Neuberger Berman account holding the Plans' assets was transferred from the WHX Trust to the Severstal Trust on November 3, 2008. (Am. Compl. 19). On November 4, 2008, DiClemente confirmed the transfer of the Neuberger Berman account to the Severstal Trust by letter dated November 3, 2008. (Am. Compl. ¶ 20).

There was no written investment management agreement from November 3, 2008, until December 5, 2008. (Am. Compl. ¶ 22). On December 5, 2008, DiClemente, on behalf of the Retirement Committee, signed an investment management agreement with Labow and WPN, titled the Third Amendment to the Severstal Wheeling, Inc. Investment Management Agreement. (Am. Compl. ¶ 23). Although the investment management agreement signed on December 5, 2008, was backdated to be effective November 1, 2008 (Am. Compl. ¶ 23), the DOL alleges that Labow and WPN's investment manager fiduciary duties became effective on December 5, 2008. In the DOL's first claim it is alleged that from November 3, 2008 through December 5, 2008, Defendants failed to discharge their fiduciary duties solely in the interest of the participants and beneficiaries by failing to prudently invest the Plans' assets when no investment management agreement was in place in violation of ERISA sections 404(a)(1)(A) and 404(a)(1)(B); 29 U.S.C. §§ 1104(a)(1)(A) & 1104(a)(1)(B). (Am. Compl. ¶ 35).

The second time period begins when the Retirement Committee entered into the investment management agreement with Labow and WPN on December 5, 2008, and ends when Labow and WPN are terminated on May 19, 2009. (Am. Compl. ¶¶ 23, 28). The Plans' assets remained in the undiversified Neuberger Berman account from December 5, 2008 through December 30, 2008. (Am. Compl. ¶ 24). On December 30, 2008, the Retirement Committee, DiClemente, and Halpin first learned that the Plans' assets were in the undiversified Neuberger

Berman account and DiClemente informed Labow and WPN of the discovery. (Am. Compl. ¶ 25).

The Plans' assets remained in the undiversified Neuberger Berman account while Defendants communicated with Labow and WPN, from December 30, 2008 through March 24, 2009. (Am. Compl. ¶ 26). On March 24, 2009, the Plans assets in the Neuberger Berman account were sold for cash. (Am. Compl. ¶ 27).

The Plans' assets remained in cash from March 24, 2009 through May 19, 2009, during which time the Retirement Committee and Halpin communicated with Labow and WPN. (Am. Compl. ¶ 29). On May 19, 2009, the investment management agreement was terminated and Labow and WPN were fired. (Am. Compl. ¶¶ 6, 28).

From November 3, 2008 through May 19, 2009, the Plans suffered losses and lost earnings of approximately $7,000,000.00. (Am. Compl. ¶ 32). The DOL's second claim alleges that Defendants failed to discharge their fiduciary duties solely in the interest of the participants and beneficiaries by failing to monitor Labow and WPN from December 5, 2008 through May 19, 2009, while they acted as investment manager for the Plans in violation of ERISA sections 404(a)(1)(A) and 404(a)(1)(B); 29 U.S.C. §§ 1104(a)(1)(A) & 1104(a)(1)(B). (Am. Compl. ¶ 35).

Finally, the DOL alleges in its third claim that Defendants are subject to co-fiduciary liability because they enabled Labow and WPN to commit a breach of ERISA section 404(a)(1), and knew of Labow and WPN's breach and failed to make reasonable efforts to remedy the breach, all in violation of ERISA sections 405(a)(2) and 405(a)(3); 29 U.S.C. §§ 1105(a)(2) & 1105(a)(3). (Am. Compl. ¶ 36).

Defendants seek dismissal of the DOL's claims for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). In the alternative, Defendants request the Court convert the motion to dismiss into a motion for summary judgment relying primarily on the fact finding developed in the related proceeding in the United States District Court for the Southern District of New York, as well as an Affidavit prepared by DiClemente. The DOL was not a party in *Severstal Wheeling, Inc. v. WPN Corp.,* No. 1:10-cv-954, nor were Defendants. Although the District Court for the Southern District of New York found Labow liable for fiduciary breaches, the decision in that case cannot be read to absolve Defendants from liability. Finally, the Court agrees with the DOL that the opportunity to obtain discovery is required before the motion is converted to a motion for summary judgment. Accordingly, the Court declines to convert the motion to dismiss to a motion for summary judgment.

## III.     Standard of Review

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir.2014) (quoting *Phillips v. Cnty of Allegheny*, 515 F.3d 224, 233 (3d Cir.2008)). A pleading party need not establish the elements of a *prima facie* case at this stage; the party must only "put forth allegations that 'raise a reasonable expectation that discovery will reveal evidence of the necessary element[s].'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir.2009) (quoting *Graff v. Subbiah Cardiology Associates, Ltd.*, 2008 WL 2312671 (W.D.Pa. June 4, 2008)); *see also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 790 (3d Cir.2016) ("Although a reviewing

court now affirmatively disregards a pleading's legal conclusions, it must still . . . assume all remaining factual allegations to be true, construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them.") (citing *Foglia v. Renal Ventures Mgmt.*, LLC, 754 F.3d 153, 154 n. 1 (3d Cir.2014)).

Nonetheless, a court need not credit bald assertions, unwarranted inferences, or legal conclusions cast in the form of factual averments. *Morse v. Lower Merion School District*, 132 F.3d 902, 906, n. 8 (3d Cir.1997). The primary question in deciding a motion to dismiss is not whether the Plaintiff will ultimately prevail, but rather whether he or she is entitled to offer evidence to establish the facts alleged in the complaint. *Maio v. Aetna*, 221 F.3d 472, 482 (3d Cir.2000). The purpose of a motion to dismiss is to "streamline [ ] litigation by dispensing with needless discovery and factfinding." *Neitzke v. Williams*, 490 U.S. 319, 326–327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

## IV.    Discussion

Defendants first argue that the DOL fails to state claims upon which relief can be granted for failure to invest or co-fiduciary liability because once Defendants appointed investment managers they are entitled to the protection of the safe harbor provision of ERISA section 405(d)(1), 29 U.S.C. § 1105(d)(1). Defendants also argue that the DOL has failed to state a claim upon which relief can be granted that Defendants breached their duty to monitor the investment managers. Defendants argue that they complied with their duty to monitor and that the DOL's claim is an improper attempt to impute the investment managers' conduct to Defendants.

As discussed below, the Court agrees that once Defendants appointed investment managers they are entitled to the safe harbor protection. The Court also finds that the DOL has properly stated a claim for failure to monitor. In addition, because the Court finds that the investment management agreement is effective as of November 1, 2008, the Court will permit the DOL to amend its Amended Complaint to conform to the ruling.

## A. Failure to Invest and Co-fiduciary Claims

Defendants argue that the DOL's failure to invest and co-fiduciary liability claims should be dismissed because Defendants are protected by the safe harbor provision of ERISA section 405(d)(1), 29 U.S.C. § 1105(d)(1). This sections states:

> **(d) Investment managers**
> **(1)** If an investment manager or managers have been appointed under section 1102(c)(3) of this title, then, notwithstanding subsections (a)(2) and (3) and subsection (b) of this section, no trustee shall be liable for the acts or omissions of such investment manager or managers, or be under an obligation to invest or otherwise manage any asset of the plan which is subject to the management of such investment manager.

29 U.S.C.A. § 1105(d)(1). Defendants argue that because they appointed an investment manager effective November 1, 2008, the safe harbor provision explicitly relieves them from liability for the acts or omissions of Labow and WPN, and from any obligation to invest assets. Accordingly, Defendants assert that both the failure to invest claim and co-fiduciary liability claim must be dismissed.

Implicit in the DOL's argument is (i) that Labow and WPN were acting as the appointed investment managers as of the November 1, 2008 backdated investment agreement, and (ii) that Defendants fall within the meaning of the term "trustee" in section 1105(d)(1). The Court addresses these arguments in turn.

### 1. Effective Date of Appointment of Investment Manager

If Defendants are correct that the appointment of the investment managers was effective as of November 1, 2008, then Defendants would not have had a duty to invest the Plans' assets from November 3, 2008 to December 5, 2008. Conceivably Defendants would be exposed to co-fiduciary liability for this time period, however Defendants' argument is that the safe harbor provision would relieve them from co-fiduciary liability for this time period as well. If, however, the effective date is December 5, 2008, then the failure to invest claim would survive the motion to dismiss. This is true because if the investment managers were not properly appointed during the relevant time period Defendants would retain control of the assets of the plan with corresponding fiduciary duties.

Defendants argue that basic contract law allows parties the freedom to impose whatever obligations they wish and that includes the ability to backdate the effective date of an agreement. Defendants rely on an opinion from the United States Court of Appeals for the Third Circuit approving insurance agreements that are not legally operative until the first premium is paid, and affirming that the effective date of the agreement is essentially backdated once the first premium is paid. *Wise v. Am. Gen. Life Ins. Co.*, 459 F.3d 443 (3d Cir. 2006). In *Wise*, the Court of Appeals reviewed several Pennsylvania cases before concluding that in Pennsylvania "backdated contracts are not inherently unfair and should be enforced according to their explicit terms." *Wise*, 459 F.3d at 449 (*citing Ford v. Fidelity Mutual Life Insurance Company*, 314 Pa. 54, 170 A. 270 (1934)).

Defendants also point to the course of conduct between the parties in this case; highlighting that Labow and WPN had been investment managers of the Plans' assets prior to the transfer to the Severstal Trust and remained as investment managers after the transfer. Thus, Defendants argue that the agreement entered into on December 5, 2008, was in effect an amendment to the ongoing investment management agreement between the parties; or, in other words, a memorialization of what had been occurring in fact since November 1, 2008.

The DOL acknowledges that backdated contracts are not inherently unlawful, and therefore, on its face the written investment agreement's effective date is November 1, 2008. However, the DOL argues that ERISA Section 3(38), defining the term "investment manager," requires that the investment manager "has acknowledged in writing that he is a fiduciary with respect to the plan." 29 U.S.C.A. § 1002(38). In addition, Defendants are prohibited under ERISA section 410(a) from entering into an agreement with the intent to absolve Defendants from liability for breaching their fiduciary duties. Section 1110(a) states in relevant part that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." 29 U.S.C. § 1110(a).

The difficulty for the DOL is that it does not affirmatively allege in the Amended Complaint (i) that Labow and WPN were not acting as investment managers from November 1, 2008 through December 5, 2008, and (ii) that Defendants' intent in backdating the agreement was to relieve itself "from responsibility or liability for any responsibility, obligation, or duty" it had to invest the Plans' assets during that time period. 29 U.S.C. § 1110(a). At best, the DOL alleges that the "Plans did not have a written investment management agreement from on or

about November 3, 2008 until December 5, 2008." (Am. Compl. ¶ 22). The written agreement on its face states that the effective date is November 1, 2008, and absent factual allegations to the contrary the Court agrees that November 1, 2008 is the effective date.

Accordingly, the Court will dismiss the DOL's failure to invest claim and will grant the DOL's request to amend its Amended Complaint in order to allege that Defendants are liable for failing to monitor the investment managers from November 3, 2008 to December 5, 2008; and to extend the time frame of the claims of fiduciary breaches against Labow and WPN back to November 3, 2008, when they were acting as investment managers pursuant to the written investment agreement.

In the alternative, the Court notes that this ruling leaves open the possibility of a claim alleging that Labow and WPN were not acting as investment managers from November 3, 2008 to December 5, 2008, that the purpose of backdating the investment agreement was to relieve Defendants from liability during a time when they in fact retained control of the assets of the plans, and that Defendants violated ERISA by failing to invest properly the Plans' assets. The DOL has not specifically indicated in its pleadings or during oral argument that it intends to assert such a claim in the alternative, but the Court cannot discount the possibility that the DOL may choose to assert such a claim. Of course for such a claim to succeed it must eventually be supported by factual evidence establishing that Labow and WPN were not acting as investment managers, and that Defendants backdated the agreement to relieve itself from liability for its failure to invest the Plans' assets.

### 2. "Trustee" Under Section 29 U.S.C. § 1105(d)(1)

It is undisputed that Defendants appointed investment managers with the authority to manage, invest, and dispose of the Plans' assets. Section 1105(d)(1) provides in part that "[i]f an investment manager or managers have been appointed . . . then . . . no trustee shall be liable for the acts or omissions of such investment manager or managers." 29 U.S.C. § 1105(d)(1). Defendants argue that the term "trustee" in the statute includes a named fiduciary with the power to appoint an investment manager even if they are not a named trustee under ERISA, and therefore they cannot be held liable as a co-fiduciary for the fiduciary breaches of Labow and WPN.

Defendants argue that a reasonable reading of the statute leads to the conclusion that a fiduciary's appointment of an investment manager would trigger the safe harbor provision of Section 405(d)(1) for the benefit of the fiduciary who took the action of appointing an investment manager regardless of whether the fiduciary is named as a trustee. In other words, where the underlying conduct invoking Section 1105(d)(1) is properly performed by a named fiduciary who is not a named trustee, Defendants argue that the terms "named fiduciary" and "trustee" are interchangeable.

The DOL's sole argument in response is that the plain language of section 1105(d)(1) provides protection only for "trustees" and since none of the Defendants are trustees they are unable to avail themselves of the safe harbor provision. *See* Am. Compl. ¶ 8 (Retirement Committee is Named Fiduciary and Plan Administrator, not a trustee); and Am. Compl. ¶¶ 9, 10 (DiClemente and Halpin are named Fiduciaries, not Trustees). Citibank was the Trustee of the Severstal Trust when the Neuberger Berman account was transferred from the WHX Trust on

November 3, 2008, and National City Bank became the Trustee on December 31, 2008. (Am. Compl. ¶ 15). There was apparently no trustee from November 3, 2008 through December 30, 2008. *See* footnote 2, *supra*.

The Court concludes that ERISA intended named fiduciaries (i) who have been granted control of the assets of a plan and (ii) who have properly appointed an investment manager to manage the assets of a plan, are protected by the safe harbor provision of Section 1105(d)(1), even though the named fiduciaries are not designated as "trustees." First, the logical reading of the interplay of the relevant statutes leads to this conclusion. Second, there is scant case law addressing this issue but the cases that do discuss it also favor this conclusion. In contrast, the Court has found no case that prohibited a named fiduciary from the benefits of the safe harbor provision based solely on the named fiduciary not being a "trustee." Finally, legislative history addressing this issue supports the Court's conclusion.

### a. Relevant Statutes

The safe harbor provision of section 1105(d)(1) only comes into play when control over the assets of a plan has been appointed to an investment manager. Therefore, the safe harbor provision must be read in context with the related statutory sections defining who has control over the assets of a plan, sections 1103(a) and 1102(c)(3), and who has authority to transfer control over the assets of a plan to an investment manager, section 1102(c)(3)).

Relevant to the issue in this case, the statutory sections allow for control over the assets of the plan to be with a trustee, a named fiduciary, or an investment manager. In the first instance, section 1103(a) provides that assets of an employee benefit plan are to be held in trust by a trustee who "shall have exclusive authority and discretion to manage and control the assets

14

of the plan." 29 U.S.C. § 1103(a). Section 1102(c)(3), however, allows for the possibility that "a person who is a named fiduciary" will have "control or management of the assets of the plan." 29 U.S.C. § 1102(c)(3). Section 1102(c)(3) also provides the authority for the investment manager to gain control over the assets of a plan; namely, when the person who has control over the assets of a plan, "a named fiduciary", appoints an investment manager. 29 U.S.C. § 1102(c)(3). Similarly section 1103(a)(2) refers to the appointment power of section 1102(c)(3) by which a trustee's "exclusive authority" over the control of the assets of a plan is "delegated" to an investment manager. 29 U.S.C. § 1103(a)(2).

Sections 1103(a), 1102(c)(3), and 1105(d)(1) all contemplate that control over the assets of the plan may be either delegated or appointed to an investment manager. Section 1105(d)(1) provides a safe harbor for the "trustee" if in fact control over the assets of the plan has been appointed to an investment manager under section 1102(c)(3). Section 1103(a)(2) provides that the trustee's control is exclusive except when control is delegated to an investment manager under section 1102(c)(3). Section 1102(c)(3), as noted, is the mechanism for the delegation of authority over control of the assets of the plan to an investment manager. 29 U.S.C. § 1102(c)(3).

A fiduciary is defined in ERISA "'not in terms of formal trusteeship, but in functional terms of control and authority over the plan.'" *Sec'y U.S. Dep't of Labor v. Koresko*, 646 F. App'x 230, 235 (3d Cir. 2016) (*quoting Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993)), citing 29 U.S.C. § 1002(21)(A)(i) ("a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets").

Here, as discussed above, control over the assets of the plan is with a trustee, a named fiduciary, or an investment manager, all of which are fiduciaries. A logical conclusion to draw from the interplay of the above ERISA statutory sections is that when control over the assets of a plan has been delegated to an investment manager appointed by a named fiduciary, then whoever had control over the assets of the plan prior to the appointment of the investment manager, no longer has such control after the appointment. This conclusion must be true whether it was the trustee's exclusive control or whether a named fiduciary had control over the assets of the plan. Significantly, the only way an investment manager can acquire control is if "a person who is a named fiduciary" appoints the investment manager. Therefore, it follows that once the appointment of an investment manager is made by a "named fiduciary" under section 1102(c)(3), that the person who had control over the assets of the plan -- trustee or named fiduciary -- obtains the benefit of the safe harbor provision of section 1105(d)(1). There is no logical support for concluding that the person with control over the assets of the plan who properly appoints an investment manager would not be permitted the benefits of the safe harbor provision.

### b. Case Law

Defendants cite two cases in support of their position. The United States Court of Appeals for the Second Circuit briefly addressed the safe harbor provision's applicability to a fiduciary stating in relevant part:

> The obligations of *named fiduciaries* with regard to their duty of care, however, can be reduced by the appointment of an investment manager under ERISA Section 402(c)(3). Under Section 405(d)(1), once such an appointment has been made, the *trustees* cannot be held liable for any act or omission of that investment manager so far as the assets entrusted to the manager are concerned. The plain intent of this statutory structure is to allow *plan trustees* to delegate investment authority to a professional advisor who then becomes a fiduciary with a duty of care and duty of loyalty to the plan while *the trustees'* legal responsibilities

regarding the wisdom of investments are correspondingly reduced.

*Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1219 (2d Cir. 1987) (emphasis added). As can be seen, the Court used the terms "named fiduciary" and "trustee" interchangeably.

In *Lowen*, the Court discussed the safe harbor provision in the context of addressing the question of whether defendant Tower Asset was a fiduciary under ERISA. *Lowen*, 829 F.2d at 1218. Tower Asset was appointed by the Trustees as the investment manager for the subject plan pursuant to an investment management agreement of the plan. *Lowen*, 829 F.2d at 1212. The Court described the "core issue in dispute" as arising from the claim that Tower Asset cannot be regarded as a fiduciary because the Trustees of the plan "compelled Tower Asset to make many, or all," of the prohibited investments. *Lowen*, 829 F.2d at 1218. The Court held that it was "simply beyond doubt" that Tower Asset was an ERISA fiduciary, noting that the plan's "named fiduciary," the Trustees, were authorized to appoint an "investment manager" under Section 402(c)(3).

Because there was an actual named trustee in this case who appointed Tower Asset as the investment manager, the *Lowen* Court did not directly address the question of whether a named fiduciary who was not a trustee is protected by the safe harbor provision. However, the *Lowen* Court's preliminary discussion regarding ERISA's structure and purposes is persuasive support that named fiduciaries are meant to be protected by the safe harbor provision. The Court of Appeals noted that ERISA requires that "every plan designate a 'named fiduciary' with power 'to control and manage' the plan." *Lowen,* 829 F.2d at 1218. The requirement of a "named fiduciary" with control over the assets of a plan focuses responsibility and liability for mismanagement with "'a degree of certainty.'" *Id. (quoting Birmingham v. Sogen-Swiss Int'l*

*Corp. Retirement Plan*, 718 F.2d 515, 522 (2d Cir. 1983). As is shown by the above discussion on the interplay of the relevant statues, the Court agrees that determining the party with control over the assets of a plan is crucial to identifying legal responsibility under ERISA. From these premises the *Lowen* Court concluded that a named fiduciary is able to benefit from the safe harbor provision.

Defendants also rely on a District Court case from the United States District Court for the Northern District of Illinois. In *Harris Trust & Sav. Bank v. Salomon Bros.*, 832 F. Supp. 1169, 1177–78 (N.D. Ill. 1993), Harris Trust and Savings Bank, as Trustee for the Ameritech Pension Trust, Ameritech Corporation, and an individual sued Salomon Brothers Inc. and Salomon Brothers Realty Corporation (collectively "Salomon") alleging, *inter alia*, violations of ERISA. Plaintiffs brought suit based on several of Salomon's investments alleged to have been based on inaccuracies and misrepresentations. The District Court had issued a prior opinion finding that plaintiffs had sufficiently alleged that Salomon was an ERISA investment advisor fiduciary.[3] *Harris Trust & Sav. Bank v. Salomon Bros.*, 813 F. Supp. 1340, 1343 (N.D. Ill. 1992). Plaintiffs subsequently filed an Amended Complaint, to which Salomon asserted a counterclaim alleging that if Salomon is liable for any breaches of duty then Ameritech Corporation is also liable and must contribute to any damages awarded.

Ameritech Corporation sought dismissal of the counterclaim, in part, by arguing that it was protected by section 1105(d)(1)'s safe harbor provision even though it was not a named trustee. The District Court agreed that Ameritech Corporation was able to avail itself of the

---

[3] Salomon is alleged to have breached its ERISA fiduciary duties while acting as a "broker-dealer and investment advisor" to the Trust. *Harris Trust & Sav. Bank v. Salomon Bros.*, 813 F. Supp. 1340, 1342 (N.D. Ill. 1992). Neither the Committee with authority to appoint an investment manager, or the investment manager was a named party in the *Harris Trust* case.

protection afforded by section 1105(d)(1) because it either fell within the definition of a "trustee," and in the alternative, even if it did not meet the definition of a trustee it was still protected from liability from the acts and omission of an appointed investment manager. *Harris Trust*, 832 F. Supp. at 1177–78.

The District Court relied on section 1103(a)'s language that a "trustee" is granted "exclusive authority and discretion to manage and control the assets of the plan" except when such authority "has been delegated" to an investment manager. *Harris Trust*, 832 F. Supp. at 1177 (*citing* 29 U.SC. § 1103(a)). The District Court reasoned that "[b]ecause the plan instrument named Ameritech as a fiduciary, and because Ameritech had control over the trust except to the extent that an investment manager was appointed, Ameritech falls within the definition of a 'trustee.'" *Id.* The District Court's unstated premise that allowed it to conclude that Ameritech Corporation fell within the definition of a "trustee," is that the term "trustee" in Section 1103(a) encompasses named fiduciaries who are not named trustees so long as such fiduciaries have control of the assets except when an investment manager has been appointed.

In *Harris Trust*, the District Court concluded in the alternative that even if Ameritech Corporation does not fall within the definition of a trustee it still is afforded protection from liability under section 1105(d)(1). The *Harris Trust* Court relied on the legislative history of ERISA, citing a "'Joint Explanatory Statement of the Committee of Conference,' [in which] Congress explained that 'as long as the named fiduciary had chosen and retained the investment manager prudentially, the named fiduciary would not be liable for the acts or omissions of the manager.'" *Harris Trust*, 832 F. Supp. at 1178 (*quoting* H.R.Conf.Rep. No. 1280, 93rd Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 5038, 5082).

Relying on regulations the District Court also noted that the DOL "stated that named fiduciaries can delegate managerial authority over plan assets to an investment manager, thereby releasing the named fiduciary from liability for the acts or omissions of the person to whom authority was delegated." *Harris Trust*, 832 F. Supp. at 1178 (*citing* 29 C.F.R. § 2509.75-8, FR-14 "Questions and answers relating to fiduciary responsibility under the Employee Retirement Income Security Act of 1974")[4]. Finally, the *Harris Trust* Court relied on the *Lowen* Court's holding that "'obligations of named fiduciaries with regard to their duty of care ... can be reduced by the appointment of an investment manager under ERISA section 402(c)(3).'" *Harris Trust*, 832 F. Supp. at 1178 (quoting *Lowen,* 829 F.2d at 1219).

The Court has found an additional case supporting the view that the safe harbor applies to named fiduciaries with control over a plan's assets who subsequently appoint an investment manager. *Harley v. Minnesota Mining & Mfg. Co.*, 42 F. Supp. 2d 898 (D. Minn. 1999), *aff'd sub nom. Harley v. Minnesota Min. & Mfg. Co.*, 284 F.3d 901 (8th Cir. 2002). In *Harley*, the fiduciary of the plan responsible for overseeing investment of the plan's assets delegated that responsibility to a Pension Asset Committee, who delegated the management of the assets to an

---

[4] As discussed in the body of the Opinion, the *Harris Trust* Court's reliance on FR-14 is misplaced as FR-14 does not refer to 29 U.S.C. § 1105(d)(1). The relevant question and answer from the Code of Regulation is as follows:

FR–14 Q: If the named fiduciaries of an employee benefit plan designate a person who is not a named fiduciary to carry out fiduciary responsibilities, to what extent will the named fiduciaries be relieved of liability for the acts and omissions of such person in the performance of his duties?

A: If the instrument under which the plan is maintained provides for a procedure under which a named fiduciary may designate persons who are not named fiduciaries to carry out fiduciary responsibilities, named fiduciaries of the plan will not be liable for acts and omissions of a person who is not a named fiduciary in carrying out the fiduciary responsibilities which such person has been designated to carry out, except as provided in section 405(a) of the Act, relating to the general rules of co-fiduciary liability, and section 405(c)(2)(A) of the Act, relating in relevant part to the designation of persons to carry out fiduciary responsibilities. . . .

29 C.F.R. § 2509.75-8

investment manager. *Harley*, 42 F. Supp. 2d at 901, 908. The District Court acknowledged that even with the appointment of an investment manager the fiduciary "still had an obligation to supervise and monitor" the investments. *Id.* at 908. In a footnote the District Court, citing *Harris Trust*, noted that "[b]ecause [the fiduciary] delegated to [an investment] manager[] the fiduciary duty to administer the Plan's assets according to agreed upon terms relating to that investment, [the fiduciary] is not subject to liability for acts or omissions of the managers that contravene those terms." *Id.* at 908 n. 13. Again, the District Court, reiterated that this does not relieve the fiduciary from oversight responsibilities, or its duty to monitor the investment over time. *Id.*

Finally, in *Whitfield v. Cohen*, the District Court stated that "ERISA permits trustees of a plan to appoint an investment manager to manage plan assets," and "[w]here such an appointment has been properly made, the trustees are not liable for the acts or omissions of the investment manager." *Whitfield v. Cohen*, 682 F. Supp. 188, 196 (S.D.N.Y. 1988) (*citing* 29 U.S.C. §§ 1102(c)(3) and 1105(d)(1)). The District Court's statements elide the distinction between a "named fiduciary" with appointing authority and a "trustee," as there is no ERISA statute stating that a "trustee" may appoint an investment manager. In *Whitfield*, the distinction between these terms was not important since the defendant-fiduciary was a "trustee" and "named fiduciary." Moreover, the *Whitfield Court* would not permit the defendant the safe harbor of section 1105(d) because the appointment of the investment manager had not been properly made. *Id.* In any event, the analysis of the statutes and discussion of the case law persuade the Court that under circumstances when an investment manager is properly appointed by a person with control over the assets of a plan the terms "trustee" and "named fiduciary" are interchangeable.

### c. *Legislative History and DOL Fiduciary Responsibility Q & A's*

The *Harris Trust* case cites legislative history as well as the DOL's "questions and answers relating to certain aspects of fiduciary responsibility" published in the Code of Regulations to support its conclusion that section 1105(d)(1) applies even if the fiduciary seeking the safe harbor is not a trustee. *Harris Trust*, 832 F.Supp. at 1178. The Court agrees that the legislative history supports the *Harris Trust* Court's conclusion; however, the regulatory source cited by the *Harris Trust* Court is misplaced; as such it merely provides instructive clarification regarding section 1105.

The *Harris Trust* Court supported its conclusion in part by explaining that in question and answer FR-14[5] the DOL "stated that named fiduciaries can delegate managerial authority over plan assets to an investment manager, thereby releasing the named fiduciary from liability for the acts or omissions of the person to whom authority was delegated." *Harris Trust*, 832 F. Supp. at 1178 (*citing* 29 C.F.R. § 2509.75-8, FR-14 "Questions and answers relating to fiduciary responsibility under the Employee Retirement Income Security Act of 1974"). However, FR-14 does not concern circumstances where an investment manager has been appointed, nor does it address the safe harbor provision of section 1105(d)(1). The "index of the questions and answers" contains a table showing that FR-14 is addressing fiduciary responsibility under sections 1105(a) and 1105(c)(2). 29 C.F.R. § 2509.75-8.

Section 1105(a) is the primary subsection addressing the circumstances of co-fiduciary liability. 29 U.S.C. § 1105(a). Section 1105(c)(1) circumscribes the type of fiduciary responsibilities, "*other than trustee responsibilities,*" that a named fiduciary may allocate

---

[5] According to the Code of Federal Regulations "Key to question prefixes," "FR -- refers to fiduciary responsibility," and "D – refers to definitions." 29 C.F.R. § 2509.75-8.

"among named fiduciaries" or to "persons other than named fiduciaries." 29 U.S.C. §§ 1105(c)(1)(A) & (B) (emphasis added). Section 1105(c)(2) is essentially the "safe harbor" provision for named fiduciaries who allocate such fiduciary responsibilities to co-fiduciaries, not investment managers. 29 U.S.C. § 1105(c)(2).

Section 1105(c)(3) notes that the meaning of "trustee responsibility" under subsection 1105(c) does not include the "power under the trust instrument of a named fiduciary to appoint an investment manager in accordance with section 1102(c)(3) of this title." 29 U.S.C. § 1105(c)(3). While subsection 1105(c) is not a model of clarity, DOL question and answer FR-15, which addresses subsections 1105(c)(2) and (c)(3), specifically clarifies the issue. The question of FR 15 is:

> Q: May a named fiduciary delegate responsibility for management and control of plan assets to anyone *other than a person who is an investment manager* as defined in section 3(38) of the Act so as to be relieved of liability for the acts and omissions of the person to whom such responsibility is delegated?

29 C.F.R. § 2509.75-8, FR-15 (emphasis added). The DOL's answer is clear:

> No. Section 405(c)(1) [concerning allocation of fiduciary responsibilities] does not allow named fiduciaries to delegate to others authority or discretion to *manage or control plan assets.*"

*Id.* (emphasis added). Clearly, that would include appointment of an investment manager as FR-15 goes on to explain that a named fiduciary may delegate the authority to manage or control plan assets to investment managers pursuant to sections 1103(a)(2) and 1102(c)(3). *Id.*

While the regulatory questions and answers do not address the question of whether a named fiduciary who appoints an investment manager is entitled to the safe harbor of section 1105(d)(1), the legislative history does. The *Harris Trust* Court relied on a truncated quote from

the legislative history of ERISA, but the full context of the quote is even more persuasive

support for the conclusion reached in *Harris Trust* and by this Court:

> *Investment managers, investment committees, etc.* -- . . . a person who is a named
> fiduciary with respect to the control or management of plan assets may appoint a
> qualified investment manager to manage all or part of the plan assets. . . . In this
> case, the plan trustee would no longer have responsibility for managing the assets
> controlled by the qualified investment manager, and the trustee would not be
> liable for the acts or omissions of the investment manager. Also, as long as the
> named fiduciary had chosen and retained the investment manager prudentially,
> the named fiduciary would not be liable for the acts or omissions of the manager.

*Id.* First, the title of this section shows that it concerns investment managers. Second, it

begins by identifying the appointing authority vested in a "named fiduciary." Next, it

points out that the "trustee" is relieved from liability when the named fiduciary appoints

an investment manager. Finally, it concludes, consistent with the case law, that the

named fiduciary who appointed the investment manager is also relieved from liability.

### d. Conclusion

The Court concludes that Defendants are entitled to the safe harbor of section

1105(d)(1). Accordingly, Defendants cannot be held liable for the acts or omissions of Labow

and WPN during the time period Labow and WPN were investment managers. There is no

dispute that from December 5, 2008 through May 19, 2009, Labow and WPN were investment

managers and accordingly, we will grant Defendants' motion to dismiss the DOL's co-fiduciary

liability claims against Defendants for this time period. As discussed above, the written

investment management agreement is effective as of November 1, 2008, and under section

1105(d)(1) Defendants were therefore not "under an obligation to invest" the assets of the plan.

Accordingly, the Court will grant Defendants' motion to dismiss the DOL's failure to invest

claim against Defendants.

**B.  Failure to Monitor Claim**

Finally, Defendants argue for dismissal of the DOL's claim alleging that Defendants failed to properly monitor the investments as managed by Labow and WPN in violation of ERISA sections 404(a)(1)(A) and 404(a)(1)(B).  The Court will deny the motion to dismiss because the DOL has properly stated a claim of failure to monitor against Defendants.

The power to appoint and dismiss an investment fiduciary "carries with it a duty 'to monitor appropriately' those subject to removal."  *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996) (*quoting Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*, 805 F.2d 732, 736 (7th Cir. 1986) and *Leigh v. Engle*, 727 F.2d 113, 135 (7th Cir. 1984)).  An appointing authority is not exposed to liability *unless* something "'put [them] on notice of possible misadventure by their appointees.'"  *Coyne*, 98 F.3d at 1466 n.10 (*quoting Newton v. Van Otterloo*, 756 F.Supp. 1121, 1132 (N.D.Ind.1991).  According to the Department of Labor's regulatory questions and answers, an appointing authority would be notified of a possible misadventure by implementation of a regular monitoring procedure:

> Q: What are the ongoing responsibilities of a fiduciary who has appointed trustees or other fiduciaries with respect to these appointments?
>
> A: At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan. No single procedure will be appropriate in all cases; the procedure adopted may vary in accordance with the nature of the plan and other facts and circumstances relevant to the choice of the procedure.

29 C.F.R. § 2509.75-8, FR-17.

The Department of Labor reiterated the basic requirements of the duty to monitor in an amicus brief submitted in the United States Court for the Northern District of Oklahoma, and

relied on by Defendants. *In re: Williams Co. ERISA Lit.*, No. 02-153 (N.D. Ola. Aug 22, 2003) (DOL Amicus Brief, attached as Ex. A to Def. Supp. Br.). The Department of Labor noted that "in most cases, it will be enough that [appointing fiduciaries] adopt and adhere to routine procedures sufficient to alert them to deficiencies in performance which could require corrective action (*e.g.*, the implementation of a system of regular reports on the investment fiduciaries decisions and performance)." DOL Amicus Brief, at 5. In its amicus brief the Department of Labor further explained that "appointing fiduciaries are not charged with directly overseeing the investments [as that would be] duplicating the responsibilities of the investment fiduciaries"; that appointing fiduciaries "are required to have procedures in place so that on an ongoing basis they may review and evaluate whether the investment fiduciaries are doing an adequate job;" and the procedures that are implemented allow the appointing fiduciary "under the applicable circumstances, to assure themselves that" the investment fiduciaries "are properly discharging their responsibilities." DOL Amicus Brief, at 8-9.

The time for review of monitoring procedures is measured under a standard of reasonableness. *See* 29 C.F.R. § 2509.75-8, FR-17 (noting that review is at "reasonable intervals"). "A fiduciary must ascertain within a reasonable time whether an agent to whom he has delegated a trust power is properly carrying out his responsibilities". *Whitfield*, 682 F. Supp. at 196 (*citing* G. Bogert, *Trusts and Trustees*, § 557 at 155 (Revised 2d Ed. 1980)). The appointing fiduciary also has a "duty to monitor [the investment manager's] performance with reasonable diligence and to withdraw the investment if it became clear or should have become clear that the investment was no longer proper for the Plan." *Whitfield*, 682 F. Supp. at 196

(*citing Public Service Co. of Colorado v. Chase Manhattan Bank*, 577 F.Supp. 92, 104 (S.D.N.Y. 1983).

As can be seen from FR-17, the Department of Labor's amicus brief, and the case law, the *minimum requirement* is that the appointing fiduciary imposes a regular monitoring procedure. The Department of Labor's guidance to appointing authorities on the duty to monitor requires, "under the applicable facts and circumstances," the following:

- the appointing authority must adopt routine monitoring procedures;
- the appointing authority must adhere to the routine monitoring procedures;
- the appointing authority must review the results of the monitoring procedures;
- the monitoring procedures must alert the appointing authorities to possible deficiencies; and
- the appointing authority must act to take required corrective action.

29 C.F.R. § 2509.75-8, FR-17; DOL Amicus Brief, at 5, 8-9. Thus, an appointing authority that has instituted proper monitoring procedures has the corresponding duty to review and evaluate what is reported by the procedures and further, to take corrective action when required.

Defendants' argument for dismissal fails primarily because it mischaracterizes the DOL's allegations as requiring a *de facto* strict liability standard for the duty to monitor. *See* Def. Reply Br. at 7-8 (DOL's claim means that Defendants had to be "guarantor's" of Labow's conduct; Defendants were required to watch "every single move of an investment manager;" Defendants had "immediate and clear duty to second-guess Labow's investment decisions"), and Def. Supp. Br. at 2 (DOL's claim requires Defendants to "terminate the investment managers at the first sign of trouble," and duty to monitor claim "improperly attempts to impute Labow's conduct and breaches" to Defendants). Defendants' argument also raises the erroneous inference that an appointing fiduciary cannot be found to have violated a duty to monitor so long as the appointing

fiduciary has implemented procedures that allow for regular reporting on the investment fiduciaries. *See* Def. Supp. Br at 2 ("fiduciaries satisfy the duty by ensuring that procedures are in place to monitor investment managers"); *id.* at 3 ( FR-17 "suggests that as long as appropriate procedures are in place, fiduciaries satisfy the duty to monitor"); and *id.* at 4 ("if appropriate procedures are in place, such as an outside auditor and annual review, the duty to monitor is satisfied"). As discussed above, the duty to monitor requires that fiduciaries adopt a regular monitoring procedure under the applicable facts and circumstances that is capable of alerting the fiduciary of irregularities; that the fiduciary adhere to the monitoring procedure; and that the fiduciary take corrective action when required. Moreover, if an appointing fiduciary is relieved from liability simply by implementing monitoring procedures with regular reporting, even when monitoring reveals a need for corrective action but the appointing fiduciary does not act, the duty to monitor is reduced to a mere procedural implementation.

Contrary to Defendants' characterization of the failure to monitor claim, the DOL's claim "does *not* require the creation of a specific monitoring procedure, does *not* require fiduciaries to duplicate the efforts of investment managers, and does *not* require constant oversight of every decision." Def. Supp. Br. at 4. The DOL alleges several specific time frames over which Defendants monitoring process was deficient and how it was deficient; that Defendants failed to take action to rectify an undiversified account; that it was Labow whose performance was inadequate; and that Labow and WPN should have been removed. The DOL does not allege an unsupported claim that because the value of the Plans' asset's declined Defendants must not have properly monitored Labow and WPN. The DOL's failure to monitor claim is supported with, *inter alia*, the following factual allegations.

- Defendants failed to inquire into the status of the assets transferred on November 3, 2008 (Am. Compl. ¶ 18);
- From November 3, 2008, when the Neuberger Berman account was transferred the assets were undiversified and Defendants did not discover this until December 30, 2008 (Am. Compl. ¶¶ 21, 25);
- Regardless of the backdated investment agreement, the DOL alleges that Defendants' failure to enter into a written agreement with a defined investment policy when the assets were transferred on November 3, 2008 contributes to their duty to monitor the investment manager (Am. Compl. ¶ 22);
- Once the undiversified account was discovered on December 30, 2008, Defendants did not act promptly to correct the failure to diversify through March 24, 2009 (Am. Compl. ¶ 26);
- Once the assets were converted to cash Defendants failed in their duty to monitor by not ensuring that Labow and WPN acted to prudently invest the assets through May 19, 2009 (Am. Compl. ¶ 29).

At this stage of the pleadings there is no record on which to evaluate the conduct of the Defendants with respect to monitoring the investment managers from November 3, 2008 through May 29, 2009. Further discovery is needed to establish exactly what efforts, if any, were made by Defendants in furtherance of their fiduciary duties. Accordingly, the Court will deny Defendants' motion to dismiss the DOL's claim for failure to monitor.

Defendants cite *Howell v. Motorola, Inc.*, 633 F.3d 552, 572 (7th Cir. 2011), noting that the Seventh Circuit Court opined that "plaintiffs' argument that summary judgment was not warranted on [the failure to monitor claim] borders on frivolous." *Howell*, 633 F.3d at 573. The *Howell* Court was criticizing plaintiffs' argument that the duty to monitor essentially requires "every appointing Board member to review all business decisions" of the investing fiduciary, a requirement, the Court noted, that would defeat the purpose of the appointment in the first place. *Id.* The *Howell* Court quoted plaintiffs' "specific" argument: "that 'appointing fiduciaries must continually monitor their appointees.'" *Id.* at 574 (*quoting* but not *citing* plaintiff's argument). Despite Defendants' characterization of the DOL's arguments in the present case, the DOL

simply does not allege that Defendants were required to "continually monitor" Labow and WPN.

Contrary to what Defendants conclude from *Howell*, the Court's opinion supports the proposition that even if appropriate monitoring procedures are in place an appointing fiduciary may be subject to liability. *Howell*, 633 F.3d at 573. The *Howell* Court stated that "[t]here is no doubt that those who appoint plan administrations have an ongoing fiduciary duty under ERISA to monitor the activities of their appointees." *Howell*, 633 F.3d at 573 (citing *Leigh*, 727 F.2d at 134-35). The Court then quotes in full FR-17, and explains that the duty to monitor "exists so that a plan administrator or sponsor cannot escape liability by passing the buck to another person and then turning a blind eye." *Howell*, 633 F.3d at 573. Moreover, the *Howell* plaintiffs' failure to monitor claim was dismissed not just because they oversimplified the duty to monitor in their allegations, but also because they failed to produce any "evidence about how many reports were produced" or "what resulted from annual reviews of the Committee by the directors." *Howell*, 633 F.3d at 573. In other words, the *Howell* plaintiffs rested the entirety of their failure to monitor claim explicitly on an argument -- with no supporting evidence -- that the duty to monitor requires the appointing fiduciary "to review all business decisions," or in plaintiffs' words "to continually monitor" appointees. *Id.* If a plaintiff fails to produce such evidence, as the *Howell* plaintiffs did, then summary judgment in favor of the appointing fiduciary may be warranted. *See Howell*, 633 F.2d at 573 (case was at Circuit Court "after all parties have had a chance to develop the record for purposes of summary judgment," and plaintiffs failed to meet their burden to show genuine issues of material fact existed).

Other cases cited by Defendants also do not support their argument that the DOL has failed to state a claim of failure to monitor. Defendants assert that the District Court for the

Northern District of California found that plaintiffs failed to state a claim because the complaint "did not specify an alleged defect in the monitoring system in place, and merely pleaded that the parties sat idly by/failed to remove fiduciaries as the plans suffered losses."  Def. Supp. Br. at 6-7 (citing *White v. Chevron Corp.*, No. 16-CV-0793-PJH, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016).  In fact the *White* Court dismissed the duty to monitor claim because it was derivative and "wholly dependent on the breaches of duty alleged in the first through fourth causes of action," which the Court had already dismissed.  *White*, 2016 WL 4502808, at *19.  In addition, the Court noted that plaintiffs had failed to allege "that the fiduciaries ignored . . .  some other signal of a problem requiring closer attention. . . ."  *White*, 2016 WL 4502808, at *16.  The Court's alternative reason for finding that plaintiffs failed to state a claim of duty to monitor was due to a specific "lack of clarity" revealing that plaintiffs' claim was based on pure supposition, explained by the Court as follows:

> The allegation that Chevron Corporation had a duty to monitor its appointees "[t]o the extent that any of [Chevron's] fiduciary responsibilities were delegated to another fiduciary," suggests that *plaintiffs do not know whether Chevron Corporation in fact delegated its fiduciary duties or to whom*. Moreover, the fifth cause of action *does not specify which "appointees" or "other fiduciaries" Chevron Corporation failed to monitor*.

*White*, 2016 WL 4502808, at *18 (emphasis added).

Similarly, in *In re Calpine Corp.*, the District Court for the Northern District of California dismissed the failure to monitor claim as moot due to the the Court's prior dismissal of plaintiff's direct claim of breach of fiduciary duty.  *In re Calpine Corp.*, No. C-03-1685 SBA, 2005 WL 1431506, at *6 (N.D. Cal. Mar. 31, 2005).  The Court also cited FR-17 and noted that plaintiff did not allege facts to support a claim that defendants had failed to periodically review the performance of the appointee.  *Id.*

Finally, the United States District Court for the District of Washington allowed plaintiffs' claim of failure to monitor for failing to provide appointees with necessary information to proceed, but dismissed plaintiffs' second claim of failure to monitor because it fell short of the facial plausibility standard set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, No. 2:08-MD-1919 MJP, 2009 WL 3246994, at *10–11 (W.D. Wash. Oct. 5, 2009). The Court's dismissal of the second failure to monitor claim is distinguishable from the present case as the claim was based on the meritless and unsupported argument that if assets declined then there must have been a failure to monitor. *Id.* 2009 WL 3246994, at *10-11. The Court explained plaintiff's lack of supporting allegations in detail, concluding that "the inference that all PIC and PAC members were necessarily under-supervised as a result of the decline in WaMu's stock price falls short of the facial plausibility standard articulated in *Iqbal*." *Id.* 2009 WL 3246994, at *11.

The Court concludes that the DOL has properly stated a failure to monitor claim and Defendants' motion to dismiss the claim will be denied.

## V.    Conclusion

For the foregoing reasons the Court finds that the Third Amendment to the Severstal Wheeling, Inc. Investment Management Agreement is effective as of November 1, 2008. Accordingly, Defendants' Motion to Dismiss (Docket No. 124) will be granted as to Plaintiff's failure to invest claim. Plaintiffs will be permitted leave to amend the Amended Complaint consistent with this Opinion.

Defendants' Motion to Dismiss (Docket No. 124) will be granted as to Plaintiff's co-fiduciary liability claim. Defendants' Motion to Dismiss (Docket No. 124) will be denied as to Plaintiff's failure to monitor claim. Defendants' alternative Motion for Summary Judgment is denied.

An appropriate Order will be entered.

By the court:

s/Nora Barry Fischer
Nora Barry Fischer
United States District Judge

Dated: June 7, 2017