IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| R. ALEXANDER ACOSTA, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 14-1494 Judge Nora Barry Fischer |
| v. | ) ) | |
| WPN CORPORATION; RONALD LABOW; SEVERSTAL WHEELING, INC. RETIREMENT COMMITTEE; MICHAEL DICLEMENTE; DENNIS HALPIN; WHEELING CORRUGATING COMPANY RETIREMENT SECURITY PLAN; and SALARIED EMPLOYEES' PENSION PLAN OF SEVERSTAL WHEELING, INC., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

### I. **INTRODUCTION**

Plaintiff, the Secretary of Labor, U.S. Department of Labor ("DOL"), brings this action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"), for Defendants' alleged failure to adequately discharge their duties as fiduciaries of the Wheeling Corrugating Company Retirement Security Plan and Salaried Employees' Pension Plan of Severstal Wheeling, Inc. (the "Plans"), resulting in the purported loss of approximately $7 million. Presently before the Court is the Motion to Disqualify Plaintiff's Expert Witness, Dr. Susan Mangiero, (Docket No. 166), filed by Michael DiClemente ("DiClemente"), Dennis Halpin ("Halpin"), and the Severstal Wheeling, Inc. Retirement Committee ("the Retirement Committee") (collectively, "Defendants").

The Court has now reviewed the Motion, (Docket No. 166), the Brief in Support of the Motion, (Docket No. 167), Plaintiff's Brief in Opposition, (Docket No. 170), the expert report of Dr. Susan Mangiero dated December 11, 2017 (Docket No. 167-2 ("Mangiero Report")), the expert rebuttal report of Dr. Susan Mangiero dated February 16, 2018, (Docket No. 167-3 ("Mangiero Rebuttal Report")), and the transcript of the deposition of Dr. Susan Mangiero that took place on February 28, 2018, (Docket No. 167-6 ("Mangiero Dep.")). The Court heard oral argument on the Motion and supplemental briefing at its hearing on May 22, 2018, during which the Court heard testimony from Dr. Susan Mangiero. (May 22, 2018 Hearing Tr.). The motion is now ripe. After careful consideration of the parties' positions, and for the following reasons, Defendants' Motion is DENIED.

## II. BACKGROUND[1]

### A. Factual Summary

The parties in this case do not dispute the underlying facts, namely that the Retirement Committee oversaw assets held in the Plans for the benefit of employees of Severstal Wheeling, Inc. (and predecessors) and that Ronald Labow and WPN Corporation (collectively, "Labow") served as the investment manager for those assets for many years with broad discretion. (Docket No. 167 at 2-3). On November 3, 2008, because the then-trustee of the WHX Trust would no longer serve as trustee after 2008, the Plans' assets were transferred by Labow to a standalone trust specific to Severstal (the "Severstal Trust"). (*Id.* at 3). The Retirement Committee instructed Labow to make this transfer and accepted into the Severstal Trust an account with Neuberger Berman as the majority of the Plans' interest. (*Id.*; Docket No. 170 at 2 (approximately 97% of the value of the Neuberger Berman account was held in eleven large cap energy stocks)). The

---

[1] Given the Court's prior recitation of the facts in its Memorandum Opinion dated June 7, 2017 (Docket No. 144) and the parties' familiarity with the factual and procedural background, the Court will limit its discussion to the background necessary for the resolution of the current motion.

Retirement Committee knew the Plans' assets were going to be divested from the WHX Trust, but did not follow up with Labow to confirm what assets from the WHX Trust would be transferred into the Severstal Trust or actively manage those assets once deposited. (*Id.* at 3).

The Retirement Committee did not formally engage the services of Labow for the assets placed into the Severstal Trust until December 5, 2008, when the previous Investment Management Agreement with Labow was amended and backdated to November 1, 2008. (Docket Nos. 167-7 at ¶ 15, 148 at 3). During this time, the Retirement Committee engaged Mercer Investment Consultants to monitor and provide periodic portfolio reviews of Labow. (Docket No. 167-7 at ¶ 16). Following a review of the Plans' assets by Mercer, the Retirement Committee learned on December 29, 2008 that the Plans' assets were largely undiversified and immediately informed Labow. (*Id.* at ¶ 18-19). Labow failed to take any action until March 24, 2009, when the account was converted to cash. (Docket No. 148 at ¶ 27-29). Labow continued to take no action to invest the cash and, ultimately as a result, the Committee terminated Labow's services on May 19, 2009. (*Id.*).

In its Second Amended Complaint, the DOL alleges that the Retirement Committee and its members, DiClemente and Halpin, failed to properly oversee the Plans and monitor Labow in breach of their fiduciary duties and in violation of ERISA. (Docket No. 148 at ¶ 11). In the alternative, the DOL alleges that the backdating of the IM Agreement was ineffective to relieve Defendants from responsibility or liability for any responsibility, obligation or duty they had to invest the Plans' assets under ERISA. (*Id.* at ¶ 12). To support their position, the DOL has designated Dr. Susan Mangiero to provide an expert opinion regarding the prevailing fiduciary standards in 2008 and 2009 for retirement committee fiduciaries who monitor investment managers for retirement plans, as well as the actual monitoring of the Plans' investment

managers, or lack thereof, by the Retirement Committee in this case. (*See* Mangiero Report; Mangiero Rebuttal Report).

### B. Dr. Mangiero's Qualifications

Dr. Susan Mangiero is a forensic economist with extensive professional training and industry experience in the financial arena. (Mangiero Report at 4). She earned a Ph.D. in finance from the University of Connecticut, a Master's in Business Administration in finance from New York University, a Master of Arts degree in economics from George Washington University and a Bachelor of Arts degree in economics from George Mason University. (*Id.*). Dr. Mangiero is also an Accredited Investment Fiduciary Analyst™, Chartered Financial Analyst®, a Certified Financial Risk Manager, a FINRA Trained Neutral, a Professional Plan Consultant™, a Certified Fraud Examiner, and a member of the Association of Certified Fraud Examiners Advisory Board. (*Id.*).

She is currently employed as a managing director with Fiduciary Leadership, LLC, where she provides compliance, dispute and litigation support to asset managers, banks, companies, institutional investors and their counsel. (*Id.* at 48). Prior to working with Fiduciary Leadership, LLC, she worked on multiple trading desks, including foreign exchange, futures, options, swaps and other over-the-counter derivatives, fixed income securities and money market instruments. (*Id.*). Of particular note, Dr. Mangiero is also affiliated with the Analysis Group, a group co-founded and run by Defendants' retained expert, Dr. Bruce E. Stangle.[2]

Dr. Mangiero also has significant experience leading numerous ERISA-focused training programs for and with retirement plan fiduciaries, advisors and regulators, including the U.S. Department of Labor. (*Id.* at 6). She speaks and writes frequently on topics including risk

---

[2] Dr. Mangiero is listed on the "Experts & Consultants" page of the Analysis Group's webpage. *See* Susan Mangiero, http://www.analysisgroup.com/experts-and-consultants/affiliated-experts/susan-mangiero/ (last visited August 3, 2018).

management, asset manager and investment consultant due diligence, monitoring of asset managers, and ERISA investment best practices. (*Id.*). She has also offered expert testimony and forensic investigations in connection with various arbitration, mediation, litigation and industry advisory proceedings and has over twenty years of experience in capital markets, global treasury, asset-liability management, portfolio management, economic and investment analysis, derivatives, financial risk control and valuation. (*Id.*). At this point in the litigation, Dr. Mangiero has produced one expert report dated December 11, 2017, an expert rebuttal report dated February 16, 2018, testified in a deposition on February 28, 2018, and testified in Court on May 22, 2018.

### C. Dr. Mangiero's Opinions

The DOL has proffered Dr. Mangiero as an expert witness to assist the fact finder in understanding the prevailing standard for the Retirement Committee fiduciaries monitoring their investment manager, Mr. Labow, and determining whether or not they met the standard that was required of them under ERISA. (Mangiero Report at 3-4). In her expert report, Dr. Mangiero explains that the "prevailing fiduciary standard in 2008 and 2009 required ERISA committee members to carry out multiple tasks on behalf of plan participants" and, to the extent "committee members chose to delegate some of its responsibilities to outside parties, the prevailing fiduciary standard required ERISA committee members to adequately monitor those parties." (Mangiero Report at ¶ 41). Where, as here, the employer appoints an investment manager, "the employer is responsible for the selection of the manager" and is "required to monitor the manager periodically to assure that it is handling the plan's investments prudently and in accordance with the appointment." (*Id.* (citing Meeting Your Fiduciary Responsibilities," U.S. Dept. of Labor, Feb. 2012)). Dr. Mangiero opines that the Retirement Committee had a duty to "carefully

monitor" Labow, (Mangiero Report at ¶ 40(a), (b)), and that it "did not do as much as [it] could have and should have" done, (Mangiero Rebuttal Report at ¶ 6). She explains that "[c]areful monitoring by ERISA fiduciaries is always important but especially during a period when major changes to a plan must be completed. . . . This transfer [to the Severstal Trust] was a big change." (*Id.* at ¶ 42). The transfer of the Plans' assets,[3] plus the "unprecedented upheaval" in the financial markets at the time, "should have led to intense monitoring by DiClemente, Halpin, and the Retirement Committee." (*Id.* at ¶ 44). In her opinion, the Retirement Committee failed to meet the prevailing fiduciary standard in numerous ways.

With regard to the transfer of assets from the WHX Trust to the Severstal Trust, Dr. Mangiero finds that the Retirement Committee "could not have satisfied [its] fiduciary duties to ensure portfolio diversification unless assets (or a cash equivalent) were proportionately transferred from the WHX Trust in the fall of 2008 and then immediately reapportioned in a more prudent manner." (*Id.* at ¶ 52). Rather than achieving diversification in November 2008, Labow made a proportionate transfer of assets from the WHX Trust to the Severstal Trust, which resulted in the Severstal Trust being unduly concentrated in hedge funds. (*Id.* at ¶ 53). Dr. Mangiero contends that it was the Retirement Committee's responsibility to follow up with Labow to ensure the transfer had been correctly completed, and to regularly monitor financial reports to understand what was happening to the Severstal Trust assets. (*Id.* at ¶ 45).

Once ERISA fiduciaries have delegated certain responsibilities to outside third parties, such as Labow in this case, Dr. Mangiero opines that

> it is incumbent upon those designating fiduciaries to regularly monitor and, if needed, revise the scope of work or terminate contracts and engage other service providers to replace those fired. Regulatory language states: "At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure

---

[3] Dr. Mangiero values the Plans' assets at $31,039,630 as of May 1, 2009. (*Id.* at ¶ 135).

that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan."

(*Id.* at ¶ 116). In Dr. Mangiero's view, despite the "unprecedented uncertainty and fear about whether certain service providers would survive" and cautions from Mercer, the Retirement Committee did not do many of the things one would ordinarily expect as part of a monitoring of a third party. (*Id.* at ¶ 117). Further, despite warnings and "serious concern[s]" raised regarding Labow, he was still given full power and discretion by the Retirement Committee and was not terminated until May 2009. (*Id.* at ¶ 122-29). Dr. Mangiero estimates that the economic damage due to lost opportunities is approximately $7 million. (*Id.* at ¶ 130-35).

### III. LEGAL STANDARD

Federal Rule of Evidence 702, which memorializes the Supreme Court's landmark case, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the basic framework for the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The United States Court of Appeals for the Third Circuit has held that "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citations omitted). "[T]he district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury." *Id*. In this role,

7

the district court is not the finder of fact but must focus on the methodology of the expert in order to "satisfy itself that 'good grounds' exist for the expert's opinion." *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (citing *Daubert*, 509 U.S. at 590); *In re TMI Litig.*, 193 F.3d 613, 713 (3d Cir. 1999) (district court should not conflate "its gatekeeping function with the fact-finders' function as the assessor of credibility").

The Third Circuit has interpreted the qualification requirement liberally, holding that "a broad range of knowledge, skills and training qualify an expert as such." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). Further, "[t]he District Court has broad discretion in determining the admissibility of evidence, and 'considerable leeway' in determining the reliability of particular expert testimony under *Daubert*." *Walker v. Gordon*, 46 Fed. Appx. 691, 694 (3d Cir. 2002) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152-53 (1999)). With respect to the "fit" prong, the expert must "apply his expertise reliably to the facts; his opinions must be well reasoned, grounded in his experience, and not speculative." *Sargent v. Commonwealth of Pennsylvania*, Civ. No. 13-00730, 2015 WL 6447742, at *2 (M.D. Pa. Oct. 26, 2015) (quoting *Roberson v. City of Philadelphia, et al.*, Civ. No. 99-3574, 2001 WL 210294, at *4 (E.D. Pa. Mar. 1, 2001)). The task is left to the trial judge of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

**IV. ANALYSIS**

Defendants challenge Dr. Mangiero's proffered expert testimony under each of the *Daubert* factors. Specifically, Defendants argue that Dr. Mangiero is unqualified to offer testimony on the Retirement Committee's duty to monitor because she has never served on an ERISA retirement committee. (Docket No. 167 at 6-7). They further point out that her

"heightened standard" is based on her investment experience, common sense, and unspecified implications from the law which, according to the Defendants, renders her standard "irrelevant, made up, or both." (*Id.*). In response, the DOL points to Dr. Mangiero's decades of experience relating to the ERISA duty to monitor, which the DOL argues provides a sufficient foundation for her opinion on the prevailing standard and her ultimate conclusion that Defendants did not satisfy their fiduciary obligation to monitor Labow. (Docket No. 170).

Having fully considered Plaintiff's proffer of Dr. Mangiero's expert testimony and the parties' respective arguments regarding the same, the Court finds that Dr. Mangiero's proffered expert testimony is admissible under *Daubert*.

### A. Dr. Mangiero's Qualifications

Dr. Mangiero has decades of experience relating to ERISA fiduciary standards and has the type of specialized knowledge required to satisfy the *Daubert* qualification prong. Under Rule 702, an expert witness testifying to non-scientific matters must have "specialized knowledge" in the area of his or her testimony. *See Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998); *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (It is well settled that "[q]ualification requires 'that the witness possess specialized expertise.'") (quoting *Schneider*, 320 F.3d at 404).

> The basis of this specialized knowledge "can be practical experience as well as academic training and credentials." [The United States Court of Appeals for the Third Circuit has] interpreted the specialized knowledge requirement liberally, and ha[s] stated that this policy of liberal admissibility of expert testimony "extends to the substantive as well as the formal qualification of experts." However, "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman . . . ."

*Waldorf,* 142 F.3d at 625 (citations omitted).

"The mere fact that [an expert] does not have the formal qualifications that [a challenging party] believes are the most appropriate does not render him unqualified." *See Trask v. Olin Corp.*, Civ. Action No. 12-340, 2016 WL 1181428, at *10 (W.D. Pa. Mar. 28, 2016). While it is true that Dr. Mangiero has never served on a retirement committee, (*see* Hearing Tr. at 24:8-12; Docket No. 167 at 19), Dr. Mangiero has *trained* ERISA retirement plans and committees on "how to engage third parties, how they monitored them, and, if necessary, the termination processes that they used or factors that they considered." (Mangiero Dep. 20:17-19). In forming her opinions, she clearly draws on her decades of experience in the investment field and in the financial arena, particularly with respect to ERISA governance, portfolio diversification, asset allocation and oversight, and her experience as a consultant to institutional investors, including retirement plan committees. In addition, Dr. Mangiero has previously been qualified as an expert and provided testimony in connection with various arbitration, mediation and litigation proceedings nationwide. (Mangiero Report at 50). Given her significant experience, the Court finds that Dr. Mangiero is qualified to present her opinions regarding the fiduciary standards prevailing in 2008 and 2009 for retirement committee fiduciaries to monitor investment managers for retirement plans similar to the ERISA retirement plans at issue in this case. She is further qualified to render her opinion as to whether Defendants met the prevailing fiduciary standard here.

**B. Reliability**

Defendants also challenge the reliability of Dr. Mangiero's proffered expert testimony, claiming that her "evermorphing standards" are a creation of her "own subjective standards, common sense, and mere implication" rather than ERISA, the DOL's regulations, or any relevant experience or reliable sources regarding the prevailing industry standard. (*See* Docket No. 167, at

2). Defendants further take issue with the fact that Dr. Mangiero does not cite to the Court's prior decision, and she admitted during her oral testimony that she had not read the same prior to writing her expert report. (Docket No. 167, n. 1; Hearing Tr. at 51:11-52:8). As a result, Defendants argue that Dr. Mangiero traces her standard to her investment experience, common sense, and unspecified implications from the law, rather than grounding her version of the duty in any actual legal framework. (Docket No. 167, at 6).

"An expert opinion is reliable when it is based on sound methodology and 'good grounds.'" *Kumho*, 526 U.S. at 137. "In a case such as this, where an expert is proffered to testify regarding non-scientific matters, the relevant reliability concerns will focus upon personal knowledge and experience of the witness and the methodology used will be applying that experience to the facts of the case." *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 286 F.R.D. 266, 269–70 (W.D. Pa. 2012) (quoting *Jackson v. City of Pittsburgh*, Civ. No. 07–111, 2010 WL 3222137, at *4 (W.D. Pa. Aug. 13, 2010) (internal quotation marks and alterations omitted). The Court is also guided by the proposition that "[t]he touchstone of Rule 702 . . . is the helpfulness of the expert testimony, *i.e.*, whether it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Voilas*, 73 F. Supp. 2d at 460 (citations omitted).

Here, after describing what she believes to be the prevailing fiduciary standard for a retirement committee's monitoring of an investment manager in 2008 and 2009, Dr. Mangiero uses her experience and specialized knowledge to apply that standard to the facts in this case. (Mangiero Report at 20-23, 29). Dr. Mangiero concludes that Defendants did not satisfy their fiduciary obligations to monitor Labow, noting that she "saw no evidence that DiClemente, Halpin and the Severstal Committee had done a lot of the things one would ordinarily expect as part of a monitoring of a third party . . . ." (*Id.* at 29). After reviewing Dr. Mangiero's expert

report, rebuttal report, deposition testimony, and hearing her testimony, this Court holds that this proposed expert has employed sufficiently reliable methods in reaching her conclusions in this case.

In addition, Defendants take issue with Dr. Mangiero's use of the term "procedural prudence." (Docket No. 167, at 9-10). However, entire books have been written on this topic. *See, e.g.*, Donald B. Trone, et al., Procedural Prudence: The Handbook for the Management of Investment Decisions (1997). Dr. Mangiero further explained during her deposition and her testimony in Court that her perception of "procedural prudence" is based on her vast experience in the industry. *See* Mangiero Dep. 16:3-18:6, 38:5-39:13, 62:10-63:5, 142:1-23; Hearing Tr. at 125:6-128:20). Nevertheless, to the extent Defendants believe Dr. Mangiero has incorrectly defined the relevant standard, her conclusions remain subject to cross-examination and Defendants will be permitted to offer their own expert testimony in rebuttal. *See CMU*, 286 F.R.D. at 272 ("The adversarial system ensures that, through '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof' expert testimony may be shown wanting.") (citing *Daubert*, 509 U.S. at 596). Defendants' Motion is denied to the extent it asserts that Dr. Mangiero does not meet the reliability prong of the *Daubert* test.

### C. Fit

Defendants' final challenge to Dr. Mangiero's proffered expert testimony is that it will not be helpful to the trier of fact because she relied on "common sense" as the basis for same. (*See, e.g.*, Mangiero Dep. at 70:3-9; 79:16-20; 125:9-14; 143:1-3, 21-25). They contend that this Court and the jury possess common sense, (Docket No. 176 at 11), and Dr. Mangiero's opinions based on "[g]eneralized common sense does not rise to the level of expert opinion solely because

it is offered by someone with an academic pedigree." *Fedor v. Freightliner, Inc.*, 193 F. Supp. 2d 820, 832 (E.D. Pa. 2002).

This Court agrees with the DOL that, while Dr. Mangiero may bolster her opinions by appealing to common sense, this does not negate the expertise with which she arrives at her conclusions. (*See* Docket No. 167 at 17 (citing Fed. Rule Evid. 701 cmt. 2000 Amendments (contrasting expert opinion, which "results from a process of reasoning which can be mastered only by specialists in the field," with lay opinion, which "results from a process of reasoning familiar in everyday life")) (citations omitted)). Further, Dr. Mangiero clarified that, when she uses the term "common sense," she is referring to being "reasonable and prudent, careful and so forth." (Hearing Tr. at 130:10-11). Her opinions demonstrate a careful review of numerous documents and materials in this case, and she thoroughly explains why the facts presented here indicate that Defendants did not satisfy their duty to monitor. (Mangiero Report at 10-31). Accordingly, this Court finds that Dr. Mangiero's testimony "could certainly prove helpful to the average juror who presumably lacks such experience in and knowledge about complex financial matters, even if doing so does not require employing any particular methodology but simply a straightforward review of the [] data." *CMU*, 286 F.R.D. at 271 (quoting *Voilas*, 73 F. Supp. 2d at 461).

## V. CONCLUSION

The Court has now exercised its gatekeeper duties and finds that Plaintiff's proffered expert, Dr. Susan Mangiero, has met each of the *Daubert* requirements such that her opinions may be admitted as expert testimony. In this Court's estimation, Dr. Mangiero's opinions are appropriately set forth based on her education, experience, and her review of the materials cited in her report. Accordingly, Defendants' motion [166] is DENIED.

An appropriate order follows.

    */s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date: August 3, 2018

cc/ecf: All counsel of record.