IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| R. ALEXANDER ACOSTA, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,<br><br>Plaintiff,<br><br>-against-<br><br>WPN CORPORATION, RONALD LABOW, SEVERSTAL WHEELING, INC. RETIREMENT COMMITTEE, MICHAEL DICLEMENTE, DENNIS HALPIN, WHEELING CORRUGATING COMPANY RETIREMENT SECURITY PLAN, and SALARIED EMPLOYEES' PENSION PLAN OF SEVERSTAL WHEELING, INC.,<br><br>Defendants. | No. 2:14-cv-01494-NBF |

**MEMORANDUM IN SUPPORT OF SEVERSTAL RETIREMENT COMMITTEE, MICHAEL DICLEMENTE AND DENNIS HALPIN'S MOTION FOR SUMMARY JUDGMENT CONCERNING DUTY TO MONITOR**

AND NOW COME Defendants, Severstal Retirement Committee, Michael DiClemente and Dennis Halpin (collectively, "Defendants") by and through their counsel, Saul Ewing Arnstein & Lehr LLP, and files this Memorandum in Support of Motion for Summary Judgment Concerning Duty to Monitor as follows:

**I.      FACTUAL BACKGROUND**

The Severstal Wheeling Inc. Retirement Committee for the period material to this action (the "Severstal Retirement Committee") included, among others, Michael DiClemente ("DiClemente") and Dennis Halpin ("Halpin"). The Retirement Committee had oversight for two pension plans, the Wheeling Corrugating Company Retirement Security Plan and the Salaried Employees Pension Plan of Severstal-Wheeling, Inc. (the "Plans"). Prior to November

1

1, 2008, the Severstal Wheeling, Inc. Retirement Committee was known as Wheeling-Pittsburgh Steel Corporation Retirement Committee. Prior to November 1, 2008, the Wheeling-Pittsburgh Steel Corporation plans were managed as part of the WHX Investment Trust. The WHX Investment Trust held pension assets for not only Wheeling-Pittsburgh Steel Corporation but also for WHX Corporation, the one-time parent of Wheeling-Pittsburgh Steel Corporation (the "Combined Trust"). At all times material to this case, Ronald LaBow and his corporation, WPN Corporation, had been the investment managers for the Combined Trust. (Concise Statement of Material Facts ("Material Facts") at ¶¶1-3, 5-6, 8).[1]

The WHX Corporation entered into an Investment Consulting Agreement with Mr. LaBow and WPN on February 1, 2004. Pursuant to the 2004 Investment Consulting Agreement, Mr. LaBow and WPN had the right to exercise "complete, unlimited and unrestricted management authority with respect to the investment of the [Combined Trust]." That investment authority included the right to "invest and reinvest the [Combined Trust] at such time in such a manner as the consultant in the complete and unlimited exercise of its discretion shall determine." (Material Facts at ¶¶10-12).

Mr. LaBow and WPN also entered a Third Amendment to the Severstal Wheeling Inc. Investment Management Agreement (the "SWI Investment Management Agreement") effective November 1, 2008. While Mr. LaBow signed the SWI Investment Management Agreement on December 5, 2008, he personally entered November 1, 2008 as the effective date for the agreement. When Mr. LaBow signed the SWI Investment Management Agreement he understood that in doing so he was simply "memorializing" the relationship between himself and WPN as investment managers for the Severstal-Wheeling Plans as he had fulfilled such duties

---

[1] Each of the paragraphs in this fact section rest on the record developed during discovery and as reflected in the Concise Statement of Material Facts ("Material Facts") filed contemporaneously with this Memorandum. Citations appearing at the end of each paragraph are to the relevant Material Facts.

since November 1, 2008. Mr. LaBow considered himself an investment fiduciary to the Severstal Plans when they were part of the WHX Combined Trust. Mr. LaBow did not change his relationship with respect to the Severstal Plans on December 5, 2008. Mr. LaBow understood himself to be a fiduciary to the Severstal Plans throughout his time as both an investment consultant and investment manager. (Material Facts at ¶¶14, 17-22).

From 2006 to Fall 2008, Mr. DiClemente was a member of the Wheeling-Pittsburgh Steel Corporation Retirement Committee. During that same period and pursuant to the WHX Agreement as amended, Mr. LaBow and WPN managed the plans of Wheeling-Pittsburgh Steel Corporation as part of the Combined Trust. The committee monitored Mr. LaBow's performance during that period by receiving and reviewing quarterly reports from Mercer Investment Consulting, Inc. ("Mercer"). During the period 2006 through November 1, 2008, Mr. LaBow acted consistent with the retirement committee's goals to have a diversified portfolio. In addition, during that period, Mr. LaBow produced exemplary performance results, frequently performing in the top two percent to three percent of all investment managers working in the United States. U.S. Department of Labor ("DOL") guidelines advise committees to consider past performance and its expert, Dr. Susan Mangiero, agrees that "it's common that past performance is used" in selecting an investment manager. (Material Facts at ¶¶23-25, 30-32, 81-82).

In light of Mr. DiClemente's understanding that the Combined Trust was going to be separated in late 2008, Mr. DiClemente approached Mr. LaBow and WPN and asked him to continue as the investment manager for the Severstal Plans. Mr. DiClemente and Mr. LaBow had discussions in the Summer of 2008 about the investment management goals of the Severstal Retirement Committee in which Mr. DiClemente advised Mr. LaBow that the Severstal

Retirement Committee wanted to receive the same percentage interest or proportionate share of each of the assets as held in the Combined Trust. Mr. LaBow admitted that when he filled the role as investment manager for the Severstal Plans he intended to use the same investment policies as he had for the Combined Trust. Mr. LaBow confirmed that he understood that the Severstal Retirement Committee expected that he would transfer a slice or proportionate share of each of the assets of the Combined Trust and that he expected to do so. Mr. LaBow told Mr. DiClemente that he would act pursuant to these instructions and transfer to the Severstal plans a slice or proportionate share of each of the Combined Trust assets so that the Severstal Retirement Committee would have a diversified portfolio. (Material Facts at ¶¶34-40).

Unbeknownst to the Severstal Retirement Committee until December 29, 2008, when Mr. LaBow attempted to transfer "an across the board slice" from the Combined Trust to the Severstal Plans, he claimed he encountered problems caused by turbulent markets associated with the financial crisis of 2008. Accordingly, Mr. LaBow unilaterally decided and instructed on November 3, 2008 that all the assets in an undiversified Neuberger Berman account (the "NB Account"), which was part of the Combined Trust and heavily weighted with energy stocks, be sent to the newly-freestanding Severstal Wheeling Plans. The WHX Pension committee complied with Mr. LaBow's instruction and transferred from the Combined Trust the NB Account to the Severstal Plans. No one from the Severstal Retirement Committee was a copy recipient on correspondence relating to this transaction. (Material Facts at ¶¶41-44).

Mr. DiClemente did not learn that Mr. LaBow had transferred an undiversified NB Account, rather than a proportionate share of all assets as the committee had instructed, until on or about December 29, 2008. Mr. DiClemente became aware of Mr. LaBow's investment decision in the normal course of established monitoring procedures during a

4

discussion with Mercer.[2] Upon receiving notice about the undiversified NB Account, Mr. DiClemente immediately contacted Mr. LaBow to discuss. Thereafter, the Severstal Retirement Committee made numerous efforts to communicate with Mr. LaBow to correct his investment asset choices. For example, on December 30, 2008, Mr. DiClemente emailed Mr. LaBow expressing concern regarding the NB Account. Also on December 30, 2008, Mr. DiClemente and the committee's ERISA lawyer, Sally King, held a conference call with Mr. LaBow to discuss how Mr. LaBow intended to proceed to reallocate the Severstal plan assets. Similar conferences and email exchanges with Mr. LaBow occurred on a daily or almost daily basis from January through April 2009. (Material Facts at ¶¶47-49, 58-73).

Mr. LaBow has repeatedly acknowledged his regret and responsibility for making the decision, and instructing the transfer of the NB Account on November 3, 2008, admitting to the Severstal Retirement Committee in February 11, 2009, for example, "maybe I did something wrong." Similarly, Mr. LaBow on Monday, March 23, 2009, left a voicemail for Mr. Halpin in which he advised that because of "turbulence in the marketplace" he was going "to leave [the Severstal Plans] as is but then I am going to go and diversify," concluding that the **"responsibility is completely mine"** for the status and investment of the plan assets. (Material Facts ¶¶55-57). [Emphasis added].

Mr. LaBow also acknowledged responsibility for causing the investment misadventure in this case through two other dramatic gestures: (a) agreeing to indemnify WHX for instructing it to transfer the NB Account to the Severstal Plans; and (b) waiving his fee for managing the assets for the Severstal Plans in November and December 2008. Mr. LaBow advised WHX in writing that WPN would indemnify WHX in connection with the transfer of the NB Account to

---

[2] Mr. DiClemente had significant and long-standing experience with Mercer dating back to 1986 in connection with Mr. DiClemente's work advising, then participating as a member of the Aristech Chemical Corporation Retirement Committee. (See Material Facts ¶¶26-28).

Severstal. Mr. LaBow understood that the Severstal Retirement Committee could one day claim that the choice of the NB Account was improper. Similarly, even though Mr. LaBow had managed the Severstal Plans' assets as investment manager beginning November 1, 2008, he chose to waive his fees for November and December 2008. (Material Facts at ¶¶52-54).

## II.   ARGUMENT

### A.   Standard for Summary Judgment

"A grant of summary judgment is appropriate when the moving party establishes 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Ryan v. PNC Fin. Servs. Grp., Inc., No. CV 14-1048, 2016 WL 374273, at *2 (W.D. Pa. Feb. 1, 2016) (quoting Heffernan v. City of Paterson, 777 F.3d 147, 151 (3d Cir. 2015) (quoting Fed. R. Civ. P. 56(a))). A "genuine issue of material fact" is one that could affect the outcome of litigation. Id. (citing Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 643 (3d Cir. 2015)). But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 475 (3d Cir. 2011) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"If the moving party carries its burden under Rule 56, the non-movant must identify 'specific facts which demonstrate that there exists a genuine issue for trial.'" Ashton v. SCI-Fayette, Pennsylvania Dep't of Corr., No. CV 16-1795, 2018 WL 2966849, at *4 (W.D. Pa. June 13, 2018) (quoting Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996)). "Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings." Diaz v. Amore Ltd. P'ship, No. 2:16-CV-00179-NBF, 2017 WL 3582378, at *2 (W.D. Pa. Aug. 18,

2017) (citing Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010)). The non-moving party must utilize affidavits, depositions, admissions, or interrogatories to demonstrate the existence of a genuine issue. See Id. (citing Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, 773 (3d Cir. 2013)).

B. **The Undisputed Record in this Case Establishes that the Defendants Met Their Duty to Monitor as a Matter of Law**

The undisputed record in this case establishes that the Severstal Retirement Committee fulfilled its duty to monitor as a matter of law. That outcome stands whether applying this Court's five-party duty to monitor test or broad ERISA trust law principles, as set forth below.

(i) **Application of This Court's Duty to Monitor Test Establishes the Severstal Retirement Committee Fulfilled Its Duty to Monitor**

As this Court stated in its memorandum opinion on June 7, 2017, the power to appoint and dismiss an investment fiduciary carries with it a duty to monitor appropriately those subject to removal. Perez v. WPN Corp., CV 14-1494, 2017 WL 2461452, at *2 (W.D. Pa. June 7, 2017), (citing Coyne & Delany Co. v. Selman, 98 F.3d 1457 (4th Cir. 1996)). An appointing authority is not exposed to liability unless something "put them on notice of possible misadventure by their appointees." Perez v. WPN Corp., CV 14-1494, 2017 WL 2461452 (W.D. Pa. June 7, 2017), (citing Coyne 98 F.3d at 1466) (quoting Newton Van Otterloo, 756 F. Supp. 1121, 1132 (N.D. Ind. 1991)). According to the Department of Labor regulatory questions and answers, an appointing authority such as Defendants would be notified of a possible misadventure by implementation of a regular monitoring procedure:

> Q. What are the ongoing responsibilities of a fiduciary <u>who has appointed trustees or other fiduciaries with respect to these appointments?</u> [3]
>
> A. <u>At reasonable intervals the **performance** of trustees</u> and other fiduciaries should

---

[3] The Severstal Retirement Committee first appointed Mr. LaBow as investment manager effective November 1, 2008, which duties he fulfilled no later than that date.

be reviewed by the appointing fiduciary, in such manner as may be reasonably expected to <u>insure that their **performance** has been in compliance with the terms of the plan and statutory standards</u>, and satisfies the needs of the plan. No single procedure will be appropriate in all cases; the procedure may vary in accordance with the nature of the plan and other facts and circumstances relevant to the choice of the procedure. 29 CFR § 2509.75-8, FR-17.[4] (Emphasis added).

This Court further expanded on the contours of the duty to monitor by citing with approval a Department of Labor Amicus Brief submitted in the United States District Court for the Northern District of Oklahoma, relating to the duty to monitor. See Perez v. WPN Corp., CV 14-1494, 2017 WL 2461452, at *12–13 (W.D. Pa. June 7, 2017) (citing In re: Williams Co. ERISA Lit., No. 02-153 (N.D. Ola. Aug 22, 2003 (Department of Labor Amicus Brief, attached as Exhibit A to Defendant's Supplemental Brief)). This Court found all of the following elements relevant in analyzing whether a retirement committee has properly performed its duty to monitor:

> The Department of Labor noted that in most cases it will be enough that appointing fiduciaries adopt and adhere to routine procedures sufficient to alert them to deficiencies in **performance** which could require corrective action (e.g., **the implementation of a system of regular reports on the investment fiduciary's decisions and performance**). Department of Labor Amicus Brief at 5.[5]
>
> In its Amicus Brief, the Department of Labor further explained that "**appointing fiduciaries are not charged with directly overseeing the investments as that would be duplicating the responsibilities of the investment fiduciaries**";[6] that appointing fiduciaries "are required to have procedures in place so that on an ongoing basis they may **review and evaluate whether the investment fiduciaries are doing an adequate job**;" and the procedures that are implemented allow the appointing fiduciary, "under the applicable circumstances, to assure themselves that "the investment fiduciaries are properly discharging their responsibilities".

Perez 2017 WL 2461452 at *12 (quoting Department of Labor Amicus Brief, at 8-9)(emphasis added).

---

[4] Mr. LaBow's first **performance** task undertaken for the Severstal Retirement Committee was the decision and instruction to transfer the NB Account from the Combined Trust to the Severstal Plans.
[5] The Severstal Retirement Committee retained Mercer to review LaBow's investment performance and produce quarterly reports for the Committee concerning that **performance.**
[6] This Court has held that the Severstal Retirement Committee had no duty to invest the assets of the Severstal Plans; that duty rested with Mr. LaBow and WPN.

This Court then summarized the applicable Department of Labor guidance into a five-part test as follows:

- The appointing authority must adopt routine monitoring procedures;
- The appointing authority must adhere to the routine monitoring procedures;
- The appointing authority must review the results of the monitoring procedures;
- The monitoring procedures must alert the appointing authorities to possible deficiencies;
- The appointing authority must act to take required corrective action.

Perez 2017 WL 2461452 at *12 (quoting C.F.R. §2509.75-8, FR-17; Department of Labor Amicus Brief at 5, 8-9). The record plainly establishes that the Severstal Retirement Committee has met this standard and fulfilled its duty to monitor in this case as a matter of law.

The undisputed facts in this case are as follows: The Defendants appointed Ronald LaBow and his corporation, WPN Corporation, to be the investment manager to the Severstal Pension Plans, which were to be funded for the first time on or about November 3, 2008. (Material Facts at ¶¶14-22). Mr. LaBow and the Retirement Committee entered the Third Amendment to the Severstal Wheeling, Inc. Investment Management Agreement with an effective date of November 1, 2008 as established by Mr. LaBow. (Material Facts at ¶14-17). Mr. LaBow actually signed the Third Amendment on or about December 5, 2008 but believed it should have an effective date of November 1 since the agreement was merely memorializing the investment activity he had undertaken on behalf of the Retirement Committee and its plans since November 1, 2008. (Material Facts ¶¶17-20).[7] Hence, as a matter of fact and as a matter of law, Mr. LaBow and WPN were the investment managers at all times material to this case.[8] (Material

---

[7] Mr. LaBow plainly and fully appreciates the legal significance of picking an effective date that memorializes his conduct because he is a lawyer holding two law degrees. (Material Facts ¶¶15-16).

[8] The DOL's Second Amended Complaint sets the relevant period as starting on November 1, 2008, as it must, because **the Retirement Committee had no performance to review** for purposes of DOL monitoring standards (i.e., 29 CFR §2509, 75-8) until Mr. LaBow made a decision on an investment portfolio and transferred assets from the Combined Trust to the Severstal Plans on or about November 3, 2008.

Facts at ¶¶21-22).

In addition, Mr. LaBow and WPN made the investment decision to transfer the NB Account of energy stocks to the Severstal Trust. (Material Facts at ¶42, 46). Mr. LaBow did not advise Mr. DiClemente or anyone else on the Severstal Retirement Committee prior to the time he made that investment decision and directed the transfer of the NB Account to Severstal. (Material Facts at ¶¶42-47; see also Mangiero Hrg. Tr. 47:25-49:16; see also Mangiero Report at ¶47). Mr. LaBow and WPN understood that the Retirement Committee had requested and expected Mr. LaBow to convey a diversified portfolio reflective of Severstal's proportional share of each of the assets invested in the WHX Combined Trust. (Material Facts ¶39). Mr. LaBow had agreed this is what he would attempt to do. (Material Facts ¶40). Hence, as a matter of law, Mr. LaBow and WPN made the relevant investment decision in this case, not the Defendants, and the Defendants cannot be held liable for the investment decisions or omissions of Mr. LaBow and WPN from November 1, 2008 onward. Perez 2017 WL 2461452, at *12 (appointing fiduciaries are not charged with directly overseeing the investments as that would be duplicating the responsibilities of the investment fiduciaries).

As this Court has also pointed out, an appointing authority, such as the Retirement Committee, is not exposed to liability unless something put them on notice of possible misadventure by their appointees. Perez 2017 WL 2461452, at *12 (quoting Coyne & Delany Co. v. Selman, 98 F.3d at 1466 n.10). In this case, it is undisputed that the "misadventure" occurred on November 3, 2008 when Mr. LaBow and WPN failed to convey a slice of the Combined WHX Trust, or some other diversified portfolio to the Severstal Plans, but rather conveyed the NB Account. (Mangiero Hrg. Tr. 65:14-24; see also Stangle Aff. at ¶27).

Dr. Mangiero has admitted that she used this Court's five-part test to analyze the

10

Severstal Retirement Committee's monitoring efforts. (Material Fact ¶85). The undisputed testimony in this case reflects that the Severstal Retirement Committee, upon notice of Mr. LaBow's misadventure, met each of the prongs in this Court's five-part test for satisfying a duty to monitor.

- **Routine Monitoring Procedure**

The Severstal Retirement Committee had a routine monitoring procedure in place in the form of a quarterly report prepared and submitted to the committee by the actuarial and benefit firm of Mercer Investment Consulting, LLC. (Mangiero Hrg. Tr. 56:19-57:1; see also Stangle Aff. at ¶¶22, 25). The committee also had an established practice for holding meetings, making decisions and documenting decisions that also constitute part of the monitoring process. Stangle Report at ¶46. Both experts, Dr. Stangle and Dr. Mangiero, agree that Mercer is a well-known, global investment monitoring company in the United States. (Mangiero Hrg. Tr. 57:2-11; see also Stangle Aff. at ¶25).

- **Adherence to Routine Monitoring Procedure**

Second, the Severstal Retirement Committee adhered to the monitoring procedures, receiving oral and written reports from Mercer relating to Mr. LaBow's investment practices for Severstal. (Material Facts ¶¶47-49).

- **Review of Mercer Report as Part of Monitoring Procedure**

Third, Mr. DiClemente reviewed Mercer reports and engaged in discussions with Mercer personnel concerning Mr. LaBow's investment performance.

- **Mercer Report Identifies LaBow Misadventure**

Fourth, the monitoring procedure worked, as Mercer in the normal course alerted the Severstal Retirement Committee of Mr. LaBow's decision to transfer the NB Account to the

11

Severstal Plans. (Mangiero Hrg. Tr. 60:10-15; <u>see also</u> Stangle Aff. at ¶¶15-16).

- **The Retirement Committee Takes Corrective Action**

Fifth, the Severstal Retirement Committee then took corrective action. As Mr. LaBow has testified, the Severstal Retirement Committee was the most active committee he had ever dealt with. Upon the discovery of the LaBow misadventure, the committee was in touch with Mr. LaBow either daily or every other day, according to Mr. LaBow, seeking a reallocation of the Severstal portfolio. (Material Facts ¶¶75-77).

Dr. Mangiero has admitted, and Dr. Stangle agrees, that appropriate corrective action upon learning of a misadventure is to contact the investment manager to discuss the problem and seek corrective action as appropriate. (Mangiero Hrg. Tr. 75:19-76:17; <u>see also</u> Mangiero Rebuttal Report ¶9; <u>see also</u> Stangle Aff. at ¶¶16-18, 27, 28). Dr. Mangiero also has admitted that corrective action occurs when a committee makes repeated requests to an investment manager to correct its deficiencies or **performance** misadventure. (Mangiero Hrg. Tr. 76:11-17). The Severstal Retirement Committee satisfied this duty in spades by engaging in all of the following communications and oversight,[9] among others:

On December 30, 2008, Mr. DiClemente emailed Mr. LaBow expressing concern regarding the NB Account. Also on December 30, 2008, Mr. DiClemente and Ms. King[10] held a conference call with Mr. LaBow to discuss how to reallocate the Severstal plan assets. Mr. LaBow said he could reallocate the assets. Ms. King followed up after the December 30 call with an email about next steps. Similar conferences and emails occurred on January 6, 2009, January

---

[9] For the following sequence of Severstal Retirement Committee and/or King communications with Mr. LaBow, see Material Facts ¶¶59-74.

[10] The Severstal Retirement Committee endeavored to ensure that it had outside guidance, seeking the input of ERISA counsel, Sally King, a partner at the McGuire Woods law firm based in Chicago. Through Ms. King and/or the Committee, the Retirement Committee repeatedly asked Mr. LaBow to provide it with a plan to reallocate and diversify the Severstal plans. Mr. LaBow consistently promised that he would provide such a reallocation plan. (Material Facts ¶¶92-93).

7, 2009, January 16, 2009, January 20, 2009, January 26, 2009 and again throughout February and March 2009.

On January 6, 2009, Mr. DiClemente called Mr. LaBow to explain that the Severstal Retirement Committee wanted Mr. LaBow to reallocate the assets in accordance with the proportionally allocated WHX Combined Trust portfolio as previously requested. On January 7, 2009, the Severstal Retirement Committee and Ms. King held a meeting via teleconference with Mr. LaBow and asked Mr. LaBow to create a plan for a diversified portfolio.

On January 16, 2009, the Severstal Retirement Committee held a meeting via teleconference with Mr. LaBow in which the Severstal Retirement Committee told Mr. LaBow to reallocate assets and he provided a list of funds that he might consider to reallocate the assets. The Severstal Retirement Committee explained that they wanted a formal allocation plan from Mr. LaBow before he took any action.

On January 20, 2009, the Severstal Retirement Committee sent a letter to Mr. LaBow requesting that Mr. LaBow prepare a written plan for the committee on how he would reallocate the assets. On January 26, 2009, the Severstal Retirement Committee held a meeting via teleconference with Mr. LaBow in which it asked that Mr. LaBow put in writing which funds could not be allocated to Severstal Plans and the specific reasons as to why not.

On February 4, 2009, Mr. LaBow sent a letter to the Severstal Retirement Committee explaining the funds he could not allocate to Severstal Plans and the reasons, and further explained his plan to invest a portion of the NB Account with Proxima, Mason Capital, Capital Defense, and a fund run by Wai Lee. On February 11, 2009, Mr. DiClemente sent an email to Mr. LaBow asking for details on any revised investment strategy, process, discipline, manager biographies and tenures, and historical performance for two funds LaBow had recommended,

13

Mason and Capital Defense. On February 24, 2009, Ms. King sent a letter to Mr. LaBow demanding that Mr. LaBow provide regular written reports about the performance status of the Severstal Plan asset.

On March 12, 2009, Ms. King thanked Mr. LaBow for responding to a recent email and advised she was looking forward to Mr. LaBow's promised report on diversification of the Severstal account. On March 19 and 23 of 2009, Mr. Halpin and Mr. LaBow exchanged emails in which Mr. LaBow described the performance of the assets and Mr. Halpin expressed that he could assist Mr. LaBow if needed in liquidating the Neuberger Berman assets the next day (March 24, 2009). On March 25, 2009, Mr. Halpin emailed Mr. LaBow providing Mr. LaBow with fund information and noting that he (Mr. Halpin) would process any paperwork needed. (Material Facts ¶¶59-74).

The Retirement Committee had prior to November 3, 2008 observed Mr. LaBow as an investment manager performing well, with consistently excellent investment results. (Stangle Aff. at ¶10). Mr. LaBow, prior to this point, had complied with requests of the Combined Trust concerning investment policies and had not done anything that would have put the Severstal Retirement Committee on notice that he would do anything other than comply with the 2008 request for a slice of the Combined Trust to provide for a diversified portfolio for Severstal. (Material Facts ¶¶32-33).

As this record reflects, the Severstal Retirement Committee promptly and aggressively exercised its duty to monitor, repeatedly communicating with Mr. LaBow, demanding a plan for the reallocation of the NB Account, reviewing Mr. LaBow's various proposals concerning alternative investments, conferring with Mercer and strategizing with its competent ERISA legal counsel, Ms. King of McGuire Woods. Those communications occurred on a daily or almost

14

daily basis, as Mr. LaBow recalls.

Those who appoint fiduciaries have an ongoing duty to monitor their activities. Howell v. Motorola, Inc., 633 F.3d 552, 573 (7th Cir. 2011). The duty exists so that a fiduciary "cannot escape liability by passing the buck to another person or turning a blind eye." Howell, 633 F.3d at 573. To quote Howell, where the Court held that Plan fiduciaries had satisfied their ERISA duties of regular review: "There is no evidence that anything like that occurred here." Id.

### ii. The Experts for the DOL and the Retirement Committee Agree that the Severstal Retirement Committee Applied Standard Industry Care and Skill in Fulfilling Its Duty to Monitor Between November 1, 2008 and May 1, 2009

ERISA broadly requires courts to determine whether fiduciaries have discharged their responsibilities "with the care, skill, prudence and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. See Tibble v. Edison Int'l, 135 S.Ct. 1823, 1828 (2015) (citing 29 U.S.C. §§1104(a)(1). An ERISA fiduciary's duty is "derived from the common law of trusts". Tibble, 135 S.Ct. at 1828 (quoting Central States, Southeast and Southwest Area Pension Fund v. Central Transport, Inc., 472 U.S. 559, 570 (1985)). Under trust law, a trustee has a continuing duty to monitor the plan's investments, which exists separate and apart from the exercise of prudence in selecting investments. Tibble, 135 S.Ct. at 1828. The duty includes a duty to monitor the plan's investment options by conducting a "regular review" of plan investments. Harmon v. FMC Corp., 2018 WL 1366621 (E.D. Pa March 16, 2018) (quoting Tibble, 135 S.Ct. at 1827). However, the evaluation of a fiduciary's investment decisions cannot be made "from the vantage point of hindsight" because ERISA **"requires prudence, not prescience."** See Harmon, 2018 WL 1366621 *5 (quoting Pension Benefit Guar. Corp. ex. rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Urgent Inc. 712 F.3d 705, 716 (2d. Cir. 2013))(emphasis added).

Significantly, both experts in this case agree on the essential duties for a retirement

15

committee to act with the requisite "care, skill, prudence and diligence" necessary to monitor an investment manager. Indeed, Dr. Mangiero repeatedly admitted in her testimony before this Court during the <u>Daubert</u> hearing that the Severstal Retirement Committee had acted with requisite fiduciary skill and care:

    a) Dr. Stangle has opined that the Severstal Retirement Committee had a proper monitoring procedure in place, i.e., a quarterly report from Mercer concerning the investment decisions made by the investment manager, Mr. LaBow. (Stangle Aff. at ¶15, 22, 25). **Dr. Mangiero admitted this was a standard monitoring procedure at the <u>Daubert</u> hearing.** (Mangiero Hrg. Tr. 55:16-23).

    b) Dr. Stangle has opined that a retirement committee receiving a monthly or quarterly report from Mercer reflects standard monitoring practice. (Stangle Aff. at ¶¶25-26). **Dr. Mangiero admitted this was a standard monitoring procedure at the <u>Daubert</u> hearing.** (Mangiero Hrg. Tr. at 21:22-22:3, 35:5-17).

    c) Dr. Stangle has opined that the Severstal Retirement Committee adhered to the monitoring procedure by receiving and reviewing quarterly reports from Mercer. (Stangle Aff. at 15-16, 27). **Dr. Mangiero admitted this at the <u>Daubert</u> hearing.** (Mangiero Hrg. Tr. 58:22-59:23, 60:10-15).

    d) Dr. Stangle has opined that the monitoring procedure worked, as Mercer through its reporting on Mr. LaBow's investment decisions, notified the Severstal Retirement Committee of Mr. LaBow's misadventure. **Dr. Mangiero admitted this at the <u>Daubert</u> hearing.** (Mangiero Hrg. Tr. 60:10-15).

    e) Dr. Stangle has opined that corrective action occurs when a retirement committee promptly and repeatedly communicates with an investment manager to see why its investment instructions were not followed. (Stangle Aff. at ¶28; <u>see also</u> Stangle Report at ¶63-64). **Dr. Mangiero has admitted this conduct reflects corrective action.** (Mangiero Hrg. Tr. 75:19-76:17; Mangiero Rebuttal Report at ¶9).

    f) Dr. Stangle has opined that appropriate corrective action is to confer with legal counsel to advise a retirement committee after a misadventure. (Stangle Aff. at ¶28). **Dr. Mangiero admitted this is corrective action.** (Mangiero Hr. Tr. at 78:4-79:2).

    g) Dr. Stangle has opined that the Severstal Retirement Committee's reliance on the advice of ERISA lawyer Sally King was a key part of its corrective

16

action. (Stangle Aff. at ¶28). **Dr. Mangiero admitted this is corrective action**. (Mangiero Hrg. Tr. 78:4-79:2).

The only additional, specific, corrective action recommended in Dr. Mangiero's expert report is at paragraph 129 where she opines that the Severstal Retirement Committee should have terminated Mr. LaBow as investment manager prior to May 1, 2009. (Mangiero Hrg. Tr. 65:25-66:17; see also Mangiero Expert Report at ¶129). Dr. Mangiero cannot identify a specific time when termination would have been appropriate, however. (Mangiero Hrg. Tr. at 67:12-14).[11] This comes as no surprise since Dr. Mangiero has admitted that she agrees with other industry standard practices identified by Dr. Stangle on the issue of terminating an investment manager. Dr. Stangle opined that the Severstal Retirement Committee took a reasonably measured approach in assessing if and when Mr. LaBow should be terminated as investment manager after his November 2008 misadventure. (Stangle Aff. at ¶29). The Severstal Retirement Committee's decision to act deliberately and not reflexively in terminating Mr. LaBow is consistent with industry custom and practice. (Id.). Retirement committees should exercise deliberation in determining whether and when to terminate an investment manager. (Material Facts ¶99). **Dr. Mangiero admitted at the <u>Daubert</u> hearing that she agrees with Dr. Stangle that it is generally appropriate for committees to provide an investment manager with several months or quarters to regain his or her footing after a misadventure. (Mangiero Hrg. Tr. 71:6-17, 117:3-7; see also Material Facts ¶100). Dr. Mangiero similarly admitted that Dr. Stangle was correct in opining that a Retirement Committee should not act hastily when terminating a manager and should consider the cost and search time for finding a new manager. (Mangiero Hrg. Tr. 69:12-17).**

---

[11] To this date, Dr. Mangiero cannot provide a specific date when termination should have occurred. Indeed, at the Daubert hearing, Dr. Mangiero said it is impossible to give an exact date. Q. Can you give us a specific date today? A. No, I don't think anyone can give you an exact date, again, because it depends on many things. (Mangiero Hrg. Tr. 67:12-14).

Dr. Stangle also opined that given the additional market uncertainty during the period of 2008 and 2009 (dubbed the Great Recession), a hasty termination would have been all the more imprudent. Prevailing market conditions required Severstal Retirement Committee to more closely consider Mr. LaBow's ability to correct his investment strategy and more closely assess the potential impact of terminating him. (Stangle Aff. at ¶30). Further, given the potentially time-consuming process of evaluating and hiring a new investment manager, quickly terminating Mr. LaBow would have been imprudent because it could have left the committee without an investment manager during a period of market disruption. (Id.). Dr. Mangiero admitted that given the market upheaval, it was important for the committee to "carefully deliberate about prudent strategies". (Mangiero Report ¶52).

Ultimately, the Retirement Committee terminated Mr. LaBow on May 19, 2009, well within the industry norms of two to three quarters for the Severstal Retirement Committee to determine if Mr. LaBow could regain his footing and suitably serve the Severstal Plans. This industry standard, *i.e.*, two to three quarters, or several quarters, is the only tangible guidepost for the timing of termination in this case. **Significantly, both Dr. Stangle and Dr. Mangiero agree it is an industry standard.** Accordingly, on the issue of termination of Mr. LaBow and the timing of that action, the undisputed record establishes that the Severstal Retirement Committee took appropriate corrective action in its review and timely termination of Mr. LaBow on May 19, 2009 and no liability can attach to the Committee as a matter of law on the DOL's duty to monitor claim.

C. **The Plaintiff's Claim Must Be Dismissed, in the Alternative, Because DOL Cannot Establish Any Damages Caused by the Severstal Retirement Committee**

Finally, this Court has an alternative basis to dismiss this action: Plaintiff cannot establish that any action of the Severstal Retirement Committee caused any injury or damages.

18

First, there is no causal link between the conduct of the Severstal Retirement Committee and any alleged losses in this case. ERISA requires a plaintiff to show that the alleged breach of duty was the proximate cause of the injury. See Edmonson v. Lincoln Nat. Life Ins. Co., 725 F.3d 406, 424 (3d Circ. 2013); see also Huffman v. Prudential Ins. Co. of Am., 2:10-CV-05135, 2017 WL 6055225, at *9 (E.D. Pa. Dec. 7, 2017), (cite). The Severstal Retirement Committee did not act as investment manager at any point between November 1, 2008 and May 1, 2009. The undisputed record reflects that Mr. LaBow was the investment manager and he alone made the investment decision and ordered the transfer of the NB Account that led to the injury and damages alleged in this case. Mr. LaBow's conduct was the proximate cause of the injury and damages. The Severstal Retirement Committee did not make the relevant investment decision; hence there is no causal connection between any alleged damages and the conduct of the committee.

Second, the same result must obtain on the issue of termination of Mr. LaBow. While Dr. Mangiero identifies termination as an issue, she cannot and does not identify any specific breach by the committee, admitting it is impossible to specify a particular date when termination should have occurred. Accordingly, Dr. Mangiero has not only failed to explain when a breach occurred with respect to termination, she has not identified any breach at all, say none that started November 1, 2008. Hence, there is no breach by the committee on the issue of termination and plainly no causal connection between the committee's conduct and any damages originating November 1, 2008, the arbitrary and unanchored starting point the DOL chose for Dr. Mangiero's damages calculation.

Third, if Mr. LaBow followed the Severstal Retirement Committee's instructions to provide the Severstal Plans with a proportional share of each of the assets as held in the

Combined Trust, there would have been no loss to the Severstal Plans. Dr. Stangle has prepared an analysis, uncontested by Dr. Mangiero, that reflects that the so-called slice portfolio would have performed comparably to the hypothetical portfolio allocations proposed by Dr. Mangiero in her report. (Compare Stangle Report at ¶88, Exhibit 4 and Mangiero Report ¶132 at Appendix 2). In short, under Dr. Mangiero's approach to damages, there would be no damages in this case had Mr. LaBow executed the directives of the Severstal Retirement Committee as he received them from the committee and promised to implement them. (Stangle Aff. at ¶32, citing Stangle Report at ¶88, Exhibit 4).

## II.  CONCLUSION

For all the reasons set forth above, this Court must enter judgment in favor of the Defendants and dismiss the Department of Labor's Second Amended Complaint with prejudice.

Dated: September 25, 2018                    Respectfully submitted,

                                             SAUL EWING ARNSTEIN & LEHR LLP

                                             */s/ Charles Kelly*

                                             Charles Kelly, Esq.
                                             PA ID No. 51942
                                             Michael J. Joyce, Esq.
                                             PA ID No. 311303
                                             One PPG Place, Suite 3010
                                             Pittsburgh, PA 15222
                                             Tel.: (412) 209-2500
                                             Fax: (412) 209-2590
                                             *Charles.Kelly@saul.com*
                                             *Michael.Joyce@saul.com*

                                             *Counsel for Defendants, The Severstal Wheeling, Inc. Retirement Committee, Michael DiClemente, and Dennis Halpin*