IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

R. ALEXANDER ACOSTA, SECRETARY
OF LABOR, UNITED STATES
DEPARTMENT OF LABOR,                        No.  2:14-cv-01494-NBF

               Plaintiff,                 Judge:  Nora Barry Fischer

  -against-

WPN CORPORATION, RONALD LABOW,
SEVERSTAL WHEELING, INC.
RETIREMENT COMMITTEE, MICHAEL
DICLEMENTE, DENNIS HALPIN,
WHEELING CORRUGATING COMPANY
RETIREMENT SECURITY PLAN,
and SALARIED EMPLOYEES' PENSION
PLAN OF SEVERSTAL WHEELING, INC.,

               Defendants.

**DEFENDANT'S SEVERSTAL WHEELING, INC. RETIREMENT COMMITTEE,
MICHAEL DICLEMENTE AND DENNIS HALPIN'S
CONCISE STATEMENT OF MATERIAL FACTS**

AND NOW come Defendants, Michael DiClemente, Dennis Halpin and the Severstal

Wheeling Inc. Retirement Committee by and through their counsel, Saul Ewing Arnstein & Lehr

LLP, and pursuant to Local Rule of Civil Procedure 56B.1 and file this Concise Statement of

Material Facts, stating as follows:

A.    **Pension Plan Facts**

    1.    The Severstal Wheeling Inc. Retirement Committee (the "Severstal Retirement

Committee") during the period material to this case included Michael DiClemente

("DiClemente") and Dennis Halpin ("Halpin").  (Affidavit of Michael DiClemente ("DiClemente

Aff.") attached as Exhibit "1" at ¶1).

    2.    The Retirement Committee had oversight for two pension plans, the Wheeling

Corrugating Company Retirement Security Plan and the Salaried Employees Pension Plan of Severstal-Wheeling, Inc. ( the "Plans"). (DiClemente Aff. at ¶2).

3.      Prior to November 1, 2008, the Severstal Retirement Committee was known as Wheeling-Pittsburgh Steel Corporation Retirement Committee. (DiClemente Aff. at ¶3).

4.      DiClemente and Halpin were both members of the Wheeling-Pittsburgh Steel Corporation Retirement Committee and continued as members of the Severstal Retirement Committee. (DiClemente Aff. at ¶4).

5.      Prior to November 1, 2008, the Wheeling-Pittsburgh Steel Corporation plans were managed as part of the WHX Investment Trust. (DiClemente Aff. at ¶5).

6.      The WHX Investment Trust held pension assets for not only Wheeling-Pittsburgh Steel Corporation but also for WHX Corporation, the one-time parent of Wheeling-Pittsburgh Steel Corporation (the "Combined Trust"). (DiClemente Aff. at ¶6).

7.      As a result of the resignation of CitiBank, N.A. as the trustee for the WHX Investment Fund, the assets of the WHX plans and the assets of the Wheeling-Pittsburgh Steel Corporation plans had to be separated in 2008. (DiClemente Aff. at ¶7).

8.      At all times material to this case, Ronald LaBow and his corporation, WPN Corporation, had been the investment managers for the Combined Trust.  (Deposition Transcript of Ronald LaBow ("LaBow Tr.") attached hereto as Exhibit "2" at 21:3-15; 24:7-23).

**B.      Ronald LaBow and WPN**

9.      Mr. LaBow and WPN acted as investment consultants for the WHX Combined Trust.

10.      The WHX Corporation entered into an Investment Consulting Agreement with Mr. LaBow and WPN on February 1, 2004.  (WHX Corporation Investment Consulting

Agreement ("WHX Agreement") attached hereto as Exhibit "3"; see also LaBow Tr. at 21:3-15; 37:10-38:12).

11.     Pursuant to the 2004 Investment Consulting Agreement, Mr. LaBow and WPN had the right to exercise "complete, unlimited and unrestricted management authority with respect to the investment of the Investment Fund [Combined Trust]." (WHX Agreement at ¶7).

12.     That investment authority included the right to "invest and reinvest the Investment Fund [Combined Trust] at such time in such a manner as the consultant in the complete and unlimited exercise of its discretion shall determine." (WHX Agreement at ¶7(a)).

13.     That Investment Consulting Agreement continued to and through 2008 including a First Amendment WHX Corporation Investment Consulting Agreement ("WHX First Amendment") and Second Amendment to the WHX Corporation Investment Consulting Agreement ("WHX Second Amendment").   (WHX First Amendment attached hereto as Exhibit "4"; see also WHX Second Amendment attached hereto as Exhibit "5"; see also LaBow Tr. 30:13-33:5).

14.     Mr. LaBow and WPN also entered a Third Amendment to the Severstal Wheeling Inc. Investment Management Agreement (the "SWI Investment Management Agreement") effective November 1, 2008.   (SWI Investment Management Agreement attached hereto as Exhibit "6"; see also LaBow Tr. 34:18-38:1).

15.     In addition to being an investment manager for Severstal, Mr. LaBow at all times material to this case was a lawyer.  Mr. LaBow obtained a J.D. from New York Law School in the 1960s and a masters in law from New York University (NYU) Law School. (LaBow Tr. 35:14-36:15).

16.     Mr. LaBow understood the significance of contractual instruments and understood

that those with whom he entered contracts would expect him to comply with the terms of the agreement in the normal course.  (LaBow Tr. 37:10-38:1; 38:14-18).

17.     While Mr. LaBow signed the SWI Investment Management Agreement on December 5, 2008, he personally entered November 1, 2008 as the effective date for the agreement. (LaBow Tr. at 226:24-227:5, 228:13-22; see also DiClemente Aff. at ¶8).

18.     When Mr. LaBow signed the SWI Investment Management Agreement he understood that in doing so he was simply "memorializing" the relationship between himself and WPN as investment managers  for the Severstal-Wheeling Plans as he had fulfilled such duties since November 1, 2008.  (LaBow Tr. 232:9-14).

19.     Mr. LaBow considered himself an investment fiduciary to the Severstal Plans when they were part of the WHX Combined Trust.  (LaBow Tr. 226:15-23).

20.     Mr. LaBow did not change his relationship with respect to the Severstal Plans on December 5, 2008.  (LaBow Tr. 228:19-22).

21.     Indeed, the SWI Investment Management Agreement gave Mr. LaBow increased responsibility as of November 1, 2008, going from an investment consultant to investment manager.  (LaBow Tr. 243:9-244:11).

22.     Mr. LaBow understood himself to be a fiduciary to the Severstal Plans throughout his time as both an investment consultant and investment manager.  (LaBow Tr. 243:9-20).

C.     **DiClemente Observes the Performance of Mr. LaBow and WPN**

23.     From 2006 to 2008,  Mr. DiClemente was a member of the Wheeling-Pittsburgh Steel Corporation Retirement Committee.  (DiClemente Aff. at ¶9).

24.     During that same period and pursuant to the WHX Agreement as amended, Mr. LaBow and WPN managed the plans of Wheeling-Pittsburgh Steel Corporation as part of the

Combined Trust. (DiClemente Aff. at ¶10).

25.     Mr. DiClemente monitored Mr. LaBow's performance during that period by receiving and reviewing quarterly reports from Mercer Investment Consulting, Inc. and conferring with Mercer, as appropriate.  (DiClemente Aff. at ¶11).

26.     Mr. DiClemente first became familiar with Mercer in 1986 while working as Manager for Cash Planning and Corporate Finance at Aristech Chemical Corporation and advising its Retirement Committee as part of my duties.  (DiClemente Aff. at ¶12).

27.     Mr. DiClemente ultimately became Corporate Treasurer for Aristech and a member of its Retirement Committee and interfaced with Mercer on retirement investment issues for the entire time of my tenure at Aristech dating from 1986 to 2000.  (DiClemente Aff. at ¶13).

28.     Mr. DiClemente has significant experience in asset allocation analyses, investment portfolio design, investment policy formation and investment manager searches from my work as an institutional investment consultant at Yanni Partners, Inc. from 2002-2004. (DiClemente Aff. at ¶14).

29.     Mercer is a nationally known and respected investments and benefit consultant. (Affidavit of Bruce Stangle, PhD attached hereto as Exhibit "7" ("Stangle Aff.")at ¶25; see also Daubert Hearing Transcript ("Mangiero Hrg.") attached hereto as Exhibit "8" at 57:2-11).

30.     During the period 2006 through November 1, 2008, Mr. LaBow acted consistent with the retirement committee's goals to have a diversified portfolio. (Stangle Aff. at ¶24; see also DiClemente Aff. at ¶15).

31.     In addition, during that period, Mr. LaBow produced exemplary performance results, frequently performing in the top two percent to three percent of all investment managers working in the United States.  (LaBow Tr. at 205:9-206:6; see also  Stangle Aff. at ¶10; see also

Stangle Report attached as "Exhibit A" to the Stangle Affidavit).

32.     At no time during the period 2006 through 2008 did Mr. LaBow act contrary to the Wheeling-Pittsburgh Steel Corporation's directives or expectations.  (Stangle Aff. at ¶12).

33.     At no time prior to December 29, 2008 did Mr. LaBow's performance lead or cause Mr. DiClemente to believe WPN or Mr. LaBow was acting in a deficient manner, which needed corrective action of any sort.  (DiClemente Aff. at ¶16;  see also  Stangle Aff. at ¶¶10, 23-24; see also Mangiero Hrg. Tr. at 80:16-80:22).

34.     In light of Mr. DiClemente's understanding that the Combined Trust was going to be separated in late 2008, Mr. DiClemente approached Mr. LaBow in the Summer of 2008 and asked him to continue as the investment manager for the Severstal Plans.  (DiClemente Aff. at ¶17; see also DiClemente email to LaBow of December 30, 2008 ("December 30 email") attached hereto as Exhibit "9"; see also  LaBow Tr. 109:6-18).

35.     Mr. LaBow expressed interest in continuing to manage the assets of the retirement committee's plans and did so. (LaBow Tr. 109:17-18).

36.     Mr. DiClemente and Mr. LaBow had a discussion in the Summer of 2008 about the investment management goals of the Severstal Retirement Committee in which Mr. DiClemente advised Mr. LaBow that the Severstal Retirement Committee wanted to receive the same percentage interest or proportionate share of each of the assets as held in the Combined Trust.  (DiClemente Aff. at ¶18; see also Stangle Aff. at ¶12; see also February 28, 2018 Deposition Transcript of Susan Mangiero, Ph.D. ("Mangiero Dep. Tr."), attached hereto as Exhibit "10", at 151:25-152:11).

37.     Mr. LaBow admitted that when he filled the role as investment manager for the Severstal Plans he intended to use the same investment policies as he had for the Combined

24900779.1 09/25/2018

Trust.   LaBow Tr. 59:10-21;  60:5-10;  See also Severstal Wheeling Inc. Investment Policy effective November 1, 2008 ("SWI Investment Policy") attached hereto as Exhibit "11".

38.    Mr. DiClemente wanted a diversified portfolio for the Severstal Plans and believed that this would be achieved by receiving a proportionate share of each of the assets invested in the Combined Trust. (DiClemente Aff. at ¶19; see also Stangle Aff. at ¶12; see also LaBow Tr. 288:5-18).

39.    Mr. LaBow confirmed that he understood that the Severstal Retirement Committee expected that he would transfer a slice or proportionate share of each of the assets of the Combined Trust and that he expected to do so.  (LaBow letter of February 4, 2009 attached hereto as Exhibit "12"; LaBow Tr. 85:8-14).

40.    Mr. LaBow told Mr. DiClemente prior to November 2008 that he would act pursuant to these instructions and transfer to the Severstal plans a slice or proportionate share of each of the Combined Trust assets so that the Severstal Retirement Committee would have a diversified portfolio.  (DiClemente Aff. at ¶20; see also Exhibit 9, December 30 email; see also Stangle Aff. at ¶13; Mangiero Hrg. Tr. 109:20-24).

41.    When Mr. LaBow attempted to transfer "an across the board slice", from the Combined Trust to the Severstal Plans, he claimed he encountered problems caused by turbulent markets.  (Exhibit 12, LaBow letter of February 4, 2009, at p. 1).

42.    So instead, Mr. LaBow decided and instructed that all the assets in an undiversified Neuberger Berman account (the "NB Account"), which was part of the Combined Trust, be sent to a new Severstal Wheeling account. (Nov. 3, 2008 WHX Pension Administration Committee letter to Citibank attached hereto as Exhibit "13"; see also LaBow Tr. 78:14-79:22).

43.    The WHX Pension committee transferred the NB Account to the Severstal

7

account. (Id.).

44.     Mr. DiClemente was not a copy recipient on correspondence relating to this transaction. (Id.).

45.     WPN knew that the Severstal Retirement Committee wanted a mirror of what the WHX pension plan was getting, and instead WPN advised Citibank to transfer the NB Account as held in the Combined Trust to the Severstal Plans. (Exhibit 14; Feb. 17, 2009 email; see also LaBow Tr. 189:9-191:6).

46.     Mr. LaBow did not convey a slice, pursuant to his agreement with Mr. DiClemente, but instead decided to transfer the NB Account heavily weighted in energy stocks. (Stangle Aff. at ¶14; see also Mangiero Hrg. Tr. 49:17-25).

47.     Mr. DiClemente did not learn that Mr. LaBow had transferred NB Account energy stocks, rather than a proportionate slice of all assets, until on or about December 29, 2008. (DiClemente Aff. at ¶22; see also Mangiero Hrg. Tr. 47:25-49:16; see also Mangiero Expert Report attached hereto as Exhibit "15" at ¶47).

48.     Mr. DiClemente became aware of Mr. LaBow's investment decision in the NB Account energy stocks as a result of receiving notification from Mercer. (DiClemente Aff. at ¶23; Stangle Aff. at ¶16; see also Mangiero Hrg. Tr. 59:2-10; 60:10-15).

49.     Upon receiving notice from the Mercer, Mr. DiClemente immediately contacted Mr. LaBow to discuss. (DiClemente Aff. at ¶24; see also Exhibit 9, December 30 email).

50.     Mr. LaBow made the investment decision to move the NB Account energy stocks from the Combined Trust to the Severstal plans. (LaBow email of November 5, 2008 to Neuberger Berman attached hereto as Exhibit "16"; see also LaBow Tr. 81:7-83:9; 85:15-24).

51.     WHX authorized the transfer of the NB Account from the Combined Trust to

8

Severstal per Mr. LaBow's instructions.  (LaBow Tr. 83:3-9).

52.    In addition to instructing the WHX Pension Committee to transfer the NB Account to the Severstal Account, Mr. LaBow advised WHX in writing that WPN would indemnify WHX in connection with the transfer of those assets to Severstal.  (December 2, 2008 letter from LaBow to Glen Kassan, Chairman of the WHX Pension Committee attached hereto as Exhibit "17"; see also LaBow Tr. 206:22-208:2).

53.    Mr. LaBow understood that the Severstal Retirement Committee could one day claim that the choice of the NB Account was improper and that because he had picked what assets to convey from the Combined Trust, he and not WHX would be responsible for this decision, leading Mr. LaBow to agree to indemnify WHX from a Severstal Retirement Committee lawsuit.  (LaBow Tr. 207:20-208:2).

54.    Mr. LaBow's understanding that he was managing the Severstal Plans as investment manager beginning November 1, 2008, included his belief that he had the right to management fees for his investment decisions and activities on behalf of the Severstal Plans for the months of November and December 2008, which he ultimately chose to waive.  (LaBow's letter to Sally King of January 12, 2009 attached hereto as Exhibit "18"; see also LaBow Tr. 102:6-103:7).

55.    Mr. LaBow has repeatedly acknowledged his responsibility and regret for making the decision, and instructing the transfer of the NB Account, acknowledging to the Severstal Retirement Committee in February 11, 2009, "maybe I did something wrong."  (LaBow Tr. 276:3-14; see also Exhibit 25, infra.).

56.    Mr. LaBow added: "Look, this is—was complicated and, you know, went on and on. So I—you know, I'm not saying—I—I was trying to say [to the committee], I'm not perfect.

Why don't you tell me what I did wrong and I'll try to correct it.  I guess I was saying that."
(LaBow Tr. 278:4-8).

57.    Mr. LaBow on Monday, March 23, 2009, left a voicemail for Dennis Halpin,
which was later transcribed. (the "LaBow voicemail transcript").  (LaBow voicemail transcript
attached hereto as Exhibit "19";  see also LaBow Tr. 134:23-135:19.)  Labow advised that
because of "the marketplace and the turbulence", he is going "to leave [the Severstal Plans] as is
but then I am going to go and diversify," concluding that the "responsibility is completely mine"
for the status and investment of the plan assets.  (Exhibit 19).

**D.     The Retirement Committee Takes Corrective Action**

58.    Upon the discovery of WPN's investment in NB Account energy stocks rather
than a slice of assets, the Severstal Retirement Committee made numerous and repeated efforts
to communicate with Mr. LaBow to correct and reallocate the Severstal Plans' assets into a
diversified portfolio as originally discussed and agreed.  (DiClemente Aff. at ¶25; see also
Stangle Aff. at 16; see also Mangiero Hrg. Tr. 47:15-24).

59.    The Committee engaged in all of the following communications:

60.    On December 30, 2008, Mr. DiClemente emailed Mr. LaBow expressing concern
regarding the NB Account.  (Exhibit 9, December 30 email).

61.    Also on December 30, 2008, Mr. DiClemente and Ms. King held a conference
call with Mr. LaBow to discuss how to reallocate the SWI plan assets.  Similar conferences and
emails occurred on January 6, 2009, January 7, 2009, January 16, 2009, January 20, 2009,
January 26, 2009 and again throughout February and March 2009.  Mr. LaBow said he could
reallocate the assets. Ms. King followed up after the call with an email about next steps.  (Sally
Doubet King email of December 30 to LaBow ("King Dec. Email"), attached hereto as Exhibit

"20").

62.     On January 6, 2009, Mr. DiClemente called Mr. LaBow to explain that the Severstal Retirement Committee wanted Mr. LaBow to reallocate the assets in accordance with the proportionally allocated WHX Combined Trust portfolio as previously requested. (DiClemente Aff. at ¶26).

63.     On January 7, 2009, the Severstal Retirement Committee and Ms. King held a meeting via teleconference with Mr. LaBow and asked Mr. LaBow to create a plan for a diversified portfolio.  (See January 7, 2009 Minutes of Call between Severstal  Retirement Committee and Mr. LaBow attached hereto as Exhibit "21".  DiClemente Aff. at ¶27).

64.     On January 16, 2009, the Severstal Retirement Committee held a meeting via teleconference with Mr. LaBow in which the Severstal Retirement Committee explained that they wanted Mr. LaBow to reallocate assets using funds for which there would be no transition issues.  Mr. LaBow responded that this request might not be possible but provided a list of funds that he could use to reallocate the assets. The Severstal Retirement Committee explained that they wanted a formal allocation plan from Mr. LaBow before he took any action.  (DiClemente Aff. at ¶28; see also January 16, 2009 Minutes of Call between Severstal Retirement Committee and Mr. LaBow attached hereto as Exhibit "22").

65.     On January 20, 2009, the Severstal Retirement Committee sent a letter to Mr. LaBow requesting that Mr. LaBow prepare a written plan to reallocate the assets and share this plan with the Severstal Retirement Committee and the WHX Pension Investment Committee. (Severstal Retirement Committee letter of January 20, 2009 to Mr. LaBow, attached hereto as Exhibit "23"; see also  DiClemente Aff. at ¶29).

66.     On January 26, 2009, the Severstal Retirement Committee held a meeting via

11

teleconference with Mr. LaBow and asked that Mr. LaBow put in writing which funds could not be allocated to Severstal Plans and the specific reasons as to why not. (See Severstal Retirement Committee Minutes of January 26, 2009 conference call with Mr. LaBow attached hereto as Exhibit "24"; see also DiClemente Aff. at ¶30).

67.     On February 4, 2009, Mr. LaBow sent a letter to the Severstal Retirement Committee explaining the funds he could not allocate to SWI and the reasons, and further explained his plan to invest a portion of the NB Account with Proxima, Mason Capital, Capital Defense, and a fund run by Wai Lee.  (February 4, 2009 LaBow letter; see also LaBow Tr. 43:16-44:5).

68.     On February 11, 2009, Mr. LaBow called the Severstal Retirement Committee to describe reasons why he could not reallocate funds to Severstal Plans and explain that he did not know what more he could have done.  (Severstal Retirement Committee Minutes of February 11, 2009 call with Mr. LaBow attached hereto as Exhibit "25"; see also  DiClemente Aff. at ¶31).

69.     Also on February 11, 2009, Mr. DiClemente sent an email to Mr. LaBow asking for details on any revised investment strategy, process, discipline, manager biographies and tenures, and historical performance for two funds LaBow had recommended,  Mason and Capital Defense.  (DiClemente email of February 11, 2009 attached hereto as Exhibit "26"; see also DiClemente Aff. at ¶32).

70.     On February 13, 2009, Mr. DiClemente emailed Mr. LaBow asking about investment materials that the Severstal Retirement Committee had asked Mr. LaBow to provide for certain funds in which Mr. LaBow was suggesting they invest. See DiClemente email of February 13, 2009 to Mr. LaBow attached hereto as Exhibit "27".  (DiClemente Aff. at ¶33).

71.     On February 24, 2009, Ms. King sent a letter to Mr. LaBow describing the

Severstal Retirement Committee steps to move the situation forward and expressing the Severstal Retirement Committee's request that Mr. LaBow provide regular written reports about the performance status of the Severstal Plan assets, in addition to the reports the Severstal Retirement Committee received quarterly from Mercer. (Sally King letter of February 24, 2009 to Mr. LaBow attached hereto as Exhibit "28").

72.     On March 12, 2009, Ms. King thanked Mr. LaBow for responding to a recent email and advised she is looking forward to Mr. LaBow's promised report on diversification of the Severstal account.  (Sally King email of March 12, 2009 to Mr. LaBow attached hereto as Exhibit "29").

73.     On March 19 and 23 of 2009, Mr. Halpin and Mr. LaBow exchanged emails in which Mr. LaBow described the performance of the assets and Mr. Halpin expressed that he could assist Mr. LaBow if needed in liquidating the Neuberger Berman assets the next day (March 24, 2009).  Stangle Report, Exhibit 2.

74.     On March 25, 2009, Mr. Halpin emailed Mr. LaBow providing Mr. LaBow with fund information and noting that he (Mr. Halpin) would process any paperwork needed.  (Stangle Report, Exhibit 2).

75.     Mr. LaBow testified that the Severstal Retirement Committee was the most active committee he had ever encountered with respect to its monitoring duties.  (LaBow Tr. 178:1-180:5).

76.     The Severstal Retirement Committee was in almost daily contact with LaBow, asking for information.  (LaBow Tr. 182:12-183:1).

77.     Attorney King's repeated communications seeking information were "fair requests".  (LaBow Tr. 188:1-189:4).

**E.**    **The Retirement Committee Acted with Prudence in Exercising Its Duty to Monitor**

78.    The Department of Labor has an expert in this case, Dr. Susan Mangiero. (Mangiero Report at ¶2).

79.    The Severstal Retirement Committee Defendants have an expert in this case, Bruce Stangle, PhD.  (Stangle Report at ¶4-5).

80.    The Severstal Retirement Committee acted in accordance with industry custom and practice with regard to monitoring Mr. LaBow and WPN between November 3, 2008 and May 1, 2009.  (Stangle Aff. at ¶20).

81.    The Severstal Retirement Committee, in retaining Mr. LaBow, selected a highly qualified investment manager with stellar  past performance; the DOL advises that committees should consider historical performance.  (Stangle Aff. at ¶22).

82.    Dr. Mangiero agrees that "it's common that [past performance] is used" in selecting an investment manager.  (Mangiero Depo. Tr. 223:7-13).

83.    The Severstal Retirement Committee had an established practice for holding meetings, making decisions and documenting decisions, which is part of the monitoring process. (Stangle Aff. at ¶22, citing Stangle Report at ¶46).

84.    Dr. Stangle and Dr. Mangiero agree that the Retirement Committee had a monitoring  procedure in place, i.e., a quarterly report from Mercer concerning the investment decisions as made by the investment manager,  Mr. LaBow.  (Stangle Aff. at ¶15, 22, 25; see also Mangiero Hrg. Tr. at 55:16-23).

85.    Dr. Mangiero admits that she utilized this Court's five-part duty to monitor test in forming her opinion in this case.  (Mangiero Hrg. Tr. 54:5-25).

86.    Dr. Stangle and Dr. Mangiero agree that the misadventure or deficiencies in this

case arose with respect to Mr. LaBow's November 2008 decision to transfer the undiversified NB Account to the Severstal Plans. (Stangle Aff. at ¶27; see also Mangiero Hrg. Tr. at 63:2-11, 65:14-24).

87.    Dr. Mangiero and Dr. Stangle agree that the undisputed facts in this case are that Mr. DiClemente received notification of Mr. LaBow's misadventure from Mercer on December 29, 2008. (Stangle Aff. at ¶16, 27; see also Mangiero Hrg. Tr. 59:2-10, 60:10-15).

88.    Dr. Stangle and Dr. Mangiero agree that Mercer is a leader in the investments and benefit management world. (Stangle Aff. at ¶25; see also Mangiero Hrg. Tr. at 56:19-57:11).

89.    Dr. Stangle and Dr. Mangiero agree that the Severstal Retirement Committee receiving monthly or quarterly reports from Mercer reflected standard monitoring practice. (Stangle Aff. at ¶¶25-26; see also Mangiero Hrg. Tr. 21:21-22:3, 35:5-17).

90.    Dr. Stangle and Dr. Mangiero agree that Mr. DiClemente adhered to the monitoring procedure, and that Mercer in the normal course of its consulting duties told Mr. DiClemente of Mr. LaBow's investment misadventure. (Stangle Aff. at ¶15-16, 27; see also Mangiero Hrg. Tr. at 58:22-59:23, 60:10-15).

91.    Dr. Stangle and Dr. Mangiero agree that corrective action occurs when a retirement committee promptly follows up with an investment manager to see why its investment instructions were not followed. (Stangle Aff. at ¶27; see also Stangle Report at ¶64; see also Mangiero Hrg. Tr. 75:19-76:17; see also Mangiero Rebuttal Report, attached hereto as Exhibit "30" at ¶9).

92.    Another example of corrective action is repeated requests to the investment manager to make corrections. (Mangiero Hrg. Tr. 76:11-17).

93.    The Committee and/or its legal counsel made repeated requests to Mr. LaBow as

reflected in Exhibit 2 to Dr. Stangle's report, which includes a list of committee communications upon which both Dr. Stangle and Dr. Mangiero relied.  (Stangle Report at Report Exhibit 2; <u>see also</u> Mangiero Hrg. Tr. 76:22-78:3).

94.    Dr. Mangiero and Dr. Stangle agree that an appropriate corrective action is to confer with legal counsel to advise a retirement committee.  (Stangle Aff. at ¶28; <u>see also</u> Mangiero Hrg. Tr. 78:4-79:2).

95.    Mr. LaBow had begun talking about issues relating to the Severstal Trust with Ms. King early in the summer of 2008.  (LaBow Tr. 102:15-23).

96.    Dr. Stangle and Dr. Mangiero agree that the retention of and reliance on Sally King, an ERISA lawyer and law partner at McGuire Woods, to advise the retirement committee was corrective action. (<u>Id.</u>).

97.    The only specific, corrective action identified in Dr. Mangiero's report is at paragraph 129 in the report when she identifies her view that the retirement committee should have terminated Mr. LaBow as investment manager.  (Mangiero Hrg. Tr. 65:25-66:17; <u>see also</u> Mangiero Expert Report at ¶129).

98.    Dr. Mangiero cannot identify a specific time when termination would have been appropriate.  (Mangiero Hrg. Tr. at 67:12-14).

99.    Dr. Stangle has opined that it is customary in the retirement committee industry for a committee to act deliberately, not hastily upon notice of a performance deficiency and Dr. Mangiero agrees.  (Stangle Aff. at ¶¶28-29; <u>see also</u> Mangiero Hrg. Tr. 71:3-72:5).

16

100.    Dr. Mangiero and Dr. Stangle agree that in the normal course a retirement committee will wait for two or three quarters before terminating a manger to see if that manager can regain his or her performance footing.  (Stangle Aff. at ¶28-30; see also Mangiero Hrg. Tr. at 71:6-12, 117:3-18).

101.    The market upheaval of 2008 made a hasty termination imprudent and required a close assessment of the potential impact of terminating Mr. LaBow.  (Stangle Aff. at ¶30).

102.    Dr. Mangiero agrees that given the market upheaval, it was important for the Severstal Retirement Committee to "carefully deliberate" about "prudent strategies." (Mangiero Report at ¶52).

103.    The Severstal Retirement Committee waited less than two quarters before terminating Mr. LaBow on May 19, 2008.  (Stangle Aff. at ¶19).

**F.       There are no Damages in this Case**

104.    Dr. Stangle did an analysis of what would have occurred had Mr. LaBow provided a slice of the WHX portfolio to the Severstal plans as Mr. LaBow agreed he would do. (Stangle Aff. at ¶31; see also Stangle Report at ¶88).

105.    That analysis is set forth in Dr. Stangle's expert report, Report Exhibit 3.  (Stangle Report at 88).

106.    Stangle's report reflects that if Mr. LaBow had invested pursuant to the slice strategy, the performance of the WHX Investment Portfolio would have outperformed the S&P 500 by over 15%.  (Stangle Report at Report Exhibit 3).

107.    Dr. Stangle also created an Exhibit 4 to his report.  (Stangle Aff at ¶31).

108.    That exhibit examines the asset value of the WHX portfolio as of May 1, 2009 had it been invested in the fashion Mr. DiClemente requested for the Severstal Plans, and Mr.

LaBow agreed to do, i.e., the slice strategy. (Id.).

109.    Dr. Mangiero utilized hypothetical portfolios A, D and X as part of her expert report to reflect diversified portfolios of a sort that she claims Mr. LaBow should have invested in. (Mangiero Report at ¶135 and pp. 38-40).

110.    Dr. Stangle compares the WHX portfolio to three other portfolios, Portfolio A, Portfolio D and Portfolio X as proposed by Dr. Mangiero.  (Stangle Report at ¶88).

111.    Dr. Stangle's Exhibit 4 also reflects that if Mr. LaBow had acted pursuant to his agreement with the Severstal Retirement Committee to provide a diversified portfolio to Severstal to mirror the WHX Combined Trust, there would be no damages in this case.

112.    The retirement committee acted properly in taking corrective action to review Mr. LaBow's conduct, requesting repeatedly that he reallocate the assets and ultimately terminate him after providing a customary several quarters for him to regain his investment performance footing.  (Stangle Aff. at ¶¶28-30).

Dated: September 25, 2018                    SAUL EWING ARNSTEIN & LEHR LLP

**JURY TRIAL DEMANDED**              /s/Charles Kelly_____
                                     Charles Kelly, Esq.
                                     PA ID No. 51942
                                     Michael J. Joyce, Esq.
                                     PA ID No. 311303
                                     One PPG Place, 30th Floor
                                     Pittsburgh, PA 15222
                                     Tel.: (412) 209-2500
                                     Fax: (412) 209-2590
                                     ckelly@saul.com
                                     mjoyce@saul.com

                                     *Counsel for Defendants, the Severstal Wheeling,*
                                     *Inc. Retirement Committee, Michael DiClemente*
                                     *and Dennis Halpin*