Exhibit 7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| R. ALEXANDER ACOSTA, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, | ) ) ) |
| | ) |
| Plaintiff, | ) ) |
| -against- | ) ) |
| WPN CORPORATION, RONALD LABOW, SEVERSTAL WHEELING, INC. RETIREMENT COMMITTEE, MICHAEL DICLEMENTE, DENNIS HALPIN, WHEELING CORRUGATING COMPANY RETIREMENT SECURITY PLAN, and SALARIED EMPLOYEES' PENSION PLAN OF SEVERSTAL WHEELING, INC., | ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) ) |

Civ. No. 2:14-cv-01494-NBF

**EXPERT AFFIDAVIT OF BRUCE E. STANGLE, Ph.D.**

**September 25, 2018**

I, Bruce Stangle, declare as follows:

## I.   INTRODUCTION

1.   I am an economist and am currently employed by Analysis Group, Inc., an international economic consulting firm with approximately 800 professionals in thirteen offices in North America, Europe, and Asia that I co-founded in 1981.

2.   I was retained in this case by counsel for Michael DiClemente and Dennis Halpin (collectively, the "Individual Severstal Retirement Committee Defendants"), who served as members of the Severstal Wheeling, Inc. Retirement Committee ("SRC" or "SWI Retirement Committee" or the "Committee"), and the Committee itself.  I was asked to evaluate the Individual Severstal Retirement Committee Defendants' performance in monitoring the investment management provided by Ronald LaBow and WPN Corporation ("WPN").  I was also asked to comment on portions of the December 11, 2017 expert report submitted on behalf of Plaintiff by Dr. Susan Mangiero ("Mangiero Report") that relate to the Individual Severstal Retirement Committee Defendants' duty to monitor Mr. LaBow and WPN's investment management.

3.   I submitted an expert report in this case on January 22, 2018 ("Stangle Report") that sets forth the opinions I reached in conducting my assignment and provides the basis for those opinions.  My expert report is attached as Exhibit A to this affidavit.  I was deposed in this case on February 27, 2018 in Boston, Massachusetts ("Stangle Deposition").

4.   I have reviewed the rebuttal report that Dr. Mangiero submitted on February 17, 2018 ("Mangiero Rebuttal Report"), the transcript of Dr. Mangiero's deposition on February 28, 2018 ("Mangiero Deposition"), and the transcript of Dr. Mangiero's Daubert hearing on May 22, 2018 ("Mangiero Hearing").

## II.   QUALIFICATIONS

5.   I have a B.A. from Bates College, and an M.S. in Management and a Ph.D. in Applied Economics from the Sloan School of Management at Massachusetts Institute of Technology.

6.   I serve on the Board of Directors of Wellington Trust Company, NA, a money management firm.  Until recently, I was also an outside director of a mutual fund family, The Marsico Investment Fund.  My duties in these roles have included monitoring fees,

expenses, and relative investment performance of the funds on our platform.  For many years, I have also served on Analysis Group, Inc.'s Investment Committee for its 401(k) plan.  I have previously served as a trustee at Bates College and was a member of the Investment Committee, which oversees the College's endowment.

7.  As a retirement planning or investment committee member, I have had the occasion to replace the investment manager engaged on behalf of the committee.[1]

## III.   RELEVANT CASE FACTS

8.  I am familiar with foundational facts in this case.  Sections II and IV of the Stangle Report describe the relevant factual background, including the following:

9.  The SRC retained Mr. LaBow to manage the SWI plan assets and Mr. LaBow had full investment discretion and authority.[2]  Dr. Mangiero included factual support of these statements in her report.[3]

10.  Mr. LaBow was one of the top-performing investment managers at the time, usually in the top 10 percent, and at times even in the top 2 or 3 percent.[4]  Mr. DiClemente had a longstanding business relationship with Mr. LaBow and trusted Mr. LaBow.[5]  Dr. Mangiero testified that she is not aware of Mr. LaBow ever acting contrary to Mr. DiClemente's requests in the past.[6]

11.  The relevant time period coincided with a period of unprecedented market conditions and volatility.[7]  Dr. Mangiero acknowledged the upheaval in the financial markets during the relevant period.[8]

12.  The SRC instructed Mr. LaBow to transfer a proportional allocation of the Combined Trust (also referred to as the WHX Trust), which included the WHX and SWI assets.[9]  The Combined Trust was a diversified portfolio.[10]  The SRC expected to receive a "slice"

---

[1]   Stangle Deposition, 17:4-17:22.
[2]   Stangle Report, ¶ 48.  Stangle Deposition, 83:10-83:13, 84:12-84:20, 103:20-103:25.
[3]   Mangiero Report, ¶¶ 126, 128.
[4]   Stangle Report, ¶ 48.
[5]   Stangle Deposition, 121:11-121:16, 124:2-124:10.
[6]   Mangiero Hearing, 80:16-80:22.
[7]   Stangle Report, ¶ 20.
[8]   Mangiero Report, ¶ 52.
[9]   Stangle Report, ¶ 62.  Stangle Deposition, 22:1-22:7.
[10]  Stangle Deposition, 57:12-57:16.

of the diversified Combined Trust assets upon the separation of the SWI plan assets. Dr. Mangiero acknowledged the SRC's directive to Mr. LaBow to proportionately transfer assets from the Combined Trust.[11]

13. Mr. LaBow understood that the SRC requested a proportionate allocation of the Combined Trust to the SWI Trust.[12] Dr. Mangiero testified in agreement with this fact.[13]

14. Mr. LaBow did not transfer a proportionate allocation of the Combined Trust to the SWI Trust. Instead, Mr. LaBow ordered the transfer of the entire contents of the Neuberger Berman Account to the SWI Trust.[14] Approximately 97 percent of the Neuberger Berman Account was held in thirteen large-capitalization equity securities, eleven of which were energy-sector stocks.[15] Dr. Mangiero agreed with these facts in her report and testimony.[16]

15. The SRC retained Mercer Investment Consulting, Inc. ("Mercer") to provide consulting support to the committee.[17] Mercer prepared quarterly reports for the SRC that provided information on the performance of the relevant investments.[18] Dr. Mangiero testified in agreement with these facts.[19]

16. Mercer notified the SRC that the SWI plan assets were in an undiversified Neuberger Berman Account on December 29, 2008.[20] The next day, Mr. DiClemente contacted Mr. LaBow to discuss his concern with the allocation of the SWI plan assets.[21] Dr. Mangiero testified that she has no reason to dispute the veracity of these facts.[22]

17. The SRC increased the frequency of communications with Mr. LaBow and sought advice from ERISA counsel, Sally King of McGuireWoods.[23] Dr. Mangiero acknowledged these facts in her testimony.[24]

---

[11]    Mangiero Report, ¶ 45. Mangiero Deposition, 151:25-152:11.
[12]    Stangle Deposition, 98:19-98:22.
[13]    Mangiero Hearing, 109:20-109:24.
[14]    Stangle Report, ¶ 19.
[15]    Stangle Report, ¶ 19.
[16]    Mangiero Report, ¶ 47. Mangiero Hearing, 49:17-49:25.
[17]    Stangle Report, ¶ 59.
[18]    Stangle Report, ¶ 59.
[19]    Mangiero Hearing, 56:21-57:1.
[20]    Stangle Report, ¶¶ 19, 63. Mangiero Hearing, 59:2-59:10, 60:10-60:15.
[21]    Stangle Report, Exhibit 2.
[22]    Mangiero Hearing, 47:15-47:24.
[23]    Stangle Report, ¶¶ 63-64, 70-71. Stangle Report, Exhibit 2.
[24]    Mangiero Hearing, 76:5-79:3, 103:3-103:9. Mangiero Deposition, 147:4-147:20, 189:5-190:1.

18. Following its discovery of the undiversified account, the SRC communicated to Mr. LaBow its continued desire for a diversified portfolio similar to a slice of the WHX Trust.[25] Dr. Mangiero agreed with these facts in her deposition.[26] Mr. LaBow indicated he would try to provide the SRC with such an allocation.[27]

19. By May 2009, less than two quarters after the SRC learned of Mr. LaBow's failure to transfer the proportionate allocation of the Combined Trust, Mr. LaBow still had not allocated the SWI assets as requested and the SRC terminated Mr. LaBow.[28] Dr. Mangiero includes factual support of these statements in her report and deposition.[29]

## IV.   PRIMARY OPINIONS

20. In my report and deposition, I have offered my overall opinion that the Individual Severstal Retirement Committee Defendants acted in accordance with industry custom and practice with regard to monitoring Mr. LaBow and WPN's investment management between November 3, 2008, and May 1, 2009 (the "relevant time period").[30]

21. The following are additional conclusions I reached in forming my overall opinion, each of which is developed in the Stangle Report:

22. The SRC established and implemented prudent foundational policies and procedures to monitor its investment manager.[31] The SRC members had relevant backgrounds and related expertise and the SRC's size was reasonable for its needs.[32] The SRC had an established practice for holding meetings, making decisions, and documenting decisions.[33]

23. The SRC, in retaining Mr. LaBow, selected a highly qualified investment manager with stellar past performance.[34] Past performance of an investment manager is a key consideration for retirement committees when selecting a potential investment manager.[35] The Department of Labor agrees that committees should consider the historical

---

[25]   Stangle Report, ¶¶ 67-68.  Stangle Deposition, 47:10-47:19, 88:23-89:1.
[26]   Mangiero Deposition, 204:15-205:4.
[27]   Stangle Deposition, 47:10-47:19, 152:9-152:23.
[28]   Stangle Report, ¶ 19.  Stangle Deposition, 166:8-166:13.
[29]   Mangiero Report, ¶¶ 110, 128.  Mangiero Deposition, 151:21-152:13.
[30]   Stangle Report, ¶ 7.
[31]   Stangle Report, ¶¶ 44-47.
[32]   Stangle Report, ¶¶ 44-45.
[33]   Stangle Report, ¶ 46.
[34]   Stangle Report, ¶ 48.
[35]   Stangle Report, ¶ 49.

performance record of investment management firms.[36]  Dr. Mangiero also testified that "it's common that [past performance] is used" in selecting and monitoring investment managers.[37]

24. Mr. LaBow had invested the Combined Trust's assets in a diversified portfolio in the past.[38]  The SRC would have received a diversified portfolio had it received a proportionally allocated slice as it had requested of Mr. LaBow.[39]

25. The SRC retained Mercer, which is a large, globally recognized, and well-known investment consulting firm that performed periodic portfolio reviews about investment performance.[40]  Dr. Mangiero testified in agreement that Mercer is a prestigious and well-known investment review company.[41]

26. The nature and frequency of the Individual Severstal Retirement Committee Defendants' monitoring are consistent with my professional training and experience as a retirement plan committee member and with general monitoring standards and procedures set forth in publicly available industry publications.  Dr. Mangiero testified in agreement that quarterly or monthly monitoring constitutes standard practice.[42]

27. Mr. LaBow did not follow the SRC's requests to transfer a slice of the diversified Combined Trust assets.  Instead, Mr. LaBow decided to order the transfer of the undiversified Neuberger Berman Account to the SWI Trust on November 3, 2008, which constitutes the "misadventure" in this matter.[43]  Dr. Mangiero testified in agreement that the "misadventure" in this matter was Mr. LaBow's decision to transfer the undiversified Neuberger Berman Account.[44]  The SRC's notice of Mr. LaBow's "misadventure" began on December 29, 2008.[45]  Dr. Mangiero also testified that the "misadventure" notice began on December 29, 2008.[46]

---

[36]     Stangle Report, ¶ 49.
[37]     Mangiero Deposition, 223:7-223:13.
[38]     Stangle Deposition, 57:12-16, 60:1-60:14.  Stangle Report, ¶ 74.
[39]     Stangle Deposition, 66:4-66:7.
[40]     Stangle Report, ¶ 46.  Mangiero Hearing, 56:19-57:11.
[41]     Mangiero Hearing, 57:2-57:7.
[42]     Mangiero Deposition, 47:5-47:9, 54:7-54:17.  Mangiero Hearing, 21:21-22:3, 35:5-35:17.
[43]     Stangle Report, ¶¶19, 62.  Stangle Deposition, 22:1-22:7, 98:19-98:22.
[44]     Mangiero Hearing, 65:14-65:24.
[45]     Stangle Report, ¶¶ 19, 63.  Stangle Deposition, 43:15-46:11, 109:10-109:13.  Mangiero Hearing, 59:2-59:10, 60:10-60:15.
[46]     Mangiero Hearing, 65:14-65:18.  Mangiero Report ¶ 127.

28. The SRC took immediate corrective action upon learning of the undiversified Neuberger Berman Account on December 29, 2008.[47]  This corrective action included increasing the frequency and intensity of SRC's monitoring and its involvement of ERISA counsel, Sally King of McGuireWoods.[48]  Ms. King provided advice on monitoring, and coordinated communications with, and oversight of, Mr. LaBow, and otherwise regularly conferred with the SRC concerning Mr. LaBow's performance and the SRC's fulfillment of its duties.[49]  Dr. Mangiero testified in agreement that the SRC took corrective action, through frequent communication with Mr. LaBow and engagement of Ms. King.[50]

29. The SRC took a reasonably measured approach to assessing if and when Mr. LaBow should be terminated.[51]  The SRC's choice to be deliberate rather than reflexively terminating Mr. LaBow is consistent with industry custom and practice.  Retirement plan committees should exercise deliberation in determining whether and when to terminate an investment management agreement.[52]  Dr. Mangiero testified that it is generally appropriate for committees to provide a manager with several months or quarters to regain his or her footing.[53]  Dr. Mangiero similarly testified that a committee should not act hastily when terminating a manager and should consider the cost and search time of finding a new manager.[54]

30. The additional market uncertainty would have made a hasty termination all the more imprudent and the prevailing market conditions required the SRC to more closely consider Mr. LaBow's ability to correct his investment strategy and more closely assess the potential impact of terminating Mr. LaBow.[55]  Further, given the potentially time-consuming process of evaluating and hiring a new investment manager, quickly terminating Mr. LaBow could have left the SRC without an investment manager during a

---

[47]    Stangle Report, ¶ 63.  Stangle Deposition, 138:12-139:18.
[48]    Stangle Report, ¶¶ 63, 70.  Stangle Report Exhibit 2.
[49]    Stangle Report, ¶¶ 58, 70.
[50]    Mangiero Hearing, 76:5-79:3, 103:3-103:9.  Mangiero Deposition, 147:4-147:20, 189:5-190:1.
[51]    Stangle Report, ¶ 76.
[52]    Stangle Report, ¶¶ 34-36.
[53]    Mangiero Hearing, 71:6-71:17, 117:3-117:7.
[54]    Mangiero Deposition, 192:8-192:21, 194:10-194:22.  Mangiero Hearing, 69:12-69:17.
[55]    Stangle Report, ¶ 77.

period of market disruption.[56]  Dr. Mangiero agrees that given the market upheaval, it was important for the SRC to "carefully deliberate about prudent strategies."[57]

31.  After learning of Mr. LaBow's failure to transfer the diversified portfolio, the SRC was prudent in increasing its oversight and monitoring of Mr. LaBow by asking that Mr. LaBow show the SRC his investment plan before taking any action.[58]  The SRC diligently tried to work with Mr. LaBow to achieve a different investment allocation.  The SRC continued to firmly push Mr. LaBow to create a more diversified portfolio for the SWI plan assets.[59]

32.  If Mr. LaBow had allocated the SWI plan assets similarly to the WHX Trust, then the SWI plan assets would have performed comparably to the hypothetical portfolio allocations proposed by the Mangiero Report.[60]  Exhibit 4 to my report, re-produced below, demonstrates this conclusion.  Therefore, under Dr. Mangiero's approach, there would be no damages in this case had Mr. LaBow executed the directives of the SRC.

---

[56]     Stangle Report, ¶ 77.
[57]     Mangiero Report, ¶52.
[58]     Stangle Report, ¶ 68.
[59]     Stangle Report, ¶¶ 67-69.  Mangiero Report, ¶¶ 54, 110.
[60]     Stangle Report, ¶ 88.  Stangle Report Exhibit 4.



**Exhibit 4**
**Value of the SWI Plan Assets under WHX Portfolio**
**Compared to Portfolios A, D, and X**
**11/1/2008 to 5/1/2009**

Notes:
[1] Asset values for Portfolios A, D, and X are from Appendix 1 of the Mangiero Report.
[2] The WHX Portfolio shows the hypothetical values of the SWI plan assets had they been invested in the same assets as the WHX Trust. Asset values for the WHX Portfolio are calculated by applying the WHX Trust's historical rate of return, provided in Appendix 1 of the Mangiero Report, to the "Rate of Return" column in the Estimated Damages Calculations section in Appendix 1 of the Mangiero Report.

Source:
[1] Expert Report of Dr. Susan Mangiero, December 11, 2017 ("Mangiero Report").

Bruce E. Stangle, Ph.D.

September 25, 2018

# EXHIBIT A

CONFIDENTIAL

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| R. ALEXANDER ACOSTA, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, | )<br>)   Civ. No. 2:14-cv-01494-NBF<br>) |
| Plaintiff, | )<br>)<br>) |
| -against- | )<br>) |
| WPN CORPORATION, RONALD LABOW, SEVERSTAL WHEELING, INC. RETIREMENT COMMITTEE, MICHAEL DICLEMENTE, DENNIS HALPIN, WHEELING CORRUGATING COMPANY RETIREMENT SECURITY PLAN, and SALARIED EMPLOYEES' PENSION PLAN OF SEVERSTAL WHEELING, INC., | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

**EXPERT REPORT OF BRUCE E. STANGLE, Ph.D.**

**January 22, 2018**

CONFIDENTIAL

## TABLE OF CONTENTS

I. INTRODUCTION..............................................................................................1

  A. QUALIFICATIONS AND PROFESSIONAL EXPERIENCE ...........................................1

  B. STATEMENT OF ASSIGNMENT ...........................................................................1

  C. SUMMARY OF OPINIONS....................................................................................2

II. BACKGROUND ...........................................................................................4

  A. RELEVANT ENTITIES AND INDIVIDUALS............................................................5

  B. CHRONOLOGY OF KEY EVENTS.........................................................................6

III. INVESTMENT MONITORING BEST PRACTICES BY RETIREMENT
    COMMITTEE MEMBERS ..............................................................................9

  A. STRUCTURE AND PROTOCOL OF RETIREMENT PLAN COMMITTEES ...................10

  B. REVIEWING AND MONITORING AN INVESTMENT MANAGER ............................14

  C. TERMINATING AN INVESTMENT MANAGER .....................................................15

IV. THE MONITORING PERFORMED BY THE INDIVIDUAL SEVERSTAL
    RETIREMENT COMMITTEE DEFENDANTS IS CONSISTENT WITH INDUSTRY
    CUSTOM AND PRACTICE ..........................................................................17

  A. CONTEXTUAL FACTORS ..................................................................................18

  B. FACTUAL OVERVIEW AND ASSESSMENT OF MONITORING CONDUCTED BY THE INDIVIDUAL
    SEVERSTAL RETIREMENT COMMITTEE DEFENDANTS .....................................20

    i. Structure and Protocol of the SWI Retirement Committee.............................20

      a) Committee membership and meeting structure and process.........................21

      b) Engagement of Mr. LaBow as an investment manager................................22

      c) Policies and authorities for investment management..................................24

      d) Engagement of ERISA legal counsel and Mercer Investment Consulting...................27

    ii. Further Review and Monitoring of Mr. LaBow During the Relevant Time Period...............................28

      a) Frequent and ongoing communication with Mr. LaBow................................28

      b) Increased oversight of Mr. LaBow's decisions and actions..........................29

      c) Reliance on expertise of ERISA legal counsel and Mercer Investment Consulting ....................30

    iii. Termination of Mr. LaBow and WPN Corporation.............................................31

V. THE MANGIERO REPORT FOCUSES ON IRRELEVANT FACTS AND
    STANDARDS UNRELATED TO THE DUTY TO MONITOR.................................34

VI. CONCLUSION ..........................................................................................38

CONFIDENTIAL

### I.   INTRODUCTION

#### A.  Qualifications and Professional Experience

1.   My name is Bruce E. Stangle.  I am an economist with more than 35 years of experience with issues relating to antitrust, regulation, and other areas of economic analysis.  I am a co-founder of Analysis Group, Inc., an international economic consulting firm with approximately 800 professionals in thirteen offices in North America, Europe, and Asia.

2.   Over the course of my career, I have provided expert testimony on such issues as ERISA, market definition, entry conditions, competitive effects, security valuation, class certification, and damages.  I also have extensive professional experience as a board member and investment committee member.  I currently serve on the Board of Directors of Wellington Trust Company, NA, a money management firm.  Until recently, I was also an outside director of a mutual fund family, The Marsico Investment Fund.  My duties in these roles have included monitoring fees, expenses, and relative investment performance of the funds on our platform.  In addition, for many years, I have served on Analysis Group, Inc.'s Investment Committee for its 401(k) plan.  Part of my duties as a committee member include reviewing the financial performance of various fund offerings, assessing fee levels for appropriateness, and ensuring that our plan offers its participants a wide array of investment products.  Additionally, I have served as a member of the Investment Committee at Bates College, which oversees the College's endowment.

3.   I have a B.A. from Bates College, and an M.S. in Management and a Ph.D. in Applied Economics from the Sloan School of Management at Massachusetts Institute of Technology.  I am a member of the American Economic Association and Trustee Emeritus of Bates College.  My curriculum vitae is attached as Appendix A.  Attached as Appendix B is a list of matters in which I have offered expert testimony, including over the last four years.

#### B.  Statement of Assignment

4.   I have been retained by counsel for Michael DiClemente and Dennis Halpin (collectively, the "Individual Severstal Retirement Committee Defendants"), who served as members of the Severstal Wheeling, Inc. Retirement Committee ("SRC" or "SWI Retirement Committee" or the "Committee"), and the Committee itself.  I have been asked to review

1

CONFIDENTIAL

and evaluate the Individual Severstal Retirement Committee Defendants' performance in monitoring the investment management provided by Ronald LaBow and WPN Corporation ("WPN"). As part of my analysis, I have been asked to describe the monitoring activities typically conducted by retirement plan committees, based on my professional experience and publicly available literature on retirement plan committee best practices.

5.  In addition, I have been asked to review and comment on portions of the December 11, 2017 expert report submitted on behalf of Plaintiff by Dr. Susan Mangiero ("Mangiero Report") that relate to the Individual Severstal Retirement Committee Defendants' duty to monitor Mr. LaBow and WPN's investment management.

6.  My opinions are based on my professional training and experience and on the materials referenced in this report. A list of the materials I have relied upon is included in Appendix C to this report. I reserve the right to change my conclusions or opinions should any additional information be provided to me in the future and to supplement or amend them to address any additional expert opinions offered in this litigation. I am being compensated at the rate of $895 per hour for my work on this matter. In addition, I have been assisted by others working under my direction and supervision. My compensation is not dependent on my conclusions or on the outcome of this matter.

### C. Summary of Opinions

7.  It is my opinion that the Individual Severstal Retirement Committee Defendants acted in accordance with industry custom and practice with regard to monitoring Mr. LaBow and WPN's investment management between November 3, 2008, and May 1, 2009 (the "relevant time period"). In particular, based on the materials I have reviewed, it is my opinion that the SRC established and implemented prudent foundational policies and procedures to monitor its investment manager. Moreover, the SRC adapted to important contextual factors during the relevant time period by taking corrective action and increasing the frequency and intensity of its monitoring. Furthermore, in my opinion, the SRC took prudent and measured steps when considering whether to terminate Mr. LaBow and WPN. The SRC's practices are consistent with my professional experience as well as with industry custom related to monitoring.

CONFIDENTIAL

8. I disagree with Dr. Mangiero's primary opinion that the Individual Severstal Retirement Committee Defendants "did not act with the care, skill and diligence expected of a fiduciary of an ERISA retirement plan with respect to carefully monitor defendants WPN Corporation and Ronald LaBow."[1] As I stated above, it is my opinion that the nature and frequency of the Individual Severstal Retirement Committee Defendants' monitoring are consistent with my professional training and experience as a retirement plan committee member and with general monitoring standards and procedures set forth in publicly available industry publications.

9. I also disagree with Dr. Mangiero's opinion that the Individual Severstal Retirement Committee Defendants should have more swiftly terminated the investment management agreement with Mr. LaBow and WPN. Dr. Mangiero's opinion that "[g]iven the grave concerns about LaBow in December 2008, the Severstal Committee should have terminated the relationship with LaBow prior to May 2009" ignores the deliberation that retirement plan committees should exercise in determining whether and when to terminate an investment management agreement.[2]

10. Beyond the specific opinions provided in Dr. Mangiero's expert report, Dr. Mangiero's overall approach to assessing the Individual Severstal Retirement Committee Defendants' monitoring is fundamentally flawed. Instead of providing a framework for analysis, Dr. Mangiero relies on highly biased selective citations, irrelevant and superficial facts, and mischaracterized evidence to assert that the Individual Severstal Retirement Committee Defendants did not fulfill their fiduciary duties related to monitoring. Specifically, Dr. Mangiero creates her own unfounded standards against which to compare the monitoring-related actions of the Individual Severstal Retirement Committee Defendants. Further, Dr. Mangiero fails to appropriately consider contextual information, such as the unforeseeable and extreme market conditions during the relevant time period, in assessing the Individual Severstal Retirement Committee Defendants' monitoring. Finally, Dr. Mangiero frequently and erroneously conflates investment manager responsibilities with retirement committee responsibilities, and thereby puts forth numerous criticisms and standards that are irrelevant to monitoring.

---

[1]    Expert Report of Dr. Susan Mangiero, December 11, 2017 ("Mangiero Report"), ¶40.
[2]    Mangiero Report, ¶129.

CONFIDENTIAL

11.    The bases for my opinions are provided in detail in my report.

## II.    BACKGROUND

12.    Plaintiff alleges that the Individual Severstal Retirement Committee Defendants are liable
        for failing to monitor Mr. LaBow and WPN's conduct during the relevant time period,
        while the Severstal Wheeling, Inc. ("SWI") plan assets were in an unmanaged,
        undiversified account.[3]   Specifically, Plaintiff alleges that the Individual Severstal
        Retirement Committee Defendants failed to (1) enter into a written agreement with a
        defined investment policy with an investment manager; (2) inquire about the SWI plan
        assets transferred from a commingled trust to a separate SWI trust on November 3, 2008;
        (3) discover that the assets in the Neuberger Berman account were undiversified until
        December 30; (4) act promptly to diversify the undiversified account once known; and (5)
        ensure that Mr. LaBow and WPN acted prudently in investing the assets once the assets
        were converted to cash in March 2009.[4]

13.    In my professional experience, when a retirement plan committee engages an investment
        manager to handle day-to-day investment decisions, the committee members have a
        continuing fiduciary responsibility to monitor the investment manager's performance.
        According to the U.S. Department of Labor ("DOL"), retirement committee members are
        not liable for individual investment decisions of the investment manager but are
        responsible for monitoring the investment manager.[5]   Specifically, the DOL prescribes the
        duty to monitor as a necessary function of a retirement plan committee.[6]   According to the
        DOL, the duty to monitor requires fiduciaries (i.e., retirement plan committee members) to
        "adopt a regular monitoring procedure under the applicable facts and circumstances that is

---

[3]        Memorandum Opinion, United States District Court for the Western District of Pennsylvania, Thomas E.
           Perez v. WPN Corporation; Severstal Wheeling, Inc. Retirement Committee; Michael DiClemente;
           Dennis Halpin; Wheeling Corrugated Company Retirement Security Plan; and Salaried Employees
           Pension Plan of Severstal Wheeling. Civ No. 14-1494, June 7, 2017 ("Memorandum Opinion" hereafter),
           p. 6.
[4]        Memorandum Opinion, p. 29.
[5]        *U.S. Department of Labor Employee Benefits Security Administration*, "Meeting Your Fiduciary
           Responsibilities," February, 2012, p. 3, available at https://www.dol.gov/sites/default/files/ebsa/about-
           ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.
[6]        Memorandum Opinion, pp. 1-2; *U.S. Department of Labor Employee Benefits Security Administration*,
           "Meeting Your Fiduciary Responsibilities," February, 2012, pp. 3, 6, 13, available at
           https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-
           center/publications/meeting-your-fiduciary-responsibilities.pdf.

4

CONFIDENTIAL

capable of alerting the fiduciary of irregularities," "adhere to the monitoring procedure," and "take corrective action when required."[7]  Moreover, as confirmed by my review of case materials, the authority of a committee to appoint and dismiss a service provider comes with the obligation "'to monitor appropriately' those subject to removal."[8]

14.   In the sections that follow, I will describe in detail my assessment that the Individual Severstal Retirement Committee Defendants acted in accordance with industry custom and practice with regard to monitoring the management of the SWI plan assets.  Before doing so, however, it is useful to describe the relevant entities and individuals in this matter as well as the key events that occurred, based on deposition testimony and other materials I have reviewed.  This factual background is helpful for understanding and assessing whether the Individual Severstal Retirement Committee Defendants exercised generally accepted best practices in their monitoring of Mr. LaBow and WPN.

### A.  Relevant Entities and Individuals

15.   Severstal, a Russian steel and mining company, acquired the U.S. steel manufacturer Wheeling-Pittsburgh Steel Corporation ("Wheeling-Pitt") in August 2008, creating Severstal Wheeling, Inc.[9]  Wheeling-Pitt had previously been part of the holding company WHX Corporation ("WHX"), and its retirement plan assets were in a combined trust with WHX's assets (the "Combined Trust").[10]

---

7       Memorandum Opinion, p. 28.
8       Memorandum Opinion, p. 25, quoting *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996) (quoting *Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*, 805 F.2d 732, 736 (7th Cir. 1986) and *Leigh v. Engle*, 727 F.2d 113, 135 (7th Cir. 1984)).
9       "Severstal Completes Esmark Acquisition," *Pittsburgh Business Times*, August 5, 2008, available at https://www.bizjournals.com/pittsburgh/stories/2008/08/04/daily14.html; "Severstal Completes Acquisition of Esmark, Wheeling-Pitt" *The Business Journal, Youngstown, Ohio*, July, 29, 2008, available at http://archive.businessjournaldaily.com/severstal-completes-acquisition-esmark-wheeling-pitt-2008-7-29; Harris, Linda, "Severstal Acquisition Includes Wheeling-Pittsburgh Steel," *State Journal Corporation*, August 8, 2008, available at http://www.redorbit.com/news/business/1539342/severstal_acquisition _includes_wheelingpittsburgh_steel/.
10      *Reuters*, "Company News; WHX Announces A Friendly Deal for Handy & Harman," *The New York Times*, March 3, 1998, available at http://www.nytimes.com/1998/03/03/business/company-news-whx-announces-a-friendly-deal-for-handy-harman.html; Deposition of Michael DiClemente, September 26, 2017 ("DiClemente Deposition" hereafter), 15:14-22; Opinion and Order, United States District Court Southern District of New York, Severstal Wheeling, Inc. Retirement Committee et al., v. WPN Corporation et al., Case No. 10CV954-LTS-GWG, August 10, 2015 ("SDNY Opinion" hereafter), p. 5.

CONFIDENTIAL

16. In 2008, Mr. DiClemente and Mr. Halpin were employees of Wheeling-Pitt, and then of SWI following the 2008 acquisition. Both committee members had a financial background: Mr. DiClemente was the corporate treasurer of SWI, and Mr. Halpin was the Director of Investor Relations.[11] Both Mr. DiClemente and Mr. Halpin were members of the Wheeling-Pitt Retirement Committee and then of the SRC until their departures from SWI in February and April 2009, respectively.[12,13]

17. When Severstal acquired Wheeling-Pitt, the Wheeling-Pitt assets in the Combined Trust became the retirement plan assets of SWI. In October 2008, the SWI plan assets comprised approximately 10 percent of the Combined Trust's total assets.[14] Prior to the 2008 acquisition, WHX had hired Mr. LaBow and his firm, WPN,[15] to manage the Combined Trust's assets. Mr. LaBow continued in this role after the formation of SWI.[16]

18. Citibank was the trustee of the Combined Trust from 2003 until 2008, when it decided to exit the trust business. Citibank's exit required the Combined Trust to be separated into its individual SWI and WHX components, and the SWI plan assets to be transferred to a new trust under a new trustee.[17] In the next section, I describe some key events before, during, and after the relevant time period.

### B. Chronology of Key Events

19. The key events identified in the timeline below are relevant to understanding the context in which the Individual Severstal Retirement Committee Defendants were monitoring and responding to Mr. LaBow's investment management decisions. I also describe some of these events in more detail in Section IV of my report.

---

[11]   DiClemente Deposition, 7:8-10; Transcript of Wheeling-Pittsburgh Conference Call, August 10, 2007, available at https://www.sec.gov/Archives/edgar/data/1392600/000119312507182923/dex991.htm; Dennis Halpin Professional Profile, LinkedIn, available at https://www.linkedin.com/in/dennishalpincpa/.

[12]   In this report, I generally use the terms "Individual Severstal Retirement Committee Defendants" and "SRC" (or "Severstal Wheeling, Inc. Retirement Committee," or "SWI Retirement Committee," or "Committee") interchangeably. However, when discussing retirement committee structure and protocol (such as in Section IV.B.i), I specifically use the term "SRC" to emphasize that the SRC's structure and protocol were foundational, rather than limited to only the relevant time period.

[13]   See, DiClemente Deposition, 10:10-18, 15:14-22; Deposition of Dennis Halpin, September 27, 2017 ("Halpin Deposition" hereafter), 7:8-12; Memorandum Opinion, p. 3.

[14]   SDNY Opinion p. 4.

[15]   In this report, references to "Mr. LaBow" refer to both Mr. LaBow and his firm, WPN.

[16]   SDNY Opinion, pp. 5, 10.

[17]   SDNY Opinion, p. 9; DiClemente Deposition, 6:17-23.

CONFIDENTIAL

- **Late 2007:** Citibank gave notice to WHX that Citibank intended to exit the pension trust business, requiring that WHX find a new trustee.  WHX began to look for a new trustee and recognized the SWI and WHX plans' assets were in a combined trust.[18]

- **June 2008:** WHX and Mr. LaBow told Mr. DiClemente that the SWI and WHX trusts needed to be separated as a result of Citibank's withdrawal as the trustee.[19]

- **September 30, 2008:**  The SWI plan assets were scheduled to be transferred from the Combined Trust to the new SWI trust.[20]

- **October 22, 2008:**  Mr. LaBow emailed Mr. DiClemente, noting that the asset transfer did not occur due to "market volatility" and that Mr. LaBow intended to complete the transfer on November 3, 2008.[21]

- **October 31, 2008:**  Mr. LaBow instructed David Riposo (Treasurer of WHX) to authorize a transfer of the entire contents of the undiversified Neuberger Berman Account from the Combined Trust to the SWI trust.[22]

- **November 3, 2008:**  The Neuberger Berman Account was transferred to SWI.[23] The Neuberger Berman Account included thirteen large-capitalization equity securities, eleven of which were energy-sector stocks.  The thirteen equity securities accounted for approximately 97 percent of the Neuberger Berman Account's market value as of October 31, 2008.[24]

- **December 5, 2008:** Mr. LaBow and the SRC signed an investment management agreement, fixing the effective date of the agreement as November 1, 2008.  This agreement memorialized the preexisting and continuing relationship between the parties.[25]

---

[18]  United States District Court Southern District of New York, Severstal Wheeling, Inc. Retirement Committee et al., v. WPN Corporation et al., Case No. 10CV954-LTS-GWG, July 8-22, 2014, Trial Transcript ("SDNY Trial Transcript" hereafter), Riposo, 67:10-20.
[19]  SDNY Opinion, p. 9; DiClemente Deposition, 6:17-23.
[20]  DiClemente Exhibit 6.
[21]  DiClemente Exhibit 8.
[22]  SDNY Opinion, p. 16.
[23]  SDNY Opinion, p. 17.
[24]  SDNY Opinion, p. 15; DiClemente Exhibit 53.  I note DiClemente Exhibit 53 indicates that, as of March 2009, the Neuberger Berman Account included 12 large-capitalization equity securities, ten of which were energy-sector stocks.
[25]  DiClemente Exhibit 17, 18, and 19; SDNY Opinion, p. 11.

CONFIDENTIAL

- **December 29, 2008:** Mr. DiClemente discovered the SWI plan assets were in the undiversified Neuberger Berman Account and informed Mr. Halpin.[26]
- **February 5, 2009:** Mr. DiClemente left SWI but continued to assist the SRC in a consulting role.[27]
- **March 24, 2009:** Mr. LaBow instructed Neuberger Berman to sell the SWI plan assets in the Neuberger Berman Account, which were subsequently converted to cash and cash equivalents.[28]
- **April 30, 2009:** Mr. Halpin left SWI, and a new retirement plan committee was formed.[29]
- **May 19, 2009:** The new SRC terminated Mr. LaBow.[30]

20.   To provide more context, the below timeline identifies key financial market events during 2008 and 2009. In addition, Exhibit 1 provides a more detailed description of important market events that occurred in the U.S. during what is now known as the Great Recession. These events show that the relevant time period coincided with a period of extreme volatility and unprecedented market conditions.

- **September 7, 2008:** Fannie Mae and Freddie Mac were placed into government conservatorship.[31]
- **September 15, 2008:** Lehman Brothers filed for Chapter 11 bankruptcy protection.[32]
- **September 16, 2008:** The Federal Reserve rescued AIG with an $85 billion loan.[33]

---

[26]   SDNY Opinion, p. 22.
[27]   DiClemente Deposition, 166:18-23, 167:13-21.
[28]   SDNY Opinion, p. 32; DiClemente Exhibit 58; DiClemente Deposition, 189:15-20.
[29]   Halpin Deposition, 209:5-15; SDNY Opinion, p. 34.
[30]   SDNY Opinion, p. 50.
[31]   *Federal Reserve Bank of St. Louis*, "The Financial Crisis: Full Timeline," available at https://www.stlouisfed.org/financial-crisis/full-timeline.
[32]   *Federal Reserve Bank of St. Louis*, "The Financial Crisis: Full Timeline," available at https://www.stlouisfed.org/financial-crisis/full-timeline.
[33]   *Federal Reserve Bank of St. Louis*, "The Financial Crisis: Full Timeline," available at https://www.stlouisfed.org/financial-crisis/full-timeline.

CONFIDENTIAL

- **December 19, 2008:** The U.S. Treasury loaned up to $13.4 billion to General Motors and $4.0 billion to Chrysler.[34]
- **January 16, 2009:** The U.S. Treasury, the Federal Reserve, and the Federal Deposit Insurance Corporation announced a package of guarantees and other relief for Bank of America and Citibank.[35]

21. As I describe in my report, the Individual Severstal Retirement Committee Defendants performed a number of actions from November 3, 2008, to May 1, 2009, that enabled them to monitor the management of the SWI plan assets by Mr. LaBow. To assess these actions with respect to the duty to monitor, I compare them against a framework for reasonable and customary conduct that is based on my professional experience and my review of the literature on prudent monitoring practices.

## III.   INVESTMENT MONITORING BEST PRACTICES BY RETIREMENT COMMITTEE MEMBERS

22. To appropriately assess whether the Individual Severstal Retirement Committee Defendants fulfilled their fiduciary responsibility to monitor, it is important to first establish an analytical framework, consistent with prevailing industry practice, with which to evaluate their actions. Accordingly, in the following sections I will describe how retirement plan committee members generally fulfill their monitoring responsibilities with respect to establishing the committee's structure and protocol, monitoring the investment manager, and making termination decisions. Along with consideration of important contextual factors, these common practices will provide a framework for assessing the Individual Severstal Retirement Committee Defendants' monitoring activities. My description of industry custom and practice is based on my training and experience as well as my decades of membership on various boards and retirement and investment committees. My description of these practices is corroborated by publicly available sources on due diligence practice.

---

[34]  *Federal Reserve Bank of St. Louis*, "The Financial Crisis: Full Timeline," available at https://www.stlouisfed.org/financial-crisis/full-timeline.

[35]  *Federal Reserve Bank of St. Louis*, "The Financial Crisis: Full Timeline," available at https://www.stlouisfed.org/financial-crisis/full-timeline.

CONFIDENTIAL

23.  In contrast to my approach, the Mangiero Report fails to establish a reliable analytical framework for assessing the monitoring activities of the Individual Severstal Retirement Committee Defendants.  Instead, the Mangiero Report creates ad hoc monitoring standards that are not rooted in industry practice.  For example, as I will further discuss in Section IV, the Mangiero Report makes numerous statements regarding purported standards for which Dr. Mangiero fails to provide support, apart from reliance on her own opinions and the benefit of hindsight.

### A. Structure and Protocol of Retirement Plan Committees

24.  Based on my professional experience and review of publicly available documents on monitoring, retirement plan committees typically share several common attributes related to structure and protocol that help ensure prudent monitoring of investment managers. These attributes generally help mitigate risk by establishing practices for retirement plan committees to maintain reasonable awareness of how investment managers are performing, to ascertain if there are issues with the investment managers, and to handle issues that may arise.  In this section, I describe how committee members generally fulfill their monitoring responsibilities with respect to establishing the committee's overall structure and protocol.

25.  First, it is industry best practice to create an appropriate committee structure, with qualified individuals and consistent practices for holding meetings and documenting decisions.  To better ensure that retirement committee members bring relevant expertise to retirement plan decisions, committees often include members with relevant experience in benefits, accounting, legal, or finance, or as a senior member of human resources, finance, or operations.[36]  Additionally, a committee's size should take a retirement plan's needs into account, and therefore a "committee might be as small as two or three individuals in a

---

[36]     *RBC Wealth Management*, "Establishing an Investment Committee for Your Company's Retirement Plan," March, 2016, p. 1, available at https://www.rbcwm-usa.com/resources/file-687792.pdf; *Vanguard*, "Best Practices for Plan Fiduciaries," 2013, p. 14, available at https://institutional.vanguard.com/iam/pdf/BestPracticesPlanFiduciaries.pdf; *Multnomah Group, Inc.*, "Retirement Plan Committee Best Practices, Simplified," available at http://www.multnomahgroup.com/retirement-plan-committee-best-practices-simplified.

CONFIDENTIAL

small firm, or as large as ten in a big company."[37]  In addition to the regular members of the retirement plan committee, it is common for there to be outside advisers such as pension consultants and legal counsel to provide additional professional advice and expertise.[38]

26.   Furthermore, as part of establishing the overall structure of the committee, in my experience, committees typically adopt a protocol for meeting and documenting the discussions and decisions made.  The frequency of meetings can depend on the complexity of a retirement plan's administrative and investment needs.[39]  In addition, it is generally best practice for committees to document the discussions at these meetings in written minutes, in order to explain the reasoning behind the committee's decisions and actions.[40]

27.   Of particular relevance to this matter, it is also industry best practice for retirement plan committees to engage qualified investment managers, with appropriate backgrounds, to provide investment guidance.  When engaging a qualified investment manager, committees typically consider the manager's background, including the manager's investment management experience, historical success, investment process, and consistency over time.[41]  For example, the DOL suggests that a fiduciary should consider

---

[37]   *Vanguard*, "Best Practices for Plan Fiduciaries," 2013, p. 13, available at https://institutional.vanguard.com/iam/pdf/BestPracticesPlanFiduciaries.pdf.

[38]   *Arnerich Massena*, "Retirement Plan Best Practices: Plan Governance," November 2016, pp. 3, 6, available at http://arnerichmassena.com/pdf/white-papers/Plan%20Governance_final.pdf; *U.S. Department of Labor Employee Benefits Security Administration*, "Getting It Right: Know Your Fiduciary Responsibilities, Tips for Selecting and Monitoring Service Providers for your Employee Benefit Plan," June 2, 2005, p. 1, available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/fs052505.pdf.

[39]   *Multnomah Group, Inc.*, "Retirement Plan Committee Best Practices, Simplified," available at http://www.multnomahgroup.com/retirement-plan-committee-best-practices-simplified.

[40]   *RBC Wealth Management*, "Establishing an Investment Committee for Your Company's Retirement Plan," March, 2016, pp. 1-2, available at https://www.rbcwm-usa.com/resources/file-687792.pdf; *Strategic Retirement Group, Inc.*, "Establishing an Investment Committee for a Defined Contribution Retirement Plan," p. 1, available at http://srg-consulting.com/sites/srg/files/attachments/Investment%20Commitee%20-%20Defined%20Contribution.pdf; *Multnomah Group, Inc.*, "Retirement Plan Committee Best Practices, Simplified," available at http://www.multnomahgroup.com/retirement-plan-committee-best-practices-simplified.

[41]   Gordon, Catherine A., Karin Peterson LaBarge, "Investment Committees: Vanguard's View of Best Practice," *Vanguard*, October 2010, p. 7, available at https://www.vanguard.co.uk/documents/adv/literature/investment-committees-best-practice.pdf; BlackRock, "Evaluating ERISA 3(38) Investment Managers: A Guide for Plan Sponsors," 2017, p. 3, available at https://www.blackrock.com/us/financial-professionals/literature/whitepaper/evaluating-erisa-investment-managers-whitepaper.pdf.

CONFIDENTIAL

a firm's "experience or performance record" when selecting a service provider.[42]  These considerations help provide assurance regarding the manager's capabilities and ability to manage the assets in a manner consistent with the committee's goals.  Such considerations are consistent with my professional experience, publicly available literature, and even Dr. Mangiero's published writing.  In her publications, Dr. Mangiero has written that as part of service provider due diligence, "[k]nowing a lot about who provides investment-related services is a sine qua non."[43]

28.  In addition to understanding the investment manager's qualifications, in my experience and as is corroborated in publicly available literature, it is standard practice for committees to have an understanding of the manager's scope of work and for the manager to acknowledge their roles and duties.[44]  In particular, prudent committees generally have a clear understanding of why the service provider is being hired, what investment decision authority the provider has, and who on the committee is coordinating the fiduciary responsibilities with the provider.[45]  This understanding helps ensure that the investment manager provides the services necessary for the plan and helps better position the committee to avoid deficiencies in management of the investments.

29.  Another important aspect of committee structure and protocol relates to a committee's overall investment objectives.  Committees often identify investment performance goals by, for example, creating "well-defined metrics" for measuring the success of the investment management.[46]  Having investment goals in place helps committees determine

---

[42]    *U.S. Department of Labor Employee Benefits Security Administration*, "Meeting Your Fiduciary Responsibilities," February, 2012, p. 5, available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

[43]    Mangiero, Susan, "An Economist's Perspective of Fiduciary Monitoring of Investments," *Bloomberg BNA, Pension & Benefits Daily*, 2015, p. 2, available at https://papers.ssrn.com/sol3/Papers.cfm?abstract_id=2611870.

[44]    Mangiero, Susan, "An Economist's Perspective of Fiduciary Monitoring of Investments," *Bloomberg BNA, Pension & Benefits Daily*, 2015, p. 2, available at https://papers.ssrn.com/sol3/Papers.cfm?abstract_id=2611870; *Arnerich Massena*, "Retirement Plan Best Practices: Plan Governance," p. 6, available at http://arnerichmassena.com/pdf/white-papers/Plan%20Governance_final.pdf.

[45]    Mangiero, Susan, Rhonda Prussack, and Emily Seymour Costin, "ERISA Plan Investment Committee Governance: Avoiding Breach of Fiduciary Duty Claims," *Strafford*, September 12, 2017, slide 51, available at http://www.investmentbestpractices.com/wp-content/uploads/sites/400/2014/11/ERISA-Plan-Investment-Committee-Governance_Straffo.pdf.

[46]    *Vanguard*, "Best Practices for Plan Fiduciaries," 2013, p. 18, available at https://institutional.vanguard.com/iam/pdf/BestPracticesPlanFiduciaries.pdf.

CONFIDENTIAL

if plan assets are invested prudently and helps facilitate assessment of the investment manager's performance over time.[47]  Such goals can be outlined in a committee's investment policy statement, which defines the plan's objectives and the general methods for better ensuring that those objectives are met.[48]  In practice, a range of methods for identifying investment goals are acceptable.  For example, a benchmarking study by Deloitte Consulting LLP found that only 83 percent of retirement plans had investment policy statements.[49]

30.  In addition, committees often engage outside service providers to assist in monitoring and evaluating investment managers.  These service providers may include ERISA legal counsel and financial consulting firms that can provide additional or specialized expertise to help committees monitor their investment managers.  For example, by partnering with firms that conduct thorough investment reviews at regular intervals, committees can receive consistent information about the investments and therefore about the investment manager's performance.[50]  Furthermore, information from outside service providers can help guide a committee's investment policies.

---

[47]  *Vanguard*, "Best Practices for Plan Fiduciaries," 2013, pp. 18-19, 22, available at https://institutional.vanguard.com/iam/pdf/BestPracticesPlanFiduciaries.pdf; U.S. Department of Labor Employee Benefits Security Administration, "Meeting Your Fiduciary Responsibilities," February, 2012, pp. 2-3, available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

[48]  *Arnerich Massena*, "Retirement Plan Best Practices: Plan Governance," November 2016, p. 9, available at http://arnerichmassena.com/pdf/white-papers/Plan%20Governance_final.pdf; Vanguard, "Best Practices for Plan Fiduciaries," 2013, p. 18, available at https://institutional.vanguard.com/iam/pdf/BestPracticesPlanFiduciaries.pdf; Mangiero, Susan, Rhonda Prussack, and Emily Seymour Costin, "ERISA Plan Investment Committee Governance: Avoiding Breach of Fiduciary Duty Claims," *Strafford*, September 12, 2017, slide 48, available at http://www.investmentbestpractices.com/wp-content/uploads/sites/400/2014/11/ERISA-Plan-Investment-Committee-Governance_Straffo.pdf; *RBC Wealth Management*, "Establishing an Investment Committee for Your Company's Retirement Plan," March, 2016, p. 2, available at https://www.rbcwm-usa.com/resources/file-687792.pdf.

[49]  *Deloitte*, Annual Defined Contribution Benchmarking Survey, 2015 Edition, p. 42, available at https://www2.deloitte.com/content/dam/Deloitte/us/Documents/human-capital/us-hc-annual-defined-benchmarking-survey-2015.pdf.

[50]  *Arnerich Massena*, "Retirement Plan Best Practices: Plan Governance," November 2016, p. 6, available at http://arnerichmassena.com/pdf/white-papers/Plan%20Governance_final.pdf.

CONFIDENTIAL

### B. Reviewing and Monitoring an Investment Manager

31. It is standard procedure for committees to engage in periodic reviews of the investment managers they have retained.[51]  In reviewing an investment manager, a committee should gather both quantitative and qualitative information about the manager's performance.[52]  Quantitative indicators, such as investment performance, can help determine if an investment manager is managing the investments appropriately given the plan's goals.  Qualitative information from meetings and phone calls with the investment manager can be used to assess whether an investment manager has a credible investment strategy, the implications of that strategy, and the manager's adherence to that strategy.

32. Publicly available literature provides varying guidance on the frequency of monitoring and review, with suggestions of annual, semiannual, quarterly, and, in some cases, more frequent reviews of investment performance.[53]  From my own experience, quarterly or semiannual performance monitoring is typical, with the frequency of review depending on the retirement plan's needs.  Even Dr. Mangiero acknowledges in her published writing

---

[51]   *Arnerich Massena*, "Retirement Plan Best Practices: Plan Governance," November 2016, p. 6, available at http://arnerichmassena.com/pdf/white-papers/Plan%20Governance_final.pdf; Vanguard "Best Practices for Plan Fiduciaries," 2013, p. 22, available at https://institutional.vanguard.com/iam/pdf/BestPracticesPlanFiduciaries.pdf; *U.S. Department of Labor Employee Benefits Security Administration*, "Meeting Your Fiduciary Responsibilities," February, 2012, p. 6, available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.; Mangiero, Susan, Rhonda Prussack, and Emily Seymour Costin, "ERISA Plan Investment Committee Governance: Avoiding Breach of Fiduciary Duty Claims," *Strafford*, September 12, 2017, slide 51, available at http://www.investmentbestpractices.com/wp-content/uploads/sites/400/2014/11/ERISA-Plan-Investment-Committee-Governance_Straffo.pdf.

[52]   *Strategic Investment Group*, "The Art and Science of Manager Termination," *Fiduciary Insights*, 2014, p. 2, available at https://www.strategicgroup.com/sites/default/files/wp-content/uploads/2014/08/OT-FI-GO-01-The-Art-and-Science-of-Manager-Termination.pdf; *Vanguard*, "Best Practices for Plan Fiduciaries," 2013, p. 22, available at https://institutional.vanguard.com/iam/pdf/BestPracticesPlanFiduciaries.pdf.

[53]   Mangiero, Susan, Rhonda Prussack, and Emily Seymour Costin, "ERISA Plan Investment Committee Governance: Avoiding Breach of Fiduciary Duty Claims," *Strafford*, September 12, 2017, slide 35, available at http://www.investmentbestpractices.com/wp-content/uploads/sites/400/2014/11/ERISA-Plan-Investment-Committee-Governance_Straffo.pdf; *The Wagner Law Group*, "Retirement Plan Governance: Understanding the Role of a Benefit Plan Committee," *Legg Mason Global Asset Management*, January 2017, p. 5, available at http://www.wagnerlawgroup.com/documents/plan-governance-wagner-white-paper.pdf; *RSM*, "Tibble confirms onus on employers for retirement plan fund monitoring," July 23, 2015, available at http://rsmus.com/what-we-do/services/wealth-management/tibble-confirms-onus-on-employers-for-retirement-plan-fund-monit.html; *Wells Fargo*, "Your Role as a Fiduciary," 2013, p. 6, available at https://www08.wellsfargomedia.com/assets/pdf/commercial/retirement-employee-benefits/perspectives/role-as-a-fiduciary.pdf; *Vanguard*, "Best Practices for Plan Fiduciaries," 2013, p. 23, available at https://institutional.vanguard.com/iam/pdf/BestPracticesPlanFiduciaries.pdf.

CONFIDENTIAL

that "what constitutes appropriate monitoring is influenced by factors specific to the plan and investments."[54]  In fact, Dr. Mangiero further explains in published writing that "plan fiduciaries may reasonably conclude that the costs of incremental monitoring outweigh the expected benefits of the heightened reviews."[55]  Given these considerations, committees should generally be aware of and adhere to a reasonable standard of review for the investment manager, while also maintaining flexibility to adjust their reviews in response to contextual factors.

33.   In addition, committees often rely on the expertise of their outside service providers to aid in the monitoring and review of investment managers.  As described above, service providers such as ERISA counsel can provide additional expertise, which may help to guide a committee's reviews.  Similarly, consulting firms can provide reports on the investment manager's performance; reviewing and understanding these reports can help a committee more thoroughly evaluate the investment manager.[56]  The information provided from the consulting firm's review can help highlight certain issues in the investment performance and management.

### C.  Terminating an Investment Manager

34.   Retirement plan committees are responsible for overseeing the potential termination of investment managers when necessary.  Based on my professional experience, it is best practice for committees to exercise careful deliberation in assessing whether an investment manager should be terminated.  This practice is corroborated by publicly available documents on monitoring, which state, for example, that committees should "use a reasoned approach that takes several factors into account when making hire/fire

---

54   Mangiero, Susan, and Lee Heavner, "Economic Analysis in Fiduciary Monitoring Disputes Following the Supreme Court's 'Tibble' Ruling," *Bloomberg BNA, Pension & Benefits Daily*, 2015, p. 3, available at http://www.analysisgroup.com/uploadedfiles/content/insights/publishing/economic_analysis_in_fiduciary _monitoring_disputes.pdf.

55   Mangiero, Susan, and Lee Heavner, "Economic Analysis in Fiduciary Monitoring Disputes Following the Supreme Court's 'Tibble' Ruling," *Bloomberg BNA, Pension & Benefits Daily*, 2015, p. 2, available at http://www.analysisgroup.com/uploadedfiles/content/insights/publishing/economic_analysis_in_fiduciary _monitoring_disputes.pdf.

56   *U.S. Department of Labor Employee Benefits Security Administration*, "Meeting Your Fiduciary Responsibilities," February, 2012, p. 6, available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

CONFIDENTIAL

decisions."[57]  If a committee concludes that an investment manager is not providing appropriate service, then the committee should assess if the issue can be resolved or if the manager should be terminated.[58]

35.  In my experience and based on publicly available sources, if concerns arise, committees typically take a number of steps when considering whether to terminate an investment manager.[59]  First, committees assess if the manager's investment practices can still be successful going forward.[60]  Second, as described above, prudent committees use a combination of quantitative and qualitative information to understand the manager's performance and practices and to assess whether the manager is likely to continue to fail to meet expectations.[61]  Third, committees more closely monitor the investment manager to determine if the manager is addressing their concerns.[62]  Lastly, committees often will put a manager about whom they have concerns on a "watch list" and then regularly discuss the manager's on-going performance at each subsequent committee meeting.[63]

---

[57]   *Vanguard*, "What matters most? An analysis of investment committee hire/fire decisions," September 2010, p. 2, available at http://agb.org/sites/default/files/legacy/u16/Vanguard%204.pdf; *Strategic Investment Group*, "The Art and Science of Manager Termination," *Fiduciary Insights*, 2014, p. 2, available at https://www.strategicgroup.com/sites/default/files/wp-content/uploads/2014/08/OT-FI-GO-01-The-Art-and-Science-of-Manager-Termination.pdf.

[58]   Gordon, Catherine A., Karin Peterson LaBarge, "Investment Committees: Vanguard's View of Best Practice," *Vanguard*, October 2010, p. 8, available at https://www.vanguard.co.uk/documents/adv/literature/investment-committees-best-practice.pdf; *Strategic Investment Group*, "The Art and Science of Manager Termination," *Fiduciary Insights*, 2014, p. 1, available at https://www.strategicgroup.com/sites/default/files/wp-content/uploads/2014/08/OT-FI-GO-01-The-Art-and-Science-of-Manager-Termination.pdf.

[59]   *Strategic Investment Group*, "The Art and Science of Manager Termination," *Fiduciary Insights*, 2014, pp. 2-3, available at https://www.strategicgroup.com/sites/default/files/wp-content/uploads/2014/08/OT-FI-GO-01-The-Art-and-Science-of-Manager-Termination.pdf.

[60]   *Strategic Investment Group*, "The Art and Science of Manager Termination," *Fiduciary Insights*, 2014, p. 2, available at https://www.strategicgroup.com/sites/default/files/wp-content/uploads/2014/08/OT-FI-GO-01-The-Art-and-Science-of-Manager-Termination.pdf.

[61]   *Strategic Investment Group*, "The Art and Science of Manager Termination," *Fiduciary Insights*, 2014, p. 2, available at https://www.strategicgroup.com/sites/default/files/wp-content/uploads/2014/08/OT-FI-GO-01-The-Art-and-Science-of-Manager-Termination.pdf.

[62]   *Strategic Investment Group*, "The Art and Science of Manager Termination," *Fiduciary Insights*, 2014, p. 4, available at https://www.strategicgroup.com/sites/default/files/wp-content/uploads/2014/08/OT-FI-GO-01-The-Art-and-Science-of-Manager-Termination.pdf.

[63]   *Strategic Investment Group*, "The Art and Science of Manager Termination," *Fiduciary Insights*, 2014, p. 1, available at https://www.strategicgroup.com/sites/default/files/wp-content/uploads/2014/08/OT-FI-GO-01-The-Art-and-Science-of-Manager-Termination.pdf; *BlackRock*, "Evaluating ERISA 3(38) Investment Managers: A Guide for Plan Sponsors," 2017, p. 15, available at https://www.blackrock.com/us/financial-professionals/literature/whitepaper/evaluating-erisa-investment-managers-whitepaper.pdf.

CONFIDENTIAL

36. Literature on this topic suggests that committees are often too fast to fire investment managers. Committees can react reflexively to investment underperformance and quickly terminate investment managers without fully understanding the situation.[64] Acting hastily can lead to premature termination of an investment manager and even a period in which the committee lacks an investment manager, since evaluating and hiring a new investment manager can be a time-consuming process.[65] Accordingly, it is best practice for committees to exercise careful judgement and to be deliberate in making termination decisions.[66] This process may include collecting necessary information, gaining a clear understanding of the situation, and assessing whether the issue can be remedied by the investment manager.

## IV.  THE MONITORING PERFORMED BY THE INDIVIDUAL SEVERSTAL RETIREMENT COMMITTEE DEFENDANTS IS CONSISTENT WITH INDUSTRY CUSTOM AND PRACTICE

37. In this section, I describe, based on case materials that I have reviewed, the monitoring that the Individual Severstal Retirement Committee Defendants conducted in connection with the investment management services provided by Mr. LaBow and WPN. I first explain the importance of appropriately considering contextual factors when establishing an analytical framework for assessing monitoring. I then describe the Individual Severstal Retirement Committee Defendants' monitoring-related activities and apply my framework to explain why these activities are consistent with my professional experience and with industry custom and practice.

---

[64]   *Vanguard*, "What matters most? An analysis of investment committee hire/fire decisions," September 2010, p. 8, available at http://agb.org/sites/default/files/legacy/u16/Vanguard%204.pdf; *Strategic Investment Group*, "The Art and Science of Manager Termination," *Fiduciary Insights*, 2014, p. 1, available at https://www.strategicgroup.com/sites/default/files/wp-content/uploads/2014/08/OT-FI-GO-01-The-Art-and-Science-of-Manager-Termination.pdf.

[65]   *Vanguard*, "What matters most? An analysis of investment committee hire/fire decisions," September 2010, p. 4, available at http://agb.org/sites/default/files/legacy/u16/Vanguard%204.pdf/.

[66]   *Vanguard*, "What matters most? An analysis of investment committee hire/fire decisions," September 2010, p. 2, available at http://agb.org/sites/default/files/legacy/u16/Vanguard%204.pdf/.

CONFIDENTIAL

### A. Contextual Factors

38.   In my professional experience, and consistent with publicly available literature, well-functioning retirement plan committees generally follow best practices for monitoring-related activities, while also accounting for individual retirement plans' needs and contexts.[67]  This view is supported by Dr. Mangiero's own published writing, including the following excerpts:

- "[A]n economic assessment as to whether plan fiduciaries have engaged in appropriate monitoring must be performed through a case-specific lens."[68]

- "[There are] limitations of trying to use a 'one size fits all' approach to ascertain whether an investment fiduciary performed appropriate monitoring."[69]

- "[W]hat constitutes appropriate monitoring is influenced by factors specific to the plan and investments (or services) at issue."[70]

39.   In my assessment of the monitoring-related activities conducted by the SRC, relevant contextual factors include both the case-specific details that I describe in Section IV.B as well as the general market context during the relevant time period.  I understand Mr. LaBow has testified that, during the time that the SRC and Mr. LaBow were making investment decisions, "the stock market...was collapsing" and "the market was in

---

[67]   *Wells Fargo*, "Your Role as a Fiduciary," 2013, p. 6, available at https://www08.wellsfargomedia.com/assets/pdf/commercial/retirement-employee-benefits/perspectives/role-as-a-fiduciary.pdf; *BlackRock*, "Evaluating ERISA 3(38) Investment Managers: A Guide for Plan Sponsors," 2017, p. 14, available at https://www.blackrock.com/us/financial-professionals/literature/whitepaper/evaluating-erisa-investment-managers-whitepaper.pdf; "Questions and answers relating to fiduciary responsibility under the Employee Retirement Income Security Act of 1974," *Code of Federal Regulations*, Title 29, Subtitle B Chapter XXV Subchapter A, Part 2509, available at https://www.ecfr.gov/cgi-bin/text-idx?SID=3dfb5ec36687b2783ba01470987e7a54&node=pt29.9.2509&rgn=div5#se29.9.2509_175_68.

[68]   Mangiero, Susan, and Lee Heavner, "Economic Analysis in Fiduciary Monitoring Disputes Following the Supreme Court's 'Tibble' Ruling," *Bloomberg BNA, Pension & Benefits Daily*, 2015, p. 1, available at http://www.analysisgroup.com/uploadedfiles/content/insights/publishing/economic_analysis_in_fiduciary_monitoring_disputes.pdf.

[69]   Mangiero, Susan, and Lee Heavner, "Economic Analysis in Fiduciary Monitoring Disputes Following the Supreme Court's 'Tibble' Ruling," *Bloomberg BNA, Pension & Benefits Daily*, 2015, p. 1, available at http://www.analysisgroup.com/uploadedfiles/content/insights/publishing/economic_analysis_in_fiduciary_monitoring_disputes.pdf.

[70]   Mangiero, Susan, and Lee Heavner, "Economic Analysis in Fiduciary Monitoring Disputes Following the Supreme Court's 'Tibble' Ruling," *Bloomberg BNA, Pension & Benefits Daily*, 2015, p. 3, available at http://www.analysisgroup.com/uploadedfiles/content/insights/publishing/economic_analysis_in_fiduciary_monitoring_disputes.pdf.

CONFIDENTIAL

disarray."[71]  During the relevant time period, market conditions were among the most volatile and uncertain since the Great Depression.[72]  The failure of large financial institutions in 2007 and 2008, especially the Lehman Brothers bankruptcy in September 2008, resulted in a global financial crisis in which world stock markets experienced severe declines.[73]  In 2008, for instance, the S&P 500 Index lost approximately 37 percent of its value.[74]  These extraordinary circumstances led to the Great Recession, which persisted from December 2007 through June 2009 in the U.S.[75]  As discussed above, Exhibit 1 provides a detailed description of important U.S. financial market events that occurred during the Great Recession.  In particular, Exhibit 1 shows that the relevant time period in this matter coincided with the S&P 500 Index and the consumer sentiment index both reaching their lowest values of the entire recession.

40.   It is important to consider the unpredictable and unprecedented market environment when assessing whether the Individual Severstal Retirement Committee Defendants acted in accordance with best practices during the relevant time period.  For example, the additional uncertainty created by the Great Recession only heightened the Individual Severstal Retirement Committee Defendants' need to act with careful deliberation.  Given these considerations, in the sections below I apply an analytical framework informed by my professional experience, by industry custom, and by case-specific and contextual factors, to assess the Individual Severstal Retirement Committee Defendants' monitoring-related activities.

---

[71]   Deposition of Ronald LaBow, September 21-22, 2017 ("LaBow Deposition" hereafter), 90:18-21, 139:13, 179:19-20.

[72]   Brunnermeier, Markus K., "Deciphering the Liquidity and Credit Crunch 2007-2008," *Journal of Economic Perspectives* 23(1), Winter 2009, p. 77, available at https://www.princeton.edu/~markus/research/papers/liquidity_credit_crunch.pdf.

[73]   Brunnermeier, Markus K., "Deciphering the Liquidity and Credit Crunch 2007-2008," *Journal of Economic Perspectives* 23(1), Winter 2009, p. 89, available at https://www.princeton.edu/~markus/research/papers/liquidity_credit_crunch.pdf.

[74]   *Callan*, "The Callan Periodic Table of Investment Returns: Annual Returns for Key Indices Ranked in Order of Performance (1997-2016)," available at https://www.callan.com/wp-content/uploads/2017/01/Callan-PeriodicTbl_KeyInd_2017.pdf.

[75]   Bernanke, Ben S., "Causes of the Recent Financial and Economic Crisis," Before the Financial Crisis Inquiry Commission, Washington D.C., September 2, 2010, available at https://www.federalreserve.gov/newsevents/testimony/bernanke20100902a.htm; Weinberg, John, "The Great Recession and its Aftermath," *Federal Reserve Bank of Richmond*, November 22, 2013, available at https://www.federalreservehistory.org/essays/great_recession_and_its_aftermath.

CONFIDENTIAL

41. In contrast, the Mangiero Report fails to establish an analytical framework and, in particular, fails to appropriately address the role of contextual factors. Instead, the Mangiero Report generally relies on the benefit of hindsight to assess the SRC's monitoring-related activities. For example, the Mangiero Report asserts that the SRC should have increased the diversification of its plan assets as early as 2006 and anticipated its liquidity needs during the financial crisis.[76] However, this assertion assumes, without any basis, that the SRC could have predicted the extreme market conditions that prevailed during the relevant time period whereas, in reality, these conditions were unexpected and unpredictable. Though the Mangiero Report stresses the necessity of considering "facts and circumstances,"[77] it fails to consider the difficulties that any retirement plan committee would have faced under such unprecedented economic conditions.

### B. Factual Overview and Assessment of Monitoring Conducted by the Individual Severstal Retirement Committee Defendants

42. In this section, I assess the Individual Severstal Retirement Committee Defendants' monitoring-related activities relative to the best practices described in Section III. The facts surrounding the Individual Severstal Retirement Committee Defendants' monitoring-related activities described in this section are based on my review of certain case materials produced and depositions taken in this matter. Additionally, I refute certain assertions made by the Mangiero Report that are based on selective citations, unsubstantiated standards, or mischaracterized evidence.

### i. Structure and Protocol of the SWI Retirement Committee

43. As described in Section III.A, it is important for retirement plan committees to establish a specific structure and set of policies. Prudent committees typically include members with appropriate backgrounds and institute practices for meetings and for documenting decisions. Further, it is best practice for committees to engage a qualified investment manager or managers, to provide clear responsibilities and investment goals for the investment managers, and to retain outside consultants for additional expertise.

---

[76]   *See, e.g.*, Mangiero Report, ¶¶56, 99.
[77]   Mangiero Report, ¶¶53, 86, 109, 115, 116, 131.

CONFIDENTIAL

### a) *Committee membership and meeting structure and process*

44.   Consistent with industry standard, the SRC members had relevant backgrounds and related expertise.  Mr. DiClemente was the corporate treasurer of SWI and had previous experience in other investment management roles.[78]  Mr. Halpin had a background in accounting and was responsible for investor relations at SWI.[79]  I understand that Mr. DiClemente had significant experience in roles relevant for a retirement plan fiduciary and trained Mr. Halpin while they were members of the SRC.[80]  In my professional experience, both committee members had backgrounds that made them well suited for serving on a retirement plan committee.

45.   The SRC's size was also reasonable for its needs.  In 2008, both the structure of SWI and the SRC were undergoing transitions in connection with Severstal's recent acquisition of Wheeling-Pitt.[81]  As a result, by August 2008, Mr. DiClemente and Mr. Halpin were SWI's only two retirement plan committee members.[82]  Although the Mangiero Report purports that in deposition Mr. DiClemente "lamented" having a small committee, this assertion is factually incorrect.[83]  To the contrary, Mr. DiClemente never lamented anything; rather, he testified that the committee membership was reduced from five to two members, due to retirements following the Severstal acquisition, but that he believed the committee membership worked for the needs of the SRC.[84]  Furthermore, I understand Mr. DiClemente testified that Rick Bowness, the Director of Benefits Accounting, acted as an advisor to the Committee and was included in communications and deliberations related to Mr. LaBow.[85]

46.   Further, the SRC had an established practice for holding meetings, making decisions, and documenting decisions, consistent with industry standards.  I understand that on a quarterly basis, Mr. DiClemente reviewed reports from Mercer Investment Consulting, Inc. ("Mercer"), a large, globally recognized, and well-known investment consulting firm

---

[78]   DiClemente Deposition, 7:8-10, 147:12-25, 148:1-23.
[79]   Halpin Deposition, 9:9-11.
[80]   DiClemente Deposition, 147:12-25, 148:1-23.
[81]   Halpin Deposition, 8:16-25.
[82]   DiClemente Deposition, 124:9-13.
[83]   Mangiero Report, ¶90; DiClemente Deposition, 125:13-25, 126:1-5, 8-15.
[84]   DiClemente Deposition, 125:13-25, 126:1-5, 8-15.
[85]   DiClemente Deposition, 126:13-15.

CONFIDENTIAL

that performed periodic portfolio reviews about investment performance. Mr. DiClemente regularly summarized Mercer's findings and provided his own input, and then shared the information with the SRC.[86] Typically the SRC would then meet to discuss the performance of the investments and address other issues.[87] In addition, I understand the SRC often communicated via email in lieu of more frequent meetings.[88] I also understand that the Committee documented its discussions and decisions, consistent with industry best practice.[89]

47. The Mangiero Report concludes that the Committee did not have clear communication as Mr. Halpin was not included on all emails.[90] By making this assertion, the Mangiero Report appears to rely on the unsubstantiated standard that every member of a committee must be included on all correspondence. However, I understand Mr. Halpin has testified that he was included on communications where reasonable and that it was not necessary that he be copied on all communications.[91] This process is also consistent with my professional experience that all members should be included when communications pertain to important decisions, but not necessarily on every single communication.

### b) Engagement of Mr. LaBow as an investment manager

48. As described earlier, the SRC retained Mr. LaBow to manage the SWI plan assets. The SRC understood from Mercer and from historical involvement that Mr. LaBow had "astonishing" past performance and was a highly qualified investment manager.[92] I understand that Mercer had evaluated Mr. LaBow and found his performance "stellar" on both an absolute and a relative basis.[93] According to Mr. LaBow's deposition testimony, Mr. LaBow was one of the top-performing investment managers at the time, usually in the top 10 percent, and at times even in the top 2 or 3 percent.[94] I understand Mr. LaBow has

---

86   Halpin Deposition, 82:14-23; SDNY Opinion, pp. 22, 23, DiClemente Exhibit 1, 34.
87   Halpin Deposition, 82:14-23.
88   DiClemente Deposition, 126:16-20.
89   Halpin Deposition, 61:3-7, 77:7-15.
90   Mangiero Report, ¶68.
91   Halpin Deposition, 27:24-25, 28:1-4, 198:3-11.
92   Halpin Deposition, 33:24-25, 34:1, 79:9-11, 101:7-9; DiClemente Deposition, 10:24-25, 11:1-3, 14:14-25, 15:1:8.
93   DiClemente Deposition, 15:3-8.
94   LaBow Deposition, 74:10-19, 205:22-25, 206:1-6.

CONFIDENTIAL

further testified that, as an investment manager for the Combined Trust, he "had made [the retirement plans] a considerable amount of money over a ten year period."[95]

49.  I understand Mr. DiClemente has testified that the SRC wanted to "continue to benefit from [Mr. LaBow's] top-level performance."[96]  The SRC's decision to engage a qualified investment manager who had exemplary historical success is consistent with my understanding of and experience with investment manager selection for retirement plan committees.  This practice is also consistent with publicly available information regarding engaging an investment manager.  For example, the DOL advises committees to consider "[i]nformation about the quality of the firm's services," including "the firm's experience or performance record."[97]  Similarly, other publicly available guidance suggests that "key components" in evaluating and selecting a potential manager include the "manager's performance" and the "firm's investment process, which…should be consistent over time."[98]

50.  In her report, Dr. Mangiero fails to recognize the importance of considering an investment manager's historical performance.  Rather, Dr. Mangiero applies her own, unfounded standard that an investment manager's "[p]ast performance is rarely a gauge to future outcomes" and that past performance is therefore not a relevant component of determining an investment manager's qualifications.[99]  However, this assertion contradicts both the generally accepted practice of reviewing a manager's historical success in making hiring decisions, as described above, and Dr. Mangiero's published writing on the importance of knowing "a lot" about an investment manager.[100]  In addition, Dr. Mangiero's report ignores the positive information the SRC had received about Mr. LaBow's performance

---

95    LaBow Deposition, 304:13-22.
96    DiClemente Deposition, 70:7-16.
97    *U.S. Department of Labor Employee Benefits Security Administration* "Meeting Your Fiduciary Responsibilities," February, 2012, p. 5, available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.
98    Gordon, Catherine A., Karin Peterson LaBarge, "Investment Committees: Vanguard's View of Best Practice," *Vanguard*, October 2010, p. 7, available at https://www.vanguard.co.uk/documents/adv/literature/investment-committees-best-practice.pdf.
99    Mangiero Report, ¶120.
100   Mangiero, Susan, "An Economist's Perspective of Fiduciary Monitoring of Investments," *Bloomberg BNA, Pension & Benefits Daily*, 2015, p. 2, available at https://papers.ssrn.com/sol3/Papers.cfm?abstract_id=2611870.

CONFIDENTIAL

and process, instead focusing on selective quotations from Mercer's review of Mr. LaBow's "unorthodox" investment practices.[101]

51.   Furthermore, the Mangiero Report erroneously asserts that the SRC did not conduct certain due diligence to determine if Mr. LaBow would be a qualified investment manager and thereby did not act in accordance with prevailing fiduciary standards.[102] However, consistent with industry practice, the SRC, among other things, relied on Mercer's due diligence to determine that Mr. LaBow was a qualified investment manager. As I understand from Mr. DiClemente's testimony, Louis Finney, the Committee's institutional investment consultant from Mercer, visited Mr. LaBow, had several phone conversations with Mr. LaBow, and subsequently provided Mr. DiClemente with "a stellar report on Ron LaBow and his process."[103] Though Mr. Finney expressed that Mr. LaBow's process was "unique," Mr. Finney also gave a "glowing recommendation" of Mr. LaBow to Mr. DiClemente.[104] Contrary to the assessment of the Mangiero Report, the SRC reviewed Mr. LaBow by relying on the expertise of Mercer's due diligence and overall positive assessment of Mr. LaBow. In addition, and as discussed above, the Individual Severstal Retirement Committee Defendants had had first-person exposure to Mr. LaBow's consistently excellent investment performance for the Combined Trust, through their previous membership on the Wheeling-Pitt Retirement Committee.

### c)   Policies and authorities for investment management

52.   The SRC clarified investment responsibilities and authorities with Mr. LaBow, and believed that Mr. LaBow understood that he had full responsibility to make investment decisions.[105] According to deposition testimony, I understand the SRC communicated to Mr. LaBow that the investment policies and goals for the SWI plan assets were the same

---

[101]   Mangiero Report, ¶¶49, 101. For example, in a memo to Mr. DiClemente on behalf of Mercer, Louis Finney described Mr. LaBow's strategy as "highly successful," explaining that Mr. LaBow's "investment process has more discipline than readily apparent." Mr. Finney also described the "historic performance of LaBow's strategy" as "excellent," and suggested that Mr. DiClemente continue the SRC's engagement of Mr. LaBow, who Mr. Finney described as "talented, dedicated, [and] insightful. (*See*, "Plaintiffs' Exhibit 2, April 6, 2006 Memo from Mercer to Michael DiClemente," U.S. District Court – Southern District of New York, Case No. 10-954 (LTS) (GWG).)

[102]   Mangiero Report, ¶117.

[103]   DiClemente Deposition, 14:14-25, 15:1-8.

[104]   DiClemente Deposition, 14:19, 25:6-8.

[105]   SDNY Opinion, p. 20, DiClemente Deposition, 84:19-24.

CONFIDENTIAL

policies and goals that had previously existed for WHX and the Combined Trust.[106] Furthermore, I understand that the investment policy document, effective November 1, 2008, guided the goals and standards for the SWI plan investments.[107] Moreover, I understand the SRC had previously communicated to Mr. LaBow that he should operate under the same agreements that had existed with WHX.[108]

53.   Contrary to the facts, the Mangiero Report makes multiple erroneous assertions regarding the SRC's investment policy statement as well as its overall investment approach regarding diversification and liquidity.  First, the Mangiero Report asserts that the SRC failed to meet the "prevailing fiduciary standard" by not having a clear investment policy statement.[109]  However, I understand from testimony given by the Individual Severstal Retirement Committee Defendants, as well as by Sally King, ERISA counsel to the SRC from McGuireWoods, that there was a clear understanding that the investment policies of the preceding Combined Trust were considered authoritative for the SWI trust as well.[110]

54.   Second, while investment policies are typically an important part of prudent monitoring, as noted above, a recent study found that only 83 percent of all plans have a formal, written investment policy.[111]  A similar view was confirmed in the New York trial; specifically, I understand that Mr. LaBow attempted to claim that he could not create an investment plan because the SRC had not provided him with an investment policy.[112] However, this argument failed to convince Judge Laura Taylor Swain, who, in her Opinion and Order, pointed to testimony that the SRC had conveyed its policies to Mr. LaBow and that "a plan without a formal investment policy could nevertheless have a diversified portfolio."[113]

---

[106]   SDNY Opinion, p. 33, citing Trial Transcript (King at 1091:3-7); Halpin Deposition, 194:1-3, 10-15, 20-23, 195:4-11, 25, 196:1-8; Halpin Exhibit 53; DiClemente Exhibit 23; LaBow Deposition, 59:18-21, 60:14-24, 129:9-18.
[107]   DiClemente Exhibit 52; Halpin Deposition, 34:15-23, 195:4-25, 196:1-9.
[108]   Halpin Deposition, 194:1-15; SDNY Opinion, p. 33, citing Trial Transcript (King at 1091:3-7), I note that Judge Laura Taylor Swain found Ms. King's testimony of these facts to be credible.
[109]   Mangiero Report, ¶45.
[110]   Halpin Deposition, 194:1-15; SDNY Opinion, p. 33, citing Trial Transcript (King at 1091:3-7).
[111]   See Section III.A. See also, Deloitte, Annual Defined Contribution Benchmarking Survey, 2015 Edition, p. 42, available at https://www2.deloitte.com/content/dam/Deloitte/us/Documents/human-capital/us-hc-annual-defined-benchmarking-survey-2015.pdf.
[112]   SDNY Opinion, p. 33.
[113]   SDNY Opinion, p. 34.

CONFIDENTIAL

55. Third, the Mangiero Report criticizes the SRC's investment policies, claiming that they did not meet diversification standards.[114] However, in reaching this conclusion, the Mangiero Report misinterprets certain information and ignores evidence contrary to this conclusion. For instance, the Mangiero Report cites to an SRC investment policy that shows certain maximums for the SWI plan's asset allocations, such as a maximum allocation of 100 percent of the plan's assets into the Fixed Income asset class.[115] The Mangiero Report misinterprets these guidelines by asserting that the maximum would likely be the actual target allocation of the assets rather than the upper limit. Based on this misinterpretation, the Mangiero Report falsely determines that these guidelines would not yield a diverse investment allocation. Furthermore, the Mangiero Report fails to interpret the guidelines in the full context of the investment policy, which specifies that WPN should ensure that the assets are "well-diversified."[116] More generally, while the Mangiero Report also notes that there is "no 'one size fits all' diversification strategy," the Mangiero Report ignores this point in assessing the SRC's diversification policies.[117]

56. Fourth, further criticizing the SRC's investment policies, the Mangiero Report repeatedly refers to a 2006 memo from Mr. Finney. In using this document, the Mangiero Report gives the impression that the extreme and unprecedented market environment that developed in 2008 was foreseeable. The Mangiero Report uses this document and the 2008 market environment to assert that Mercer's 2006 recommendations were prudent with regard to de-risking and increasing liquidity.[118] However, this conclusion engages in hindsight bias. In 2006, the Wheeling-Pitt Retirement Committee (the predecessor of the SRC) could not have foreseen that the financial crisis would occur and that Mr. LaBow would fail to provide the SRC with a diversified portfolio in 2008.

57. Fifth, the Mangiero Report relies on mischaracterized evidence and hindsight to assert that the SRC should have paid more attention to the need for cash for disbursements to pensioners.[119] However, I understand that the SRC regularly communicated with Mr.

---

114    Mangiero Report, ¶¶45, 97.
115    Mangiero Report, ¶¶97-99.
116    DiClemente Exhibit 52.
117    Mangiero Report, ¶109.
118    Mangiero Report, ¶¶56, 87.
119    Mangiero Report, ¶¶50, 60.

CONFIDENTIAL

Bowness, who kept track of the cash needs of the plan.[120] To my knowledge, the SWI plan never failed to make required payments to plan participants. Similarly, as I have explained above, the Mangiero Report's emphasis on the need for liquidity given the age of the plan participants relies on the benefit of hindsight in a period for which the extreme market dislocation could not have been predicted.[121]

### d) Engagement of ERISA legal counsel and Mercer Investment Consulting

58.  In addition to engaging a qualified investment manager, the SRC retained outside service providers to aid in monitoring the investment management of the SWI plan assets. Specifically, the SRC retained ERISA counsel, Sally King of McGuireWoods. Ms. King provided advice on monitoring, coordinated communications with and oversight of Mr. LaBow, and otherwise conferred regularly with the SRC concerning Mr. LaBow's performance and the SRC's fulfillment of its duties.[122]

59.  In addition, the SRC retained Mercer as outside consulting support. Mercer provided quarterly reports reviewing the investment performance and management of the SWI plan assets.[123] These reports were one important way in which the SRC monitored Mr. LaBow's investment management at regular intervals. I understand Mr. DiClemente has testified that the Mercer reports were a primary channel of information for the SRC about Mr. LaBow's performance.[124]

60.  The SRC's engagements of Ms. King and Mercer are consistent with the industry practice of engaging outside service providers, who can help improve a committee's effectiveness in monitoring investment managers and in detecting and resolving any potential issues that arise. Furthermore, the SRC's reliance on Mercer's reports is consistent with Dr. Mangiero's own statement in her expert report that it is necessary for committees to "regularly monitor" an investment manager.[125]

---

[120]  DiClemente Deposition 92:22-25, 93:1-2, 126:13-15; Halpin Deposition, 24:17-19, 71:1-2; DiClemente Exhibit 40.
[121]  Mangiero Report, ¶¶40, 56, 58.
[122]  See, e.g., DiClemente Deposition, 137:23-25, 142:22-25; Halpin Deposition, 43:6-16, 102:3-16; DiClemente Exhibit 22, 25, 29, 37, 50.
[123]  DiClemente Deposition, 81:2-6, 94:1-6, 179:2-5.
[124]  DiClemente Deposition, 94:1-6.
[125]  Mangiero Report, ¶116.

CONFIDENTIAL

### ii.   Further Review and Monitoring of Mr. LaBow During the Relevant Time Period

61.   As I described in Section III.B, it is customary for committees to periodically review and monitor an investment manager.  Based on my review of the case materials, the SRC's actions are consistent with my experience and generally accepted industry practice.  Of particular importance, the SRC adapted its monitoring to important contextual factors during the relevant time period.

### a)  Frequent and ongoing communication with Mr. LaBow

62.   Between June and November 2008, leading up to the transfer of the SWI plan assets, the SRC's communications with Mr. LaBow were in accordance with industry best practices.  First, the SRC communicated with Mr. LaBow to engage him as investment manager and discuss the separation of the Combined Trust as a proportional allocation of assets.[126]  Similarly, after the transfer of the SWI plan assets on November 3, 2008, I understand that the SRC regularly communicated with Mr. LaBow.[127]

63.   Upon learning of the undiversified Neuberger Berman Account on December 29, 2008, through communication with Mercer regarding Mr. LaBow's investment management,[128] the SRC engaged immediately in corrective action by increasing its communication with Mr. LaBow.  I understand Mr. Halpin has testified that the SRC's "monitoring role stepped up dramatically,"[129] with "almost daily" conversations between the SRC and Mr. LaBow.[130]  Indeed, Mr. LaBow testified that in his experience there had never been a committee in contact with him as often as the SRC was during the relevant time period.[131]  Mr. LaBow further explained that the situation was "extraordinary…[t]he market was in disarray" and that he "didn't think it was abnormal" for the SRC to be contacting him so often.[132]  Similarly, I understand Mr. Halpin has testified that the "frequency and depth of the monitoring…was almost overkill.  This consumed almost a full part of [their] jobs."[133]

---

[126]   DiClemente Deposition, 23:4-25, 24:1-25, 25:1-14, 58:23-25; DiClemente Exhibit 5.
[127]   DiClemente Exhibit 16, 17, 18, 19, 21.
[128]   SDNY Trial Transcript, 447:12-20; SDNY Opinion, p. 22.
[129]   Halpin Deposition, 163:25, 164:1.
[130]   LaBow Deposition, 107:24-25, 181:3; Halpin Deposition, 161:25, 162:1.
[131]   LaBow Deposition, 179:3-25, 180:1-5.
[132]   LaBow Deposition, 179:8-22.
[133]   Halpin Deposition, 163:11-14.

CONFIDENTIAL

64. Exhibit 2 provides a detailed chronology of the key communications between the SRC and Mr. LaBow following the SRC's discovery of the undiversified Neuberger Berman Account. As this chronology illustrates, the SRC increased the frequency and intensity of its monitoring through heightened communication with Mr. LaBow when issues arose.

65. The communication between the SRC and Mr. LaBow was frequent and comprehensive during the relevant time period. The frequency with which the SRC questioned Mr. LaBow on his progress and prompted Mr. LaBow to take action demonstrates the SRC's adherence to a high standard of monitoring following the discovery of the undiversified account—a discovery that resulted from the SRC's prudent engagement of Mercer for quarterly performance reviews, which enabled the SRC to identify investment manager activity inconsistent with the SRC's investment directives.

### b) Increased oversight of Mr. LaBow's decisions and actions

66. It is standard practice for a retirement plan committee to more carefully review and monitor the investment manager when the committee observes that the investment manager may have acted inconsistently with the committee's investment policies or directives. As I describe below, the Individual Severstal Retirement Committee Defendants' actions following their discovery of the undiversified account are consistent with this practice.

67. Rather than passively accepting Mr. LaBow's sole transfer of the Neuberger Berman Account, the SRC diligently tried to work with Mr. LaBow to achieve a different investment allocation. As Mr. Halpin explained in an April 2009 plan status update, the SRC "fought vigorously" against having the Neuberger Berman Account as it did not conform with the plan's "investment guidelines with specific regard to the manager and portfolio diversity."[134] Seeking corrective action, the SRC continued to firmly push Mr. LaBow to create a more diversified portfolio for the SWI plan assets, rather than allowing Mr. LaBow to invest however he pleased.

68. Although, as I understand, Mr. LaBow still had full authority to make investment decisions on his own, the SRC increased its oversight and monitoring of Mr. LaBow by

---

[134]    Halpin Exhibit 59.

29

CONFIDENTIAL

asking that Mr. LaBow show the SRC his investment plan before taking any action.[135]   I understand that Mr. DiClemente "emphatically" told Mr. LaBow that the SRC did not want Mr. LaBow "to take any action prior to providing [the SRC] with his formal allocation plan, specifically stating, 'Don't act until you show us the allocation.'"[136]   As I understand Mr. DiClemente testified, Mr. LaBow "was being scrutinized" by the SRC "because of his prior missteps."[137]

69.   Further, rather than blindly accepting investment plans that Mr. LaBow provided and simply allowing Mr. LaBow to invest freely, the SRC requested and reviewed information from Mr. LaBow for each investment he proposed.[138]   I understand even Mr. LaBow has agreed that such requests for additional information were "fair" given the "turbulent times in which the committee and Miss King were acting."[139]   In my opinion, the SRC's increased oversight is consistent with prudent monitoring.

### c)   Reliance on expertise of ERISA legal counsel and Mercer Investment Consulting

70.   Beyond frequent communication with and oversight of Mr. LaBow, the SRC further acted in accordance with best practices by relying on outside service providers for additional expertise.   In particular, after discovering the unmanaged, undiversified account, the SRC worked with Ms. King, frequently leveraging her ERISA expertise to additionally monitor and communicate with Mr. LaBow as well as to create a plan for the investments going forward.[140]   Similarly, the SRC continued to enlist Mercer to review the SWI trust's investment performance and understand the Neuberger Berman Account.[141]   Relying on this type of expertise to monitor investment management, especially when issues arise, complies with the custom and practice of retirement plan committees.

71.   Contradicting the evidentiary record, the Mangiero Report makes several erroneous assertions regarding the SRC's reliance on outside service providers.   First, the Mangiero

---

135   SDNY Opinion, pp. 12, 20, 26;   DiClemente Deposition, 177:8-12; DiClemente Exhibit 36; Halpin Deposition, 96:6-15
136   DiClemente Exhibit 36.
137   DiClemente Deposition, 145:6-10.
138   LaBow Deposition, 254:12-14.
139   LaBow Deposition, 202:10-14.
140   DiClemente Deposition, 137:23-25, 142:22-25; Halpin Deposition, 43:6-16, 102:3-16; DiClemente Exhibit 22, 25, 29, 37, 50.
141   DiClemente Deposition, 76:21-24, 81:25, 81:1-4; DiClemente Exhibit 26, 34, 51.

CONFIDENTIAL

Report purports that the SRC did not consult with ERISA counsel, even though the deposition testimony that I have reviewed suggests that the SRC heavily relied on the expertise of ERISA counsel.[142]  For example, I understand Mr. Halpin has testified that the SRC's actions and decisions happened under "expert ERISA counsel" and were "done with regular consultation of McGuireWoods."[143]

72.   Additionally, the Mangiero Report asserts that the SRC "failed to heed the 2006 recommendations by Mercer to diversify Plan assets."[144]  In making such an assertion, Dr. Mangiero imposes her own unsubstantiated requirement that retirement committees need to implement all suggestions provided by an outside consulting firm.  However, in my professional experience, a committee does not need to heed all advice the consultant provides.  Furthermore, the Mangiero Report fails to acknowledge the variability that existed even in Mercer's recommended allocations, including, for example, a potential allocation of 90 percent of assets to equity.[145]  The range of Mercer's recommended allocations underscores both the fact that committees are not obligated to implement all suggestions from a consultant and the importance of considering individual committees' unique investment objectives and circumstances.

### iii.   Termination of Mr. LaBow and WPN Corporation

73.   As I described in Section III.C, and consistent with my professional experience, published literature on industry best practices generally advises that retirement plan committees exercise careful judgement and proceed in a deliberate fashion when deciding to terminate an investment manager.  My review of the case materials leads me to conclude that, consistent with industry best practices, the SRC was deliberate in assessing whether Mr. LaBow should continue as its investment manager.

74.   Upon learning about Mr. LaBow's failure to deliver a diversified portfolio, the SRC did not fire him immediately.  Rather, I understand that the SRC recognized Mr. LaBow's prior successes and wanted to continue to benefit from his investment approach.[146]  As

---

142      Mangiero Report, ¶106.
143      Halpin Deposition, 102:9-14.
144      Mangiero Report, ¶56.
145      Mangiero Report, ¶111; "Plaintiffs' Exhibit 2, April 6, 2006 Memo from Mercer to Michael DiClemente," U.S. District Court – Southern District of New York, Case No. 10-954 (LTS) (GWG).
146      Halpin Deposition, 101:3-18, 122:9-18.

CONFIDENTIAL

Mr. Halpin testified, "I thought the guy was fantastic. I mean he did stellar in good times; he did stellar in bad times… so I'm not going to lose this guy because he fumbled the ball once, if he can recover the ball."[147]  Consistent with Mr. Halpin's testimony, the WHX pension plan managed by Mr. LaBow had performed significantly better than or comparably to the SRC's target rate of return and the S&P 500 Index in the years leading up to the relevant time period (as illustrated in Exhibit 3).  Moreover, even during the Great Recession in 2008, the WHX plan outperformed the S&P 500 Index by over 15 percentage points.  In addition to recognizing Mr. LaBow's prior successes, I understand the SRC remained optimistic that Mr. LaBow could reset the portfolio since Mr. LaBow continued to provide the SRC with an "ever evolving story of what could or could not be done" with the SWI plan assets.[148]

75.  Due to these relevant considerations, as described earlier, the Committee increased its monitoring of Mr. LaBow instead of immediately terminating him.  In addition, the SRC continued to gather quantitative and qualitative evidence to determine whether Mr. LaBow could be successful in the future.  For example, as I described above, the SRC increased its communication with Mr. LaBow.  Similarly, the SRC gathered information by reviewing the investment plans and investment information from Mr. LaBow and assessing whether Mr. LaBow could successfully invest the assets.  In addition, the SRC was in regular consultation with its outside counsel and with senior management of WHX.[149]

76.  These practices are consistent with my professional experience and with published guidance that committees should exercise judgement in determining whether to remove an investment manager.[150]  In my opinion, given Mr. LaBow's successful past performance, the SRC took a reasonably measured approach to assessing if and when Mr. LaBow

---

[147]    Halpin Deposition, 101:12-18.

[148]    SDNY Opinion, p. 26, citing (Trial Transcript (DiClemente) at 474:5-7). I note that Judge Swain found Mr. DiClemente's testimony to be credible.

[149]    Halpin Deposition, 102:13-14; Halpin Exhibit 40, 41; DiClemente Exhibit 33, 44.

[150]    *Vanguard*, "What matters most? An analysis of investment committee hire/fire decisions," September 2010, p. 2, available at http://agb.org/sites/default/files/legacy/u16/Vanguard%204.pdf; *Strategic Investment Group*, "The Art and Science of Manager Termination," Fiduciary Insights, 2014, p. 4, available at https://www.strategicgroup.com/sites/default/files/wp-content/uploads/2014/08/OT-FI-GO-01-The-Art-and-Science-of-Manager-Termination.pdf.

CONFIDENTIAL

should be terminated.  The SRC's choice to be deliberate rather than reflexively terminating Mr. LaBow is consistent with industry custom and practice.

77.   Furthermore, the extreme market environment during the relevant time period enhanced the SRC's need to act with deliberation rather than speed.  In fact, the Mangiero Report acknowledges that "[g]iven the upheaval in the financial markets," it was important for the SRC to "carefully deliberate about prudent strategies."[151]  The volatility and uncertainty of the market required that the SRC more closely consider Mr. LaBow's ability to correct his investment strategy and more closely assess the potential impact of terminating Mr. LaBow.  The additional market uncertainty would have made a hasty termination all the more imprudent.  In addition, due to the potentially time-consuming process of evaluating and hiring a new investment manager, quickly terminating Mr. LaBow could have left the SRC without an investment manager during a time of market upheaval.  Therefore, in my opinion, the SRC's decision to follow a measured approach was reasonable and in line with established industry practice, particularly given the prevailing market conditions.

78.   By simply concluding that the SRC should have terminated Mr. LaBow sooner, the Mangiero Report fails to consider the importance of deliberation in making termination decisions.  The Mangiero Report's assessment of the SRC's termination decision is not in line with industry custom that prescribes evaluating a manager more closely when issues arise and using additional information to carefully decide whether and when to terminate a manager.  Furthermore, despite acknowledging the contemporaneous volatile market environment and necessity of considering unique "facts and circumstances," the Mangiero Report ignores the role the extreme market environment played in the need to act with additional care and deliberation rather than haste in terminating Mr. LaBow.  Based on my own experience, the fact that Mr. LaBow was terminated within a period of four to five months of the SRC's discovery that Mr. LaBow could not replicate the Combined Trust underscores that the SRC undertook its fiduciary duties with reasonable care.

---

[151]     Mangiero Report, ¶52.

CONFIDENTIAL

## V.   THE MANGIERO REPORT FOCUSES ON IRRELEVANT FACTS AND STANDARDS UNRELATED TO THE DUTY TO MONITOR

79.   The Mangiero Report also includes certain ad hoc criticisms and standards that are irrelevant to assessing the SRC's monitoring-related actions.  The Mangiero Report not only enumerates facts about the SRC and Mr. LaBow that are unrelated to monitoring, but also mistakes Mr. LaBow's investment manager responsibilities for the SRC's monitoring duties.  In doing so, the Mangiero Report frequently gives the false impression that the results of the SWI plan assets were a product of the SRC's monitoring-related actions rather than Mr. LaBow's failures to follow the SRC's investment policies and be forthcoming with the SRC.  In this section, I discuss key flaws in the Mangiero Report as they relate to these irrelevant facts and standards.

80.   First, rather than assessing the SRC with respect to its duty to monitor, the Mangiero Report frequently points to facts that are unrelated to monitoring.  In doing so, the Mangiero Report makes numerous statements of purported standards that are irrelevant to assessing the SRC's monitoring activities.  For example, the Mangiero Report claims that Mr. DiClemente had a conflict of interest in his corporate role as a treasurer.[152]  However, the Mangiero Report fails to explain the relevance of this purported problem for assessing the duty to monitor, and I understand there is no evidence to indicate that Mr. DiClemente failed to protect the interests of the SWI plan participants as a result of his role as the corporate treasurer.  Furthermore, the Mangiero Report fails to acknowledge that Mr. DiClemente's corporate role was an important qualification for his membership on the SRC.

81.   Second, the Mangiero Report departs from guidelines indicating that retirement plan committees are responsible for monitoring an investment manager but are not liable for that manager's specific investment decisions.[153]  For example, the Mangiero Report

---

[152]   Mangiero Report, ¶88.

[153]   *U.S. Department of Labor Employee Benefits Security Administration,* "Meeting Your Fiduciary Responsibilities," February, 2012, p. 3, available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf; Tenenbaum, Jeffery, Rory Cohen, Michael Graham, and Charles Tate, "Due Diligence Considerations for Nonprofit Investment Fiduciaries," *Venable, Merrill Lynch,* and *Tate & Tryon,* May 7, 2009, p. 54, available at https://www.venable.com/files/publication/405c67c9-d836-4ea0-a87e-6b93598b128e/presentation/publicationattachment/22441015-12ac-4c38-8c33-

CONFIDENTIAL

asserts that the SRC should have known that, due to small plan size, they would not be able to invest in certain hedge funds because of size minimums.[154]  However, in my experience and consistent with industry practice, making such a determination is the investment manager's responsibility.[155]

82.   The Mangiero Report offers several criticisms of Mr. LaBow's asset allocation, particularly the lack of diversification in the SWI plan assets.[156]  However, as explained earlier, the SRC had policies for diversification.  For example, the SRC's investment guidelines stated that "WPN Corporation should ensure that the [SWI] Trust's assets are well-diversified."[157]  Further, I understand that the SRC requested from Mr. LaBow an investment strategy of a proportionally allocated slice of the Combined Trust.[158]  However, I also understand that it was Mr. LaBow's responsibility to implement the strategy or explain to the SRC that it was not achievable, and ex post, it was clear that Mr. LaBow did not follow these policies.

83.   The Mangiero Report also confuses a committee's fiduciary duty to monitor with a responsibility to achieve favorable investment performance.  The Mangiero Report emphasizes the need for Mr. LaBow to "perform well, on a risk-adjusted basis in the future."[159]  Based on my professional experience and review of relevant published

---

[154]   6eb5abbcfb3c/due_diligence_seminar_5.7.09.pdf; *Vanguard*, "Best Practices for Plan Fiduciaries," 2013, p. 15, available at https://institutional.vanguard.com/iam/pdf/BestPracticesPlanFiduciaries.pdf; *BlackRock*, "Evaluating ERISA 3(38) Investment Managers: A Guide for Plan Sponsors," 2017, p. 2, available at https://www.blackrock.com/us/financial-professionals/literature/whitepaper/evaluating-erisa-investment-managers-whitepaper.pdf.

[154]   Mangiero Report, ¶70.

[155]   *U.S. Department of Labor Employee Benefits Security Administration*, "Meeting Your Fiduciary Responsibilities," February, 2012, p. 3, available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf; Tenenbaum, Jeffery, Rory Cohen, Michael Graham, and Charles Tate, "Due Diligence Considerations for Nonprofit Investment Fiduciaries," *Venable, Merrill Lynch, and Tate & Tryon*, May 7, 2009, p. 54, available at https://www.venable.com/files/publication/405c67c9-d836-4ea0-a87e-6b93598b128e/presentation/publicationattachment/22441015-12ac-4c38-8c33-6eb5abbcfb3c/due_diligence_seminar_5.7.09.pdf; *Vanguard*, "Best Practices for Plan Fiduciaries," 2013, p. 15, available at https://institutional.vanguard.com/iam/pdf/BestPracticesPlanFiduciaries.pdf; *BlackRock*, "Evaluating ERISA 3(38) Investment Managers: A Guide for Plan Sponsors," 2017, pp. 2, 8, available at https://www.blackrock.com/us/financial-professionals/literature/whitepaper/evaluating-erisa-investment-managers-whitepaper.pdf.

[156]   Mangiero Report, ¶¶55, 59, 64, 70, 72, 73, 74, 81, 107.

[157]   DiClemente Exhibit 52.

[158]   DiClemente Deposition, 23:4-12, 25:17-23, 35:10-14; DiClemente Exhibit 7, 27, 37.

[159]   Mangiero Report, ¶120.

CONFIDENTIAL

literature, fiduciaries are not guarantors of favorable investment performance, and a failure to predict the future is not a breach of fiduciary duty, let alone a breach of the duty to monitor.[160]

84.     Furthermore, the Mangiero Report misattributes Mr. LaBow's failure to be forthcoming with the SRC to the SRC's duty to monitor, and thereby incorrectly claims that the SRC did not have adequate communication.[161] However, I understand that testimony from the Individual Severstal Retirement Committee Defendants and Ms. King refutes this claim. For example, the Individual Severstal Retirement Committee Defendants and Ms. King clearly and frequently communicated that they wanted a proportional allocation of the investments that had been in the Combined Trust and that Mr. LaBow had full power and authority to invest the SWI plan assets.[162,163] However, Mr. LaBow failed to be forthcoming with the SRC about his investment management. For example, I understand Ms. King has testified that prior to November 3, 2008, Mr. LaBow did not tell her or the SRC, during any conversation to which she was party, that a proportional allocation would not be possible.[164] Furthermore, as explained above, I understand Mr. LaBow provided the SRC with an "ever evolving story of what could or could not be done" with the SWI plan assets.[165]

---

[160]     Mangiero, Susan, Rhonda Prussack, and Emily Seymour Costin, "ERISA Plan Investment Committee Governance: Avoiding Breach of Fiduciary Duty Claims," *Strafford*, September 12, 2017, slide 34, available at http://www.investmentbestpractices.com/wp-content/uploads/sites/400/2014/11/ERISA-Plan-Investment-Committee-Governance_Straffo.pdf; Van Loon, Gilbert, "Best Practices in Period Review of Participant Directed Retirement Plans," *Butler, Snow, O'Mara, Stevens & Cannada, PLLC.*, May 2013, p. 1, available at http://www.butlersnow.com/wp-content/uploads/2014/08/Benefits-Commentary-Best-Practices-in-Periodic-Reviews.pdf; Horak, John, "Fiduciary Duties and Bad Outcomes," *Fiduciary Investment Advisors*, May 2011, p. 1, available at http://www.fiallc.com/wp-content/uploads/2017/01/Fiduciary-Duties-and-Bad-Outcomes_Horak_NEW.pdf.

[161]     *See* Mangiero Report, ¶63.

[162]     For example, I understand from the SRC's meeting minutes that Mr. DiClemente "reiterated the Committee's desire to have Ron allocate the assets in the same proportionate share of the undivided interest in the investment portfolio of the WHX Trust." *See*, DiClemente Exhibit 29. *See also*, DiClemente Deposition, 23:4-12, 25:17-23, 35:10-14; DiClemente Exhibit 27, 37.

[163]     For example, the opinion from the New York trial notes that "Halpin testified credibly that 'everything we did, including this, was consistent with that [LaBow] had the authority exclusively.'" *See*, SDNY Opinion, p. 26. Similarly, I understand Ms. King testified in the New York trial that "every call that [she] was on, it was indicated to Mr. LaBow that he had the authority and did not need direction." *See*, SDNY Trial Transcript, 1098:18-20. *See also*, DiClemente Exhibit 50, 52; DiClemente Deposition, 172:20-25; Halpin Deposition, 56:22-24, 57:7-9, 96:6-23, 215:3-9.

[164]     SDNY Trial Transcript, 1076:6-10.

[165]     SDNY Opinion, p. 26, citing (Trial Transcript (DiClemente) at 474:5-7). I note that Judge Swain found Mr. DiClemente's testimony to be credible.

CONFIDENTIAL

85. In a similar fashion, the Mangiero Report incorrectly imputes the opinion of the New York trial, which found Mr. LaBow in breach of fiduciary duty, to claim that the SRC in fact breached its fiduciary duty.[166] However, I understand the opinion from the New York trial actually found Mr. LaBow's attempts to shift blame to the SRC "disingenuous."[167] Furthermore, the fiduciary responsibilities of Mr. LaBow at issue in the New York trial are not the same as the monitoring responsibilities of the SRC.[168] The Mangiero Report gives the false impression that because Mr. LaBow was found to have failed to apprise the Committee of his misconduct, the SRC was also at fault for Mr. LaBow's breach of fiduciary duty.[169]

86. The Mangiero Report also applies the same faulty logic to assess damages. Specifically, the Mangiero Report provides an analysis that simply demonstrates how different allocations of the SWI plan assets would have yielded higher returns than the actual allocations as of May 1, 2009.[170] The Mangiero Report then, without basis, attributes the differences in value between these hypothetical allocations and the actual value of the SWI plan assets to the SRC's purported failure to monitor. In doing so, the Mangiero Report's entire damages analysis builds on the false premise that these "lost opportunities" resulted from the SRC's monitoring-related activities.[171] In short, Dr. Mangiero fails to establish loss causation.

87. However, I understand Judge Swain concluded that Mr. LaBow's failure to fulfill his responsibilities as an investment manager caused the resulting SWI plan portfolio allocation.[172] In particular, the resulting SWI plan portfolio allocation was not the allocation that the SRC had requested leading up to the separation of the Combined Trust, nor was it the allocation that the SRC had clearly and frequently asked Mr. LaBow to implement after the discovery of the undiversified account.[173]

---

| 166 | Mangiero Report, ¶¶47, 55. |
| 167 | SDNY Opinion, pp. 30-31. |
| 168 | SDNY Opinion, pp. 3-4. |
| 169 | Mangiero Report, ¶47. |
| 170 | Mangiero Report, Section V. |
| 171 | Mangiero Report, ¶132. |
| 172 | SDNY Opinion, pp. 3, 4, 54. |
| 173 | DiClemente Deposition, 23:4-12, 25:17-23, 35:10-14; DiClemente Exhibit 7, 27, 37; Halpin Exhibit 59. |

CONFIDENTIAL

88. Furthermore, the allocation was not consistent with what I understand Mr. LaBow had communicated would be possible.[174] If Mr. LaBow had implemented the SRC's directives—as he led the SRC to believe was possible—and had, for example, allocated the SWI plan assets similarly to the WHX Trust, then the SWI plan assets would have performed comparably to the hypothetical portfolio allocations proposed by the Mangiero Report. As is evident from the first and third tables in Appendix 1 of the Mangiero Report, the WHX Trust fared better than Portfolios D and X and nearly as well as Portfolio A.[175]

89. Additionally, in Exhibit 4, I show the hypothetical values of the SWI plan assets had they been invested in the same assets as the WHX Trust. I compare this hypothetical allocation ("WHX Portfolio") to Dr. Mangiero's hypothetical Portfolios A, D, and X. The exhibit shows that if Mr. LaBow had followed the prudent and emphatic requests of the SRC to invest in a proportionally allocated "slice" of the Combined Trust, then the SWI plan assets would have performed comparably to Dr. Mangiero's suggested portfolios.

## VI.   CONCLUSION

90. In summary, it is my opinion that the Individual Severstal Retirement Committee Defendants acted in accordance with industry custom and practice with regard to monitoring Mr. LaBow's management of the SWI plan assets. Based on the case materials I have reviewed, the SRC had policies and procedures in place to alert them to possible investment issues. Following the discovery of an investment issue, the SRC engaged in corrective action by increasing communication with and oversight of Mr. LaBow, while also relying on outside ERISA counsel and pension consultants. Finally, the SRC took measured steps in deliberating the termination of Mr. LaBow, an approach that was especially important given the unprecedented and volatile market environment. These actions are in line with my experience and understanding of industry best practices related to retirement plan committee monitoring.

91. The Mangiero Report's assessment that the Individual Severstal Retirement Committee Defendants did not fulfill their duty to monitor is fundamentally flawed. The Mangiero

---

[174]   DiClemente Exhibit 29.
[175]   Mangiero Report, pp. 38 and 40.

CONFIDENTIAL

Report ignores relevant aspects surrounding the prudent actions of the SRC, selectively includes biased and results-oriented information, and misconstrues certain facts.  In particular, the Mangiero Report does not construct a reasonable standard against which to measure and assess the SRC's monitoring.  Instead, the Mangiero Report points to irrelevant facts and specific responsibilities of investment managers, rather than monitoring-related responsibilities of retirement plan committees, to draw conclusions against the Individual Severstal Retirement Committee Defendants.

92.  Furthermore, numerous standards expressed in the Mangiero Report, including those relating to a committee's assessment of an investment manager's qualifications and historical performance, depart even from Dr. Mangiero's own published writings.  In addition, the Mangiero Report relies on hindsight and fails to appropriately consider the volatile, unpredictable, and uncertain market conditions that the SRC faced during the relevant time period.  Finally, the Mangiero Report also applies flawed logic in its assessment of damages and erroneously attributes "lost opportunities" to the SRC rather than to Mr. LaBow.

93.  Based on the case materials I have reviewed and the flaws in the analytical approach of the Mangiero Report, I disagree with Dr. Mangiero's conclusion that the Individual Severstal Retirement Committee Defendants did not fulfill their duty to monitor.  Rather, it is my opinion that the Individual Severstal Retirement Committee Defendants' monitoring of Mr. LaBow and his management of the SWI plan assets is consistent with industry custom and practice.

Bruce E. Stangle

Bruce E. Stangle

January 22, 2018

CONFIDENTIAL

**Exhibit 1**
**Financial Market Events**
**December 2007 - December 2010**



**Source:** Maidment, Paul, "A U.S. Treasury View of the 2008 Financial Crisis and its Aftermath," *Blouin News*, September 11, 2013, available at http://blogs.blouinnews.com/blouinbeatbusiness/2013/09/11/a-u-s-treasury-view-of-the-2008-financial-crisis-and-its-aftermath/.

CONFIDENTIAL

**Exhibit 2**
**Key Communications Between the SRC and Mr. LaBow**

| Date | Description | Source |
|------|-------------|--------|
| December 30, 2008 | Mr. DiClemente emailed Mr. LaBow expressing concern regarding the unmanaged, undiversified Neuberger Berman Account. | DiClemente Exhibit 24 |
| December 30, 2008 | Mr. DiClemente and Ms. King held a conference call with Mr. LaBow to discuss how to reallocate the SWI plan assets. Mr. LaBow said he could reallocate the assets. Ms. King followed up after the call with an email about next steps. | DiClemente Exhibit 25; SDNY Opinion, pp. 23-24 |
| January 6, 2009 | Mr. DiClemente called Mr. LaBow to explain that the SRC wanted Mr. LaBow to reallocate the assets in accordance with the proportionally allocated portfolio as previously requested. | DiClemente Exhibit 27 |
| January 7, 2009 | The SRC and Ms. King held a meeting via teleconference with Mr. LaBow in which Mr. LaBow explained he could not reallocate the assets as he had originally indicated he would and suggested liquidating the account. The SRC asked Mr. LaBow to create a plan for a diversified portfolio. | DiClemente Exhibits 28, 29 |
| January 16, 2009 | The SRC held a meeting via teleconference with Mr. LaBow in which the SRC explained that they wanted Mr. LaBow to reallocate assets using funds for which there would be no transition issues. Mr. LaBow responded that this request might not be possible but provided a list of funds that he could use to reallocate the assets. The SRC explained that they wanted a formal allocation plan from Mr. LaBow before he took any action. | DiClemente Exhibit 36 |
| January 20, 2009 | The SRC sent a letter to Mr. LaBow, requesting that Mr. LaBow prepare a written plan to reallocate the assets and share this plan with the SRC and the WHX Pension Investment Committee. | DiClemente Exhibit 37 |
| January 26, 2009 | The SRC held a meeting via teleconference with Mr. LaBow in which Mr. LaBow explained why he could not reallocate the assets with certain funds. The SRC asked that Mr. LaBow put in writing which funds could not be allocated to SWI and the specific reasons as to why not. | DiClemente Exhibit 39 |

CONFIDENTIAL

| February 4, 2009 | Mr. LaBow sent a letter to the SRC explaining the funds he could not allocate to SWI and the reasons, and further explained his plan to invest a portion of the Neuberger Berman Account with Proxima, Mason Capital, Capital Defense, and a fund run by Wai Lee. | DiClemente Exhibit 40 |
|---|---|---|
| February 11, 2009 | Mr. LaBow called the SRC to describe reasons why he could not allocate funds to SWI and explain that he did not know what more he could have done. | DiClemente Exhibit 45 |
| February 11, 2009 | Mr. LaBow emailed the SRC asking about two funds discussed in the February 11, 2009, call and urging the SRC to turn the assets into cash. | DiClemente Exhibit 46 |
| February 13, 2009 | Mr. DiClemente emailed Mr. LaBow asking about investment materials that the SRC had asked Mr. LaBow to provide for certain funds in which Mr. LaBow was suggesting they invest. | DiClemente Exhibit 47 |
| February 24, 2009 | Ms. King sent a letter to Mr. LaBow describing the SRC's steps to move the situation forward and expressing the SRC's request that Mr. LaBow provide regular written reports about the performance status of the SWI plan assets, as an addition to the reports the SRC received quarterly from Mercer. | DiClemente Exhibit 50 |
| March 19 and 23, 2009 | Mr. Halpin and Mr. LaBow exchanged emails in which Mr. LaBow described the performance of the assets and Mr. Halpin expressed that he could assist Mr. LaBow if needed in liquidating the Neuberger Berman assets the next day (March 24, 2009). | DiClemente Exhibit 55 |
| March 25, 2009 | Mr. Halpin emailed Mr. LaBow providing Mr. LaBow with fund information and noting that he (Mr. Halpin) would process any paperwork needed. | DiClemente Exhibit 57 |

CONFIDENTIAL

**Exhibit 3**
**Comparison of Annual Returns for WHX Pension Plan,**
**SRC Target Rate of Return, and S&P 500 Index**

|  | Annual Returns | | | WHX Outperformance of S&P 500 |
|---|---|---|---|---|
|  | WHX | SRC Target | S&P 500 |  |
| **2004** | 12.04% | 8.00% | 10.74% | 1.30% |
| **2005** | 10.79% | 8.00% | 4.83% | 5.96% |
| **2006** | 13.87% | 8.00% | 15.61% | -1.74% |
| **2007** | 12.36% | 8.00% | 5.48% | 6.88% |
| **2008** | -21.28% | 8.00% | -36.55% | 15.27% |

Sources:
[1] WPN006358 at 64.
[2] "Plaintiffs' Exhibit 2, April 6, 2006 Memo from Mercer to Michael DiClemente," U.S. District Court – Southern District of New York, Case No. 10-954 (LTS) (GWG).
[3] Damodaran, Aswath, "Annual Returns on Stock, T.Bonds and T.Bills: 1928 - Current," NYU Stern, available at http://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/histretSP.html.

CONFIDENTIAL

Exhibit 4
### Value of the SWI Plan Assets under WHX Portfolio
### Compared to Portfolios A, D, and X
### 11/1/2008 to 5/1/2009



Final Asset Value as of May 1, 2009

| | |
|---|---|
| WHX Portfolio: | $38,303,579 |
| Portfolio A: | $38,863,003 |
| Portfolio D: | $38,033,256 |
| Portfolio X: | $37,814,873 |

Notes:
[1] Asset values for Portfolios A, D, and X are from Appendix 1 of the Mangiero Report.
[2] The WHX Portfolio shows the hypothetical values of the SWI plan assets had they been invested in the same assets as the WHX Trust. Asset values for the WHX Portfolio are calculated by applying the WHX Trust's historical rate of return, provided in Appendix 1 of the Mangiero Report, to the "Rate of Return" column in the Estimated Damages Calculations section in Appendix 1 of the Mangiero Report.

Source:
[1] Expert Report of Dr. Susan Mangiero, December 11, 2017 ("Mangiero Report").

CONFIDENTIAL

## Appendix A

### BRUCE E. STANGLE, PH.D.
**Co-founder**

Phone: 617 425 8110
Fax: 617 425 8001
bruce.stangle@analysisgroup.com

111 Huntington Avenue
14th Floor
Boston, MA 02199

A co-founder of Analysis Group, Inc., Dr. Stangle specializes in the fields of industrial organization, economics, and finance. He has over 30 years of experience directing large research projects in numerous industries on issues relating to antitrust, regulation, bankruptcy, ERISA, and securities matters, and has consulted with Fortune 500 companies on various management, strategy and policy issues. Dr. Stangle has provided testimony on class certification, market definition, entry conditions, competitive effects, securities valuation, and damages. He is a member of the Board of Directors of Wellington Trust Company, NA, and, until recently, The Marsico Investment Fund, two separate money management firms. He is a Trustee Emeritus of Bates College. Dr. Stangle also occasionally serves on the boards of startup firms and was formerly a director of a venture capital firm.

## EDUCATION

| | |
|---|---|
| 1978 | Ph.D., applied economics, MIT Sloan School of Management |
| 1974 | M.S., management, MIT Sloan School of Management<br>*Thesis: "An Analysis of Computer Security in an Ambulatory Medical Care Facility"* |
| 1970 | B.A., English, Bates College |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1981–Present | Analysis Group, Inc.<br>*Co-founder* |
| 2001–Present | Wellington Trust Company, NA<br>*Member, Board of Directors* |
| 2010–2017 | The Marsico Investment Fund<br>*Independent Trustee* |
| 1998–2012 | Bates College<br>*Trustee* |
| 1998–2010 | Massachusetts Institute of Technology, Economics Department<br>*Member, Visiting Committee* |
| 1994–1998 | Massachusetts Technology Development Corporation<br>*Member, Board of Directors* |
| 1978–1980 | Arthur D. Little, Inc.<br>*Senior Economist* |

CONFIDENTIAL

## DISSERTATION

"Price Determination in the Markets for Beef," Committee: M.A. Adelman (Chair), Paul L. Joskow, Lester C. Thurow

## PUBLICATIONS AND PRESENTATIONS

"Back to the Future: Revisiting Class Certification in In Re: Visa Check/MasterMoney Antitrust Litigation Under the Standards Enunciated in In Re: Initial Public Offering Securities Litigation," participant in mock hearing at New York State Bar Association, Antitrust Law Section Annual Meeting (January 26, 2012)

"What Did Satyam Investors Lose?" with Gaurav Jetley, guest op-ed column, *The Economic Times* (February 25, 2009)

"Calculating Cartel Overcharges," presented at Fordham Law School (November 2007-2011)

"An Assessment of Competition in California Title Insurance and Escrow Markets," with Bruce A. Strombom, report prepared for First American Title Insurance Company (August 30, 2006)

"Evaluation of Proposed Regulations for the California Title Insurance and Escrow Industry," with Bruce A. Strombom, report prepared for First American Title Insurance Company (August 30, 2006)

"Competition and Title Insurance Rates in California," with Bruce A. Strombom, report prepared for First American Title Insurance Company (January 23, 2006)

"Market Efficiency Versus Behavioral Finance," with Burton Malkiel and Sendhil Mullainathan, *Journal of Applied Corporate Finance*; 17(3):74-84 (Summer 2005)

"Is Competitive Entry Free? Bypass and Partial Deregulation in Natural Gas Markets," with Paul W. MacAvoy and Daniel F. Spulber, *Yale Journal on Regulation* (1989)

"Economics of U.S. and Pacific Rim Insurance Markets," invited paper presented at the American Bar Association annual meeting, Hawaii (August 8, 1989)

"How Much Is Your Bank Worth?" with Michael F. Koehn and Laura Stiglin, *1988 Bank Performance Annual*, Edwin B. Cox, ed., Boston, MA: Warren, Gorham & Lamont (1988)

"Market Share and Profitability," with M.A. Adelman, *Antitrust and Regulation: Essays in Memory of John J. McGowan*, Franklin M. Fisher, ed., Cambridge, MA: M.I.T. Press (1985)

"New Antitrust Chief and Herfindahl Index," with William C. Pelster, *New York Law Journal* (1981)

"The Effect of Deposit-Rate Ceilings on Bank Risk: A Comment," with Michael F. Koehn, *Journal of Banking & Finance,* December 1980; 4(5):381-386.

"The Determinants of Systematic Risk and the Cost of Capital for the Regulated Electric Utility Industry," Cambridge, Mass: Working Paper, MIT Sloan School of Management.

"Federal Regulation of Energy, 1972-1974," with Paul W. MacAvoy, presented at the American Association for the Advancement of Science Annual Meeting, Session on Regulation, chaired by Professor George J. Stigler, New York (January 1975). Also published in *Technology Review*.

CONFIDENTIAL

## Appendix B

### BRUCE E. STANGLE, PH.D.
### Recent Expert Testimony

- ***JP Morgan Stable Value Fund ERISA Litigation***
  *U.S. District Court, Southern District of New York*, Case No. 1:12-cv-02548
  Deposition testimony regarding whether from an economic standpoint, liability, causation, and damages can be determined on a class-wide basis.

- **Modafinil antitrust litigation**
  *U.S. District Court, Eastern District of Pennsylvania*, Case No. 2:06-cv-01797
  Deposition testimony (on two occasions) regarding damages in case involving alleged delay of generic entry.

- ***Merrimon et al. v. Unum Life Insurance Company of America***
  *U.S. District Court, District of Maine*, Case No. 2:10-cv-00447
  Deposition and trial testimony regarding the reasonableness of the interest rate provided by Unum for its Retained Asset Account.

- ***Class v. Genworth Financial Wealth Management, Inc., et al.***
  *U.S. District Court, Eastern District of New York*, Case No. 2:09-cv-05603
  Deposition testimony regarding class wide injury and damages in Rule 10b-5 securities case involving mutual funds.

- **Flonase antitrust litigation**
  *U.S. District Court, Eastern District of Pennsylvania*, Case No. 2:08-cv-3301
  Deposition and evidentiary hearing testimony regarding indirect purchaser class certification in case involving alleged delay of generic entry.

- ***Charters v. John Hancock Life Insurance Company***
  *U.S. District Court, District of Massachusetts*, Case No. 1:07-cv-11371
  Deposition testimony in an ERISA case regarding fees charged to 401(k) plans.

- ***AT&T Inc. v. United States of America***
  *U.S. District Court, Western District of Texas, San Antonio Division*, Case No. 5:07-cv-00197
  Deposition testimony in a tax case regarding interpretation of Universal Service Fund payments.

- ***Class v. Bechtel Corporation, et al.***
  *U.S. District Court, Northern District of California, San Francisco Division*, Case No. 3:06-cv-05566
  Deposition testimony regarding damages in an ERISA case regarding a 401(k) plan.

CONFIDENTIAL

## Appendix C

## Materials Relied Upon

**Court Documents**

Memorandum Opinion, Thomas E. Perez, Secretary of Labor, United States Department of Labor v. WPN Corporation; Severstal Wheeling, Inc. Retirement Committee; Michael DiClemente; Dennis Halpin; Wheeling Corrugating Company Retirement Security Plan; and Salaried Employees Pension Plan of Severstal Wheeling, Case No. 2:14-cv-01494-NBF, United States District Court for the Western District of Pennsylvania, June 7, 2017.

Opinion and Order, Severstal Wheeling, Inc. Retirement Committee et al., v. WPN Corporation et al., Case No. 10CV954-LTS-GWG, United States District Court Southern District of New York, August 10, 2015.

Second Amended Complaint, R. Alexander Acosta, Secretary of Labor, United States Department of Labor v. WPN Corporation; Severstal Wheeling, Inc. Retirement Committee; Michael DiClemente; Dennis Halpin; Wheeling Corrugating Company Retirement Security Plan; and Salaried Employees Pension Plan of Severstal Wheeling, Case No. 2:14-cv-01494-NBF, United States District Court for the Western District of Pennsylvania, June 28, 2017.

Severstal Wheeling, Inc. Retirement Committee et al., v. WPN Corporation et al., Case No. 10CV954-LTS-GWG, United States District Court Southern District of New York, July 8-22, 2014 Trial Transcript.

**Expert Report**

Expert Report of Dr. Susan Mangiero, including data and documents considered, December 11, 2017.

**Depositions and Related Deposition Exhibits**

Deposition of Michael DiClemente, September 26, 2017.

Deposition of Dennis Halpin, September 27, 2017.

Deposition of Ronald LaBow, September 21-22, 2017.

CONFIDENTIAL

**Other Court Documents**

"Plaintiffs' Exhibit 2, April 6, 2006 Memo from Mercer to Michael DiClemente," U.S. District Court – Southern District of New York, Case No. 10-954 (LTS) (GWG).

**Bates Stamped Documents**

WPN006358

**Academic Articles and Publicly Available Documents**

*Arnerich Massena*, "Retirement Plan Best Practices: Plan Governance," November 2016, p. 9, available at http://arnerichmassena.com/pdf/white-papers/Plan%20Governance_final.pdf (last visited January 22, 2018).

Bernanke, Ben S., "Causes of the Recent Financial and Economic Crisis," Before the Financial Crisis Inquiry Commission, Washington D.C., September 2, 2010, available at https://www.federalreserve.gov/newsevents/testimony/bernanke20100902a.htm (last visited January 22, 2018).

*BlackRock*, "Evaluating ERISA 3(38) Investment Managers: A Guide for Plan Sponsors," 2017, available at https://www.blackrock.com/us/financial-professionals/literature/whitepaper/evaluating-erisa-investment-managers-whitepaper.pdf (last visited January 22, 2018).

Brunnermeier, Markus K., "Deciphering the Liquidity and Credit Crunch 2007-2008," *Journal of Economic Perspectives* 23(1), Winter 2009, available at https://www.princeton.edu/~markus/research/papers/liquidity_credit_crunch.pdf (last visited January 22, 2018).

*Callan*, "The Callan Periodic Table of Investment Returns: Annual Returns for Key Indices Ranked in Order of Performance (1997-2016)," available at https://www.callan.com/wp-content/uploads/2017/01/Callan-PeriodicTbl_KeyInd_2017.pdf (last visited January 22, 2018).

Damodaran, Aswath, "Annual Returns on Stock, T.Bonds and T.Bills: 1928 - Current," *NYU Stern*, available at http://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/histretSP.html (last visited January 22, 2018).

*Deloitte*, Annual Defined Contribution Benchmarking Survey, 2015 Edition, available at https://www2.deloitte.com/content/dam/Deloitte/us/Documents/human-capital/us-hc-annual-defined-benchmarking-survey-2015.pdf (last visited January 22, 2018).

Dennis Halpin Professional Profile, *LinkedIn*, available at https://www.linkedin.com/in/dennishalpincpa/ (last visited January 22, 2018).

C-2

CONFIDENTIAL

*Federal Reserve Bank of St. Louis*, "The Financial Crisis: Full Timeline," available at https://www.stlouisfed.org/financial-crisis/full-timeline (last visited January 22, 2018).

Gordon, Catherine A., Karin Peterson LaBarge, "Investment Committees: Vanguard's View of Best Practice," *Vanguard*, October 2010, available at https://www.vanguard.co.uk/documents/adv/literature/investment-committees-best-practice.pdf (last visited January 22, 2018).

Harris, Linda, "Severstal Acquisition Includes Wheeling-Pittsburgh Steel," *State Journal Corporation*, August 8, 2008, available at http://www.redorbit.com/news/business/1539342/severstal_acquisition_includes_wheelingpittsburgh_steel/ (last visited January 22, 2018).

Horak, John, "Fiduciary Duties and Bad Outcomes," *Fiduciary Investment Advisors*, May 2011, available at http://www.fiallc.com/wp-content/uploads/2017/01/Fiduciary-Duties-and-Bad-Outcomes_Horak_NEW.pdf (last visited January 22, 2018).

Maidment, Paul, "A U.S. Treasury View of the 2008 Financial Crisis and its Aftermath," *Blouin News*, September 11, 2013, available at http://blogs.blouinnews.com/blouinbeatbusiness/2013/09/11/a-u-s-treasury-view-of-the-2008-financial-crisis-and-its-aftermath/ (last visited January 22, 2018).

Mangiero, Susan, "An Economist's Perspective of Fiduciary Monitoring of Investments," *Bloomberg BNA, Pension & Benefits Daily*, 2015, available at https://papers.ssrn.com/sol3/Papers.cfm?abstract_id=2611870 (last visited January 22, 2018).

Mangiero, Susan, and Lee Heavner, "Economic Analysis in Fiduciary Monitoring Disputes Following the Supreme Court's 'Tibble' Ruling," *Bloomberg BNA, Pension & Benefits Daily*, 2015, available at http://www.analysisgroup.com/uploadedfiles/content/insights/publishing/economic_analysis_in_fiduciary_monitoring_disputes.pdf (last visited January 22, 2018).

Mangiero, Susan, Rhonda Prussack, and Emily Seymour Costin, "ERISA Plan Investment Committee Governance: Avoiding Breach of Fiduciary Duty Claims," *Strafford*, September 12, 2017, available at http://www.investmentbestpractices.com/wp-content/uploads/sites/400/2014/11/ERISA-Plan-Investment-Committee-Governance_Straffo.pdf (last visited January 22, 2018).

*Multnomah Group, Inc.*, "Retirement Plan Committee Best Practices, Simplified," available at http://www.multnomahgroup.com/retirement-plan-committee-best-practices-simplified (last visited January 22, 2018).

"Questions and Answers Relating to Fiduciary Responsibility Under the Employee Retirement Income Security Act of 1974," *Code of Federal Regulations*, Title 29, Subtitle B Chapter XXV Subchapter A, Part 2509, available at https://www.ecfr.gov/cgi-bin/text-idx?SID=3dfb5ec36687b2783ba01470987e7a54&node=pt29.9.2509&rgn=div5#se29.9.2509_175_68 (last visited January 22, 2018).

CONFIDENTIAL

*RBC Wealth Management*, "Establishing an Investment Committee for Your Company's Retirement Plan," March, 2016, available at https://www.rbcwm-usa.com/resources/file-687792.pdf (last visited January 22, 2018).

*Reuters*, "Company News; WHX Announces a Friendly Deal for Handy & Harman," *The New York Times*, March 3, 1998, available at http://www.nytimes.com/1998/03/03/business/company-news-whx-announces-a-friendly-deal-for-handy-harman.html (last visited January 22, 2018).

*RSM*, "Tibble Confirms Onus on Employers for Retirement Plan Fund Monitoring," July 23, 2015, available at http://rsmus.com/what-we-do/services/wealth-management/tibble-confirms-onus-on-employers-for-retirement-plan-fund-monit.html (last visited January 22, 2018).

"Severstal Completes Acquisition of Esmark, Wheeling-Pitt" *The Business Journal, Youngstown, Ohio*, July, 29, 2008, available at http://archive.businessjournaldaily.com/severstal-completes-acquisition-esmark-wheeling-pitt-2008-7-29 (last visited January 22, 2018).

"Severstal Completes Esmark Acquisition," *Pittsburgh Business Times*, August 5, 2008, available at https://www.bizjournals.com/pittsburgh/stories/2008/08/04/daily14.html (last visited January 22, 2018).

*Strategic Investment Group*, "The Art and Science of Manager Termination," *Fiduciary Insights*, 2014, pp. 3-4, available at https://www.strategicgroup.com/sites/default/files/wp-content/uploads/2014/08/OT-FI-GO-01-The-Art-and-Science-of-Manager-Termination.pdf (last visited January 22, 2018).

*Strategic Retirement Group, Inc.*, "Establishing an Investment Committee for a Defined Contribution Retirement Plan," available at http://srg-consulting.com/sites/srg/files/attachments/Investment%20Commitee%20-%20Defined%20Contribution.pdf (last visited January 22, 2018).

Tenenbaum, Jeffery, Rory Cohen, Michael Graham, and Charles Tate, "Due Diligence Considerations for Nonprofit Investment Fiduciaries," *Venable, Merrill Lynch, Tate & Tryon*, May 7, 2009, available at https://www.venable.com/files/publication/405c67c9-d836-4ea0-a87e-6b93598b128e/presentation/publicationattachment/22441015-12ac-4c38-8c33-6eb5abbcfb3c/due_diligence_seminar_5.7.09.pdf (last visited January 22, 2018).

Transcript of Wheeling-Pittsburgh Conference Call, August 10, 2007, available at https://www.sec.gov/Archives/edgar/data/1392600/000119312507182923/dex991.htm (last visited January 22, 2018).

*U.S. Department of Labor Employee Benefits Security Administration*, "Getting It Right: Know Your Fiduciary Responsibilities, Tips for Selecting and Monitoring Service Providers for your Employee Benefit Plan," June 2, 2005, available at https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/fs052505.pdf (last visited January 22, 2018).

*U.S. Department of Labor Employee Benefits Security Administration*, "Meeting Your Fiduciary Responsibilities," February 2012, available at https://www.dol.gov/sites/default/files/ebsa/about-

C-4

CONFIDENTIAL

ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf (last visited January 22, 2018).

Van Loon, Gilbert, "Best Practices in Period Review of Participant Directed Retirement Plans," *Butler, Snow, O'Mara, Stevens & Cannada, PLLC*, May 2013, available at http://www.butlersnow.com/wp-content/uploads/2014/08/Benefits-Commentary-Best-Practices-in-Periodic-Reviews.pdf (last visited January 22, 2018).

*Vanguard*, "Best Practices for Plan Fiduciaries," 2013, available at https://institutional.vanguard.com/iam/pdf/BestPracticesPlanFiduciaries.pdf (last visited January 22, 2018).

*Vanguard*, "What Matters Most? An Analysis of Investment Committee Hire/Fire Decisions," September 2010, available at http://agb.org/sites/default/files/legacy/u16/Vanguard%204.pdf (last visited January 22, 2018).

*The Wagner Law Group*, "Retirement Plan Governance: Understanding the Role of a Benefit Plan Committee," Legg Mason Global Asset Management, January 2017, available at http://www.wagnerlawgroup.com/documents/plan-governance-wagner-white-paper.pdf (last visited January 22, 2018).

Weinberg, John, "The Great Recession and its Aftermath," *Federal Reserve Bank of Richmond*, November 22, 2013, available at https://www.federalreservehistory.org/essays/great_recession_and_its_aftermath (last visited January 22, 2018).

*Wells Fargo*, "Your Role as a Fiduciary," available at https://www08.wellsfargomedia.com/assets/pdf/commercial/retirement-employee-benefits/perspectives/role-as-a-fiduciary.pdf (last visited January 22, 2018).