**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| R. ALEXANDER ACOSTA, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, | : | |
| Plaintiff, | : | Case No. 2:14-cv-01494-NBF |
| v. | : | |
| WPN CORPORATION, RONALD LABOW, SEVERSTAL WHEELING, INC. RETIREMENT COMMITTEE, MICHAEL DICLEMENTE, DENNIS HALPIN, WHEELING CORRUGATING COMPANY RETIREMENT SECURITY PLAN, and SALARIED EMPLOYEES' PENSION PLAN OF SEVERSTAL WHEELING, INC., | : | |
| Defendants. | : | |

---

## SECRETARY'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS SEVERSTAL WHEELING, INC. RETIREMENT COMMITTEE, MICHAEL DICLEMENTE, AND DENNIS HALPIN

**I.     INTRODUCTION**

Plaintiff, R. Alexander Acosta, Secretary of Labor, United States Department of Labor, ("Secretary"), moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment against Defendants Severstal Wheeling, Inc. Retirement Committee ("Retirement Committee"), Michael DiClemente, and Dennis Halpin ("Defendants") and submits this memorandum of law in support.  The Wheeling Corrugating Company Retirement Security Plan ("Wheeling Corrugating Plan") and the Salaried Employees' Pension Plan of Severstal Wheeling, Inc. ("Salaried Plan") (collectively "the Plans") are employee retirement plans and are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. Defendants were fiduciaries to the Plans and had a duty under ERISA to ensure that, when the

Plans' assets were being separated from the commingled WHX Trust, the appropriate and agreed upon assets were received into the Plans. Defendants also had a fiduciary duty to monitor their investment manager, Ronald LaBow, and his company, WPN Corporation (collectively, "LaBow") and had a duty to remove him when he failed to properly invest the assets of the Severstal Trust. Defendants breached their duties.

As a result of these breaches, from November 3, 2008 through July 16, 2009, several hundred participants and beneficiaries of the Plans lost millions of dollars of their retirement savings.[1] The Secretary seeks the restoration of these losses by Defendants to the Plans.[2] Defendants do not dispute that the Plans were imprudently invested, first in an undiversified portfolio of energy stocks between November 3, 2008 and March 24, 2009, and then after the stocks were sold, 100% in cash from March 24, 2009 to July 16, 2009. There also is no dispute that Defendants—the named fiduciaries with overall responsibility for the Plans—(a) accepted the undiversified assets into the Plans, (b) failed to discover that the assets they approved were undiversified and not being managed, and (c) failed to act to protect the participants' retirement

---

[1] The publicly available Form 5500 reports filed annually by the Plans with the Department of Labor indicate that there were 945 participants at the end of the 2008 plan year and 796 at the end of the 2009 plan year. See Appendix.

[2] The Retirement Committee sued Mr. LaBow and WPN in the Southern District of New York for imprudently investing the Plans' assets. Messrs. DiClemente, Halpin and LaBow, among others, testified at the hearing. Judge Laura Taylor Swain issued her decision on August 10, 2015, entering judgment against Mr. LaBow and WPN in the amount of approximately $15 million. *Severstal Wheeling, Inc. Retirement Committee v. WPN Corp.*, 119 F.Supp. 3d 240, 270 (S.D.N.Y. 2015) ("Severstal I"). The Second Circuit Court of Appeals upheld the decision on August 30, 2016. *Severstal Wheeling, Inc. Retirement Committee v. WPN Corp.,* 659 F. App'x 24 (2nd Cir. 2016) ("Severstal II"). To date, only about 15% of the award from the Southern District of New York has been satisfied from the sale of WPN's condominium in New York City. The liability of the Retirement Committee, Mr. DiClemente, and Mr. Halpin for failing to take reasonable steps to ensure that appropriate assets were received into the Plans and for failing to prudently monitor Mr. LaBow and WPN, was not an issue in the Southern District of New York case. Earlier in this litigation, the Secretary settled his claims against the Retirement Committee for actions taken after May 1, 2009 by the members of the Retirement Committee who replaced Mr. DiClemente and Mr. Halpin. ECF No. 104. Therefore, the period pertinent to damages in this litigation is from November 1, 2008 through May 1, 2009.

savings for months thereafter while losses mounted.  Defendants are liable for these breaches and cannot simply shift all blame to their service provider, Mr. LaBow.

**II.   ARGUMENT**

    A.    <u>The Secretary is Entitled to Partial Summary Judgment Against Defendants.</u>

Under Federal Rule of Civil Procedure 56, a party is entitled to summary judgment on a showing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006)).  Disputed facts will only preclude summary judgment if they might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When deciding a motion for summary judgment, a court must accept well-pleaded factual allegations as true and draw all reasonable inferences in the nonmoving party's favor given the record as a whole. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).  However, conclusory or speculative allegations do not suffice to create a genuine dispute, nor does a mere scintilla of evidence in support of the nonmoving party's case. *Thompson v. Potomac Elec. Power*, 312 F.3d 645, 649 (4th Cir. 2002).

    B.    <u>The Plans are Governed by ERISA.</u>

No dispute exists over whether ERISA covers the Plans in this case.  ERISA applies to any "employee benefit plan established or maintained by . . . any employer engaged in commerce." 29 U.S.C. § 1003(a).  An "employee welfare benefit plan" is any plan, fund, or program established or maintained by an employer for the purpose of providing certain benefits,

3

including retirement benefits, for its participants or their beneficiaries.  29 U.S.C. §§ 1002(1), 186(c).  "An ERISA plan 'is established if from the surrounding circumstances a reasonable person can ascertain (1) the intended benefits, (2) a class of beneficiaries, (3) the source of financing, and (4) procedures for receiving benefits.'"  *Menkes v. Prudential Ins. Co. of America*, 762 F.3d 285, 290 (3d Cir. 2014) (quoting *Shaver v. Siemens Corp.*, 670 F.3d 462, 475 (3d Cir. 2012)).  Important factors in this analysis are "whether the employer has expressed an intention to provide benefits on a regular and long-term basis," *Gruber v. Hubbard Bert Karle Weber, Inc.*, 159 F.3d 780, 789 (3d Cir. 1998), and whether the plan establishes a "separate and ongoing administrative scheme . . . to determine eligibility for benefits."  *Menkes*, 762 F.3d at 290 (quoting *Shaver*, 670 F.3d at 476).

Here, the Plans were funded by direct employer contributions to provide retirement benefits to employees on a regular and long-term basis.  Michael DiClemente Deposition, September 26, 2017 ("DiClemente") at 60, 148; Dennis Halpin Deposition, September 27, 2017 ("Halpin") at 47, 48; *Severstal I* at 243, n.2, JX 6 at p. 8-9, JX 7 at p. 8-9.  The Plans had 945 participants at the end of the 2008 plan year and 796 at the end of 2009.  The Plans' documents also provide for an administrative scheme by which employees were enrolled in and received benefits from the Plans.  Halpin at 48; *Severstal I* at 243, n.2, JX 6 at p. 5, 16, JX 7 at p. 8, 13, 14.  Indeed, Mr. LaBow testified at his deposition in the present case that the Plans were governed by ERISA and that the Plans needed cash to be able to pay benefits to employees.  Ronald LaBow Deposition, September 22, 2017 ("LaBow") at 47, 89-90, 143, 155, 258, 307-08.

    C.    <u>Defendants are Fiduciaries to the Plans.</u>

ERISA recognizes two types of fiduciary: named fiduciaries and functional fiduciaries.  *See Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co.*, 768 F.3d 284, 291

(3d Cir. 2014). Named fiduciaries are those identified in the plan document as required by statute for the establishment of a plan. *See* 29 U.S.C. § 1102(a)(2). A person is a functional fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i). Further, a person may be a fiduciary if he "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(iii). The term "administration" means acting with "such powers as are necessary or appropriate for the carrying out of the purposes" of the plan. *Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996) (internal quotation marks omitted). Thus, the statute defines a fiduciary, in part, in functional terms of control and authority over the plan, which expands the universe of persons subject to fiduciary duties beyond the common law definition. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993); *Sec'y U.S. Dep't. of Labor v. Koresko,* 646 F. App'x 230, 235 (3d Cir. 2016). Whether a defendant is a fiduciary is a mixed question of law and fact. *Reich v. Lancaster,* 55 F.3d 1034, 1044 (5th Cir. 1995).

Defendants are fiduciaries under ERISA, both as named fiduciaries and as functional fiduciaries. The Plan document of the Wheeling Corrugating Plan states:

> The general administration of the Plan and the responsibility for carrying out the provisions of the Plan shall be placed in a Retirement Committee comprised of not less than three (3) directors, officers, or employees of Wheeling-Pittsburgh Steel Corporation appointed from time to time by the Board. The Committee shall be the plan administrator within the meaning of ERISA, and the Committee and each member thereof also shall be deemed to be a Named Fiduciary within the meaning of ERISA.

*Severstal I* at 243, n.2, JX 6 at 29. The Salaried Plan states similarly:

> The general administration of the Plan and the responsibility for carrying out the provisions of the Plan shall be placed in a Retirement Committee comprised of not less than three directors, officers, or employees of the Company appointed from time to time by the Board of Directors. The Committee shall be the Plan Administrator

5

> within the meaning of ERISA, and the Committee and each member thereof also shall be deemed to be a Named Fiduciary within the meaning of ERISA.

*Severstal I* at 243, n.2, JX 7 at 27. Mr. DiClemente and Mr. Halpin had both the *authority* and the *responsibility,* as the only members of the Retirement Committee (DiClemente 10) (Halpin 7, 10, 135) and as named fiduciaries in the Plans' documents, to be fiduciaries under Section 3(21)(A)(iii) of ERISA. Mr. DiClemente concedes that he owed fiduciary responsibilities to the "plan sponsor and the participants in [sic] the beneficiaries." Michael DiClemente Deposition, October 28, 2010 ("DiClemente SDNY") at 66. The Retirement Committee as the plan administrator likewise had the authority and responsibility, conferred directly by the Plans' documents, to be a fiduciary under Section 3(21)(A)(iii) of ERISA. *Severstal I* at 243, n. 2, JX 6 at p. 29, JX 7 at p. 27.

Defendants also *exercised* authority over the management and administration of the Plans to constitute fiduciaries under Section 3(21)(A)(i) of ERISA. Defendants hired and retained service providers including Mr. LaBow as investment manager (DiClemente at 65; Halpin at 33), Citibank (DiClemente at 52) and then National City Bank (DiClemente at 115) as trustees, Mercer as investment consultants (DiClemente at 12; Halpin at 82, 102, 103) and Sally King of Maguire Woods (DiClemente at 64; Halpin at 102) as attorney. Defendants also negotiated with Neuberger Berman to manage the account but ultimately did not retain them because they could not agree on fees. (DiClemente 56; Halpin 187, 225, 226).

Finally, Defendants exercised control over the Plans' *assets* by directing Citibank to accept the undiversified Neuberger Berman account of undiversified energy stocks into the Plans' trust as the Plans' sole asset in the Severstal Trust, and are therefore fiduciaries under Section 3(21)(A)(i) of ERISA on this basis as well. DiClemente at 52, EX 10, 11. Indeed, Mr. DiClemente had discussed for months prior to November 3, 2008 how the new Severstal Trust would receive its assets. DiClemente at 24, 38, 42; Halpin at 28. Ultimately, Mr. DiClemente

directed that the Severstal Trust accept an undiversified and imprudent portfolio of stock.  After discovering that the Plans' only asset in the new Severstal Trust was the undiversified Neuberger Berman account, Mr. DiClemente and Mr. Halpin discussed how to reallocate Plan assets with LaBow and WHX to attempt to redistribute the assets.  DiClemente at 164, 165; Halpin at 89.

The power to hire, retain, and remove plan fiduciaries is an example of discretionary authority that renders the Retirement Committee, Mr. DiClemente, and Mr. Halpin ERISA fiduciaries.  *Coyne & Delaney Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996) ("[T]he power . . . to appoint, retain and remove plan fiduciaries constitutes 'discretionary authority' over the management or administration of a plan within the meaning of § 1002(21)(A).").  Therefore, Defendants are fiduciaries to the Plans and the Secretary is entitled to summary judgment.

D.  ERISA's Fiduciary Duties

ERISA imposes three different but overlapping requirements on fiduciaries, including the duty of loyalty, the duty of prudence, and the duty to act for the exclusive purpose of providing benefits to plan participants.  29 U.S.C. § 1104(a)(1)(A), (B); *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982).  Congress meant for courts to interpret the fiduciary standards through the development of a federal common law of rights and obligations under the statute, *see Varity Corp.*, 516 U.S. at 497, with the underlying principle that fiduciary duties are "the highest known to the law."  *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) (citation omitted).  Breaching these duties subjects fiduciaries to personal liability to make good to the plan any losses resulting from breaches of fiduciary duty.  29 U.S.C. § 1109(a); *Tatum,* 761 F.3d at 356.  Defendants in the present case had fiduciary duties to the Plans' participants in carrying out the administration and management of the Plans and the disposition of their assets.

7

1.      Defendants' Acceptance of the Undiversified Neuberger Berman Account Constitutes a Breach of Their Fiduciary Duty to the Plans.

"In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). The Supreme Court explains that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1828 (2015). As explained in the Law of Trusts and Trustees:

> A trustee taking office immediately owes the beneficiary the duty of examining the trust property, possession of and title to which is tendered to the trustee, for the purpose of ascertaining whether it corresponds in kind and amount with that which ought to be delivered, regardless whether the trustee takes office by receipt of the trust property from the settlor or executor, or upon appointment as the successor of a sole trustee, or upon becoming a co-trustee.

A. Hess, G. Bogert, The Law Of Trusts And Trustees § 684 (duty to examine and review trust investments). "ERISA clearly assumes that trustees will act to ensure that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries. . . ." *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 571 (1985). Here, there is no dispute that Defendants took *no action* to confirm that when the Severstal Trust was being funded it received the type of assets that were expected.

There is no dispute that at the time the assets were being transferred to the Plans, Mr. DiClemente and Mr. Halpin had agreed to and expected to receive a different set of investments—ones that represented a diversified share from the WHX Trust. Mr. DiClemente concedes that "[w]e had an understanding that we were expected to receive a proportionate share of the assets that comprised the combined portfolio." DiClemente at 44, 45; Halpin at 28. This expectation arose because of Mr. DiClemente's understanding that the Plans had "a

8

proportionate interest in [the WHX Trust] whose assets were commingled and managed together." DiClemente SDNY at 84. Consistent with this understanding and prior to accepting the assets into the trust, Mr. DiClemente directed on September 30, 2008 that the WHX Trust transfer the assets to Citibank "in the same percentage allocations as existed in the WHX Pension Trust." DiClemente at 44, EX 7.

On November 4, 2008, Citibank asked Mr. DiClemente (not Mr. LaBow) for instructions regarding "how you want these assets to be separated." DiClemente at 53; *Severstal I* at 250. In response, Mr. DiClemente drafted a letter directing the receipt of assets from the WHX Trust without checking with Mr. LaBow or ever confirming the value or type of assets he was accepting into the Severstal Trust. DiClemente at 53, 88. Indeed, Mr. Halpin stated that he saw no need to check if Defendants' instructions had been properly carried out and that the Plans had received the diversified assets he expected. Halpin at 23.

At the time Defendants accepted the undiversified assets, a written investment management agreement did not exist and, therefore, Citibank looked to the Defendants to authorize the receipt of the Neuberger Berman account into the Severstal Trust. Defendants therefore exerted *full* control over the Plans' assets and had a duty to ascertain that the assets were transferred in a manner consistent with the agreements regarding the segregation of the Plans' assets (*i.e.* transfer of assets that were diversified and prudent) and to ensure assets were being properly managed. See ERISA Section 404(a)(1)(B) – a fiduciary's duty to act prudently. Defendants owed a duty to the Plans to act prudently to confirm that the assets being received from the WHX Trust were consistent with the existing agreements regarding how the portfolios were to be divided.

9

### 2. Defendants Had a Duty under ERISA to Monitor Their Investment Manager, Mr. LaBow.

Courts, including this Court, have uniformly recognized that a duty to monitor a service provider is inherent in a fiduciary's power to appoint and dismiss that service provider. Slip Op. at 25, ECF No. 144; *see, e.g.*, *Coyne & Delany Company v. Selman,* 98 F.3d 1457, 1465-66 (4th Cir. 1996); *Ed Miniat, Inc. v. Globe Life Insurance Group, Inc.*, 805 F.2d 732, 736 (7th Cir. 1986), *cert. denied*, 482 U.S. 915 (1987); *Martin v. Feilen*, 965 F.2d 660, 669-70 (8th Cir. 1992), *cert. denied,* 506 U.S. 1054 (1993); *Henry v. Frontier Industries, Inc.*, Nos. 87-3879, 87-389, 1988 WL 132577, *3 (9th Cir. Dec. 1, 1988). Courts within the Third Circuit have likewise recognized this duty of fiduciaries. *See, e.g.*, *Graden v. Conexant Systems, Inc.*, 574 F. Supp. 2d 456, 466-67 (D.N.J. 2008); *In re Merck & Company, Inc. Securities Derivative & ERISA Litigation*, No. 05–2369, 2006 WL 2050577, *17 (D.N.J. July 11, 2006); *In re RCN Litigation*, No. 04–5068, 2006 WL 753149, *9 (D.N.J. Mar. 21, 2006); *Mehling v. New York Life Ins. Co.*, 163 F. Supp. 2d 502, 509-10 (E.D. Pa. 2001). Therefore, Defendants owed a duty to the participants of the Plans to monitor Mr. LaBow as the investment manager for the Plans.

The Secretary's regulations address an appointing fiduciary's duty to monitor:

> Q: What are the ongoing responsibilities of a fiduciary who has appointed trustees or other fiduciaries with respect to those appointments?
> A: At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan. No single procedure will be appropriate in all cases; the procedure adopted may vary in accordance with the nature of the plan and other facts and circumstances relevant to the choice of the procedure.

29 C.F.R. § 2509.75–8, at FR–17. Courts have likewise held that monitoring fiduciaries must carefully evaluate the service providers they hire. "Defendants' argument that the duty to

monitor is not so broad as to go beyond merely appointing and terminating plan fiduciaries is untenable.  The duty to appoint or remove a plan fiduciary would be rendered meaningless if it did not inherently involve an evaluation of the fiduciary's performance vis-a-vis the statutory prudent man standard of care owed by plan fiduciaries to participants." *Graden v. Conexant Sys., Inc.*, 574 F. Supp. 2d at 467 (citing *In re Westar Energy, Inc., ERISA Litig.*, No. 03–4032, 2005 WL 2403832, at *24 (D. Kan. Sept. 29, 2005)).  Under ERISA, the "power to appoint carries with it the power to reasonably monitor the individuals who have been appointed." *Chao v. Constable*, No. 04-1002, 2006 WL 3759749, at *5 (W.D. Pa. Dec. 19, 2006).

Defendants here had a duty to monitor Mr. LaBow as part of their duties of loyalty and prudence under Section 404(a)(1)(A) and (B) of ERISA.  As fiduciaries to the Plans, Defendants hired Mr. LaBow as investment manager for the Plans and retained him as long as Mr. DiClemente and Mr. Halpin were on the Retirement Committee.  DiClemente at 65.  Mr. LaBow was only fired on or about May 19, 2009 after new members had replaced Mr. DiClemente and Mr. Halpin on the Retirement Committee.  *Severstal I* at 260.  Defendants unquestionably breached their duty in the months that followed their ill-fated decision to accept an undiversified portfolio of stock into the Severstal Trust.  This Court has stated that an appointing fiduciary has a duty "to take corrective action when required" as part of its duty to monitor.  Slip Op. at 27, ECF No. 144.  "Moreover, if an appointing fiduciary is relieved from liability simply by implementing monitoring procedures with regular reporting, even when monitoring reveals a need for corrective action but the appointing fiduciary does not act, the duty to monitor is reduced to a mere procedural implementation." Id., at 28.  Dr. Mangiero determined that Defendants should have fired Mr. LaBow sooner.  Mangiero Report at 31.  For these reasons, the Secretary is entitled to summary judgment on this issue.

### 3. Defendants Breached Their Duty Under ERISA to Monitor Their Investment Manager, Mr. LaBow, and Discover His Fiduciary Breaches.

As fiduciaries, Defendants were charged with separating the Plans' assets from the commingled WHX trust. The trust separation was a significant change for the Plans and Defendants could not satisfy their duty to monitor Mr. LaBow in those circumstances by passively relying on quarterly reports as they had in the past. Halpin at 16-17; Mangiero Rep. at 20, 22, 29, 32. "The duty of prudence also requires fiduciaries to monitor the prudence of their investment decisions to ensure that they remain in the best interest of plan participants." *DiFelice v. U.S. Airways, Inc*. 497 F.3d 410, 423 (4th Cir. 2007). "The evaluation is not a general one, but rather must 'depend on the character and aim of the particular plan and decision at issue and the circumstances prevailing at the time." *Id*. at 420 (alteration omitted) (quoting *Bussian v. RJR Nabisco, Inc*., 223 F.3d 286, 299 (5th Cir.2000)). *See also Tatum v. RJR Pension Inv. Comm*., 761 F.3d at 358.

In creating the standalone Severstal Trust, Defendants not only had to establish an independent trust, but also had to initiate new contracts with service providers. Defendants could no longer rely on WHX to contract with investment fund managers for Mr. LaBow or to direct the trustee to transfer assets. DiClemente at 56. Mr. DiClemente and Mr. Halpin did not know that WHX had contracted with fund managers directly, rather than through Mr. LaBow, in the commingled trust. DiClemente at 59, 122. Moreover, because of the commingled assets, Defendants were aware an independent audit was required to determine the interest each retirement plan had in the assets before final separation. DiClemente at 151-52. In addition, the adverse economic conditions then prevailing heightened the care required to be exercised by a prudent fiduciary. Mangiero Rep. at 9, 13. Therefore, Defendants were charged with implementing a complex financial transaction and, as such, had to take steps commensurate to

ensure that the transaction was prudently executed on behalf of the participants of the Plans. Defendants were experienced in financial matters and, therefore, should have recognized their responsibilities. Mr. DiClemente made much of his experience as an "institutional investment advisor". DiClemente at 20, 147-48. Mr. DiClemente even stated that he had dealt with trust separations in the past, which Mr. LaBow had not. DiClemente at 95, 96; LaBow at 247. Mr. Halpin was a CPA and was therefore familiar with financial affairs. Halpin at 9. Defendants were equipped by their training and experience to understand the issues involved in the trust separation and to effectively monitor their investment manager, Mr. LaBow.

Defendants first breached their duty to monitor Mr. LaBow by not creating the structures necessary to oversee an investment manager. *See* Mangiero Rep. at 22. Defendants did not give Mr. LaBow a written investment policy to follow prior to the trust separation so they could benchmark his performance. DiClemente at 178-79; EX 51, 52; *Severstal I* at 259. Defendants did not even have a written contract drafted and executed until December 5, 2008 with Mr. LaBow. Regardless of the effective date of the investment management agreement, Defendants were still negotiating the terms of Mr. LaBow's contract weeks after the independent Severstal Trust was established. DiClemente at 63-65, EX 16, 17, 18, 19. Significantly, Defendants never had a written agreement with Mr. LaBow as to the assets they would receive from the commingled trust. DiClemente at 44, 45; Halpin at 23, 24. Instead, Mr. DiClemente stated that they had an "understanding". DiClemente at 44. Mr. DiClemente explained that "they trusted Ron." DiClemente at 87-88. Defendants' abject failure to commit their service provider in writing as to his duties and as to what assets the Severstal Trust would receive in the trust separation is a patent abdication of their monitoring responsibility.

Defendants had warning signs before November 3, 2008 that Mr. LaBow could not be trusted to follow through on Defendants' expectations. Defendants initially asked for the separation of the commingled trust on September 30, 2008. DiClemente at 37, 38, EX 6, 7. Only by letter dated October 22, 2008, did Mr. LaBow inform Defendants that the transfer had not taken place and he would attempt to separate the trusts on November 3, 2008. DiClemente 45-47, EX 8. Mr. LaBow had failed to carry out Defendants' instructions to separate the trusts on September 30, 2008 and did not bother to inform them for over three weeks. Neither did Defendants inquire into the separation of assets on November 3, 2008. Such inaction was not sufficient to meet their duty to monitor, which requires more than just to "trust Ron."

After the trust separation occurred on November 3, 2008, Citibank contacted Mr. DiClemente on November 4, 2008, to authorize the Severstal Trust to accept the Neuberger Berman account. DiClemente at 52; *Severstal I* at 250. On November 4, 2008, Mr. DiClemente on behalf of Defendants directed Citibank to accept the Neuberger Berman account, in its entirety, into the Severstal Trust and backdated the letter to November 3, 2008. DiClemente at 52-54, EX 10, 11. Despite the warning signs that Mr. LaBow could not be trusted and despite the absence of a written agreement with Mr. LaBow about the assets the Severstal Trust would receive, Defendants made no effort to determine what assets they had authorized Citibank to accept for the Plans. Mr. DiClemente and Mr. Halpin acknowledged that they did not know what was in the Neuberger Berman account when they accepted these assets. DiClemente at 90; Halpin at 23. Mr. DiClemente admitted also that he could have discovered what assets the Severstal Trust contained at any time after the transfer. DiClemente at 81. Defendants expected more than the Neuberger Berman account and wanted a proportional share of every fund held in the WHX Trust. DiClemente at 61. Mr. DiClemente conceded that he did not check on the

14

assets and stated only that "I don't recall why we didn't check.  All I know is that we—we trusted Ron."  DiClemente at 87-88.

Defendants also breached their duty to monitor by failing to discover that the Plans' assets were not being managed.  On November 3, 2008, and thereafter, Defendants were alerted that Neuberger Berman had not been contracted to manage the Plans' assets in the Neuberger Berman account.  The trustee Citibank, Neuberger Berman, and Mr. LaBow all contacted Defendants to hire Neuberger Berman to begin managing the Plans' assets.  DiClemente at 49, 55-62, EX 9, 11, 12, 13, 14, 15.  Defendants then engaged in protracted negotiations with Neuberger Berman but never concluded a contract and cannot reasonably have believed that Neuberger Berman was managing the assets while negotiating the terms of their contract.  Belatedly, on December 12, 2008, Defendants discovered that Neuberger Berman was not managing the Plans' assets.  DiClemente at 66, 67, EX 20.

Defendants had a dysfunctional relationship with Mr. LaBow.  For example, Mr. DiClemente stated that "Our preference would have been for Ron to enter into agreements with any investor manager that he chose to retain in order to fulfill his services to us."  DiClemente at 69.  Instead, Mr. DiClemente capitulated to Mr. LaBow over his better judgment and without getting satisfactory answers to questions such as why he had to enter into the Neuberger Berman agreement.  DiClemente at 56.  Mr. DiClemente explained only that Mr. LaBow "forces people to listen to him."  DiClemente at 56, 57.  Defendants actions fall far short of the oversight monitoring fiduciaries must have over their service providers.

In sum, from November 3, 2008 through December 30, 2008, Defendants failed to adequately monitor their investment manager, Mr. LaBow.  Defendants did not prepare for the separation of the commingled trust and the additional monitoring which would be required by

such a significant change to the management of the Plans.  Defendants failed to confirm in advance, in writing, with Mr. LaBow the specific assets the Severstal Trust would receive, the investment policy they were to follow, and the terms of the investment management agreement.  Defendants neglected to ensure the assets the Severstal Trust received in the separation of the trusts on November 3, 2008 were the diversified assets they had agreed upon.  Despite warning signs, Defendants did not discover that neither Neuberger Berman nor Mr. LaBow were managing the Plans' assets for some time.

> 4. <u>Defendants Breached Their Fiduciary Duties to the Plans by Failing to Remove Mr. LaBow as Their Investment Manager After Discovering His Fiduciary Breaches.</u>

Part of an appointing fiduciary's duty to monitor is the duty to replace a service provider who is acting detrimentally to the plan.  "The duty to monitor carries with it, of course, the duty to take action upon discovery that the appointed fiduciaries are not performing properly." *Liss v. Smith*, 991 F. Supp. 278, 311 (S.D.N.Y. 1998); *see* Slip Op. at 27, ECF 144.  By its failure to take appropriate steps to remove fiduciaries "who it knew were breaching their fiduciary obligations to the Fund, defendant . . . failed to act solely in the interest of the Fund's participants and beneficiaries . . . in violation of ERISA §§ 404(a)(1)(A) and (B)." *Whitfield v. Tomasso*, 682 F.Supp. 1287, 1304-05 (E.D.N.Y. 1988).  A failure to monitor appointees and to remove those who do not perform renders the appointing fiduciary jointly and severally liable for the appointed fiduciaries' breaches.  *Liss*, 991 F.Supp. at 311.

Courts have upheld this duty to monitor and to remove errant service providers in the context of plan investments, such as in the present case with Mr. LaBow. *Leigh,* 727 F.2d at 134-35; *In re RCN Litigation,* 2006 WL 753149 at *9; *Graden*, 574 F. Supp. 2d at 466-67; *In re Merck & Company, Inc.,* 2006 WL 2050577 at *17-18; *Liss*, 991 F. Supp. at 310-11; *Whitfield,*

682 F. Supp. at 1295, 1305. Implicit in Defendants' power to select fiduciaries "is the duty to monitor the fiduciaries' actions, including their investment of Plan assets." *Mehling*, 163 F. Supp. 2d at 510 (citing *Leigh,* 727 F.2d at 134–35). Defendants had a duty in this case to monitor Mr. LaBow and to remove him when he failed to manage the Plans' assets.

As stated above, Defendants discovered that Neuberger Berman was not managing the Plans' assets on December 12, 2008. DiClemente at 66, EX 20. Defendants did not then sign the contract with Neuberger Berman, however, or direct Mr. LaBow to begin managing the assets. DiClemente at 69-73. Defendants thereby allowed the Plans' assets to remain unmanaged during a time of adverse economic conditions.

On December 30, 2008, Defendants called Mr. LaBow to say that they had just learned that the only asset the Severstal Trust had was the undiversified Neuberger Berman account. DiClemente at 76-78, EX 24. From December 30, 2008 until March 24, 2009, Defendants remonstrated with Mr. LaBow but did not otherwise move to protect the participants' retirement funds. DiClemente at 163. They neither replaced Mr. LaBow, nor directed him to sell, nor acted themselves to sell, the Neuberger Berman account. DiClemente at 142-44. Mr. DiClemente knew of no reason why Defendants could not have directed Citibank to sell the Neuberger Berman account themselves. DiClemente at 97-98.

Instead of replacing Mr. LaBow, who had already breached his fiduciary duties to the Plans by leaving the Plans' assets unmanaged from November 3, 2008 onward, Defendants vacillated as to how to respond. Initially, Defendants attempted to persuade WHX to take back the Neuberger Berman account and give the Plans a retroactive reallocation of their proportional share of the commingled WHX assets they originally expected. DiClemente at 152, 165-66; Halpin at 50. Indeed, Mr., DiClemente stated to WHX on February 6, 2009, that Defendants

could be subject to liability by the participants and beneficiaries of the Plans for having accepted such a concentrated portfolio of assets. DiClemente at 149-50, EX 42. When WHX refused to take the Neuberger Berman account back, Defendants attempted to have Mr. LaBow create a mix of investments, which mimicked the WHX asset mix, with other funds. DiClemente at 144, 161. On January 16, 2009, Defendants told Mr. LaBow not to take *any* action without Defendants' approval. DiClemente at 135-36, 142, 144-45, EX 36; Halpin at 95-97, EX 28. Defendants reversed course a few weeks later and told Mr. LaBow that all investment decisions were his alone. DiClemente at 176-77.

Mr. DiClemente acknowledged that Mr. LaBow was not responsive to Defendants' requests, yet Defendants did not act to remove him. DiClemente at 154. Indeed Mr. Halpin stated that he did not want to remove Mr. LaBow in January or February 2009. Halpin at 78, 79, 101, 143. Defendants had full knowledge during this period that the Plans' assets remained in the undiversified Neuberger Berman account, and were not being managed by Mr. LaBow, but chose to continue arguing in vain instead of taking actions to protect the value of the retirement savings of the participants and beneficiaries.

On March 24, 2009, Mr. LaBow sold the Neuberger Berman account for cash. *Severstal I* at 258. Defendants knew the Plans' assets were now invested entirely in cash and that Mr. LaBow was not managing the assets, but even then, Defendants still took no action. Halpin at 214-15. Not until after new members had replaced Mr. DiClemente and Mr. Halpin did the Retirement Committee take action to remove Mr. LaBow and to diversify the Plans' assets. *Severstal I* at 260.

Defendants' duty to the participants and beneficiaries did not allow them to ignore their investment manager's performance and fail to take action to protect the Plans' assets. The duty

to monitor requires a fiduciary to act when she/he discovers that a service provider has failed to comply with its contract, the plan's documents, or the requirements of ERISA. *Coyne & Delany Company,* 98 F.3d at 1465-66*; Martin,* 965 F.2d at 669-70; *Atwood v. Burlington Industries Equity, Inc*., No. 2:92CV00716, 1994 WL 698314, *6 (M.D.N.C. Aug. 3, 1994). "The duty [to monitor] exists so that a plan administrator or sponsor cannot escape liability by passing the buck to another person and then turning a blind eye." *Howell v. Motorola, Inc*., 633 F.3d 552, 573 (7th Cir. 2011). Fiduciaries cannot "abdicate their duties under ERISA merely through the device of giving their lieutenants primary responsibility for the day to day management of the trust." *Leigh*, 727 F.2d at 134–35. Rather a fiduciary that assigns responsibility is "obliged to act with an appropriate prudence and reasonableness in overseeing" the person or entity to whom he assigned that responsibility. *Id*.

Defendants plainly failed to take the action necessary to protect the retirement savings of the Plans' participants and thereby breached their duty to act after discovering Mr. LaBow's fiduciary breaches. Defendants did not replace Mr. LaBow and allowed the Plans' assets to sit undiversified and unmanaged first in the Neuberger Berman account and later as cash. Therefore, the Secretary is entitled to summary judgment on this issue as well.

E.    Defendants Are Liable for the Plans' Losses.

Defendants have not disputed that the Plans in this case lost money. As stated above, Judge Swain found that the Plans had lost approximately $15 million. Dr, Susan Mangiero determined in her report that the Plans had lost between $6,775,243 and $7,823,373. Mangiero at 34. This is due in part to the shorter damages period in the instant case and the more conservative investment portfolio Dr. Mangiero used for comparison. Mangiero at 32-34.

19

Therefore, Dr. Mangiero's analysis as to the losses suffered by the Plans' participants is unchallenged and the Secretary is entitled to summary judgment on this issue as well.

## III. CONCLUSION

Based on the above discussion, there is no material issue of fact to be tried before this Court and the Secretary is entitled to summary judgment as a matter of law.

Respectfully submitted,

KATE S. O'SCANNLAIN
Solicitor of Labor

OSCAR L. HAMPTON III
Regional Solicitor

JODEEN M. HOBBS
Regional Counsel for ERISA

/s/ John M. Strawn
Attorney, PA ID # 49789

Katrina T. Liu
Attorney, PA ID # 318630

Office of the Solicitor
Suite 630 East, The Curtis Center
170 South Independence Mall West
Philadelphia, PA 19106-3306
Telephone No. (215) 861-5145
Facsimile No. (215) 861-5162
strawn.john@dol.gov

U.S. DEPARTMENT OF LABOR

September 25, 2018

SCOTT W. BRADY
United States Attorney

/s/ Paul E. Skirtich
Assistant United States Attorney
PA ID # 30440
U.S. Department of Justice
United States Attorney's Office
700 Grant Street, Suite 400
Pittsburgh, PA 15219
paul.skirtich@usdoj.gov

Attorneys for Plaintiff