# In The Matter Of:

*R. Alexander Acosta, et al. vs.*
*WPN Corporation, and et al.*

---

*Michael DiClemente*
*September 26, 2017*

---

*Morse Gantverg & Hodge Court Reporters, Inc*

Original File 9-26-17 DiClemente.txt
**Min-U-Script® with Word Index**

This Page Intentionally Left Blank

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Case 2:14-cv-01494-NBF   Document 184-12   Filed 09/25/18   Page 3 of 55

Michael DiClemente
September 26, 2017

## Page 1

```
 1          UNITED STATES DISTRICT COURT
 2         WESTERN DISTRICT OF PENNSYLVANIA
 3                    -----
 4
 5  R. ALEXANDER ACOSTA,            )
    SECRETARY OF LABOR, UNITED      )
 6  STATES DEPARTMENT OF LABOR,     )
                                    ) Case No.
 7          Plaintiff,              ) 2:14-cv-01494-NBF
 8        v.                        )
 9  WPN CORPORATION, RONALD         )
    LABOW, SEVERSTAL WHEELING       )
10  INC. RETIREMENT COMMITTEE,      )
    MICHAEL DiCLEMENTE, DENNIS      )
11  HALPIN, WHEELING                )
    CORRUGATING COMPANY             )
12  RETIREMENT SECURITY PLAN,       )
    and SALARIED EMPLOYEES'         )
13  PENSION PLAN OF SEVERSTAL       )
    WHEELING, INC.,                 )
14                                  )
          Defendants.               )
15
16                    -----
17        DEPOSITION OF MICHAEL DiCLEMENTE
18                    -----
19        Tuesday, September 26, 2017
20                    -----
21
22
23
24
25
```

## Page 2

```
 1        DEPOSITION OF MICHAEL DiCLEMENTE,
 2  a Defendant herein, called by the Plaintiff for
 3  examination, taken pursuant to the Pennsylvania
 4  Rules of Civil Procedure, by and before Constance
 5  Lee, a Registered Professional Reporter and a
 6  Notary Public in and for the Commonwealth of
 7  Pennsylvania, at the law offices of Saul Ewing
 8  Arnstein & Lehr LLP, One PPG Place, Suite 3010,
 9  Pittsburgh, PA, on Tuesday, September 26, 2017,
10  at 9:54 a.m.
11                    -----
12  COUNSEL PRESENT:
13
14    For the Plaintiff:
15           U.S. DEPARTMENT OF LABOR
16           JOHN M. STRAWN, ESQ.
17           170 South Independence Mall West
18           Suite 630E, The Curtis Center
19           Philadelphia, PA 19106
20
21    For the Defendant:
22           SAUL EWING ARNSTEIN & LEHR LLP
23           MICHAEL J. JOYCE, ESQ.
24           One PPG Place, Suite 3010
25           Pittsburgh, PA 15222
```

## Page 3

```
 1                    INDEX
 2  EXAMINATION                           PAGE
 3    BY MR. STRAWN                         5
 4
 5  EXHIBITS                              PAGE
 6  1                                      17
 7  2                                      21
 8  3                                      28
 9  4                                      29
10  5                                      36
11  6                                      36
12  7                                      40
13  8                                      45
14  9                                      48
15  10                                     50
16  11                                     50
17  12 and 13                              58
18  14 and 15                              61
19  16 through 18                          62
20  19                                     65
21  20                                     66
22  21 through 23                          69
23  24 and 25                              76
24  26                                    100
25  27                                    102
    28                                    106
    29                                    112
    30                                    113
    31                                    114
    32                                    114
    33                                    117
    34                                    122
    35                                    127
    36                                    131
    37                                    136
    38                                    138
    39                                    140
    40                                    144
    41                                    146
    42                                    148
    43                                    151
    44                                    153
    45                                    154
    46 and 47                             160
```

## Page 4

```
 1  49                                    165
 2  50                                    168
 3  51 and 52                             178
 4  53                                    179
 5  54                                    185
 6  55                                    186
 7  56                                    187
    57                                    188
 8  58                                    188
 9  59                                    195
10  60                                    197
11  61                                    200
12  62                                    201
13
14                    -----
```

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 5

1          P R O C E E D I N G S
2                    -----
3          MICHAEL DiCLEMENTE
4    a Defendant herein, having been first duly sworn,
5    was examined and testified as follows:
6                    -----
7          EXAMINATION
8    BY MR. STRAWN:
9    Q.  Mr. DiClemente, let me reintroduce myself on
10   the record.  My name is John Strawn.  I'm the
11   attorney for the Department of Labor, and I'll ask
12   you some questions today about the lawsuit we filed
13   back on October 31st, 2014.
14        I know Mike has given you some
15   directions and you've been deposed before, but I'll
16   just go over it again.  If you don't hear my
17   question, you just ask me, I'll repeat it.  If you
18   don't understand my question, which is not an
19   infrequent response by witnesses who hear my
20   question, just ask me and I'll rephrase it.  If you
21   need a break, let us know.  If you're not sure, let
22   us know.  For our court reporter Connie's sake, we
23   need verbal answers, yes or no, not shaking the
24   head, not nodding the head or uh-huh or huh-uh.
25   A.  Okay.

Page 6

1    Q.  Is there any circumstance today that would
2    prevent you from understanding my questions and
3    giving accurate answers?
4    A.  No.
5    Q.  So Mr. DiClemente, for the record, can you
6    state your full name.
7    A.  Michael Paul DiClemente.
8    Q.  And can you tell me your current address.
9    A.  326 Cobblestone Circle, two B's in
10   Cobblestone, McKees Rocks, Pennsylvania -- McKees
11   Rocks is two words -- 15136.
12   Q.  By whom are you currently employed?
13   A.  Esmark, Inc.
14   Q.  How long have you worked for Esmark?
15   A.  I've worked for the current version of Esmark
16   for three years, approximately three years.
17   Q.  And let me jump back in time.  June 2008,
18   when -- I take it that's when you first got word
19   that the Severstal Wheeling-Pittsburgh, the plans in
20   this case, were being separated from the larger WHX
21   trust, June of 2008, does that --
22   A.  That date is very familiar with me in terms
23   of when discussions started.
24   Q.  Okay.  Good.  So at that time, in June of
25   2008, who were you employed by?

Page 7

1    A.  I was employed by Severstal Wheeling, Inc.
2    Q.  Okay.  And when did Severstal merge with
3    Wheeling -- Wheeling-Pittsburgh?  If you remember.
4    A.  I don't recall exactly.
5    Q.  Was it around that time or a little bit
6    before?
7    A.  It was just a little bit before that time.
8    Q.  And what was your position with Severstal
9    back in June of 2008?
10   A.  Corporate treasurer.
11   Q.  How long had you been corporate treasurer?
12   A.  I had been corporate treasurer for
13   approximately five years from the inception date
14   when I joined with Wheeling-Pittsburgh Steel
15   Corporation.  I look at my tenure there as -- tenure
16   of one organization with multiple ownerships.
17   Q.  Right.  That's sure the way it seemed like
18   looking through the files of what was going on.
19   A.  Yes.
20   Q.  So as corporate treasurer, who did you report
21   to?
22   A.  The chief financial officer.
23   Q.  And who was that back in June of 2008?
24   A.  I don't recall.  He was -- he was from
25   Dearborn.  Mark Yost, excuse me.  Mark Yost, okay.

Page 8

1    Q.  And --
2    A.  That's who I believe I reported to.
3    Q.  Okay.  And what was he doing in Dearborn?
4    A.  He was the chief financial officer for
5    Severstal.
6    Q.  Is that where the headquarters was for
7    Severstal?
8    A.  Domestic headquarters, yes.  Severstal is a
9    Russian company.  Technically -- I'm a little hazy
10   on this.  Technically, I may have reported not to
11   Mark on paper.  I may have reported to Wilbur
12   Winland, W-I-N-L-A-N-D, who was the head of the
13   Severstal Wheeling organization in Wheeling.
14   Q.  Oh, okay.
15   A.  So, you know, it was kind of you a, you know,
16   since we had been taken over by the Russians, and
17   we're no longer in -- an independent company, you
18   know, the chain of command was a little bit
19   different than customary.
20   Q.  But before Severstal took over, who did you
21   report to?  Was it a more clear chain of command?
22   A.  Yes.  I reported to Paul Mooney, who was the
23   chief financial officer.
24   Q.  Okay.  Okay.  And then again back to June
25   2008, who reported to you?  Who did you supervise?

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 9

1    A.  I had Drew Landon, who was the director of
2    banking and finance.
3    Q.  Did Mr. Bowness work for you?
4    A.  Mr. Bowness did not report directly to me,
5    but I worked directly with him.  I'm drawing a
6    blank.  I had several people in the corporate credit
7    department that reported to me.
8    Q.  Okay.
9    A.  It was a relatively small organization but
10   very effective organization.
11   Q.  Okay.  Now, from June of 2008 through, I
12   guess, the following year until June of 2009, did
13   who you report to change during that period of time,
14   or would it have been the same individuals in
15   Wheeling and Dearborn?
16   A.  It would have been the same.
17   Q.  Okay.  And as far as who you were
18   supervising, would that have changed over that year
19   or -- again, I know this goes back a ways.
20   A.  I'm trying to recall the specific dates, but
21   at one point in time I resigned from the company as
22   the corporate treasurer and became a consultant.
23   What I don't believe is, once I became a consultant,
24   I necessarily had official direct reports.
25   Q.  Right.  And my understanding from looking at

Page 10

1    the record was probably about February of 2009 is
2    when you became --
3    A.  That sounds about right, yes.  Thank you for
4    that.
5    Q.  We'll work our way through.
6         And as corporate treasurer, what were
7    your duties?  I didn't ask that already, did I?
8    A.  Corporate finance, treasury management,
9    investment management.
10   Q.  How did you get to be on the retirement
11   committee?
12   A.  Very interesting question.  When I arrived at
13   Wheeling-Pitt, I understood that they did not have a
14   retirement committee.  And I was just learning about
15   the organization in that regard -- because the
16   first, virtually, the entire year that I was with
17   Wheeling-Pitt, my responsibilities were very focused
18   on providing some financing for the company.
19        It wasn't until the end of that year
20   that I started focusing on the customary duties and
21   was learning a little bit about the pension
22   investment management activities.  And I was told by
23   the people that were monitoring that, that we had
24   Ron LaBow as the investment manager and that he
25   performed very well.  And I asked how they knew that

Page 11

1    he performed very well, and they said that they got
2    these reports, and they seemed to be pleased with
3    the performance.
4    Q.  And sorry to interrupt you, but who was
5    telling you these things?
6    A.  Some of the executive management team, like
7    Paul Mooney.
8    Q.  Okay.
9    A.  Would have been John Testa, I believe, who
10   was the secretary at the time.  Dan Keenan (sic) who
11   would have been the vice president of human
12   resources.
13        (Cell phone rings.)
14        MR. STRAWN: Sorry, I thought I had --
15   off the record.
16        (Discussion held off the record.)
17   Q.  In terms of people who would have been
18   telling about Mr. LaBow's performance --
19   A.  So I said, well, we should really find out
20   exactly how well he's doing.  We should have his
21   performance measured by an institutional investment
22   consultant.  It seems to me we ought to retain an
23   organization like that to serve us, because that's
24   what's the prudent thing to do.  That's what I have
25   done in my prior organizations.

Page 12

1         And I have a very high regard for
2    Mercer Investment Consulting.  To me, they are the
3    premier global investment consultant organization.
4    I hired them recently again as a board member of a
5    local hospital.  They are top notch.
6    Q.  So going back, you told me who was telling
7    you Mr. LaBow was doing well, and then -- were they
8    the ones who referenced reports, or did you get the
9    reports from Mercer to validate?
10   A.  I think they were referencing reports.  I
11   was -- really had not been involved, because I was
12   really immersed in these other activities.
13   Q.  Going back to those other activities, I would
14   hazard a guess that that was a challenging economic
15   environment for the steel industry at that time.
16   A.  Sure.
17   Q.  So you were saying about for the first year
18   you spent a lot of time getting financing for the
19   company?
20   A.  Yes.
21   Q.  After that time, after that first year,
22   then -- and you said you got back more into
23   traditional treasurer-type duties -- what did you
24   spend your time on?
25   A.  Financing.

Michael DiClemente
September 26, 2017

Case 2:14-cv-01494-NBF   Document 184-12   Filed 09/25/18   Page 6 of 55

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 13

1  Q. Okay.
2  A. Primarily financing and treasury management.
3  Q. Okay.
4  A. But then very actively became involved with
5  the investment management of the pension plans.
6  **Q. Do you know how you -- it seems like a**
7  **natural fit, but how did you get to be on the**
8  **retirement committee?  Was that part of your**
9  **description, or was it more ad hoc?**
10  A. I would say that I made sure I was on the
11  retirement committee, because we had no discipline.
12  We had no process in the organization.  It was
13  periodically getting a report that suggested his
14  performance was very good.  But we had no one
15  validating the reported performance.  And the
16  prudent thing to do is to have an independent third
17  party institutional investment consultant validate
18  that performance and then measure that performance
19  relative to an appropriate index benchmark, as well
20  as an appropriate universe benchmark.
21  **Q. Universe being --**
22  A. Universe of like-kind managers.
23  **Q. Okay.  And how is that different than an**
24  **index?**
25  A. Well, an index would be like a -- a bogey.

Page 14

1  Like the S&P 500, the S&P 500 generates a return
2  daily, obviously, but you measure -- you generally
3  measure investment managers over a longer time
4  frame.  So you compare that investment manager's
5  return over trailing periods, compared to the
6  appropriate index benchmark, for example, for the
7  trailing three months, for the trailing six months,
8  for the trailing one year, three year, five year.
9  So you see the performance over time how well that
10  investment manager is performing relative to the
11  index.
12  **Q. Got you.  So what reports did you get from**
13  **Mercer about Mr. LaBow?**
14  A. We received our reports, not only about Ron
15  LaBow initially, in terms of his unique
16  capabilities, and Louis Finney was the institutional
17  investment consultant that went to visit him, and he
18  provided us with a stellar report on Ron LaBow and
19  his process -- unique process, I shall say.  A
20  little bit of a process different from a lot of
21  other organizations, but a unique process that
22  delivered, over time, returns that any investment
23  manager would be proud of, can brag about.
24  Ron had a bogey.  His bogey was an 8
25  percent absolute return, not necessarily I'm going

Page 15

1  to beat the S&P 500.  He had I'm going to return,
2  over time, on average 8 percent per year or greater.
3  When Louis and his company evaluated
4  Ron LaBow's performance, it was stellar; and not
5  only was it stellar on an absolute basis, it was
6  stellar on a universe basis where Ron LaBow would
7  perform at the 0 percentile, the 1 percentile of all
8  investment managers that invest money like him.
9  I think the worst that I may have
10  seen -- it's been a while -- but the worst I may
11  have seen was he was all the way down to the 5th
12  percentile.  And it doesn't get any better than
13  that.
14  **Q. Yeah, that sure sounds like good returns.**
15  **Now, with regard to WHX, how did that**
16  **relate to Wheeling-Pittsburgh and Severstal?  Did it**
17  **own Wheeling-Pitt at one point and spin it off?**
18  A. My understanding is at one point it owned
19  Wheeling-Pitt.
20  **Q. And the retirement plans were in the same**
21  **trust?**
22  A. They were in a commingled trust.
23  **Q. Do you think prior management may have leaned**
24  **on WHX in terms of management of the retirement**
25  **plans?**

Page 16

1  **MR. JOYCE:** Objection.  Speculation.
2  **Q. You can answer.**
3  A. Could you repeat the question.
4  **Q. Sure.  WHX was a larger organization than**
5  **Wheeling-Pitt, Severstal Wheeling-Pitt.**
6  A. I don't know that, John.  I don't know that
7  WHX was larger.  I don't recall ever seeing their
8  financial statements.  I don't know necessarily the
9  nature of the business or the scale.
10  **Q. Okay.  WHX's retirement plan, though, at**
11  **about this period in time was about 90 percent of**
12  **what was in the commingled trust and about 10**
13  **percent to Severstal Wheeling?**
14  A. That sounds correct.
15  **Q. And I also just said that because my**
16  **recollection was that WHX had spun off**
17  **Wheeling-Pitt, but I don't -- I can't tell you what**
18  **the size is of the corporate bodies right now.**
19  **All right.  So going back to June of**
20  **2008, I take it that there was -- there was nothing**
21  **in the corporate governing documents that said who**
22  **should be on the retirement committee?**
23  A. Not that I know of.
24  **Q. So after you got involved and you made sure**
25  **you got on the retirement committee like you were**

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 17

```
 1    saying, who else, in June of 2008, was on the
 2    retirement committee?
 3    A. I believe it would have been Paul Mooney,
 4    John Testa, and likely Dan Keenan.  Keaton, excuse
 5    me.
 6    Q. What about Mr. Halpin, Dennis Halpin?
 7    A. Dennis was not a member of the committee at
 8    that point in time.
 9    Q. When did Mr. Halpin become a member?
10    A. Many years later.  Essentially as result of
11    a significant amount of attrition, where people
12    retired, left the company, through -- because of,
13    you know, mergers.  And so basically it was left to
14    Dennis and me at the end.
15    Q. It sure seemed like there was steady
16    attrition through the documents I've seen.
17    A. Yeah.
18    Q. So in June of 2008, who would have been on
19    the committee at that point in time?
20    A. I believe it would have been just Dennis and
21    myself.
22    Q. Okay.  All right.  Let me show you the first
23    of many documents.
24    A. I think that will be helpful.
25         (DiClemente Deposition Exhibit No. 1 was
```

Page 18

```
 1    marked for identification.)
 2    Q. Take a look at the document.
 3    A. Uh-huh.
 4    Q. Let me know if it seems familiar to you.
 5    A. It does.
 6    Q. And just for the record, I'll say it's an
 7    e-mail from Michael DiClemente to Dennis Halpin,
 8    David Luptak, Paul Mooney, Greg --
 9    A. Pilewicz.
10    Q. Pilewicz.  Let me show you on the second
11    page, the last paragraph, Transition to Severstal,
12    where it says, "Unless advised otherwise, we should
13    initiate discussions with Severstal regarding a
14    transition of responsibilities for this activity,
15    including determining how the 401(k) plan fits
16    within the future benefit program.  Assuming the
17    plan will continue, Severstal should, among other
18    things, reconstitute the Retirement Committee
19    membership.  Also, one of the outstanding projects
20    is to determine whether the Company should continue
21    with or replace Wachovia as the service provider.
22    If the decision is to replace Wachovia, then a
23    determination should be made regarding the
24    timeliness of doing so, which could impact whether
25    the Company proceeds with the aforementioned fund
```

Page 19

```
 1    replacements."
 2         So I have a couple questions based on
 3    that.  The first is:  What function, if you recall,
 4    was Wachovia performing at the time?
 5    A. I'm a little unsure, John.
 6    Q. Okay.
 7    A. I could speculate, but I don't know if that
 8    would be appropriate.  I have an idea.
 9    Q. Oh, okay, if you're not sure, that's fine.
10    Just give me what you think it might be.
11         MR. JOYCE: And I'll just remind you,
12    don't speculate if you don't know.
13    A. Okay.  I just -- I guess I better not.
14         MR. STRAWN: Well, I'm interested in
15    what he thinks it might be.  It's not crucial, but
16    he could still speculate.
17         MR. JOYCE: If you remember what it is,
18    certainly answer it.
19    A. I don't remember what it is.  I really don't.
20    Q. Okay.
21    A. I honestly don't.
22    Q. So then the other point was where you say
23    here, "reconstitute the Retirement Committee
24    membership."  So what did you mean by that?
25         (Witness reviews document.)
```

Page 20

```
 1    A. I believe that at this point in time -- a
 2    little bit hazy on the sequence of corporate
 3    events -- but I believe at this time, due to changes
 4    in ownership and maybe not necessarily change in --
 5    the imminent departure of certain individuals that
 6    were on the retirement committee, we would want to
 7    reconstitute the committee with new individuals.
 8    Q. Do you recall how many individuals were --
 9    according to the plan documents -- were supposed to
10    be on the retirement committee?
11    A. I don't know that the plan documents ever
12    prescribed the official number of members.
13    Q. Do you know if there was another corporate
14    document that would have said how many individuals
15    should be on the retirement committee?
16    A. I don't believe there was.  I know that in my
17    prior life as an institutional investment
18    consultant, I had done some research on behalf of
19    one of my clients.  There's not necessarily a
20    prescribed number, but there is generally an
21    identification of certain individuals by capacity
22    who would have knowledge about such activities.
23    Q. And when you say "capacity," you mean by
24    position in the company?
25    A. Positions, yes.  And then there would be --
```

Michael DiClemente
September 26, 2017

Case 2:14-cv-01494-NBF  Document 184-12  Filed 09/25/18  Page 8 of 55

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 21

1  it would be appropriate to have an odd number of
2  members.
3  Q. And the reason for that would be --
4  A. In terms of voting, making sure that you, you
5  know, had the appropriate approval for any actions
6  that were taking place.  As I look at the document,
7  I could see that some of the individuals on the --
8  on the e-mail to whom it was directed were likely
9  not going to be there much longer.
10  Q. Okay.  And anyone in particular that you
11  can --
12  A. I would say Dave Luptak, Paul Mooney and Greg
13  Pilewicz, and leaving Dennis Halpin.
14  Q. Do you know why Mr. Luptak, Mr. Mooney and
15  Mr. Pilewicz were leaving?
16  A. They chose to leave because the ownership had
17  changed.
18  Q. Okay.
19  A. They had the ability to opt out.  They had an
20  employment contract, John.
21  Q. All right.  Let me show you what we can mark
22  as Exhibit No. 2.
23      (DiClemente Deposition Exhibit No. 2 was
24  marked for identification.)
25  Q. Take a look at that document, which is

Page 22

1  one-sided.  One-sided in terms of the printing.
2      (Witness reviews document.)
3  A. Oh, okay.
4  Q. All right.  Now, this is an e-mail from David
5  Riposo.  Do you recall who Mr. Riposo was?
6  A. Yes.
7  Q. Who was he?  What was his position?
8  A. He was the treasurer of WHX.
9  Q. Okay.  So he had been your counterpart in a
10  way?
11  A. Yes.
12  Q. It's e-mail September 15, 2008, to Ron LaBow,
13  and the body says, "Ron, I heard back from the
14  Treasurer at Severstal Wheeling."  That would have
15  been you, Mr. DiClemente, at the time?
16  A. Yes.
17  Q. "And they will be ready to divest their
18  portion of the (sic) Co-mingled Group Trust as of
19  October 1 per our request."  And it goes on from
20  there.  Next-to-last sentence, "I also confirmed
21  they will be taking their assets in cash."
22      Now, do you recall, I guess in June of
23  2008, till this date, September 15th of 2008, what
24  you had done to prepare for the separation of the
25  trusts?

Page 23

1      (Witness reviews document.)
2  A. To some extent, yes, I do.
3  Q. And what steps did you take?
4  A. I had had conversations with Ron LaBow, I
5  believe, in the latter half of the second quarter,
6  and obviously, told Ron LaBow that we wanted to
7  continue to enjoy the benefits of his investment
8  acumen and were very interested in continuing to
9  enjoy the benefits of his diversified portfolio and
10  that we wanted him to transfer the assets -- our
11  proportionate share of the assets in kind to our
12  separate trust.
13  Q. And these conversations were the second
14  quarter, so that would have been --
15  A. So June.
16  Q. June of 2008?
17  A. June of 2008, yes.
18  Q. Okay.  And going back -- I think you were
19  probably in mid response.  So in addition to talking
20  to Mr. LaBow, did you take any other steps to
21  prepare for the separation of the trust?
22  A. You mean around this time?
23  Q. How about from June to -- June to September
24  of 2008, what did you --
25  A. In June, while we were having those

Page 24

1  discussions, Ron didn't particularly like my idea of
2  transferring the assets in kind.  I'm not sure he
3  ever heard of that before.  I said, Ron this is very
4  customary.  As an institutional investment
5  consultant, I previously have done that on behalf of
6  one of my clients.  The reason for doing so is that
7  it makes no sense to sell the securities, the
8  appropriate share of securities and then rebuy those
9  same securities.  It's a waste of money.  And it's
10  very easy to have the trustee transfer the assets in
11  kind from one trust to another.  And that's what we
12  would like you to do.
13  Q. And these were all conversations on the
14  phone?
15  A. On the phone, yes.
16  Q. Okay.
17  A. Ron absolutely didn't like that idea.  So I
18  said, Ron, this is not a novel idea.  This is
19  customary.  So please allow me to arrange for a
20  conference call with Mercer Investment Consulting.
21  And Louis Finney was on the phone.  He had already
22  met Louis Finney.  And Louis said, Ron, this is --
23  this is absolutely the right way to do it.  This is
24  the best way to do it.  There's no reason why you
25  shouldn't do it.  Ron continued to balk.

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 25

1    And so after we got off the phone,
2    Louis said, I mean, Ron can do what he wants to do.
3    You don't -- he doesn't have to do what you think
4    the preferable thing to do is. But let him do what
5    he wants to do.
6    **Q. And Mr. Finney was the individual who had**
7    **given you a glowing recommendation of Mr. LaBow?**
8    A. Correct, correct.
9    **Q. Do you recall about what time this**
10   **conversation took place?**
11   A. That would have been in June, probably the
12   June time frame. Very, very basically, it was
13   shortly after the conversation I had with Ron in
14   June.
15   **Q. Did Mr. LaBow give you a reason, technical or**
16   **personal preference?**
17   A. He gave me no reason why he didn't want to do
18   it. And all I said was, John -- John, all I said to
19   him was, we want our proportionate share of assets.
20   In fact, when it came time to create a direction
21   letter, I sent a letter, I believe it was dated
22   September 30th, indicating that we wanted our
23   appropriate percentage share of those assets.
24   **Q. I take it from what you're testifying to just**
25   **a minute ago that you agreed with Mr. Finney that**

Page 26

1    **the Severstal trust wouldn't have had a right to any**
2    **particular assets in the commingled trust?**
3    MR. JOYCE: Just object to form and
4    speculation.
5    A. No. Repeat that again, John. I don't
6    think -- if I said that, I didn't mean to say that.
7    **Q. I believe you said Mr. Finney said that**
8    **Mr. LaBow wouldn't have to transfer you a**
9    **proportionate slice of all the investments. Am I**
10   **characterizing your testimony accurately?**
11   A. No. If he felt he had to sell the assets and
12   rebuy those assets for our proportionate share and,
13   in turn, require both plan sponsors to,
14   unfortunately, absorb the transactions cost, then
15   he's going to do that.
16   **Q. Okay. I understand you. So from that phone**
17   **call with Mr. Finney and Mr. LaBow in June of 2008**
18   **and until we get to this e-mail, September 15th of**
19   **2008, did you have any other discussions,**
20   **conversations, any other actions with regard to**
21   **the --**
22   A. I don't know that we had any more
23   conversations. I can't say that we didn't. But not
24   necessarily of import here, other than I will say
25   this, the content of this e-mail where it says, "I

Page 27

1    also confirmed they will be taking their assets in
2    cash," I don't understand that comment.
3    **Q. Oh, okay. Can you explain that. Like had**
4    **Mr. --**
5    A. No. We -- I don't recall ever saying that we
6    were going to take our assets in cash. We were
7    going to take our assets -- our proportionate shares
8    of the securities in the plan.
9    **Q. Okay. Did Mr. Riposo at any point up to this**
10   **e-mail, September 15th, tell you that the plan was**
11   **to give you -- the Severstal plans' value in the**
12   **commingled trust as cash?**
13   A. I don't recall.
14   **Q. Is it possible that he -- that he said that,**
15   **or -- I'm just trying to gauge whether you're**
16   **saying, no, he never said that, or he may have, but**
17   **I don't recall.**
18   A. I don't recall that he said that.
19   **Q. Okay.**
20   A. I could speculate here as to what he might be
21   suggesting, and it fits with the story I just told
22   you, but I'm not sure I should speculate. But that
23   fits with, you know, Ron not wanting to reallocate
24   the assets in kind. So if they're going to be
25   liquidated, at some point in time they're going to

Page 28

1    be cash, and at some point in time, based upon my
2    direction or request, that he reconstitute the
3    portfolio with the same assets.
4    **Q. Right.**
5    A. Just in my proportionate share, then
6    obviously at some point in time there has to be
7    cash.
8    **Q. Right.**
9    A. But you know, I never said -- I don't recall
10   ever saying -- that I said we're going to be taking
11   our assets in cash.
12   **Q. Right. This isn't an e-mail between you and**
13   **Mr. Riposo. It's Mr. Riposo and Mr. LaBow. So I**
14   **take it then that the comment here, "I also**
15   **confirmed they will be taking their assets in cash,"**
16   **and if it's $49 million, that it probably would have**
17   **entailed selling assets and giving the Severstal**
18   **plans cash --**
19   A. Sounding reasonable. This is so long ago,
20   John, I can't even opine on the dollar amount.
21   **Q. Sure. I'm just asking to try to make sense**
22   **out of everything.**
23   All right. Let me refer you to the
24   next exhibit.
25   (DiClemente Deposition Exhibit No. 3 was

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 29

1 marked for identification.)
2 Q. Again, this is an e-mail that doesn't have
3 your name anywhere on it. It's between Mr. LaBow --
4 it looks as if he's responding to Mr. Riposo on the
5 same date, September 15th, although there's no
6 e-mail trail, and it says, "They may not get cash
7 but we shall see."
8      Do you know why the plan was, at that
9 point, for you maybe not to get cash?
10      MR. JOYCE: Objection to form.
11 Speculation. He's not on the e-mail.
12 A. I don't know.
13 Q. Okay. Had there been any -- aside from your
14 discussion with Mr. LaBow that you testified to --
15 in your discussion with Mr. LaBow with Mr. Finney,
16 what discussions had you had with the individuals
17 from WHX, like Mr. Riposo, about the separation?
18 A. I don't recall at this point.
19 Q. Okay. But at least as of September 15th, you
20 don't recall asking for cash. As a matter of fact,
21 you're saying that what your expressed desire was
22 was to get a proportionate slice?
23 A. Correct.
24 Q. Let me refer you -- we're up to No. 4.
25      (DiClemente Deposition Exhibit No. 4 was

Page 30

1 marked for identification.)
2 Q. And this is another e-mail, and you're not on
3 it. It's from Mr. Riposo, and it's the next day,
4 September 16th, 2008, to Mr. LaBow. It says,
5 "Ron... okay, but if you plan to give them
6 something other than cash, when will you know so you
7 can tell them?"
8      Again, you're not a party of these
9 e-mails back and forth or the conversations back and
10 forth with Mr. Riposo and Mr. LaBow, but had anybody
11 ever communicated to you that they were -- they were
12 unsure of what assets to give to the Severstal
13 plans?
14 A. I don't recall.
15 Q. That -- and again, just up to this point from
16 June of 2008 to September 16th of 2008, you
17 gathered, from speaking with Mr. LaBow, that he
18 didn't want to give a proportional slice of the
19 assets to the Severstal plans; correct?
20 A. That I heard from him that he did not want to
21 give?
22 Q. Right.
23 A. I don't know that I heard that from him.
24 Q. It's just that he was resistant to the idea
25 of giving a proportional slice?

Page 31

1 A. I don't recall him being resistant.
2 Q. I'm just confused. Your testimony was, back
3 in June of 2008, you spoke to Mr. LaBow and said you
4 wanted a proportionate share of the assets from the
5 WHX.
6 A. Yes. Well, I wanted a -- I thought he was
7 going to sell and rebuy.
8 Q. All right. So I guess I'm not understanding
9 then. So what was the resistance Mr. LaBow had?
10 Was it to the idea of a 10 percent slice of a
11 proportionate share of the assets from the overall
12 trust, or what was the resistance you were getting
13 from him?
14 A. I'm not sure what his resistance was.
15 Q. So what did he tell you he was planning --
16 this is going back to June of 2008 up to September
17 16th of 2008 -- what did he tell you he was going to
18 give the new trust, the Severstal stand-alone trust?
19 A. I don't recall that he -- that he told me
20 anything specifically. I just was telling him what
21 we expected.
22 Q. Okay. And you testified that you expected a
23 proportionate share of all of the investments in the
24 WHX trust?
25 A. Correct.

Page 32

1 Q. So Mr. LaBow never said yes to that and
2 agreed to that?
3 A. I don't believe he said no.
4 Q. And did he ever say yes to that? In that
5 time period.
6 A. I don't recall that he said yes.
7 Q. Okay. So if he didn't say yes and he didn't
8 say no, what did he -- what did he respond in terms
9 of how he was going to give the Severstal trust its
10 share of the assets?
11      MR. JOYCE: Just object to form. I
12 don't think he said that he didn't say yes. I think
13 he just said he didn't remember or doesn't recall
14 him ever saying yes.
15      MR. STRAWN: Not exactly what he said.
16 Q. But Mr. DiClemente, let's go back to square
17 one then.
18 A. Okay.
19 Q. So June of 2008, you speak to Mr. LaBow and
20 you indicated to him what?
21 A. That we wanted to continue to enjoy the
22 benefits of his diversified model using the same
23 type of investments that currently comprise the
24 portfolio.
25 Q. And what did Mr. LaBow say to you?

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 33

1  A. I believe he said that we could continue to
2  do that.
3  Q. Okay. And why did you have a follow-up phone
4  call with Mr. LaBow with Mr. Finney on the call?
5  A. Because we wanted to explain to him that it's
6  very easy for him to transfer the assets in kind.
7  It's a typical arrangement.
8  Q. So did you have that follow-up phone call
9  because Mr. LaBow indicated that there would be no
10 problem in doing it, or did you have that follow-up
11 phone call because Mr. LaBow indicated that it would
12 not be easy to give you a distribution in kind?
13 A. I don't think that Ron knew that was a
14 possibility. We were trying to enlighten him. I'm
15 not sure Ron had ever encountered that before.
16 Q. So going back to your initial conversation in
17 June of 2008 with Mr. LaBow where you indicated that
18 you wanted a proportional share of the assets from
19 the WHX trust in the stand-alone Severstal trust, I
20 take it then that Mr. LaBow indicated that he had
21 not heard of that before.
22 A. I don't know that. It sounds like he hadn't
23 encountered that before. I'm not sure if he never
24 heard of it. But he had never done that himself.
25 Q. Why would you need a follow-up phone call

Page 34

1  with Mr. Finney? Let me ask at it this way: Why
2  did you have a follow-up phone call with Mr. Finney
3  and Mr. LaBow?
4  A. So that Ron could -- LaBow could hear from an
5  expert that this is something that's commonly done
6  in situations like this.
7  Q. So then did Mr. LaBow indicate to you in that
8  initial conversation that he hadn't heard of it
9  before or he had done it all the time or something
10 else?
11 A. I don't recall.
12 Q. So as of September 16, 2008, you didn't know
13 what assets were going into the Severstal trust, did
14 you?
15      MR. JOYCE: Objection. Form.
16 Argumentative.
17      MR. STRAWN: It's not argumentative, and
18 the form is fine. Mr. DiClemente can answer.
19      MR. JOYCE: Reiterate my objection, but
20 you can answer, if you know.
21 A. Would you repeat the question, please.
22 Q. So as of September 16th, 2008, you didn't
23 know what assets the Severstal trust was going to
24 get when it was separated?
25      MR. JOYCE: Same objections.

Page 35

1  A. I felt that we ultimately were going to
2  receive a diversified portfolio.
3  Q. So you felt that, but what steps had you
4  taken to ensure that the Severstal trust was going
5  to get a proportionate share?
6  A. I'm not sure I follow the question, John.
7  Q. Okay. As of September 16th, 2008, what was
8  your understanding that the Severstal trust was
9  going to receive on the separation of the trusts?
10 A. I felt that we were going to get our
11 appropriate proportional share of the assets.
12 Q. And this feeling of yours was based on what?
13 A. Based upon the discussions we had with Ron
14 and Louis Finney.
15 Q. Okay.
16 A. And I ultimately wrote a letter -- direction
17 letter saying that we were expecting to receive a
18 proportionate share.
19 Q. Right. We're not up to that letter yet.
20      So what in the conversations with
21 Mr. LaBow and with Mr. LaBow and Mr. Finney gave you
22 that belief that you were going to get a
23 proportionate share?
24 A. After the conversation with -- the
25 three-party conversation, you know, Louis said that

Page 36

1  if Ron wants to sell and rebuy the securities, then
2  let him do that. He'll just do that; that's fine.
3  You will incur transaction costs you don't otherwise
4  have to incur.
5  Q. Okay. Let me show you what will -- give it
6  to Mr. Joyce first. What's marked as Exhibit No. 5.
7      (DiClemente Deposition Exhibit No. 5 was
8  marked for identification.)
9  Q. This is another e-mail between Mr. LaBow and
10 Mr. Riposo, and it says, "I spoke with Mike and will
11 keep you posted." This is dated September 16, 2008.
12      Do you recall any conversations -- I
13 know you testified to June of 2008 -- but do you
14 recall any conversations with Mr. LaBow closer in
15 time to September 16th of 2008?
16 A. I do not.
17 Q. I'll refer you to the next document, number
18 6.
19      (DiClemente Deposition Exhibit No. 6 was
20 marked for identification.)
21 Q. Take a look at that.
22      (Witness reviews document.)
23 Q. It's got two pages.
24      (Witness reviews document.)
25 Q. I think the pages are actually --

Michael DiClemente
September 26, 2017

Case 2:14-cv-01494-NBF   Document 184-12   Filed 09/25/18   Page 12 of 55

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 37

1  A. Let me see here.  Okay.
2  Q. Now, the second page appears to be an e-mail
3  from Mr. Riposo to Nancy -- who I assume is Nancy
4  Kronenberg -- attaching a letter, which is the first
5  page, dated September 29, 2008.  And in there
6  there's a letter to Ms. Kronenberg, and it's signed
7  by you as Member of Retirement Committee for
8  Wheeling-Pittsburgh Steel Corporation Retirement
9  Committee.  Underneath, also "Approved by the WHX
10  Corporation Retirement Committee."
11        First question, can you tell me who
12  signed it for WHX?  Is that Mr. Riposo's signature?
13  A. I don't think it's Dave's.
14  Q. It doesn't look like Mr. Kassan or
15  Mr. McCabe's, does it?
16  A. I don't know.
17  Q. Okay.  Oh, and where it says,
18  "Wheeling-Pittsburgh Steel Corporation Retirement
19  Committee," at that point, had you become Severstal
20  Wheeling, or had that merger not occurred yet?
21  A. I don't recall the date of the merger at this
22  point.
23  Q. Okay.  So the letter here, September 29,
24  2008, is it familiar to you?
25  A. Yes.

Page 38

1  Q. Okay.  And it looks like it says, "Pursuant
2  to the terms of the respective trust agreements, the
3  Wheeling-Pittsburgh Steel Corporation Retirement
4  Committee, acting in the capacity of the Pension
5  Investment Committee (the 'Committee'), hereby
6  directs the Trustee to transfer the assets of the
7  Salaried Employees' Pension Plan of
8  Wheeling-Pittsburgh Steel Corporation" -- gives the
9  account number -- "and the Wheeling Corrugating
10  Company Retirement Security Plan" -- gives the
11  account number -- "from the WHX Pension Plan Trust
12  into the Wheeling-Pittsburgh Steel Corporation
13  Pension Plan Trust.  This should be done
14  September 30, 2008.
15        "The execution of this letter shall
16  constitute a representation that the Committee is a
17  'named fiduciary' of the Trust within the meaning
18  of" ERISA, and it goes on.
19        And in this letter it doesn't say how
20  the assets are supposed to be transferred in terms
21  of cash or a proportionate share or anything like
22  that.  Is that your understanding of the letter?
23  A. That's my understanding.
24  Q. Okay.  And do you know why you signed this
25  letter to Citibank about the separation of the

Page 39

1  trusts?
2        (Witness reviews document.)
3  A. I could speculate.
4  Q. Okay, go ahead.
5        MR. JOYCE: Don't speculate.
6        MR. STRAWN: Are you directing him not
7  to answer?
8        MR. JOYCE: I'm directing him not to
9  speculate.  I don't think you want him to speculate
10  either.
11        MR. STRAWN: I want him to speculate
12  because this is a discovery deposition.  I want to
13  find out what he recalls and getting his
14  recollections out of him has been trying so far this
15  morning.
16        MR. JOYCE: If he recalls something, he
17  can testify to it.
18        MR. STRAWN: Right.
19        MR. JOYCE: If he doesn't recall
20  something, he's not going to testify to it.
21        MR. STRAWN: I want him to --
22        MR. JOYCE: And if he doesn't recall
23  something, he's not going to speculate to it.
24        MR. STRAWN: It's perfectly reasonable
25  for the witness to say, I don't recall, but this

Page 40

1  would have been reasonable under the circumstances.
2  And that seems to be something that I look for in
3  discovery depositions all the time, to try to find
4  out what the witness thinks happened, even though I
5  know that he doesn't know it.  That's why witnesses
6  say I know versus I believe versus I'm not sure,
7  maybe this is what happened.
8    BY MR. STRAWN:
9  Q. So Mr. DiClemente, what do you know about
10  that letter?
11        (Witness reviews document.)
12  A. I believe I may have been asked by Citibank
13  to sign this letter in conjunction with WHX to move
14  the Wheeling-Pitt assets out of the WHX trust into
15  our own independent trust.
16  Q. Sure.  And let me show you what's marked as
17  DiClemente Exhibit No. 7.
18        (DiClemente Deposition Exhibit No. 7 was
19  marked for identification.)
20  Q. This just has the one page.
21  A. Uh-huh.
22        (Witness reviews document.)
23  A. Okay.
24  Q. Okay.  Now, this is a letter dated
25  September 30th to Glen Kassan, chairman, pension

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 41

1  investment committee of WHX corporation, and it's
2  signed by you.  And underneath it says, "I hereby
3  agree and acknowledge that the above instructions
4  are true and correct," and it has a line for Ron
5  LaBow to sign as investment advisor and a line for
6  Glen Kassan to sign.  It says, "I hereby accept this
7  letter of direction."
8         First question, in looking through all
9  the documents, I didn't see a copy that had both --
10 I've seen copies with your signature and your
11 signature and Mr. Kassan, but not with Ron LaBow's
12 signature.  Are you aware of --
13        MR. STRAWN: -- or Mike, are you
14 aware of any document that has all three signatures?
15        MR. JOYCE: I'm not aware of anything.
16 You know, it's tough because -- I think all of this
17 was from Southern District in New York.
18        MR. STRAWN: Right.
19        MR. JOYCE: It's even tough, the
20 organization of it.  No, I haven't seen, and
21 certainly, I don't think we produced one, and I
22 haven't seen one.
23        MR. STRAWN: Right.  I think in the
24 concordance document system that we had, they could
25 pick out documents that were identical and -- but

Page 42

1  ones that were close, they couldn't associate.
2         MR. JOYCE: Yeah.
3  Q.  Anyway, getting back to you, Mr. DiClemente.
4  September 30, 2008, letter to Mr. Kassan.  And it
5  says in here, midway through, "Pursuant to Section
6  4.4 of the aforementioned Trust Agreement, please
7  direct Citibank, N.A. as trustee of the Trust, to
8  transfer the assets set forth on Schedule A, in the
9  same percentage allocations as existed in the WHX
10 Pension Trust, on or about September 30, 2008, to
11 account no. 312933 at Citibank, N.A., as trustee of
12 the WPSC Pension Plan Trust."
13        Now, is this the letter you were
14 referring to where you asked for a proportionate
15 slice of the assets from the WHX trust?
16 A.  Yes.
17 Q.  Okay.  And had you had any conversations --
18 it's dated September 30th.  Had you had any
19 conversations with Mr. Kassan about getting a
20 proportionate share of the assets?
21 A.  At that point, no.  My conversations would
22 have been directly with David Riposo.
23 Q.  Okay.
24 A.  And obviously, seeing is Glen Kassan's
25 signature there is consistent with my conversations

Page 43

1  with David Riposo that our receiving a proportionate
2  share of those assets would be acceptable to them.
3  Q.  I take it that Mr. Kassan signing it, it sure
4  looks like they accepted the letter or the
5  direction.
6  A.  (Witness nods head.)
7  Q.  Is that a yes for the --
8  A.  Yes, yes.
9  Q.  Now, we don't have the -- what's set forth on
10 Schedule A, but that's what it appears to be.  Also,
11 the reference to the WPSC pension plan trust, is
12 that Wheeling-Pittsburgh --
13 A.  Steel corporation.
14 Q.  Okay.  So nothing says "Severstal" yet, does
15 it?  Oh, except at the bottom of the page, it says
16 "Severstal Wheeling Inc.," and on the top of the
17 page it says "Severstal International."
18 A.  Yes.
19 Q.  Who was Severstal International at this
20 point?  Would that have been your letterhead since
21 you signed the letter?  Then the return address at
22 the bottom is Severstal Wheeling, Inc., Wheeling.
23 Is that where your office was, Wheeling?
24 A.  That's where my office was.  I -- this was
25 the letterhead that was made available to me --

Page 44

1  Q.  I understand.
2  A.  -- as a result of my new owner.
3  Q.  So at this point then, September 30th, 2008,
4  had anybody from WHX told you that you couldn't get
5  a proportionate slice of the assets from the larger
6  trust?
7  A.  No.
8  Q.  Had Mr. LaBow told you that you couldn't get
9  a proportionate slice of the assets from the larger
10 trust?
11 A.  I don't recall that he said that.
12 Q.  Do you recall anything Mr. LaBow said about
13 the assets -- I mean, looking at the letter, it
14 seems like it's a representation by WHX about the
15 assets that you were to receive.  But had you had
16 anything in writing yet from Mr. LaBow that said
17 what you were going to receive?
18 A.  I don't recall, but we clearly had an
19 understanding.
20 Q.  And when you say you had an understanding,
21 what kind of an understanding?
22 A.  We had an understanding that we were expected
23 to receive a proportionate share of the assets that
24 comprised the combined portfolio.
25 Q.  So going up to this point in time, September

Page 45

1  30, 2008, had Mr. LaBow stated to you verbally that,
2  yes, this is how you're going to get the assets?
3  A. I do not recall that he indicated the form.
4  Q. Okay. But you're clear on that you asked for
5  the form you wanted to receive them in?
6  A. We wanted our proportionate share of the
7  assets.
8  Q. Let me refer you to Exhibit No. 8. This one
9  has two sides.
10       (DiClemente Deposition Exhibit No. 8 was
11  marked for identification.)
12       (Witness reviews document.)
13  Q. Have you had a chance --
14  A. Oh, two sides. I didn't read the other side.
15  I'm sorry. Yeah.
16       (Witness reviews document.)
17  A. Okay.
18  Q. All right. Now, page 1 is an e-mail from
19  Maureen McGrath, who I understand worked for
20  Mr. LaBow. Is that your understanding?
21  A. That's what it looks like, yes.
22  Q. Oh, yeah, I guess -- her signature line says
23  "WPN Corporation." It's dated October 22nd, and
24  it's to Michael DiClemente. The other side, it's a
25  letter dated October 22nd, 2008, from Mr. LaBow to

Page 46

1  you. I didn't see a signed copy to any of the
2  documents.
3       MR. STRAWN: Mike, you haven't seen a
4  signed copy, have you?
5       MR. JOYCE: This might be his version of
6  a signed copy.
7       MR. STRAWN: Right.
8  Q. All right. Now, in the letter,
9  Mr. DiClemente, it says, "As you're aware by letter
10  dated September 29, 2008, Citibank, N.A., as trustee
11  of the WHX Pension Plan Trust (the 'Trust') was
12  directed to transfer, on September 30th, 2008, the
13  assets of the Salaried Employees' Pension Plan of
14  Wheeling-Pittsburgh Steel Corporation and the
15  Wheeling Corrugating Company Retirement Security
16  Plan (collectively, the 'Plans') from the Trust into
17  the Wheeling-Pittsburgh Steel Corporation Pension
18  Plan Trust (the 'WPSC Trust')."
19       I take it that's a reference to the
20  September 29 letter, Exhibit No. 6, where you and
21  somebody from WHX directed Citibank to accept the
22  assets from WHX into a separate trust for your
23  company.
24  A. Yes.
25  Q. And then it does not have a reference, just

Page 47

1  on the surface here, to September 30th, 2008,
2  letter. But then it goes on to say, "Please be
3  advised that as a result of the market volatility
4  that has continued for the past several months, such
5  transfer of assets of the Plans did not occur." So
6  this is over three weeks later then on October 22nd,
7  2008.
8       "On November 3rd, 2008, I intend to
9  direct the transfer of most of the assets of the
10  plans to the WPSC Trust, with the balance to be
11  transferred after Citibank, N.A. issues its October
12  31st, 2008, report for the trust."
13       do you recall this letter from
14  Mr. LaBow?
15  A. I do.
16  Q. what did you do as a result of getting this
17  letter?
18  A. I don't recall what my immediate action was,
19  if any.
20  Q. do you know if you followed up with anybody
21  from WHX?
22  A. at this point, I do not know exactly when I
23  may have had any further conversations.
24  Q. let me go to, I guess, the letter. the first
25  letter that was signed, Exhibit 6, was September

Page 48

1  29th of 2008. From September 29 --
2  A. This one here (indicating)?
3  Q. Yeah, No. 6.
4  A. Okay.
5  Q. So from September 29 of 2008 through
6  October 22nd, 2008, had you received any -- any word
7  that the separation of the trusts had not indeed
8  occurred?
9  A. I do not recall at this point.
10  Q. Was this letter, if you can recall, your
11  first information that the trust hadn't been
12  separated?
13  A. I do not recall. I wish I did. I don't.
14  Q. Sure, sure, no, I understand. Do you recall
15  any conversations leading up to November 3rd of 2008
16  that the -- any conversations with -- with anybody
17  at this point that dealt with how the trusts were
18  going to be separated on November 3rd?
19  A. I do not at this point.
20  Q. Okay. Now, let me refer you to -- I guess
21  we'll just start with this one first. I think we're
22  up to 9.
23       (DiClemente Deposition Exhibit No. 9 was
24  marked for identification.)
25  Q. This is just one side.

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 49

1      (Witness reviews document.)
2  Q. Have you had a chance to look at that,
3  Mr. DiClemente?
4  A. Yes.
5  Q. Okay. Now, this looks like an e-mail from
6  Nancy Kronenberg at Citibank to Michael DiClemente,
7  and then underneath it, it has -- I don't understand
8  the chain here, but underneath it it, says,
9  "Original Message" from Nancy Kronenberg to Ron
10  LaBow, Michael DiClemente, and Mr. Riposo at WHX.
11  Do you recall this e-mail?
12  A. Now that I'm looking at it, I -- I understand
13  it. I can't say that I specifically recall it,
14  but --
15  Q. Sure.
16  A. Can -- can -- conforms to activities at the
17  time.
18  Q. Okay. And in the body of the -- what it says
19  is the original message from Ms. Kronenberg, it
20  says, "Good afternoon Gentlemen, I have contacted
21  Russell" -- do you know if his --
22  A. I think it's Khanuk.
23  Q. -- "Khanuk of Neuberger Berman to advise him
24  of a change of Account number and account
25  registration for the transfer of assets from WHX to

Page 50

1  Severstal. Russell informed me of documentation
2  that would be needed by Neuberger Berman to effect
3  the change.
4      "Gentlemen, would you be available at
5  3 PM today," November 3rd, 2008, "for a conference
6  call from Neuberger Berman? Please let me know.
7  Thank you!"
8      Do you recall having a phone call on
9  November 3rd of 2008 with Mr. Riposo and Mr. LaBow
10  and Ms. Kronenberg?
11  A. I do not.
12  Q. Okay. Do you recall a conversation on
13  November 3rd with anybody with regard to the
14  separation of the trusts?
15  A. I do not.
16  Q. Okay.
17  A. Not saying it didn't happen; I just don't
18  recall.
19  Q. Sure. Let me show you the next exhibit,
20  number 10.
21      (DiClemente Deposition Exhibit No. 10
22  was marked for identification.)
23  Q. And No. 11, while we're at it.
24      (DiClemente Deposition Exhibit No. 11
25  was marked for identification.)

Page 51

1      (Witness reviews document.)
2  Q. So number 10 just has one side. And number
3  11 just has one side.
4  A. Okay.
5  Q. Have you had a chance to look at those?
6  A. I did, yep.
7  Q. Okay. Now, number 10 is a letter, and it's
8  from you to Ms. Kronenberg dated November 3rd, 2008.
9  And it says, "Dear Nancy: I am a member of the
10  Retirement Committee of Severstal Wheeling, Inc.
11  with responsibility for the Salaried Employees'
12  Pension plan of Wheeling-Pittsburgh Steel
13  Corporation and the Wheeling Corrugating Company
14  Retirement Security Plan ('SWI Plans').
15      "As part of transferring the assets of
16  these plans from the WHX Corporation trust to
17  Severstal Wheeling's existing trust at Citibank, we
18  direct Citibank to transfer, prior to market opening
19  on November 3rd" -- just says November 3rd; it
20  doesn't say 2008 -- "all assets in the Neuberger
21  Berman account, number 312153, to our account number
22  312933."
23      Now, Exhibit 11 is an e-mail from you
24  to Mr. Richard -- do you pronounce his name Bowness?
25  A. Bowness, yes.

Page 52

1  Q. Okay. That's spelled B-O-W-N-E-S-S.
2      That's dated November 4th, 2008. It
3  says, "Rick, Please review this letter, which was
4  drafted at Nancy K's request.
5      "I will be receiving agreements from
6  Neuberger Berman to directly establish the
7  investment management arrangement with us. Mike."
8      The first question is: Do you recall
9  this letter, November 3rd, 2008, Exhibit 10?
10  A. I do.
11  Q. Okay. And what do you recall about it?
12  A. This was a letter that Citibank wanted to
13  receive from us indicating how we expected to see
14  the assets separated from the WHX corporate trust.
15  Q. Okay. And how did they communicate with you?
16  Was it by phone call?
17  A. Phone call or e-mail.
18  Q. Okay. And the e-mail here, Exhibit No. 11
19  that's on November 4th, what do you recall about
20  this?
21  A. It looks like I asked Rick to take a look at
22  this letter before I sent it.
23  Q. Okay. So was the letter dictated by
24  Citibank, or did they tell you what they needed to
25  have in the letter, or what do you recall?

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 53

1   A. I don't think it was a form letter that they
2   asked me to sign. I think they just said, please
3   let you know exactly how you want these assets
4   separated.
5   Q. Okay.
6   A. I assume they got a separate letter from -- I
7   don't know. They may have gotten a separate letter
8   from --
9   Q. WHX?
10  A. -- WHX.
11  Q. Oh, so in the e-mail on November 4th when it
12  says, review this letter that was drafted at
13  Nancy K.'s request, it doesn't mean she gave you the
14  letter. The letter was initiated --
15  A. Correct, correct, yeah.
16  Q. Okay. All right. What do you recall
17  Citibank -- well, let me ask you the first question.
18  I assume Ms. Kronenberg was your contact at Citibank
19  for this process?
20  A. Yes.
21  Q. And what did Ms. Kronenberg indicate to you
22  about the transfer or about what she needed in the
23  transfer or what the questions were or whatever you
24  can recall.
25  A. I don't recall.

Page 54

1   Q. Okay. So I -- was there any follow-up to
2   this letter, or did it do the trick?
3   A. Did it do the trick?
4   Q. Did Citibank come back to you and say, no, we
5   needed something else in the letter?
6   A. No, I don't remember them calling or
7   e-mailing back with any sort of response. But I
8   guess what I do know is that, while the letter was
9   dated November 3rd, I believe it ultimately wasn't
10  delivered until November 4th. And my understanding
11  is that the assets were, in fact, separated on
12  November 3rd, after they would have received any
13  letter from me, because Ron LaBow had already
14  previously made arrangements where he said, I intend
15  to direct the transfer of the assets. So Ron
16  LaBow's --
17  Q. I, Mr. LaBow.
18  A. I, Mr. LaBow, intend to direct -- I think we
19  saw that in a previous document here. So that
20  action predated the actual delivery of this letter.
21  Q. Right. Right. Now, on the -- Exhibit 10,
22  the November 3rd letter, there's a CC to V.D.
23  Assetta.
24  A. That's Vince Assetta. He was a counterpart
25  of mine at Wheeling-Pittsburgh Steel, succeeded by

Page 55

1   Severstal. I was the corporate treasurer. He was
2   the corporate controller.
3   Q. And were you in separate lines of command or
4   authority, or did he report to you or you report to
5   him?
6   A. We each had our own organization, and we both
7   reported to the chief financial officer.
8   Q. And Mr. Bowness and Mr. Halpin are on the CC
9   we've encountered before. T.S. Rogers, can you tell
10  me --
11  A. Tim Rogers was in Vince Assetta's
12  organization, in the accounting organization.
13  Q. And J.R. Sullivan, the last name?
14  A. Jim Sullivan was in the human resources
15  organization working with Rick Bowness.
16  Q. Okay.
17  A. Rick Bowness had an interesting role; quasi-
18  human resources, quasi-accounting individual. Very
19  unique.
20  Q. That does sound unique.
21         All right. Well, let me then point
22  you to Exhibit 11 where it says that, the second
23  sentence, "I will be receiving agreements from
24  Neuberger Berman to directly establish the
25  investment management arrangement with us."

Page 56

1         What do you recall about that?
2   A. I was merely communicating to Rick that,
3   apparently, there are investment management
4   agreements that need to be established with
5   Neuberger Berman. I was a little bit unsure exactly
6   why. And ultimately, you know, there were -- I
7   did -- I believe I did receive those documents. But
8   ultimately, I objected to entering into those
9   arrangements, with Ron LaBow, indicating to Ron that
10  we -- our arrangement was with him, and to the
11  extent that he wanted to engage outside parties and
12  they needed an investment management agreement, that
13  he should be entering into those agreements directly
14  and not have us do so on his behalf.
15  Q. Do you know how the arrangement was with
16  Neuberger Berman and WHX if Mr. LaBow had the
17  contract with them, or whether it was through the
18  company or their retirement committee?
19  A. I believe I subsequently learned that WHX may
20  have entered into those agreements on -- at Ron
21  LaBow's insistence. Of course, we have to
22  understand -- and I think we do understand -- who
23  Ron LaBow is and how he operates.
24  Q. Okay. For the record, who is he and how does
25  he operate?

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 57

1  A. He's a very commanding individual, and he
2  forces people to listen to him.
3  Q. How does he force people -- or at least at
4  the time how did he force people to --
5  A. This is basically what I need to have done in
6  order to accomplish what I need to do on your
7  behalf.
8  Q. Okay. Do you recall what your first
9  information was that you had to sign an agreement
10 with Neuberger Berman? Was it on November 4th or
11 November 3rd or before that, after that?
12 A. Obviously, I'll be receiving them either very
13 late in the day on November 4th or some later day.
14 Q. And okay -- and then who -- who would have
15 given you the information that you had to sign with
16 Neuberger Berman?
17 A. I believe I got them directly from Neuberger
18 Berman. I'm not sure.
19 Q. Okay. And what was your understanding at the
20 time here, November 4th, about an investment
21 management arrangement that would -- what kind of
22 relationship that that was with the committee? Your
23 committee.
24 A. I'm not sure I follow the question, John.
25 Will you please repeat that.

Page 58

1  Q. Sure, sure. Do you know why you had to -- at
2  the time did you know why you had to sign an
3  agreement with Neuberger Berman?
4  A. I did not know why at the time. It was news
5  to me.
6  Q. Okay. Let me show you two more exhibits.
7  We're up to 12 and 13.
8      (DiClemente Deposition Exhibit Nos. 12
9  and 13 were marked for identification.)
10 Q. So they're both single-sided exhibits here.
11 Number 12, have you had a chance to look at that?
12 A. Yes.
13 Q. Okay. And it's an e-mail sent November 5th,
14 2008, from Michael D. DiClemente to Ron LaBow. It
15 says, "Thanks, Ron. I'm not sure how you do it, but
16 am very appreciative of talents. FYI, we're in the
17 process of establishing an investment management
18 agreement with Neuberger Berman and I may give you a
19 call if I have any questions. Mike."
20      Do you know if you followed up with
21 any questions to Mr. LaBow about the contract with
22 Neuberger Berman?
23 A. I believe at some point thereafter I
24 questioned Ron why I was being required to enter
25 into the Neuberger Berman agreement. I had felt

Page 59

1  that it was -- didn't make sense for us to do that,
2  because we had engaged only one investment manager,
3  that was him. If he chose to use the talents of
4  other investment managers to fulfill his overall
5  responsibilities, that would be his direct
6  responsibility to do so.
7  Q. Got you.
8  A. But then later, ultimately, we acquiesced at
9  his insistence. That's the only way we're going to
10 do business with Ron LaBow if we want to continue to
11 enjoy his services and talents.
12      We engaged Ron LaBow to assist us in,
13 I believe, negotiating the investment management fee
14 that Neuberger Berman was proposing they charge us.
15 Q. Now, going back to when you had the assets of
16 both trusts commingled, are you aware of whether WHX
17 signed management agreements with other of the funds
18 that it was invested in?
19 A. I may have learned at a later date that that
20 was the process.
21 Q. Okay. Now, with regard to Exhibit 13, did
22 you have a chance to look at that?
23      (Witness reviews document.)
24 A. Yes.
25 Q. Okay. It looks like -- the bottom e-mail in

Page 60

1  the chain looks like it's from you to Mr. Bowness.
2  It looks like it's November 4th, 2008. "Rick, I
3  will be forwarding copies of the documents (to you
4  and others) that need to be completed to open up a
5  new account with Neuberger and Berman, which Ron
6  LaBow uses to manage some of the money in the DC
7  plans."
8      The DC, I take it, is the defined
9  contributions 401(k) plans?
10 A. Correct.
11 Q. "N & B is looking for the trust agreement
12 with Citibank (which will soon have to be replaced
13 with NatCity's)" -- which I think is National City?
14 A. Correct.
15 Q. -- "as well as the plan documents for both
16 plans. Would you please forward these documents to
17 me?"
18      And then it looks like Mr. Bowness
19 replied on November 5th, "Re: Plan and Trust
20 Documents - DC Plans. The documents that you
21 requested are attached."
22      Do you recall whether you had any
23 discussions in-house with Mr. Bowness or anybody
24 else in your organization about dealing with
25 Neuberger Berman?

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 61

1   A. Other than this, no.
2   Q. Okay. Did you have any discussions with
3   anybody about why you had to sign up with Neuberger
4   Berman or whether you had to or whether it sounded
5   like the right thing to do? Whatever you can
6   recall.
7   A. I don't recall.
8   Q. Okay.
9   A. But I would like to emphasize here that my
10  comment that I made that comports with my
11  expectation that this was one of many managers that
12  we were going to enjoy, because, as I said -- which
13  Ron LaBow uses to manage some of the money in the DC
14  plans. I just want to continue to affirm the theme
15  where we felt that Ron LaBow was going to manage
16  a -- on our behalf, just like he managed on a
17  combined basis -- a diversified portfolio using
18  essentially the same strategies, to the extent that
19  they could be replicated for the smaller portfolio.
20  Q. Right.
21      (A brief recess was taken.)
22      (DiClemente Deposition Exhibit Nos. 14
23  and 15 were marked for identification.)
24   BY MR. STRAWN:
25  Q. Exhibit 14 has a single side, and the same

Page 62

1   with Exhibit 15.
2       (Witness reviews document.)
3   Q. Have you had a chance to look at them both?
4   A. Yes, yes. I have looked at this one
5   (indicating). Let me see what this one is
6   (indicating).
7       (Witness reviews document.)
8   A. Okay.
9   Q. Now, Exhibit 14 looks like e-mails between
10  you and Neuberger Berman and, I guess, Exhibit 15 is
11  also between you and Neuberger Berman. And it seems
12  this is where you're providing documents with --
13  regarding the two plans to them, not the investment
14  management agreement with but plan.
15  A. Yes, plan documents and trust documents, yes.
16  Q. Do you know why Neuberger Berman wouldn't
17  have had the plan documents already if it was a
18  commingled trust?
19  A. I do not know that.
20  Q. Okay. Well, let me show you another two
21  documents, 16 and 17. And 18.
22      (DiClemente Deposition Exhibit Nos. 16
23  through 18 were marked for identification.)
24  Q. Take them one at a time. But the first one
25  there, Exhibit 16, looks to be an e-mail from you to

Page 63

1   Mr. LaBow, November 24th, 2008. And it says, "Hi
2   Ron. Awhile back you faxed to us a marked-up
3   version of the Second Amendment to the Investment
4   Consulting Agreement that you used as a base to
5   create the third amendment, which will now be
6   directly with Severstal Wheeling, Inc."
7       This is you getting a direct
8   investment management relationship with Mr. LaBow?
9   A. Correct.
10  Q. Do you know what the relationship was with
11  Mr. LaBow and the two plans, the two 401(k) plans,
12  before the plan separated? I don't recall seeing
13  any documents between WHX and Wheeling-Pitt saying
14  we'll invest your money for you. There wasn't any
15  document between -- between your plans and Mr. LaBow
16  that I saw either. So do you know what the
17  relationship was? There had to be a contract
18  somewhere.
19  A. I do not know that, John. I joined the
20  organization, and I understood that there was this
21  relationship, and as a result, as I indicated
22  earlier, my initiatives to start to understand what
23  we had -- it was a developing story for me.
24  Q. Right. All right. So Exhibit 16, going back
25  to it then, it looks as if what this is saying is

Page 64

1   that Mr. LaBow sent you an agreement to use as a
2   template, a form for how you were going to have the
3   investment management agreement directly with him?
4   A. Correct.
5   Q. Okay. And I take it that Exhibit 17, which
6   is an e-mail dated December 3rd and goes on for a
7   number of pages and some previous e-mails as well,
8   that looks to be some of the drafting that was done
9   to the agreement?
10  A. This looks like the culmination of the
11  exercise that we went through to, you know, take the
12  third amendment -- second amendment and put it into
13  the form of a third amendment directly between our
14  two originals.
15  Q. Who worked on the agreement?
16  A. I believe it would have been Dennis Halpin.
17  I'm sure he reviewed it. But I probably had a
18  primary role. And I may have enlisted the aid of
19  our outside counsel.
20  Q. Who was your outside counsel at the time?
21  A. McGuireWoods.
22  Q. And in particular?
23  A. Sally King.
24  Q. Okay. I'll refer you to Exhibit 18, and
25  that's an e-mail from you on December 5th, 2008, to

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 65

1    Mr. LaBow. "Ron, As requested, I faxed the fully
2    executed Third Amendment to the Management Agreement
3    to" -- give us a number. So that's when it was
4    finalized, both parties had executed it?
5        (Witness reviews document.)
6    A. What I -- never mind. What I did not see
7    here that -- it was -- it was dated -- eventually
8    dated November 1, handwritten in at -- by Ron LaBow,
9    and he selected the effective date.
10   Q. That's the next exhibit. So just so the
11   record's clear, December 5th is when you exchanged
12   the fully executed documents for the third
13   amendment?
14   A. That certainly looks like that's what
15   happened, yes.
16   Q. Okay. Now, let me refer you to the third
17   amendment.
18       (DiClemente Deposition Exhibit No. 19
19   was marked for identification.)
20   Q. That's a multi-page document?
21   A. Uh-huh.
22   Q. I see on the first page there it's
23   handwritten in November 1, 2008. What were you just
24   telling me about that?
25   A. Ron LaBow wrote that date in.

Page 66

1    Q. Do you know why he said to write in November
2    1st?
3    A. I don't recall exactly why.
4    Q. Okay. But he was the one who picked November
5    1st?
6    A. He absolutely was the one who picked that
7    date.
8    Q. All right. Let me refer you to the next one.
9    We're up to 20.
10       (DiClemente Deposition Exhibit No. 20
11   was marked for identification.)
12   Q. Just has a single side.
13       (Witness reviews document.)
14   A. Okay.
15   Q. Okay. So this is an e-mail from you,
16   December 12, 2008. It doesn't say who it is to. Do
17   you know who it was to?
18   A. I think, John, my recollection is this was
19   merely a file memo to myself. I wanted this -- I
20   wanted this document. Because this, to me, was
21   significant, that we had our assets transferred and
22   presumably managed by Neuberger Berman at some
23   earlier date, and they remained unmanaged for a
24   period of time. Very upset.
25   Q. And it says Charlie --

Page 67

1    A. Diccianni.
2    Q. And who was he?
3    A. He was my representative at Neuberger Berman.
4    I cannot tell you today in what capacity. He may
5    very well have been a relationship manager as
6    opposed to an investment manager.
7    Q. It says in your memo here, "Charlie Diccianni
8    called on 12-10-2008" "to make sure we understand
9    what is required to establish a relationship with
10   them."
11       Is that phone call your first
12   indication that Neuberger Berman was not managing
13   the assets?
14   A. That certainly looks like it.
15   Q. Okay. Then the second -- second line there
16   says, "I laid into him because they have not managed
17   our money (and maybe WHX's money) since the trustee
18   transition at the beginning of November."
19       And then last line, "Ron LaBow
20   returned my previous calls earlier in the week and
21   left a voice message at work" on 12/10 "and followed
22   up with another message." "He then called me on his
23   cell phone as I originally directed."
24       So, okay. So that looks as if this is
25   on December 12th you're writing it down that

Page 68

1    Mr. LaBow finally did speak to you on December 10th?
2    Am I interpreting that right?
3    A. Let's see.
4        (Witness reviews document.)
5    A. I can't interpret exactly what happened here
6    at this point, John. It looks like he may have left
7    me a voice message on December 10th, and I'm not
8    sure that we actually connected on December 10th.
9    Q. Okay.
10   A. It's unclear.
11   Q. What do you recall? Did you speak to
12   Mr. LaBow about the fact that Neuberger Berman
13   hadn't been managing the assets?
14   A. I don't recall exactly the sequence here of
15   what the nature of the voice message was.
16   Q. Okay. And I'll take it out from this --
17   these particular dates, the 10th, the 12th of
18   December. At some point you spoke to Mr. LaBow
19   after you found out that Neuberger Berman hadn't
20   been managing the plan's assets.
21   A. That's fair.
22   Q. And what do you recall about that
23   conversation with Mr. LaBow?
24   A. I don't specifically recall. I have an idea,
25   but if you produce another document, I may be able

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

---

Page 69

1  to confirm my suspicions.
2  Q.  Okay.
3  A.  If you have such a document.
4  Q.  Okay.  Let me show you what we can mark as 21
5  and 22 and 23.
6         (DiClemente Deposition Exhibit Nos. 21
7  through 23 were marked for identification.)
8  Q.  Might as well start with Exhibit 21, an
9  e-mail from December 2008 from Mr. LaBow to you.  It
10  says, "I spoke with Sally and Russell at Neuberger -
11  Russell is going over docs to see if they can accept
12  my signature."
13         Okay.  Does that refresh your
14  recollection as to --
15  A.  It does a little, John.  I -- it gets back to
16  the comment, I believe I made such earlier, about
17  whether or not we should be entering into an
18  agreement beyond what we already felt we had solely
19  with Ron LaBow.  And our preference would have been
20  for Ron to enter into agreements with any investor
21  manager that he chose to retain in order to fulfill
22  his services to us.
23  Q.  Right.  At that point, I haven't seen
24  anything in the documents about -- about the fees
25  yet, about reducing the fees.  Do you know if there

---

Page 70

1  were any other concerns that you had, aside from the
2  fees?  I take it from what you're testifying that it
3  was just the -- I guess the direct relationship
4  between you and Mr. LaBow and whether you needed to
5  have a separate direct relationship with Neuberger
6  Berman.  To the extent you can elaborate on that.
7  A.  Well, our concern was fundamentally regarding
8  whether we had to enter into an independent or
9  separate agreement with one of Ron LaBow's managers.
10  But yes, you're right.  I suspected that we would
11  get to the point of what that fee should be.  So we
12  did have -- once we acquiesced and basically were
13  forced into conforming to Ron LaBow's desires if we
14  wanted to continue to benefit from his, you know,
15  top-level performance, we agreed to enter into that
16  agreement.  But then the subject of fees came up.
17  Q.  Okay.  Before we get to the fee, just going
18  back to Exhibit 20.  Do you recall anything else
19  that you did as a result of learning that Neuberger
20  Berman had not been managing the plan's assets?
21  Again, this is December 12, 2008.  Anything up to
22  December 12, 2008?
23  A.  I don't, John.
24  Q.  Okay.  Do you recall if you did anything
25  after December 12, 2008, when you found out

---

Page 71

1  Neuberger Berman wasn't managing the plan's assets?
2  A.  I don't recall.
3  Q.  Do you know who you thought was managing the
4  plan's assets at that point in time, December 12,
5  2008?
6  A.  I don't know that anyone was.
7  Q.  Right.  But at the time who did you think was
8  managing your assets?
9  A.  Ron LaBow.
10  Q.  Would -- if you thought Mr. LaBow was
11  managing the assets, why would it have been an issue
12  that Neuberger Berman wasn't managing the assets?
13  I'm just trying to understand the upset at Neuberger
14  Berman.
15  A.  We were upset that Neuberger Berman wasn't
16  managing the assets.  We felt that it was Ron LaBow
17  who was retaining Neuberger Berman to manage the
18  assets.  So Ron LaBow had a higher level of
19  authority to assure that the investment manager that
20  he retained was, in fact, managing the assets on his
21  behalf and, in turn, on our behalf.
22  Q.  Got you.  All right.  Now, I'll point you to
23  exhibits in --
24  A.  In other words, Ron LaBow doesn't get to wash
25  his hands from the activities or lack thereof with

---

Page 72

1  regard to his retention of Neuberger Berman.
2  Q.  Got you.  All right.  Now, let me refer you
3  to Exhibits 22 and 23.  22 is just a single side,
4  and it looks like an e-mail chain.  The top says
5  from Kevin Handwerker to Marvin Schwartz, Henry
6  Ramallo; CC Carolyn Golub, Jeff Warnock.
7         (Witness reviews document.)
8  Q.  And it says in there, "I spoke with the
9  attorney for the Severstal Wheeling Pension Plan.
10  We will be getting some comments on our agreement
11  and they will provide us the standard documentation
12  that we require.  She requested that we begin
13  managing the assets immediately and I agreed to
14  accommodate their request provided we get
15  authorization from Mike DiClemente requesting that
16  we do so."
17         Based on that e-mail, they needed you
18  to sign something as opposed to your attorney, for
19  some reason, signing something.
20  A.  It's possible.
21  Q.  And underneath that is the e-mail from Sally
22  King dated December 17, 2008, to Kevin Handwerker
23  and CCing you, and it says, "Kevin:  Thank you for
24  your time this afternoon discussing the Severstal
25  Wheeling issues.  I am sure that we can now work out

---

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 73

1 an arrangement that will be satisfactory to both of
2 our clients.
3          "You should receive an e-mail from
4 Michael DiClemente early tomorrow that outlines the
5 issues that we would like to discuss relating to the
6 Investment Advisory Agreement.  Mike will also
7 verify on behalf of the Severstal Wheeling
8 Retirement Committee their intent to have Neuberger
9 Berman manage the pension assets that had been
10 transferred to N.B. and their desire to have
11 management begin immediately.  Also, we intend to
12 work with N.B. to formalize the Agreement and
13 provide supporting documentation as soon as
14 possible.
15          "Please let me or Mike know if there
16 are other issues that need to be addressed at this
17 time."
18          I take it that this sounds as if you
19 were trying to get an agreement done with Neuberger
20 Berman at the time.
21 A. Correct.
22 Q. And Exhibit 23 is one day later, December
23 18th, 2008, and that's an e-mail from you to
24 Mr. LaBow, and it's got attachments and then it
25 says:  "Kevin" -- which I assume is Mr. Handwerker.

Page 74

1 Maybe we don't have the whole e-mail trail here.
2 A. Yeah, it's not quite following along here,
3 John.  Let's see here.
4 Q. It looks like three pages.
5          (Witness reviews document.)
6 Q. Looks like those are succeeding e-mails to
7 the one from Sally King that you just talked about.
8 A. Uh-huh.
9 Q. Okay.  So it looks as if you've gotten down
10 to brass tacks -- if that's the right expression --
11 to talking about what you liked in their agreement
12 and what you didn't like in that agreement.
13 A. That's what it looks like, John.  The curious
14 thing about this is this looks like a letter -- an
15 e-mail from me to Ron LaBow.  And that's -- but in
16 terms of the e-mail directions, but the e-mail is to
17 Kevin.
18 Q. Right.
19 A. There's something a little odd about this
20 e-mail.
21 Q. Right.  This was originally marked as
22 Exhibit 20 in your deposition from the New York
23 case.
24 A. Humpf.
25 Q. So it looks as if there are a handful of

Page 75

1 issues here, including the fees.  Do you recall --
2 which -- and this is again December 18, 2008.  This
3 e-mail aside, do you recall discussing these issues
4 with Neuberger Berman about problems that you had
5 with their contract?
6 A. Other than what's laid out here, I -- you
7 know, I didn't understand with regard to the same
8 specificity as I -- as contained in this e-mail, but
9 obviously we had some issues with it, and I presume
10 those were ultimately satisfactorily agreed to.
11 Q. Do you recall whether Neuberger Berman made
12 any changes to their standard agreement?
13 A. I don't know.  It sounds as if we may have
14 agreed on some of these changes.  I don't have it in
15 front of me.
16 Q. Sure.
17 A. But I don't believe that any issues that we
18 had, that we -- if they weren't addressed at our
19 request, ultimately, as I think everyone is well
20 aware, there's always a negotiation process when
21 you're entering into an agreement, and I believe
22 ultimately we came to a satisfactory resolution on
23 the items that allows us to enter into the
24 agreement.
25 Q. Was the biggest or the last outstanding issue

Page 76

1 the fees?
2 A. They were the fees, yes.
3 Q. Okay.  We'll get to that.
4 A. Okay.
5 Q. All right.  Let me refer you to the next two
6 documents, and we're up to 24 and 25.
7          (DiClemente Deposition Exhibit Nos. 24
8 and 25 were marked for identification.)
9 Q. Let me know when you've had a chance to look
10 at number 24.
11 A. Okay.
12          (Witness reviews document.)
13 A. I've read it, John.  I remember this very
14 well.
15 Q. Okay.  So it says in this e-mail, Exhibit 24,
16 the December 30, e-mail, from you to Mr. LaBow about
17 how you just learned yesterday from Mercer that the
18 plans were solely invested in those assets in the
19 Neuberger Berman account.  So how did you learn from
20 Mercer?
21 A. I called Mercer to get some feedback from
22 them with regard to the fee that was being proposed
23 by Neuberger Berman for the management of those
24 assets.
25 Q. Okay.

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 77

1  A. And in my conversation, I said, okay, the
2  Neuberger Berman assets should have a value of
3  approximately X dollars. I don't remember that
4  number at this point.
5  Q. Sure.
6  A. Representing about 10 percent of the
7  Neuberger Berman account in totality.
8  Q. In totality from the WHX commingled?
9  A. From the WHX, yes. And through that
10 conversation -- and I was looking for feedback so I
11 can go back to negotiate with Neuberger Berman.
12 Through that conversation, I learned from
13 Mercer that we had received the entire Neuberger
14 Berman account to satisfy most of the assets that
15 would be transferred to the Wheeling-Pitt account,
16 separated from the WHX trust. And that's when
17 things got very ugly.
18 Q. Okay. And in the letter you spell out how,
19 as you testified, that you wanted to use Mr. LaBow's
20 services and with the same strategies, not a change
21 in strategy, for the Severstal plans. Would that be
22 fair?
23 A. Correct.
24 Q. The last paragraph on the first page says
25 that you just learned this month that Neuberger

Page 78

1  Berman had not been managing the assets. So it
2  would have been December. That's what you recall?
3  A. Correct, yes.
4  Q. Okay. So this e-mail is sent on December 30;
5  and then did you have a phone call with Mr. LaBow on
6  the 30th?
7  A. I don't recall the exact date.
8  Q. Oh, okay. Let me refer you to Exhibit 25.
9  A. Okay.
10    (Witness reviews document.)
11 A. Okay.
12 Q. All right. So Exhibit 25, that looks like an
13 e-mail from Sally King to Mr. LaBow, and I don't see
14 a CC to you, but I --
15 A. Seems odd.
16 Q. It -- yeah, just the one side. Anyway, have
17 you ever seen that e-mail before?
18 A. I believe I have.
19 Q. Okay. So it says, "Based on our conference
20 call this afternoon, the following items will be
21 done as soon as possible."
22    "Ron LaBow will negotiate the fee
23 adjustment with Neuberger Berman, once the fees are
24 changed, Mike DiClemente will execute the
25 agreement."

Page 79

1     What do you recall about your
2  discussions with Mr. LaBow on the fees?
3  A. I don't recall specifically at this moment.
4  Q. Okay. Just that they were too high?
5  A. They were high, yes. We thought there was
6  something that was more reasonable.
7  Q. Okay. Do you know what you based that on,
8  about the fees being more reasonable?
9  A. I have an understanding of what investment
10 management fees are in general. And then also I
11 took into consideration the fact that we were
12 already paying Ron LaBow a fee.
13 Q. Right.
14 A. And so we were piling up fees, and we wanted
15 to make sure that we had an overall all-in
16 reasonable fee level for the management of those
17 assets.
18 Q. Right. No. 2, item 2 is, "Ron LaBow will
19 request the most recent statement from Neuberger"
20 and forward a copy to Mike DiClemente. Did you not
21 have access to Neuberger Berman's statements at that
22 time?
23 A. I'm not aware that we had access to the
24 statements.
25 Q. Okay.

Page 80

1  A. I don't remember receiving -- when you asked
2  that question, you were talking about over the
3  entire life of our participation in the --
4  Q. Oh, yeah. I guess I should qualify that. So
5  from November 3rd, 2008, when the separate Severstal
6  trust was set up, until this e-mail, December 30,
7  2008, did you have access to be able to find out
8  what -- yeah, I guess I should qualify that.
9     It says most recent statement from
10 Neuberger Berman. But typically would you get a
11 statement if you actually had an account with them?
12 That's what -- I'm just thinking to myself now as
13 I'm reading this and trying to ask you a question,
14 that you might not have been getting statements
15 because you were not a customer of Neuberger Berman?
16 A. We were not.
17 Q. I take it, though, that you would have been
18 able to find out how the -- well, let me ask it this
19 way: You would have been able to find out what the
20 assets were in your trust because Mercer knew when
21 you were talking to them on December 29th or
22 thereabouts?
23 A. That's when they told us what we had
24 received.
25 Q. Do you know how Mercer found out or knew what

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 81

1 the assets were in the trust?
2 A. I don't recall, but as our investment
3 manager, they would receive investment statements
4 from managers. And that's how Mercer and
5 organizations like it go about validating the
6 investment performance of a particular manager.
7 Q. Right, but as we're talking, then I'm
8 thinking, well, you didn't get any statements from
9 Mr. LaBow during that period, November 3rd to
10 December 30th.
11 A. We did not.
12 Q. And if you didn't have a contract with
13 Neuberger Berman, you probably didn't get a
14 statement from them. That may be the only way --
15 and let me know if this sounds reasonable -- the
16 only way you or Mercer could have found out what the
17 assets were was by checking with Citibank, the
18 trustee, as to what they were holding?
19 A. Yes, we could have done that.
20 Q. Would you have gotten statements from
21 Citibank?
22 A. John, I don't know that. I don't know what
23 we may or may not have been receiving. I know I did
24 not receive them.
25 Q. The only -- the only service providers at

Page 82

1 this time, December 30th, that you had, that the
2 plans had, would have been with Mercer Consulting;
3 so is that a yes?
4 A. Yes.
5 Q. And with Citibank?
6 A. Yes.
7 Q. And Mr. LaBow?
8 A. And LaBow, yes.
9 Q. And any other service providers you would
10 have had at that time?
11 A. Not that I know of.
12 Q. Ms. King is in a different category in a way.
13 She would have been providing services to you
14 directly in the retirement committee, though, not to
15 the company as a whole because she was an ERISA
16 attorney.
17 A. Correct.
18 Q. So going back to the e-mail, Exhibit 25, No.
19 3, "Mike DiClemente will contact Dave Riposo to
20 request the status (and delivery) of the audit
21 report."
22     I take it that the audit was a source
23 of some contention going on. And the audit, my
24 understanding, was -- it was an outside accounting
25 firm was trying to figure out the commingled trust,

Page 83

1 how much belonged to the Seversal trust and how
2 much belonged to the WHX trust?
3 A. That's my understanding, John. I think the
4 name of the firm was Cohn, C-O-H-N, something like
5 that.
6 Q. That's my understanding, too.
7 A. Okay.
8 Q. No. 4, "Sally King will draft a memo
9 outlining the guidelines to be implemented between
10 Ron LaBow and Mike DiClemente relating to procedural
11 issues under the LaBow Investment Management
12 Agreement."
13     So what does that refer to? What does
14 that mean?
15 A. I'm not sure, John. It almost looks as if
16 the investment management agreement had yet to be
17 fully negotiated.
18 Q. And from looking back at the previous
19 exhibits, Exhibit 19, the third amendment to the
20 Seversal Wheeling, Inc., investment management
21 agreement, backdated to November 1st, 2008, was
22 already signed by you and Mr. LaBow?
23 A. Uh-huh. Already -- yes, I see that. I see
24 the time stamp on that was in later November -- on
25 the top of the page.

Page 84

1 Q. You should have a copy there.
2 A. Sorry about that, yeah, yeah. What number
3 was that, John. Here it is, November 22nd.
4 Q. No. 19. The fax says November 22nd, 1996?
5 A. 1996. Well, let's not rely upon that date
6 then.
7 Q. There are a lot of interesting notations on
8 the documents in this case, but -- so going back to
9 Exhibit 25 and item 4, "Sally King will draft a memo
10 outlining the guidelines to be implemented between
11 Ron LaBow and Mike DiClemente relating to procedural
12 issues under the LaBow Investment Management
13 Agreement."
14     I take it that the LaBow investment
15 management agreement is referring back to
16 Exhibit 19, the third amendment to the investment
17 management agreement?
18 A. Yes.
19 Q. And my understanding of looking at the
20 contract and what you have been saying so far in the
21 testimony today, that Mr. LaBow had independent
22 authority and responsibility to invest the assets
23 for the Seversal trust?
24 A. Full discretionary authority.
25 Q. So -- and if you don't recall, you don't

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

---

Page 85

1 recall -- but again, do you have any idea what
2 "procedural issues under the LaBow Investment
3 Management Agreement" would mean?
4 A. At this point, I don't.
5 Q. And they're Ms. King's words, not yours, from
6 looking at this e-mail.
7         Let me put it this way. What was your
8 level of trust with Mr. LaBow by this point,
9 December 30th, 2008?
10 A. May I go back?
11 Q. Yeah, sure. It's open book.
12      (Witness reviews document.)
13 A. I would say it was suspect, to be kind.
14 Q. Now, I don't want to characterize the
15 relationship -- and we'll see the documents as we go
16 forward -- but it seems that a lot of the thrust of
17 your communications with Mr. LaBow were, it's your
18 responsibility, it's your job, do your job.
19 A. Correct.
20 Q. At the same time, procedural issues under the
21 LaBow investment management agreement -- well, if
22 you don't recall, you don't recall what that means.
23      Were you trying to get, at this time,
24 more communication from Mr. LaBow? Would that be a
25 fair statement?

---

Page 86

1 A. Sounds reasonable.
2 Q. Okay. Had -- and going back to -- in time to
3 when the trust was separated on November 3rd,
4 Mr. LaBow had indicated to you to sign an agreement
5 with Neuberger Berman?
6 A. Correct.
7 Q. Did he elaborate? Did he say why you needed
8 to get an agreement with Neuberger Berman?
9 A. I don't recall.
10 Q. Did he -- did he indicate to you that the
11 assets you received were not being managed?
12 A. I don't recall that he ever said that. Had I
13 known that, I think that I -- I would have been very
14 proactive.
15 Q. Right. From November 3rd, 2008, up till
16 December 28th, 2008, before you found out from
17 Mercer that the plans were just invested in
18 Neuberger Berman and mostly energy stocks, had you
19 had any communications with Mr. LaBow as to why do
20 we have to have this contract with Neuberger Berman?
21 You know, asking him, what's the point?
22 A. At some point I know I registered that
23 concern, because I had already indicated to him that
24 we had an investment manager, you're the investment
25 manager, we have an agreement with you. Why am I

---

Page 87

1 required to enter into auxiliary investment
2 management agreements?
3 Q. And would that have been before December
4 30th, with the conference call with Mr. LaBow?
5 A. Within context, I just can't recall, John.
6 Q. Sure.
7 A. It sounds reasonable that I would have done
8 that. And if you showed me a document, I could
9 probably confirm that. This kind of meshes together
10 from time to time.
11 Q. Sure. Aside from the documents that we've
12 looked at, were there any other contracts or written
13 agreements that you had with WHX as -- about how the
14 trusts were going to be separated? Before November
15 3rd, 2008, when they were separated.
16 A. I don't recall that we had any such
17 agreements.
18 Q. And before Exhibit 19 was signed on or about
19 December 5th, 2008 -- actually, that could go back
20 to Exhibits 17 and 18 as well. 18 is the e-mail
21 saying fax the fully executed agreement.
22 A. Uh-huh.
23 Q. Aside from that agreement with Mr. LaBow and
24 any of the other documents we've looked at so far,
25 there aren't any other contracts or writings with

---

Page 88

1 Mr. LaBow as to what assets you're going to receive
2 on November 3rd, 2008?
3 A. I don't recall any.
4 Q. Any other contracts or writings with
5 Mr. LaBow as to how the assets were going to be
6 managed, you know, aside from your contract with
7 him?
8 A. I don't recall.
9 Q. I take it then on November 3rd or 4th when
10 the trust was separated that you didn't check to see
11 what assets you had?
12 A. No, I don't believe we did.
13 Q. And because if you had, you might have taken
14 some action?
15 A. Absolutely.
16 Q. Do you know why you didn't check on November
17 3rd, November 4th as to what assets you received in
18 the separation?
19 A. I don't recall why we didn't check. All I
20 know is we -- we trusted Ron.
21 Q. Around that time, do you recall if there was
22 anything else going on with your job as treasurer
23 that was maybe taking a lot of your time and
24 attention, you know, merger or something else going
25 on or other financing issues?

---

Case 2:14-cv-01494-NBF  Document 184-12  Filed 09/25/18  Page 25 of 55

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 89

1  A. I don't recall anything specific. I do know
2  this: I had a very engaging and enjoyable job and
3  thrust myself into all the issues of the day. So I
4  wasn't sitting around. I was fully occupied. But I
5  would not in any way characterize my being
6  distracted.
7  Q. The fact that the economy was in a pretty bad
8  situation around November 3rd of 2008, would that
9  have affected your ability to focus on the
10  retirement plan?
11  A. Not at all. No. I mean, I'm -- I was in,
12  certainly, an officer position, focussed in the
13  financial arena. I was certainly responsible for
14  making sure that we were keeping the banks happy
15  with regard to company performance. So I was well
16  aware of the company performance, but I did not
17  regulate company performance or have any --
18  necessarily any responsibilities for determining how
19  the company was going to operate; pulling back on
20  operations, scaling back, moving in a different
21  direction. That was outside my purview.
22  Q. And going back to the exhibit. Let me get
23  the right one. Here we go. Exhibit 10.
24  A. Exhibit 10, okay.
25  Q. The November 3rd, 2008.

Page 90

1  A. Yes.
2  Q. Directed Citibank to transfer, prior to
3  market opening on November 3rd, all assets in the
4  Neuberger Berman account.
5       What was your understanding of what
6  was in the Neuberger Berman account at that time?
7  A. I'm not sure I knew what the composition of
8  the Neuberger Berman account was.
9  Q. Okay. Would you have been able to find out
10  what was in the Neuberger Berman account?
11  A. I could have.
12  Q. And as far as who was managing the plan's
13  assets at the time, what was your understanding
14  about who was -- on November 3rd, 2008, who was
15  managing the plan's assets?
16  A. I thought Ron LaBow was doing that on our
17  behalf.
18  Q. What was that based on?
19  A. Based upon our prior relationship with Ron as
20  part of the commingled trust.
21  Q. And in addition, you had conversations with
22  him after -- when the separation was going on?
23  A. We did, yes.
24      MR. STRAWN: Off the record.
25      (Discussion held off the record.)

Page 91

1  Q. Mr. DiClemente, at any time after the trust
2  was separated, did Mr. LaBow indicate to you that
3  you didn't get a proportional slice of the
4  commingled trust assets?
5  A. He never indicated that.
6  Q. Did he ever indicate to you after separation
7  what you did receive?
8  A. Prior to my learning independently, no. I
9  just wanted to make sure I understood the context of
10  the question.
11  Q. Sure. Let me ask you this: Why did you want
12  to get a proportional slice of the assets from the
13  larger trust?
14  A. We wanted to continue to enjoy the same
15  diversified portfolio of assets that we previously
16  participated in.
17  Q. At any point in the process up till December
18  29th when you learned things hadn't gone right, did
19  you talk to -- who did you talk to about the plan
20  and -- from your side? I assume you talked to
21  Mr. Halpin.
22  A. I would have talked with Dennis from time to
23  time about it. It would not have been a daily
24  occurrence.
25  Q. Do you know what you would have talked to him

Page 92

1  about? Did you talk to him about the Neuberger
2  Berman issue?
3  A. I wouldn't -- I would not -- not until I
4  learned of the Neuberger Berman issue did I talk to
5  him about that, but I --
6  Q. The issue being that they weren't managing
7  anything or the issue being that it was not
8  diversified?
9  A. Well, throughout the month of December until
10  we learned about -- that we got Neuberger Berman, it
11  would have been just general discussions.
12  Q. Would you have talked to him about being
13  upset to find out that Neuberger Berman wasn't
14  managing the assets, that was somewhat earlier in
15  December?
16  A. I don't recall that, John.
17  Q. Would there have been anybody else that you
18  would have spoken to, again, before, you know,
19  learning that the plans weren't diversified?
20  Anybody else in the corporation and the sponsor
21  employer?
22  A. The only other person that I think I could
23  have had a conversation with would have been Rick
24  Bowness, but I don't know that I had any
25  conversations. I'm assuming -- I would speak with

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 93

1 Rick regularly, but not necessarily just solely
2 about this topic.
3 Q. Oh, sure. It seems as if his name was on
4 some of the e-mails with regard to the Neuberger
5 Berman contract. Correct?
6 A. (No response.)
7 Q. That's okay. The documents say what they
8 say.
9 A. Okay.
10 Q. Before June 2008, when you had to deal with
11 the separation of the Severstal trust from the WHX
12 trust, how much contact had you had with Mr. LaBow?
13 A. Fairly limited.
14 Q. Could you characterize when you would speak
15 to him or e-mail to him or communicate with him?
16 A. Other than very limited.
17 Q. Would it have been with regard to annual
18 reports or returns or -- I don't know. If you could
19 point that out, on what occasions you would have
20 communicated with him.
21 A. There's a possibility I would have had a
22 conversation with him to compliment him on his
23 performance.
24 Q. Right.
25 A. But there wouldn't have been any day-to-day

Page 94

1 reason for doing so. The reason why -- and I'll
2 also offer this, John, is that once we engaged
3 Mercer Investment Consulting, the intelligence that
4 we received about Ron LaBow was primarily through
5 our independent investment consultant that provided
6 reports on his performance.
7 Q. Right, about performance. That's the
8 information you were getting from Mercer --
9 A. Correct.
10 Q. -- not some other information. Did you ever
11 ask Mr. LaBow, up till signing the agreement on or
12 about December 5th, 2008, the third amendment to the
13 investment management agreement, did you ever ask
14 him if he had insurance, liability insurance?
15 A. I did not, but I believe -- I'm not sure.
16 Never mind.
17 Q. Do you know whether Mr. LaBow was ever
18 investigated by another governmental organization --
19 A. I don't recall that.
20 Q. -- before or after your situation with him?
21 A. No, I do not recall anything like that.
22 Q. Do you think there was enough time to
23 properly plan and execute the plan separation from,
24 I guess, June of 2008 till, I guess, when it finally
25 occurred on November 3rd, 2008?

Page 95

1        MR. JOYCE: Objection on speculation.
2 And to the extent it asks for an expert opinion.
3 But if you have an idea, Mike, you can answer.
4 A. If you could repeat the question, John.
5 Q. Do you think you had enough time to carry out
6 the trust separation properly from, I guess, June of
7 2008, when you got the word that you had to separate
8 the trust, till November 3rd, 2008, when it actually
9 was separated?
10 A. It seems like that would be a reasonable
11 length of time.
12 Q. Had you ever been involved in a trust
13 separation before?
14 A. Yes.
15 Q. Okay. Could you just describe --
16 A. Previously, when I was an institutional
17 investment consultant, I facilitated a separation of
18 assets between -- from one trust into another trust.
19 Q. A retirement-plan-type trust?
20 A. Retirement plan. I was the -- again, I was
21 the consultant on behalf of one of my clients, and I
22 worked with the two banks in that regard.
23 Q. Okay. How did you do the separation? Was it
24 a proportional share of all the assets?
25 A. I do not recall that. But we did transfer

Page 96

1 the assets in kind, which is what I was originally
2 proposing. And that's how I knew that that was a
3 distinct possibility.
4 Q. Right. As you testified.
5        Had Mr. LaBow ever indicated to you
6 that he thought you put too many changes into the
7 third investment management agreement?
8 A. No, I don't recall anything like that.
9 Q. Did he ever say anything -- I don't know, up
10 to this point, December 30th of 2008 -- that you had
11 taken too long on your side to do anything?
12 A. No, I do not recall any such commentary
13 feedback from him.
14 Q. In retrospect, were there any warning signs
15 that Mr. LaBow might not have been carrying out his
16 duties as you intended before December 29th, 2008?
17 A. I do not recall any such warning signs. I
18 just will emphasize and re-emphasize that we trusted
19 Ron.
20 Q. Do you think Mr. LaBow had any conflict in
21 his position dealing on behalf of WHX and Severstal
22 in separating the trusts?
23        MR. JOYCE: Objection. Speculation.
24 Q. You can answer.
25 A. Eventually, the thought crossed my mind.

Case 2:14-cv-01494-NBF   Document 184-12   Filed 09/25/18   Page 27 of 55

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 97

1   Q. And now I'm speculating. Is that because you
2   think he favored WHX over the Severstal trust?
3       MR. JOYCE: Same objections.
4   Speculation.
5       You can answer if you know.
6   Q. Or how about this: Why do you think that?
7   That's a fairer question.
8   A. They had the lion's share of assets.
9   Q. Meaning what?
10  A. They had 90 percent -- approximately 90
11  percent of the assets. And that's where the lion's
12  share of his fee revenue was sourced.
13  Q. Is there anything that prevented Severstal
14  from -- I guess, the retirement committee -- from
15  selling the Neuberger Berman account, the assets in
16  there on November 3rd or November 4th, 2008?
17  A. Would you repeat that question, please, John.
18  Q. Is there anything that would have prevented
19  you from selling the assets in the Neuberger Berman
20  account on November 3rd or November 4th, 2008,
21  whenever you could have sold those assets?
22  A. I don't know. We had -- we had an
23  arrangement with Ron. Ron was the investment
24  manager. It would -- if that thought had crossed
25  our mind, we would have chose to turn our backs on

Page 98

1   an investment manager who produced stellar returns.
2   And there would be no reason for us to think that we
3   would want to do something contrary to what Ron
4   wanted to do.
5   Q. Going back to that conversation with
6   Mr. Finney and Mr. LaBow, I take it that you thought
7   that -- that, as opposed to divvying up the assets
8   proportionally, what you took to Mr. LaBow, one, is
9   to sell the assets into cash and then rebuy the
10  assets. Is that what your understanding was?
11  A. No. We -- just to clarify, we felt that it
12  was feasible that we would have transferred in kind --
13  transferred in kind --
14  Q. Right.
15  A. -- and that was the -- that was a specific
16  topic of discussion when we had that three-party
17  conference call, and I remember Louis Finney saying,
18  if he ultimately wants to sell and rebuy, let him
19  sell and rebuy. Let him make the decision.
20      You expressed your desire to continue
21  to utilize his services. You recommended the
22  optimal way to do it. Mercer agreed with that
23  optimal way. But if Ron LaBow was going to object,
24  we weren't going to stand in the way of Ron LaBow
25  effecting the separation of assets via a

Page 99

1   sell-and-rebuy program.
2   Q. And I take it that, if it was a
3   sell-and-rebuy program, you would have gotten cash,
4   not the Neuberger Berman account.
5   A. No. We would have sold all of the -- all of
6   our interests in each of the investments that
7   comprised the WHX portfolio and re-bought those
8   assets for each of the accounts, not just the
9   Neuberger Berman account.
10  Q. You would have gotten distributed cash from
11  the WHX plan and then -- and then the Severstal
12  trust would have re-bought the assets.
13  A. Via Ron LaBow.
14  Q. Right. But you didn't get cash. You got the
15  Neuberger Berman accounts.
16  A. Correct.
17  Q. So it wasn't the scenario that was being
18  discussed about selling and rebuying --
19  A. Correct.
20  Q. -- as it turned out?
21  A. As it turned out, correct.
22  Q. You said that Mercer said the optimal way --
23  was the optimal way to do the separation was to do
24  it proportionately? I just didn't understand what
25  you said.

Page 100

1   A. The optimal way was not to incur transaction
2   costs.
3   Q. Right, okay. Did Mr. LaBow ever say to you
4   at any point that he wasn't your investment manager,
5   that he wasn't performing services for the Severstal
6   plans?
7   A. He never made any such representation.
8   Q. Never said you didn't have a contract with
9   him?
10  A. Nope. Obviously, we ultimately did.
11  Q. You ultimately did; how so?
12  A. Through the third amendment.
13  Q. Right, right, I understand what you're saying
14  now.
15      Did he ever say to you that he didn't
16  know what you wanted him to do, in terms of getting
17  a proportional share of the --
18  A. No, he never -- never feigned ignorance or
19  anything like that, no.
20  Q. Okay. Let me show you what we're marking as
21  26.
22      (DiClemente Deposition Exhibit No. 26
23  was marked for identification.)
24      (Witness reviews document.)
25  Q. Let me know when you're done with that.

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

---

Page 101

1   A. I've read it, John.
2   Q. Did Mr. LaBow ever indicate to you at any
3   point, not just the date of this e-mail, at any
4   point, that he didn't want to go ahead with the
5   separation of the trust because the markets were so
6   volatile, it would have made accurate valuation of
7   the trust a lot more difficult?
8   A. I just don't recall that, John.
9   Q. Now, this e-mail, Exhibit 26, is from you to
10  Mr. Halpin and Mr. Bowness, and it's with regard to
11  the Neuberger Berman account's declines. And you go
12  on to say that, "We have described whereby we did
13  not receive a proportionate share of our assets in a
14  diversified portfolio, as we had expected. Of
15  course, the direction makes this more meaningful."
16      I assume the downward direction in
17  terms of value?
18  A. Right.
19  Q. "I am awaiting a call from Dave Riposo at
20  WHX. Once I have additional information, we should
21  arrange a conference call with Mercer no later than
22  tomorrow."
23      Do you recall your discussions at this
24  time with Mr. Halpin and Mr. Bowness?
25  A. I don't recall specific discussions, other

---

Page 102

1   than this would have been a very serious issue that
2   needed to be addressed as quickly as possible.
3   Q. I got you. Let me give you what we can mark
4   as 27. It's just one page. An e-mail from you to
5   Mr. Bowness and Mr. Halpin, January 7th, which is
6   two days later.
7       (DiClemente Deposition Exhibit No. 27
8   was marked for identification.)
9       (Witness reviews document.)
10  Q. Let me know when you've had a chance to read
11  it.
12  A. Okay. Okay. I've read it, John.
13  Q. Okay. Now, it sounds as if from this -- this
14  e-mail -- again, January 7th, 2009, and the subject
15  is discussion with Ron LaBow, the day before on
16  January 6th, 2009 -- that Mr. LaBow indicated to you
17  that he couldn't give you a proportional slice of
18  the plans. Was this the first time that he
19  represented that to you?
20  A. I'm not sure it's the first time he
21  represented that. I'm not sure. I'm just not sure.
22  Q. Do you know if he ever said that to you
23  before you found out that the plans weren't
24  diversified?
25  A. I just don't recall.

---

Page 103

1   Q. Okay. Did you ever find out whether or not
2   that was, indeed, accurate, that you could not have
3   gotten a proportionate slice of all the investments
4   of the WHX trust?
5   A. Did I ever validate that?
6   Q. Right. To know whether that was an accurate
7   statement by Mr. LaBow about the --
8   A. His ability to do so?
9   Q. Right.
10  A. I -- no, we took no actions to attempt to
11  contact each of the investment managers. We
12  accepted Ron LaBow's conclusion.
13  Q. Now, it -- the second paragraph in the
14  e-mail, you indicate that Mr. LaBow thought the best
15  option at that point would be to liquidate 80
16  percent of the Neuberger Berman account to lock in
17  gains. What was your understanding at this point as
18  to the relative performance of the Neuberger Berman
19  account that you had versus what the rest of the WHX
20  trust had been doing in the meantime?
21  A. I don't know that we had an ability to make a
22  comparison.
23  Q. And I'm just surmising that, if the Neuberger
24  Berman account had done better than the WHX trust,
25  that would have been a different situation than if

---

Page 104

1   the Neuberger Berman account had done a lot worse
2   than the WHX trust.
3   A. In an absolute independent statement way,
4   certainly that's accurate.
5   Q. Right.
6   A. But we had no basis to compare between the
7   two.
8   Q. Right.
9   A. And certainly this was a concentrated
10  portfolio, of a concentrated portfolio that we did
11  not want. It was not diversified, and we were
12  interested in a diversified portfolio.
13  Q. Right. Aside from the fact that you hadn't
14  got what you expected and it wasn't diversified, did
15  you think you had suffered losses by that point,
16  compared to what you would have gotten had you had a
17  diversified portfolio?
18  A. As of this point of time, does not look like
19  we had suffered losses.
20  Q. And again, referring to Exhibit 27 -- that's
21  Exhibit 27 in front of you.
22  A. Okay.
23  Q. Right. So according to Exhibit 27 and what
24  you say Mr. LaBow's representations were to you that
25  you hadn't suffered a loss at that point is what

---

Case 2:14-cv-01494-NBF   Document 184-12   Filed 09/25/18   Page 29 of 55

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 105

1    he's saying, but not that you have an independent
2    verification?
3    A. We did not have an independent verification.
4    Q. Okay. Now, it seems as if from -- again,
5    that second paragraph in the e-mail that he's saying
6    the best option is to liquidate 80 percent and then
7    diversify. Was he asking you for permission? Was
8    he saying this is something he was thinking about?
9    A. Well, I mean, we've also found it very
10   interesting that now he wanted us to participate in
11   his investment decisions and that's -- we hired him
12   to make his own investment decisions and we weren't
13   going to be a party to that. We understood what he
14   thought might make sense, but he was the man to
15   execute or not execute at any point in time.
16   Q. I take it that he didn't ask your permission
17   before he made any --
18   A. He did not.
19   Q. -- decisions with the WHX trust?
20   A. No.
21   Q. Do you know whether he spoke with the WHX
22   retirement committee before he made decisions on the
23   investments?
24   A. I have no factual basis to make a comment.
25   Q. Okay. I'll refer you to the next exhibit.

Page 106

1    This will be 28. And it's got two pages. The first
2    page there in front of you is an e-mail from
3    Mr. Halpin --
4    A. Okay.
5    Q. -- to you dated January 8th. And then the
6    second side is where it says, "Discussion Summary:
7    Telephonic conference"?
8    A. Uh-huh.
9        (DiClemente Deposition Exhibit No. 28
10   was marked for identification.)
11   Q. Let me know when you've had a chance to look
12   at that.
13   A. Okay.
14       (Witness reviews document.)
15   A. I've read it.
16   Q. All right. Now, do you recall this
17   conversation?
18   A. I do.
19   Q. So it was -- it says, "Meeting Date" -- I
20   guess it was a telephone conversation, really --
21   January 7th, 2009, participants Michael DiClemente,
22   Dennis Halpin, and Sally -- I assume you had your
23   attorney, Sally King, in?
24   A. Sally King. That looks like Sally King, yes.
25   Q. And Ron LaBow. Now, without making any

Page 107

1    representation as to whether Mr. LaBow had actually
2    done any of these things, those bullet points in the
3    first paragraph about some minimum investment
4    requirements that would have been too high or there
5    were limits on additional partners coming in, or
6    there were certain restricted access periods for
7    certain funds, that, at least, all sounds possible
8    and plausible; right?
9    A. Those are possible reasons.
10   Q. Now, the second paragraph says, "Ron reminded
11   us how the portfolio we were currently in has
12   performed during the past couple of months, and that
13   any loss in value since 10/31 had been essentially
14   recovered as of January 6th, 2009."
15       So at the time, at least from looking
16   at these notes, nobody challenged Mr. LaBow and
17   said, no, that's not true?
18   A. I don't believe that we did.
19   Q. That last sentence, "He also stated how
20   'nimble' our portfolio was, and how readily we could
21   convert it to cash if we desired."
22       That's because it had all of those
23   large publicly traded company stocks that could have
24   been sold?
25   A. Correct.

Page 108

1    Q. And the next paragraph there, "Given Ron
2    could not reset portfolio to original
3    composition" -- I guess I should ask you the first
4    question. Who wrote those notes? Is that
5    Mr. Halpin?
6    A. This looks like Dennis Halpin. We have
7    different writing styles.
8    Q. And so that next paragraph, "Given Ron could
9    not reset the portfolio to original composition" --
10   was that a proposition that you accepted at that
11   point, that Mr. LaBow could not set you back to the
12   November 3rd, 2008, or you know, the pre-separation
13   mix of assets?
14   A. I did not necessarily remember this, John,
15   that this was the demarcation date where we had
16   given up on the portfolio reset. So I'm just
17   catching up here.
18   Q. Oh, sure. We've got a few more documents to
19   go through.
20   A. Yeah, yeah.
21   Q. But looking at it, that's how I -- I took it
22   when it was -- when it was worded; and again,
23   Mr. Halpin's wording, not yours.
24   A. This was Dennis Halpin representing what Ron
25   said.

Case 2:14-cv-01494-NBF   Document 184-12   Filed 09/25/18   Page 30 of 55

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 109

1  Q. Right.  So then -- anyway, follow up on that,
2  the rest of the sentence, "Mike and I both agreed
3  that Ron should liquidate the NB fund as he (Ron)
4  deemed prudent so as to preserve value, and to begin
5  reconstructing a more balanced diversified
6  portfolio."
7      A little further on it says, "Mike
8  acknowledged Ron's point and agreed to its
9  likelihood."  That seems to be referring back to
10  Mr. LaBow going out to managers of the funds that
11  WHX was currently in.  And that, I take it, you
12  would have to be applying as a new member, a new
13  investor.
14      (Witness reviews document.)
15  A.  A new investor in each of these funds that
16  had minimums and partnership limitations, et cetera.
17  Q.  Right.
18  A.  Yeah.  I mean, if those were true statements,
19  then those would be -- those would make it very
20  difficult to achieve what we wanted to otherwise
21  enjoy.
22  Q.  Sorry, didn't mean to cut you off.  It says,
23  "Mike acknowledged Ron's point and agreed to its
24  likelihood."  Do you know what "likelihood" means?
25  The likelihood that you would have to go back and

Page 110

1  basically reapply, reinvest in all of these plans
2  that you had, up to November 3rd, 2008, been an
3  investor in as part of a commingled trust?  I just
4  wasn't sure --
5  A.  I'm not sure.  There -- that may be a
6  reference to our having to sign certain documents to
7  achieve this.
8  Q.  Yeah.
9  A.  I'm not sure.
10  Q.  All right.  And then it -- and then it goes
11  on to say, "Ron sought investment guidance/direction
12  on several occasions from the Pension committee
13  members, including 'when' he should liquidate the NB
14  fund; Mike replied when Ron deemed prudent and that,
15  in each case, such action was Ron's responsibility
16  and that his responsibilities had not changed."
17      What did you take it to mean when
18  Mr. LaBow was, according to Mr. Halpin's writing
19  here, asking for guidance or floating ideas to you
20  there?
21  A.  I think Ron was trying to offload
22  responsibility.
23  Q.  Do you know why he would be trying to offload
24  responsibility?
25  A.  I'm not sure.  Again, I could speculate, but

Page 111

1  I guess I better not.
2  Q.  Just on the one hand, if you had what's
3  referred to as a nimble portfolio and he had ideas
4  going forward and you were saying if, you know, the
5  representation here is accurate, do what you think
6  is prudent, he could have gone and run and done
7  these things, invested it and proceeded --
8  A.  He had full discretionary authority to do
9  just that.
10  Q.  And again, just going back, when there's a
11  reference to the different documents that you had to
12  sign to get into different funds, you don't know
13  whether or not WHX's retirement committee actually
14  filled all those things out, those applications and
15  documents rather than Mr. LaBow as their investment
16  manager?
17      (Witness reviews document.)
18  A.  I'm not sure about that.
19  Q.  I get what you're saying, that, as the
20  investment manager, you're the one investing and
21  making decisions.  That's what you contracted for.
22  But I didn't know whether you had -- had an
23  understanding of WHX if it were -- from your, you
24  know, prior experience in the institutional
25  investing.

Page 112

1  A.  I'm a little bit hazy on what Ron's
2  relationship was with WHX relative to documentation.
3  Q.  Okay.  And I take it from looking at the
4  notes here, there was no -- no statement by
5  Mr. LaBow that he couldn't carry out his
6  responsibility and do investing because there were
7  any impediments?
8  A.  That is accurate.
9  Q.  Okay.  Now, this might clear a few things up,
10  too.  This is Exhibit 29.  It looks as if there's a
11  different writing style.  So let me know whether
12  these are your notes from that same conversation.
13      (DiClemente Deposition Exhibit No. 29
14  was marked for identification.)
15      (Witness reviews document.)
16  A.  Okay.  I've read it.
17  Q.  Is it possible that this is just a different
18  draft of Mr. Halpin's notes?
19  A.  No, this looks like this was written by me.
20  Q.  Okay, okay.  You seem to be certain.  Similar
21  phrases about a nimble portfolio and reconstruction
22  of the assets and given that Ron could not reset the
23  portfolio.  But that's -- that's all based on the
24  conversation.
25  A.  Correct.

Case 2:14-cv-01494-NBF   Document 184-12   Filed 09/25/18   Page 31 of 55

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 113

1  Q. Okay. And it seems to be a little bit
2  longer, but it seemed to agree with the last exhibit
3  with Mr. Halpin's notes?
4  A. They're certainly consistent, just a more
5  fulsome recitation. He makes certain admissions
6  here. Basically, he had the ability to construct a
7  more diversified portfolio. Again, he was trying to
8  transfer responsibility to us for his decisions.
9  Q. And you're basing that on him asking for your
10  sign-off on --
11  A. Correct, correct, he wants us to participate.
12  Q. Let me show you what we can mark as No. 30.
13      (DiClemente Deposition Exhibit No. 30
14  was marked for identification.)
15  Q. You're not on this e-mail. It's just one
16  page. But it's from Mr. Bowness to Amanda Pierce at
17  Allegiant Group. There are three e-mails back and
18  forth.
19  A. Okay. Let's see here.
20      (Witness reviews document.)
21  A. Okay.
22  Q. Okay. So I guess the biggest thing I take
23  from this document is just that -- the holdup in
24  getting an investment management agreement signed
25  with Neuberger Berman were the fees they were

Page 114

1  charging?
2  A. Correct.
3  Q. Okay. And that's your recollection?
4  A. Yes.
5  Q. Let's just, for good measure, use 31.
6      (DiClemente Deposition Exhibit No. 31
7  was marked for identification.)
8  Q. This one, when it gets to your hands, is an
9  e-mail from Mr. Bowness to you.
10  A. Okay.
11      (Witness reviews document.)
12  Q. And that's the same issue?
13  A. I follow this, yes.
14  Q. Any other issues at that time? I know before
15  December 30th there were, I don't know, more markups
16  or drafts. But it just seems in these e-mails it's
17  down to the fees.
18  A. Correct.
19      THE WITNESS: May we take a quick break?
20      MR. STRAWN: Yeah, yeah, sure.
21      (A brief recess was taken.)
22  BY MR. STRAWN:
23  Q. We're up to 32.
24      (DiClemente Deposition Exhibit No. 32
25  was marked for identification.)

Page 115

1  Q. Mr. DiClemente, let me show you what's been
2  marked as Government (sic) Exhibit 32 in front of
3  you. It's a Certificate As to Signatures. Do you
4  recognize this document?
5  A. I recognize it, but I have to catch up on
6  what it is.
7  Q. Uh-huh.
8      (Witness reviews document.)
9  Q. There's only one side, so it doesn't have
10  anything else to it.
11  A. Okay. I'm good.
12  Q. I would guess if it's dated the 6th day of
13  January, 2009, that it may be the retirement
14  committee's new -- or a part of their new agreement
15  with the new trustee, National City?
16  A. That's what it looks like.
17  Q. Can you tell me why Mr. LaBow isn't listed as
18  one of the signatories here?
19  A. I do not know.
20  Q. Do you know whether he's listed as a
21  signatory for WHX trust purposes?
22  A. I do not know that.
23  Q. Based on your experience, do investment
24  managers get listed on -- I guess this is literally
25  called a Certificate As to Signatures?

Page 116

1  A. I would say my recollection -- my reference
2  points would be that they would not necessarily be a
3  signatory to a trust.
4  Q. If -- if National City was given -- again,
5  this is based on your knowledge as to what -- --
6  what happened, but if you gave the investment
7  management agreement with Mr. LaBow to National
8  City, are you aware of any impediment to whether
9  Mr. LaBow could have had, you know, access to the
10  funds, may have been able to make trades?
11  A. I believe -- I believe he would have. My
12  recollection is, based upon some documentation that
13  I've seen, that a specific representative of the
14  bank would have recognized Ron LaBow's authority.
15  Q. Did you ever have any conversations with
16  National City about making sure Mr. LaBow had
17  access?
18  A. I don't recall that. What I do recall seeing
19  in some documentation where I believe a lady by the
20  name of Jacquie Thomas has represented that she
21  would have recognized his authority.
22  Q. I take it at some point Mr. LaBow said
23  National City doesn't recognize his authority. Is
24  that your recollection?
25  A. Seems familiar.

Case 2:14-cv-01494-NBF   Document 184-12   Filed 09/25/18   Page 32 of 55

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 117

1  Q. At the time, did you take any steps to verify
2  it to find out if National City would indeed accept
3  his -- his say-so or given whatever authority they
4  needed?
5  A. I believe it's through that e-mail that I
6  just referenced where Jacquie Thomas said that she
7  would have recognized his authority.
8  Q. Do you recall following up on any of
9  Mr. LaBow's statements about they won't talk to me,
10 to go to National City to find out what the problem
11 was from them as opposed to dealing with Mr. LaBow?
12 A. I don't recall.
13 Q. Okay.  The person who signed on the bottom
14 here, is that Mr. Halpin's signature?
15 A. Yes, it is.
16 Q. That will come in handy.
17 A. Actually, I don't quite remember his
18 signature being quite like that for his last name.
19 Q. Yeah.  Let me give you what we can mark as
20 33.
21      (DiClemente Deposition Exhibit No. 33
22 was marked for identification.)
23 Q. When you get it, you will see that those are
24 some notes of SWI retirement committee discussions
25 with Mr. Riposo.

Page 118

1  A. Okay.
2  Q. Uh-huh.
3  A. Okay.  I'm good.
4  Q. All right.  So do you recall this
5  conversation on January 14, 2009, with Mr. Halpin
6  and Mr. Riposo?
7  A. Yes, I do.
8  Q. So in the first paragraph there, it refers
9  to, I think, a conversation between you and
10 Mr. Riposo on December 31st, 2008.
11 A. Correct.
12 Q. What do you recall about that conversation?
13 A. David Riposo was astounded that we had just
14 recently learned how Ron had allocated the assets
15 between the two different plan sponsors, and he had
16 a very immediate reaction.  He said that, "If I were
17 you, I would fire Ron."  And he further commented
18 that he has "given up on Ron," and that "Ron does
19 what he wants to do."  And I gathered from that
20 conversation, those remarks and just the tone of the
21 conversation, that Dave Riposo has been frustrated
22 with how Ron behaves.
23 Q. When he says "given up on Ron," do you -- do
24 you get the impression that there was any -- any
25 more difficulties in dealing with Mr. LaBow around

Page 119

1  this period in time versus, you know, the several
2  years before?
3  A. My understanding is that that was not
4  necessarily isolated to any recent events.
5  Q. Oh, okay.  I was going to say you hadn't had
6  the same amount of contact before the separation
7  with Mr. LaBow; and to be able to compare it to, I
8  was just wondering if there was something new going
9  on.  Mr. Riposo didn't tell you, Ron's been
10 difficult to deal with lately?
11 A. I think it's been a historical issue.
12 Q. And Mr. Riposo says it wouldn't matter to him
13 if that were done and a redistribution of the assets
14 kind of going back to November 3rd and doing a
15 do-over in terms of who gets what assets.
16      I take it that, despite Mr. Riposo's
17 statement, that that would matter to the WHX fund
18 that they couldn't trade more valuable assets for
19 less valuable assets at this point in time, January
20 14th, 2009, without running afoul with their own
21 participants.  Is that your --
22 A. I'm not sure I follow that, John.  Could you
23 repeat that.  It sounds as if --
24 Q. Yeah, I'm just saying that Mr. Riposo is
25 saying, yeah, we could go back and do a do-over and

Page 120

1  try to get everything back to where it was November
2  3rd, 2008, and you had a 10 percent share.
3  A. Right.
4  Q. But that didn't happen, did it?
5  A. Correct.
6  Q. And my assumption is that the WHX fund trust
7  couldn't trade -- if it had more valuable assets for
8  less valuable assets without having a problem --
9  without breaching their fiduciary duties with regard
10 to their own participants, that there would be some
11 exposure on their part?
12      MR. JOYCE: Objection.  Form.
13 Speculation.  Legal conclusion.
14      If you understand, you can answer,
15 Mike.
16      MR. STRAWN: Probably a few more than
17 that, too.
18      MR. JOYCE: Yeah.
19 A. That's a possibility.  But at the same time,
20 we just saw on a previous document that apparently
21 the Neuberger Berman assets had risen considerably
22 in value, and that -- they may very well have been
23 upgrading in terms of trading out 90 percent of the
24 assets.
25 Q. Maybe this is getting ahead in the documents,

Case 2:14-cv-01494-NBF   Document 184-12   Filed 09/25/18   Page 33 of 55

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 121

1  but do you know why WHX didn't go along with a
2  do-over?
3  A. I don't know an underlying reason why.  I
4  just know, at a later date there was an individual
5  in a higher capacity at WHX that was not interested
6  in that.
7  Q. Mr. Kassan?
8  A. Yes.
9  Q. We'll get to that document.
10  A. Yep, yep.
11  Q. Fourth paragraph down, first line, "Mike also
12  expressed his appreciation to Dave for his strong
13  reaction on December 31st."
14        So -- I take it, and without putting
15  words in your mouth, that you appreciated the fact
16  that Dave thought that was unfair and not -- not
17  proper for --
18  A. Absolutely.  It was -- I was -- it felt very
19  good to hear the other party independently agree
20  with that.  He wasn't -- he wasn't patronizing me.
21  Q. Right.  And the next paragraph, first line
22  there, "Dave asked us whether we understood the
23  mechanical considerations in doing so," and that's
24  going back to the -- the different assets.  Going
25  back to the sentence there, "Dave asked us whether

Page 122

1  we understood the mechanical considerations in doing
2  so, specifically that we would have to enter into
3  subscription agreements and other documentation with
4  each investment manager."
5        So that sounds as if WHX was doing it
6  that way, that they were signing agreements?
7  A. Correct.
8  Q. The next sentence, "We advised Dave that we
9  are aware that" documentation with each -- "We
10  advised Dave that we are aware that Ron wants us to
11  do that because we have already received
12  documentation from two of the existing managers that
13  Ron wants us to use," --
14  A. Correct.
15  Q. -- "once he sells some of the holdings in the
16  Neuberger Berman portfolio."
17  A. Right.
18  Q. Okay.  Let me show you what we can mark as
19  Exhibit 34.
20        (DiClemente Deposition Exhibit No. 34
21  was marked for identification.)
22  Q. When you see it, it's an e-mail from you to
23  Drew Landon, dated January 14, 2009.
24        (Witness reviews document.)
25  Q. And just in general, I was interested on the

Page 123

1  third page, the last full paragraph.
2  A. Okay.
3  Q. Transition of Severstal.
4  A. Yep.
5  Q. That paragraph reads, "Following up on prior
6  e-mails regarding a transition of Severstal given
7  the departure of most of the previous Committee
8  members, Mel Baggett, Mike Clarke, and I spoke in
9  December about the need to reconstitute the
10  Retirement Committee.  We currently have targeted
11  mid-February 2009 for an orientation meeting to
12  provide an overview of the Committee
13  responsibilities and assess the direction of various
14  outstanding projects."
15        Is this a report to the -- to
16  Severstal, to the company, the sponsor of the plans?
17        (Witness reviews document.)
18  Q. Just if you know what the purpose --
19  A. I'm pretty sure I know.  If you just repeat
20  the question, John.
21  Q. Is this a report to the sponsor, like you to
22  the corporation, you as a member of the committee?
23  A. Yes.  At this point -- well, let me back up
24  for a second.  The company did not have a consistent
25  record of convening retirement committees meetings,

Page 124

1  so in lieu of at times not having meetings, I would
2  choose to present the results of our pension 401(k)
3  plans to show that the proper due diligence was
4  being completed.
5  Q. Right.
6  A. This is an example of that.  This happens to
7  be a more complete recitation of those types of
8  activities given the events of the day.
9  Q. Right.  And that sentence about the departure
10  of most of the previous committee members, you
11  mentioned that before.  So it was just you and
12  Mr. Halpin; right?
13  A. At this point, yes.
14  Q. Right.
15  A. Yes.
16  Q. So then where it says, "Mel Baggett, Mike
17  Clarke, and I spoke in December about the need to
18  reconstitute the Retirement Committee," those were
19  two individuals you were talking about joining the
20  retirement committee or about getting other people
21  on?
22  A. I think about getting other people --
23  reconstitute the committee.  Mel Baggett was a
24  Severstal employee, I believe, in HR in Dearborn.
25  Q. Okay.

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 125

1  A. Mike Clarke was the HR -- human resources
2  vice president in Wheeling.
3  Q. Did you ever have any problems in dealing
4  with your own, I guess what would you call it, your
5  reports, if that's the right word -- anyway, the
6  people that you had to report to -- that they didn't
7  get back to you with decisions that you needed, or
8  they didn't give you the backup that you needed?
9  A. No.
10  Q. And the idea about reconstituting the
11  retirement committee, what was behind that as the
12  purpose?
13  A. Well, the -- the company was in a state of
14  transition, having been acquired by Severstal,
15  previously having been Wheeling-Pittsburgh Steel
16  Corporation, which had then been acquired by Esmark,
17  Incorporated. So we had individuals in executive
18  management positions that were previously with
19  Wheeling-Pitt. Then we had new Esmark executives
20  come in and take over some of those executive
21  management positions. And we had previous
22  Wheeling-Pitt executive managers retained by Esmark
23  once that merger occurred.
24       So when Severstal took over
25  Wheeling-Pitt/Esmark, we had executive managers take

Page 126

1  advantage of their employment contracts and
2  voluntarily leave so that they did not forfeit those
3  benefits. So some of those managers were on the
4  retirement committee, leaving us with very few
5  people on the retirement committee.
6  Q. And what's the problem with having very few
7  people on the retirement committee?
8  A. It's -- you -- first of all, you don't have
9  different perspectives, and if you have an even
10  number of people, you could potentially run into
11  problems. But Dennis Halpin and I never had any
12  problem with that. My recollection is that we had
13  five members on the retirement committee. And we
14  had Rick Bowness as an advisor to the committee, not
15  a voting member.
16  Q. I just assume that, during this period of
17  time, the retirement committee meetings are you
18  talking or e-mailing with Mr. Halpin?
19  A. Those -- those became meetings, as you can
20  see from the documentation.
21  Q. Right. Were you even in the same office?
22  A. We were in the same office building, yes.
23  Q. Okay. Was Mr. Bowness in the same building,
24  too?
25  A. He was.

Page 127

1  Q. Okay.
2       (DiClemente Deposition Exhibit No. 35
3  was marked for identification.)
4  Q. This is an e-mail, January 15, 2009, from you
5  to Mr. Halpin. Have you had a chance to look at it?
6  A. Yes.
7  Q. So it says, "Dennis, If LaBow balks at the
8  (modified) reset, rather than advise him that he is
9  accountable for the losses, I'm thinking that an
10  alternative would be to seek recourse with WHX by
11  convincing WHX that they are implicated in this
12  allocation by accepting assets that were inequitably
13  distributed, and that they should likewise with us
14  force LaBow to do the right thing. My sense is that
15  WHX knows that what LaBow did is wrong. Mike."
16       So when you say that, "My sense is
17  that WHX knows that what LaBow did is wrong," is
18  that from talking to Mr. Riposo?
19  A. Yes, in part.
20  Q. Anybody else?
21  A. No, not anyone else at WHX.
22  Q. Oh, okay. So what was your feeling, your
23  strategy, your thought about how to address the
24  situation that the Severstal trust was in at this
25  point, looking at your e-mail here from January

Page 128

1  15th?
2  A. Well, we felt that WHX knew what LaBow did
3  was inappropriate. Without sharing the specific
4  thoughts with WHX, although I've shared them with
5  Dennis Halpin, I felt that WHX was -- it was a
6  possibility that they were complicit in this
7  activity.
8  Q. Complicit, as in working with Mr. LaBow to
9  achieve an inequitable result in your --
10  A. Correct.
11  Q. Okay.
12  A. Had no factual basis for that, but I think
13  based upon the long-standing relationship that LaBow
14  has had with WHX and LaBow having been the, I
15  understand, the former chairman of WHX, perhaps it
16  could -- these are my thoughts.
17  Q. Sure.
18  A. That he was favoring that organization, and
19  as a result, we were on the wrong end, but I don't
20  know that. But those are fairly strong feelings of
21  mine.
22  Q. Oh, sure. Positing a less -- "sinister" is
23  maybe not the right word -- scenario, if it was
24  easier for Mr. LaBow to give you the Severstal
25  share -- the value of the -- not the assets but the

Case 2:14-cv-01494-NBF   Document 184-12   Filed 09/25/18   Page 35 of 55

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 129

1    value, and the Neuberger Berman account with those
2    stocks were the most liquid, could it have been that
3    that was the explanation, not for the lack of
4    communication, but for why it was distributed that
5    way?
6            MR. JOYCE: Object to form and
7    speculation.
8    A. I don't know.
9    Q. If Mr. LaBow had told you I'm going to give
10   you the Neuberger Berman account and you got to sell
11   it on day one and diversify or I'm going to sell it
12   on day one and diversify, you wouldn't have had any
13   cause for complaint, would you?
14           MR. JOYCE: Same objections.
15   A. I certainly would have asked a lot of
16   questions as to why he would not have been able to
17   allow us to participate in the combined portfolio
18   that obviously delivered stellar results.
19   Q. Right. Do you know at this point in time,
20   January 2009, whether WHX was even in all the same
21   investments that they had been on November 3rd of
22   2008?
23   A. I don't know that.
24   Q. Did Mr. LaBow indicate to you that WHX had
25   actually gotten out of some of the investments that

Page 130

1    were in the original group of assets from before
2    November 3rd, 2008?
3    A. I don't know that.
4    Q. In going --
5    A. Off the record, John. Do you know that?
6    Q. We're on the record.
7    A. Okay.
8    Q. With regard to -- where was I -- to the
9    e-mail here, January 15th of 2009, did you think
10   your options at this point were suing Mr. LaBow or
11   suing WHX or suing both of them, or something else?
12   A. I don't recall that we had the thought of
13   suing WHX. I think at some point in time -- at that
14   time, I don't think so. At some point in time I
15   think that was a thought that crossed our minds.
16   Q. And certainly later on, the newer committee
17   sued WHX as part of the suit against Mr. LaBow.
18   A. Yeah.
19   Q. What did Mr. Halpin respond to you on January
20   15th, 2009? Did he -- did he say anything with
21   regard to your thought?
22   A. I don't recall. Obviously, we -- we, you
23   know, didn't take course against WHX.
24   Q. You and Mr. Halpin?
25   A. Yes, right, right.

Page 131

1    Q. And again, I guess I asked this before. In
2    January 15th of 2009, the tone certainly is that
3    Mr. LaBow has done us wrong, but -- and I understand
4    the lack of communication -- but had you actually
5    sustained a loss at that point?
6    A. At this point, I don't recall that we made a
7    calculation. I do know that we made periodic
8    calculations.
9    Q. What was your thought --
10   A. But the fundamental issue was the lack of
11   diversification.
12   Q. Right, going forward, certainly.
13   A. Yes, right.
14   Q. Okay. Let me refer you to what's Exhibit 36.
15           (DiClemente Deposition Exhibit No. 36
16   was marked for identification.)
17   Q. These are notes of a teleconference from
18   January 16th, 2009.
19           (Witness reviews document.)
20   A. Okay.
21   Q. Okay. So this is a conference call, January
22   16th, 2009. You and Mr. Halpin and Mr. LaBow -- and
23   Ms. King couldn't participate in this one?
24   A. Yes.
25   Q. Do you recall this phone call?

Page 132

1    A. I do.
2    Q. All right. It looks like the fourth
3    paragraph down, Ron's immediate reaction that he did
4    not think that he could reset the allocation, saying
5    that he's not even sure it was legal to do so, I
6    assume it has something to do with WHX going --
7    giving away some of the assets?
8    A. It's quite possible, yeah.
9    Q. Does it mean something else, or might it mean
10   something else?
11   A. No, I -- I -- I think it may very well
12   reference WHX, but it could be something else.
13   Q. I got you. So it sounds as if he's going
14   through funds that didn't -- could not accommodate
15   this redirection, and he lists a few -- and then he
16   says he could reset and he lists a few more funds.
17           And then the next paragraph says, "He
18   conveyed that he was puzzled as to why we continued
19   down this reset path citing that there could be cost
20   and adding that he would prepare a writing
21   indicating that such action would result in added
22   fees and lower asset values and that he would
23   formally advise against such action."
24           I guess this is a hypothetical. But
25   could it be that at this point the prudent thing to

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 133

1 do would have been to invest the plan prudently
2 going forward rather than getting a reset to what
3 the fund distribution was before November 3rd, 2008?
4     MR. JOYCE: Object to form.
5 Speculation. Legal conclusion.
6     MR. STRAWN: You know, because I guess
7 we don't even know what the values are at this
8 point.
9 Q. But anyway, is it possible that the prudent
10 thing going forward, based on what the values of the
11 different funds were, would be to diversify going
12 forward and not looking for a reset back to the
13 pre-November 3rd, 2008, distribution?
14 A. It's possible, but it certainly could have
15 been a recast into a diversified portfolio rather
16 than a concentrated portfolio.
17 Q. Sure.
18 A. It could have taken the form of some of the
19 original investments in the portfolio.
20 Q. Right.
21 A. Which are still available going forward, in
22 conjunction with further diversification, via new
23 investments that would comprise a -- a diversified
24 portfolio that would, within the entire context, be
25 acceptable.

Page 134

1 Q. Right. And the next-to-last paragraph there,
2 "Ron then strongly reacted to our reset request,
3 stating 'If I can do it, I will do it...once you
4 tell me to do it, I'm going to do it' and that we
5 would not have" -- "we would not have an opportunity
6 to assess it and ask him to re-do it once it's
7 completed. His reaction supports the fact that he
8 executed the allocation of assets on his own without
9 any input from SWI, expecting that we would just
10 accept his decision. Mike had to emphatically reply
11 that he did not want Ron to take any action prior to
12 providing us with his formal allocation plan,
13 specifically stating, 'Don't act until you show us
14 the allocation.' Ron paused, seeming to then fully
15 grasp what Mike was asking for."
16     So I guess the first question is: Who
17 wrote this?
18 A. This one looks like it was written by Dennis.
19 Q. Okay.
20 A. I'm not sure. I'm not sure. The format --
21 the format suggests it's me, but I will also say
22 that, oftentimes, when we were creating these
23 minutes, we would share them in draft form before we
24 would finalize them.
25 Q. Oh, sure.

Page 135

1 A. This might have been a composite.
2 Q. Oh, sure. Yeah, yeah, just to make sure
3 everyone heard the same thing.
4 A. Right, right.
5 Q. So the first sentence there that Ron's
6 strongly reacting to the reset, it seems to me as if
7 he was saying, if you direct me to do it, I'm going
8 to do it, but you can't undo it. Does that sound
9 like a fair --
10 A. That sounds reasonable, yes.
11 Q. And the next statement, "His reaction
12 supports the fact that he executed the allocation of
13 assets on his own without any input from SWI." He's
14 supposed to be an independent investment manager and
15 making investments on his own, but this is referring
16 back to the initial allocation back on November 3rd,
17 the setting up of the trust.
18 A. Correct.
19 Q. Then finally, about Mike saying he didn't
20 "want Ron to take any action prior to providing us
21 with his formal allocation plan," that really seems
22 to be clipping his wings; that we don't want you to
23 make any trades on your own until we know what
24 you're doing, and sign off on it.
25 A. One could conclude -- make that conclusion,

Page 136

1 but I think the real message here is that we wanted
2 to make sure that what he was doing was reasonable
3 and not unreasonable compared to what we had
4 previously experienced.
5 Q. Right.
6 A. But we weren't necessarily going to say you
7 can't buy this investment or you can't buy that
8 investment. It was, contextually, was this a good
9 diversification plan.
10 Q. Now, if this had taken place back on, say,
11 November 10th, 2008, or something like that, it
12 would have been in Mr. LaBow's authority to make
13 whatever trades and allocate the plan's assets how
14 he saw fit as the investment manager; right?
15 A. Correct. But once someone makes an egregious
16 misdirection to our disfavor, I mean, I would be
17 disappointed if we did not take this tact. Because
18 he can run afoul a second time, which would further
19 damage our position.
20 Q. Certainly a fiduciary has many things to take
21 into account. Let me refer you to 37. This is a
22 two-page exhibit.
23     (DiClemente Deposition Exhibit No. 37
24 was marked for identification.)
25     (Witness reviews document.)

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 137

1   A. Okay.
2   Q. So it -- just for the record, it's an e-mail
3   from you, January 20th, 2009, to Mr. LaBow, CCing
4   Ms. King, Dennis Halpin and Dave Riposo.  And the
5   letter that's attached, if I can summarize, says we
6   want you to reallocate the assets as of November
7   3rd, 2008, getting us a proportionate share of the
8   portfolio, recognizing that there may be certain
9   limitations to achieving that.  Let me ask you
10  that:  Is that first part of my summary fair?
11  A. Yes.
12  Q. And then following up on what you were saying
13  from the notes of the last call that we talked
14  about:  The second paragraph says about preparing a
15  written plan to reallocate that and to document,
16  basically, why you can't get into certain plans.
17  And what Mr. LaBow's recommendation is going forward
18  is to get a diversified plan.  Does that seem to be
19  a fair --
20  A. That's a fair characterization, yes.
21  Q. That seems to be documenting what your notes
22  were from that last call?
23  A. Yes, somewhat.  It's a more fulsome
24  characterization.  It looks like Sally King was a
25  participant in developing the letter and --

Page 138

1   Q. Oh, okay.
2   A. -- she may have been a participant -- I'm
3   sure she had seen this letter before it went out to
4   Ron LaBow.
5   Q. Only fair, if we have a lawyer, to use them.
6   A. Yeah.
7   Q. Let me show you this next one, Exhibit 38.
8   When you get it, it will be an e-mail from you to
9   Jacquie Thomas at Allegiant Group, CCing Dennis
10  Halpin and -- Rick or Rich?
11  A. Rick.
12  Q. Rick Bowness.
13      (DiClemente Deposition Exhibit No. 38
14  was marked for identification.)
15      (Witness reviews document.)
16  A. Okay.
17  Q. So this is an e-mail from you to Jacquie
18  Thomas at Allegiant.  Is that the same as National
19  City?
20  A. Yes, it is.
21  Q. The new trustee for the plan?
22  A. Correct.
23  Q. "Following our discussion (you, Rick," -- I
24  assume Rick Bowness -- and you, Mr. DiClemente, you
25  attached the letter you sent to Ron LaBow.  I assume

Page 139

1   that's the January 20th letter?
2   A. That sounds like that's what it would be.
3   Q. Okay.  Just saying the attachments, direction
4   letter, reallocation of assets, 1/20/09.  Where
5   you're telling her what you're in the process of
6   doing, reallocating the assets between WHX and
7   Severstal.  At this point, WHX had a different
8   trustee.  They weren't with National City; right?
9   A. No, I don't think they were with National
10  City.  They may have stayed with Citibank.
11  Q. At a certain point, everybody was with
12  Citibank, and it was just a matter of putting a
13  different account number on.
14      And you're saying here about, "Ron
15  needs to present his plan," Severstal and WHX need
16  to agree, and have to enter into direct investment
17  management agreements.  I guess that's with each of
18  the portfolio managers?
19  A. Yes.
20  Q. "There is a lot of work ahead of us.  Thank
21  you for your patience."  So what was the purpose of
22  having this conversation with National City, with
23  the trustee?
24  A. At this point, John, I don't really recall.
25  It may have just been an information update, but I

Page 140

1   don't recall.
2   Q. Do you think a purpose behind this would have
3   been to make sure they didn't follow any
4   recommendations or any transactions that Mr. LaBow
5   tried to do?
6   A. It's possible.
7   Q. Would it have been to allow Mr. LaBow to
8   perform any transactions?
9   A. I don't know what documentation may have been
10  in place with National City relative to Ron LaBow.
11  I don't -- I just don't recall.
12  Q. At that point, going through the documents
13  that we have so far today, Mr. LaBow hasn't said he
14  wasn't capable of making trades; correct?
15  A. I don't recall that we saw anything like
16  that.
17  Q. Nothing from Citibank or National City at
18  this point?
19  A. Right, right.
20  Q. Let's go for Exhibit 39.
21      (DiClemente Deposition Exhibit No. 39
22  was marked for identification.)
23  Q. Minutes of a conference call January 26, '09.
24  A. Okay.
25      (Witness reviews document.)

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 141

1  A.  Okay.

2  Q.  So this was another -- another call with

3  Mr. Halpin, you and Mr. LaBow, and it indicates in

4  the second paragraph that that call was at Ron's

5  request -- I'm sorry -- Mr. LaBow's request.

6  A.  Yes.

7  Q.  And was that him trying to -- I don't know --

8  answer the requests that you had made up to this

9  point?

10  A.  He was going to provide us an update on those

11  activities.

12  Q.  Okay.  And next-to-last paragraph, it says,

13  "While we understood the deepened rationale provided

14  in this call, we expressed our disappointment at

15  this update, developing a growing 'frustration' that

16  'new' or 'more refined' information seems to surface

17  to thwart Ron's ability to fulfill our ongoing

18  request to sufficiently reallocate the initial

19  assets in a manner keeping the fund profile intact

20  with regard to diversity of managers and

21  investments."  So I guess that's not saying that you

22  wanted a perfect pre-November 3rd, 2008, slice.

23  A.  That's correct.  We knew that that could not

24  be duplicated, replicated.

25  Q.  Could it be partly that Mr. LaBow is not big

Page 142

1  on documenting or writing letters in terms of giving

2  you the information, but he was giving it to you

3  verbally?

4  A.  That was his method of operation.

5  Q.  But still at this point you didn't want him

6  to make any actions until he, I guess, justified his

7  statements about why he couldn't go back into

8  certain funds?

9  A.  Absolutely.  Ron -- as can you see from this

10  set of minutes, Ron is a storyteller, and he engages

11  in ever-evolving stories to suit his best interests.

12  Excuse me for that, but I mean, there's no doubt in

13  my mind that we understand who this individual is.

14  Q.  So it seems that by this point -- this is

15  January 26th -- that -- don't let me put words in

16  your mouth -- the level of trust that you had with

17  him had eroded from the previous several weeks?

18  A.  Very fair.

19  Q.  At this point, what was your opinion as to

20  getting rid of Mr. LaBow or suing Mr. LaBow or suing

21  WHX or -- what were your thoughts at this point?

22  A.  Certainly at this point I felt that we were

23  proceeding toward litigation.  Of course, we had

24  already obtained the services of Sally King, and she

25  was a witness to a lot of this activity.

Page 143

1  Q.  Right.

2  A.  We hadn't yet decided exactly when we were

3  going to part ways, but this evolution certainly

4  cemented that we were going to take significant

5  action.

6  Q.  And at this point, being January 26th or the

7  end of January 2009, or could you quantify it any

8  better?

9  A.  That's a reasonable time frame.

10  Q.  And did you give any -- any consideration to

11  selling the Neuberger Berman assets or taking other

12  action to protect the value of the assets or

13  directing Mr. LaBow to do something to protect the

14  assets?

15  A.  We were still trying to work with Ron.  I

16  mean, we, I'd say, certainly had been -- were very

17  disappointed with his actions and inactions to date.

18  Q.  Would there have been any -- any additional

19  information you would have needed at that point to

20  decide to take action directly with regard to the

21  assets in the trust to direct him to sell it or to,

22  I don't know, hire another manager or something like

23  that?

24        I get what you're saying that at this

25  point you were still trying to work through him, but

Page 144

1  was there a line that you thought was going to --

2  would have been where you had to act?

3        MR. JOYCE: Object to the form, to the

4  extent it's seeking a legal or expert conclusion.

5        You can answer.

6  A.  We, obviously, hadn't taken the action at

7  this point which we ultimately did.

8  Q.  Okay.  Let me show you Exhibit 40.

9        (DiClemente Deposition Exhibit No. 40

10  was marked for identification.)

11  A.  Okay.

12  Q.  I take it that this letter, Exhibit 40 -- oh,

13  and again, dated February 4th, 2009, from Mr. LaBow

14  to you and Mr. Halpin -- I take it this didn't

15  satisfy you.

16  A.  I don't believe it did.

17  Q.  Okay.  And why not?

18  A.  It just did not seem like it was a -- a fully

19  well-thought-out diversified investment program.

20  Q.  So at this point, you didn't want Mr. LaBow

21  to take any action?

22  A.  I don't recall at this point, John.

23  Q.  When he says in the next-to-last paragraph

24  that, "Of course none of this will be done without

25  your approval," is he -- is he shirking his

Case 2:14-cv-01494-NBF  Document 184-12  Filed 09/25/18  Page 39 of 55

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 145

1  responsibility since he's the investment manager and
2  he has the authority to go ahead and do this, or is
3  he -- does he not have that authority right now
4  because he has got to give you a diversification
5  plan before he can go ahead?
6  A.  Well, he knew that he was being scrutinized
7  because of his prior missteps, and we wanted to
8  assure ourselves that any future actions he was
9  taking would not be counter to our desired outcome
10  of a diversified portfolio.
11  Q.  With regard to the funds that he mentions
12  that he could get going forward, did you have any --
13  any problems with that diversification, separated
14  from the -- we weren't told you were going to put it
15  just in these limited plans or you haven't
16  demonstrated to us that we really can't be in these
17  other funds?  But just with regard to the
18  investments going forward from a diversification
19  standpoint, did you have any problem with it?
20  A.  At this point, I'm not sure.  I don't know
21  that we necessarily knew that -- what the investment
22  asset classes and risk profiles were for each of the
23  company names that he was also recommending.  For
24  example, we have a very generic reference to a macro
25  fund run by Wai Lee.  We knew nothing about those

Page 146

1  organizations.
2  Q.  And that leads perfectly in Exhibit 41.
3      (DiClemente Deposition Exhibit No. 41
4  was marked for identification.)
5  Q.  When you get it, it will be an e-mail from
6  Mr. Halpin to you, also dated February 5th.  It's
7  the day after Mr. LaBow's letter.
8  A.  Uh-huh.
9      (Witness reviews document.)
10  A.  Very good.
11  Q.  This is a two-page document, and it looks as
12  if -- did Mr. LaBow -- I thought it was just a
13  letter being forwarded, but it looks as if maybe he
14  forwarded plan information as well, from Mason
15  Capital Management?
16  A.  It looked like -- it looks like there is some
17  document attached there from Mason.
18  Q.  Okay.  So just going to the e-mail from
19  Mr. Halpin to you, "Mike, Not sure of the risk
20  profile and investment strategies at either Mason or
21  Capital, but given that they aggregated to slightly
22  over $113 million or 29% of the total trust value
23  at" October 31st, 2008, "and coupled with the CASH
24  at that time of almost $45 million would represent
25  40% of the entire trust amount," "why can we

Page 147

1  satisfactorily 'reset' utilizing just these three
2  'funds'... SO LONG AS MASON AND CAPITAL:"
3      "Investment strategies and risk
4  profile align with combined WHX trust, and
5      "Their combined performance during the
6  transition period align with the combined WHX trust
7  performance, and
8      "Both WHX and SWI committees agree
9  with tentative solution."
10      So is Mr. Halpin saying, why settle
11  for this plan from Mr. LaBow?
12  A.  Need more information.  I have to say, I love
13  the way Dennis wrote this.  Dennis, being a new
14  member of the retirement committee, went through a
15  very quick learning curve and is up to speed in
16  understanding what we need to do.  On the other
17  hand, my experience in this is longstanding and
18  Dennis -- probably maybe was a little slower than
19  Dennis coming up to speed.  But then again, we were
20  under fire.
21  Q.  Sorry, someone was a little slower coming up?
22  A.  My -- my experience as a representative of
23  Aristech Chemical Corporation, along with a new
24  company -- it was the USS chemicals division of
25  Aristech Chemical Corporation.  It spun off Aristech

Page 148

1  into an independent publicly traded company on the
2  New York Stock Exchange.  That was my first position
3  in treasury where I was asked to join this new
4  public company.  I'm relatively -- I'm ten years of
5  experience, and I'm invited by the treasurer of the
6  chemicals division, who is now the treasurer of this
7  New York Stock Exchange company, to be the second in
8  command.
9      So I got the benefit of really ramping
10  up, becoming a treasury professional, including
11  beginning an investment management program for our
12  defined benefit, defined contribution and 401(k)
13  plans.
14      So my learning curve was much more
15  gradual than --
16  Q.  Now I got you.
17  A.  -- than Dennis's.  Certainly, he's much older
18  than I was, you know, when he entered this type of
19  activity.
20  Q.  I got you.
21  A.  But then he was under fire.  So he ramped up,
22  where I had the benefit of being able to be a slow
23  grower.
24  Q.  I got you.  Let me show you Exhibit 42.
25      (DiClemente Deposition Exhibit No. 42

Case 2:14-cv-01494-NBF   Document 184-12   Filed 09/25/18   Page 40 of 55

Michael DiClemente                                              R. Alexander Acosta, et al. vs.
September 26, 2017                                              WPN Corporation, and et al.

Page 149

1  was marked for identification.)
2        (Witness reviews document.)
3  A. Okay.
4  Q. All right. Now this e-mail, February 6th,
5  2009, from Mr. Riposo to Mr. LaBow referencing a
6  call from you and Mr. Halpin the same date, February
7  6th, 2009. Do you recall speaking to Mr. Riposo at
8  this time?
9  A. I recall speaking with David Riposo on more
10 than one occasion about this time.
11 Q. Okay. And Mr. Riposo goes on to say about,
12 "Their frustration centered around two main themes,"
13 that he had verbally indicated -- Mr. LaBow, that
14 is -- "would be able to retroactively provide a more
15 diversified allocation of assets," and that the
16 letter, I guess, was a backtrack from that. Is that
17 a fair way of --
18 A. Fair.
19 Q. And in the second it says, "They are very
20 concerned that accepting such a concentrated
21 portfolio of energy related assets exposes them
22 should participants allege some sort of breach of
23 fiduciary responsibility."
24        Do you recall saying anything like
25 that to Mr. Riposo?

Page 150

1  A. I suspect that we did have a conversation
2  like that. I don't remember this specific
3  conversation.
4  Q. Sure. And what -- what was your concern at
5  that -- at that point or generally, if you don't
6  remember the individual conversation?
7  A. What was our concern? Could you repeat that,
8  please.
9  Q. You know, when he says in here, "The second
10 is that they are very concerned that accepting such
11 a concentrated portfolio" -- that would be the
12 Neuberger Berman account -- "of energy related
13 assets exposes them should participants allege some
14 sort of breach of fiduciary responsibility," which
15 sounds like a class action suit by participants.
16 A. Possible.
17 Q. So could you -- just describe a little more
18 fully what your concern was about having the
19 Neuberger Berman account.
20 A. Other than what has already been
21 characterized in multiple ways, it was a highly
22 concentrated portfolio that, you know, fits the
23 classic definition of not being diversified, and
24 that we wanted to enjoy the benefit of a diversified
25 portfolio.

Page 151

1  Q. All right. So that seems to lead to
2  Exhibit 43.
3        (DiClemente Deposition Exhibit No. 43
4  was marked for identification.)
5  Q. Which is two pages.
6        (Witness reviews document.)
7  A. Okay.
8  Q. So Exhibit 43 here, the date is February 6th,
9  2009, teleconference notes with you, Mr. Halpin and
10 Mr. Riposo. That seems to be referring to the same
11 phone call of the e-mail between Mr. Riposo and
12 Mr. LaBow that was the previous Exhibit 42.
13 A. Uh-huh.
14 Q. Is that a yes, for the record?
15 A. Yes. I'm sorry, yes.
16 Q. Mr. Riposo confirmed that he had received a
17 copy of Mr. LaBow's reply to the letter and
18 acknowledged that was rather predictable. The next
19 portion about the audit that -- Mr. Riposo stated
20 "that he would look into it, but was surprised to
21 hear that we were now calling its need 'urgent.'"
22        That was still just the audit that was
23 eventually done by J.D. Cohn --
24 A. Cohn, yes.
25 Q. -- to finalize the value Severstal had and

Page 152

1  the value that WHX had in the commingled trust?
2  A. Yes.
3  Q. And the trueing up is the final allocation to
4  make sure that both trusts were up to the
5  appropriate amount?
6  A. Correct.
7  Q. Now, in the last paragraph on the first page
8  there, "Michael" -- meaning you, Mr. DiClemente --
9  "reminded Dave" -- Mr. Riposo -- "of their previous
10 discussions (from the very start - which began on
11 December 31, 2008 -- and on multiple occasions since
12 then), whereby WHX would have to be a part of the
13 resolution of the misallocation of assets, since the
14 assets would have to be retroactively reallocated in
15 order to ensure that the assets were equitably
16 allocated."
17        In this phone call, did Mr. Riposo
18 backtrack from any assurances he had given you
19 before?
20 A. No. I don't recall that he did. Although,
21 that eventually did occur, but not directly via Dave
22 but via someone else.
23 Q. Last sentence of the first paragraph on the
24 second page there, "After realizing our position, he
25 stated" -- I think being Riposo -- "that we may want

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 153

1  to have a near term discussion with Michael, Dennis,
2  David and both our ERISA counsel present given this
3  new understanding."
4  A. He was now soliciting input from other
5  parties, but this was not a new topic with Dave.
6  Q. And specifically ERISA counsel, which makes
7  it sound -- and let me know if this is fair -- it's
8  progressing to the point --
9  A. Elevated, yes.
10  Q. The next exhibit, conveniently No. 44.
11       (DiClemente Deposition Exhibit No. 44
12  was marked for identification.)
13  A. Boy, we had a lot of meetings.
14  Q. There's a few more.
15  A. Yeah, I think I know what it's going to be
16  based on this based on the participants.
17       (Witness reviews document.)
18  A. Okay.
19  Q. So the minutes of this call from February
20  10th of 2009, it's again, you and Mr. Halpin,
21  Mr. Riposo, but the new participant is Jim McCabe,
22  retirement committee member. What was his position
23  with the company?
24  A. I do not know what role he played in -- for
25  WHX corporation itself. I don't know if he was in

Page 154

1  an officer position or not.
2  Q. Was he -- I don't know what you call it -- an
3  equal to Mr. Riposo, or did he report to Mr. Riposo?
4  A. I do not know the chain of command.
5  Q. So the upshot of this meeting seemed to be --
6  on the second page -- where you wanted to have a --
7  basically, to have WHX and Severstal, with counsel,
8  agree to a solution and then present that to
9  Mr. LaBow?
10  A. Correct.
11  Q. And I take that to be you didn't think you
12  were getting anywhere with Mr. LaBow?
13  A. Correct.
14  Q. All right. That's February 10th. Then
15  there's another call on the 11th, and that will be
16  Exhibit 45.
17       (DiClemente Deposition Exhibit No. 45
18  was marked for identification.)
19       (Witness reviews document.)
20  A. Okay.
21  Q. So this is notes of a conference call on
22  February 11th, 2009. It says that Mr. LaBow called
23  Mr. Halpin, and then he got you on the phone?
24  A. Uh-huh.
25  Q. And -- is that a yes, for the record?

Page 155

1  A. Yes. I'm sorry, John, yes, yes.
2  Q. That's okay.
3  A. Yep.
4  Q. So a few different points in this call from
5  some of the others. In the third paragraph down on
6  the first page, "Ron stressed that our account
7  benefitted from how heavy the cash concentration
8  was." And then the last paragraph on the second
9  page, Mr. LaBow says something about going back and
10  changing the allocation with regard to -- looks like
11  Capital Defense, Mason Capital and Neuberger Berman
12  would be giving money back to WHX. Dennis replied,
13  "That seems wrong, Ron, since the N&B account is
14  down about 19%." And then Mr. LaBow stated that
15  "Mason and Capital had performed worse."
16       So at this point, do you know whether
17  the Severstal trust had actually suffered a loss?
18  A. I don't recall, John.
19  Q. At what point had you started keeping
20  track -- I know you alluded to it earlier -- of the
21  plan suffering as a result of the distribution that
22  Mr. LaBow gave you?
23       MR. JOYCE: Just object to speculation.
24  Legal and expert conclusion.
25       MR. STRAWN: Oh, no, the part was about

Page 156

1  when Mr. DiClemente started keeping track of whether
2  they were losing money versus the assets they
3  thought they were getting. That might not have been
4  obvious from listening to my question.
5       MR. JOYCE: I thought you were asking
6  him to talk about losses. That's where my objection
7  came from.
8       MR. STRAWN: Sure.
9  A. I personally wasn't keeping track of that;
10  Dennis Halpin was.
11  Q. Okay.
12  A. I, at this point, don't recall the frequency
13  of those measurements.
14  Q. I assume then he would have to know --
15  A. He would know something about that.
16  Q. -- that he would have to know how the WHX
17  assets were doing so we would have a point of
18  comparison?
19  A. Something like that. I don't know that he
20  had those specific points of reference, but he was
21  keeping track of our performance, not necessarily
22  versus what we could have had. We were just keeping
23  track of our absolute performance. Maybe I
24  misunderstood your question, John.
25  Q. I thought you said earlier that at some point

Case 2:14-cv-01494-NBF   Document 184-12   Filed 09/25/18   Page 42 of 55

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 157

1  you were keeping track of how you were losing money,
2  and maybe I was assuming that the only way you could
3  keep track of how you were losing money is these are
4  the WHX assets, how they were doing?
5  A. I'm not sure we knew that -- we knew what
6  their performance was. We just assumed that they
7  continued to enjoy the same diversified portfolio
8  that we once also had.
9  Q. At what point did you make a determination
10  that you actually had suffered a loss?
11       MR. JOYCE: I'll object to that as
12  speculation and as a legal and expert conclusion.
13       MR. STRAWN: Expert in terms of returns
14  of the different plans?
15       MR. JOYCE: I think "loss" is an expert
16  conclusion, and, you know, presumably one or more
17  experts are going to try to figure out if the plans
18  lost anything.
19       MR. STRAWN: Right.
20       MR. JOYCE: I think it's more
21  complicated than, you know, did the funds go down.
22       MR. STRAWN: Right.
23       MR. JOYCE: I think just that there was
24  a loss doesn't necessarily mean that there was
25  anything wrong or that their retirement committee

Page 158

1  did anything wrong.
2       MR. STRAWN: Right.
3       MR. JOYCE: Not strict liability, in
4  other words.
5       MR. STRAWN: Right. Or that there could
6  have been something wrong with no loss, which is
7  another possibility.
8    BY MR. STRAWN:
9  Q. Anyway, aside from talking to Mr. Joyce,
10  which I don't have to do on your time, at some point
11  did you make a determination -- I guess I'm getting
12  back to the same objectionable question -- make a
13  determination that the plans had suffered based on
14  the distribution of the Neuberger Berman assets
15  versus what you expected to get, you know, the
16  diversified 10 percent slice of the larger plan?
17       MR. JOYCE: Same objection.
18  Q. So did you ever make a determination?
19  A. I don't know that we had the ability to make
20  a determination relative to --
21  Q. Right.
22  A. -- what WHX continued to enjoy.
23  Q. So the -- and when you say "continued to
24  enjoy," I assume they were enjoying returns that
25  they had --

Page 159

1  A. Well, yes. There is an implied assumption
2  there, John. I could just reference back to how
3  well Ron LaBow had performed based upon the
4  independent assessment of Mercer Investment
5  Consulting. That's certainly back tested.
6  Q. Did you ever get any information from Mercer
7  about how badly, relatively, the Severstal trust had
8  performed?
9  A. I don't recall. I don't recall.
10  Q. At some point, I assume, this went into
11  litigation mode. Was that after you had left?
12  A. Yes.
13  Q. Okay. There was some statement where
14  Mr. LaBow, at the bottom of the first page, said
15  that you "should have known much earlier through
16  correspondence from Neuberger and Berman in early
17  November." And that you replied, while you did
18  receive information from Neuberger Berman at that
19  time, it never indicated that the entire fund was
20  yours and that this fund was never settlement.
21       You quote a sentence here -- and when
22  I say "you," I guess you or Mr. Halpin, overwrote
23  these notes that Mr. LaBow said, "'Maybe I did
24  something wrong. I don't think so, but maybe I did
25  something wrong.'"

Page 160

1       What did you think the significance of
2  that statement was?
3  A. I thought it was pretty significant that he's
4  come to the realization that he did not do what was
5  in the best interest for all parties.
6  Q. Okay. And toward the end of that last
7  paragraph on page 2, Mr. LaBow said that he was
8  going to liquidate some of the Neuberger Berman
9  account and to Capital and Mason -- that he was
10  going to do this some time ago in November, but
11  we -- "we" meaning you and Mr. Halpin -- never gave
12  him the okay. Then you replied, "'That's the first
13  I'm hearing you say that Ron,'" to which he read
14  from a letter from February 4th.
15       Well, so how did the call end then?
16  Were you still waiting to get a plan from Mr. LaBow
17  before he could do any trades?
18  A. I don't have a conclusion on these particular
19  sets of minutes, John.
20  Q. Okay. Let me show you the next exhibit, 46.
21  And 47.
22       (DiClemente Deposition Exhibit Nos. 46
23  and 47 were marked for identification.)
24       (Witness reviews document.)
25  A. Okay.

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 161

1   Q. So Exhibit 46 is an e-mail from Mr. LaBow
2   to -- it doesn't seem to show who it's going to, but
3   the subject says, "Re:  Mike - I assume you are
4   waiting to hear back from."  Then underneath, "I am
5   not sure what you want me to do about Mason and
6   Capital Defense after our conversation this
7   afternoon."
8          So that was dated February 11th, 2009?
9   A. Okay.
10  Q. So that, I guess, corresponds to Exhibit 45,
11  the last one we just looked at.  "I again urge you
12  to turn the whole thing into cash since this process
13  seems to take forever."
14         So were you waiting to get a plan
15  before giving Mr. LaBow the go-ahead to make any
16  trades?
17         Before you answer that, I guess I
18  could refer you to Exhibit 47.  That looks like an
19  e-mail from you, February 13th.
20  A. Looks like we were assembling materials to
21  have a better understanding of what a revised
22  portfolio would look like.
23  Q. Yes.  The dating on some of these exhibits is
24  a little bit --
25  A. Yep.  I'm following it, though, the way

Page 162

1   you're following it.
2   Q. So at the bottom there, I guess, the first
3   e-mail on 47, Exhibit 47 is from Mr. LaBow.  "I
4   would like to know what you want me to do with Mason
5   and Capital Defense given our last conversation?
6   Please let me know."  Which is a little bit
7   different from the one that's Exhibit 46, February
8   11th, 2009, which again is about Mason and Capital,
9   but it seems a little bit different in small caps,
10  not all large caps.
11         But the response seems to be from you
12  on the top of Exhibit 47.  We're "evaluating what we
13  want to do" and you had a conversation with WHX this
14  morning and that you were looking to assemble
15  information as to what to do going forward?
16  A. Correct.
17  Q. So it seems as if in Exhibit 47 that you're
18  kind of trying to do two things.  One, looking at
19  the funds going forward but still verifying what
20  Mr. LaBow is saying about how you can't get into
21  some of the other funds retrospectively looking
22  back?
23  A. Correct.  We're looking for the reasons why
24  we couldn't be allocated positions in Proxima,
25  Titan, Sage, Lehman and Farallon, and we're trying

Page 163

1   to do -- get more due diligence on the potential
2   prospective managers.
3   Q. At any point did you think you were getting
4   nowhere with Mr. LaBow and you had to take some
5   steps to protect the assets?
6   A. We were disappointed in his responsiveness.
7   Q. But --
8   A. It was also an ever-evolving story with Ron.
9   Q. Right, but in terms of taking another step to
10  do something to preserve the plan's assets, which
11  were, to this point, still in the Neuberger Berman
12  stock?
13  A. I don't recall.
14  Q. Okay.  Now, let me refer to you Exhibit 48,
15  which we presaged -- if that's the word -- earlier.
16         (DiClemente Deposition Exhibit No. 48
17  were marked for identification.)
18  Q. It's an e-mail from Glen@steelpartners,
19  which, at the bottom, is Glen Kassan?
20  A. Uh-huh.
21  Q. That's three pages.
22  A. Oh, boy.  Okay.
23         (Witness reviews document.)
24  A. Okay.
25  Q. So it sounds like from the e-mails here going

Page 164

1   back and forth on Exhibit 48 that you had a
2   conference call on February 13th, 2009, with
3   Mr. Kassan; and do you know who else would have been
4   on that call?  It looks like --
5   A. I'm assuming that it would have been Sally
6   King and Dennis Halpin.
7   Q. It sounds like Mr. Kassan replies that he has
8   to talk to his team, so maybe he was just on his
9   own.  Do you recall the first conversation with
10  Mr. Kassan was just with him or anybody else on his
11  side from WHX?
12  A. Which first conversation?
13  Q. The conversation from February 13th that you
14  followed up with an e-mail to Mr. Kassan about
15  agreeing to a retroactive reallocation.
16  A. John, I don't recall that it was just a
17  two-party call.  I believe it was a multiple-party
18  call based upon my specific reference to a
19  conference call.
20  Q. Oh, sure.  Do you know if Mr. Kassan had
21  anybody else from WHX on the call?
22  A. I don't know that he did or not.
23  Q. Okay.  So the upshot of that seems to be
24  that, on the February 17th, 2009, Mr. Kassan replied
25  that they would give you whatever data and help get

Michael DiClemente
September 26, 2017

Case 2:14-cv-01494-NBF   Document 184-12   Filed 09/25/18   Page 44 of 55

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 165

1  WPN to rectify the situation, but they weren't going
2  to change the allocations of the assets at that
3  point?
4  A. That's a correct consideration; that's
5  accurate.
6  Q. Do you think that Mr. Kassan said something
7  that led you to believe the opposite when you sent
8  the e-mail on the 13th?
9  A. Absolutely.
10  Q. So was there anything further than this
11  trying to pursue a reallocation with WHX, or was
12  that kind of the last -- the last word on it?
13  A. This may have been the last. I'm unsure at
14  this point. Perhaps as we go through some further
15  documents, that will be validated, but this looks
16  like the end is near.
17  Q. Okay.
18       (DiClemente Deposition Exhibit No. 49
19  was marked for identification.)
20  Q. Take a look at Exhibit 49. I think this has
21  to do with the trueing up, the final distribution.
22  A. Okay.
23       (Witness reviews document.)
24  A. That's what it looks like. Getting closer to
25  a finalization.

Page 166

1  Q. In the, I guess, the first full paragraph in
2  Exhibit 49 -- and this is a letter from Mr. Halpin
3  that CCed you. It says, "Upon consideration of that
4  proposal, the Retirement Committee of Severstal
5  Wheeling Inc. agrees to accept $6 million in cash in
6  partial settlement of the equitable division of
7  assets of the WHX master trust."
8       From looking at some of the other
9  documents, it sounded like there was a little going
10  back and forth, just figuring out what the final
11  amounts were for each trust.
12  A. Correct.
13  Q. Okay. When it says "partial settlement," is
14  it partial settlement of the final distribution, not
15  partial settlement of the issue about the -- being
16  given all of the Neuberger Berman assets?
17  A. Correct, correct.
18  Q. Now, we're into February 2009 going through
19  the chronology here. At some point did you leave
20  Severstal?
21  A. I did.
22  Q. What date was that?
23  A. I believe it was February 5th, 2009.
24  Q. Okay.
25  A. I voluntarily terminated my employment.

Page 167

1  Q. Did you go to another firm at that point or
2  later?
3  A. Later. I voluntarily terminated my
4  employment by design in order to enjoy the benefits
5  of my employment contract. Had I not resigned, I
6  would have forfeited --
7  Q. Along the lines of the other retirement
8  committee members back in June of 2008?
9  A. Correct.
10  Q. I get the impression, though, that your
11  affiliation with the retirement committee wasn't
12  done at that point?
13  A. I was asked to stay on as a consultant. I
14  stayed on as a consultant to continue on with this
15  activity, but then ultimately, within a couple -- a
16  couple months later, I provided a tutorial to the
17  reconstituted retirement committee, not only with
18  regard to this -- this activity, but with regard to
19  just explaining to the new retirement committee
20  members, who did not necessarily have the background
21  in this area --
22  Q. Right.
23  A. -- what their true important role is.
24  Q. Right. Do you know when you finally left
25  doing any work on the committee as a consultant?

Page 168

1  A. I don't have a specific date that I can
2  recall. I mean, I have records. I can get back to
3  you and give you a definitive answer in that regard,
4  because, as a consultant, I was billing my time on
5  an hourly basis.
6  Q. Would that have been beyond July of 2009?
7  A. I don't think so.
8  Q. Okay.
9  A. I don't think so.
10  Q. Did you put in a resignation letter --
11  A. I did. I can produce -- I think I still have
12  that letter, if you need that.
13  Q. As a member of the retirement committee as
14  opposed to the company?
15  A. No, I don't think I did anything like that.
16  Q. So at this point you were a consultant to the
17  committee, which consisted of Mr. Halpin, in
18  February of 2009?
19  A. Immediately, yes, until it was reconstituted.
20  Q. My understanding, it wasn't reconstituted
21  until May of 2009. Is that your understanding?
22  A. That sounds familiar, yep.
23  Q. Now we're up to Exhibit 50. Take a look at
24  that.
25       (DiClemente Deposition Exhibit No. 50

Case 2:14-cv-01494-NBF   Document 184-12   Filed 09/25/18   Page 45 of 55

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 169

1　was marked for identification.)
2　　　(Witness reviews document.)
3　A. Okay.
4　Q. All right.  Do you recognize this document?
5　A. I do.
6　Q. All right.  So it's a letter, February 24,
7　2009, to Mr. LaBow from your ERISA counsel,
8　Ms. King.  And the third paragraph there states
9　that, "The Committee believes that it is important
10　to work toward a resolution of the investment of the
11　previously transferred assets and not to wait until
12　the financial materials are reviewed and analyzed by
13　the Committee."
14　　　So this is, I guess, a week after that
15　e-mail from Mr. Kassan from WHX.  And I take it at
16　this point then you're just trying to work with
17　Mr. LaBow to get the plan diversified?
18　A. Yes.
19　Q. And then it lists a number of bullet points
20　here.  "The Committee wants to ensure that it has
21　taken all actions to facilitate your fulfilling your
22　duties as investment manager of the SWI pension
23　assets."
24　　　At this point, I haven't seen in the
25　documents any statement that Mr. LaBow is not able

Page 170

1　to carry out any actions.  Had he stated anything
2　that -- before this February 24th, 2009, letter,
3　that required a response to ensure that it has
4　taken -- the committee, that is -- taken all actions
5　to facilitate your fulfilling your duties as
6　investment manager?
7　A. I'm sorry to ask you.  Could you read that
8　back to me, please.
9　Q. Let me ditch it.  It will be quicker
10　probably.
11　A. Very good.
12　Q. So the fact that that sentence says, "The
13　Committee wants to ensure that it has taken all
14　actions to facilitate your fulfilling your duties as
15　investment manager" makes it sound as if some
16　question had been raised that he couldn't fulfill
17　all of his duties as investment manager.  Would you
18　think that is a fair reading of that?
19　A. Yeah --
20　　　MR. JOYCE: I'll just object on
21　speculation.  It's not his letter.
22　Q. I'm sorry, what did you say, Mr. DiClemente?
23　A. I was going to say, I mean, that could be
24　read that way, but I don't know exactly what she
25　means there, but I follow that logic.

Page 171

1　Q. Are you aware of any statements by Mr. LaBow
2　or anybody else that he couldn't fulfill his
3　responsibilities as investment manager before
4　February 24th, 2009?
5　A. I'm not sure I follow that question, John.  I
6　mean, could you just help me along on that, please.
7　Q. Did Mr. LaBow ever indicate to you that he
8　couldn't fulfill his duties as investment manager
9　because the retirement committee hadn't done
10　something, like telling Citibank or National City,
11　that he's the investment manager, do what he says?
12　A. I don't recall.
13　Q. So in the whole tenure with the retirement
14　committee, Mr. LaBow never indicated to you that he
15　couldn't carry out his duties because the retirement
16　committee failed to do something?
17　A. John, I'm just trying to run through the
18　chronology of all the activities, and I want to make
19　sure I answer that question -- because it seems like
20　it's an all-encompassing question, and I want to be
21　careful about how I answer it.
22　Q. Right.  Because I was asking about February
23　24th, 2009, and you weren't sure.  So then I said,
24　did Mr. LaBow ever say he needed the committee to do
25　something that it didn't do?  So you can answer that

Page 172

1　however --
2　A. Yeah.  I'm just unsure, John.
3　Q. Okay.
4　A. I'm not trying to be evasive or anything like
5　that.  I'm just trying to remember everything that's
6　happened.  That's an all-encompassing question.
7　Sorry for that.
8　Q. With regard to the bullet points here, the
9　first one says, the investment management agreement
10　between Severstal and WPN states that WPN has
11　complete authority to select and designate
12　investment managers, for example, Neuberger Berman.
13　And "After conversations with you, the Committee
14　agreed to work with Neuberger Berman to get an
15　agreement in place between SWI and Neuberger Berman
16　for investment services."
17　　　So just looking at that first bullet
18　point -- do you see it there?
19　A. Yes.
20　Q. It seems as if there's a little tension there
21　that the investment management agreement says
22　Mr. LaBow is the investment manager and has complete
23　authority to retain fund managers underneath him.
24　Is that your understanding?
25　A. That's right.  That's correct.

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 173

1  Q. But on the other hand, Mr. LaBow was saying
2  to you and, apparently Neuberger Berman as well,
3  that they needed the committee to fill out the
4  paperwork to set up a relationship.
5  A. That's correct. That, apparently, was what
6  the arrangement was when he was the manager directly
7  with WHX.
8  Q. Right.
9  A. Yes.
10 Q. So then the next bullet point says that the
11 committee negotiated all provisions but the fee
12 negotiation; and the third bullet point, the
13 committee is still waiting for you to finalize the
14 fee adjustment. And I -- I guess at that point had
15 Mr. LaBow said to you that -- or communicated to you
16 that Neuberger Berman wouldn't lower their fee?
17      (Witness reviews document.)
18 A. Just with the passage of time, I just don't
19 have that information handy.
20 Q. I haven't seen it in the documents. I see
21 that the documents say that, going back to 2008,
22 saying Mr. LaBow's going to check on the fees, check
23 on the fees, check on the fees with Neuberger
24 Berman, but I don't see anything in any of the
25 conversations, in any of the notes or the minutes

Page 174

1  that Neuberger Berman is not going to cut their
2  fees. Is that accurate --
3  A. That sounds reasonable, but again, it's
4  just -- just hazy on -- I'm actually very good on
5  some of the details but not all of the details.
6  Please excuse me in that regard. I'm not being
7  evasive.
8  Q. No, no, that's okay. Just going back through
9  the documents that we've gone through today, I
10 didn't see that, and I take it you didn't see
11 anything there where he said in any of these
12 documents that Neuberger Berman wouldn't adjust the
13 fee down.
14 A. Got it.
15 Q. Okay. So the fourth bullet point there says,
16 "The Committee expressed its concerns to you on
17 multiple occasions regarding the lack of
18 diversification of the portfolio based on allocation
19 of the entire Neuberger Berman account to the SWI
20 Pension Trust. Subsequently, the Committee asked
21 you for additional information and alternative
22 proposals to address its diversification concerns.
23 In particular, the Committee is looking for a
24 proposal whose portfolio diversification can satisfy
25 ERISA and SWI Pension Trust investment policy

Page 175

1  requirements and guidelines."
2       So again, to the documents that we've
3  looked through today, it doesn't seem as if you or
4  the committee had been satisfied that Mr. LaBow gave
5  you all the information that you wanted.
6  A. Correct.
7  Q. The next paragraph there, the first full
8  paragraph on page 2 says, "At this point, the
9  Committee is taking several steps in an effort to
10 move the situation forward. First, the Committee
11 will sign the Neuberger Berman investment management
12 agreement even though it is our understanding that
13 the fee issue has not been resolved."
14       Until the fee issue was resolved, it
15 wasn't going to do very much doing that; would it?
16 A. Correct.
17 Q. And the next sentence, "Although the
18 Committee continues to disagree that all of this
19 account should have been allocated to the SWI
20 Pension Trust, it feels that the resolution of that
21 issue should be addressed separately."
22       So it sounds as if, on this point, you
23 were trying to get the Neuberger -- get Neuberger
24 Berman managing the account and deal with any issues
25 from the allocation on November 3rd, 2008,

Page 176

1  separately?
2  A. Absolutely.
3  Q. The next paragraph says, "Second, the
4  Committee will facilitate transfers of assets and
5  will provide direction for Neuberger Berman or
6  National City (as trustee and custodian) to execute
7  your instructions regarding this investment
8  management of the Neuberger Berman account."
9       So to this point, do you know whether
10 or not National City had not recognized Mr. LaBow's
11 authority with regard to the plan's assets?
12 A. I was under the impression that they had
13 already recognized him prior to this February 24th
14 date, but I don't have the chronology.
15 Q. And the last sentence, "The Committee will
16 not approve or reject investment actions made by
17 you, since you are investment manager and have full
18 authority regarding investment decisions under this
19 Agreement."
20       So that sounds like a change from just
21 the last few documents, that no longer we're going
22 to expect to get a plan going forward of the -- how
23 the plan's assets should be invested.
24 A. You mean as in reallocated?
25 Q. Not the reallocation, but as to the Neuberger

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 177

1 Berman assets, the committee was no longer going to
2 approve or tell Mr. LaBow what to do; that he was
3 the investment manager, he's supposed to invest.
4 And there is no provision in here saying don't do
5 anything until you give us a plan.
6 A. Correct. That's the way it should have been
7 happening all along.
8 Q. So you say that, but at the same time you
9 stated in these phone calls with Mr. LaBow that you
10 memorialized, don't do anything until you get us a
11 plan.
12 A. Once he went off track.
13 Q. He should have been the investment manager
14 since November 3rd, making investments for the plans
15 without referring them to you for approval?
16 A. Correct.
17 Q. But that -- but after things went off track,
18 like you said, and you had the Neuberger Berman
19 account, you insisted on getting a report from him
20 or a plan to approve before he could invest
21 anything?
22 A. That's exactly right. We felt that that was
23 the most prudent thing that we should be doing on
24 behalf of our participants. We could not allow him
25 to again go off track.

Page 178

1 Q. Okay.
2       (A brief recess was taken.)
3   BY MR. STRAWN:
4 Q. Mr. DiClemente, let me show you what's marked
5 as 51 and 52.
6       (DiClemente Deposition Exhibit Nos. 51
7 and 52 were marked for identification.)
8 Q. And they're both supposed to be the Severstal
9 Wheeling Pension Plan Investment Policy. And 51
10 says it's February 2009, a draft. And 52 says,
11 effective November 1st, 2008. And I don't see any
12 other dates on it. So I just was going to ask you
13 how -- when you developed an investment policy for
14 the Severstal stand-alone trust.
15       (Witness reviews document.)
16 A. Boy, I see two investment policies here.
17 They both look familiar. But I'm not sure why we
18 have two investment policies that have dates
19 relatively close with one another. I'm wondering if
20 the second one superseded the first. I'm trying to
21 catch up here.
22 Q. Okay. Do you recall being involved in
23 working out an investment policy with Mercer?
24 A. I know that we had retained Mercer Investment
25 Consulting, and this would be a customary part of

Page 179

1 those responsibilities.
2 Q. And Exhibit 51 says, draft, February 2009,
3 and has Mercer's name on it. But you retained
4 Mercer years before this; right?
5 A. We did.
6 Q. Did you have an independent investment policy
7 when your assets were in the commingled trust?
8 A. I don't recall. I don't recall that we did.
9       I'm trying to remember what the
10 content of the investment management agreement was.
11 I just don't recall at this point. Perhaps you have
12 something that would facilitate reminding me?
13 Q. I think this is about it. Both of these
14 policies reference Mr. LaBow and WPN. I was just
15 looking for when you thought these actually came
16 into existence. Again, 52 says, effective November
17 2008, but do you know if this was in existence
18 November 1st, 2008?
19 A. I don't know at this point. This is where I
20 wish I would have access to my e-mails to allow me
21 to construct things.
22 Q. Right. Okay. Well, I guess that's all we
23 have with that. Let me show you what's marked as
24 Exhibit 53.
25       (DiClemente Deposition Exhibit No. 53

Page 180

1 was marked for identification.)
2       (Witness reviews document.)
3 Q. So Exhibit 53 is titled, "Evaluation of WPN
4 Corporation's Compliance with the WHX Pension Plan
5 Investment Policy" -- "the WHX Pension Plan
6 Investment Policy as of March 2004" -- I take it
7 that must have been the last investment policy that
8 was out there -- "and the Severstal Wheeling, Inc.
9 (SWI) Pension Plan Investment Policy effective
10 November 1, 2008." And then it says "March 2009."
11       And the second page says at the
12 bottom, March 9th, 2009. So I assume that's the
13 date this was done, and in a way it doesn't read
14 like an evaluation of a compliance with an
15 investment policy. It seems more like it's pointing
16 out all of the obvious flaws and being invested in
17 just the Neuberger Berman account.
18       Do you recognize that document?
19 A. It looks familiar.
20 Q. And the reference seems to be to the SWI
21 pension plan investment policy effective November 1,
22 2008, which would be Exhibit 52.
23 A. I see that, yes. Uh-huh.
24 Q. And in No. 6 on the second page it says,
25 "Despite the aforementioned policy violations, we

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

---

Page 181

1 note that WPN permitted WHX to stay invested in the
2 remaining assets" -- you know, not the Neuberger
3 Berman assets -- "of the fully diversified
4 portfolio, consisting of over a dozen
5 managers/investment strategies."
6        I assume that's based on an assumption
7 based on what the portfolio had been prior to
8 November 3rd, 2008, and the trust being separated.
9 It doesn't reference any current investments by WHX.
10 But I don't know that.
11 A. I do not know that, but that's a fair
12 observation, but they're really -- certainly there
13 could have been changes between those November and
14 March dates, but --
15 Q. It says, "WPN and WHX each had an obligation
16 to ensure that the assets of each bifurcated fund
17 remain well diversified."
18        What was WHX's obligation toward the
19 Severstal trust?
20        (Witness reviews document.)
21 Q. Still on the numbered paragraph section.
22 A. Yes, I'm looking at that. I'm trying --
23 let's see here.
24        (Witness reviews document.)
25 A. I'm looking at that sentence, John, and I'm

---

Page 182

1 wondering if, you know, it might have better read
2 WPN and WHX each respectively had an obligation to
3 each ensure that the assets of each bifurcated fund
4 remain well diversified. But then again, this is as
5 of -- trying to get the specific date. This is an
6 investment policy as of November 1, and the assets
7 were transferred on November 3rd.
8 Q. All right. Let me -- so --
9 A. So each -- we -- each party would participate
10 in a proportionate share of the combined trust as of
11 November 1, and they weren't separated until
12 November 3rd.
13 Q. All right. I could just move on.
14 A. Okay.
15 Q. The next numbered paragraph, No. 7, says,
16 "WPN did not ensure that SWI received a monthly
17 listing (for November 2008) of individual security
18 holdings at cost and market until December 30th,
19 2008, the day after SWI learned how the assets were
20 allocated."
21        Do you have any knowledge of that?
22 A. It sounds like an accurate statement. Had we
23 received a monthly listing of the individual
24 security holdings prior to our -- the revelation, we
25 would have known much earlier.

---

Page 183

1 Q. Is that something that you got when you were
2 in the commingled trust, a monthly report? I should
3 say a monthly listing of individual security
4 holdings across the market?
5 A. We didn't -- well, what I would say, John, is
6 I don't remember receiving any listing of any
7 security -- any securities that comprised a
8 portfolio directly. That information went directly
9 to Mercer Investment Consulting --
10 Q. Oh.
11 A. -- who performed the investment evaluation.
12 And I can tell you from firsthand experience that
13 when I was an institutional investment consultant,
14 the investment managers reported the security
15 listings and holdings and the change in values
16 directly to Yanni Partners for whom I worked.
17 Q. The which partner?
18 A. Yanni, Y-A-N-N-I, Partners. That was the
19 name of the company I worked for --
20 Q. Okay.
21 A. -- that was an institutional investment
22 consulting firm. And the institutional investment
23 consultant then compiles that information into a
24 report to their client, evaluates how that
25 investment manager or set of investment managers

---

Page 184

1 performed relative to the investment objectives
2 outlined in the investment policy with the two
3 primary determinants being a return relative to an
4 index benchmark and relative to an appropriate
5 universe.
6 Q. Let me ask you this: So did Mercer give you
7 monthly reports or quarterly reports?
8 A. Quarterly reports.
9 Q. And where do they get their information from?
10 A. They would get that directly from the
11 investment manager.
12 Q. So Mercer would have gotten that information
13 from Mr. LaBow --
14 A. I don't know if they got it from the
15 investment manager or the trustee. I'm not sure.
16 Q. Okay. So when it says in that paragraph 7,
17 "WPN did not ensure that SWI received a monthly
18 listing (for November 2008) of individual security
19 holdings," do I understand your testimony that you
20 hadn't received monthly listings prior to the trust
21 separating?
22 A. I don't recall that we ever received anything
23 else from -- because when we were -- when we were a
24 part of the overall fund, we were just a small
25 component.

---

Case 2:14-cv-01494-NBF   Document 184-12   Filed 09/25/18   Page 49 of 55

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 185

1   Q. And do you know when you would have
2   received -- no, you said you don't recall receiving.
3   A. I don't recall any.
4   Q. Okay. All right. Now let me skip over a
5   couple more of these Neuberger Berman exhibits. We
6   can go to Exhibit 54.
7        (DiClemente Deposition Exhibit No. 54
8   was marked for identification.)
9   Q. So it's just one page, and the -- it's an
10  e-mail chain and the -- the top of the page there on
11  Exhibit 54 is from Russell --
12  A. Khanuk.
13  Q. -- Khanuk, sent March 20th, to Dennis Halpin,
14  CCed you and Ms. King and Charlie Diccianni?
15  A. Correct, well done.
16  Q. And the e-mail says, "Hi Dennis, We are all
17  set with the paperwork and the account has been
18  opened and linked to National City. We are waiting
19  for the fee schedule to be worked out prior to any
20  trading."
21       So I take it as of March 20, you still
22  hadn't gotten a deal cut with Neuberger Berman?
23  A. That's what it looks like, yes.
24  Q. Do you know, did you ever get a deal with
25  Neuberger Berman?

Page 186

1   A. I'm unsure. At this point I'm no longer an
2   employee and engaged, to some extent, as a
3   consultant. Somewhat active but I'm not sure as
4   active as Dennis.
5   Q. As active as Dennis?
6   A. As Dennis Halpin, I'm not sure I was as
7   active as Dennis -- as actively engaged as Dennis.
8   Q. This is Exhibit 55. Do you know how much you
9   were used? Was it just on an as-needed basis, or
10  were still things kind of run through you as before?
11  A. At this point, I would say that I was still
12  involved, but I was not involved in every
13  conversation.
14       (DiClemente Deposition Exhibit No. 55
15  was marked for identification.)
16  Q. So this is a one-page exhibit, 55, and it's
17  an e-mail. And it looks to be from Mr. Halpin to
18  Mr. LaBow March 23rd. Sounds like you made
19  contact with National City, it goes on, "If somehow
20  you need my assistance tomorrow to complete NB
21  trades...call my cell."
22       Are you familiar with this at all or
23  any --
24  A. Not familiar with this, no.
25  Q. Okay. We'll go to 56.

Page 187

1        (DiClemente Deposition Exhibit No. 56
2   was marked for identification.)
3   Q. This is a transcription of a voice mail
4   message from Mr. LaBow to Sally King I believe.
5        (Witness reviews document.)
6   A. Okay.
7   Q. Have you ever seen this before?
8   A. Seems like I may have seen this as part of
9   preparing for the case in New York.
10  Q. Okay. And were you familiar at the time back
11  in -- this is dated March 23rd, 2009. Were you
12  familiar at the time with the back and forth between
13  Mr. LaBow and Ms. King or Mr. Halpin?
14  A. I may have been made aware of this at the
15  time. Again, I wasn't involved daily. But I was
16  still tuned in.
17  Q. And I -- my understanding is that the
18  Neuberger Berman account was finally sold on March
19  24th of 2009. Are you familiar with how that -- how
20  that was done?
21  A. I do not recall.
22  Q. Do you know if Neuberger Berman made the
23  trade or Mr. LaBow made the trade on his own without
24  any --
25  A. I don't recall.

Page 188

1   Q. Okay.
2        THE WITNESS: So John, you're saying it
3   was liquidated on the 24th.
4        MR. STRAWN: That's my understanding.
5        Mike, if that's yours.
6        MR. JOYCE: Yeah.
7        THE WITNESS: Okay.
8        (DiClemente Deposition Exhibit No. 57
9   was marked for identification.)
10       (Witness reviews document.)
11  Q. On this line there it says, "Michael
12  DiClemente 3/25/2009." Do you think that was a CC?
13  A. I don't know, John.
14  Q. The top of the document says, "Message Sent:
15  3/25/2009," from Dennis Halpin -- looks like it says
16  BCC: LaBow. And it says, "Ron: Believe this
17  should provide you with all you need. Let me know
18  your decision. If OK with this government fund, I
19  will process the needed paperwork today so that the
20  settlement funds can go directly into this account."
21       Do you remember these transactions at
22  all?
23  A. Not really.
24  Q. Okay. Let's go to Exhibit 58.
25       (DiClemente Deposition Exhibit No. 58

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 189

1   was marked for identification.)
2        (Witness reviews document.)
3   A. Okay.
4   Q. Have you seen this document before?
5   A. I'm not sure. I'm reading some of it, and
6   some of it looks like new information. But I'm also
7   thinking that somehow I may have seen this during
8   litigation preparation.
9   Q. Okay. Let me --
10  A. What does look familiar is item number 2. I
11  know that Dennis was very concerned about being the
12  last individual.
13  Q. Standing?
14  A. Yep, yep.
15  Q. The first part there it says, "Neuberger Fund
16  Performance." My understanding is it had been
17  liquidated to cash on March 24. Oh, there we go.
18  It even says it there, March 24th, 2009,
19  third-to-last line it looks like.
20  A. I see that.
21  Q. It says, "Since the bifurcation (November
22  3rd, 2008), the Neuberger Berman account had lost
23  approximately 15% through the liquidation," overall
24  account loss around 13 percent when they take the
25  cash into account.

Page 190

1        It says in the first bullet point
2   there, "WHX account was essentially 'breakeven,'"
3   maybe a 1 percent loss through 2009 and maybe better
4   after that.
5        Were you aware of any of this at the
6   time about a comparison between how the funds for
7   the two trusts have performed?
8   A. I may have. This does not really resonate
9   with me, but it's very possible that I may have seen
10  this at some point later, maybe not real time.
11  Q. It is interesting there it says, "S&P Index
12  performed at an approximate 25% loss over this
13  4 month period" when Neuberger Berman was down
14  15 percent. That's just an observation.
15       So the second paragraph says,
16  "Reconstitute the SWI Retirement Committee." My
17  understanding is Mr. Halpin left at the end of this
18  month, at the end of April 2009, and he was the last
19  member of the committee at this time.
20  A. Correct, that's correct. Yes.
21  Q. Is it important to have more people on the
22  committee because there's more work to do or
23  shoulders to spread the load around? I know you
24  said about getting different perspectives.
25       MR. JOYCE: I'll object just on the

Page 191

1   grounds of speculation, to the extent it seeks
2   either legal or expert opinion from Mr. DiClemente.
3   A. The composition of a retirement committee
4   generally consists of more than one or two
5   individuals. And generally, it's comprised, based
6   upon my experience, of at least five members. And I
7   believe that, subsequent to Dennis's departure,
8   there was a newly reconstituted retirement
9   committee, and that I was invited back to the
10  committee to educate those individuals who
11  previously had no such experience to tell them how
12  important this level of responsibility is.
13  Q. Right.
14  A. And it was a very lengthy meeting with, I
15  believe, exhibits or some tutorials. I may have
16  that still available, but I'm not sure. And I think
17  there were minutes to that meeting. Fairly certain
18  there were minutes to that meeting.
19  Q. What was that, before or after May 1st?
20  A. I don't recall, John. I don't recall the
21  specific date.
22  Q. It says in here in the second numbered
23  paragraph, "If this fund/plan is to remain at the
24  'local' level" -- so I assume that's not at wherever
25  the headquarters was at that point?

Page 192

1   A. In Dearborn.
2   Q. -- "for the foreseeable future, then I
3   believe its committee staffing should remain
4   'local,' to include human resources and finance with
5   possible involvement by SNA (Dearborn) legal."
6   A. Uh-huh.
7   Q. What is SNA?
8   A. Severstal North America.
9   Q. Did Severstal own -- Severstal North America
10  own more than Severstal Wheeling?
11  A. They owned facilities in Dearborn, and then
12  there was another entity that I believe they picked
13  up called WCI, and I think that might be in Ohio.
14  I'm a little bit unclear at this point.
15  Q. Were they steel or steel related?
16  A. It was steel related, yep.
17  Q. Okay. So paragraph 6, it says, "Consulting
18  Services/'NERA' Engagement." "We are in the process
19  of engaging National Economic Research Associates,
20  Inc., an affiliate of Mercer, to perform certain
21  professional services relative to the fund assigned
22  to SWI by WPN. These services currently consist of:
23       "Validate the amount of the SWI plans'
24  interest in the WHX Master Trust as of 10/31."
25       It seems to get back to the audit as

Case 2:14-cv-01494-NBF   Document 184-12   Filed 09/25/18   Page 51 of 55

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 193

1   to making sure Severstal got its proper share value
2   of the --
3   A. The Cohn audit?
4   Q. Yeah.
5   A. It sounds very similar, I should say.
6   Q. Number 2, "Compare the actual results of the
7   SWI trust from 10/31/08 to 3/31/09."
8        Number three, "Compare the actual
9   results of the SWI trust from 10/31/08 to 3/31/09
10  with the result that would have occurred if the
11  10/31/08 transfer had consisted of proportional
12  interests in all 'separable' funds, to include
13  Neuberger Berman, Capital Defense and Mason
14  Capital."
15       That sounds like a -- what do you call
16  it -- like a modified 10 percent slice, like
17  whatever portions the trust could have gotten or --
18  is that what you take that to mean, Paragraph 3?
19       MR. JOYCE: I'll just object to
20  speculation.  I don't know if he's sure if he's seen
21  it, and I don't think he wrote it.
22  Q. You get what I'm looking at there,
23  Mr. DiClemente?
24  A. And your question, John, is --
25  Q. In the paragraph 6 where it's got 3 numbered

Page 194

1   paragraphs --
2   A. Uh-huh.
3   Q. -- where it was going to engage -- the
4   committee was going to engage NERA, the third one
5   says, "Compare the actual results of the SWI trust
6   from 10/31/08 to 3/31/09 with the result that would
7   have occurred if the 10/31/08 transfer had consisted
8   of proportional interests in all 'separable' funds,
9   to include Neuberger Berman, Capital Defense and
10  Mason Capital."
11       So that sounds to me when I was
12  reading it that that was recognizing that there may
13  have been some investments that the WHX trust had
14  that could not have been parsed out, 10 percent
15  share to Severstal.  Is that what you take --
16  A. That's my understanding.  So they were
17  looking -- NERA was looking to evaluate -- calculate
18  the results of the portfolio had Severstal Wheeling
19  continued to enjoy the same level of
20  diversification, same or similar level of
21  diversification that they previously had.  I believe
22  NERA was -- testified at the trial in New York.
23  Q. Oh, okay.
24  A. I believe they may have.
25  Q. Let me show you Exhibit 59.

Page 195

1        (DiClemente Deposition Exhibit No. 59
2   was marked for identification.)
3        (Witness reviews document.)
4   A. I've read it.
5   Q. Okay.  So that's a letter, May 5th of 2009,
6   from Vincent Assetta, and it gives his title of
7   "Chair, Severstal Wheeling, Inc., Retirement
8   Committee" to Ronald LaBow, and there's a CC to you.
9   Do you recall this letter?
10  A. I do.
11  Q. All right.  And the letter is basically, I
12  guess, an introduction from Mr. Assetta and -- I
13  don't know if reengagement with Mr. LaBow is the
14  right phrase -- an engagement with Mr. LaBow asking
15  him for -- let's see here -- the third paragraph it
16  says, "Therefore, the Committee renews the request
17  that was previously made to you for a complete
18  investment plan for these assets.  The Committee
19  believes that it is important that the investment
20  plan address its concerns that there be portfolio
21  diversification that satisfies both ERISA and the
22  Plans' investment policy requirements and
23  guidelines."
24        Do you know if there was an investment
25  policy at that time?

Page 196

1   A. I believe there was.
2   Q. And what do you base that on?
3   A. I believe I had seen an investment policy
4   before.
5   Q. Either of the exhibits we saw today?
6   A. I'm not sure which one.  I'm a little bit
7   confused about both of those.
8   Q. Okay.  Where it -- the final full paragraph
9   there, it says, "Given the recent lack of
10  diversification of the Plans' assets and the
11  corresponding performance of the assets, the
12  Committee believes that it would be advisable to
13  maintain the current investment of the assets until
14  you have provided the Committee with a complete
15  asset investment plan."
16        So it sounds like we're back to don't
17  make any trades until we approve your plan?
18  A. Yes, that's correct.  They wanted to make
19  sure that there were no further missteps as had
20  previously been committed.
21  Q. Okay.
22  A. And by the way, this is -- Vince Assetta, as
23  it indicates, is the chair of Severstal Wheeling,
24  Inc. retirement committee.  It was Vince and another
25  group of people to whom I apprised the retirement

Michael DiClemente
September 26, 2017

Case 2:14-cv-01494-NBF   Document 184-12   Filed 09/25/18   Page 52 of 55

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 197

1 committee of their newly appointed responsibilities.
2 Q. Right, right. I got you.
3        Let me show you Exhibit 60.
4        (DiClemente Deposition Exhibit No. 60
5 was marked for identification.)
6 Q. And at the top is an e-mail from Mel Baggett
7 to Vince Assetta. It says, "RE: LaBow Letter re
8 Retirement Committee Discussions - sent5-5-09."
9        So I would assume that's the letter we
10 just looked at, Exhibit 59, that's May 5th, 2009.
11 A. I'm sorry, John, are you looking for a
12 response?
13 Q. No, just let me know when you're done looking
14 at it.
15 A. I'm done.
16 Q. So the e-mail at the top from Mel Baggett to
17 Vince Assetta, May 6, '09, it says, "Vince, We need
18 an 'investment policy' to guide the work of the
19 Committee and to protect us fiduciarily. This
20 policy should be developed by Mercer or an
21 independent asset consultant. I will call you to
22 discuss."
23        Are you familiar with what was going
24 on at the time, if there was anything -- any
25 investment policy that the committee could use?

Page 198

1 A. I was under -- I don't know what's going on
2 at this point. I can speculate that Mel is in
3 Dearborn and not completely aware of all the
4 activities that are under way in Wheeling with
5 regard to the reconstitution of the committee, et
6 cetera.
7 Q. And I don't recall if I got this from you
8 before, was he on the retirement committee in May of
9 2009, part of the new committee, new committee
10 membership?
11 A. Mel or Vince?
12 Q. Mel.
13 A. Mel was not -- to my knowledge, he was not on
14 the committee.
15 Q. Oh, okay.
16 A. Mel was in Dearborn, and my understanding is
17 all the committee members in Wheeling were in
18 Wheeling.
19 Q. So why would Mr. Baggett be on the e-mails
20 with the committee? Let me go back. You may have
21 told me already. What was his position?
22 A. Maybe Mel was on the committee. Maybe he
23 was. I'm not sure.
24 Q. Okay.
25 A. Maybe he was. I was under the impression it

Page 199

1 was Wheeling-related, but what I don't recall is
2 that, when I presented to the committee, that there
3 were -- there was anyone on the phone. So maybe Mel
4 was on the committee.
5 Q. Okay. And what was his position in Dearborn?
6 A. I was under the impression -- I'm not sure.
7 I'm not sure. He may have been in the human
8 resources. I'm a little bit unsure.
9 Q. Okay. Just the e-mail below that was from
10 Vince to Drew Landon, James Sullivan, Kathy Bartek,
11 Mel Baggett, Michael Clarke, Michael DiClemente,
12 Michelle Ivey. It looks like Richard Bowness, Tim
13 Rogers, Steve Kittrell. "The attached letter was
14 sent to LaBow yesterday. Prior to sending I
15 received a call from him as a result of him trying
16 to reach Dennis Halpin." And Mr. Halpin, my
17 understanding is he was gone by that point, May 6th
18 of 2009. "During a call back discussion, he
19 suggested that he has been attempting to provide an
20 'investment plan' by presenting a particular
21 mortgage type investment to Dennis and Mike. He
22 asked to present it to me and discuss. We agreed on
23 3pm today. After considering what he presents, I am
24 expecting to inform him that this is not a 'complete
25 investment plan' as we are requesting but at best a

Page 200

1 specific component of an investment plan, and to
2 emphasize the details of the attached letter."
3 A. I'm aware of those discussions.
4 Q. And what discussions were had?
5 A. My recollection is that this was the sole
6 investment option that LaBow was recommending. And
7 it was not a diversified portfolio, and this was the
8 beginning of the end for Ron LaBow.
9 Q. Okay. Let me show you Exhibit 61.
10        (DiClemente Deposition Exhibit No. 61
11 was marked for identification.)
12 Q. That's a letter dated November 20th, 2009,
13 from Mr. LaBow. It appears to be in response to his
14 termination letter.
15        (Witness reviews document.)
16 A. Okay. I'm not sure I understand what the May
17 19th letter is.
18 Q. I don't actually have it here. But that
19 was -- my understanding, and Mike you could
20 confirm -- that was the letter to Mr. LaBow
21 terminating his services?
22 A. That fits with what I recall. Okay.
23 Q. So are you familiar with this letter, the
24 Exhibit --
25 A. I think I may have seen this before.

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 201

1  Q. And the second paragraph there from Mr. LaBow
2  says, "For the past 60-90 days, I have attempted to
3  convince Dennis Halpin to invest the cash residing
4  at City National into pass-through mortgages
5  yielding between 12-16% annually."
6       Are you aware that that was going on?
7  A. I do not recall that that was going on. I do
8  not. My recollection -- is that when he had
9  recommended that to Vince, that may have been the
10 first time I think I heard of it. Then again I
11 would also say that I'm a consultant and I'm in and
12 out with this.
13 Q. Might not have been privy to everything.
14 A. Yes, right.
15 Q. All right. My understanding is that the
16 plans were just in cash at that point. They weren't
17 invested in any other kind of security or stock. Is
18 that your understanding?
19 A. That's my understanding.
20 Q. Okay. And last but not least, let me show
21 you Exhibit 62. Sorry, it's not a very good copy.
22       (DiClemente Deposition Exhibit No. 62
23 was marked for identification.)
24 Q. It's an e-mail --
25 A. Tim Rogers to an inbox.

Page 202

1  Q. Is there something interesting about that,
2  "Posted to: Inbox"?
3  A. I've never seen a format like that.
4  Q. Yeah, me neither. Subject: Neuberger
5  Berman, To: Retirement Committee. And he
6  references a call from Charlie, who I imagine from
7  the e-mail chain below --
8  A. It looks like Charlie Diccianni, yes.
9  Q. And in the fuzzy e-mails down below, it looks
10 like one's dated June 1, 2009. "Hi Tim, Thank you
11 very much for talking to me today. As I mentioned
12 Neuberger Berman was an investment manager for WHX.
13 We had begun working with Dennis Halpin to restart
14 as investment manager for Severstal with Plan
15 documents, IA agreement, etc, when he had departed
16 and I believe there is very little paperwork left to
17 open the account."
18       It makes it sound as if there never
19 was a contract or a relationship set up with
20 Neuberger Berman.
21 A. It looks --
22       MR. JOYCE: I'll just object to the
23 extent Mr. DiClemente is not copied on the e-mail.
24 I'm not sure if he's ever seen it before today
25 either.

Page 203

1  A. I have not seen this before. I don't recall
2  seeing this before, even for litigation preparation.
3  Q. Okay. So I guess the upshot of all that is
4  you don't know whether a contract was ever set up
5  with Neuberger Berman?
6  A. At this point, I just don't recall, John.
7  Q. Okay. Are you aware of any contact between
8  Mr. LaBow and Mr. Halpin, the committee, from March
9  24th, 2009, when the Neuberger Berman account was
10 sold for cash, until Mr. LaBow was fired?
11 A. I don't recall.
12 Q. Do you know if there were any communications
13 between Mr. Halpin and Mr. LaBow?
14 A. I don't know.
15 Q. Just to do a little housekeeping of what I
16 missed along the way. As treasurer, did you hold
17 that same position from June 2008 all the way
18 through February 2009 when you left Severstal?
19 A. June of 2008?
20 Q. Correct.
21 A. To February of 2009?
22 Q. Right.
23 A. Yes.
24 Q. So I understand, you never asked WHX for a
25 cash distribution. You only ever wanted a

Page 204

1  proportional 10 percent slice from the commingled
2  trust?
3  A. That's my understanding, John. I don't
4  understand where the thought crossed anyone's mind
5  that I asked for a cash distribution. That's just
6  foreign to me.
7  Q. No, I understand. There's no e-mail from you
8  asking for a 10 percent cash, at least that we
9  looked at.
10 A. Okay. I just don't understand the question,
11 yeah.
12       I mean, I understand the question. I
13 don't understand why the question is being asked.
14 It was never part of my thought process, that I
15 recall.
16 Q. Oh, you're asking why I'm asking.
17 A. Yes.
18 Q. And I'm asking because there was the e-mail
19 from -- I believe it was Mr. Riposo saying, I told
20 him they would get it in cash?
21 A. Yes, yes, okay, yes. Okay, thank you.
22 Q. Do you recall -- and I might have asked this
23 already -- but did Mr. LaBow ever indicate to you
24 that he wanted to put off the separation on November
25 3rd? I think I did ask this already. But while

Michael DiClemente
September 26, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

---

Page 205

1  we're at it -- put off the separation of November
2  3rd, 2008, because the markets were too volatile
3  and -- I did ask it because -- it made valuing the
4  different assets that much trickier because they
5  were fluctuating more.
6  A.  Could you respond (sic) to that?
7  Q.  Maybe we can stick with your first answer
8  from this morning.
9  A.  Okay.
10  Q.  Did you ever have any discussions with
11  Mr. Halpin from March 24th, 2009, after the
12  Neuberger Berman account was sold for cash, to
13  diversify or to do something other than leaving the
14  plans invested in cash through May?
15  A.  I don't recall.
16  Q.  When you signed the investment management
17  agreement around December 5th of 2008, with
18  Mr. LaBow, dating it to November 1st of 2008, that
19  didn't change how you interacted with Mr. LaBow, did
20  it?
21  A.  It did not.
22  Q.  Did Mr. LaBow ever ask you to send the
23  investment management agreement that you had with
24  him to Citibank or National City to get his
25  authority recognized as investment manager?

---

Page 206

1  A.  I don't recall that he did.  He may have.  I
2  don't recall.
3      MR. STRAWN: Sorry to tell you,
4  Mr. DiClemente, I don't have any other questions.
5  So I'm sure Mike would be more than happy to jump in
6  here and ask some more but maybe not today.
7      MR. JOYCE: I think I will pass for
8  today.
9      MR. STRAWN: Thanks very much.  I assume
10  you're going to read and sign.
11      MR. JOYCE: Yeah, we'll read.
12      MR. STRAWN: I have to go through the
13  procurement-type people, meaning my office manager.
14  I'll figure that out when I get back to the office.
15      MR. JOYCE: You can just e-mail ours to
16  me, mini.
17      (Signature not waived.)
18      (Whereupon, the above-entitled matter
19  was concluded at 4:14 p.m.)
20          -----
21
22
23
24
25

---

Page 207

1          DEPOSITION ERRATA SHEET
2  Case Caption:
   ACOSTA
3          vs.
   WPN CORPORATION, et al.
4
   Case No. 2:14-cv-01494-NBF
5
6      DECLARATION UNDER PENALTY OF PERJURY
7          I declare under penalty of perjury
   that I have read the entire transcript of my
8  deposition taken in the above-captioned matter or
   the same has been read to me, and the same is true
9  and accurate, save and except for changes and/or
   corrections, if any, as indicated by me on the
10 DEPOSITION ERRATA SHEET hereof, with the
   understanding that I offer these changes as if
11 still under oath.
12
   Signed on the _____ day of _____, 2017.
13
14      _____
15          MICHAEL DiCLEMENTE
16
17
18
19
20
21
22
23
24
25

---

Page 208

1          DEPOSITION ERRATA SHEET
2  Page No.____ Line No.____ Change_____
                            To _____
3  Reason for change:_____
4  Page No.____ Line No.____ Change_____
                            To _____
5  Reason for change:_____
6  Page No.____ Line No.____ Change_____
                            To _____
7  Reason for change:_____
8  Page No.____ Line No.____ Change_____
                            To _____
9  Reason for change:_____
10 Page No.____ Line No.____ Change_____
                            To _____
11 Reason for change:_____
12 Page No.____ Line No.____ Change_____
                            To _____
13 Reason for change:_____
14 Page No.____ Line No.____ Change_____
                            To _____
15 Reason for change:_____
16 Page No.____ Line No.____ Change_____
                            To _____
17 Reason for change:_____
18 Page No.____ Line No.____ Change_____
                            To _____
19 Reason for change:_____
20 Page No.____ Line No.____ Change_____
                            To _____
21 Reason for change:_____
22
23 SIGNATURE:_____DATE:_____
          MICHAEL DiCLEMENTE
24 NOTARY SIGNATURE:_____DATE:_____
   My Commission Expires:_____
25

---

Case 2:14-cv-01494-NBF  Document 184-12  Filed 09/25/18  Page 55 of 55

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Michael DiClemente
September 26, 2017

Page 209

1    COMMONWEALTH OF PENNSYLVANIA)
2    COUNTY OF ALLEGHENY        )

3         I, Constance Lee, Registered
     Professional Reporter and Notary Public in and for
4    the Commonwealth of Pennsylvania, do hereby
     certify that the witness was by me first duly
5    sworn to testify the truth, the whole truth, and
     nothing but the truth; that the foregoing
6    deposition was taken at the time and place stated
     herein; and that the said deposition was recorded
7    stenographically by me and then reduced to
     typewriting under my direction, and constitutes a
8    true record of the testimony given by said
     witness, all to the best of my skill and ability.
9
          I further certify that the inspection,
10   reading and signing of said deposition were not
     waived by counsel for the respective parties and
11   by the witness and if after 30 days the transcript
     has not been signed by said witness that the
12   witness received notification and has failed to
     respond and the deposition may then be used as
13   though signed.

14        I further certify that I am not a
     relative, or employee of either counsel, and that
15   I am in no way interested, directly or indirectly,
     in this action.
16
          IN WITNESS WHEREOF, I have hereunto set
17   my hand and affixed my seal of office this 11th
     day of October, 2017.
18

19

20        _____

21        Constance Lee, RPR, CSR(IL)
          NCRA Realtime Systems Administrator
22

23

24

25