## Michael DiClemente - Quarterly Investment Performance Reports for 1Q 2008

| | |
|---|---|
| **From:** | Michael DiClemente |
| **To:** | Halpin, Dennis; Luptak, David; Mooney, Paul; Pilewicz, J. Gregory |
| **Date:** | 7/28/2008 9:28 AM |
| **Subject:** | Quarterly Investment Performance Reports for 1Q 2008 |
| **CC:** | Sullivan, James |
| **Attachments:** | Notice from Citibank Regarding Discontinuation of Trust Services (07-16-08).pdf; Notice from Citibank Regarding Discontinuation of Trust Services (07-16-08).pdf |

Gentlemen

The performance reports for periods ending 1Q 2008 for our two 401(k) plans (one bound copy), the defined contribution plans (one bound copy) and the defined benefit plan (one bound copy) will be delivered to your office today. As done in the past, I reviewed (and in this case also discussed) the reports with Mercer on behalf of the Retirement Committee.

Following are observations:.

**401(k) Plans**

Funds of note relative to performance include:

John Hancock Classic Value Fund (domestic large cap value equity fund)
The John Hancock Classic Value Fund, which is in both the Management and Union Plans, has not met its index and peer group performance benchmarks for all trailing periods ending March 31, 2008. Although the Fund has outperformed its index and peer group in five of the last eight years ending March 31, 2008, most recent performances starting in 2006 and continuing through 1Q 2008 have significantly contributed to overall underperformance. We had placed Hancock on "watch" in 1Q 2007.

As previously advised, Mercer had met with Pzena, the manager of the Fund, in February 2008 and learned that the underperformance has been due to the team's overweighted position in financial stocks, which Pzena still believes have opportunities for outperformance and continues to invest with its convictions. Mercer does not anticipate recommending a change in their rating of this fund and will continue to monitor performance.

I questioned Mercer about the lack of any further discussion or recommendation for any action regarding the fund considering both the length of time that it has been on "watch" as well as the magnitude by which it has underperformed relative to both its peer group and index benchmarks. Mercer reiterated that Hancock is generally a volatile fund due to its position in financial stocks and that as soon as financials start performing well fund performance will return. When I indicated that other large cap value funds would generally have a position in financials (which they acknowledged) and that Hancock compares poorly to its peers, I was advised that Hancock has an overweighted position in financials relative to its peers. They are reluctant to recommend that it be replaced just yet, and suggested that we re-evaluate the fund after a couple more quarters. (See further discussion under "Transition to Severstal".)

Franklin Small-Mid Cap Growth Fund (domestic small to mid cap growth fund)
At the Retirement Committee meeting in July 2006, we pointed out that the trend of the Franklin Small-Mid Cap Growth Fund, which is in the Union Plan, was unfavorable and suggested to Mercer that we consider putting this fund on "watch". Franklin has underperformed its index and peer group for all trailing periods ending March 31, 2008. Mercer had since removed Franklin from the "watch" list through December 2007 (which they indicated was an oversight), but recently put the fund back on "watch" in 1Q 2008.

I also challenged Mercer on this fund as well, citing the duration of underperformance (longer than Hancock's) as well as magnitude. Mercer indicated that they would be comfortable removing Franklin at this point. (See further discussion under "Transition to Severstal".)

Also, Mercer provided selected commentary on several funds on pages 8 and 9 of the report, which are unrelated to historical performance. These comments are summarized as follows:

American Funds Growth Fund of America (domestic large cap growth fund)



Severstal 09182

This fund, which is in both plans, has performed very well on both an index and peer group universe basis for all trailing periods ending March 31, 2008. Growth Fund of America ranked in the 11th, 36th, 13th, and 7th percentiles for the quarter, and one, three, and five year periods ending March 31, 2008, also outperforming the index by an appreciable margin in all such periods. Mercer is concerned (1) that asset growth, due to positive performance itself and cash inflows resulting from such performance, will have a negative influence on performance, and (2) that an apparent lack of cohesiveness between the portfolio managers and analysts may result in less than optimal returns. Mercer has downgraded its rating from "B+" to "B".

<u>PIMCO Total Return Fund (domestic, intermediate-term fixed income fund)</u>
The PIMCO Total Return Fund, which is in both plans, has performed very well on a long-term basis. PIMCO ranked in the 4th, 2nd, 3rd, and 9th percentiles for the quarter, and one, three, and five year periods ending March 31, 2008, also outperforming the index (by a wide margin for a bond fund) in all such periods. Mercer is concerned that three Managing Directors that retired during the quarter, which PIMCO contends are independent, and which Mercer says is a continuing trend of senior management departures, may affect performance. No change in Mercer's rating is contemplated at this time. They intend to meet with PIMCO and closely monitor developments there.

<u>Lord Abbett Small Cap Blend (domestic small cap core equity fund)</u>

This fund is only in the Management Plan. Two of the five team members that manage this strategy have left the firm (for different reasons), which Mercer believes is significant. Mercer is currently evaluating the "A" rating assigned to this strategy.

All other funds are generally performing well.

**Defined Contribution Pension Plan**

Ron Labow continued his stellar performance in 1Q 2008 earning 2.5% for the quarter, outpacing the quarterly target (relative to the 8% annual return objective). This is a particularly strong result compared to the -9.4% loss posted by the S&P 500 Index for 1Q. Labow's returns rank in the 0 percentile for the first quarter of 2008 as well as for the one, two, and three years ending March 31, 2008 (first time I have ever seen this in my 20+ years of plan sponsor responsibilities), and rank in the 16th percentile for the five years ending March 31, 2008. His annualized returns for one, two, three, and five years ending March 31, 2008 are 13+% in each case, comparing very favorably to his 8.0% absolute annual return objective, as well as very favorably against the S&P 500 Index return of -5.1%, 3.0%, 5.9%, and 11.3% for one, two, three, and five years ending March 31, 2008.

As previously noted in my June 27 email, we have been advised by WHX that Citibank is exiting the trust business and that the WHX Trust must seek a replacement trustee. Since our pension plans are included in the WHX Trust, along with the much larger WHX Plan, WHX advised that they have been unable to find a successor trustee to hold the assets of a common commingle trust fund (which is the case here since the plans in the WHX Trust are sponsored by two different plan sponsors, WHX and WPSC). Therefore, we have to seek a replacement trustee on our own and according to WHX must do so by September 30, 2008. I have contacted Citibank and expressed concern about this timetable, especially in light of the merger with Severstal. They expressed some flexibility in extending the transition date, stating that they do not intend to wind up their affairs until year-end. During the call, I advised Citibank that we had yet to receive direct notice from them regarding discontinuation of their trustee services, specifically as it relates to WPSC's defined benefit plan. Subsequently, we received the attached letter dated July 16, 2008. I have a call into Mark Yost to apprise him of this activity and seek input on how to proceed.

**Defined Benefit Pension Plan**

As you know, in 4Q 2006 we implemented a new and simple, index-based investment strategy, consisting of Vanguard short-term and intermediate-term bond index funds with the balance invested in a money market fund managed by the trustee, Citibank. The fund has lagged its index by 20 basis points, which is reasonable for a bond index strategy, considering that the Vanguard funds carry a 10 bp expense ratio and that it is a little more difficult for bonds funds to replicate the index.

**Transition to Severstal**

Unless advised otherwise, we should initiate discussions with Severstal regarding a transition of responsibilities for this activity, including determining how the 401(k) plan fits within the future benefit program. Assuming the plan will continue, Severstal should, among other things, reconstitute the Retirement Committee membership. Also, one of the outstanding projects is to determine whether the Company should continue with or replace Wachovia as the service provider. If the decision is to replace Wachovia, then a determination should be made regarding the timeliness of doing so, which could impact whether the Company proceeds with the aforementioned fund replacements.

Severstal 09183

| | |
|---|---|
| **From:** | David Riposo Account Name:  Account Number:  Bloomberg UUID:  Firm Number: |
| **Sent:** | Monday, September 15, 2008 5:30 PM |
| **To:** | RON LABOW Account Name: STONEHILL INVESTMENT Account Number: 30006385 Bloomberg UUID: 41273 Firm Number: 5801 |
| **Subject:** | Severstal Wheeling |
| **Attachments:** | 578798713188001.HTM |

Ron,

I heard back from the Treasurer at Severstal Wheeling and they will be ready to divest their portion of the Common Co-mingled Group Trust as of Oct 1 per our request. They have made arrangements on a temporary basis to move the assets to another Trust account they have at Citi until they finalize selection of a new trustee. I also confirmed they will be taking their assets in cash. For planning purposes the 7/31 balances totaled $49,204,448.53.

Dave

---

David A. Riposo, CTP
Corporate Treasurer
WHX / Handy & Harman
1133 Westchester Avenue
Suite N222
White Plains, NY 10604
V: (914) 461-1264
F: (914) 696-8684
C: (203) 554-7771
DRiposo@WHXCorp.com

This e-mail is confidential and is intended only for the named recipient(s) and may contain information that is privileged, confidential work product or exempt from disclosure under applicable law. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer. Thank you.

1



EXHIBIT
2
D. Clemente
PENGAD 800-631-6989
99930755

| | |
|---|---|
| **From:** | RON LABOW Account Name: STONEHILL INVESTMENT Account Number: 30006385 |
| | Bloomberg UUID: 41273 Firm Number: 5801 |
| **Sent:** | Monday, September 15, 2008 7:11 PM |
| **To:** | DRIPOSO Account Name:  Account Number:  Bloomberg UUID:  Firm Number: |
| **Subject:** | Re:Severstal Wheeling |
| **Attachments:** | 578798713188001.HTM |

THEY MAY NOT GET CASH BUT WE SHALL SEE

1



99930379

| | |
|---|---|
| **From:** | David Riposo Account Name: Account Number: Bloomberg UUID: Firm Number: |
| **Sent:** | Tuesday, September 16, 2008 10:44 AM |
| **To:** | RON LABOW Account Name: STONEHILL INVESTMENT Account Number: 30006385 Bloomberg UUID: 41273 Firm Number: 5801 |
| **Subject:** | RE: Severstal Wheeling |

Ron ... okay, but if you plan to give them something other than cash
when will you know so you can tell them?

Dave

----------------------------------------------------------

David A. Riposo, CTP
Corporate Treasurer
WHX / Handy & Harman
1133 Westchester Avenue
Suite N222
White Plains, NY 10604
V: (914) 461-1264
F: (914) 696-8684
C: (203) 554-7771
DRiposo@WHXCorp.com

This e-mail is confidential and is intended only for the named
recipient(s) and may contain information that is privileged,
confidential work product or exempt from disclosure under applicable
law. If you have received this message in error, please immediately
notify the sender and delete this e-mail message from your computer.
Thank you.

-----Original Message-----
From: RON LABOW, STONEHILL INVESTMENT [mailto:labow@bloomberg.net]
Sent: Monday, September 15, 2008 7:11 PM
To: David Riposo
Subject: Re:Severstal Wheeling

THEY MAY NOT GET CASH BUT WE SHALL SEE

1



| | |
|---|---|
| **From:** | RON LABOW Account Name: STONEHILL INVESTMENT Account Number: 30006385 Bloomberg UUID: 41273 Firm Number: 5801 |
| **Sent:** | Tuesday, September 16, 2008 11:56 AM |
| **To:** | DRIPOSO Account Name:  Account Number:  Bloomberg UUID:  Firm Number: |
| **Subject:** | RE: Severstal Wheeling |

I SPOKE WITH MIKE AND WILL KEEP YOU POSTED

1

Severstal99929480





**Severstal**
International

September 29, 2008

Ms. Nancy Kronenberg
Citibank, N.A.
14th Floor / Zone 6
111 Wall Street
New York, New York 10043

RE:   Citibank, N.A. as Directed Trustee for Wheeling-Pittsburgh Steel Corporation Pension Plan
Trust and the WHX Pension Plan Trust

Dear Nancy:

Pursuant to the terms of the respective trust agreements, the Wheeling-Pittsburgh Steel Corporation
Retirement Committee, acting in the capacity of the Pension Investment Committee (the
"Committee"), hereby directs the Trustee to transfer the assets of the Salaried Employees' Pension
Plan of Wheeling-Pittsburgh Steel Corporation - Account Number 200505 and the Wheeling
Corrugating Company Retirement Security Plan - Account Number 200502 from the WHX Pension Plan
Trust into the Wheeling-Pittsburgh Steel Corporation Pension Plan Trust. This should be done on
September 30, 2008.

The execution of this letter shall constitute a representation that the Committee is a "named
fiduciary" of the Trust within the meaning of Section 402(a)(2) of the Employee Retirement Income
Security Act of 1974, as amended ("ERISA").

WHEELING-PITTSBURGH STEEL CORPORATION RETIREMENT COMMITTEE

By: _M. P. DiClemente_
Member of Retirement Committee

APPROVED BY THE WHX CORPORATION RETIREMENT COMMITTEE

By: _____
MEMBER , PENSION INVESTMENT
COMMITTEE

Severstal Wheeling, Inc.          T: (304) 234-2811
1134 Market Street                F: (304) 234-2555
Wheeling, WV 26003                E: Michael.DiClemente@severstal.com
                                  www.severstalna.com



Severstal 16354



**Severstal**
International

September 30, 2008

Mr. Glen Kassan
Chairman
Pension Investment Committee of WHX Corporation
WHX Corporation
1133 Westchester Avenue, Suite N-222
White Plains, NY 10604

Dear Mr. Kassan:

     I am a member of the Retirement Committee of Severstal Wheeling, Inc. with responsibility for the Salaried Employees' Pension Plan of Wheeling-Pittsburgh Steel Corporation and the Wheeling Corrugating Company Retirement Security Plan ("SWI Plans") and I am a Participating Plan Administrator as defined in Section 1.2 of the WHX Pension Plan Trust ("Trust"), established pursuant to a Trust Agreement dated as of July 1, 1998 between Citibank, N.A. and WHX Corporation. Pursuant to Section 4.4 of the aforementioned Trust Agreement, please direct Citibank, N.A. as trustee of the Trust, to transfer the assets set forth on Schedule A, in the same percentage allocations as existed in the WHX Pension Trust, on or about September 30, 2008 to account no. 312933 at Citibank, N.A., as trustee of the WPSC Pension Plan Trust. Citibank will establish a separate code within that account no. in order to segregate plan assets.

     Please indicate your acceptance of this letter of direction by your signature below.

Very truly yours,

*M. P. DiClemente*

Michael P. DiClemente

I hereby agree and acknowledge that the above instructions are true and correct.

_____
Ron LaBow, Investment Advisor

I hereby accept this letter of direction.

_____
Glenn Kassan, Chairman

Severstal Wheeling Inc.    T: (304) 234.2811
1134 Market Street      F: (304) 234.2555
Wheeling, WV 26003    E: michael.diclemente@severstalns.com
U.S.A.              www.severstal.com



EXHIBIT
7
DiClemente

99929297

```
┌─────────────────────────────────────────────────────────────┐
│                                                               │
│                        Redacted:                              │
│                 Attorney Client Privilege                     │
│                                                               │
└─────────────────────────────────────────────────────────────┘
```

>>> David Riposo <DRiposo@whxcorp.com> 9/30/2008 9:41 AM >>>

Nancy,

Attached is the executed direction letter separating the SWI and WHX plans.  Hard copy has been sent via overnight to you.

Thanks,

Dave

<<SWI-WHX Citi Direction Letter.pdf>>

────────────────────────────────

David A. Riposo, CTP

Corporate Treasurer

WHX / Handy & Harman

1133 Westchester Avenue

Suite N222

White Plains, NY 10604

V: (914) 461-1264

F: (914) 696-8684

C: (203) 554-7771

DRiposo@WHXCorp.com

This e-mail is confidential and is intended only for the named recipient(s) and may contain information that is privileged, confidential work product or exempt from disclosure under applicable law. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer. Thank you.

PLAINTIFF'S EX
11 - ID: 7-12-11

Severstal 16353

| From: | Maureen McGrath <mmcgrath@stonehillpartnerslp.com> |
|---|---|
| | [mmcgrath@stonehillpartnerslp.com] |
| Sent: | Wednesday, October 22, 2008 3:44 PM |
| To: | Michael DiClemente |
| Subject: | From Maureen at WPN Corp. |
| Attachments: | WPNwheeling102008.doc |

Please confirm receipt. Thank you.

Maureen F. McGrath
WPN Corporation
110 East 59th Street
30th Floor
New York, NY 10022
Phone: 212-771-1250
Fax: 212-355-5363

1



EXHIBIT
8
DiClemente
PENGAD 800-631-6989
10-26-17
Severstal 17382

*WPN Corporation*
*110 East 59ᵗʰ Street*
*30ᵗʰ Floor*
*New York, NY 10022*
*Phone: 212-771-1250*
*Fax: 212-355-5363*

October 22, 2008

Mr. Michael P. DiClemente
Member
Wheeling-Pittsburgh Steel Corporation Retirement Committee
Severstal Wheeling Inc.
1134 Market Street
Wheeling, WV 26003

Dear Michael:

As you are aware, by letter dated September 29, 2008, Citibank N.A., as trustee of the WHX Pension Plan Trust (the "Trust") was directed to transfer, on September 30, 2008, the assets of the Salaried Employees' Pension Plan of Wheeling-Pittsburgh Steel Corporation and the Wheeling Corrugating Company Retirement Security Plan (collectively, the "Plans") from the Trust into the Wheeling-Pittsburgh Steel Corporation Pension Plan Trust (the "WPSC Trust"). Please be advised that as a result of the market volatility that has continued for the past several months, such transfer of assets of the Plans did not occur. On November 3, 2008, I intend to direct the transfer of most of the assets of the plans to the WPSC Trust, with the balance to be transferred after Citibank, N.A. issues its October 31, 2008 report for the trust.

If you have any questions with respect to this matter, please call me.

Very truly yours,

Ron LaBow

Severstal 17383

| | |
|---|---|
| From: | "Kronenberg, Nancy " <nancy.kronenberg@citi.com> [nancy.kronenberg@citi.com] |
| Sent: | Monday, November 03, 2008 6:53 PM |
| To: | Michael DiClemente |
| Subject: | FW: Transfer of assets from WHX to Severstal |

-----Original Message-----
From: Kronenberg, Nancy [CMB-GTS]
Sent: Monday, November 03, 2008 1:50 PM
To: 'RON LABOW, STONEHILL INVESTMENT';
'Michael.DiClemente@severstalna.com'; 'DRiposo@whxcorp.com'
Subject: Transfer of assets from WHX to Severstal

 Good Afternoon Gentlemen,  I have contacted Russel Khanuk of Neuberger
Berman to advise him of a change of Account number and account
registration for the transfer of assets from WHX to Severstal.
Russel informed me of documentation that would be needed by Neuberger
Berman to effect the change.
Gentlemen, would you be available at 3 PM today, 11/3/08, for a
conference call with Neuberger Berman?
Please let me know.  Thank you!

*************************************************************
**********************************************
The information included with this electronic mail communication is not
being transmitted by secure means.  Citibank and its affiliates have no
responsibility for unauthorized access and/or alteration to this
communication, nor for any consequence based on or arising from your use
of information that may have been accessed or altered by any person.
*************************************************************
*******************************

1



Severstal 11545



**Severstal**
International

November 3, 2008

Nancy Kronenberg
Citibank, N.A.
111 Wall Street
14th Floor, Zone 8
New York, NY 10043

Dear Nancy:

I am a member of the Retirement Committee of Severstal Wheeling, Inc. with responsibility for the Salaried Employees' Pension Plan of Wheeling-Pittsburgh Steel Corporation and the Wheeling Corrugating Company Retirement Security Plan ("SWI Plans").

As part of transferring the assets of these plans from the WHX Corporation trust to Severstal Wheeling's existing trust at Citibank, we direct Citibank to transfer, prior to market opening on November 3, all assets in the Neuberger Berman account, number 312153, to our account number 312933.

Sincerely,

*M. P. DiClemente*

Michael P. DiClemente

c: V. D. Assetta
   R. E. Bowness
   D. P. Halpin
   T. S. Rogers
   J. R. Sullivan



Severstal Wheeling Inc.       T: (304) 234.2811
1134 Market Street            F: (304) 234.2555
Wheeling, WV 26003           E: michael.diclemente@severstalna.com
U.S.A.                        www.severstal.com

Severstal 09688

From:           Michael DiClemente
Sent:           Tuesday, November 04, 2008 3:18 PM
To:             Richard Bowness
Subject:        Direction Letter to Citibank
Attachments:    Directon Letter to Citibank (11-03-08) Draft.doc

Rick

Please review this letter, which was drafted at Nancy K's request.

I will be receiving agreements from Neuberger Berman to directly establish the investment management arrangement with us.

Mike



1

Severstal 11511

=====Begin Message=====
Message#: 107
Message Sent: 11/05/2008 12:51:36
From: Michael.DiClemente@severstalna.com|Michael DiClemente| | |
To: LABOW@Bloomberg.net|RON LABOW|STONEHILL INVESTMENT|5801|30006385
Subject: Re: FOR YOUR INFO THE TRANSFER ON OCT,31 HAS RESULTED IN A 10%

Thanks, Ron. I'm not sure how you do it, but am very appreciative of talents.

FYI, we're in the process of establishing an investment management agreement with Neuberger and Berman and I may give you call if I have any questions.

Mike




>>> "RON LABOW, STONEHILL INVESTMENT" <labow@bloomberg.net> 11/04/08 11:08 AM >>>
FOR YOUR INFO THE TRANSFER ON OCT,31 HAS RESULTED IN A 10% GAIN
AS OF TODAY'S TRADING.




=====End Message=====



| | |
|---|---|
| From: | Richard Bowness |
| Posted At: | Wednesday, November 05, 2008 2:18 AM |
| Posted To: | Inbox |
| Subject: | Re: Plan and Trust Documents - DC Plans |

The documents that you requested are attached.

Richard E. Bowness
Severstal Wheeling
Email:
Richard.Bowness@severstalna.com
Cell:
304 312-0494

>>> Michael DiClemente 11/4/2008 4:40 PM >>>
Rick

I will be forwarding copies of the documents (to you and others) that need to be completed to open up a new account with Neuberger and Berman, which Ron LaBow uses to manage some of the money in the DC plans.  N&B is looking for the trust agreement with Citibank (which will soon have to be replaced with NatCity's) as well as the plan documents for both plans.  Would you please forward these documents to me?

Thanks,

Mike



1

Severstal 11587

| | |
|---|---|
| From: | Richard Bowness |
| Sent: | Wednesday, November 12, 2008 3:46 AM |
| To: | Russel Khanuk; Michael DiClemente |
| Cc: | Charlie Diclanni |
| Subject: | RE: Plan and Trust Documents - DC Plans |
| Attachments: | WCC RSP.pdf; Salaried Employees' Pension Plan.pdf; WPSC Pension Plan Trust - Trust Agreement.pdf; IMAGE.gif |

Russel,

The executed plan documents are attached as well as the WPSC Pension Plan Trust Agreement.

Rick

Richard E. Bowness
Severstal Wheeling
Email:
Richard.Bowness@severstalna.com
Cell:
304 312-0494


>>> "Khanuk, Russel" <russel.khanuk@nb.com> 11/5/2008 1:56 PM >>>
Hi Michael,

Do you have any executed copies? The reason I ask is because I want to know who the authorized control people are. Once we get the process going, I will need to obtain copies of the executed docs in order to open the account. I don't think Neuberger's legal and compliance team will approve an account without executed copies. To my understanding, Citibank should have everything on file.

Russel Khanuk
Client Associate
Neuberger Berman Wealth Management
605 Third Ave, Floor 36
New York, NY, 10158
212-476-5606
Fax: 212-520-9485
Email: Rkhanuk@nb.com

NEUBERGER | BERMAN


From: Richard Bowness [mailto:Richard.Bowness@severstalna.com]
Sent: Tuesday, November 04, 2008 9:18 PM
To: Michael DiClemente
Subject: Re: Plan and Trust Documents - DC Plans

The documents that you requested are attached.

Richard E. Bowness
Severstal Wheeling
Email:

EXHIBIT
14
DiClemente  9-26-17
PENGAD 800-631-6989

1

Severstal 12172

| | |
|---|---|
| **From:** | "Khanuk, Russel" <russel.khanuk@nb.com> [russel.khanuk@nb.com] |
| **Sent:** | Thursday, November 13, 2008 2:32 PM |
| **To:** | Charlie Diccianni; Michael DiClemente; Richard Bowness |
| **Subject:** | RE: Plan and Trust Documents - DC Plans |
| **Attachments:** | ATT3453818.gif; nb_logo_trans.gif |

Hi Michael,

Hope all is well. Thank you for providing the appropriate documents. I had my compliance team review all the docs and to my understanding, we have everything we need in terms of company documents. The last step is for you to fill out the packet I sent and provide a signature list of the authorized control people. Please let me know if I can be of any help.

Thank You

Russel Khanuk
Client Associate
Neuberger Berman Wealth Management
605 Third Ave, Floor 36
New York, NY, 10158
212-476-5606
Fax: 212-520-9485
Email: Rkhanuk@nb.com



**From:** Michael DiClemente [mailto:Michael.DiClemente@severstalna.com]
**Sent:** Wednesday, November 12, 2008 12:57 PM
**To:** Bowness, Richard; Diccianni, Charlie
**Cc:** Khanuk, Russel
**Subject:** RE: Plan and Trust Documents - DC Plans

Charlie and Russel

We are also forwarding the second amendment and accompanying documents to the WCC Retirement Security Plan.

Mike

Attachments (3)


>>> "Diccianni, Charlie" <CDiccianni@nb.com> 11/12/2008 8:40 AM >>>

Thank you very much. We will have our compliance review today.  Best regards,  Charlie

NEUBERGER | BERMAN

1

EXHIBIT
15
DiClemente 9-26-17
PENGAD 800-631-6989

Severstal 12007

=====Begin Message=====
Message#: 19
Message Sent: 11/24/2008 16:53:25
From: Michael.DiClemente@severstalna.com|Michael DiClemente| | |
To: LABOW@Bloomberg.net|RON LABOW|STONEHILL INVESTMENT|5801|30006385
Attachment: 2299199056417001.HTM
FileID: 492B225700001C8007F5454D.HTM
Attachment: WI_Comments_to_Third_Amendment_to.doc
FileID: 492B2258000010B307E4131C.doc
Subject: Third Amendment to Investment Consulting Agreement

Hi Ron

Awhile back you faxed to us a marked-up version of the Second Amendment to the Investment
Consulting Agreement that you used as a base to create the third amendment, which will now be
directly with Severstal Wheeling, Inc.

We took that document and put it into an electronic form that both captured your comments (in
marked form) and includes our comments (also in marked form).

Please review the document to assure that we captured your comments as well as to review our
recommended changes.  If acceptable, I can provide a clean copy for execution.

Hope all is well and Happy Thanksgiving.

Thanks,

Mike


=====End Message=====



**From:** "RON LABOW, STONEHILL INVESTMENT" <labow@bloomberg.net>
[labow@bloomberg.net]
**Sent:** Wednesday, December 03, 2008 5:48 PM
**To:** Michael DiClemente
**Subject:** Re:Third Amendment to Investment Consulting Agreement

Severstall_Wheelin 2146181377381001
g__-_Investm...          .HTM

PLS FAX TO 212 355 5363 AND I WILL SIGN—DATE IS NOV 1 2008



severstal 12394

Ron

As requested, I just sent you the final version of the Third Amendment by fax.  Also for your convenience, I've attached an electronic copy to this email.

I'll sign and send two originals for your signature.  What address should I use?  Please return one to my attention at:

Michael P. DiClemente
Severstal Wheeling, Inc.
1134 Market Street
Wheeling, WV  26003

Also, what date do you believe should be used for the amendment?

Mike

304-234-2811 (office)
412-480-2966 (cell)


Attachment (1)




>>> "RON LABOW, STONEHILL INVESTMENT" <labow@bloomberg.net> 11/25/2008 5:53 PM >>>
NO PROBLEM -THANKS

Severstal 12395

# THIRD AMENDMENT
# TO THE
# SEVERSTAL WHEELING, INC.

## INVESTMENT MANAGEMENT AGREEMENT

This Third Amendment ("Amendment") to the Investment Management Agreement ("Agreement), formerly known as the WHX Corporation Investment Consulting Agreement, dated the first day of February, 2004, by and between WPN Corp. ("Consultant") and Severstal Wheeling, Inc. ("SWI", as successor to Wheeling-Pittsburgh Steel Corporation), on behalf of the Wheeling-Pittsburgh Steel Corporation Pension Plan Trust, is effective _____, 2008.

## WITNESSETH:

WHEREAS, pursuant to the Agreement, Wheeling-Pittsburgh Steel Corporation, predecessor of SWI, retained the Manager to provide investment management services for the Salaried Employees' Pension Plan of Wheeling-Pittsburgh Steel Corporation and the Wheeling Corrugating Company Retirement Security Plan (collectively, the "Pension Plans");

WHEREAS, the Agreement has previously been amended; .

WHEREAS, the parties wish to further amend the Agreement, among other things, to allow the Consultant to expand his current engagement;

WHEREAS, Section 20 of the Agreement provides that the parties may amend the Agreement, and

NOW THEREFORE, the parties agree to amend the Agreement as follows:

[Page]

severstal 12396

1. The Agreement shall be renamed the "Severstal Wheeling, Inc. Investment Management Agreement" and all references to "Consultant" shall be deleted and "Manager" shall be substituted therefore.

2. Section 3 of the Agreement shall be deleted in its entirety and the following shall be substituted therefore:

> "3. **Manager's Representation and Warranties.** The Manager hereby represents and warrants to the Client and the SWI Retirement Committee ("Committee") that, as of the date hereof and continuing each day throughout the term of the Agreement:
>
> (a) The Manager is a New York corporation, duly organized, validly existing and in good standing under the laws of the State of New York, has the power, authority and legal right to own its assets and to transact the business it is engaged in, and is duly qualified to do business and is in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of business requires such qualification;
>
> (b) The Manager has full power and authority to enter into and execute, deliver and perform fully the terms of the Agreement and that the Agreement shall be binding upon the Manager in accordance with the terms hereof, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law);
>
> (c) The Manager has taken all necessary actions to authorize the execution, delivery and performance of the Agreement;
>
> (d) the Agreement has been duly executed and delivered on behalf of the Manager;
>
> (e) the Manager is registered with the SEC as an investment adviser under the Investment Advisers Act of 1940;
>
> (f) the Manager maintains policies and procedures reasonably designed to comply, in all material respects, with all applicable laws, rules and regulations, including, without limitation, anti-money laundering rules and regulations in the United States with respect to the Manager;

[Page]

Severstal 12397

(g)      the execution, delivery and performance by the Manager of the Agreement does not and will not violate (i) the organizational or governing documents of the Manager or (ii) any law, treaty, rule or regulation (including any applicable licensing or registration requirements), and the Manager is not, to the best of its knowledge, the subject of any formal or informal investigation of or violation of any applicable law, rule or regulation or subject to a prohibition or suspension of trading or other determination of an arbitrator or privileges on any securities exchange, board of trade or other organized market, court or other government authority applicable or binding upon the Manager or any of its property or to which the Manager or any of its property is bound;

(h)      the execution, delivery and performance by the Manager of the Agreement will not result in, or require, the creation or imposition of any lien on any of its property, assets or revenues;

(i)       no litigation, proceeding or investigation (formal or informal) of or before any arbitrator or government authority is pending or, to the Manager's best knowledge, threatened (i) asserting the invalidity or unenforceability of the Agreement, (ii) seeking to prevent the consummation of any transactions contemplated by the Agreement or (iii) seeking any determination or ruling that would reasonably be expected to have an adverse effect on the ability of the Manager to perform its obligations under the Agreement;

(j)       the Manager and its principals have and will maintain during the term of the Agreement, all governmental, regulatory and exchange licenses, registrations and approval required by law as may be necessary to perform its obligations under the Agreement, and will maintain during the term of the Agreement, all filings and registration with governmental and regulatory authorities necessary or required in order to perform its obligations hereunder;

(k)      except as otherwise provided herein or with the prior written consent of the Committee, the Manager shall manage the Investment Fund in accordance with the provisions and requirements provided in the investment guidelines of the Pension Plans and under no circumstances shall it engage in any conduct which violates any provision or requirement provided in such investment guidelines without the written consent of the Committee;

(l)       Ron LaBow has the primary responsibility for performing the services of the Manager with respect to the Investment Fund and the Manager shall notify the Committee if there is any change with respect to LaBow's responsibilities with respect to the Investment Fund or the Manager, or if there is any change with respect to the Manager's directors,

[Page]

Severstal 12398

officers or employees with responsibility for decisions regarding the Investment Fund or a material change in the control of the Manager;

(m)     the Manager has not received any payment or other form of compensation or commission (including "soft dollar" payments), directly or indirectly from any broker with respect to its management of the Investment Fund, other than such soft dollar payments that comply with the requirements of Section 28(e) of the Securities Exchange Act of 1934, as amended or as otherwise consented to by the Committee in writing; and

(n)     all actions taken by the Manager under this Agreement shall be in accordance with ERISA and the Manager acknowledges that it is a fiduciary acting within the scope of Section 3(38) of ERISA.

3.     The last sentence of Section 4 of the Agreement shall be deleted.

4.     The last sentence of Section 6 of the Agreement shall be deleted.

5.     Sections 7 through 16 of the Agreement shall be redesignated as Sections 8 through 27 of the Agreement respectively, all cross-references thereto shall be modified accordingly and a new Section 7 of the Agreement shall be added to read as follows:

"7. Appointment of Designated Managers. Pursuant to the terms of the Pension Plans, the Committee hereby appoints the Manager as a "Named Fiduciary" of the Pension Plans for purposes of selecting and designating other investment managers ("Designated Managers") to manage, acquire and dispose of all or a portion of the Investment Fund, including, without limitation, through private pooled investments and the purchase with the Investment Fund of securities of entities or interests in common or collective trust funds or group trusts exempt from taxation under Internal Revenue Service Revenue Ruling 81-100, 1981-1 .B. 326, as modified by Revenue Ruling 2004-67, 2004-28 I.R.B. 28, managed by such Designated Managers.  Except as may be permitted by the Committee from time to time, the Manager shall use commercially reasonable efforts to ensure that at least seventy five percent (75%) of the Investment Fund is placed with Designated Managers at any one time.  The Pension Plans shall be responsible for the payment of all fees and expenses associated with such investments, which may include management fees, performance-based compensation and expenses related to investments.  Certain Designated Managers may be managers of "funds of funds", whereby the portion of the Investment Fund invested with such funds managed by such Designated Managers is invested in other pooled investment accounts."

[Page]

Severstal 12399

6.    Sections 15 through 27 of the Agreement, determined after the fifth paragraph hereof, shall be redesignated as Sections 17 through 29 of the Agreement, respectively, all cross-references thereto shall be modified accordingly, and new Sections 15 through 16 of the Agreement shall be added to read as follows:

"15.    Cooperation with Auditors.  In connection with the audit of the Pension Plans or the related Pension Plans Trust (collectively, "Program") including any audit by the Internal Revenue Service, the Department of Labor or the Pension Benefit Guaranty Corporation, the Manager shall use commercially reasonable efforts to cooperate with the auditors as may be reasonably necessary in connection with such audit in connection with the Investment Fund.  In connection with the foregoing, the auditors may request in writing that the manager provide the auditors with information concerning specific investments made on behalf of the Investment Fund which are also made by the Manager or it affiliates on behalf of other accounts they manage.  Such information shall be true and correct and shall be limited to that which is necessary to provide the auditors with a reasonable statistical sample only for purposes of conducting its audit of the Program.  Nothing in the Agreement shall require the Manager to prepare any tax work, financial statements or supporting schedules in connection with the audit or otherwise or permit the Committee, the Trustee or the auditors to have access to the Manager's business offices to examine any book, record, or both; provided, however, that such access will be permitted to the Program's auditors (i) upon the Committee's reasonable prior notice to the Manager, during the Manager's normal business hours and on such date (or dates) as reasonably determined by the Manager, (ii) limited to the Manager's books and records relating solely to the Investment Fund and relating solely to the performance and trade allocations of the Program, and (ii) solely in connection with the Program's audit.

"16.    Indemnification.

        (a)     SWI agrees to indemnify and hold harmless the Manager and its affiliates and their respective directors, officers and employees, from and against any losses, expenses, judgments, disbursements, suits, claims, liabilities, obligations, fines, penalties, charges, settlement costs, fees and related expenses (including attorneys' fees, paralegal fees and expenses), costs, damages and interest on any of the foregoing (collectively, "Damages") that are imposed upon or incurred by the Manager and its affiliates and their respective directors, officers and employees, as a result of SWI's or the Committee's breach of its representations and warranties made under the Agreement.  Without limiting the generality of the foregoing, SWI and the Committee shall have no responsibility and shall incur no liability whatsoever under the Agreement for any loss or other damages that have resulted from the Manager's or the Manager's directors',

[Page]

severstal 12400

officers' or employees' (i) bad faith, (ii) fraud, (iii) willful misconduct or (vi) reckless disregard of such Manager's duties and obligations hereunder.

(b)     Manager hereby agrees to indemnify and hold harmless the Client, the Committee, and each of SWI's directors, officers and employees and any person who was at the time in question such a person (each, an "Indemnified Person") from and against Damages in connection with any action, suit, claim, inquiry, investigation, appeal or other proceeding, whether civil or criminal, whether pending or threatened, whether or not the Indemnified Person is or may be a party thereto, before any court or administrative or investigative body by reason of any of Manager's acts, errors, or omissions committed in the scope of performance of Manager's duties in connection with the Agreement that are a result of negligence, willful misconduct, fraud or reckless disregard of the duties and obligations of the Manager undertaken by it under the provisions of the Agreement.  Without limiting the generality of the foregoing, the Manager shall have no responsibility and shall incur no liability whatsoever under the Agreement and for any loss or other damages that shall have resulted from such Indemnified Person's (i) bad faith, (ii) fraud, (iii) willful misconduct or (iv) reckless disregard of such Indemnified person's duties and obligations hereunder.

(c)     Manager agrees to reasonably cooperate fully with the Indemnified Persons in responding to any threatened or actual claims.  If an Indemnified Person under this Section 16 is reasonably required to bring any action to enforce rights or collect monies due under this Section and is successful in such action, Manager shall reimburse such Indemnified Person or its subrogee for reasonable fees (including attorneys' fees, paralegal fees and expenses) incurred in bringing and pursuing such action.  Indemnification pursuant to this Section 16 is intended to be supplemental to any other rights to indemnification available to the Indemnified Persons.  Nothing herein shall be deemed to diminish or otherwise restrict the Indemnified Persons' rights to indemnification under applicable laws.

(d)     In the absence of agreement between the parties hereto to the contrary, each party shall prosecute its own defense of any third party cause of action involving the determination of the rights or obligations of any third party making any claim pursuant to the Agreement, the Program, or any local, state or federal law.  Each party hereto shall have sole authority to select its counsel in any such proceeding.  The Manager shall use its best efforts to obtain the cooperation of its employees and agents in the defense of any litigation arising in connection with the Agreement.  Further, SWI shall retain sole and final authority with regard to any settlement of any claim or portion thereof to the extent that the same involves benefits payable or alleged to be payable under the Pension Plans. The right of a party hereto to be indemnified and held harmless by the other party shall not be abridged or otherwise compromised by its prosecution of its own defense in any action, but no settlement may occur without the consent of the indemnifying party which consent may not be unreasonably withheld.

[Page]

Severstal 12401

(e)    The conditions of the foregoing defense, indemnity and hold harmless covenant are that (i) the Indemnified Persons shall inform the Manager within a reasonable period of time of any claims threatened or made against any Indemnified Person, (ii) the Indemnified Persons shall reasonably cooperate with Manager in responding to such threatened or actual claims, (iii) any settlement agreement shall require the written approval of Manager, which consent shall not be unreasonably withheld or delayed and (iv) as to attorneys' fees, the provision of Section 16(c) have been fulfilled."

7.    Section 17 of the Agreement (determined after the fifth and sixth paragraphs hereto) shall be amended by adding the following sentence at the end thereof:

"The Manager agrees to comply with regulations issued by the Department of Labor, as issued from time to time, with respect to fee and conflict of interest disclosure (without regard to the effective date of such regulations)."

8.    Section 25 of the Agreement (determined after the fifth and sixth paragraphs hereto) shall be amended by adding the following at the end thereof:

"If to Committee:

SWI Retirement Committee

c/o Severstal Wheeling, Inc.

1134 Market Street

Wheeling, WV 28113

Each party may change its address by giving written notice of such to the other parties."

9.    Exhibit A shall be amended to read as follows:

"Manager will be paid .90% per year, charged 1/12th monthly, of the fair market value of the Investment Fund, such fair market value to be determined based on the Trustee's accounting as of the last business day of such month"

10.    As hereby amended, the Agreement shall continue in full force and effect.

[Page]

Severstal 12402

IN WITNESS WHEREOF, the parties have executed this amendment as of the date written above.

By:_____

Name:_____

Title:_____


By:_____

Name:_____

Title:_____

s6613394.2

[Page]

Severstal 12403

| From: | "RON LABOW, STONEHILL INVESTMENT" <labow@bloomberg.net> [labow@bloomberg.net] |
|---|---|
| Sent: | Tuesday, November 25, 2008 10:53 PM |
| To: | Michael DiClemente |
| Subject: | Re:Third Amendment to Investment Consulting Agreement |

1173403025629001 .HTM

NO PROBLEM -THANKS

1

severstal 12404

Ron

I haven't forgotten about you.  When I tried to create an execution copy, I ran into technical difficulties and am now seeking assistance.  Since I won't be in the office for the balance of the week, I'll send it early next week.

Mike

>>> "RON LABOW, STONEHILL INVESTMENT" <labow@bloomberg.net> 11/25/2008 10:40 AM >>>
IT LOOKS FINE--PLS SEND BY FAX A CLEAN COPY TO 561 514 3016

Severstal 12405

| | |
|---|---|
| **From:** | "RON LABOW, STONEHILL INVESTMENT" <labow@bloomberg.net> [labow@bloomberg.net] |
| **Sent:** | Tuesday, November 25, 2008 3:40 PM |
| **To:** | Michael DiClemente |
| **Subject:** | Re:Third Amendment to Investment Consulting Agreement |

WI_Comments_to_2299199056417001
Third_Amendment...               .HTM

IT LOOKS FINE--PLS SEND BY FAX A CLEAN COPY TO 561-514-3016

1

Severstal 12406

# THIRD AMENDMENT
# TO THE
# ~~WHX CORPORATION~~
# <u>SEVERSTAL WHEELING, INC.</u>

## INVESTMENT CONSULTING AGREEMENT

This ~~third amendment~~<u>Third Amendment</u> ("Amendment") to the <u>Investment Consulting Agreement ("Agreement), formerly known as the</u> WHX Corporation Investment Consulting Agreement ~~("Agreement)~~, dated the <u>first</u>~~fist~~ day of February, 2004, by and between WPN Corp. ("Consultant") and ~~WHX~~<u>Severstal Wheeling, Inc. ("SWI", as successor to Wheeling-Pittsburgh Steel</u> Corporation), on behalf of ~~WHX~~ <u>the Wheeling-Pittsburgh Steel Corporation</u> Pension Plan Trust, is effective _____, 2008.

## WITNESSETH:

**WHEREAS**, pursuant to the Agreement, ~~WHX Corporation retained the Consultant~~<u>Wheeling-Pittsburgh Steel Corporation, predecessor of SWI, retained the Manager</u>~~Consultant~~ <u>to provide investment management services for the Wheeling-Pittsburgh Steel Corporation Pension Plan</u>~~, Schedule A (Supplemental Pension Plan for Salaried Employees of Wheeling-Pittsburgh Steel Corporation) and the Salaried Employees' Pension Plan of Wheeling-Pittsburgh Steel Corporation <u>and the Wheeling Corrugating Company Retirement Security Plan (collectively, the "Pension Plans")</u>;

**WHEREAS**, the Agreement has previously been amended;

**WHEREAS**, the parties wish to further amend the Agreement, among other things, to allow the Consultant to expand his current engagement;

**WHEREAS**, Section 20 of the Agreement provides that the parties may amend the Agreement, and

**NOW THEREFORE**, the parties agree to amend the Agreement as follows:

[Page]

Severstal 12408

1. The Agreement shall be renamed the "~~WHX Corporation~~SWISeverstal Wheeling, Inc. Investment Management Agreement" and all references to "Consultant" shall be deleted and "Manager" shall be substituted therefore.

2. Section 3 of the Agreement shall be deleted in its entirety and the following shall be substituted therefore:

"3. **Manager's Representation and Warranties.** The Manager hereby represents and warrants to the Client and the ~~WHX Corporation pension~~SWL RetirementPension Investment Committee ("Committee") that, as of the date hereof and continuing each day throughout the term of the Agreement:

(a) The Manager is a New York corporation, duly organized, validly existing and in good standing under the laws of the State of New York, has the power, authority and legal right to own its assets and to transact the business it is engaged in, and is duly qualified to do business and is in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of business requires such qualification;

(b) The Manager has full power and authority to enter into and execute, deliver and perform fully the terms of the Agreement and that the Agreement shall be binding upon the Manager in accordance with the terms hereof, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law);

(c) The Manager has taken all necessary actions to authorize the execution, delivery and performance of the Agreement;

(d) the Agreement has been duly executed and delivered on behalf of the Manager;

(e) the Manager is registered with the SEC as an investment adviser under the Investment Advisers Act of 1940;

(f) the Manager maintains policies and procedures reasonably designed to comply, in all material respects, with all applicable laws, rules and regulations, including, without limitation, anti-money laundering rules and regulations in the United States with respect to the Manager;

[Page]

Severstal 12409

(g)    the execution, delivery and performance by the Manager of the Agreement does not and will not violate (i) the organizational or governing documents of the Manager or (ii) any law, treaty, rule or regulation (including any applicable licensing or registration requirements), and the Manager is not, to the best of its knowledge, the subject of any formal or informal investigation of or violation of any applicable law, rule or regulation or subject to a prohibition or suspension of trading or other determination of an arbitrator or privileges on any securities exchange, board of trade or other organized market, court or other government authority applicable or binding upon the Manager or any of its property or to which the Manager or any of its property is bound;

(h)    the execution, delivery and performance by the Manager of the Agreement will not result in, or require, the creation or imposition of any lien on any of its property, assets or revenues;

(i)    no litigation, proceeding or investigation (formal or informal) of or before any arbitrator or government authority is pending or, to the Manager's best knowledge, threatened (i) asserting the invalidity or unenforceability of the Agreement, (ii) seeking to prevent the consummation of any transactions contemplated by the Agreement or (iii) seeking any determination or ruling that would reasonably be expected to have an adverse effect on the ability of the Manager to perform its obligations under the Agreement;

(j)    the Manager and its principals have and will maintain during the term of the Agreement, all governmental, regulatory and exchange licenses, registrations and approval required by law as may be necessary to perform its obligations under the Agreement, and will maintain during the term of the Agreement, all filings and registration with governmental and regulatory authorities necessary or required in order to perform its obligations hereunder;

(k)    except as otherwise provided herein or with the prior written consent of the Committee, the Manager shall manage the Investment Fund in accordance with the provisions and requirements provided in the investment guidelines of the ~~WHX~~ Pension Plans and under no circumstances shall it engage in any conduct which violates any provision or requirement provided in such investment guidelines without the written consent of the Committee;

(l)    Ron LaBow has the primary responsibility for performing the services of the Manager with respect to the Investment Fund and the Manager shall notify the Committee if there is any change with respect to LaBow's responsibilities with respect to the Investment Fund or the Manager, or if there is any change with respect to the Manager's directors,

[Page]

Severstal 12410

officers or employees with responsibility for decisions regarding the Investment Fund or a material change in the control of the Manager;

(m)   the Manager has not received any payment or other form of compensation or commission (including "soft dollar" payments), directly or indirectly from any broker with respect to its management of the Investment Fund, other than such soft dollar payments that comply with the requirements of Section 28(e) of the Securities Exchange Act of 1934, as amended or as otherwise consented to by the Committee in writing; and

(n)   all actions taken by the Manager under Section 6.7 and 8 hereofthis Agreement shall be in accordance with_ERISA and the Manager acknowledges that it is a fiduciary acting within the scope of Section 3(38) of ERISA.

3.   The last sentence of Section 4 of the Agreement shall be deleted.

4.   The last sentence of Section 6 of the Agreement shall be deleted.

5.   Sections 7 through 16 of the Agreement shall be redesignated as Sections 8 through 27 of the Agreement respectively, all cross-references thereto shall be modified accordingly and a new Section 7 of the Agreement shall be added to read as follows:

"7. Appointment of Designated Managers.  Pursuant to the terms of the WHX Pension PlanPlans, the Committee hereby appoints the Manager as a "Named fiduciaryFiduciary" of the WHX Pension PlanPlans for purposes of selecting and designating other investment managers ("Designated Managers") to manage, acquire and dispose of all or a portion of the Investment Fund, including, without limitation, through private pooled investments and the purchase with the Investment Fund of securities of entities or interests in common or collective trust funds or group trusts exempt from taxation under Internal Revenue Service Revenue Ruling 81-100, 1981-1 .B. 326, as modified by Revenue Ruling 2004-67, 2004-28 I.R.B. 28, managed by such Designated Managers.  Except as may be permitted by the Committee from time to time, the Manager shall use commercially reasonable efforts to ensure that at least seventy five percent (75%) of the Investment Fund is placed with Designated Managers at any one time.  The WHX Pension PlanPlans shall be responsible for the payment of all fees and expenses associated with such investments, which may include management fees, performance-based compensation and expenses related to investments.  Certain Designated Managers may be managers of "funds of funds", whereby the portion of the Investment Fund invested with such funds managed by such Designated Managers is invested in other pooled investment accounts."

[Page]

severstal 12411

6.     Sections 15 through 27 of the Agreement, determined after the fifth paragraph hereof, shall be redesignated as Sections 17 through 29 of the Agreement, respectively, all cross-references thereto shall be modified accordingly, and new Sections 15 through 16 of the Agreement shall be added to read as follows:

"15.     Cooperation with Auditors.  In connection with the audit of the WHX Pension PlanPlans or the WHXrelated Pension PlanPlans Trust (collectively, "Program") including any audit by the Internal Revenue Service, the Department of Labor or the Pension Benefit Guaranty Corporation, the Manager shall use commercially reasonable efforts to cooperate with the auditors as may be reasonably necessary in connection with such audit in connection with the Investment Fund.  In connection with the foregoing, the auditors may request in writing that the manager provide the auditors with information concerning specific investments made on behalf of the Investment Fund which are also made by the Manager or it affiliates on behalf of other accounts they manage.  Such information shall be true and correct and shall be limited to that which is necessary to provide the auditors with a reasonable statistical sample only for purposes of conducting its audit of the Program.  Nothing in the Agreement shall require the Manager to prepare any tax work, financial statements or supporting schedules in connection with the audit or otherwise or permit the Committee, the Trustee or the auditors to have access to the Manager's business offices to examine any book, record, or both; provided, however, that such access will be permitted to the Program's auditors (i) upon the Committee's- reasonable prior notice to the Manager, during the Manager's normal business hours and on such date (or dates) as reasonably determined by the Manager, (ii) limited to the Manager's books and records relating solely to the Investment Fund and relating solely to the performance and trade allocations of the Program, and (ii) solely in connection with the Program's audit.

"16.     Indemnification.

(a)     WHX CorporationSWI agrees to indemnify and hold harmless the Manager and its affiliates and their respective directors, officers and employees, from and against any losses, expenses, judgments, disbursements, suits, claims, liabilities, obligations, fines, penalties, charges, settlement costs, fees and related expenses (including attorneys' fees, paralegal fees and expenses), costs, damages and interest on any of the foregoing (collectively, "Damages") that are imposed upon or incurred by the Manager and its affiliates and their respective directors, officers and employees, as a result of WHX CorporationSWI's or the Committee's breach of its representations and warranties made under the Agreement.  Without limiting the generality of the foregoing, WHX CorporationSWI and the Committee shall have no responsibility and shall incur no liability whatsoever under the Agreement for any loss or other

[Page]

damages that have resulted from the Manager's or the Manager's directors', officers' or employees' (i) bad faith, (ii) fraud, (iii) willful misconduct or (vi) reckless disregard of such Manager's duties and obligations hereunder.

(b)                    Manager hereby agrees to indemnify and hold harmless the Client, the Committee, and each of ~~WHX Corporation~~SWI's directors, officers and employees and any person who was at the time in question such a person (each, an "Indemnified Person") from and against Damages in connection with any action, suit, claim, inquiry, investigation, appeal or other proceeding, whether civil or criminal, whether pending or threatened, whether or not the Indemnified Person is or may be a party thereto, before any court or administrative or investigative body by reason of any of Manager's acts, errors, or omissions committed in the scope of performance of Manager's duties in connection with the Agreement that are a result of negligence, willful misconduct, fraud or reckless disregard of the duties and obligations of the Manager undertaken by it under the provisions of the Agreement.  Without limiting the generality of the foregoing, the Manager shall have no responsibility and shall incur no liability whatsoever under the Agreement and for any loss or other damages that shall have resulted from such Indemnified Person's (i) bad faith, (ii) fraud, (iii) willful misconduct or (iv) reckless disregard of such Indemnified person's duties and obligations hereunder.

(c)        Manager agrees to reasonably cooperate fully with the Indemnified Persons in responding  to any threatened or actual claims.  If an Indemnified Person under this Section 16 is reasonably required to bring any action to enforce rights or collect monies due under this Section and is successful in such action, Manager shall reimburse such Indemnified Person, or its subrogee for reasonable fees (including attorneys' fees, paralegal fees and expenses) incurred in bringing and pursuing such action.  Indemnification pursuant to this Section 16 is intended to be supplemental to any other rights to indemnification available to the Indemnified Persons.  Nothing herein shall be deemed to diminish or otherwise restrict the Indemnified Persons' rights to indemnification under applicable laws.

(d)        In the absence of agreement between the parties hereto to the contrary, each party shall prosecute its own defense of any third party cause of action involving the determination of the rights or obligations of any third party making any claim pursuant to the Agreement, the Program, or any local, state or federal law.  Each party hereto shall have sole authority to select its counsel in any such proceeding.  The Manager shall use its best efforts to obtain the cooperation of its employees and agents in the defense of any litigation arising in connection with the Agreement.  Further ~~WHX Corporation~~, SWI shall retain sole and final authority with regard to any settlement of any claim or portion thereof to the extent that the same involves benefits payable or alleged to be payable under the ~~WHX Pension Plan~~Plans.  The right of a party hereto to be indemnified and held harmless by the other party shall not be abridged or otherwise compromised by its prosecution of its own defense in any action, but no settlement may occur

[Page]

Severstal 12413

without the consent of the indemnifying party which consent may not be unreasonably withheld.

(e)     The conditions of the foregoing defense, indemnity and hold harmless covenant are that (i) the Indemnified Persons shall inform the Manager within a reasonable period of time of any claims threatened or made against any Indemnified Person, (ii) the Indemnified Persons shall reasonably cooperate with Manager in responding to such threatened or actual claims, (iii) any settlement agreement shall require the written approval of Manager, which consent shall not be unreasonably withheld or delayed and (iv) as to attorneys' fees, the provision of Section 16(c) have been fulfilled."

7.     Section 17 of the Agreement (determined after the fifth and sixth paragraphs hereto) shall be amended by adding the following sentence at the end thereof:

"The Manager agrees to comply with regulations issued by the Department of Labor, as issued from time to time, with respect to fee and conflict of interest disclosure (without regard to the effective date of such regulations)."

8.     Section 25 of the Agreement (determined after the fifth and sixth paragraphs hereto) shall be amended by adding the following at the end thereof:

"If to Committee:

~~WHX Corporation~~SWI Retirement~~Pension Investment~~ Committee

~~c/o WHX Corporation~~

c/o Severstal Wheeling, Inc.

1134 Market Street~~— ——— —— —~~

Wheeling, WV  28113~~——— ————~~

Each party may change its address by giving written notice of such to the other parties."

9.     Exhibit A shall be amended to read as follows:

"Manager will be paid .90% per year, charged 1/12[th] monthly, of the ~~amount~~fair_market_value of the Investment Fund, such_fair_market_value_to_be_determined_based_on_the_Trustee's_accounting_as_of_the_last_business_day_of_such_month."

[Page]

severstal 12414

10.     As hereby amended, the Agreement shall continue in full force and effect.

IN WITNESS WHEREOF, the ~~Manager and the Client~~parties have executed this amendment as of the date written above.

By:_____

Name:_____

Title:_____


By:   _____

Name:_____

Title:_____

\6613394.1
\6613394.2

[Page]

Severstal 12415

Document comparison done by DeltaView on Friday, October 17, 2008 1:01:54 PM

| Input | |
|---|---|
| Document 1 | interwovenSite://CHIDMS/Active/6613394/1 |
| Document 2 | interwovenSite://CHIDMS/Active/6613394/2 |
| Rendering set | MW Standard |

| Legend | |
|---|---|
| Insertion | |
| Deletion | |
| Moved-from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved-deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics | Count |
|---|---|
| Insertions | 33 |
| Deletions | 34 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 67 |

severstal 12416

=====Begin Message=====
Message#: 57
Message Sent: 12/05/2008 09:51:00
From: Michael.DiClemente@severstalna.com|Michael DiClemente| | |
To: LABOW@Bloomberg.net|RON LABOW|STONEHILL INVESTMENT|5801|30006385
Attachment: 1898047771715001.HTM
FileID: 49393FD6000009DA07F491DD.HTM
Attachment: ement_Agreement_dated_11-01-08_be.pdf
FileID: 49393FD7000009DA07F491E6.pdf
Subject: Fully-Executed Third Amendment to Investment ManagementAgreement

Ron

As requested, I faxed the fully-executed Third Amendment to the Investment Management Agreement
to 212-355-5363. For your convenience, I've also attached an electronic copy to this email.

Please confirm receipt.

Thanks,

Mike


=====End Message=====



=====Begin Message=====
Message#: 60
Message Sent: 12/05/2008 12:52:10
From: LABOW@Bloomberg.net|RON LABOW|STONEHILL INVESTMENT|5801|30006385
To: agingras@stonehillpartnerslp.com|AGINGRAS| | |
Attachment: 1898047771715001.HTM
FileID: 49393FD6000009DA07F491DD.HTM
Attachment: ement_Agreement_dated_11-01-08_be.pdf
FileID: 49393FD7000009DA07F491E6.pdf
Subject: Fwd:Fully-Executed Third Amendment to Investment


---- Original Message From: Michael DiClemente <Michael.DiClemente@severstalna.com> At: 12/05
9:51:00
Ron

As requested, I faxed the fully-executed Third Amendment to the Investment Management Agreement
to 212-355-5363.  For your convenience, I've also attached an electronic copy to this email.

Please confirm receipt.

Thanks,

Mike
=====End Message=====

# THIRD AMENDMENT
# TO THE
# SEVERSTAL WHEELING, INC.

## INVESTMENT MANAGEMENT AGREEMENT

This Third Amendment ("Amendment") to the Investment Management Agreement ("Agreement"), formerly known as the WHX Corporation Investment Consulting Agreement, dated the first day of February, 2004, by and between WPN Corp. ("Consultant") and Severstal Wheeling, Inc. ("SWI", as successor to Wheeling-Pittsburgh Steel Corporation), on behalf of the Wheeling-Pittsburgh Steel Corporation Pension Plan Trust, is effective _November 1_, 2008.

## WITNESSETH:

**WHEREAS,** pursuant to the Agreement, Wheeling-Pittsburgh Steel Corporation, predecessor of SWI, retained the Manager to provide investment management services for the Salaried Employees' Pension Plan of Wheeling-Pittsburgh Steel Corporation and the Wheeling Corrugating Company Retirement Security Plan (collectively, the "Pension Plans");

**WHEREAS,** the Agreement has previously been amended;

**WHEREAS,** the parties wish to further amend the Agreement, among other things, to allow the Consultant to expand his current engagement;

**WHEREAS,** Section 20 of the Agreement provides that the parties may amend the Agreement, and

**NOW THEREFORE,** the parties agree to amend the Agreement as follows:



EXHIBIT
19
DiClemente

1.      The Agreement shall be renamed the "Severstal Wheeling, Inc. Investment Management Agreement" and all references to "Consultant" shall be deleted and "Manager" shall be substituted therefore.

2.      Section 3 of the Agreement shall be deleted in its entirety and the following shall be substituted therefore:

"3.      **Manager's Representation and Warranties.**  The Manager hereby represents and warrants to the Client and the SWI Retirement Committee ("Committee") that, as of the date hereof and continuing each day throughout the term of the Agreement:

(a)      The Manager is a New York corporation, duly organized, validly existing and in good standing under the laws of the State of New York, has the power, authority and legal right to own its assets and to transact the business it is engaged in, and is duly qualified to do business and is in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of business requires such qualification;

(b)      The Manager has full power and authority to enter into and execute, deliver and perform fully the terms of the Agreement and that the Agreement shall be binding upon the Manager in accordance with the terms hereof, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law);

(c)      The Manager has taken all necessary actions to authorize the execution, delivery and performance of the Agreement;

(d)      the Agreement has been duly executed and delivered on behalf of the Manager;

(e)      the Manager is registered with the SEC as an investment adviser under the Investment Advisers Act of 1940;

(f)      the Manager maintains policies and procedures reasonably designed to comply, in all material respects, with all applicable laws, rules and regulations, including, without limitation, anti-money laundering rules and regulations in the United States with respect to the Manager;

2

(g) the execution, delivery and performance by the Manager of the Agreement does not and will not violate (i) the organizational or governing documents of the Manager or (ii) any law, treaty, rule or regulation (including any applicable licensing or registration requirements), and the Manager is not, to the best of its knowledge, the subject of any formal or informal investigation of or violation of any applicable law, rule or regulation or subject to a prohibition or suspension of trading or other determination of an arbitrator or privileges on any securities exchange, board of trade or other organized market, court or other government authority applicable or binding upon the Manager or any of its property or to which the Manager or any of its property is bound;

(h) the execution, delivery and performance by the Manager of the Agreement will not result in, or require, the creation or imposition of any lien on any of its property, assets or revenues;

(i) no litigation, proceeding or investigation (formal or informal) of or before any arbitrator or government authority is pending or, to the Manager's best knowledge, threatened (i) asserting the invalidity or unenforceability of the Agreement, (ii) seeking to prevent the consummation of any transactions contemplated by the Agreement or (iii) seeking any determination or ruling that would reasonably be expected to have an adverse effect on the ability of the Manager to perform its obligations under the Agreement;

(j) the Manager and its principals have and will maintain during the term of the Agreement, all governmental, regulatory and exchange licenses, registrations and approval required by law as may be necessary to perform its obligations under the Agreement, and will maintain during the term of the Agreement, all filings and registration with governmental and regulatory authorities necessary or required in order to perform its obligations hereunder;

(k) except as otherwise provided herein or with the prior written consent of the Committee, the Manager shall manage the Investment Fund in accordance with the provisions and requirements provided in the investment guidelines of the Pension Plans and under no circumstances shall it engage in any conduct which violates any provision or requirement provided in such investment guidelines without the written consent of the Committee;

(l) Ron LaBow has the primary responsibility for performing the services of the Manager with respect to the Investment Fund and the Manager shall notify the Committee if there is any change with respect to LaBow's responsibilities with respect to the Investment Fund or the Manager, or if there is any change with respect to the Manager's directors,

3

officers or employees with responsibility for decisions regarding the Investment Fund or a material change in the control of the Manager;

(m)   the Manager has not received any payment or other form of compensation or commission (including "soft dollar" payments), directly or indirectly from any broker with respect to its management of the Investment Fund, other than such soft dollar payments that comply with the requirements of Section 28(e) of the Securities Exchange Act of 1934, as amended or as otherwise consented to by the Committee in writing; and

(n)   all actions taken by the Manager under this Agreement shall be in accordance with ERISA and the Manager acknowledges that it is a fiduciary acting within the scope of Section 3(38) of ERISA.

3.   The last sentence of Section 4 of the Agreement shall be deleted.

4.   The last sentence of Section 6 of the Agreement shall be deleted.

5.   Sections 7 through 16 of the Agreement shall be redesignated as Sections 8 through 27 of the Agreement respectively, all cross-references thereto shall be modified accordingly and a new Section 7 of the Agreement shall be added to read as follows:

"7.  **Appointment of Designated Managers.** Pursuant to the terms of the Pension Plans, the Committee hereby appoints the Manager as a "Named Fiduciary" of the Pension Plans for purposes of selecting and designating other investment managers ("Designated Managers") to manage, acquire and dispose of all or a portion of the Investment Fund, including, without limitation, through private pooled investments and the purchase with the Investment Fund of securities of entities or interests in common or collective trust funds or group trusts exempt from taxation under Internal Revenue Service Revenue Ruling 81-100, 1981-1 .B. 326, as modified by Revenue Ruling 2004-67, 2004-28 I.R.B. 28, managed by such Designated Managers.  Except as may be permitted by the Committee from time to time, the Manager shall use commercially reasonable efforts to ensure that at least seventy five percent (75%) of the Investment Fund is placed with Designated Managers at any one time.  The Pension Plans shall be responsible for the payment of all fees and expenses associated with such investments, which may include management fees, performance-based compensation and expenses related to investments.  Certain Designated Managers may be managers of "funds of funds", whereby the portion of the Investment Fund invested with such funds managed by such Designated Managers is invested in other pooled investment accounts."

4

6.      Sections 15 through 27 of the Agreement, determined after the fifth paragraph hereof, shall be redesignated as Sections 17 through 29 of the Agreement, respectively, all cross-references thereto shall be modified accordingly, and new Sections 15 through 16 of the Agreement shall be added to read as follows:

"15.    **Cooperation with Auditors.** In connection with the audit of the Pension Plans or the related Pension Plans Trust (collectively, "Program") including any audit by the Internal Revenue Service, the Department of Labor or the Pension Benefit Guaranty Corporation, the Manager shall use commercially reasonable efforts to cooperate with the auditors as may be reasonably necessary in connection with such audit in connection with the Investment Fund.  In connection with the foregoing, the auditors may request in writing that the manager provide the auditors with information concerning specific investments made on behalf of the Investment Fund which are also made by the Manager or it affiliates on behalf of other accounts they manage. Such information shall be true and correct and shall be limited to that which is necessary to provide the auditors with a reasonable statistical sample only for purposes of conducting its audit of the Program. Nothing in the Agreement shall require the Manager to prepare any tax work, financial statements or supporting schedules in connection with the audit or otherwise or permit the Committee, the Trustee or the auditors to have access to the Manager's business offices to examine any book, record, or both; provided, however, that such access will be permitted to the Program's auditors (i) upon the Committee's reasonable prior notice to the Manager, during the Manager's normal business hours and on such date (or dates) as reasonably determined by the Manager, (ii) limited to the Manager's books and records relating solely to the Investment Fund and relating solely to the performance and trade allocations of the Program, and (ii) solely in connection with the Program's audit.

"16.    **Indemnification.**

        (a)     SWI agrees to indemnify and hold harmless the Manager and its affiliates and their respective directors, officers and employees, from and against any losses, expenses, judgments, disbursements, suits, claims, liabilities, obligations, fines, penalties, charges, settlement costs, fees and related expenses (including attorneys' fees, paralegal fees and expenses), costs, damages and interest on any of the foregoing (collectively, "Damages") that are imposed upon or incurred by the Manager and its affiliates and their respective directors, officers and employees, as a result of SWI's or the Committee's breach of its representations and warranties made under the Agreement. Without limiting the generality of the foregoing, SWI and the Committee shall have no responsibility and shall incur no liability whatsoever under the Agreement for any loss or other damages that have resulted from the Manager's or the Manager's directors',

5

officers' or employees' (i) bad faith, (ii) fraud, (iii) willful misconduct or (vi) reckless disregard of such Manager's duties and obligations hereunder.

(b)     Manager hereby agrees to indemnify and hold harmless the Client, the Committee, and each of SWI's directors, officers and employees and any person who was at the time in question such a person (each, an "Indemnified Person") from and against Damages in connection with any action, suit, claim, inquiry, investigation, appeal or other proceeding, whether civil or criminal, whether pending or threatened, whether or not the Indemnified Person is or may be a party thereto, before any court or administrative or investigative body by reason of any of Manager's acts, errors, or omissions committed in the scope of performance of Manager's duties in connection with the Agreement that are a result of negligence, willful misconduct, fraud or reckless disregard of the duties and obligations of the Manager undertaken by it under the provisions of the Agreement. Without limiting the generality of the foregoing, the Manager shall have no responsibility and shall incur no liability whatsoever under the Agreement and for any loss or other damages that shall have resulted from such Indemnified Person's (i) bad faith, (ii) fraud, (iii) willful misconduct or (iv) reckless disregard of such Indemnified person's duties and obligations hereunder.

(c)     Manager agrees to reasonably cooperate fully with the Indemnified Persons in responding to any threatened or actual claims. If an Indemnified Person under this Section 16 is reasonably required to bring any action to enforce rights or collect monies due under this Section and is successful in such action, Manager shall reimburse such Indemnified Person or its subrogee for reasonable fees (including attorneys' fees, paralegal fees and expenses) incurred in bringing and pursuing such action. Indemnification pursuant to this Section 16 is intended to be supplemental to any other rights to indemnification available to the Indemnified Persons. Nothing herein shall be deemed to diminish or otherwise restrict the Indemnified Persons' rights to indemnification under applicable laws.

(d)     In the absence of agreement between the parties hereto to the contrary, each party shall prosecute its own defense of any third party cause of action involving the determination of the rights or obligations of any third party making any claim pursuant to the Agreement, the Program, or any local, state or federal law. Each party hereto shall have sole authority to select its counsel in any such proceeding.  The Manager shall use its best efforts to obtain the cooperation of its employees and agents in the defense of any litigation arising in connection with the Agreement. Further, SWI shall retain sole and final authority with regard to any settlement of any claim or portion thereof to the extent that the same involves benefits payable or alleged to be payable under the Pension Plans. The right of a party hereto to be indemnified and held harmless by the other party shall not be abridged or otherwise compromised by its prosecution of its own defense in any action, but no settlement may occur without the consent of the indemnifying party which consent may not be unreasonably withheld.

6

(e)    The conditions of the foregoing defense, indemnity and hold harmless covenant are that (i) the Indemnified Persons shall inform the Manager within a reasonable period of time of any claims threatened or made against any Indemnified Person, (ii) the Indemnified Persons shall reasonably cooperate with Manager in responding to such threatened or actual claims, (iii) any settlement agreement shall require the written approval of Manager, which consent shall not be unreasonably withheld or delayed and (iv) as to attorneys' fees, the provision of Section 16(c) have been fulfilled."

7.    Section 17 of the Agreement (determined after the fifth and sixth paragraphs hereto) shall be amended by adding the following sentence at the end thereof:

"The Manager agrees to comply with regulations issued by the Department of Labor, as issued from time to time, with respect to fee and conflict of interest disclosure (without regard to the effective date of such regulations)."

8.    Section 25 of the Agreement (determined after the fifth and sixth paragraphs hereto) shall be amended by adding the following at the end thereof:

"If to Committee:

SWI Retirement Committee

c/o Severstal Wheeling, Inc.

1134 Market Street

Wheeling, WV 28113

Each party may change its address by giving written notice of such to the other parties."

9.    Exhibit A shall be amended to read as follows:

"Manager will be paid .90% per year, charged $1/12^{th}$ monthly, of the fair market value of the Investment Fund, such fair market value to be determined based on the Trustee's accounting as of the last business day of such month"

10.    As hereby amended, the Agreement shall continue in full force and effect.

7

IN WITNESS WHEREOF, the parties have executed this amendment as of the date written above.

By: _Ron LaBow_

Name: _Ron LaBow_

Title: _President  WPN_

By: _M. P. DiClemente_

Name: _MICHAEL P. DiCLEMENTE_

Title: _MEMBER_

_SWI RETIREMENT COMMITTEE_

V6613394.2

8

**From:**       Michael DiClemente
**Sent:**       Friday, December 12, 2008 3:01 PM
**Subject:**   Neuberger Berman

Charlie Dicianni called on 12-10-08 (212-476-5740) to make sure we understand what is required to establish a relationship with them.

I laid into him because they have not managed our money (and maybe WHX's money) since the trustee transition at the beginning of November.

Ron LaBow returned my previous calls earlier in the week and left a voice message at work at 4:17 PM on 12-10-08 and followed up with another message at 4:45.  He then called me on my cell phone as I originally directed.



1

Severstal 11864

EX 18

```
=====Begin Message=====
Message#: 0
Message Sent: 12/16/2008 10:53:15
From: LABOW@Bloomberg.net|RON LABOW|STONEHILL INVESTMENT|5801|30006385
To: Michael.DiClemente@severstalna.com|MICHAEL.DiCLEMENTE| | |
Attachment: 8734639938952001.HTM
FileID: 4947BAFA000015DC07E41FFC.HTM
Subject: Re:Set-Up Phone Call for Today
```

I SPOKE WITH SALLY AND RUSSELL AT NEUBERGER--RUSSELL IS GOING OVER DOCS TO SEE
IF THEY CAN ACCEPT MY SIGNATURE.
=====End Message=====



EXHIBIT
21
DiClemente

**From:** Handwerker, Kevin
**Sent:** Wednesday, December 17, 2008 4:41 PM
**To:** Schwartz, Marvin; Ramallo, Henry
**Cc:** Golub, Carolyn S; Warnock, Jeffrey
**Subject:** FW: Severstal Wheeling

I spoke with the attorney for the Severstal Wheeling Pension Plan. We will be getting some comments on our agreement and they will provide us the standard documentation that we require. She requested that we begin managing the assets immediately and I agreed to accommodate their request provided we get authorization from Mike DiClemente requesting that we do so.

Kevin

**From:** King, Sally Doubet [mailto:sking@mcguirewoods.com]
**Sent:** Wednesday, December 17, 2008 4:29 PM
**To:** Handwerker, Kevin
**Cc:** Michael DiClemente
**Subject:** Severstal Wheeling

Kevin:

Thank you for your time this afternoon discussing the Severstal Wheeling issues. I am sure that we can now work out an arrangement that will be satisfactory to both of our clients.

You should receive an email from Michael DiClemente early tomorrow that outlines the issues that we would like to discuss relating to the Investment Advisory Agreement. Mike will also verify on behalf of the Several Wheeling Retirement Committee (Committee) their intent to have Neuberger Berman (NB) manage the pension assets that have been transferred to NB and their desire to have management begin immediately. Also, we intend to work with NB to formalize the Agreement and provide supporting documentation as soon as possible.

Please let me or Mike know if there are other issues that need to be addressed at this time.

Sally

Sally Doubet King

MCGUIREWOODS
McGuireWoods LLP
77 West Wacker Drive
Suite 4100
Chicago, IL 60601-1818
312.849.3684 (Direct Line)
312.849.3050 (Direct FAX)
sking@mcguirewoods.com



TAX NOTICE: Tax advice in this email (including any attachment), if any, is not intended or written to be used,

=====Begin Message=====
Message#: 14
Message Sent: 12/18/2008 13:49:59
From: Michael.DiClemente@severstalna.com|Michael DiClemente| | |
To: LABOW@Bloomberg.net|RON LABOW|STONEHILL INVESTMENT|5801|30006385
Attachment: 237876244804001.HTM
FileID: 494A9B5800001BCD07F454C2.HTM
Attachment: 245149623182002.gif
FileID: 494A9B5A00000FB707E3931D.gif
Subject: RE: Severstal Wheeling

Kevin

Following up on Sally's email, listed below are our comments regarding the Neuberger Berman
Discretionary Investment Advisory Agreement - ERISA:
Paragraph 2
States that unless otherwise instructed in writing, NB or an unaffiliated third party service provider
engaged by NB shall act as custodian for all assets in the Account. Citibank currently acts in such
capacity and is expected to be replaced by National City Bank at the beginning of January 2009.
Paragraph 3
States that NB's discretionary authority shall be subject to the limitations and restrictions set forth in the
Agreement and the Investment Guidelines. Since we have not yet established Investment Guidelines,
but intend to do so, we authorize the temporary use of the previous guidelines upon signing of this
agreement. We intend to engage our investment consultant, Mercer Investment Consulting, to draft
new Investment Guidelines soon and will provide those as soon as available.
Please explain the last two sentences regarding the discretion to use any Affiliated Investment Advisor.
How does this relate to utilization of the professional services of Marvin Schwartz? Have you exercised
this discretionary authority in the past?
Paragraph 4
Subparagraph 4.6 - Have you delivered ADV II?
Paragraph 6
The liability standards are very high. Please replace "grossly negligent management or actual
wrongdoing" with "negligent management". Further, we cannot accept that NB will not be responsible
for the acts of agents just because you used reasonable care in selecting agents. The problem with this
is that we would not have a contractual relationship with the agent so we would not have recourse
against the agent. NB should be responsible for its agents; NB could then sue them if they don't
perform.
We need to discuss fees.
Paragraph 15.1
Addresses "Client Directed Transactions"; if we use this provision we must have a way to maintain the
records separately. We note that NB has no responsibility for these transactions. Are transactions
directed by Ron LaBow covered by this provision? If so, it will be important to have separate records to
verify that the trust is not being charged overlapping fees.
Paragraph 17
Addresses termination provisions, but no time frame is given. We would like to incorporate a mutually
agreeable time period so that we can find another advisor if NB wants to resign.
Paragraph 22



The agreement requires mandatory arbitration. We would like to understand how this affects our ability to sue for a fiduciary breach under ERISA. Is this right covered under the arbitration provision?
Paragraph 23
At the end of Paragraph 23, add the following sentence: All cross-transactions will be conducted in accordance with Department of Labor rules and other applicable law.
Sally, please feel free to add or clarify anything you deem appropriate.

Thanks,

Mike

>>> "Handwerker, Kevin" <KHandwerker@nb.com> 12/17/2008 4:37 PM >>>

Sally,

Thanks very much. It was a pleasure speaking with you earlier and we look forward to working with you and Mike.

Kevin

From: King, Sally Doubet [mailto:sking@mcguirewoods.com]
Sent: Wednesday, December 17, 2008 4:29 PM
To: Handwerker, Kevin
Cc: Michael DiClemente
Subject: Severstal Wheeling

Kevin:

Thank you for your time this afternoon discussing the Severstal Wheeling issues. I am sure that we can now work out an arrangement that will be satisfactory to both of our clients.

You should receive an email from Michael DiClemente early tomorrow that outlines the issues that we would like to discuss relating to the Investment Advisory Agreement. Mike will also verify on behalf of the Several Wheeling Retirement Committee (Committee) their intent to have Neuberger Berman (NB) manage the pension assets that have been transferred to NB and their desire to have management begin immediately. Also, we intend to work with NB to formalize the Agreement and provide supporting documentation as soon as possible.

Please let me or Mike know if there are other issues that need to be addressed at this time.

Sally

Sally Doubet King

McGuireWoods LLP
77 West Wacker Drive
Suite 4100
Chicago, IL 60601-1818
312.849.3684 (Direct Line)
312.849.3050 (Direct FAX)
sking@mcguirewoods.com

TAX NOTICE: Tax advice in this email (including any attachment), if any, is not intended or written to be used, and cannot be used, to avoid penalties under the Internal Revenue Code or to promote, market, or recommend to another party any transaction or matter addressed herein.
This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.

- - - - - - - - - - - - - - - - - - - - - - - - - - - This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Neuberger Berman. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice. -------- IRS Circular 230 Disclosure: Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.
=====End Message=====

EX 21

=====Begin Message=====
Message#: 61
Message Sent: 12/30/2008 11:19:24
From: Michael.DiClemente@severstalna.com|Michael DiClemente| | |
To: LABOW@Bloomberg.net|RON LABOW|STONEHILL INVESTMENT|5801|30006385
Attachment: 4548281497490001.HTM
FileID: 495A4A0D00001C3007E3BF6E.HTM
Attachment: Neuberger.pdf
FileID: 495A4A0F0000146407F5BB42.pdf
Subject: Urgent - Need to Discuss Neuberger Berman Investment

EXHIBIT
24
DiClemente 9-26-17

Ron

I just learned yesterday from Mercer that you have allocated your entire position in the Neuberger
Berman account solely to the Severstal Wheeling pension plans as part of the transition of the WHX and
Wheeling accounts to separate trusts.

Prior to the transition, you asked me on multiple occasions whether Wheeling wanted to continue to
utilize your services and I responded that we definitely desired to do so, with the understanding that
you continue to implement the same strategies that you have been using on behalf of both plan
sponsors when the funds were managed as part of the same portfolio. I clarified by stating that
Wheeling's account and WHX's account transactions should continue to parallel one another and be
substantially similar. You agreed and advised that there may be practical limitations given the size of
Wheeling's account relative to WHX's, but that investment management of both plans would continue
to be substantially similar.

If what Mercer has said is correct, this significant allocation of Neuberger Berman assets solely to
Wheeling's plans is in direct contradiction to our earlier discussions.

Furthermore, while we have been aware that the trustee transition is underway, there has been a
virtual lack of communication of the investment management activities to both myself as the Wheeling
representative and to Mercer Investment Consulting, our investment consultant. Attached is an analysis
prepared by Mercer on Dec. 17, 2008 that demonstrates how the Neuberger Berman assets have been
proportionally allocated between the WHX and Wheeling plans. For example, as of Sept. 30, 2008,
Neuberger Berman assets represented 11.1% of the respective portfolios. To our knowledge, atthis time
the Neuberger position represents the total amount of assets currently assigned to a manager for the
Wheeling plans; this is an extreme departure from the prior diversification model. Until your recent
phone discussion with Mercer, they likewise were not aware that these assets were entirely directed to
the Wheeling plans as part of the trustee transition, nor - like we at Wheeling - did they expect such.

We are further disturbed that this situation has been compounded by that fact that we did not learn
until this month that Neuberger Berman has not been managing the assets (and to the best of our
knowledge continues not to manage the assets) because you as our investment advisor had not entered
into an investment management agreement with them. You in no way communicated that you
expected us to enter into the agreement, despite the fact that our investment management
relationship, as documented by our agreement, is with you. At no time were we informed that the
Wheeling Retirement Committee was obligated to perform due diligence and select another investment
manager. We therefore maintain our position that the responsibility for the assets is yours alone since

you, and not the Retirement Committee, selected Neuberger Berman. We have recently entered into negotiations with Neuberger; however, we would have addressed this issue much earlier had the requirements under this new arrangement been clearly communicated to us. While we intend to sign the agreement with Neuberger, we do this primarily to protect the assets and to ensure that they are under management and not as a ratification of the actions taken (or not taken) during this transition period. We need to establish clear lines of communication and to define the guidelines for handling these assets going forward.

Ron, we need to have a conference call today to discuss this matter. Please be prepared to provide us with the following:
The value of Neuberger Berman assets transferred to the WHX and Wheeling plans, respectively, and the percentage of such assets relative to the overall portfolios.
The investment amounts allocated to other investment management vehicles, by investment vehicle, for each of the WHX and Wheeling plans, respectively.
We recognize that an audit is underway, but that should not preclude providing this information.


Our outside counsel will participate in the call. Also, another member of Wheeling's Retirement Committee may participate.

Please advise when you are available today after 2:00 PM and we will circulate a call-in number.

Mike


>>> "Hafner, Patricia" <Patricia.Hafner@mercer.com> 12/17/2008 2:21 PM >>>
Mike -

Attached is the information that you requested concerning Neuberger.

<<Neuberger.pdf>>

Patty (Schneider) Hafner
Mercer
10 South Wacker Drive, Suite 1700
Chicago, IL 60606

Phone:+1 312 902 7695

mailto:patricia.hafner@mercer.com
www.mercer.com

Services provided by Mercer Investment Consulting, Inc.

-----

------------------------------------------------------------
This e-mail and any attachments may be confidential or legally privileged. If you received this message in error or are not the intended recipient, you should destroy the e-mail message and any attachments or copies, and you are prohibited from retaining, distributing, disclosing, or using any information contained herein.  Please inform us of the erroneous delivery by return e-mail. Thank you for your cooperation.
------------------------------------------------------------

FE01

=====End Message=====

=====Begin Message=====
Message#: 65
Message Sent: 12/30/2008 16:34:57
From: sking@mcguirewoods.com|Sally Doubet King| | |
To: LABOW@Bloomberg.net|RON LABOW|STONEHILL INVESTMENT|5801|30006385
Attachment: 4241399326894001.HTM
FileID: 495A94020000147207F413D7.HTM
Attachment: signature.gif
FileID: 495A94040000146407F53B03.gif
Subject: Conference Call Follow-up

Based on our conference call this afternoon, the following items will be
done as soon as possible:

1.      Ron LaBow will negotiate the fee adjustment with Neuberger
Berman; once the fees are changed, Mike DiClemente will execute the
agreement.
2.      Ron LaBow will request the most recent statement from Neuberger
Berman (we believe this is the 11/30/08 statement) and will forward a
copy to Mike DiClemente.
3.      Mike DiClemente will contact Dave Riposo to request the status
(and delivery) of the audit report.
4.      Sally King will draft a memo outlining the guidelines to be
implemented between Ron LaBow and Mike DiClemente relating to procedural
issues under the LaBow Investment Management Agreement.

Please let me know if you have any questions or comments.  Thanks to
everyone for your time and effort in moving this process forward.

Sally Doubet King
  <http://www.mcguirewoods.com/>
McGuireWoods LLP
77 West Wacker Drive
Suite 4100
Chicago, IL 60601-1818
312.849.3684 (Direct Line)
312.849.3050 (Direct FAX)
sking@mcguirewoods.com

_____

TAX NOTICE: Tax advice in this email (including any attachment), if
any, is not intended or written to be used, and cannot be used, to avoid
penalties under the Internal Revenue Code or to promote, market, or
recommend to another party any transaction or matter addressed herein.

This e-mail may contain confidential or privileged information.  If you



are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.


=====End Message=====

| | |
|---|---|
| From: | Michael DiClemente |
| Sent: | Monday, January 05, 2009 7:10 PM |
| To: | Dennis Halpin; Richard Bowness |
| Subject: | Fwd: FW: whx |
| Attachments: | whx.pdf |

Gents

Here are Neuberger Berman reports that I just received that show a $3.8 million decline (-12.7%) in the value of the NB portfolio from the Oct. 31, 2008 pre-transition date to Dec. 31, 2008.   The volatility of the performance in such a concentrated portfolio, regardless of the performance direction, is evidence of the points we have discussed whereby we did not receive a proportionate share of our assets in a diversified portfolio, as we had expected.  Of course, the direction makes this more meaningful.  I am awaiting a call from Dave Riposo at WHX.  Once I have additional information, we should arrange a conference call with Mercer no later than tomorrow.

Mike

>>> "Iovino, Vincent" <vincent.iovino@nb.com> 1/5/2009 1:12 PM >>>
Hello Michael.  Thank you for your patience.  These are the balances for October, November and December 2008.

-----Original Message-----
From: viovino [mailto:viovino@lehman.com]
Sent: Tuesday, December 23, 2008 12:10 PM
To: Iovino, Vincent
Subject: whx

-------------------------------------------------------------

Please open the attached document.
This document was sent to you using an HP Digital Sender.

Sent by:            viovino <viovino@lehman.com>
Number of pages:       18
Document type:      B/W Document
Attachment File Format:    Adobe PDF

To view this document you need to use the Adobe Acrobat Reader.
For free copy of the Acrobat reader please visit:

   http://www.adobe.com

For more information on the HP Digital Sender please visit:

   http://www.digitalsender.hp.com
- - - - - - - - - - - - - - - - - - - - - - - - - - -
This message is intended only for the personal and confidential use of the designated recipient(s) named above.  If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited.  This communication is for information purposes only and should not be

1



Severstal 15935

**From:** Michael DiClemente
**Sent:** Wednesday, January 07, 2009 2:28 PM
**To:** Richard Bowness; Dennis Halpin
**Subject:** Result of Discussion with Ron LaBow on Jan. 6, 2009

Gentlemen

I'm forwarding the draft email below, along with the following explanation, for our records. Late yesterday when I verbally delivered to Ron LaBow the conclusion of the Retirement Committee that we want him to reallocate the assets effective as of the trustee transition date the way we expected them to be, which was going to be followed with the email below (which was not sent), I was advised by Ron LaBow that he would not be able to reallocate the portfolio as of the effective transition date. As you know, last week during a conference call with him and Sally King of MW, when I reserved our rights to take this approach, he offered to do this. Today, however, he advised that many of the fund managers in the portfolio require minimum investment amounts, which we would not be able to meet because of our small portfolio size. He also cited that some of the funds are partnerships which limit the number of partners, which in turn would prohibit adding us as an additional partner (now that WHX has taken the previous slot). He now alleges that he "went down this path" prior to making the transition and had to proceed the way he did.

He feels that our best option is to allow him to liquidate about 80% of the Nueberger Berman portfolio to lock in current gains and maintain the same value of the portfolio as of the transition date. As of yesterday during trading hours, he said that the entire NB portfolio, based on the significant run-up in the energy stocks that comprise the portfolio, had a greater value than it did as of the end of October 2008 (which was $30.176 million). I also note based on the Dec. 31, 2008 statement that I requested from NB that the value then was $26.337 million. So based on his representations, in the first few trading days of 2009, the portfolio value has improved by at least $3.8 million (+14%). Upon liquidation, Ron advised that he would then construct the diversified portfolio that we need.

We'll hear more about this on the conference call with Ron LaBow this morning.

Mike



Email that was going to be delivered to Ron after our discussion yesterday. This email was not sent.

Ron

Confirming our discussion today, Severstal Wheeling's Retirement Committee has decided that, in order to fulfill its ERISA-mandated fiduciary responsibilities, its investment portfolio should continue to consist of a well-diversified portfolio after the trustee transition occurred, based on the model that existed prior to that transition. As you know, we expected that we would continue to have our proportionate share of the undivided interest in the investment portfolio on a post-transition basis as we had prior to the trustee transition. Considering that the portfolio was allocated without consultation or communication with SWI to a highly concentrated portfolio, we are directing that the portfolio be reallocated as of the effective date of the transition, based on our understanding and expectation pursuant to acceptable ERISA investment guidelines. Also, going forward, we expect that the portfolio composition would to continue to be invested using the same investment strategies that you have used in the past, consistent with ERISA investment guideline, and would parallel and be substantially similar to the portfolio composition of that managed for WHX. If you believe that there are practical limitations in managing the assets in a substantially similar way to those managed for WHX, please let us know.

Mike
On behalf of the SWI Retirement Committee



EXHIBIT
27
DiClemente 9-26-17
PENGAD 800-631-6989

1

Severstal  17132

**From:**          Dennis Halpin
**Sent:**          Thursday, January 08, 2009 5:15 PM
**To:**            Michael DiClemente
**Subject:**       meeting notes
**Attachments:**   Discussion Summary_2009_Jan7_RonLabow.doc

1



Severstal 10978

Severstal 10978

Discussion Summary: Telephonic conference – SWI Pension Trust

Meeting Date: 1/7/09 (10am - 11am)
Meeting Participants: Michael DiClemente, Dennis Halpin, Sally ? , Ronald Labow

Mike requested, on behalf of (a unanimous opinion of) the SWI pension committee, that Ron "reset" the portfolio to its original composition, containing a diversity of fund managers and market investment. Ron identified several reasons why he was unable to reset our portfolio to its original condition...

- a number of the funds contain minimum investment requirements, of which our carved out portfolio would fall below. Spoke for a brief time to "Favored Nation Clauses" and consequence of rule changes.
- Partnership limitations...separating the trust into WHX and SWI could be considered two partners vs. one, possibly causing partnership regulation violations or conflicts.
- Ron was mindful of our portfolio liquidity concern, and certain funds contained "gates" (restricted access periods). He cited the Ferralon (?) fund as having a gate...Mike replied that he was very familiar with gates and was not over-concerned with them or their concept.
- After several weeks of unsuccessfully pursuing this path, Ron gave up.

Ron reminded us how the portfolio we are currently in has performed during the past couple of months, and that any loss in value since 10/31 had been essentially recovered as of Jan 6th, 2009. (Mike noted that those same funds were not performing well on the day of this call.) He also stated how "nimble" or portfolio was, and how readily we could convert it to cash if we desired.

Given Ron could not reset the portfolio to original composition, Mike and I both agreed that Ron should liquidate the NB fund as he (Ron) deemed prudent so as to preserve value, and to begin reconstructing a more balanced diversified portfolio. Regarding "reconstruction", Ron said he would reach out to managers and funds that WHX currently participates in, but stated that we may need to sign certain documents in order to do this...Mike acknowledged Ron's point and agreed to its likelihood. Ron sought investment guidance /direction on several occasions from the Pension committee members, including "when" he should liquidate the NB fund; Mike replied when Ron deemed prudent and that, in each case, such action was Ron's responsibility and that his responsibilities had not changed.

Additionally, Ron said he would send Mike the J.D. Cohen audit once it's completed, which should be very soon.

Severstal 10979

**Severstal 10979**



EXHIBIT
29
DiClemente

## Minutes of Conference Call
## Severstal Wheeling, Inc. (SWI) Retirement Committee

Via Teleconference

10:00 a.m. – 11:00 a.m.
January 7, 2009

A special meeting of the Retirement Committee of Severstal Wheeling, Inc. (the "Committee") was held via teleconference on January 7, 2009.  The following individuals were present:

> Michael P. DiClemente – Member of the Committee
> Dennis P. Halpin – Member of the Committee
> Sally King – Counsel, McGuireWoods LLP
> Ron LaBow – Investment Manager for SWI's Defined Pension Plans' Investment Portfolio

The purpose of the meeting was to communicate to Ron LaBow that the Committee has decided that its investment portfolio should continue to be diversified as it had been on and before October 31, 2008, which was the last business day before the transition to a new trustee.  (The Company had learned on Dec. 30, 2008 that the assets had not been allocated in the way that it had expected, and instead had been arbitrarily allocated by Ron LaBow to a concentrated portfolio of 13 stocks and cash.  This portfolio is further concentrated by being invested predominantly in 11 energy stocks.  We have been discussing this issue directly with Ron LaBow, and separately internally and with outside counsel since then.)  In particular, Mike reiterated the Committee's desire to have Ron allocate the assets in the same proportionate share of the undivided interest in the investment portfolio of the WHX Trust on a post-transition basis as we had prior to the trustee transition (in other words, "reset" the portfolio).  Despite the fact that Ron had indicated a willingness to reset the portfolio during a conversation with Mike and Sally on Dec. 30, 2008, Ron identified several reasons why he was unable to reset our portfolio to its original condition:

- A number of the funds contain minimum investment requirements, of which our proportionate share would fall below.  Ron spoke for a brief time to "Favored Nation Clauses" and the consequence of rule changes, in which we believe he implied that the minimum investments levels would have to be waived for others if waived for us.
- Partnership limitations – separating the master trust investment into separate WHX and SWI investments could be considered two partners vs. one, possibly causing partnership regulation violations or conflicts. It is important to note that he allowed WHX to assume the slot previously held by both plans sponsors as essentially one participant in the previous WHX master trust.
- Ron was mindful of our portfolio liquidity concern, and pointed out that certain funds contained withdrawal "gates" (restricted access periods). He cited the Farallon fund as having a gate.  Mike replied that he was familiar with gates and was not overly concerned with them or their concept, particularly if we maintained the previous diversified investment portfolio.

[Page]

Severstal 09822

Ron had not identified any of these reasons on Dec. 30, 2008, when he indicated he was willing to reset the portfolio. The day prior (Jan. 6) to this conference call, Ron gave Mike a prelude to this new position and said there were two investment vehicles that he would have been unable to allocate, then said there could be a total of three or as many as four.

Ron advised that after unsuccessfully pursuing this path, he chose to allocate the assets as he did. Ron advised that he could have allocated some of the funds, which did not have liquidity, partnership limitations, or minimum investments considerations, to SWI. [This comment is noteworthy since it's an admission that he had the ability to construct a more diversified portfolio for SWI (as opposed to the highly concentrated portfolio), albeit it would not have been as completely diversified as before.]

Ron reminded us how the portfolio we are currently in has performed during the past couple of months, and that any loss in value since 10/31 had been essentially recovered as of Jan. 6, 2009. (Mike noted that those same funds were not performing well on the day of this call.) Ron also stated how "nimble" our portfolio was, and how readily we could convert it to cash if we desired. We note that the nimbleness is directly a function of the concentrated portfolio.

Given that Ron could not reset the portfolio to original composition, based on his representations, we advised Ron that he should construct a more balanced diversified portfolio and should do everything he can to preserve value in making the transition from the Neuberger Berman (NB) portfolio. Regarding "reconstruction", Ron said he would reach out to managers and funds that WHX currently participates in, but stated that we may need to sign certain documents in order to do this. Mike acknowledged Ron's point. Ron sought investment guidance/direction on several occasions from the Committee members, including "when" he should liquidate the NB fund; Mike replied that it should be when Ron deemed prudent and that, in each case, such action was Ron's responsibility and that his responsibilities had not changed. Ron sought direction more than once during the meeting, and in each case Mike emphasized that this is his responsibility.

Additionally, Ron said he would send Mike the J.D. Cohen (sp?) audit of the trustee transition once it's completed, which should be very soon.

Mike brought up the issue of fees. [Ron initially raised this issue on Dec. 30, 2008, when he said that he would make up lost performance via reducing/eliminating his fees and through future increased investment performance. The latter didn't sound correct, since it appears that any incremental performance would only come from altering the risk profile of the portfolio beyond its customary allocation.] Ron advised on Jan. 7, 2009 that he would not charge any fees for Nov. and Dec. 2008, and would reduce his ongoing fee, which he would outline in a letter for us that he would send to Sally King. Ron advised that he was not reducing his fees in order to make up performance.

Lastly, Ron asked for an indication of the Company's future cash needs in order to meet distributions. We advised that we would provide a range of such needs.

[Page]

Severstal 09823

| | |
|---|---|
| From: | Richard Bowness |
| Sent: | Thursday, January 08, 2009 9:29 PM |
| To: | Amanda.Pierce@AllegiantGroup.com |
| Subject: | Re: WebConnect Access Form 2007 1211.doc |

Yes, Mike did call me. He is going to call Ron LaBow. It seems as if the holdup with Neuberger was with the fees that they were going to charge us and Ron was to talk with Neuberger to have the fees reduced.

*******************************
This email was sent from my Blackberry.
*******************************

-----Original Message-----
From: "Pierce, Amanda (Allegiant Group)" <Amanda.Pierce@AllegiantGroup.com>
To: Bowness, Richard <Richard.Bowness@severstalna.com>

Sent: 1/8/2009 4:10:04 PM
Subject: RE: WebConnect Access Form 2007 1211.doc

We only needed the one signed form since I will be submitting them together.

I think that a portion of the wire that came in from Citi should have been deposited to the DB plans, those IRA Rollovers were to be allocated to that plan, however, there was no cash to complete the transaction, so I sent the funds from the DC account. Once I know what cash should be allocated to each of the plans, I will make sure that these disbursements from the incorrect account are corrected.

Also, it is my understanding from our back office that Citi did not submit the paperwork to transfer the mutual funds until today, therefore it could be another 5 - 7 business days before we see the assets transferred into our account. From speaking with Citi, it seems as if there is a problem with the 11/30 statements, I'm not sure if you were aware or not, but I did want to try and keep you in the loop.

Also, did Mike give you a call in regards to our earlier VM?

Amanda

-----Original Message-----
From: Richard Bowness [mailto:Richard.Bowness@severstalna.com]
Sent: Thursday, January 08, 2009 3:21 PM
To: Pierce, Amanda (Allegiant Group)
Subject: Re: WebConnect Access Form 2007 1211.doc

Amanda,

   Will you be sending Mike another form for him to have access?

      Rick

*******************************
This email was sent from my Blackberry.

EXHIBIT
30
DiClemente
9-26-17
PENGAD 800-631-6989

1

Severstal 05748

**From:** Richard Bowness
**Sent:** Monday, January 12, 2009 1:45 PM
**To:** Michael DiClemente
**Subject:** Re: Ron LaBow

I was curious since National City can't get any information until that is done.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This email was sent from my Blackberry.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
-----Original Message-----
From: Michael DiClemente
To: Bowness, Richard <Richard.Bowness@severstalna.com>

Sent: 1/12/2009 7:52:34 AM
Subject: Re: Ron LaBow

We spoke about this late Friday.  He still hasn't done it, despite agreeing to do it on Dec. 30 and early last week, so we've discussed it three times now.  Very frustrating.




>>> Richard Bowness 1/11/2009 9:08 PM >>>
Mike,

How did you make out with Ron regarding the Neuberger Berman fees in the agreement?

        Rick



1

Severstal 17046

# CERTIFICATE AS TO SIGNATURES

## SEVERSTAL WHEELING, INC PENSION PLAN MASTER TRUST

The undersigned, being a duly authorized Officer of Severstal Wheeling Inc, Pension Plan Master Trust ("The Principal"), and having in that capacity personal knowledge of the matters referred to herein, certifies that the persons designated as follows have authority to communicate written instructions on behalf of the Principal. The undersigned further certifies that any instructions delivered by the Principal shall be signed by any ___1___ of these persons and that the signatures set forth below are true and genuine signatures of these persons.

| Name | Title | Signature |
|------|-------|-----------|
| Michael P. DiClemente | VP & Treasurer | _M. P. DiClemente_ |
| | Ret. Comm. Member | |
| Timothy S. Rogers** | Controller | _Timothy S. Rogers_ |
| David Bischof** | Mgr. P/R & Ben. | _David C Bischof_ |
| Marsha A. Porter** | Sec. P/R & Ben. | _Marsha A. Porter_ |
| Holly J. Caseman** | Admin. P/R & Ben. | _Holly J. Caseman_ |
| Richard E. Bowness | Contract Emp./Consultant | _Richard E. Bowness_ |

**\*\* - Only have authority as it relates to benefit payments; no investment direction authority**
The persons designated above are the only persons entitled to act as authorized representatives of the Principal and will continue to have authority as defined herein until written notice otherwise is delivered by the Principal. All authority granted by previous Certificate is hereby revoked.

IN WITNESS WHEREOF, the Principal has caused this Certificate to be signed in its name by its duly authorized Officer this ___6th___ day of _____ January, 2009.

By: _Dennis P. V___

Title: _Retirement Committee Member_

EXHIBIT
32
DiClemente 9-26-17
PENGAD 800-631-6989

SWI Retirement Committee
Discussion with Dave Riposo, Corporate Treasurer, WHX Corporation
Regarding Allocation of Assets In Conjunction with the Trustee Transition
January 14, 2009


On January 14, 2009, Mike DiClemente and Dennis Halpin called Dave Riposo of WHX in order to:

1. Confirm, and allow another SWI individual hear directly from Dave, what Mike DiClemente heard from him on Dec. 31, 2008;
2. To advise him that our position on how the assets were inequitably allocated between WHX and SWI as part of the trustee transition has not changed.

As a recap of the December 31, 2008 call, which is partially recapped in Mike's December 31, 2008 email to Dennis Halpin and Rick Bowness, Dave was astounded to hear that we just learned on Dec. 29, 2008 that we did not know how Ron had allocated the assets. His immediate reaction to that was, "If I were you, I would fire Ron." He commented that he has "given up on Ron" and that "Ron does what he wants to do". Dave assumed that we knew what was going on and even asked Ron if we had been apprised of the activities. I advised Dave that we were going to ask Ron to re-set the portfolio as of the trustee transition date and that Dave should know that, because it would obviously affect how the assets are finally distributed to WHX. Dave in turn advised that it wouldn't matter to him if that were done.

Mike advised Dave today, January 14, 2009, that we had registered our request with Ron to reset the portfolio and that Ron advised that he was unable to do so because there are certain limitations preventing such, citing the same liquidity, partnership, and minimum investment restrictions that Ron described to us. I told Dave that we were now going to advise Ron to allocate the assets equitably, taking into consideration these restrictions, and that again WHX's allocation would be affected.

Mike also expressed his appreciation to Dave for his strong reaction on Dec. 31 (without specifically repeating his words), and further asked him to clarify whether in fact he actually asked Ron if we knew how the assets were being allocated. Dave advised that he specifically asked Ron if he had advised us (which he had never done).

Dave asked us whether we understood the mechanical considerations in doing so, specifically that we would have to enter into subscription agreements and other documentation with each investment manager. We advised Dave that we are aware that Ron wants us to do that because we have already received documentation from two of the existing managers that Ron wants us to use, once he sells some of the holdings in the Neuberger Berman portfolio that Ron has (autonomously) assigned to our pension plans. Dave asked and we confirmed that we expect a portion of the Neuberger Berman account to be allocated to WHX.

Mike inquired about the status of the J. H. Cohn audit of the transition of assets. Dave advised that he has not received it yet, but indicated as he has done in the past that we would get a copy as soon as he receives it. Dave feels that (despite the intent to

[Page]



EXHIBIT
33
DiClemente 9-26-17

Severstal 09988

reallocate the assets as of transition date) the audit will still be of value because it will "be germane for purposes of valuation".

In response to our inquiry, Dave advised that he had not spoken with Ron since our December 31, 2008 conversation to which we asked that he not share our conversation today with Ron because we intend to call him next (targeted for January 15, 2009). Dave responded that he would not say anything to Ron.

[Page]

Severstal 09989

From:        Michael DiClemente
Sent:        Wednesday, January 14, 2009 8:33 PM
To:          Drew Landon
Subject:     Fwd: SWI Retirement Plans - Quarterly Investment Performance Reports for 3Q 2008

For your records

>>> Michael DiClemente 1/14/2009 1:25 PM >>>

Gentlemen

The performance reports for periods ending 3Q 2008 for SWI's two 401(k) plans, the defined
contribution plans, and the defined benefit plan will be sent out to you today.  As done in
the past, I reviewed the reports with Mercer on behalf of the Retirement Committee.  This
detailed email is provided in lieu of a Committee meeting and to report on recent and ongoing
activities.  Please note the comment below relative to the trustee transition and allocation
of assets under the "Defined Contribution Pension Plans" heading.

Please note the following observations:


401(k) Plans

Quarter-end asset balance:
        Management Plan - $30.1 million
        Union Plan - $75.0 million


Funds of note relative to performance include:

John Hancock Classic Value Fund (domestic large cap value equity fund) The John Hancock
Classic Value Fund, which is in both the Management and Union Plans, has not met its index
and peer group performance benchmarks for all trailing periods ending September 30, 2008.  We
are conducting a search for a replacement investment option for a similar type fund.  In this
quarter's report, Mercer has chosen to provide further input on the manager responsible for
running the portfolio, which you may review on pages 11 and 12.

Franklin Small-Mid Cap Growth Fund (domestic small to mid cap growth fund) The Franklin
Small-Mid Cap Growth Fund, which is in the Union Plan, has not met its benchmarks for all (1,
3, and 5 years) trailing periods ending September 30, 2008.  We are also conducting a search
for a replacement fund for this fund.  It is interesting to note that the fund outperformed
its benchmarks for the third quarter, which we haven't seen for some time.  Taking a sneak
peek at 4Q performance, we note an uninspiring loss of -26.3%, resulting in full-year 2008
loss of -42.5%, but do not yet have comparable benchmark data for the full year.

The Boston Company Small Cap Value (domestic small cap core equity fund) This fund, which is
in the Union Plan, has underperformed its index benchmark for the quarter, and 1 and 3 years
ending September 30, 2008, but has met its peer group benchmarks for all periods through 5
years.  We recently heard from Mercer that due to market conditions The Boston Company has
reduced staff by 30%, including a like percentage of investment professionals.  The small cap

1                    

Severstal 14169

value strategy has not been affected by this staff reduction activity.  Mercer has placed the
fund on "watch".

AllianceBernstein International Value fund (international large cap core equity fund) The
fund, which is in both plans, has underperformed its index and peer group benchmarks for the
1, 3, and 5 years ended September 30, 2008.  As previously advised, AllianceBernstein has
decided to change its investment strategy from a deep value, concentrated approach to a more
conservative value strategy, which they believe is more appropriate for the retail market.
Mercer is neutral on the migration and continues to rate each strategy as an "A".
Additionally, in late December 2008, Lew Sanders (Chairman and CEO) retired.  While no reason
was given for the retirement, Mercer speculates that he may be the fall guy for the company's
recent failings as performance has been poor, as we have experienced, across most products.
Mercer has placed the fund on "watch".

Lord Abbett Small Cap Blend (domestic small cap core equity fund) This fund is only in the
Management Plan.  Lord Abbett did not meet our benchmark objectives for 3Q, but has done so
for all periods through 5 years ending September 30, 2008.  As previously advised, two of the
five team members that manage this strategy have left the firm (for different reasons), which
Mercer believes is significant.  At that time, Mercer was evaluating the "A" rating assigned
to this strategy, which they have since downgraded to "A-".

Also, Mercer provided selected commentary on several funds on pages 7 - 12, which are not
necessarily related to historical performance.


Defined Contribution Pension Plans
Quarter-end asset balance:
        Salaried Plan - $41.4 million
        Wheeling Corrugating Plan - $1.6 million


The collapse of the capital markets severely hit plan performance as all but one of the
plans' investments declined in value.  The largest loss was due to the concentrated energy
exposure of Neuberger Berman.  As a result of 3Q performance, Ron LaBow's stellar record was
greatly diminished, with plan performance ranking at the 100th percentile for 3Q and in
direct contrast to prior performance levels.  As you'll recall, his performance through 2Q
2008 ranked in the 0 percentile for the one, two, three, and five years ending June 30, 2008
(first time I have ever seen this in my 20+ years of plan sponsor responsibilities).  With
the 3Q performance, in combination with strong past performance, trailing returns rank in the
5th, 3rd, and 5th percentiles for the one, three, and five years ending September 30, 2008.
Since inception in 1999, LaBow has produced an annualized return of 8.6%, exceeding his 8.0%
absolute annual return objective and significantly exceeding the S&P 500 Index return of 1.1%
annualized.  With this very atypical 3Q performance, LaBow will very likely break an enviable
streak of never losing money in any year (2008 should be a loss year), since he began
managing money for us.  Notably, he was able to produce positive returns each year since 1999
even when the stock market put together three consecutive years of sizeable losses in 2000 -
2002.

Trustee Transition
The separation of the Wheeling plans from the WHX Trust occurred at the beginning of November
2008, which was required because Citibank is exiting the trust business and because we were
advised by WHX that a successor could not be found that would have continued to handle the
trust business for two plan sponsors within the same trust.  While we separated from the WHX
Trust in November, we temporarily stayed with Citibank until we transferred our assets to
National City Bank early this month.  However, it is important to note that the separation of
our investments from the WHX Trust did not occur as expected relative to how the assets were
allocated between the two plans prior to separation.  We learned of this fact on December 30,

2

2008, have been continually evaluating this with our advisors, and are working with LaBow to arrive at an acceptable arrangement. We will provide an update very soon.

Defined Benefit Pension Plan

Quarter-end asset balance: $4.9 million

As you know, in 4Q 2006 we implemented a new and simple, index-based investment strategy, consisting of Vanguard short-term and intermediate-term bond index funds with the balance invested in a money market fund managed by the trustee. The fund has slightly outperformed its composite index since inception due to out performance by both of Vanguard's bond index funds, which is very good for an index strategy (whether for bonds or equities), considering they also have to cover expenses.

Transition to Severstal

Following up on prior emails regarding the need for a transition to Severstal given the departure of most of the previous Committee members, Mel Baggett, Mike Clarke, and I spoke in December about the need to reconstitute the Retirement Committee. We currently have targeted mid-February 2009 for an orientation meeting to provide an overview of the Committee responsibilities and assess the direction of various outstanding projects.


Mike



Hard copy bound reports to be delivered (3):
        SWI's two 401(k) plans (one bound copy)
        SWI's defined contribution plans (one bound copy)
        SWI's defined benefit plan (one bound copy)

3

Severstal 14171

| From: | Michael DiClemente |
|---|---|
| Sent: | Thursday, January 15, 2009 3:20 AM |
| To: | Dennis Halpin |
| Subject: | A thought . . . |

Dennis

If LaBow balks at the (modified) reset, rather than advise him that he is accountable for the losses, I'm thinking that an alternative would be to seek recourse with WHX by convincing WHX that they are implicated in this allocation by accepting assets that were inequitably distributed, and that they should likewise with us force LaBow to do the right thing.  My sense is that WHX knows that what LaBow did is wrong.

Mike



1

Severstal 15193

### Minutes of Conference Call
### Severstal Wheeling, Inc. (SWI) Retirement Committee

Via Teleconference

12:00 p.m. – 12:30 p.m.
**January 16, 2009**

The Retirement Committee of Severstal Wheeling, Inc. (the "Committee") held a meeting with Ron LaBow via teleconference on January 16, 2009. Sally King (Counsel, McGuireWoods LLP) was invited but unable to participate. The following individuals were present on the call:

> Michael P. DiClemente – Member of the Committee
> Dennis P. Halpin – Member of the Committee
> Ron LaBow – Investment Manager for SWI's Defined Contribution
> Pension Plans' Investment Portfolio

The focus of the meeting was to communicate to Ron LaBow that the Committee has decided, (subsequent to Ron stating during our January 7 teleconference his inability to fully reset the portfolio) to reset the portfolio to the extent possible and provide detail regarding those funds where it is not possible, and instruct him to send a plan for diversification of the portfolio consistent with the WHX Master Trust to the extent reasonable. Michael began by reiterating certain statements Ron had made in a previous discussion, specifically including:

- Ron's initial indication to Mike and Sally King during their conference call on December 29, 2008 that he could in fact reset the portfolio if we wished to do so
- Ron's subsequent change of this statement (on Jan. 7, 2009), stating instead that he did not think that he could go back to reset several of the investments citing an inability to do so for anywhere from 2 to 4 investment accounts.

Mike then advised that the Committee had decided that Ron needs to reset the portfolio using those investments for which there are no transition issues, and that Ron should present his recommended plan of reallocation to the Committee for our review.

Ron's immediate reaction was that he did not think he could reset the allocations, adding that he was not even sure if it's legal to do so. He then began individually citing those funds for which he could not accommodate this re-direction, including the following:
- Titan Masters from whom he will be withdrawing
    - We note that as of Oct. 31, 2008, the account balance was $25.4 million (6.5% of total pre-transition assets totaling $395.1 million)
- Stafford from whom he will be withdrawing
    - As of Oct. 31, 2008, the account balance was $6.1 million (1.5% of total pre-transition assets)
- Procyon Partners from which he has since withdrawn
    - As of Oct. 31, 2008, the account balance was $4.3 million (1.1% of total pre-transition assets)

[Page]



Severstal 16814

- Farallon which has imposed an inability to withdraw funds until a deferred date ($49.2 million, or 12.5% of total pre-transition assets)

Based on this preliminary feedback, we note that we may not have an ability to participate in approximately $85.0 million, or 21.5% of the pre-transition assets.

He stated that he could reset the following:
- Sage Capital
- Capital Defense
- Mason Capital
- Proxima Capital
- DG Partners
- Lehman

He conveyed that he was puzzled as to "why" we continue down this (reset) path, citing that there would be costs and adding that he would "prepare a writing" indicating that "such action would result in added fees and lower asset values", and that he would formally advise against such action.

We also advised that we had spoken to WHX Treasurer, David Riposo, and he was in general agreement with our thinking and our intended actions. We also advised Ron that David indicated that the J.H. Cohn audit report would be forthcoming shortly and would provide us a copy.

Ron then strongly reacted to our reset request, stating "If I can do it, I will do it...once you tell me to do it, I'm going to do it" and that we would not have an opportunity to assess it and ask him to re-do it once it's completed. His reaction supports the fact that he executed the allocation of assets on his own without any input from SWI, expecting that we would just accept his decision. Mike had to emphatically reply that he did not want Ron to take any action prior to providing us with his formal allocation plan, specifically stating, "Don't act until you show us the allocation". Ron paused, seeming to then fully grasp what Mike was asking for.

Ron then altered his earlier approach, asking the Committee to prepare a writing formalizing our specific request to which he will then respond. Given we already had intentions to do this, we readily agreed.

[Page]

Severstal 16815

| | |
|---|---|
| **From:** | Michael DiClemente |
| **Sent:** | Tuesday, January 20, 2009 10:51 PM |
| **To:** | STONEHILL INVESTMENT RON LABOW |
| **Cc:** | "King, Sally Doubet" <sking@mcguirewoods.com>; Dennis Halpin; David Riposo <DRiposo@whxcorp.com> |
| **Subject:** | Reallocation of Assets from the WHX Master Trust |
| **Attachments:** | Direction Letter - Reallocation of Assets from WHX Master Trust (01-20-08).pdf |

Ron

Confirming our discussions on Jan. 16, 2009, attached is the letter outlining our understanding of how we will proceed with the reallocation of assets from the WHX Master Trust.

Mike

1

EXHIBIT

37

DiClemente

Severstal 17090



Michael P. DiClemente
PHONE: 304 234 2811
FAX: 304 234 2453
Michael_DiClemente@severstalna.com

January 20, 2009

Mr. Ronald LaBow
WPN Corp.
110 East 59ᵗʰ Street
New York, NY  10022

Dear Ron:

Subject:     **Reallocation of Assets from WHX Master Trust**

Confirming our continuing discussions and in accordance with ERISA requirements, it is critical that the Severstal Wheeling, Inc. (SWI) Pension Plan Trust and its participants continue to benefit from a diversified portfolio, equivalent, to the extent feasible, to the portfolio that existed prior to the trustee transition that occurred as of the beginning of November 2008.  Therefore, we would expect that the assets that were allocated between the WHX Corporation and SWI pension plans as of the trustee transition date will be reallocated to produce two separate portfolios, with the SWI pension fund continuing its proportionate share of the undivided interest in the WHX master trust portfolio prior to the transition, recognizing that there may be certain limitations to achieving an identical allocation.

Please prepare a written plan to reallocate the assets retroactively as of the transition date and provide that plan to both the WHX Pension Investment Committee and the SWI Retirement Committee for our collective review.  We will work together with WHX and then provide you with any feedback in order to assure that both parties are mutually satisfied with the final allocation.  When you provide your recommended allocation, please (a) identify in writing those accounts that cannot or should not be proportionally allocated, (b) provide the reason(s) for such treatment, and (c) indicate how you are recommending equitable allocation of those assets among the remaining (or substitute) investments.

Once the retirement committees have reviewed and approved the plan of reallocation, you will be asked to implement the reallocation.  Also, SWI will work with you and the investment managers to establish direct relationships between the SWI Retirement Committee and individual managers, as required.

Sincerely,

*M. P. DiClemente*

Michael P. DiClemente
On behalf of the Severstal Wheeling, Inc. Retirement Committee

c:     Dennis P. Halpin, SWI Retirement Committee
       Sally Doubet King, Counsel, McGuireWoods, LLP
       David A. Riposo, WHX Corporation

Severstal 17091

PNC0000920

From: Michael DiClemente [Michael.DiClemente@severstalna.com]
Sent: Friday, January 23, 2009 4:35 PM
To: Thomas, Jacqueline (Allegiant Group)
Cc: Dennis Halpin; Richard Bowness
Subject: Direction Letter to Ron LaBow Regarding Reallocation of
WHXTrust Assets - Privileged and Confidential

Attachments: Direction Letter - Reallocation of Assets from WHX Master
Trust (01-20-09).pdf

Jacquie

Following our discussion (you, Rick, and myself) today, attached is the letter we sent to Ron
LaBow directing that the assets be reallocated between the WHX and SWI pension plans that
resulted from the trustee transition that pre-dated your involvement.  Ron needs to present
his plan, SWI and WHX need to agree, and we need to enter into direct investment
management agreements with each of the managers that will permit execution of the
reallocation.  There is a lot of work ahead of us.  Thank you for your patience as we work
through this process.

As discussed, we'll follow up with another letter regarding the assets that currently reside in
our account.

Thanks,

Mike



**Minutes of Conference Call**
**Severstal Wheeling, Inc. (SWI) Retirement Committee**

10:45 a.m. – 11:15 a.m.
Via Teleconference                                                                                         January 26, 2009

A special meeting of the Retirement Committee of Severstal Wheeling, Inc. (the "Committee") was held via teleconference on January 26, 2009. The following individuals were present:

>           Michael P. DiClemente – Member of the Committee
>           Dennis P. Halpin – Member of the Committee
>           Ron LaBow – Investment Manager for SWI's Defined Pension Plans'
>           Investment Portfolio

This meeting was held pursuant to Ron's request. Mike began the call by updating Ron that we had confirmed with Allegiant (National City) that they were not lending out any of our (Neuberger Berman) securities currently held by them. While Allegiant asserted that they had authority to do so, they customarily do not make use of such authority until receiving written consent from the customer.

Ron was comforted by this news, then began to inform us that he would not be able to execute the reallocation strategy outlined in our written communication to him dated January 20, 2009. Asserting that last August / September when he began his effort to separate the portfolios, essentially each fund into a 90/10 split, "one" of the problems encountered was that several funds would not take a fund whose value was below a stated minimum (indicating $20 - $25 million). NOW…they just won't do it…period. To illustrate this, Ron offered that the Sage and Proxima funds (valued at approximately $28.1 mil and $45.5 mil, respectively) are both domiciled at Morgan Stanley, and it's Morgan Stanley who will not handle an account at our low dollar level. The rationale was more of a cascading issue…Ron stated that separating the fund values would push our account below a level acceptable to Morgan Stanley (i.e., it's not Proxima that has the problem but rather Morgan Stanley). Mike expressed his surprise and confusion over this (i.e., that Morgan Stanley would have some issue as to the level of any given custodial account based solely on value), but Ron repeated the Morgan Stanley simply won't do it, adding that Morgan Stanley wouldn't handle an account nowadays below $50 million. Ron added that, with specific regard to Proxima, it is a "managed account" meaning that the account is comprised of specific securities/positions (vs. a fund that may have liquidity restrictions), providing Ron with "ready" account movement (e.g., could promptly close or cash out at his discretion)…a feature that he considers very important to the SWI trust profile. He added that SWI's need to access cash caused additional hurdles to his ability to execute our reallocation instructions. Ron then provided a few examples of accounts which he has moved out of, citing Farallon as one of them. Mike quickly questioned this statement, asking Ron, "I thought you said in previous discussions that Farallon had a gate?". Ron replied that he meant a reduced position, not "out", and that this position was being reduced on January 31, 2009 by approximately $11 million. Mike also commented that even if we could not participate with Proxima on a separate account managed basis, it seems – based on Ron's prior comments that Proxima's strategy is "extraordinarily



EXHIBIT
39
DiClemente 9-26-17

Severstal 16868

conservative" and that we have received investment materials from Proxima that we could participate in their commingled fund product – that we should still be able to utilize this investment strategy as part of our portfolio. Ron acknowledged that. (While not part of the conversation with Ron, Dennis and Mike observed after the meeting that any future participation in Proxima may have to come from assets that are directed to Proxima after the reallocation. It appears that the best way to allow for such re-direction when Ron reallocates the WHX/SWI assets is to set those funds aside for SWI in cash until such investment is made.)

Ron then provided some insight as to what criteria he focuses on in deciding "where" to place investment monies, specifically citing his familiarity with three critical interfaces:
- Prime broker
- Lawyer
- Accountant

His familiarity with names of the above is critical to him in making a favorable decision on "where" he places the monies.

While we understood the deepened rationale provided in this call, we expressed our disappointment at this update, developing a growing "frustration" that "new" or "more refined" information seems to surface to thwart Ron's ability to fulfill our ongoing request to sufficiently reallocate the initial assets in a manner keeping the fund profile intact with regard to diversity of managers and investments. Given this new information, which admittedly places a greater difficulty in getting the portfolio reset to a risk profile aligned with the WHX Master Trust pre-Nov 2008, Dennis Halpin questioned Ron's initial choice that, if only "one" fund could be assigned to SWI, why couldn't it have been one with a more conservative style (like Proxima) versus the Neuberger & Berman fund, given its heavy concentration in one industry (energy). Ron did not directly reply to this, other than agree that the Proxima fund does have a very conservative-style manager.

Mike requested that Ron put today's information to writing – specifically, which funds Ron was now asserting could not be reallocated and providing the underlying reason(s)...Ron agreed to do so. Ron finished the call by inquiring what cash level we thought needed at any given time...suggesting that our prior correspondence implied $2.0 mil for the year. Mike said that it was $2.0 mil for maybe a 6 month period, not a year, Ron asked where we came up with that number. Mike replied that we had received input from Rick Bowness on this, and then refined it based on certain business conditions existing at SWI and near term actions being contemplated. Ron acknowledged Mike's comments.

**WPN Corporation**
**110 East 59th Street**
**30th Floor**
**New York, New York 10022**
**Phone: 212-771-1250**
**Fax: 212-355-5363**

February 4, 2009

Messrs. Michael DiClemente
      Dennis Halpin
      SWI Retirement Committee
      1134 Market Street
      Wheeling, West Virginia  26003

Gentlemen:

Pursuant to our many conversations I will attempt to summarize the problem in attempting to achieve a proportionate share of the WHX Pension account as of October 31, 2008.

In the summer of 2008 in attempting to give an across the board "slice" of the WHX account to Severstal Wheeling I ran across major roadblocks.  Because of the turbulence in the markets several prime brokers would not accept new accounts for less than approximately $50 million.  In addition, only Mason and Capital Defense were willing to divide up the WHX account and of those remaining, three were being closed down; they were Farallon, Procyon and Mercantile.  If we had done a "slice" with Mason and/or Capital Defense we would have been fully invested with no cash available to pay benefits.  Rick Bowness has calculated the account needs $2.0-2.5 million a year for said benefits and we would have been in an awkward position because I had no knowledge regarding the timing of the benefits.

EXHIBIT
40
DiClemente

Severstal 09949

I felt I had no other option given market conditions and the previous decline in energy shares to transfer the entire Neuberger Berman account and reserve a substantial amount of cash in the "new" account for Severstal Wheeling so it would have some protection against further market turbulence. The cash remains in place and I continue strongly to urge the transfer to National City, the new trustee/custodian. WHX is prepared to make the transfer upon your instructions.

I plan on investing the cash and a substantial portion of the Neuberger Berman account with Proxima, Mason Capital, Capital Defense and the macro fund run by Wai Lee. Of course none of this will be done without your approval. Because of the extremely high transaction costs and fees the two fund of funds owned by WHX are going to be liquidated. I have been talking to DG Partners and Cohanzick and will advise you of my thinking.

At the end of the first quarter of 2009, WHX will have most of the assets managed in a similar manner I am suggesting for Severstal Wheeling.


Very truly yours,

Ron LaBow

WPN Corp.


cc: Glen Kassan
    Sally Doubet King, Esq.
    Jim McCabe
    Manes Merrit, Esq.
    David Riposo

Severstal 09950

| | |
|---|---|
| **From:** | Dennis Halpin |
| **Sent:** | Thursday, February 05, 2009 10:47 PM |
| **To:** | Michael DiClemente |
| **Subject:** | Re: Fwd:FW: Attached Image |

Mike
 Not sure of the risk profile and investment strategies at either Mason or Capital, but given that they aggregated to slightly over $113 mil or 29% of the total trust value at 10/31/08 and coupled with the CASH at that time of almost $45 mil would represent 40% of the entire trust amount (at 10/31/08)...why can we satisfactorily "reset" utilizing just these three "funds"...SO LONG AS MASON AND CAPITAL:
   a) INVESTMENT STRATEGIES AND RISK PROFILE ALIGN WITH COMBINED WHX TRUST, AND
   b) THEIR COMBINED PERFORMANCE DURING THE TRANSITION PERIOD ALIGN WITH COMBINED WHX TRUST PERFORMANCE, AND
   C) BOTH WHX AND SWI COMMITTEES AGREE WITH TENTATIVE SOLUTION
Am I being too simplistic here?
Dennis


>>> Michael DiClemente 2/5/2009 4:21 PM >>>
I'm forwarding the letter from Ron LaBow.




>>> "RON LABOW, STONEHILL INVESTMENT" <labow@bloomberg.net> 2/5/2009 3:34 PM >>>

---- Original Message From: Marielle Scholl <mscholl@masoncap.com> At:  2/05 15:28:46




Marielle Scholl

Mason Capital Management

110 E 59th St, 30th fl

New York, NY 10022

T: (212) 771-1206

F: (212) 644-4264


This communication (including any attachments) is intended for the use of the intended recipient(s) only and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication. Thank you for your cooperation.

1



EXHIBIT
41
DiClemente 9-26-17

Severstal 16996

From: scanner@MASONCAP.com [mailto:scanner@MASONCAP.com]
Sent: Thursday, February 05, 2009 3:33 PM
To: Marielle Scholl
Subject: Attached Image

2

Severstal 16997

=====Begin Message=====
Message#: 51
Message Sent: 02/06/2009 16:45:28
From: DRiposo@whxcorp.com|David Riposo| | |
BCC: LABOW@Bloomberg.net|RON LABOW|STONEHILL INVESTMENT|5801|30006385
Attachment: 1965170592794001.HTM
FileID: 498CAF79000002B007E4DC50.HTM
Subject: Severstal Wheeling call

Ron,

I received a call from Mike DiClemente and Dennis Halpin from SWI this
afternoon. They had reviewed your letter of 2/4/2009 and were very
concerned, to the point of being upset, with the lack of options with
respect to the Neuberger Berman assets transferred to them on 11/3/2008.
Their frustration centered around two main themes. The first is they
said that you had verbally indicated in previous conversations that you
would be able to retroactively provide a more diversified allocation of
assets and the letter seemed contrary to those verbal assurances. The
second is that they are very concerned that accepting such a
concentrated portfolio of energy related assets exposes them should
participants allege some sort of breach of fiduciary responsibility.

Please contact them as soon as possible to address their concerns so we
can conclude this matter.

Thanks,

Dave

_____

David A. Riposo, CTP
Corporate Treasurer
WHX / Handy & Harman
1133 Westchester Avenue
Suite N222
White Plains, NY 10604
V: (914) 461-1264
F: (914) 696-8684
C: (203) 554-7771
DRiposo@WHXCorp.com

This e-mail is confidential and is intended only for the named
recipient(s) and may contain information that is privileged,
confidential work product or exempt from disclosure under applicable
law. If you have received this message in error, please immediately
notify the sender and delete this e-mail message from your computer.
Thank you.
=====End Message=====

PLAINTIFFS' EF
C6-ID-7-13-11
JRC


EXHIBIT
42
DiClemente 4-26-17

**Minutes of Conference Call**
**Severstal Wheeling, Inc. (SWI) Retirement Committee**

**2:45 p.m. – 3:30 p.m.**
Via Teleconference                                                    **February 6, 2009**

The Retirement Committee of Severstal Wheeling, Inc. (the "Committee") held a meeting with WHX Treasurer, David Riposo, via teleconference on February 6, 2009. The following individuals were present on the call:

> Michael P. DiClemente – Member of the Committee
> Dennis P. Halpin – Member of the Committee
> David Riposo – WHX Treasurer

The focus of the meeting was to:
- Confirm that David received a copy of Ron LaBow's letter and inquire as to his general opinion of the letter
- Inquire as to the status of the Cohn Audit.

David confirmed that he did in fact receive a copy of Ron's recent reply to our letter, acknowledging that it was rather predictable. He said that the audit would be completed very soon. When Michael asked why it is still not done (considering we have heard since late December that it would be completed within days, and that we have heard since then repeated promises of delivery on a very near-term basis), stressing that our need is "urgent", David stated that he would look into it, but was surprised to hear that we were now calling its need "urgent". Dennis clarified that its findings were needed to establish a starting point for each trusts' beginning values and that its delay was placing us in an awkward position for retirees should they request a distribution. David seemed confused, as he thought that this value was simply be used to determine how much cash was needed to true up our accounts, and we had recently advised Dave during the week ending January 30, 2009 that we felt it was inappropriate to take the cash because it would present another reconciling item as part of the reallocation that likely would result in a return of at least some of that cash. Dennis replied that it was needed to establish starting points, but NOT determination of truing up the Neuberger Berman account BUT RATHER truing up both accounts through this transition period. David seemed to quickly grasp what we were defining to be the "true up" position (in our words, the "reallocation"), realizing his prior understanding may have been completely different…but now agreeing with where we were going.

Michael reminded Dave of their previous discussions (from the very start – which began on December 31, 2008 -- and on multiple occasions since then), whereby WHX would have to be a part of the resolution of the misallocation of assets, since the assets would have to be retroactively reallocated in order to ensure that the assets were equitably allocated. He further stated that, as a participant in the WHX Master Trust, WHX is implicated in such activities from a fiduciary perspective and also has fiduciary responsibility for satisfactory resolution. We

[Page]



Severstal 15429

advised that there must be an equitable resolution, such that neither party is advantaged or disadvantaged relative to the other, and that we should ultimately mutually agree to the resolution. Considering that Ron LaBow has not and will not present an equitable solution, we are then bound by our fiduciary obligation to do this on our own. We advised that WHX should begin developing alternative equitable solutions to share with us and that we likewise would do so with him. After realizing our position, he stated that we may want to have a near term discussion with Michael, Dennis, David and both our ERISA counsel present given this new understanding.

We are planning on having a WHX and SWI conference call with our respective ERISA counsel during the week of February 9, 2009

We agreed, emphasizing that we ALL need to get this right.
We ended by saying we would keep in touch.

[Page]

Severstal 15430

**Minutes of Conference Call**
**Severstal Wheeling, Inc. (SWI) Retirement Committee**

3:30 p.m. – 3:45 p.m.
**Via Teleconference**                                                           **February 10, 2009**

The Retirement Committee of Severstal Wheeling, Inc. (the "Committee") held a meeting with WHX Treasurer David Riposo and retirement committee member Jim McCabe via teleconference on February 10,, 2009. The following individuals were present on the call:

       Michael P. DiClemente – Member of the Committee
       Dennis P. Halpin -- Member of the Committee
       David Riposo - WHX Treasurer
       Jim McCabe – WHX retirement Committee member

The focus of the meeting was to establish a specific date and time to conduct a conference call to include both SWI and WHX pension fund committee members AND their respective ERISA counsel. The focus of such a call would be to discuss possible Trust separation / reallocation alternatives, given that the latest reply from Investment Advisor Ron Labow (letter dated February 4, 2009) once again asserted a single, exclusive separation option (i.e. the Neuberger & Berman fund plus cash)...a option the SWI committee members have repeatedly and consistently rejected due to the funds composition coupled with absence of supportive reasoning.

Jim seemed a bit confused, as he thought we at SWI had already "accepted" this alternative. Michael strongly and clearly denied our acceptance of this fund and/or the strategy...even Mike then spent a few minutes updating Jim on the last six weeks activity on this subject. Jim then stated that they were holding a committee meeting Thursday and would get back to us after holding their meeting to further discuss our request to hold a mutli-party discussion with ERISA counsel attending. We inquired why they needed to wait until after their committee meeting to set up such a call...but they simply replied that was their preference. We accepted this but then stated we wanted to consider setting up a date and time "now" to be held as soon as possible after their committee meeting. They replied they would call their committee members once they hung up with us to inform them of our request, and then would get back to us. We closed out the call by thanking them for their time and looked forward to their call.

Within a few minutes, we called them back and left a message with David's assistant, advising them NOT tot speak with Ron regarding the comments from the meeting just held. Given they had both already joined another call, we asked their assistant to please "walk" our message into Dave and hand in to him. She stated she would.

Minutes after that call, David and Jim called us back, stating that they were in receipt of our message and inquiring as to why we were asking them not to call their investment advisor, as they were intending to do just that. Mike replied that our request was specific to the contents of the meeting we just had with them. Specifically, we argued that Ron has followed a singular path without ever providing sufficient justification and with NO substitute alternative ever offered,

[Page]



EXHIBIT
44
DiClemente

Severstal 15241

though his high-level reasoning has altered itself considerably during this time. After receiving Ron's latest (written) reply dated February 4th, we thought it prudent to reach out to WHX's committee and hold a multi-party conference with ERISA counsel to discuss possible alternatives, which we would then present to Ron as a JOINTLY APPROVED path. They understood our position and argument, agreeing not to discuss the contents of our prior meeting (or this current call) with Ron. We concluded by emphasizing the solution that we eventually go with needs to comply with ERISA AND be and acceptable to both parties, and we are confident that our joint meeting will bring us closer to that answer.

[Page]

Severstal 15242

**Minutes of Conference Call**
**Severstal Wheeling, Inc. (SWI) Retirement Committee**

Via Teleconference

2:30 p.m. – 3:00 p.m.
February 11, 2009

Ron LaBow called Dennis Halpin on February 11, 2009 at around 2:30 p.m. and stated the following:

- He was forwarding Michael DiClemente various emails which evidence that reasons why specific funds could not be reallocated in the manner we have been asking;

- expressed his frustration at this impasse we seem to be going through, stating that he didn't know what more to do at this point;

- He said he had not reached Michael today so he was informing me. I replied I had spoken to Mike today and would be willing to conference him in (at home on cell), which I successfully did. As a result, the following individuals participated on the call:

> Michael P. DiClemente – Consultant
> Dennis P. Halpin – Member of the Committee
> Ron LaBow – Investment Manager for SWI's Defined Pension Plans' Investment Portfolio

Ron reiterated what he had stated to me (above), and said he did not know what more he could have done. He said that he now was adding Procyon and Sage to this list. He said that the e-mails coming to Mike would evidence that, except for Mason and Capital (Defense), we would readily see that he was unable to do what we continue to request. Mike stated that Ron's inability to do so continues to change...from "being able to do it at the outset" to essentially not having any ability to do it. For example, Sage and another firm both at Morgan Stanley had $25 million minimums; Titan was closed for 2 years (?), etc. Additionally, a number of the funds are partnerships vs. "managed" funds, where the partnerships have severe cash-out limitations. Ron mentioned that you couldn't get to your money for 3 days. When Mike stated we have never held that timeframe to be unacceptable, Ron revised his comment by saying that these partnerships would not allow you to access your money for 6 months to 1 year. Furthermore, regarding Procyon, Ron said that due to ERISA fund concentration levels, Procyon requested that we liquidate the account...and Ron agreed (an example of certain accounts that had closed).

Ron stressed that our account benefitted from how heavy the cash concentration was, how "protected we were in cash", suggesting 40%. I questioned that level, stating that the Neuberger account at 10/31 was approximately $28 - $29 million and the remainder (maybe $8 million) was cash...how is that 40%?. Ron did not answer.

Ron repeated that he has done all that he can do and doesn't know what more he can do. Mike expressed his disappointment not only as to the fund chosen but also about the absence of updating provided SWI on his separation action, so that he learned of this allocation indirectly in late December through Mercer. Ron stated that, while he may not have directly told Michael, Michael should have known much earlier through correspondence from Neuberger and Berman (N&B) in early November. Mike replied that, while he did receive information from N&B at that

EXHIBIT
45
DiClemente
PENGAD 800-631-6989
9-26-17

RLP AND JFP's Ex
69-JD-7-13-11

Severstal 09858

time, it never indicated that the entire fund was ours or that this fund was our settlement. Ron then stated "Maybe I did something wrong. I don't think so, but maybe I did something wrong."

Dennis offered a hypothetical solution, given Ron's repeated comment that he had no other options… "Given that you say you could have separated Capital Defense ($22 mil) and Mason Capital ($91 mil) and we assume N&B ($28 mil), why couldn't you have apportioned some percentage of each one of these supplemented with cash? In that way, we would better conform to the multiple managers / diversified portfolio investment profiles…versus a single fund like N&B in such a concentrated sector". Ron said that such an allocation would have us giving money back to WHX. Dennis replied "that seems wrong Ron, since the N&B account is down about 19%". Ron asked, "From when?" Dennis said "since October 31"…Ron concurred with this performance but said that Mason and Capital had performed worse. Dennis replied that it would be beneficial to see so. Ron then said he was going to liquidate some of the N&B account into Capital and Mason some time ago (November) but we never gave him the OK. Mike quickly replied, "That's the first I'm hearing you say that Ron", to which Ron read from his letter from a week ago dated February 4th. Mike replied…"but you just said you were going to do this in November…and remember that I didn't become aware of the N&B allocation fully to SWI until late December". Ron said that he was always looking out for the participants, and always had them in mind (Nancy Duck, Lynn Barron), and doesn't know what he could have done more. He ended by saying that WHX was heading in a whole different direction as early as tomorrow, but that he can't do that with us. Having said that, he told Mike to look over the emails being sent …Mike said he would do so and that essentially ended the call.

Severstal 09859

| | |
|---|---|
| From: | RON LABOW Account Name: STONEHILL INVESTMENT Account Number: 30006385 |
| | Bloomberg UUID: 41273 Firm Number: 5801 |
| Sent: | Wednesday, February 11, 2009 7:35 PM |
| Subject: | Re: MIKE--I ASSUME YOU ARE WAITING TO HEAR BACK FROM |
| Attachments: | 400932793126001.HTM |

i am not sure what you want me to do about mason and capital defense after our conversation this afternoon. i again urge you to turn the whole thing into cash since this process seems to take forever.

1



EXHIBIT
46
DiClemente
PENGAD 800-631-6989

99810795

---- Original Message From: Michael DiClemente <Michael.DiClemente@severstalna.com> At: 2/13
12:37:11
Ron

We are evaluating what we want to do and had a conversation with WHX this morning.

On Wednesday we asked for investment materials (description of the investment management strategy, process, discipline, manager biographies and tenures, and historical performance) on Mason and Capital Defense. Are they forthcoming so that we can make an informed decision?

Also, you forwarded emails earlier this week that you received from certain managers describing why you could not allocate SWI assets to Proxima, Titan, Sage, Lehman, and Faralion. Will you be providing similar emails for Stafford, DG Partners, Procyon, and Cohanzick Absolute, or were they available for investment like Mason and Capital Defense?

Mike

>>> "RON LABOW, STONEHILL INVESTMENT" <labow@bloomberg.net> 2/13/2009 9:43 AM >>>
I WOULD LIKE TO KNOW WHAT YOU WANT ME TO DO WITH MASON AND
CAPITAL DEFENSE GIVEN OUR LAST CONVERSATION?PLEASE LET ME KNOW.
=====End Message=====



EXHIBIT
47
DiClemente 9-26-17

| From: | glen@steelpartners.com |
|---|---|
| Sent: | Tuesday, February 17, 2009 3:01 PM |
| To: | Michael.DiClemente@severstalna.com |
| Cc: | sking@mcguirewoods.com; mmerrit@olshanlaw.com; Dennis.Halpin@severstalna.com; David Riposo <DRiposo@whxcorp.com>; Jim McCabe <JMcCabe@whxcorp.com>; Peter Gelfman <PGelfman@whxcorp.com>; labow@bloomberg.net |
| Subject: | RE: Confirmation of Agreement |

Dear Mike,

I am writing to you in response to our conversation last Friday regarding the distribution of assets from the co-mingled trust.

When the assets in the co-mingled trust were "split up," we did not participate with WPN in determining which entity, WHX's pension plan, or Severstal's pension plan ("SWI PP"), was to receive which assets of the trust. WPN told us at that time that Severstal wanted a "mirror" of what the WHX Plan was getting but that WPN could not work that out because some of the Investment Managers could not accept SWI PP monies for various reasons (I understand that WPN has now sent you a number of e-mails regarding this topic). WPN then told us that it had worked out with SWI PP what it would get. We then received confirmation from WPN that the assets we were retaining were appropriate for all parties. Pursuant to WPN's instructions on November 3, 2008, we advised the Trustee to transfer assets (the Neuberger Berman account) to SWI PP. A copy of this instruction was simultaneously sent to you (Mr. DiClemente.) Kindly note that WPN advises me that it has copies of several e-mails between Ron LaBow and you from last November discussing Neuberger and with WPN (Ron) asking if you wanted to sell part or all of the Neuberger account.

Next, please note that I did not propose and did not intend to propose on our call last Friday that we accept a proportional share of the assets held in the Neuberger account. What I intended (as I think I did) convey is that if you don't want that account now, it should be sold ASAP to limit any further unwanted exposure to that account. I was and am still willing to ask WPN whether it wants the WHX Pension Plan to own part of that account on a go forward basis. That decision is WPN's, not mine nor the Pension Investment Committee as long as any such decision by WPN as our Investment Advisor fits within our investment guidelines im the ordinary course.

Importantly please also note that we remain very willing to promptly provide you with all the data we have regarding the valuation of the co-mingled trust account as of 10.31.08 and to assist, to the extent we can, in facilitating an audit as set forth in Sally's e-mail. I do not know what the cost of such an audit might be and will leave that to you.

Sally and you also expressed frustration with WPN's communication and cooperation over the last several months. I remain willing to use whatever influence we have to get WPN to meet with you personally or telephonically to discuss the events related to the 10.31.08 distribution. Please let me know if I can be of assistance in this area.

We are also interested in (and have been as communicated to you for several weeks) transferring to the SWI PP the $6+ million of cash that we believe are SWI PP funds. If you agree, please provide wire transfer instructions.

I am available to discuss any of this further with you at your convenience.

Best,

Glen Kassan

WHX Corporation, CEO

(White Plains, NY) -914-461-1260

Home office-732-254-5012

HO Fax-732-651-1247



cell-732-690-5023

**From:** Michael DiClemente [mailto:Michael.DiClemente@severstalna.com]
**Sent:** Monday, February 16, 2009 3:44 PM
**To:** Glen Kassan
**Cc:** sking@mcguirewoods.com; mmerrit@olshanlaw.com; Dennis Halpin; DRiposo@whxcorp.com;
JMcCabe@whxcorp.com; PGelfman@whxcorp.com
**Subject:** RE: Confirmation of Agreement

Glen, we're just checking in to see when we may hear from you.

> >> <glen@steelpartners.com> 2/13/2009 12:48 PM >>>

I am in receipt of your e-mail as provided below and will review your comments with my group and get back to you as
quickly as possible. Please note that I did not make the proposal cited in the first paragraph in your e-mail. However, we
are willing to work with your group to try to assist in resolving your problem.

Glen Kassan
WHX Corporation, CEO
Steel Partners, Ltd., Operating Partner
590 Madison Avenue, 32nd Floor
New York, NY 10022
(o) 212-520-2304
(fax) 212-520-2301
NJ (o) 732-254-5012
NJ (fax) 732-651-1247

(cell) 732-690-5023

**From:** Michael DiClemente [mailto:Michael.DiClemente@severstalna.com]
**Sent:** Friday, February 13, 2009 11:44 AM
**To:** Glen Kassan
**Cc:** Sally Doubet King; Dennis Halpin
**Subject:** Confirmation of Agreement

Glen

Pursuant to our conference call on 2/13/09, the SWI Retirement Committee accepts the proposal
made by Glen Kassan on behalf of the WHX Pension Investment Committee to accept a
proportional share of the assets held as of this date in the Neuberger Berman account and further
agrees to the liquidation of those assets, with the concurrence of WPN Corp., and receipt of the
proportional share of proceeds as partial settlement of the transfer of SWI pension assets. The SWI
Retirement Committee further agrees that the balance of assets attributable to SWI pension plans
(based on the October 31, 2008 valuation, as adjusted for gains or losses) will be transferred to
National City Bank, as Trustee, as soon as practicable. This transfer will be made in-kind from
existing transferable assets and cash; in the alternative, the transfer will be made entirely in cash.

SWI Retirement Committee further agrees to work in good faith with the WHX Pension Investment Committee and we understand that the WHX Pension Investment Committee will work in good faith to achieve a swift and equitable division of all assets previously held in the commingled master trust account.

Since time is of the essence in resolving these issues, the SWI Retirement Committee requests acknowledgement of this agreement by affirmative response to this email, for example:  On behalf of WHX, I agree to the conditions as outlined.

Mike DiClemente
On behalf of the SWI Retirement Committee
304-234-2811



DENNIS P. HALPIN
PHONE:        304 234 2421
FAX:           304 234 2206
DENNIS.HALPIN@SEVERSTALNA.COM

*Via Email*

David A. Riposo, CTP
Corporate Treasurer
WHX Corporation
1133 Westchester Avenue, Suite N222
White Plains, NY  10604
February 20, 2009

Dear Dave:

This letter follows up on our conversation about the division of assets in the WHX master trust.

You proposed in an earlier call that the WHX master trust could send between $6 million and $7 million of cash to the Severstal Wheeling, Inc. trust.  This proposal was reiterated in Glen Kassan's February 17, 2009 email correspondence. Upon consideration of that proposal, the Retirement Committee of Severstal Wheeling, Inc. agrees to accept $6 million in cash in partial settlement of the equitable division of assets of the WHX master trust.

The transfer should be made to the Severstal Wheeling, Inc. Pension Plan Master Trust, National City Bank as Trustee of the Trust.  The wire transfer instructions are below:

WIRE: ABA #041-000-124
BNF# 2171150005490

BNF Name: Trust Operations Dept. Attn: Amanda Pierce
FFCT: Severstal Wheeling DC Master Trust
Acct #56000179460

Please make the transfer on Monday, February 23, 2009. If this date is not possible, please advise what date we should expect the transfer to occur.  Contact me if you need any further information.

Sincerely,

Dennis Halpin

c:     Ron LaBow
        Glen Kassan
        Mike DiClemente
        Sally Doubet King

EXHIBIT
49
DiClemente
PENGAD 800-631-6989
4-26-17

McGuireWoods LLP
77 West Wacker Drive
Suite 4100
Chicago, IL 60601-1818
Phone: 312.849.8100
Fax: 312.849.3690
www.mcguirewoods.com

Sally Doubet King
Direct: 312.849.3684 | **MCGUIREWOODS**

sking@mcguirewoods.com

February 24, 2009

Mr. Ronald LaBow
WPN Corporation
110 East 59th Street
New York, NY 10022

Dear Ron:

I am writing on behalf of the Severstal Wheeling, Inc. Retirement Committee (the "Committee").

As you know, the Committee is awaiting the opportunity to review and analyze copies of the financial report prepared by J. H. Cohn on the WHX Master Pension Trust and the transfer of the Severstal Wheeling Inc. (SWI) pension plan trust assets.

The Committee believes that it is important to work toward a resolution of the investment of the previously transferred assets and not to wait until the financial materials are reviewed and analyzed by the Committee.

The Committee wants to ensure that it has taken all actions to facilitate your fulfilling your duties as investment manager of the SWI pension assets. The Committee is acting based on the following prior events.

- The investment management agreement between Severstal Wheeling, Inc. and WPN Corporation states that, as an ERISA Named Fiduciary, your company has complete authority to select and designate other investment managers, for example, Neuberger Berman. After conversations with you, the Committee agreed to work with Neuberger Berman to get an agreement in place between SWI and Neuberger Berman for investment services.
- The Committee successfully negotiated all provisions, except the fee provisions, of the Neuberger Berman agreement. You agreed to handle the fee negotiation with Neuberger Berman and secure a more favorable fee structure.
- The Committee has not signed the agreement with Neuberger Berman while waiting on the finalization of the fee adjustment with Neuberger Berman.
- The Committee expressed its concerns to you on multiple occasions regarding the lack of diversification of the portfolio based on allocation of the entire Neuberger Berman account to the SWI Pension Trust. Subsequently, the

Almaty | Atlanta | Baltimore | Brussels | Charlotte | Charlottesville | Chicago | Jacksonville | Los Angeles
New York | Norfolk | Pittsburgh | Raleigh | Richmond | Tysons Corner | Washington, D.C. | Wilmington



Severstal 00033

Mr. Ron LaBow
February 24, 2009
Page 2

Committee asked you for additional information and alternative proposals to address its diversification concerns. In particular, the Committee is looking for a proposal whose portfolio diversification can satisfy ERISA and SWI Pension Trust investment policy requirements and guidelines.

At this point, the Committee is taking several steps in an effort to move the situation forward. First, the Committee will sign the Neuberger Berman investment management agreement even though it is our understanding that the fee issue has not been resolved. Although the Committee continues to disagree that all of this account should have been allocated to the SWI Pension Trust, it feels that the resolution of that issue should be addressed separately.

Second, the Committee will facilitate transfers of assets and will provide direction for Neuberger Berman or National City (as trustee and custodian) to execute your instructions regarding the investment management of the Neuberger Berman account. The Committee will not approve or reject investment actions made by you, since you are investment manager and have full authority regarding investment decisions under the Agreement.

Third, the Committee requests regular written reports from you regarding the status and performance of all assets in the SWI Pension Trust, including a report indicating how the post-transfer trust fund complies with each of the investment management agreement and the investment guidelines.

Sincerely yours,


Sally Doubet King


cc:   Michael DiClemente, SWI
      Dennis Halpin, SWI
      Steven D. Kittrell, MW

**Salaried Employee's Pension Plan of Severstal Wheeling, Inc.**
**Severstal Wheeling, Inc. Corrugating Company Retirement Security Plan**

## *STATEMENT OF INVESTMENT POLICY*

**February 2009**
Draft

**Mercer Investment Consulting**
**10 South Wacker Drive**
**Chicago, IL 60606**
**Phone: 312 902 7500**



EXHIBIT
51
Di Clemente 9-26-17
PENGAD 800-631-6989

Severstal 09940

# TABLE OF CONTENTS

| | PAGE |
|---|---|
| Executive Summary | 1 |
| Purpose | 2 |
| Responsible Parties and Fiduciary Duties | 3 |
| Objectives and Investment Structure | 5 |
| Evaluation and Review | 6 |

Severstal 09941

## EXECUTIVE SUMMARY

## Severstal Wheeling, Inc.

Type of Plan:                              Defined Contribution

Plan Sponsor:                             Severstal Wheeling, Inc.

Plan Administrator:                     Investment and Oversight Committee

Investment Advisor:                    Ron LaBow

Severstal 09942

## PURPOSE

### Purpose of the Plan

This *Statement of Pension Investment Policies and Objectives* is the result of discussions between the Salaried Employee's Pension Plan of Severstal Wheeling, Inc. and Severstal Wheeling, Inc. Corrugating Company Retirement Security Plan ("the Plan") and Mercer Investment Consulting. The purpose of this Statement is to assist Severstal Wheeling, Inc. (Severstal) investment advisors of the Plan in effectively supervising and managing the assets of the Plan sponsored by Severstal.

#### Purpose of Investment Policy

The purpose of this document is to define the investment policy for the Plan. The policy will identify a set of investment objectives, guidelines and performance standards for the assets of the Plan. This statement:

- Describes the objectives of the Plans;
- Outlines the investment guidelines and responsibilities of the advisor; and
- Establishes the criteria for evaluating the performance of the investment advisor.

This Statement of Investment Policy (Policy) represents the formal document for the investment of the Plan assets and is to be communicated to the investment advisor for their use in developing an appropriate investment program, to the Plan's administrator for use in exercising fiduciary responsibility in overseeing the Plan and upon request to the Plan's participants. This document will also be used as the basis for future investment performance measurement and evaluation.

Severstal 09943

### Investment Advisor

The investment advisor will be considered a fiduciary to the Plan and thus will discharge their duties solely in the interests of beneficiaries and with the care, skill, prudence and diligence under the prevailing circumstances that a prudent person acting in a like capacity and familiar with matters of the type would use in the conduct of an enterprise with a like character and like aims. The duties and responsibilities of the Plan's advisor include:

- Investing the Plan's assets according to the stated investment philosophy that is appropriate and prudent on behalf of the Plan participants; and,

- Meeting as required with the Committee and/or their designees to review portfolio and investment results

- Notifying the Committee and/or their designees in advance of potential changes in fund operation under consideration or about to be implemented. This includes organizational or strategy changes that impact asset management.

- Issuing a periodic report to the Committee and/or their designees which includes the following information:
    - The market value of Plan assets;
    - The portion of fund assets allocated to each manager;
    - Time-weighted rates of return measured net of investment management fees and all expenses for the current quarter, year-to-date, and historical time periods;
    - Average manager characteristics and number of holdings at quarter-end;
    - Expenses;
    - Current investment strategy; and,
    - Changes implemented over the prior quarter.

### Investment Consultant

The Committee may retain the services of a third party Investment Consultant to provide expert advice and recommendations to help the Committee discharge its fiduciary responsibilities in furtherance of the Plan's goals and objectives. Such services provided by the Investment Consultant will include the following:

- Monitoring of long-term capital market trends;

- Periodic review of asset allocation, investment policies and objectives, and suggestion of appropriate changes;

- Evaluation of Total Fund asset allocation and performance; and

- Assume responsibility as a fiduciary only with respect to the investment advice given.

### Other Service Provider(s)

Other parties may be appointed by the Committee to perform specialized functions that may be in the best interest of the Plan. Such service providers will perform their activities as directed by the Committee in the sole interest of Plan participants.

Severstal 09945

## OBJECTIVES AND INVESTMENT STRUCTURE

<u>Investment Objectives</u>

The primary investment objectives of the Plan are to offer a set of investment options such that:

- Over an annual and rolling three-year period, the performance of the total Pension Plan will be measured against an absolute return of 8.0% net-of-fees;

- The volatility of this fund will also be monitored to make sure that it is not excessive.  Given the management style of the plan, an appropriate volatility benchmark is 4.0% annually;

- Diversity in the investment managers underlying the Plan, amongst sectors and type of holdings;

- The Plan is adequately diversified, holding more than 100 securities; and

- Three or more managers are utilized for the implementation of the assets.

<u>Review</u>

The Committee will monitor the performance on a quarterly basis.

Severstal 09946

## EVALUATION AND REVIEW

### Review of Investment Objectives and Policy

The Committee will review the achievement of investment objectives on a quarterly basis. The review will focus on the continuing feasibility of achieving the objectives and the continued appropriateness of the investment policy. It is not expected that the investment policy will change frequently; in particular, short-term changes in the financial markets generally should not require an adjustment in the investment policy.

As a general rule, this Statement should be reviewed every three to five years. Some specific occurrences which might suggest to the Committee an earlier review are:

- Significant changes in Plan demographics, or benefit design;
- Significant changes in the prospects for corporate growth, for growth of the work force, or for growth of employee salaries;
- Changes in the overall marketplace;
- The availability of new technology, the application of which the Committee believes will improve this investment policy; and
- The passage of relevant new legislation or regulations.

Specific policy issues may be visited whenever the Committee deems necessary.

### Review of Investment Advisor

The Investment Advisor shall discharge their responsibilities with respect to that portion of the Plan's assets under its management in accordance with ERISA's fiduciary responsibility provisions.

The Committee will review the Investment Advisor at least annually. The annual reviews will focus on:

- Adherence to guidelines;
- The opportunities available in the different asset markets; and,
- Material changes in the manager/provider organizations, such as philosophy and personnel changes, acquisition or loss of major accounts, etc.

If the Investment Advisor demonstrates poor performance or experiences a material change in personnel, more frequent meetings may be necessary. The Committee may retain the services of an Investment Consultant to help fulfill this duty.

Severstal 09947

### Performance Monitoring

Time-weighted rates of return will be calculated at quarterly intervals for the plan. Measurements shall be reported for the most recent quarter, year, three-year and five-year periods, and ten-year periods, if available.

In addition to quantitative data, the Committee should obtain qualitative and subjective analysis on the performance of its investment managers/fund providers, as requested

The performance of the Investment Advisor will be monitored on an ongoing basis and it is at the Committee's discretion to take corrective action by replacing the advisor if they deem it appropriate at any time. A formal evaluation may be initiated if an extraordinary event occurs that could interfere with the advisor's ability to fulfill their role in the future, or if the advisor fails to achieve agreed upon performance objectives over agreed upon time periods.

- A formal manager evaluation may include the following steps:
    1. A letter to the advisor asking for an analysis of their underperformance.
    2. An analysis of recent transactions, holdings and portfolio characteristics to determine the cause for underperformance or to verify a change in style.
    3. A meeting with the advisor, which may be conducted on-site, to gain insight into organizational changes and any changes in strategy or discipline.
    4. A formal review of gathered information leading to a decision to either: (1) retain the advisor in a normal capacity; (2) retain subject to a "watchlist" status; or (3) terminate.

### Investment Advisor Termination

Upon termination of an Investment Advisor, the Committee will undergo an extensive search process to replace the Advisor.

Severstal 09948

## RESPONSIBLE PARTIES AND FIDUCIARY DUTIES

### Board of Directors

Pursuant to the Board Resolution, the Board of Directors of Severstal Wheeling, Inc. has delegated authority and responsibility for the Plan to the Investment & Oversight Committee (Committee) as the Plan Administrator for the Severstal Wheeling Savings and Retirement Savings Plans.

### Investment & Oversight Committee (Committee)

The Committee is composed of executive members and employees of Severstal Wheeling, Inc. whose responsibilities encompass the following:

- Developing an investment program that offers a diversified range of holdings;

- Identifying an investment advisor which it deems appropriate and prudent to make decisions on behalf of the Plan participants;

- Monitoring investment results by means of regular reviews and analyses to determine whether those responsible for investment results are meeting the guidelines and criteria identified in this Policy Statement;

- Evaluating the program structure and types of options to ensure that the program meets the needs of the diverse participant base; and

- Deciding on and taking appropriate action if objectives are not being met or if policies and guidelines are not being followed; and

### Staff

The Committee has delegated responsibility for the following duties to certain Severstal Wheeling employees.

- Managing and monitoring plan activity with general oversight of the plan administration;

- Coordinating Committee meetings, advisor presentations and discussions, and consultant activities, presentations and discussions;

- Identifying issues to be brought before the Committee and preparing recommendations to the Board on those matters; and

- Such other matters as are directed by the Committee and the Board from time to time.

Severstal 09944

*Effective November 1, 2008*

## Severstal Wheeling, Inc.

## Pension Plan Investment Policy

Several Wheeling, Inc. has contracted with WPN Corporation to manage the assets of the SWI Pension Plan Trust (the Trust). The contract outlines the scope of WPN's discretionary authority, which is subject to the investment polices set forth in this investment policy statement. The SWI Retirement Committee approved the retention of WPN and set the terms of WPN's compensation and will review the terms set forth in the contract at least annually.

### Responsibilities

**Board of Directors**

1.  Appoint members to the SWI Retirement Committee (the Retirement Committee); the Retirement Committee is charged with responsibility for fiduciary oversight of the Trust's investments.

2.  The Retirement Committee is charged with developing and maintaining this investment policy statement, including guidelines, objectives and processes outlined herein, which will be reviewed and reported to the Board no less than annually.

**Retirement Committee**

1.  Ensure the Plan's assets are managed in compliance with the Employee Retirement Income Security Act (ERISA) and other applicable laws and regulations.

2.  Ensure that the Plan's assets are invested such that funds are available to meet benefit obligations when due.

3.  Develop and maintain this investment policy statement. The Retirement Committee will submit this investment policy statement to the Board annually for its review and approval. The Retirement Committee may make changes to this investment policy statement at any time based on its ongoing review of the status of the Trust and conditions in the investable markets. Material changes should be submitted to the Board at its next regularly scheduled meeting for review and approval.

4.  Retain, at its discretion, a trustee and other professional services to facilitate and assist with the management of the Plan's assets, including setting or agreeing to the terms of compensation for these third party service providers. With the advice of WPN, the Retirement Committee will retain, on behalf of the Trust, the

1



*Effective November 1, 2008*

managers selected by WPN, unless the Retirement Committee determines that it is not prudent to do so.

5. Review regularly the performance of the Trust's assets and service providers, and report quarterly to the Board of Directors.

WPN Corporation

1. Determine the Trust's asset allocation strategy.

2. Subject to paragraph 4 of the section entitled "Retirement Committee", exercise complete, unlimited and unrestricted management authority with respect to the investment of the Trust, including selecting investment managers and negotiating the terms of their employment by the Trust.

INVESTMENT GUIDELINES

1. WPN Corporation should ensure that the Trust's assets are well-diversified with respect to the type of assets (equity, fixed income, etc.), investment strategies employed and number of investment managers used. The following table provides broad diversification guidelines.

| Strategy | Max % of Fund | Max with a Single Manager |
|---|---|---|
| Traditional Strategies | 100% | |
| Equities | 75% | 25% |
| Fixed Income | 100% | 100% |
| Cash Equivalents | 100% | 100% |
| Convertibles | 25% | 20% |
| High Yield | 25% | 20% |
| Alternative Strategies | 75% | |
| Fund of Funds | | 20% |
| Multi-Strategy Invs | | 20% |
| Single Strategy Invs | | 20% |
| Venture Capital | | 20% |

2. Derivatives may be used as a part of certain of the Trust's investment strategies. However, in no case may derivatives be used to leverage the Trust's commitment to a particular investment strategy or manager, i.e., a poorly performing derivative position can not require the Trust to provide additional funding to an investment manager or strategy.

3. WPN Corporation must ensure that in aggregate the issues of SWI Corporation or entities more than 50% owned by SWI Corporation do not exceed 10% of the Trust's assets.

*Effective November 1, 2008*

4. The assets of the Trust should be invested substantially in assets that provide the Trust liquidity on at least a quarterly basis. The Retirement Committee will inform WPN annually of the anticipated cash requirements to pay benefits and administrative expenses of the plans invested in the Trust.

## STANDARDS OF PERFORMANCE

The three (3) to five (5) year objective of the Plan is to achieve a rate of return, net of expenses, that exceeds the Trust's assumed expected earnings rate at prudent levels of risk.

## PROXY VOTING

Proxies should be voted and rights exercised exclusively in the best interest of the Trust's beneficiaries. WPN Corporation may at its discretion direct the voting of proxies; however, it is anticipated that the Trust's investment managers will normally be responsible for voting the proxies, and other decisions regarding rights, which may be connected to the Trust's ownership of securities. WPN Corporation will oversee this activity and provide the Retirement Committee with its written proxy voting policies and, where applicable, the policies of each of the Trust's investment managers. WPN Corporation will keep the Retirement Committee updated on any changes to these policies. The Retirement Committee will review WPN Corporation's and each manager's policy and ensure it provides satisfactory guidelines for voting proxies in the best interest of the Trust's beneficiaries.

## BROKERAGE

Brokerage commissions are expenses of the Trust. As expenses of the Trust, brokerage commissions must be managed in the best interest of the Trust's beneficiaries. WPN Corporation has sole discretion to select brokers or otherwise manage the brokerage of the Trust. WPN Corporation must ensure that the transactions of the Trust are in aggregate executed at a reasonable cost, given the competitive environment for brokerage services and the value of research services, if any, received. As a regular part of its review, WPN Corporation will review each investment manager's trading practices to ensure that trading costs and other practices are consistent with the interests of the Trust. WPN Corporation will periodically, but at least annually, report to the Retirement Committee on the brokerage activity of the Trust. WPN Corporation's report should provide, at a minimum: (1) the names of all brokers receiving a material amount of commissions; (2) the dollar amount of the commissions received; (3) WPN's description of any research services received; and (4) WPN's assessment of the broker's execution abilities. The report should specifically focus on any directed brokerage arrangements entered into by WPN.

## INVESTMENT MANAGER REPORTING

The WPN Corporation will ensure that each investment manager provides the Retirement Committee with the following information:

- A monthly listing of individual security holdings at cost and market.

- Where feasible, a monthly listing of all transactions by individual security.

*Effective November 1, 2008*

- A quarterly report such as would be provided to the Retirement Committee for a presentation, even though the manager or WPN may not make a personal presentation to the Retirement Committee during that quarter.

\7645585.1

Evaluation of WPN Corporation's Compliance with the
WHX Pension Plan Investment Policy as of March 2004 and the
Seversital Wheeling, Inc. (SWI) Pension Plan Investment Policy effective Nov. 1, 2008
March 2009

As part of the separation of the WHX pension plan(s) and SWI pension plans from the WHX
Master Trust, WPN Corporation allocated assets to the respective parties using account
balances as of October 31, 2008.  The assets were transferred on November 3, 2008 (the next
business day).

Per a February 11, 2009 report prepared by J. H. Cohn, LLP, who the WHX Pension Plan
Administration Committee engaged to validate the asset and account values, Cohn assigned
the following values to the SWI pension plans as of October 31, 2008, prior to recognition of the
Farallon Capital adjustment:

| | |
|---|---|
| Wheeling Corrugating Company Retirement Security Plan | $1,475,045.67 |
| Salaried Employees' Pension Plan of WPSC | $36,672,833.82 |
| Before Farallon Capital Adjustment | $38,147,879.49 |

At the time of separation, Ron LaBow, the investment manager at WPN, unilaterally allocated
assets to SWI consisting of the entire value of the Neuberger Berman (NB) portfolio with the
remaining amount to be satisfied in cash.  Cohn's report assigned $31,446,845.38 as the value
of the NB portfolio as of Oct. 31, 2008, which included some level of cash.  Review of the
security portion of the NB portfolio using the Citicorp trust statements and NB's own statements
determined that $29,700,670 of this account value consisted of common and preferred
stocks/ADRs as follows:

| No. | Issuer | Value | % | Sector | Security Type |
|---|---|---|---|---|---|
| 1 | Anadarko Petroleum Corp. | $3,530,000 | 9.3% | Energy | Common Stock |
| 2 | Chesapeake Energy Corp. | 2,197,000 | 5.8% | Energy | Common Stock |
| 3 | Devon Energy Corporation | 4,851,600 | 12.7% | Energy | Common Stock |
| 4 | ENSCO International Inc. | 3,667,965 | 9.6% | Energy | Common Stock |
| 5 | Petroleo Brasileiro SA | 489,600 | 1.3% | Energy | ADR |
| 6 | Pride International, Inc. | 563,700 | 1.4% | Energy | Common Stock |
| 7 | Rowan Companies, Inc. | 1,814,000 | 4.8% | Energy | Common Stock |
| 8 | Whiting Petroleum Corp. | 5,121,015 | 13.4% | Energy | Common Stock |
| 9 | XTO Energy, Inc. | 2,157,000 | 5.7% | Energy | Common Stock |
| 10 | Talisman Energy, Inc. | 2,520,000 | 6.6% | Energy | Common Stock |
| | Total – Energy | 26,911,880 | 70.6% | | |
| 11 | AIG, Inc. | 462,990 | 1.2% | Insurance | Preferred Stock |
| 12 | Xerox Corporation | 2,325,800 | 6.1% | Office/Bus. | Common Stock |
| | Total – Other | 2,788,790 | 7.3% | | |
| | Total – Stocks/ADRs | 29,700,670 | 77.9% | | |
| | Cash Equivalents | 8,447,209 | 22.1% | Before Farallon adjustment | |
| | Grand Total to SWI | 38,147,879 | 100.0% | Before Farallon adjustment | |



EXHIBIT
53
Di Clemente  9-26-17

Seversital 10011

## Observations

The policies state that WPN is to ensure that the assets are well-diversified with respect to type of assets (equity, fixed income, etc.), investment strategies employed and number of investment managers used.

### *Portfolio Violations*

WPN did not ensure that the portfolio continued to be well diversified.

1. WPN allocated SWI's share of the WHX Master Trust assets to a concentrated portfolio of 12 stocks representing approximately 78% of the value of the entire portfolio with the balance allocated to cash equivalents.
2. WPN further allocated 10 of the 12 issues to stocks in the energy sector, representing over 70% of the value of the entire portfolio.
3. In several instances, WPN further invested approximately 10% or more of the portfolio's value in securities of a single issuer.
   a. Anadarko Petroleum Corp. – 9.3%
   b. Devon Energy – 12.7%
   c. ENSCO International Inc. – 9.6%
   d. Whiting Petroleum – 13.4%
4. WPN utilized a single manager, Neuberger Berman, to manage the concentrated stock portfolio. The policy states that the maximum amount permitted to be managed by a single equity manager is 25% of overall equities. At approximately 78% of the portfolio, the NB portfolio represents over three times that allowed for any one manager.
5. WPN did not construct a portfolio using prudent levels of risk. The WHX policy states that the objective is to achieve a rate of return that exceeds the Trust's assumed expected earnings rate at prudent levels of risk, and likewise SWI's policy requires that the assets be prudently invested.
6. Despite the aforementioned policy violations, we note that WPN permitted WHX to stay invested in the remaining assets of the fully diversified portfolio, consisting of over a dozen different managers/investment strategies. WPN and WHX each had an obligation to ensure that the assets of each bifurcated fund remain well diversified.
7. WPN did not ensure that SWI received a monthly listing (for November 2008) of individual security holdings at cost and market until December 30, 2008, the day after SWI learned how the assets were allocated.

In short, WPN failed to adhere to the "diversification", "prudent man", and "exclusive purpose" standards prescribed by ERISA.

March 9, 2009

Severstal 10012

| | |
|---|---|
| **From:** | Khanuk, Russel <russel.khanuk@nb.com> |
| **Sent:** | Friday, March 20, 2009 2:23 PM |
| **To:** | Dennis Halpin <Dennis.Halpin@severstalna.com> |
| **Cc:** | Michael DiClemente <Michael.DiClemente@severstalna.com>; Sally DoubetKing <sking@mcguirewoods.com>; Diccianni, Charlie <CDiccianni@nb.com> |
| **Subject:** | RE: |
| **Attach:** | nb_logo_trans.gif |

Hi Dennis,

We are all set with the paperwork and the account has been opened and linked to NatCity. We are waiting for the fee schedule to be worked out prior to any trading.

Thank You


Russel Khanuk
Client Associate
Neuberger Berman Wealth Management
605 Third Ave, Floor 36
New York, NY, 10158
212-476-5606
Fax: 212-520-9485
Email: Rkhanuk@nb.com

---

**From:** Dennis Halpin [mailto:Dennis.Halpin@severstalna.com]
**Sent:** Friday, March 20, 2009 1:50 PM
**To:** Khanuk, Russel
**Cc:** Michael DiClemente; Sally DoubetKing
**Subject:** Re:

Russel
Just doing a final check...can you confirm that you now have everything you needed?
Please let me know
Dennis

>>> "Khanuk, Russel" <russel.khanuk@nb.com> 3/16/2009 3:38 PM >>>
Good Afternoon,

I want to thank you for working with us and all your patience on opening account at Neuberger Berman for Severstal Wheeling.

As of Fridays close, we have uploaded the account based on NatCities security holdings and the account is ready for trading.

With that being said, I am waiting for Ron Labow and Marvin Schwartz ( portfolio manager) to agree on the fee schedule prior to any trading. From what I was told, Marvin has placed a call to Ron but was unable to reach him. Once both parties work out a fee, we will begin trading.

Thank you for being so helpful in the account opening process, I will keep you both posted once we are up and running.



EXHIBIT
54
DiClemente

=====Begin Message=====
Message#: 21
Message Sent: 03/23/2009 19:14:50
From: Dennis.Halpin@severstalna.com|Dennis Halpin| | |
BCC: LABOW@Bloomberg.net|RON LABOW|STONEHILL INVESTMENT|5801|30006385
Subject: NB trade assistance

Ron
 Sounds like you made contact with Nat City late today (Jackie Thomas).
If somehow you need my assistance tomorrow to complete NB trades...call my cell 304-650-6474
Dennis
-----Original Message-----
From: "RON LABOW, STONEHILL INVESTMENT" <labow@bloomberg.net>
To: Halpin, Dennis <Dennis.Halpin@severstalna.com>

Sent: 3/19/2009 1:43:18 PM
Subject: INCLUDING 400K DUE YOU WE ARE AT ROUGHLY $32 MILLION SO WE HAVE

INCLUDING 400K DUE YOU WE ARE AT ROUGHLY $32 MILLION SO WE HAVE
TO GAIN 25% FROM HERE TO GET BACK TO $40 MILLION--WILL KEEP YOU
POSTED

=====End Message=====



Transcription of Voice Mail Message
Monday, March 23, 2009
9:49 a.m. CDT

Severstal Wheeling

Sally, this is Ron LaBow. I am merely checking in with you I am not asking you to agree
to anything or not agree to anything, I just want to keep you apprised of....I have been
speaking with Dennis Halpin. I have tried to call Mike a couple of times. I am not sure
he is in all the time. Anyway, we have made, I have not , still not diversified nor invested
the cash. What I have done though, I have been lucky in .. with what ..the positions have
have been doing...doing real well and we have made back the big chunk of money. I am
going to liquidate the account when I think its appropriate turning the whole thing into
cash and go to diversification..and go to the more normal diversification. And hopefully
I will do it correctly, but I would say we are up ...the account in the additional four
hundred and some thousand are going to be _____. I would say the account is up to $33
million or thereabouts so that's down …. So that's down less than 20% from the peak and
I think that's right. But anyway I just wanted to keep you informed. I still haven't .
diversified. I have a list where we are going when we do diversify but the account
because of what's going on in the marketplace and the turbulence and why I think what
we own is exactly what we should own now for a short period of time I am going to leave
it as is but then I am going to go and diversify..and I have cleared this ...I haven't cleared
it, I have told Dennis what I am doing and if you have a problem with this merely send
me an email. I …and I am not asking for your permission or asking you to sign off on
anything I am just merely keeping you informed .. the responsibility is completely mine.
If you need to speak to me send me an email and I will call you back immediately I am
on my computer

\8281231.1



=====Begin Message=====
Message#: 76
Message Sent: 03/25/2009 10:14:40
From: Dennis.Halpin@severstalna.com|Dennis Halpin| | |
BCC: LABOW@Bloomberg.net|RON LABOW|STONEHILL INVESTMENT|5801|30006385
Attachment: 157944216012001.HTM
FileID: 49CA3C5200000B4307E4F81C.HTM
Subject: Fwd: RE: Allegiant Money Market Funds

Ron:
  Believe this should provide you with all you need.
  Let me know your decision. If OK with this (govt) fund, I will process the needed paperwork today so
that the settlement funds can go directly into this account.
Dennis

>>> Michael DiClemente 3/25/2009 9:51 AM >>>



**Severstal Wheeling Inc. (SWI) Defined Contribution Pension Plans - Status Update: April 1, 2009**

## 1) <u>Neuberger Fund Performance:</u>

Recent correspondence from WHX included receipt of AON-prepared monthly WHX portfolio performance reports. WHX actually used these monthly rates to support adjustments to their settlement balance due SWI. These reports clearly indicate that the WHX (separated) trust has well outperformed the fund assigned SWI...a fund whose acceptance the SWI retirement committee has fought vigorously given its non-conformance to our investment guidelines with specific regard to manager and portfolio diversity. Since the bifurcation (November 3, 2008), the Neuberger Berman account had lost approximately 15% through liquidation date (March 24, 2009), making the overall account's loss around 13% when the cash portion is considered. However, a review of the monthly AON reports from November 2008 through February 2009 suggests:

  *- WHX (separated) account was essentially "breakeven" (maybe a 1% cumulative loss) during Nov 2008 – Feb 2009 ...and likely even better if the period extends through March 2009.*

  *- Mason Capital and Capital Defense accounts collectively performed at approximately a 5.5% loss (simple avg.) level during this Nov 2008 – Feb 2009 period.*

  *- S&P Index performed at an approximate 25% loss over this 4 month period (simple average) ending Feb 2009*

Equipped with this information, there may be a case for seeking recovery for damages. See item 6 below for added comments on engaging professional services to conduct this workscope.

## 2) <u>Reconstitute the SWI Retirement Committee:</u>

Given this critical point in the WHX Master Trust bifurcation process, and the possibility of litigation, coupled with the recent departure of Michael DiClemente, leaving myself as the sole committee member, *I restate the urgent need to reconstitute this committee.* If this fund/plan is to remain at the "local" level for the foreseeable future, then I believe its committee staffing should remain "local", to include human resources and finance with possible involvement by SNA (Dearborn) legal. If it is to be combined into a larger, more corporate plan/account, then I believe its oversight staffing should reflect such.

## 3) <u>Year End Account Statements</u> – tentative decision is to issue 12/31/08 statements with a cover letter updating participants with a general performance comment about Q1 2009 in order to lessen possible concern over the interim account erosion at year end, given how reduced that balance



Severstal 18277

was and the marked improvement from then until March 24, 2009 when the account was liquidated and reinvested into government securities.

4) **Distribution Requests:**
Given the downside "floor" resulting from liquidating the fund on March 24, 2009, it has been tentatively decided to use 70% as an interim distribution rate for participants seeking distributions since October 31, 2009.

5) **Fund Settlement per WHX contention**: SWI received another $321K payment on 3/31/09 as final settlement of the SWI Trust obligation per WHX's contention.

a) Final Fund Value (per WHX):

| | |
|---|---:|
| Oct. 31, 2008 value per Citibank | $38,147,879 |
| Farallon adjustment | (582,305) |
| Post 10/31 acct. transactions | (104,890) |
| Post 10/31 WHX fund performance | ( 92,078) |
| | $37,368,606 |

b) Settlement by WHX:

| | |
|---|---:|
| Neuberger Berman account - | $31,446,845 |
| Supplemental cash payment - | 5,600,000 |
| Supplemental cash payment - | 321,761 |
| | $37,368,606 |

c) SWI "carved-out" value @ 10/31/08    $37,368,606   *(per WHX)*

| | |
|---|---:|
| Account value at 3/31/09 | 32,433,852 |
| Fund loss -$ | $4,934,754 |
| Fund loss - % | 13.2% |

6) **Consulting Services / "NERA" Engagement:**
We are in the process of engaging National Economic Research Associates, Inc. ("NERA"), an affiliate of Mercer, to perform certain professional services relative to the fund assigned to SWI by WPN. These services currently consist of:

*1. Validate the amount of the SWI plans' interest in the WHX Master Trust as of 10/31/08*

*2. Compare the actual results of the SWI trust from 10/31/08 to 3/31/09 with the anticipated results from a diversified portfolio for that same period*

*3. Compare the actual results of the SWI trust from 10/31/08 to 3/31/09 with the result that would have occurred if the 10/31/08 transfer had consisted of proportional interests in all "separable" funds, to include Neuberger Berman, Capital Defense and Mason Capital.*

Severstal 18278

We recently received an engagement letter from them detailing their terms and hourly rates. The retirement committee considers these services necessary under the circumstances, yet wanted to apprise Company management of the committee's action. We will request an estimate of the total work scope from NERA and forward this to Company management upon receipt.

Severstal 18279



**Severstal**
International

VIA OVERNIGHT MAIL
VIA FACSIMILE 212-751-0773

May 5, 2009

Mr. Ronald LaBow
WPN Corporation
110 East 59th Street
New York, NY 10022

Dear Mr. LaBow:

I am writing to you as the new chairman of the Severstal Wheeling, Inc. Retirement Committee (the "Committee").

In addition to my appointment as the chairman of the Committee, other new members have been appointed to the Committee. The new members of the Committee have been briefed on the history since November 2008 of the investment of assets of the Salaried Employees' Pension Plan of Wheeling-Pittsburgh Steel Corporation and the Wheeling Corrugating Company Retirement Security Plan (the "Plans"). The performance and lack of diversification of the assets during this period was discussed.

Implementing an appropriate ongoing investment of the assets of the Plans remains a top priority for the Committee. Therefore, the Committee renews the request that was previously made to you for a complete investment plan for these assets. The Committee believes that it is important that the investment plan address its concerns that there be portfolio diversification that satisfies both ERISA and the Plans' investment policy requirements and guidelines.

Given the recent lack of diversification of the Plans' assets and the corresponding performance of the assets, the Committee believes that it would be advisable to maintain the current investment of the assets until you have provided the Committee with a complete asset investment plan. Since this request has been pending for over two months, the Committee hopes that you can provide this plan promptly and that the appropriate investment of the assets then can be made expeditiously.

I look forward to your prompt response to this request.

Sincerely yours,

*Vince Assetta*

Vincent D. Assetta
Chair, Severstal Wheeling, Inc. Retirement Committee


cc:  Michael DiClemente, SWI
     Steven D. Kittrell, MW


Severstal Wheeling, Inc.          T: (304) 234 2255
1134 Market Street                F: (304) 234 2261
Wheeling, WV  26003               E: Vince.Assetta@severstalna.com
                                  www.severstal.com



PLAINTIFF'S EX
76-ED-T-13-11

Severstal 10116

| | |
|---|---|
| From: | "Baggett, Mel" <mbaggett@severstalna.com> [mbaggett@severstalna.com] |
| Sent: | Wednesday, May 06, 2009 11:42 AM |
| To: | Vince Assetta |
| Subject: | RE: LaBow Letter re Retirement Committee Discussions - sent5-5-09 |

Vince,


We need an "investment policy" to guide the work of the Committee and to protect us fiduciarily.  This policy should be developed by Mercer or an independent asset consultant.  I will call you to discuss.


Mel

---

**From:** Vince Assetta [mailto:Vince.Assetta@severstalna.com]
**Sent:** Wednesday, May 06, 2009 6:55 AM
**To:** Drew Landon; James Sullivan; Kathy Bartek; Baggett, Mel; Michael Clark; Michael DiClemente; Ivey, Michelle; Richard Bowness; Tim Rogers
**Cc:** Steve Kittrell
**Subject:** Fwd: LaBow Letter re Retirement Committee Discussions - sent5-5-09


The attached letter was sent to LaBow yesterday.  Prior to sending I received a call from him as a result of him trying to reach Dennis Halpin.  During a call back discussion, he suggested that he has been attempting to provide an "investment plan" by presenting a particular mortgage type investment to Dennis and Mike.  He asked to present it to me and discuss.  We agreed on 3pm today.  After considering what he presents, I am expecting to inform him that this is not a "complete investment plan" as we are requesting but at best a specific component of an investment plan, and to emphasize the details of the attached letter.

We can discuss results of call at the Monday Committee meeting.




>>> Lynn Barron 5/5/2009 4:49 PM >>>

attached



1

Severstal 00241

**WPN Corporation**
**110 East 59th Street**
**30th Floor**
**New York, New York 10022**
**Phone: 212-771-1250**
**Fax: 212-355-5363**

May 20, 2009

Vincent Assetta
Chair, Severstal Wheeling
Retirement Committee
1134 Market Street
Wheeling, West Virginia 26003

Mr. Assetta:

I am in receipt of your letter dated May 19, 2009.

For the past 60-90 days I have attempted to convince Dennis Halpin to invest the cash residing at City National into pass-through mortgages yielding between 12-16% annually.

I felt it was inappropriate to have the pension plan earning nominal returns when such opportunities exist.

For your information another plan WPN manages has made almost 10% during that period. This would have enabled the Severstal Wheeling plan to recover almost all of the losses incurred because of the 2008 stock market crash.

While WPN managed the plan it has appreciated between 7-8% from 1997 through 2008; this is in the top 1% of all plans managed during that period according to Aon Investment Consultants.

Very truly yours,

*Ron LaBow*

Ron LaBow

EXHIBIT
61
DiClemente 9-26-17
84-ID. 7-15-11

Severstal 00005

| From: | Tim Rogers <Tim.Rogers@severstalna.com> |
|---|---|
| Posted At: | Friday, June 05, 2009 10:54 AM |
| Posted To: | Inbox |
| Subject: | Neuberger Berman |

To: Retirement Committee

FYI
I took a call from Charlie Monday.
He said he was available to answer any questions we might have on the transition from WHX.
Tim

>>>

From:   "Diccianni, Charlie" <CDiccianni@nb.com>
To:     "Tim.Rogers@severstalna.com>
CC:     "Schwartz, Marvin" <MSchwartz@nb.com>; "Khanuk, Russel" <russel.khanuk@nb.com>; "Ramallo, Henry" <hramallo@nb.com>
Date:   6/1/2009 10:24 AM
Subject: Severstal

Hi Tim,

Thank you very much for talking to me today.

As I mentioned , Neuberger Berman was an investment manager for WHX. We had begun working with Dennis Halpin to restart as investment manager for Severstal with
Plan documents, IA agreement, etc when he had departed and I believe there is very little paperwork left to open the account.

We would like very much to manage money for Severstal and would appreciate any help you can give us on how to proceed.

Please feel free to call me. We look forward to working with you.

Best regards,

Charlie

Charles Diccianni
Vice President
Wealth Management
Neuberger Berman
605 Third Avenue | New York, NY 10158
T: 212 476 5740 |F: 646 758 3900
CDiccianni@nb.com

This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Neuberger Berman. Email transmission cannot be guaranteed to be

1



Severstal 23003

secure or error-free.  Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such.  All information is subject to change without notice.
Investment advisory services offered by Neuberger Berman LLC, Neuberger Berman Management LLC, NB Alternatives Advisers LLC, NB Alternative Fund Management LLC, NB Alternative Investment Management LLC, and Neuberger Berman Fixed Income LLC.  Broker-dealer services offered by Neuberger Berman, LLC.  Mutual funds distributed by Neuberger Berman Management LLC.

IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

2

Severstal 23004