# In The Matter Of:

*R. Alexander Acosta, et al. vs.*
*WPN Corporation, and et al.*

---

*Dennis Halpin*
*September 27, 2017*

---

*Morse Gantverg & Hodge Court Reporters, Inc*

Original File 9-27-17 Halpin.txt

Min-U-Script® with Word Index

**This Page Intentionally Left Blank**

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

---

**Page 1**

```
 1           UNITED STATES DISTRICT COURT

 2          WESTERN DISTRICT OF PENNSYLVANIA

 3                   -----

 4

 5  R. ALEXANDER ACOSTA,            )
    SECRETARY OF LABOR, UNITED      )
 6  STATES DEPARTMENT OF LABOR,     )
                                    ) Case No.
 7          Plaintiff,              ) 2:14-cv-01494-NBF

 8          v.                      )

 9  WPN CORPORATION, RONALD         )
    LABOW, SEVERSTAL WHEELING       )
10  INC. RETIREMENT COMMITTEE,      )
    MICHAEL DICLEMENTE, DENNIS      )
11  HALPIN, WHEELING               )
    CORRUGATING COMPANY             )
12  RETIREMENT SECURITY PLAN,       )
    and SALARIED EMPLOYEES'         )
13  PENSION PLAN OF SEVERSTAL       )
    WHEELING, INC.,                 )

14          Defendants.             )

15

16                   -----

17         DEPOSITION OF DENNIS HALPIN

18                   -----

19      Wednesday, September 27, 2017

20                   -----

21

22

23

24

25
```

---

**Page 2**

```
 1          DEPOSITION OF DENNIS HALPIN,

 2  a Defendant herein, called by the Plaintiff for

 3  examination, taken pursuant to the Pennsylvania

 4  Rules of Civil Procedure, by and before Constance

 5  Lee, a Registered Professional Reporter and a

 6  Notary Public in and for the Commonwealth of

 7  Pennsylvania, at the law offices of Saul Ewing

 8  Arnstein & Lehr LLP, One PPG Place, Suite 3010,

 9  Pittsburgh, PA, on Wednesday, September 27, 2017,

10  at 9:55 a.m.

11                   -----

12  COUNSEL PRESENT:

13

14  For the Plaintiff:

15          U.S. DEPARTMENT OF LABOR

16          JOHN M. STRAWN, ESQ.

17          170 South Independence Mall West

18          Suite 630E, The Curtis Center

19          Philadelphia, PA 19106

20

21  For the Defendant:

22          SAUL EWING ARNSTEIN & LEHR LLP

23          MICHAEL J. JOYCE, ESQ.

24          One PPG Place, Suite 3010

25          Pittsburgh, PA 15222
```

---

**Page 3**

```
 1                    INDEX

 2  EXAMINATION                           PAGE

 3    BY MR. STRAWN                          5

 4

 5  EXHIBITS                              PAGE

 6  1                                        7
    2                                       11
 7  3                                       12
    4                                       15
 8  5                                       17
    6                                       18
 9  7                                       22
    8                                       24
10  9                                       26
    10                                      29
11  11                                      31
    12                                      32
12  13                                      35
    14                                      37
13  15                                      38
    16                                      40
14  17                                      44
    18                                      46
15  19                                      48
    20                                      54
16  21                                      58
    22                                      64
17  23                                      66
    24                                      71
18  25                                      76
    26                                      81
19  27                                      85
    28                                      90
20  29                                      97
    30                                     103
21  31                                     106
    32                                     111
22  33                                     117
    34                                     120
23  35                                     123
    36                                     127
24  37                                     131
    38                                     138
25  39                                     142
```

---

**Page 4**

```
 1  41                                     157
    42                                     165
 2  43                                     170
    44                                     173
 3  45                                     174
    46                                     178
 4  47                                     184
    48                                     186
 5  49                                     188
    50                                     190
 6  51                                     192
    52 and 53                              192
 7  54                                     198
    55                                     200
 8  56                                     202
    57                                     203
 9  58                                     206
    59                                     208
10  60                                     216
    61                                     218
11  62                                     221
    63                                     223
12  64                                     227
    65                                     231
13  66                                     233

14                   -----

15

16

17

18

19

20

21

22

23

24

25
```

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 4 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 5

1    P R O C E E D I N G S
2              -----
3         DENNIS HALPIN
4    a Defendant herein, having been first duly sworn,
5    was examined and testified as follows:
6              -----
7         EXAMINATION
8    BY MR. STRAWN:
9    Q.  Mr. Halpin, let me reintroduce myself for the
10   record.  My name is John Strawn.  I'm the attorney
11   for the Department of Labor.  I'll ask you questions
12   today about the lawsuit we filed against a number of
13   defendants, including yourself, back on October
14   31st, 2014.
15       I know Mike has prepared you and given
16   you ground rules, but let me just go over a few
17   more.  If you don't hear a question that I ask, just
18   tell me, I'll repeat it.  If you don't understand a
19   question that I ask, just ask me, and I'll rephrase
20   it.
21   A.  Okay.
22   Q.  If you need a break, just let us now.  For
23   our court reporter, Connie's sake, you have to give
24   verbal answers, so no nodding or shaking of the
25   head, you have to say yes or no; and uh-huh and

Page 6

1    huh-uh also don't look good on the transcript.
2    A.  I may slip on that.
3    Q.  If you know what your answer is, wait until I
4    finish asking the question just so we're not talking
5    over each other on the transcript.
6    A.  Okay.
7    Q.  I'm trying to think if there's anything else.
8    Is there any circumstance today that would prevent
9    you from understanding my questions and giving
10   accurate answers?
11   A.  No.
12   Q.  Okay.  Mr. Halpin, could you state your full
13   name for the record.
14   A.  Dennis Patrick Halpin.
15   Q.  Where is your -- where do you live?
16   A.  1357 Falla Drive, Bethel Park, Pennsylvania
17   15102.
18   Q.  Sorry, didn't mean to talk over you.
19   A.  That's okay.  That's a strike against you.
20   Q.  And who is your current employer?
21   A.  H.D. Advanced Manufacturing in -- I guess
22   it's Wexford, Pennsylvania.
23   Q.  Mr. Halpin, what did you do to prepare for
24   your deposition today?  Don't tell me anything Mike
25   told you, but --

Page 7

1    A.  I went through documents that I had had
2    before and spent a portion of a day working with
3    Mike with the prep.
4    Q.  Okay.  Well, let me ask you, going back in
5    time to the time that this lawsuit is concerned with
6    in 2008 and 2009, can you tell me, how did you
7    become a member of the retirement committee?
8    A.  Michael DiClemente, at some point in time,
9    invited me to become a member of the committee.
10   Q.  Okay.  Do you recall when?
11   A.  I'm going to say -- I'm going to say spring
12   of 2007.  Somewhere around that time.
13   Q.  All right.  Let me show you a document that
14   we'll get marked as Halpin 1.
15        (Halpin Deposition Exhibit No. 1 was
16   marked for identification.)
17        (Witness reviews document.)
18   Q.  Mr. Halpin, this looks like an e-mail.  This
19   is from Michael DiClemente to Dennis Halpin, David
20   Luptak, Paul Mooney and Greg Pilewicz, July 28th,
21   2008.  Does this indicate that you were on the
22   retirement committee in July of 2008?
23   A.  I was.
24   Q.  Okay.  And let me refer you to the second
25   page, last paragraph, where it says "Transition to

Page 8

1    Severstal"?
2    A.  Uh-huh.  Sorry, yes.
3        That's one for me.
4    Q.  Very good.  That last paragraph's got --
5    let's see here -- "Unless advised otherwise, we
6    should initiate discussions with Severstal regarding
7    a transition of responsibilities for this activity,
8    including determining how the 401(k) plan fits
9    within the future benefit program."
10       I guess first question is:  Has
11   Severstal acquired Wheeling-Pitt at that point?
12   A.  I'm not exactly sure what month they had
13   acquired us by.  But they -- I believe at that point
14   in time, it was a very recent acquisition by
15   Severstal.
16   Q.  The next sentence, "Assuming the plan will
17   continue, Severstal should, among other things,
18   reconstitute the Retirement Committee membership."
19       Can you just describe to me, was the
20   retirement committee membership in flux at that
21   time?
22   A.  I can't -- I can't recall.  There may have
23   been a few people that were moving out based on the
24   acquisition, may have left, so there may have been
25   some transition.

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 9

1   Q. Okay. So if this document was, like I said,
2   July 28th, 2008, so you think you became a member of
3   the retirement committee about a year before that
4   or --
5   A. I would say around a year before that.
6   Q. Okay. And what was your background, or why,
7   if you know, did Mr. DiClemente ask you to join the
8   retirement committee?
9   A. I was a CPA, so I had an accounting
10  background, and I believe that background probably
11  complemented the committee's membership.
12  Q. All right. I take it it was in the month
13  before, in June of 2008, when you first got the word
14  that Citibank was going to get out of the trust
15  business and require the commingled trust, Severstal
16  trust and WHX trust, to be separated. Do you have
17  any recollection of that?
18  A. I had heard at some point in time. I won't
19  say it was June. I don't know what month it would
20  have been. But I knew there was some -- Citibank
21  was exiting that -- that action. So I had heard
22  that there was going to be a need to have a
23  replacement, but I don't know what month it would
24  have been.
25  Q. All right. And just looking again at the

Page 10

1   people who received that e-mail from Mr. DiClemente,
2   does that indicate that they were current members of
3   the retirement committee, but --
4   A. Yeah. I mean, I know -- I know each one of
5   their positions. But I -- I can't say if they were,
6   at that time, committee members or not. I don't
7   know. I don't recall.
8   Q. Okay. At some point, the retirement
9   committee, it was just you and Mr. DiClemente;
10  correct?
11  A. Yeah, that's correct.
12  Q. Do you know about when that -- that was the
13  situation?
14  A. I'm going to say fourth quarter 2008,
15  sometime probably there.
16  Q. All right. You recall in this case that the
17  trust -- the Severstal trust was set up
18  independently on November 3rd, 2008. Is that your
19  understanding?
20  A. There was -- yeah, I'd say November 3rd,
21  2008.
22  Q. Do you know, was there anybody else who had
23  any input on the decisions on the retirement
24  committee besides you and Mr. DiClemente? Was there
25  anybody else still in the picture?

Page 11

1   A. I don't -- I can't recall that.
2   Q. Okay.
3   A. I don't know.
4   Q. Let me show you the next exhibit. We could
5   call it Exhibit 2.
6          (Halpin Deposition Exhibit No. 2 was
7   marked for identification.)
8          THE WITNESS: Do I just move this over
9   or something? Just put it here? Make a difference,
10  or do you get it back?
11         MR. STRAWN: No, no, you hold on to it,
12  but eventually we give it to Connie at the end.
13         MR. JOYCE: I'll flip it over so it
14  stays in order.
15         THE WITNESS: Okay.
16  Q. Mr. Halpin, what's in front of you as
17  Exhibit No. 2 is an e-mail from David Riposo. For
18  the record, do you know who he is?
19  A. He was the WHX treasurer.
20  Q. And it's to Ron LaBow. And in the body of
21  the e-mail, "Ron, I heard back from the Treasurer at
22  Severstal Wheeling" -- who would the treasurer at
23  Severstal Wheeling have been at that time?
24  A. Mike DiClemente.
25  Q. -- "and they will be ready to divest their

Page 12

1   portion of the Common Co-mingled Group Trust as of
2   October 1 per our request. They have made
3   arrangements on a temporary basis to move the assets
4   to another Trust account they have at Citi until
5   they finalize selection of a new trustee. I also
6   confirmed they will be taking their assets in cash."
7          So what was your understanding --
8   again, I'll say in the summer of 2008, leading up to
9   the separation, what was your understanding of how
10  the Severstal trust would take its interests from
11  the commingled trusts?
12  A. My understanding was it was going to be a
13  proportional share of the WHX master trust.
14  Q. Did you ever have any discussions with
15  Mr. DiClemente or anybody else about taking it as
16  cash?
17  A. No, I've never heard that before, that it
18  would be in cash.
19  Q. Okay. Let me show you what we could mark as
20  Exhibit 3.
21         (Halpin Deposition Exhibit No. 3 was
22  marked for identification.)
23  Q. That's a letter dated September 29th, 2008,
24  to Nancy Kronenberg, and I guess the second page
25  there is a part of an e-mail dated September 30th,

Dennis Halpin
September 27, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 13

1    2008, and it looks to be from David Riposo to Nancy
2    Kronenberg.  For the record, who is Nancy
3    Kronenberg?
4    A.  I believe she was with Citibank.  No, it
5    says -- yeah, she's Citibank.
6    Q.  In the body of the document there it looks as
7    if they're going to separate the Wheeling-Pittsburgh
8    Steel Corporation -- sorry -- the Salaried
9    Employees' Pension Plan of Wheeling-Pittsburgh Steel
10   Corporation and the Wheeling Corrugating Company
11   Retirement Security Plan, and Mr. DiClemente signed
12   for the Wheeling- Pittsburgh Steel Corporation
13   retirement committee.
14       Do you know when the committee (sic)
15   became Severstal?  When the company became
16   Severstal?
17       And just the letterhead at the top
18   says, "Severstal International," and down at the
19   bottom of the mailing address it's, "Severstal
20   Wheeling, Inc."; I don't know if there's any light
21   you can shed on that.
22   A.  I can't tell you when actually the name
23   changed.  It probably was a technical thing, because
24   we were acquired by Severstal, but as to when the
25   name had changed, I don't recall.

Page 14

1    Q.  All right.  So the date at the end of the
2    first paragraph there is -- the letter on the first
3    page says, "This should be done on September 30th,
4    2008."
5        Do you recall whether there -- there
6    was a target date for the separation of the trust
7    when you were preparing for this?
8    A.  I think that Citibank had said that they
9    needed to get out by the end of the year.  That kind
10   of was the target date.
11       If I can just preface some of the
12   stuff, probably a lot of this stuff, my general
13   understanding was I was sort of like monitoring the
14   fund, if you will.  On a quarterly basis we would
15   get some information from Mercer, et cetera.  The
16   actual mechanical stuff of the transfer and the
17   discussions, I probably did none of that, as a
18   participant.  Michael really was the go-to guy that
19   worked with WHX, worked with Ron.
20       I had not had conversations with Ron
21   or WHX prior to December 30th.  So I may be copied
22   on some of these items.  There may have been general
23   discussions about what the expectation was, but in
24   terms of these kind of documents, sometimes I may
25   be -- I'd almost have to say I'm going to guess at

Page 15

1    what it may be.  I would rather not do that.
2    Q.  Right.
3    A.  I know there was going to be a separation.  I
4    do believe that the date was told to us by Citibank.
5    We had to be out by the end of the year.  So
6    September 30th is before that.  So I'm not exactly
7    sure why that was the date that it was going to
8    happen.
9    Q.  Okay.  Do you know why it was moved from
10   September 30th?
11   A.  I don't.
12   Q.  Okay.  I'll show you what we can mark as
13   Exhibit 4.
14       (Halpin Deposition Exhibit No. 4 was
15   marked for identification.)
16   Q.  It's a letter dated September 30th from
17   Mr. DiClemente to Mr. Kassan, and I see Mr. Kassan
18   has signed at the bottom as well.  And in the body
19   of the letter it says, in part -- about four lines
20   from the bottom there -- "to transfer the assets set
21   forth on Schedule A, in the same percentage
22   allocations as existed in the WHX Pension Trust, on
23   or about September 30th, 2008 to" an account at
24   Citibank "as trustee of the WPSC Pension Plan
25   Trust."

Page 16

1        The WPSC, that's
2    Wheeling-Pittsburgh --
3    A.  Steel Corporation.
4    Q.  Steel Corporation, okay.  And your
5    understanding was that when the trusts were
6    separated, as it says in this letter, that the new
7    Severstal trust, the stand-alone Severstal trust,
8    would have a percentage of the same investments that
9    were in the commingled trust?
10   A.  That was always my understanding, that it
11   would be a proportional share.
12   Q.  Okay.  And your information, I guess up to
13   the date of this letter, September 30th, 2008, has
14   it -- was it all through Mr. DiClemente, or did you
15   have any discussions with anybody else up to this
16   point?
17   A.  No, I think there was probably just general
18   discussions about what our expectation was, but I
19   can't recall anybody else I would have spoken to.
20   Q.  And Mr. Halpin, if I understood what you were
21   saying a few questions back, that your job on the
22   committee was monitoring, and did you say quarterly,
23   the results of the --
24   A.  While I was part of the committee, there was,
25   I'm going to say, regular monitoring, and that was

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 17

1   typically done on a quarterly basis, yes.
2   Q.  Okay.  I just wanted to make sure I heard you
3   correctly.
4           Let me show you what's Exhibit No. 5.
5           (Halpin Deposition Exhibit No. 5 was
6   marked for identification.)
7   Q.  On the first page there, it's an e-mail from
8   Maureen McGrath to Michael DiClemente, and then it
9   looks like the attachment is on the second page.
10  And that's a letter dated October 22nd from
11  Mr. LaBow to Mr. DiClemente indicating that the
12  transfer had not gone through.
13          (Witness reviews document.)
14  A.  Okay.
15  Q.  Were you aware at the time that the transfer
16  didn't go through?  Did you ever see this notice?
17  A.  I didn't.  I haven't seen that notice, and I
18  don't recall this letter either.
19  Q.  Okay.  Do you recall speaking with
20  Mr. DiClemente at the time about -- that the
21  transfer had not gone through or the separation, I
22  should say, really, had not gone through?
23  A.  I don't recall talking to Mike that it didn't
24  go through.
25  Q.  Do you recall whether it was an issue that

Page 18

1   the separation of the trust hadn't occurred?
2           MR. JOYCE: Objection to the form and
3   speculation, to the extent it's a legal or expert
4   opinion.
5           You can answer, if you know.
6   A.  I'm sorry.  Now -- short-term memory is bad.
7   Q.  I won't phrase the question the same way I'm
8   sure.  Were you aware at the time there was any
9   issue with the fact that the separation of trusts
10  hadn't gone through?
11          MR. JOYCE: Same objections.
12  A.  I can't say I was aware of any issue at the
13  time.
14  Q.  Okay.  All right.  We're up to Exhibit No. 6.
15          (Halpin Deposition Exhibit No. 6 was
16  marked for identification.)
17  Q.  Mr. Halpin, Exhibit 6 in front of you is an
18  e-mail, just a one-page e-mail, from Nancy
19  Kronenberg dated November 3rd, 2008, to
20  Mr. DiClemente.  Some of these exhibits are a little
21  choppy.  There's an original message underneath
22  there from Ms. Kronenberg, November 3rd, 2008, to
23  Ron LaBow, Michael DiClemente, and Mr. Riposo
24  regarding the transfer of assets from WHX to
25  Severstal.  Have you ever seen this e-mail before?

Page 19

1   A.  I've seen it recently, but back then I had
2   not.
3   Q.  Okay.  And the body of the e-mail there from
4   Ms. Kronenberg says, "Good Afternoon Gentlemen, I
5   have contacted Russell" -- do you know how to
6   pronounce --
7   A.  I'm going to say Khanuk.  I'm going to guess.
8   Q.  "Khanuk of Neuberger Berman to advise him of
9   a change of Account number and account registration
10  for the transfer of assets from WHX to Severstal."
11  Also inform you of "documentation that will be
12  needed by Neuberger Berman to effect the change.
13  Gentlemen, would you be available at 3 p.m.,
14  11/3/2008, for a conference call with Neuberger
15  Berman?  Please let me know.  Thank you!"
16          Are you aware of a conference call
17  that happened on November 3rd, 2008, about the
18  transfer?
19  A.  I don't recall a conference call scheduled.
20  Q.  Are you aware of any -- any issue on or about
21  November 3rd with the transfer of the assets from
22  the WHX trust to the Severstal trust?
23  A.  Can you mention it -- like by way of an
24  issue, you mean, or say that again?
25  Q.  Are you aware of the transfer of the

Page 20

1   Neuberger Berman assets from the WHX trust to the
2   Severstal trust around November 3rd, 2008?
3   A.  I'm -- I'm aware that there was a transfer
4   made on November 3rd.  I don't know if I could say
5   more than that.  I'm aware that there was a
6   transfer.  I'm probably not answering your question
7   right.
8   Q.  No, no, that's perfectly fine.  So you
9   know -- you weren't CCed on any of this.  Did you
10  know at the time that there was -- that there were
11  discussions proposed at least with regard to
12  transferring the Neuberger Berman assets to the
13  Severstal trust?
14  A.  I was not aware of what assets were going to
15  be transferred, no.
16  Q.  How much did Mr. DiClemente -- again, up to
17  November 3rd here -- how much did he include you in
18  the, as you were saying, the mechanics of the
19  separation of the trusts?
20  A.  I mean, he would keep me up-to-date in a
21  general sense, but again, I think Mike's background
22  clearly was proficient in committee activities on
23  the technical side, as well as he was, for the time
24  I was in the committee, the somewhat exclusive link
25  to the WHX team and Ron.  I don't think there was a

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 8 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 21

1  need to be redundant to that. I don't think we
2  needed to have multiple people. Clearly, his role
3  was, I would say, the link to the WHX, Ron LaBow.
4         That's how Ron liked it. He didn't
5  like to deal with too many people. He had one
6  person. That's who he dealt with. If I tried to
7  get any info, he would probably say I don't need
8  another guy, I deal with Mike. Mike's background, I
9  was very comfortable that he could handle that.
10        But in terms of generally what was
11 going on, there was going to be a separation. This
12 is what we expect it's going to be. I would say in
13 a general sense, he would keep me up-to-date.
14 Q. When you say "this is what we expect it's
15 going to be," do you mean a percentage of the
16 assets?
17 A. Yes, some prorated allocation of the assets.
18 Q. Up until, I guess, the date of this exhibit,
19 November 3rd, 2008, had you had any contact with
20 anybody from WHX about the separation of the trusts?
21 A. No.
22 Q. And same question with regard to Mr. LaBow;
23 had you had any contact with Mr. LaBow regarding the
24 separation of the trusts?
25 A. No.

Page 22

1  Q. I think we're up to Exhibit 7.
2         (Halpin Deposition Exhibit No. 7 was
3  marked for identification.)
4  Q. This is a letter dated November 3rd to
5  Ms. Kronenberg from Mr. DiClemente. Unfortunately,
6  you're CCed on it, D. P. Halpin.
7         (Witness reviews document.)
8  Q. Have you had a chance to look at that?
9  A. Uh-huh, yes.
10 Q. Have you ever seen this letter before?
11 A. I have seen it.
12 Q. Okay. Do you recall at the time -- did
13 Mr. DiClemente discuss with you around November 3rd,
14 2008, about the assets coming into the Severstal
15 trust?
16 A. I don't recall either way a conversation.
17 Q. Okay. Any other communication, e-mail,
18 something else?
19 A. Other than being copied on this, I can't say
20 I recall any communication.
21 Q. Okay. In the second paragraph there it says,
22 "As part of transferring the assets of these plans
23 from the WHX Corporation trust to Severstal
24 Wheeling's existing trust at Citibank, we direct
25 Citibank to transfer, prior to market opening on

Page 23

1  November 3rd, all assets in the Neuberger Berman
2  account, number 312153, to our account number
3  312933."
4         Did you know at the time what the
5  assets were in the Neuberger Berman account?
6  A. I did not.
7  Q. Did anybody -- well, I'll just ask you: Did
8  you check to see what the assets were at the time in
9  the Neuberger Berman account?
10 A. I didn't, and I wouldn't see a need to.
11 Q. Okay. And why would you not see a need to?
12 A. I think there was previous documents that
13 told you that we said exactly how we wanted the
14 transfer to be. I would expect that to have been
15 done as we instructed.
16 Q. Okay. Do you know if Mr. DiClemente checked
17 to see what was in the Neuberger Berman account that
18 was transferred?
19 A. I honestly don't know what Mike did.
20 Q. Okay. Can you tell me, are there any
21 documents other than the ones we've looked at today
22 that describe what assets the Severstal trust was
23 going to receive when the trust was separated?
24 A. Before November 3rd?
25 Q. Yeah, up to and including November 3rd.

Page 24

1  A. I -- I was not provided any documentation as
2  to -- or any communication as to what assets or even
3  any information as to what was in the Neuberger
4  account.
5  Q. Okay. Are you aware of any document or other
6  writing from Mr. LaBow indicating what assets he
7  planned to transfer to the Severstal trust?
8  A. Previous to the transfer, I received nothing
9  from Ron, or WHX, regarding what was being
10 transferred.
11 Q. Okay. Let me show you what's Exhibit 8.
12        (Halpin Deposition Exhibit No. 8 was
13 marked for identification.)
14 Q. And this is an e-mail and it's from
15 Mr. DiClemente to Richard Bowness. Can you tell me,
16 for the record, who Mr. Bowness was.
17 A. He was the director of -- I can't be exact,
18 but the director of benefits accounting at Wheeling-
19 Pittsburgh Steel, Severstal Wheeling.
20 Q. So he was not, I take it, on the committee,
21 the retirement committee?
22 A. I don't believe he was a formal member of the
23 retirement committee.
24 Q. All right. So the body of the letter here
25 says, "Rick, Please review this letter, which was

Case 2:14-cv-01494-NBF    Document 184-14    Filed 09/25/18    Page 9 of 63

R. Alexander Acosta, et al. vs.                                                    Dennis Halpin
WPN Corporation, and et al.                                              September 27, 2017

Page 25

1   drafted at Nancy K's request.  I will be receiving
2   agreements from Neuberger Berman to directly
3   establish the investment management arrangement with
4   us.  Mike."
5          Are you aware at this time -- I guess
6   the e-mail is dated November 4th, 2008 -- of any
7   discussion regarding retaining Neuberger Berman as
8   an investment manager?
9   A.  At that time, like around that November time?
10  Q.  Right.
11  A.  I can't recall any discussions with regard to
12  retaining Neuberger Berman as an investment manager.
13  The only investment manager I knew was Ron.
14  Q.  I'm just wondering, looking back at the last
15  exhibit, Exhibit 7, that was the only one in these
16  documents that we were going through where you were
17  CCed on it.  Also CCed was Mr. Assetta.  Say for the
18  record, Mr. Assetta was?
19  A.  I get the titles a little bit off.  I think
20  he was the controller.
21  Q.  We covered Mr. Bowness.  We covered
22  Mr. Halpin.  T.S. Rogers?
23  A.  I want to say he was the assistant
24  controller.
25  Q.  That's Tim Rogers?

Page 26

1   A.  Tim Rogers.
2   Q.  And the last one, J.R. Sullivan?
3   A.  He was -- he had -- he worked in the benefits
4   department.  I don't exactly know what his title
5   was.
6   Q.  I know this isn't your letter, but do you
7   know why you and the other individuals were CCed on
8   Exhibit 7 but -- I haven't seen a lot of other CCs
9   that included you or other individuals?
10  A.  I'm not sure why they were on this one.  I'm
11  not sure why this was written to Rick.  So I would
12  say, no, I don't know why the copy variety.
13  Q.  Okay.  I got you.  I believe we're up to 9.
14         (Halpin Deposition Exhibit No. 9 was
15  marked for identification.)
16  Q.  Mr. Halpin, it looks like Exhibit 9 here is
17  an e-mail from November 5th, 2008, from
18  Mr. DiClemente to Mr. LaBow.  I don't see anybody
19  else CCed on this.  And there's an e-mail exchange,
20  it looks like there's an e-mail from Mr. LaBow on
21  the bottom.  Mr. DiClemente's e-mail to Mr. LaBow
22  says, "Thanks, Ron.  I'm not sure how you do it, but
23  I'm very appreciative of your talents.  FYI, we're
24  in the process of establishing an investment
25  management agreement with Neuberger and Berman and I

Page 27

1   may give you a call if we have some questions.
2   Mike."
3          Do you know what the process was
4   Mr. DiClemente was talking about getting an
5   investment management agreement with Neuberger
6   Berman?
7   A.  Certainly at the time I did not know why
8   Neuberger Berman was being brought in as an
9   investment manager.
10  Q.  Okay.
11  A.  Subsequent documents I know a little bit
12  more.  But then, I would say I did not.
13  Q.  Right.  "I may give you a call if I have any
14  questions."  Did Mr. DiClemente ever discuss with
15  you retaining Neuberger Berman?
16  A.  I can't recall either way.  I'd say today I
17  don't remember that, but I can't say either way did
18  he have a discussion with me at that time or not.
19  Q.  Okay.  It just sounds like from what you're
20  saying and looking at the documents that he didn't
21  necessarily include you in all the communications
22  or -- would that be a fair statement on the whole,
23  communications?
24  A.  I would have would say, again, knowing his
25  background, he included me in those communications

Page 28

1   that he felt were appropriate to send me.  I don't
2   think he included me in every one of them,
3   obviously.  I think any one that he felt had some
4   significance that he would CC me on it.
5   Q.  What about the decisions?  Do you think he --
6   from looking at these documents that he included you
7   in the decisions as to the separation of the trusts?
8   A.  I would say we both had a consistent
9   expectation.  And so did he consult with me?  I
10  think we -- you know, we were unanimous on the first
11  vote, so we clearly thought that it was going to be
12  a proportionate allocation.  I think we talked to
13  all the right parties.  Did he include me in that, I
14  would say yeah.
15  Q.  When you say "we talked to all the right
16  parties," do you mean we or him?
17  A.  I mean the committee, based on instructions
18  that Mike gave in an e-mail or a correspondence or a
19  letter regarding the expectation of the proportional
20  share, the committee spoke to all those people and
21  gave that expectation.  I may not have spoke to them
22  directly.
23  Q.  Okay.  When do you recall -- and we have more
24  documents to go, but when do you recall first
25  hearing about Neuberger Berman?

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 10 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 29

1  A. I'm going to say -- I didn't hear about it in
2  2008. It had to be sometime in 2009. When, I can't
3  say.
4  Q. All right. I'll show you what we can mark as
5  Exhibit 10.
6       (Halpin Deposition Exhibit No. 10 was
7  marked for identification.)
8  Q. Mr. Halpin, that's an e-mail -- it looks like
9  it's from Richard Bowness, posted to inbox. Do you
10  know what posted to inbox means?
11  A. I don't.
12  Q. And it says, "The documents that you
13  requested are attached." And Mr. Bowness's
14  signature line there. And then underneath it looks
15  like an e-mail chain that goes down to an e-mail
16  from Mr. DiClemente to Mr. Bowness on November 4th.
17  "I will be forwarding copies of the documents (to
18  you and others) that need to be completed to open up
19  a new account with Neuberger and Berman, which Ron
20  LaBow uses to manage some of the money in the DC
21  plans."
22       I take it that's the defined
23  contribution plans, DC plans?
24  A. I would think that's what it is.
25  Q. Then "N&B is looking for the trust agreement

Page 30

1  with Citibank (which will soon have to be replaced
2  with NatCity's) as well as the plan documents for
3  both plans. Would you please forward these
4  documents to me?"
5       Do you know why Mr. DiClemente was
6  asking Mr. Bowness about these documents and not you
7  or not CCing you on this?
8       MR. JOYCE: Object to the extent it
9  seeks speculation.
10  A. Yeah, I don't know why.
11  Q. Did Mr. Bowness have these documents and you
12  did not have these documents?
13       MR. JOYCE: Same objection.
14  A. I can't say -- I don't know why he sent them
15  to Rick or sent the e-mail to Rick.
16  Q. Got you. Would you have had the two plan
17  documents for the two 401(k) plans at issue here?
18  A. I had seen them. Did I have them? Again,
19  I'm going to say I probably had them, but -- so why
20  didn't he ask, I don't know. There must have been
21  other things that he was asking for. I don't know.
22  Q. The trust agreement with Citibank, would you
23  have had that document at the time?
24  A. I don't recall. I don't recall that.
25  Q. Did Mr. Bowness work for DiClemente or some

Page 31

1  other reason why --
2  A. I think -- the only thing I know is that Rick
3  would somehow be involved in calculating pensioner's
4  payments. So I think Rick, when somebody was
5  looking to cash out -- again, I was a pensioner for
6  20 years there, so I'm a long-standing Wheeling-Pitt
7  employee that was involved in this plan, and Rick
8  was the guy that when somebody was looking to, you
9  know, do something with their fund, he would do the
10  calculation.
11  Q. Okay.
12  A. That's what I think his role was. He may
13  have had a bigger role, but I know he did that.
14  Q. All right. Let's go for Exhibit 11.
15       (Halpin Deposition Exhibit No. 11 was
16  marked for identification.)
17  Q. And the -- this is a one-page document. The
18  e-mail on top is from Richard Bowness, November 12,
19  2008, to Russell Khanuk, Michael DiClemente and CC
20  Charlie Diccianni. My understanding from
21  yesterday's deposition is Mr. Diccianni worked at
22  Neuberger Berman?
23  A. I didn't know that at the time. I'd say I
24  know that now.
25  Q. Again, it seems as if Mr. Bowness is

Page 32

1  forwarding documents to Neuberger Berman and -- so
2  at the time, this is November 12, 2008, were you
3  aware that this exchange of information was going
4  back and forth?
5  A. I don't believe I was aware.
6  Q. Okay. It seems to me like retaining another
7  investment manager, that's something that's pretty
8  significant for a retirement committee. If it's
9  only two members, it wouldn't take too much effort
10  to let the whole committee know what was going on.
11  It sounds as if you weren't included in these
12  actions?
13  A. I would say that that responsibility was
14  Ron's. Ron picked the investment managers. I would
15  say the processing of that is a mechanical thing. I
16  wouldn't need to know that. Ron picks who he wants.
17  You can question why he needed another one. To the
18  degree another one was needed, I'm sure it was based
19  on Ron wanting something, and Michael and Rick or
20  whoever processing Ron's request for another
21  investment manager. So I don't see a need for me to
22  know that Ron wanted another investment manager, per
23  se.
24  Q. Okay. I think we're up to No. 12.
25       (Halpin Deposition Exhibit No. 12 was

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 33

1   marked for identification.)
2   Q. Mr. Halpin, what's finally appropriately in
3   front of you as Exhibit No. 12 is an e-mail dated
4   November 24th from Mr. DiClemente, and it's to
5   Mr. LaBow, and I don't see you CCed on it.  Take a
6   look at it, but the gist of it seems to be
7   concluding an investment management agreement of
8   some sort with Mr. LaBow.
9           (Witness reviews document.)
10  Q. I don't want to rush you.  Have you had a
11  chance to take a look at that yet?
12  A. Uh-huh, yes.
13  Q. So at the time, going back to November 2008,
14  were you involved in drafting or discussions of
15  retaining Mr. LaBow as an investment manager to the
16  Severstal plans?
17  A. There was some discussions about retaining
18  Ron subsequent to the separation.
19  Q. Are you aware of any discussions about
20  retaining Mr. LaBow as investment manager for the
21  Severstal plans before the separation occurred?
22  A. Yeah, yes.
23  Q. And what do you recall?
24  A. I recall discussing should we retain Ron
25  subsequent to the transfer.  I think his prior

Page 34

1   performance was astonishing.  As a pensioner and
2   fiduciary, I would say I don't see why we wouldn't
3   keep him.  So yeah, there was discussions about
4   keeping him.
5   Q. And those discussions, were they just you and
6   Mr. DiClemente?
7   A. I know they were me and Mike.  Were there
8   other people?  I can't remember if there were other
9   people at the time.  But certainly me and Mike had
10  had discussions about retaining Ron subsequent to
11  the breakup or to the transfer.
12  Q. Got you.  As far as the mechanics of and
13  drafting of an agreement, was there any discussion
14  about that before the separation or only afterwards?
15  A. His expectation was that we were essentially
16  going to take the WHX trust agreement, the WHX
17  guidelines, carbon copy them, change "WHX committee"
18  to "SWI committee."  They were going to essentially
19  be a mirror image of each other.  So we were going
20  to retain Ron.  We were going to continue the same
21  policies and plans in place.  Just make the
22  mechanical changes to make sure it was correct in
23  terms of the committee's name itself, et cetera.
24  Q. So now subsequent to the transfer on November
25  3rd, 2008, were you involved in any of the drafting

Page 35

1   or looking at any of the documents?
2   A. I believe there was an e-mail where I was
3   copied on that had asked -- I can't say if it was
4   asking for my comments or not, but I believe it was
5   one of the drafts, let's say.
6   Q. Okay.  Let's see if I can find that.  We're
7   up to Exhibit 13.
8           (Halpin Deposition Exhibit No. 13 was
9   marked for identification.)
10  Q. To this exhibit, the first page is an e-mail
11  from Mr. LaBow to Mr. DiClemente on December 3rd.
12  This seems to be toward the end of the process here.
13  Please fax to -- gives a number -- I will sign-date
14  as November 1st.
15          In the e-mail chain on the second page
16  there, it looks like Mr. DiClemente's sending the
17  final version, and I don't -- I don't see you CCed
18  on it.  There's a draft agreement behind it.
19  A. Uh-huh.  Yes.
20  Q. And then partway through there's another
21  e-mail from Mr. LaBow to Mr. DiClemente.  And
22  another marked-up draft.  Just having gone through
23  all those pages in Exhibit 13 --
24  A. Sure.
25  Q. -- I don't see your name on it.  But you're

Page 36

1   pretty sure that at some point during the drafting
2   that you saw a copy of --
3   A. I believe there was at some point in time --
4   I don't know if it was the final draft or whatever.
5   But again, I would say that my understanding is we
6   were going to essentially mirror the WHX agreement,
7   investment management agreement and the guidelines,
8   and make some very cosmetic changes to keep it, you
9   know, technically correct in terms of let's say
10  committee name.
11          So for me to see that -- again, I
12  believe Sally King was involved in it, which was
13  ERISA counsel, Mike's background clearly is that.
14  So again, it's not like I would be -- some sort of a
15  value added to saying, hey, let me tell you guys you
16  got this wrong or you need to put this in.
17          So again, my trust in Michael's
18  background, especially with McGuireWoods involved in
19  it, I don't see the need to keep me copied and ask
20  for my comments.  So long as I knew the
21  expectations; that the policies in place prior to
22  that were essentially going to mirror the policies
23  in place effective the date of the transfer.
24  Q. Okay.
25  A. So any copy would somewhat be a courtesy

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 12 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 37

1   copy.  I do believe at one point in time I did get
2   copied on something that was very close to final or
3   final draft.
4   Q.  Anything copied to you is also informational,
5   too, not just courtesy?
6   A.  It would be.  But if it's mirroring the old
7   one, it's a repeat of information that I've already
8   seen.  In my mind, unless something was dramatically
9   changed, I think Mike will say, you need to look at
10  this because we're making a dramatic change here.
11  Other than that, I would expect that the changes are
12  somewhat cosmetic.  Seeing SWI retirement committee
13  versus WHX retirement committee, is that
14  informational, I don't know.  I'd say probably not.
15  Q.  All right.  Let's go on to Exhibit 14.
16         (Halpin Deposition Exhibit No. 14 was
17  marked for identification.)
18  Q.  This, to my understanding, is the final copy
19  signed by Mr. LaBow and Mr. DiClemente for the
20  committee.
21  A.  Okay.
22  Q.  Is that your understanding?
23  A.  I -- I'm going to assume yes.  I see penciled
24  in, so I don't know -- but I would say that looks
25  like the final copy that I remember seeing.

Page 38

1   Q.  When you say "penciled in," which page were
2   you talking about?
3   A.  Well, November 1st is not typed in, let's
4   say.  So I would say to that point, but I believe it
5   is the final copy, and I have seen that before.
6   Q.  Okay.  I guess keep that in order, but we may
7   end up referring back to that then.
8   A.  I'll highlight like this so I won't have to
9   go back rummaging for it.
10  Q.  Now we're up to Exhibit 15.
11         (Halpin Deposition Exhibit No. 15 was
12  marked for identification.)
13  Q.  Mr. Halpin, for the record, that's an e-mail
14  from Mr. DiClemente.  Actually I think yesterday it
15  said memo to file as opposed to e-mail.
16  A.  I don't see a To.
17  Q.  Yeah, some of the exhibits in the e-mails are
18  a little choppy.  It's hard to figure out exactly
19  what they were.
20        But anyway, it's from Mr. DiClemente
21  dated December 12, 2008, and it says in here,
22  Charlie Diccianni called on December 10, 2008 --
23  gives a phone number -- "to make sure we understand
24  what is required to establish a relationship with
25  them."

Page 39

1         Again, Mr. Diccianni was with
2   Neuberger Berman?
3   A.  Subsequently, yeah, I know that, that's true.
4   Q.  Next sentence, "I laid into him because they
5   have not managed our money (and maybe WHX's money)
6   since the trustee transition at the beginning of
7   November."  And that -- my understanding, if this is
8   dated the 12th and he's talking about a phone call
9   on the 10th and he says "I laid into him because
10  they have not managed our money," it sounds as if
11  Mr. DiClemente had learned that Neuberger Berman was
12  not managing the money at some point before the
13  10th.  But what is your understanding of what was
14  going on at the time?
15  A.  I can't recall ever seeing this.
16  Q.  Oh, sure, yeah, you're not copied on it.
17  A.  Yeah, but I don't remember seeing it.  I
18  don't remember a conversation where he had -- with
19  Neuberger Berman being upset, so I would say I
20  don't -- I can't really -- I can't offer any comment
21  on --
22  Q.  I got you.
23  A.  You know, I don't know.
24  Q.  In the last sentence, "Ron LaBow returned my
25  previous calls earlier in the week and left a voice

Page 40

1   message at work."  It goes on from there.  So I take
2   it from your last answer that around the time, the
3   December 12th, 2008, you weren't aware that there
4   was an issue with Neuberger Berman yet in terms of
5   them not managing the assets in the account?
6   A.  I would say before December 30th, I was not
7   aware -- I can't recall any activity with Neuberger
8   Berman at all.
9   Q.  Okay.  And with regard to Mr. LaBow, before
10  December 30th, 2008, were you aware of any issues
11  with Mr. LaBow not managing the assets of the plans?
12  A.  I was not.
13        (Discussion held off the record.)
14        (Halpin Deposition Exhibit No. 16 was
15  marked for identification.)
16  Q.  Mr. Halpin, what's in front of you now is
17  Exhibit 16, and it's looks like part of another
18  e-mail chain.  On top there's an e-mail from Kevin
19  Handwerker.  I believe he's at Neuberger Berman.  Is
20  that your understanding?
21  A.  It's such a unique name, I should remember
22  it.  But I can't say I recall where he's from.
23  Q.  It's to Marvin Schwartz.
24  A.  Yeah, I know him.
25  Q.  He's at Neuberger.  And it's -- underneath

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 13 of 63

Dennis Halpin
September 27, 2017

Page 41

1   the body there it says, "I spoke with the attorney
2   for the Severstal Wheeling Pension Plan.  We will be
3   getting some comments on our agreement and they will
4   provide us the standard documentation that we
5   require.  She requested that we begin managing the
6   assets immediately and I agreed to accommodate their
7   request provided we get authorization from Mike
8   DiClemente requesting that we do so."
9          Again, you're not copied on this.
10   Below there's an e-mail from Sally King who I
11   understand is your ERISA counsel?
12   A.  At that time, yes.
13   Q.  To Mr. Handwerker, CCing Mr. DiClemente, and
14   the body there, it's from Ms. King to Mr. Handwerker
15   is, "Kevin:  Thank you for your time this afternoon
16   discussing the Severstal Wheeling issues.  I am sure
17   that we can now work out an arrangement that will be
18   satisfactory to both of our clients," which makes me
19   think that maybe he's an attorney at Neuberger.
20          "You should receive an e-mail from
21   Michael DiClemente early tomorrow that outlines the
22   issues that we would like to discuss relating to the
23   Investment Advisory Agreement.  Mike will also
24   verify on behalf of the Severstal Wheeling
25   Retirement Committee their intent to have Neuberger

Page 42

1   Berman manage the pension assets that have been
2   transferred to Neuberger Berman (sic) and their
3   desire to have management begin immediately.  Also,
4   we intend to work with Neuberger Berman to formalize
5   the Agreement and provide supporting documentation
6   as soon as possible.
7          "Please let me or Mike know if there
8   are other issues that need to be addressed at this
9   time."
10          So at the time, this is December 17,
11   2008, were you aware that this issue was going on
12   with Neuberger Berman about retaining them to manage
13   the assets?
14   A.  At that time I was not.
15   Q.  Were you aware that there was an issue as to
16   them -- or a discovery that they had not been
17   managing the assets since the trust was separated?
18   A.  I was not aware of any activity with
19   Neuberger at that time.
20   Q.  Do you think if there was an issue of
21   discovering the fact that the assets had not been
22   being managed that that might have prompted somebody
23   to look to see what those assets were and how they
24   were doing?
25          MR. JOYCE:  Object to the form,

Page 43

1   speculation, and also to the extent it seeks a legal
2   or expert opinion.
3          THE WITNESS: Does that mean -- can I
4   answer?
5          MR. JOYCE: You can answer, yes.
6   A.  I'm going to say that the people involved in
7   this, Mike DiClemente, again, from a technical
8   perspective, Sally King from an ERISA -- in my mind
9   expert level, I think the right two people on this
10   are -- are on this.  So if there was issues to be,
11   at that point, solved, I think they were probably
12   very proactive in solving those issues.
13   Q.  When you say an expert level, you're
14   referring to Ms. King?
15   A.  Yeah, yeah.  I would say -- in my mind she
16   was an expert ERISA counsel.
17   Q.  Yeah, I just want to make sure I heard you
18   right.
19   A.  Yeah, yeah.  I would say the two people that
20   needed to be -- if there was something to be
21   resolved with Neuberger Berman, I would say the
22   right two people are on the case.
23   Q.  Okay.
24          (Discussion held off the record.)
25          (A brief recess was taken.)

Page 44

1      BY MR. STRAWN:
2   Q.  Mr. Halpin, let me show you what's marked
3   as -- what will be marked as Exhibit 17.
4          (Halpin Deposition Exhibit No. 17 was
5   marked for identification.)
6   Q.  Now, I don't see your name on this.  It's an
7   e-mail sent December 30th from Mr. DiClemente to
8   Mr. LaBow, but is this -- have you ever seen this
9   before?
10          (Witness reviews document.)
11   A.  I have.
12   Q.  Okay.  And is this the first time you learned
13   about the issues, or did you speak about it
14   previously with Mr. DiClemente?
15   A.  Actually, I didn't learn of it from this one.
16   I believe that same day Michael made a phone call to
17   me.  I was on vacation, so he made a phone call and
18   told me about it, and probably essentially what he
19   was saying in here, but I've learned of the transfer
20   from Mike on a phone call on December -- I want to
21   say it was December 30th.
22   Q.  Okay.  And what did Mr. DiClemente tell you?
23   A.  That he was very disturbed that the
24   allocation, the transfer that was made was
25   inappropriate, that what was concentrated in a

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 14 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 45

1 certain group of stocks was not in line with our
2 expectations or instructions, and we needed to
3 address it once I got back.
4 Q. And what did you say to Mr. DiClemente at
5 that time?
6 A. I said, if that's true, Mike, that's
7 extremely disturbing, and the first day we're back
8 in the office, let's meet.
9 Q. Okay. So this e-mail on December 30th from
10 Mr. DiClemente to Mr. LaBow, Exhibit 11 in front of
11 you, was that before you got back to the office?
12 A. Yeah. I didn't get back to the office until
13 probably the 2nd of January or 3rd of January.
14 Q. Okay.
15 A. Of 2009.
16 Q. Okay. My understanding from here and from
17 Mr. DiClemente's testimony was that he learned from
18 a report from Mercer about the -- of the allocation
19 of the assets in the trust. Is that your
20 understanding?
21 A. That is my understanding.
22 Q. All right. Keep an eye on this exhibit, too,
23 about coming back to it.
24 A. Okay.
25 Q. Make sure I'm not getting these all together.

Page 46

1 A. That happens even if you don't want it to.
2 Q. Now we're up to Exhibit 18.
3      (Discussion held off the record.)
4      (Halpin Deposition Exhibit No. 18 was
5 marked for identification.)
6 Q. All right. So Exhibit 18 is an e-mail from
7 Mr. DiClemente to you and Mr. Bowness, January 5th,
8 2009, and the e-mail there discusses the Neuberger
9 Berman account. Let me know when you're done
10 looking at that.
11      (Witness reviews document.)
12 A. Okay.
13 Q. All right. It looks like from the e-mail
14 train there was some information that Mr. DiClemente
15 was sending you from Neuberger Berman about the
16 performance of the stocks in the trust?
17 A. Did he -- I don't think he attached them to
18 here. I'm not sure if they were actually part of
19 this e-mail. He was discussing things that he
20 already received, yes.
21 Q. I was just referring to -- it looks like the
22 e-mail chain from Vincent Iovino, and it looks like
23 a Neuberger Berman e-mail address.
24 A. Yes.
25 Q. Here the balance is, looking at it from

Page 47

1 below, it looks like there must have been an
2 attachment. Oh, there you go. It's got an
3 attachment at the top that says whx.pdf. Do you
4 recall any discussions at this time, as of January
5 5th, 2009, about the performance of the Severstal
6 trust versus other assets?
7 A. I don't recollect talking so much about the
8 performance as opposed to the nature of the fund
9 itself.
10 Q. And could you just explain that a little
11 further about the nature of the fund.
12 A. That it was concentrated in energy stocks,
13 that it was not in accordance with our investment
14 guidelines, and that we needed to get some sort of
15 correction of that.
16 Q. All right. Again, you know why Mr. Bowness
17 is included on this e-mail?
18 A. Again, the only thing I remember Rick did was
19 try to value pensioners', you know, fund portfolio.
20 So I don't know why he's copied on this particular
21 one.
22 Q. When you're saying "portfolios," you mean
23 what sums they would be withdrawing for benefits?
24 A. Yeah. He would estimate or calculate what
25 their actual pension amount was when they decided

Page 48

1 they were going to retire and what was their
2 pension.
3 Q. Okay. Oh, that's right. Because this isn't
4 a traditional 401(k) where they're making
5 contributions. This is where the employer was
6 making the contributions in their name.
7 A. Yeah. Then so when someone says, I want a
8 lump sum or I want to take an annuity, he would
9 calculate what their benefit would be.
10 Q. Right. The employer is directing the
11 investments, not the individuals?
12 A. Right.
13 Q. Let me show you Exhibit 19.
14      (Halpin Deposition Exhibit No. 19 was
15 marked for identification.)
16 Q. And this is an e-mail dated December 30th, so
17 I'm going back a couple days on you there. It looks
18 like it's from Ms. King to Mr. LaBow, and I don't
19 see you or Mr. DiClemente CCed on this. It's two
20 pages. Did you -- have you ever seen this before?
21 A. Have I seen it as of through today?
22 Q. Yeah.
23 A. I've seen it. Did I see it at that time, no.
24 I think this was -- again, December 30th, so this is
25 probably Sally and/or Michael working with Ron on

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 15 of 63

R. Alexander Acosta, et al. vs.                                         Dennis Halpin
WPN Corporation, and et al.                                      September 27, 2017

Page 49

1   that date.
2   Q. Okay. So it looks as if it's a follow-up on
3   a conference call. Well, I guess my first question
4   to you: Did you participate on a call on December
5   30th with Ms. King and Mr. LaBow and Mr. DiClemente?
6   A. I did not.
7   Q. It looks like there are four bullet points
8   that Ms. King is talking about here. The first one
9   is, Mr. LaBow "will negotiate the fee adjustment
10  with Neuberger Berman; once the fees are changed,
11  Mr. (sic) DiClemente will execute the agreement."
12       I guess as of December 30th, had you
13  discussed that -- those facts with Mr. DiClemente?
14  A. Prior to January, I was not aware of the
15  Neuberger Berman fee issue.
16  Q. It was only after you came back to the office
17  then that you became aware of that?
18  A. I would say I was not -- at that time the
19  number one issue was to work with Ron and WHX to
20  reset the portfolio as soon as possible. This may
21  have been one of those items that was discussed, but
22  my recollection was focused on the reset.
23  Q. Got you. And when you say "reset," do you
24  mean prospectively looking at what investments the
25  trust has going forward, or going back in time to

Page 50

1   redo the transfer, the separation of the trust?
2   A. I almost jumped out and answered it before
3   you finished, but it's to go back and do a
4   retroactive reallocation.
5   Q. The second bullet point here, Mr. LaBow "will
6   request the most recent statement from Neuberger
7   Berman."
8       Do you know why you didn't -- when I
9   say "you," meaning the committee -- did not have a
10  statement from Neuberger Berman?
11  A. I don't know. I don't know why.
12  Q. I think I was -- "brainstorming" is the right
13  word -- with Mr. DiClemente yesterday in that it
14  could be you didn't have a contract, an agreement
15  with Neuberger Berman. You weren't receiving
16  statements, you weren't a client. I don't know if
17  that makes sense.
18  A. I would say at that time I didn't even know
19  about the Neuberger Berman fee issue.
20  Q. Sure.
21  A. So I would say anything that was attached to
22  that, I didn't know about it.
23  Q. The third bullet point there, Mr. DiClemente
24  will contact Mr. Riposo from WHX about the status of
25  the audit report.

Page 51

1        My understanding is that the issues
2   with the audit was just getting a final accounting
3   about what belonged to WHX and what belonged to
4   Severstal so there was a final complete separation.
5   A. I believe that we probably thought the audit
6   report was a little more than that. I think that's
7   what it ended up being, but I think -- when I hear
8   the word "audit," I think of a much deeper analysis
9   that was done than a compilation of numbers.
10  Q. What did you think the purpose of the audit
11  was then?
12  A. I think the purpose of the audit was to make
13  sure that the distribution that was being made
14  between the two was a valid allocation.
15  Q. Do you believe that -- when you say "valid,"
16  could you explain that a little further?
17  A. Well, I think, again, the difference, a
18  compilation is somebody adding numbers up and
19  saying, here's the value. An audit is more detailed
20  and goes back and looks at the statements and makes
21  sure they're correct. There's a percentage that's
22  supposed to be assigned to both people. It's a much
23  more comprehensive effort. So we were -- when we
24  were getting this Cohn report, we expected it to be
25  a little deeper than it was, and sooner.

Page 52

1   Q. Well, who commissioned the Cohn audit?
2   A. It's my understanding Ron -- Ron ordered the
3   audit.
4   Q. Okay. Did you ever see any -- what the
5   agreement was with Cohn to do the audit, what they
6   were instructed to do?
7   A. I don't recall seeing it.
8   Q. And going, back as far as the assets in the
9   commingled trust, do you think Severstal -- the
10  Severstal trust -- was entitled to specific assets
11  in the commingled trust?
12  A. I think we were entitled to our proportionate
13  share to each item to the degree you could have
14  that.
15  Q. If Severstal were to get the dollar value of
16  what it was -- what its share of the value of the
17  WHX trust, would you think that there was any
18  problem in receiving that value?
19       MR. JOYCE: Objection to form,
20  speculation, and to the extent it's seeking a nonlay
21  opinion.
22       You can answer.
23       THE WITNESS: That's it.
24       MR. JOYCE: You can answer unless I say
25  don't answer.

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 16 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 53

1         THE WITNESS: Yeah, yeah.
2    A.  I would say that we expected to get a certain
3    value and an allocation that was in line with our
4    guidelines.
5    Q.  And again, I think I know the answer.  You
6    weren't involved in any discussions beforehand --
7    before the transfer of two trusts -- the separation
8    of two trusts as to the mechanics as to how that
9    could be achieved?
10   A.  My understanding would be that we have 10
11   percent of the fund, we get 10 percent of every --
12   of every individual fund or every individual
13   portfolio.
14   Q.  Okay.  The fourth bullet point here in
15   Exhibit 19 says, "Sally King will draft a memo
16   outlining the guidelines to be implemented between
17   Ron LaBow and Mike DiClemente relating to procedural
18   issues under the LaBow investment Management
19   Agreement."
20        What's your understanding of what that
21   means?
22   A.  As I read it now, I'm looking at that saying
23   there must have been an issue or two.  So there was
24   some sort of -- she was going to draft a memo
25   regarding issues.

Page 54

1    Q.  And do you know what those issues were?
2    A.  At the time I certainly didn't, because I was
3    not involved, as of 12/30, in this.  So I would say,
4    no, I did not know what the issues were.
5    Q.  Okay.  Now, here's an e-mail with your actual
6    name on it.  We can mark that as --
7    A.  Highlight that.
8    Q.  -- Exhibit 20.
9         (Halpin Deposition Exhibit No. 20 was
10   marked for identification.)
11   Q.  And for the record, that's an e-mail from
12   Mr. DiClemente to Mr. Bowness and yourself, January
13   7th, 2009.  So take a look at it and let me know
14   when you're done.  It's just one page.
15        (Witness reviews document.)
16   A.  Should I read the bottom, too?  Is there a
17   question on that?
18   Q.  Yeah, yeah, sure.
19   A.  Okay.
20        (Witness reviews document.)
21   A.  Okay.
22   Q.  All right.  So Mr. Halpin, have you seen this
23   before?
24   A.  I have seen this before.
25   Q.  All right.  At the time, back on January 7th,

Page 55

1    2009, were there any discussions or any other
2    communications with Mr. DiClemente and Mr. Bowness
3    about the situation with how the plans were
4    invested?
5    A.  I can't remember what specific days.  I do
6    remember that there were numerous conversations with
7    WHX and/or Ron regarding a reallocation request.
8    Q.  Was there any discussion about how the plans
9    were currently invested and what was the best move
10   to protect the plan's assets at that point, January
11   7th?
12   A.  I think the focus at this time was to, as
13   quickly as we could, do an acceptable reallocation
14   of the initial transfer.
15   Q.  Now, I know way back when we first talked in
16   2014, you and me, before you had an attorney, you
17   said that Mr. LaBow was looking for direction and
18   you didn't want to give him direction because then
19   the onus would be on the committee for taking the
20   responsibility for directing him.  Do you recall
21   that conversation?
22   A.  I don't, but I would say that we were not
23   going to be coauthors of the investments.  That's
24   his role, and I think every time that he looked for
25   approval or guidance or whatever it may be, both

Page 56

1    myself and Michael were very clear and consistent
2    that that was his job.  He never asked previously to
3    do this in all those years.
4         And every time he asked us -- whatever
5    way he cushioned it, we made it very clear to him
6    that investments were his decision.  He had the full
7    authority to do it, and that if he felt there was a
8    better way to allocate or better way to manage, that
9    was his prerogative and that was his responsibility.
10   Q.  As far as the discussion about going back to,
11   basically, do over the separation of the trusts,
12   could that have been handled as a separate issue?
13   Like the current investment of the plans, one issue,
14   and getting some recompense for how they were
15   allocated a separate issue?
16        MR. JOYCE: Object to the form of the
17   question and also to the extent that it's asking
18   Mr. Halpin to render an expert or a legal opinion on
19   what could have been done.
20        You can answer.  I will remind you --
21        THE WITNESS: That's okay.
22   A.  I will say this:  Ron had, always,
23   authority -- full authority, exclusive authority to
24   make an investment.  So while we were asking for a
25   reallocation to true this thing up to a transfer in

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 17 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 57

1     a portfolio that was within our guidelines, he had
2     the ability to, if he thought that there should have
3     been a better allocation, cash it out -- 80 --
4     whatever it was, he never lost that authority.
5           So could they have been separate? Ron
6     could have done whatever he wanted on any day in
7     terms of how to manage the investments. We did not
8     preclude him from that, and certainly the guidelines
9     in the management agreement gave him that authority.
10    **Q. Just referring to the e-mail here where --**
11    **seems to be some discussion -- Mr. DiClemente**
12    **relating to you that Mr. LaBow said that not all of**
13    **the assets in the combined trusts were**
14    **necessarily -- could be separated 90/10. Is that a**
15    **fair statement? I don't want to mischaracterize it.**
16    A. I would say that there couldn't have been a
17    perfect -- in hindsight, there probably couldn't be
18    a perfect allocation. I don't think we ever
19    required that from him. His reasoning changed
20    hourly. It was fragmented. It was inconsistent.
21    It was incomplete.
22          All we looked for was a single piece
23    of paper to tell us what could have been
24    apportioned, what couldn't have been and why, and
25    then to do an allocation that was acceptable based

Page 58

1     on that kind of analysis.
2           I -- I -- it always amazed me that he
3     never really completed that and fulfilled that
4     requirement. Today it was a gate, tomorrow it's a
5     dollar amount. I mean, it changed every time.
6     **Q. I know it was challenging. Okay. Let me**
7     **show you the next exhibit. We're up to 21.**
8     **(Halpin Deposition Exhibit No. 21 was**
9     **marked for identification.)**
10    **Q. This is two pages. The first page is an**
11    **e-mail from you to Mr. DiClemente, January 8th,**
12    **2009. So that's, I guess, the day after the last**
13    **exhibit.**
14    **(Witness reviews document.)**
15    **Q. Have you seen this before?**
16    A. I have.
17    **Q. And what is the -- what is it?**
18    A. It is a -- notes, takeaways from a
19    conversation between myself, Michael and Ron and
20    Sally.
21    **Q. And Sally being Sally King, the attorney?**
22    A. I think at that time I didn't know her last
23    name, so I put the question mark, but Sally was part
24    of that.
25    **Q. Okay. Take a look at that and let me know**

Page 59

1     **when you've gone through it.**
2           **(Witness reviews document.)**
3     A. Okay.
4     **Q. All right. There's some -- I guess it's**
5     **the -- I guess the paragraph in the middle of the**
6     **page, third from the bottom, the next-to-last line,**
7     **"He also stated" -- "he" being Mr. LaBow -- "how**
8     **'nimble' our (sic) portfolio was, and how readily we**
9     **could convert it to cash if we desired."**
10          **Was that your understanding at the**
11    **time, that the stocks in the Neuberger Berman**
12    **account could have been liquidated easily?**
13    A. I mean, he made that assertion. So I assumed
14    he knew how nimble they were. I don't know how
15    nimble they were at the time.
16    **Q. The next paragraph down starts with, "Given**
17    **Ron could not reset the portfolio to original**
18    **composition" -- was that your understanding, and did**
19    **you agree with that? Here, I might as well finish**
20    **the sentence. "Mike and I both agreed that Ron**
21    **should liquidate the NB fund as he (Ron) deemed**
22    **prudent so as to preserve value, and to begin**
23    **reconstructing a more balanced diversified**
24    **portfolio."**
25          **Am I accurate when I take from that**

Page 60

1     **that you and Mr. DiClemente agreed with at least**
2     **some of what Mr. LaBow was saying, that he could not**
3     **reset the Severstal trust to include a 10 percent**
4     **portion off all the investments in the WHX trust?**
5     A. At that point in time Ron was making the
6     argument that it could not be a perfect
7     reallocation. So I mean -- and I say "perfect."
8     That was his argument. It couldn't be perfectly
9     done. But there could be -- other funds could have
10    been used other than just Neuberger Berman, but it
11    couldn't be perfect.
12    **Q. Got you. So the part where "Mike and I both**
13    **agreed that Ron should liquidate the NB fund," the**
14    **Neuberger Berman fund, as he "deemed prudent,"**
15    **again, that was putting it on Mr. LaBow as the**
16    **investment manager to make the decision?**
17    A. I think we -- that comment is consistent with
18    every time we said, Ron, you do what you think is
19    best. You're the expert. If you believe it should
20    be liquidated, then liquidate it, but as he felt it
21    needed to be done. If you need us to do something
22    to facilitate that, let us know.
23    **Q. And nothing in your notes here from the**
24    **January 7th, 2009, call where Mr. LaBow said that he**
25    **needed something from you, that Citibank or National**

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 18 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 61

1  City wasn't recognizing his authority or there was
2  some other impediment?
3  A. I don't see anything in the notes saying
4  that. I can't recall today if there was something
5  said on that or not, but I would say I'm a pretty
6  good note taker. I probably drafted most of these.
7  Then Mike probably reviewed them and edited them.
8  If I don't see it in here, it probably wasn't
9  discussed, but I can't say for sure.
10 Q. Do you recall at any point in your
11 involvement with this, until you left the committee,
12 that Mr. LaBow said to you that there was some
13 impediment, that there was something that he needed
14 from the committee so he would be able to do his
15 job?
16 A. I won't remember the dates, but I think at
17 some point in time, well down the road, certainly
18 not in January or early January, whatever, did he
19 ever say that I want to do this and I need you guys
20 to do this so I can do my job. I do not recall him
21 ever giving us an impediment to what he needed to
22 do.
23 Q. Do you recall what that was that he was
24 asking you for?
25 A. He was at some point in time, probably in

Page 62

1  February, talking about this Neuberger Berman
2  account.
3  Q. About getting a management agreement set up
4  with them?
5  A. About, I think, getting one signed. I think
6  there may be a difference between having the ability
7  to do it -- I mean, he came from Neuberger.
8  Q. Right.
9  A. I'm sure he knew everybody at Neuberger, and
10 I'm sure they knew him.
11 Q. Right.
12 A. So if he had a problem with it and he was
13 managing it, I would have thought that he would have
14 asked for that way before February -- end of
15 February.
16 Q. And you're referring to some sort of
17 agreement or contract with Neuberger?
18 A. Yeah. And again, I have -- I'm going to have
19 to separate what did I know back in January, let's
20 say, versus now.
21 Q. Sure.
22 A. I now realize there was an issue with the
23 fee. I realize that the fee appeared to be
24 duplicative, so there was a question as to why we
25 needed them in the first place. He was the

Page 63

1  management person. If he wanted to hire them, he
2  could have hired them. We didn't have to hire them,
3  he could have hired them. I realize that now,
4  later, what he was saying.
5          Back then, I would have to say I don't
6  know when I fully became aware of the impediment
7  that he was bringing up late in the game.
8  Q. I got you. So the next-to-the-last paragraph
9  then in Exhibit 21, last sentence, "Mike replied
10 when Ron deemed prudent and that, in each case, such
11 action was Ron's responsibility and that his
12 responsibilities had not changed."
13          So that sounds as if the committee is
14 saying to Mr. LaBow it's up to him to make the
15 decision on the -- how the plan is invested going
16 forward?
17 A. Any investment at any time was always his
18 decision. Whether it was -- he made them in the
19 past; he made them in the future. He had never
20 sought guidance from us previous to once or twice
21 here when he's saying it. He always did what he
22 wanted to do, and I think he was very familiar with
23 what needed to get done if he wanted to do
24 something.
25          So any time he tried to make this

Page 64

1  coauthored or, you know, ask for our guidance, I
2  think we were very, very clear and emphatic that any
3  investment decision he needed to get done or he
4  thought was prudent, he should do it. He shouldn't
5  have to ask us.
6  Q. Got you. Let me show you Exhibit 22.
7          (Halpin Deposition Exhibit No. 22 was
8  marked for identification.)
9  Q. Exhibit 22 has a heading of Minutes of
10 Conference Call, Severstal Wheeling, Inc. Retirement
11 Committee. This is also January 7, 2009. Do you
12 know if Exhibit 21 was a draft of 22 or how they
13 relate?
14 A. I'm going to say that they're the same,
15 because the meeting date and time are exact, January
16 7th, 10 a.m. to 11 a.m.
17 Q. The documents themselves aren't an exact
18 match.
19 A. No. Again, I would say it's the same
20 meeting, notes of the same meeting.
21 Q. Sure. Do you know if one -- your notes,
22 somebody -- Mr. DiClemente's or somebody else's, the
23 other notes or whether there were different drafts
24 or what the differences between them were?
25 A. I don't know if this was a final draft of

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 19 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 65

1 that. I don't know if they were done separately. I
2 can't say. They're definitely from the same
3 meeting.
4 Q. Okay. It seems as if -- I should actually
5 let you finish looking at it. It seems as if there
6 are a few other issues in this exhibit than the last
7 one.
8          (Witness reviews document.)
9 A. There's a tail to it, yeah. There's a couple
10 paragraphs at the end of it.
11 Q. Okay.
12          (Witness reviews document.)
13 A. Okay.
14 Q. On the second page there, next-to-last
15 paragraph, "Mike brought up the issue of fees."
16 That's not in the first one.
17 A. I don't see it in the first one.
18 Q. Okay. It says, "Mike brought up the issue of
19 fees." Again, the second-to-last paragraph on the
20 second page.
21       Just looking at that paragraph, are
22 those fees -- is Mike bringing up the issue of the
23 fees Mr. LaBow was charging or Neuberger Berman or
24 something else?
25 A. Those are the fees that Ron was charging.

Page 66

1 Q. Okay. So it sounds, in that paragraph, that
2 Mr. LaBow was saying he would make up any losses by
3 not charging fees and making better returns for the
4 plans?
5 A. The only thing I would say is I remember Ron
6 asking for his fees for November/December.
7 Subsequently, he decided to waive those fees, but
8 initially he had asked for them. So I don't know if
9 that answers your question, but I would say -- he's
10 saying here or the notes say that he was giving some
11 concession to his fees based on feeling sorry or
12 something, but -- I do remember him asking for them
13 and then in this meeting saying that he would waive
14 them.
15 Q. Okay. Let me show you what we can mark as
16 Exhibit 23.
17          (Halpin Deposition Exhibit No. 23 was
18 marked for identification.)
19 Q. Just for the record, this is an e-mail -- the
20 one on the top is from Mr. Bowness to
21 Amanda.Pierce@AllegiantGroup.com, January 8th, 2009.
22          (Witness reviews document.)
23 A. Okay.
24 Q. Have you seen this before?
25 A. I don't remember this one.

Page 67

1 Q. Okay. Looking at -- it looks like there's a
2 couple different issues being brought up. On top
3 there, Mr. Bowness -- Amanda Pierce at Allegiant
4 Group, was that your trustee contact at National
5 City, or what's your understanding?
6 A. At that time I would have said I'm not sure
7 who that was. In hindsight, I believe she is with
8 Allegiant or National City. I don't know -- back
9 then, I would say, this date, I don't know who she
10 was.
11 Q. Sure, sure. But just for making the record
12 clear, this is your new trustee who is involved in
13 these e-mails?
14 A. I believe that's true. I can't say with
15 certainty. I see Allegiant Group. I'm trying to
16 think Allegiant, National City, are they synonymous?
17 The name, I can't say. I can say that she was the
18 person we spoke to. On the trustee, I'm not sure.
19 Q. Sure, if you're not sure.
20 A. Amanda Pierce. I remember the name, but it's
21 a very vague name.
22 Q. I'm just trying to make sense out of this
23 e-mail. The top e-mail from Mr. Bowness to Amanda
24 Pierce says, "Yes, Mike did call me. He is going to
25 call Ron LaBow." Again, the date is January 8th.

Page 68

1 "It seems as if the holdup with Neuberger was with
2 the fees that they were going to charge us and Ron
3 was to talk with Neuberger to have the fees
4 reduced."
5       That seems consistent with one of the
6 previous exhibits we saw there that they were going
7 to try to get the fees reduced from Neuberger. Is
8 that a fair statement?
9 A. Yeah. And again, I would say at this time I
10 would not really be able to fully appreciate what
11 that meant. Today, it's certainly my understanding
12 that Ron charged a healthy fee. Ron now has an
13 investment manager that he wants to now charge a
14 separate fee. They both do the same thing. What's
15 with the repetitive fees. Somebody needs to come a
16 little bit on the fee structure here. So unless --
17 if he wants to divvy up the fee between his own fee,
18 why are we paying another guy to do what you're
19 supposed to do.
20 Q. How were the fees handled when there was a
21 commingled trust with Neuberger Berman and
22 Mr. LaBow?
23 A. I'm not sure how those fees were handled.
24 Q. So it could be -- not that you know -- but it
25 could be that Neuberger Berman and Mr. LaBow were

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 20 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 69

1 charging the same fees for the commingled trust for
2 November 3rd?
3 A. I can't say I know what they did then. I
4 just know in this particular case -- I now realize
5 today that the problem was the redundant fee.
6 Q. Right. I understand that. But it sounds as
7 if you can't say today or at the time that that was
8 a different situation, having duplicative -- I
9 shouldn't say duplicative -- anyway, a fee from
10 Mr. LaBow and a fee from Neuberger from what the
11 situation was before the trusts were separated?
12 A. I can't say I know -- I didn't know the
13 specifics of the fee structure of the WHX trust.
14 Q. Were there any discussions with
15 Mr. DiClemente or anybody else that -- that the fee
16 situation was different than it had been before?
17 A. I'm not aware of any -- I'm not aware of any
18 fee discussions, you know, when it was underneath
19 the WHX trust.
20 Q. Right. It seems to me if -- if the issue
21 came up that if we're being charged more fees than
22 we had been charged before when we were in the
23 combined trust, that that's something that should be
24 discussed. But it sounds as though --
25 A. I can't say either way on that one.

Page 70

1 Q. Okay. The -- on the bottom of that page --
2 the only page, the first page there, it's from
3 Mr. Bowness to Amanda Pierce, and it says, "Amanda,
4 Will you be sending Mike another form for him to
5 have access? Rick."
6     That's sounds, to me -- and let me
7 know your understanding today -- again, you're not
8 CCed on any of this -- that Mr. DiClemente was
9 trying to make sure he had access to the new trust
10 with the new trustee.
11 A. Yeah, I would have to tell you that it would
12 be difficult for me to tell you what I thought then.
13 Even as I read it now, I'm not going to say I know
14 what that specifically means. It's kind of general,
15 "have access."
16 Q. Sure. Any tricky e-mails in the documents I
17 was going through --
18 A. Yeah, it's a vague -- it's a vague question,
19 so I don't know what Amanda was asking about Mike to
20 get access. Or Rick. I'm not sure what access they
21 were referring to.
22 Q. And while we're at it, do you know why
23 Mr. Bowness was involved in these conversations with
24 Ms. Pierce?
25 A. I can't say I know why he's actually

Page 71

1 involved. Again, the only thing I knew that Rick
2 did was these calculations for pensioners' benefits.
3 Q. So I would assume if he was involved with
4 paying out benefits from the trust, he would have to
5 have some contact with the new trustee or some
6 understanding or something like that?
7 A. That sounds appropriate.
8 Q. Let me show you what's Exhibit 24.
9     (Halpin Deposition Exhibit No. 24 was
10 marked for identification.)
11     (Witness reviews document.)
12 Q. And this is just one page. It says
13 "Certificate As to Signatures." So the first -- so
14 "Certificate As to Signatures, Seventstal Wheeling,
15 Inc. Pension Plan Master Trust." So that was the
16 name of the new trust that -- the new separate
17 Seventstal trust; right?
18 A. I believe so.
19 Q. "The undersigned, being a duly authorized
20 Officer of Seventstal Wheeling, Inc. Pension Plan
21 Master Trust," and then I'm looking at the bottom.
22 Is that your signature?
23 A. Yeah, that's my signature.
24 Q. Okay. So have you seen this document before?
25 A. I've seen it -- if I signed it, yeah, I

Page 72

1 definitely saw it.
2 Q. So it goes on to say, certifies -- I guess it
3 "certifies that the persons designated as follows
4 have authority to communicate written instructions
5 on behalf of the Principal. The undersigned further
6 certifies that any instructions delivered by the
7 Principal shall be signed by any 1 of these persons
8 and that the signatures set forth below are true and
9 genuine signatures of the person."
10     Did you know why -- and the date at
11 the bottom there is January 6th, 2009. Do you know
12 why you would have been signing this as opposed to
13 Mr. DiClemente?
14 A. I don't know if there would be a distinction
15 between the two of us.
16 Q. And the signatures as to who can, I guess,
17 communicate with the trustee, Mr. DiClemente is
18 listed there as, first vice president and treasurer,
19 retirement committee member. Then it also goes on
20 to Tim Rogers, Dave Bishof, Marsha Porter, Holly
21 Caseman and Rick Bowness. There are asterisks next
22 to Mr. Rogers, Mr. Bishof, Ms. Porter and
23 Ms. Caseman. And the legend there says, "Only have
24 authority as it relates to benefit payments; no
25 investment direction authority."

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 73

1       Is that a fair reading of the
2   document?
3         MR. JOYCE: I'll just object on
4   speculation. I don't think we know or we haven't
5   established exactly what the document is. I know it
6   says master trust, but it doesn't say who's the
7   trust or who these people can give instructions to.
8         MR. STRAWN: Well, sure, it says -- it
9   says who the trust is in the first line -- the
10  second line. And it -- it -- Mr. Halpin is signing,
11  giving authority to these people to communicate with
12  the trust. It seems to be abundantly clear.
13        MR. JOYCE: I think it says they have
14  authority to communicate on behalf of the principal.
15  What I'm missing is the other party.
16        MR. STRAWN: Sure. Oh, right. This is
17  an attachment, I think, to the trust agreement.
18        MR. JOYCE: Probably, yeah.
19  Q. Okay. So anyway going back, Mr. Halpin, what
20  do you recall about this document?
21  A. That I signed it.
22  Q. Do you know why there are four individuals,
23  that I just read off, that have authority as it
24  relates to benefit payments, no investment direction
25  authority?

Page 74

1   A. Well, I don't -- I can't remember when Tim
2   joined. Obviously, Marsha, Holly and Dave are all
3   part of payroll, I believe, and benefits. They're
4   not part of the retirement committee.
5   Q. P/R is payroll?
6   A. Yeah, payroll, payroll and payroll. So these
7   three were part of a payroll. So I assume if there
8   was some kind of a payment being made, maybe they
9   were involved for that reason, but I know they were
10  not part of the committee. None of those four.
11  Q. There wouldn't be deductions from employees
12  going into it. It would be contributions from the
13  employer going into the trust. Is that accurate?
14  A. Say that again.
15  Q. That there -- I'm just thinking about how
16  payroll might be connected to this. That there
17  aren't going to be withholdings from the employees
18  because it's not a traditional 401(k) plan where
19  there are withholdings from people's paychecks that
20  go into it.
21  A. They may be involved in the calculation, like
22  Rick was, into what the benefit payment may be. I
23  would only be speculating.
24  Q. Sure. The payments going out as opposed
25  to --

Page 75

1   A. Yeah, yeah.
2   Q. Now Mr. Bowness does not have two asterisks
3   next to his name, so that makes it sound, you know,
4   where it is two asterisk, "Only have authority as it
5   relates to benefit payments; no investment direction
6   authority," that makes it sound as if by being
7   excluded that he does have investment direction
8   authority. Is that a fair reading?
9         MR. JOYCE: Just object on the basis of
10  speculation and form.
11  A. I would say I would be adding some -- at this
12  point, I'm looking at it, I'd say I would be trying
13  to give you some sort of insight that I would be --
14  I would be speculating as to what insight looking at
15  that now, what that exactly means.
16  Q. Okay. Do you know why you're not listed as
17  an authorized signer here?
18        (Witness reviews document.)
19  A. I would be speculating what it would be. I
20  don't know why I'm not an authorized signer.
21  Q. And do you know why Mr. LaBow wasn't listed
22  as an authorized signer?
23        MR. JOYCE: Same objection on
24  speculation.
25  A. I mean, I'm going to say I don't know this to

Page 76

1   be all-inclusive. I don't know. I know when I
2   signed it. I know these individuals. I would
3   probably know their signature, but I don't know if
4   it's all-inclusive. I couldn't tell you if it is.
5   Q. Got you.
6   A. -- it is -- this is it, and it's only this.
7   Q. And it says there in the next-to-last
8   paragraph, "The persons designated above are the
9   only persons entitled to act as authorized
10  representatives of the Principal." It sure sounds
11  exclusive. Anyway, if that's all you can recall
12  about the document, that's fine.
13  A. That's all I can recall about it.
14  Q. Okay. Now we're up to Exhibit 25.
15        (Halpin Deposition Exhibit No. 25 was
16  marked for identification.)
17  Q. Take a look at that and let me know when
18  you've had a chance to look at it.
19  A. Okay.
20        (Witness reviews document.)
21  A. I'll have to do a little reread again, but I
22  think that I've given it a cursory reading.
23  Q. Okay. It -- the document Exhibit 25 says,
24  "SWI Retirement Committee Discussion with Dave
25  Riposo, Corporate Treasurer, WHX Corporation,

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 22 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 77

1    Regarding Allocation of Assets in Conjunction With
2    the Trustee Transition, January 14th, 2009."
3          Have you seen this document before?
4    A.  I have.
5    Q.  And was it in preparation for testimony, or
6    was it at the time, or is this your document or --
7    A.  I would say, in general, every time we had a
8    meeting with WHX or Ron, we took notes of the
9    meeting.  So I would say this was done at or near
10   January 14th.
11   Q.  So you -- if not the author, you contributed
12   or looked at it?
13   A.  I would say, yeah, any of the meetings that
14   we had, I would have, at some point in time, been
15   involved in the note taking.
16   Q.  All right.  So it says in the first
17   paragraph, "On January 14th, 2009, Mike DiClemente
18   and Dennis Halpin called Dave Riposo at WHX."  Do
19   you recall that conversation?
20   A.  I can't say I can affirm the date, but
21   certainly we did have numerous calls in January with
22   Dave Riposo.
23   Q.  Okay.  The first numbered paragraph there is,
24   "Confirm, and allow another SWI individual hear
25   directly from Dave, what Mike DiClemente heard from

Page 78

1    him on December 31, 2008."
2          That sounds as if Mr. DiClemente
3    wanted you on the phone to hear what Mr. Riposo was
4    saying?
5    A.  I would say that's fair.
6    Q.  Number two, "To advise him," being
7    Mr. Riposo, "that our position on how the assets
8    were inequitably allocated between WHX and SWI as
9    part of the trustee transition has not changed."
10         What did you take away from this
11   conversation with regard to Mr. Riposo and WHX's
12   attitude toward how the assets had been separated?
13   A.  I think that they were -- I think David was
14   saying that they were fully in agreement with our
15   intention to reallocate.
16   Q.  Okay.  When it says here, his immediate
17   reaction being, oh -- being Mr. Riposo -- his
18   immediate reaction was, "If I were you, I would fire
19   Ron."
20         Do you recall him saying that?
21   A.  I can't say I recall today we had, but
22   if it's in the notes, I'd say he probably said it.
23   Q.  I got you.  At this time, January 14th, 2009,
24   had you had any discussions with Mr. DiClemente or
25   anybody else regarding getting rid of or firing

Page 79

1    Mr. LaBow?
2    A.  On January 14th, no.
3    Q.  And you sound pretty sure of that.  Why are
4    you saying that?
5    A.  I would say in January, we were clearly under
6    the impression that Ron could reset, to some degree.
7    We had WHX's concurrence with that.  They were on
8    board with a reset.  And I mean, Ron -- again, as a
9    20-year pensioner, I think Ron's performance was
10   stellar.  The guy was a -- super performance in good
11   and bad times.
12         So if he's going to say he's willing
13   to reset in some degree and WHX is on board with
14   that and I have a number one draft pick with a
15   2,000-yard season, I'm not getting rid of him.  I
16   just want him to go back to the degree he committed
17   to, say let's get -- if we can't get perfect, let's
18   get a reset or a reallocation that's acceptable to
19   everybody.
20         I don't think they fired him.  I think
21   he stayed there for quite a while.  So if he's
22   saying that, it's sort of ironic.
23   Q.  The next-to-last paragraph there starts with,
24   "Dave asked us whether we understood the mechanical
25   considerations in doing so, specifically that we

Page 80

1    would have to enter into subscription agreements and
2    other documentation with each investment manager."
3          Do you recall that?
4    A.  I can't say I recall today, but again, if
5    it's in the notes, I would say it's -- there
6    probably was some discussion on that.  I don't think
7    we would have had a problem with it.  If something
8    needed to be done to get the allocation, we were
9    more than willing to do it.
10   Q.  The next sentence, "We advised Dave that we
11   are aware that Ron wants us to do that because we
12   have already received documentation from two of the
13   existing managers that Ron wants us to use, once he
14   sells some of the holdings in the Neuberger Berman
15   portfolio that Ron has (autonomously) assigned to
16   our pension plans.  Dave asked and we confirmed that
17   we expect a portion of the Neuberger Berman account
18   to be allocated to WHX."
19         Let me take that separately.  So do
20   you recall who the two other existing managers were
21   that Mr. LaBow wanted you to use?
22   A.  I can't say -- I can't say today that I
23   remember who they would be.
24   Q.  Okay.  I assume they were managers from the
25   commingled trust?

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 23 of 63

R. Alexander Acosta, et al. vs.                                    Dennis Halpin
WPN Corporation, and et al.                                September 27, 2017

Page 81

1    A. I would say that's a fair assumption.
2    Q. And then the last sentence, "Dave asked and
3    we confirmed that we expect a portion of the
4    Neuberger Berman account to be allocated to WHX."
5         So that goes to what you were
6    testifying to about WHX -- I think you said being on
7    board to taking its share of the Neuberger Berman
8    account back?
9    A. I would say it's almost like a Catholic
10   annulment; right? Let's forget that one and go back
11   and say we just want to reset to an -- they owned a
12   share of it before it was separated, so they should
13   take their fair share of that asset.
14   Q. Okay. Let me show you the next exhibit.
15   Exhibit 26.
16        (Halpin Deposition Exhibit No. 26 was
17        marked for identification.)
18   Q. This is another e-mail that you're not on,
19   from Mr. DiClemente, January 14th, 2009, to Drew
20   Landon. For the record, can you say who Drew Landon
21   was.
22   A. I want to say Drew was the assistant
23   treasurer. He worked in the treasury department.
24   I'm not sure if he was assistant treasurer. He
25   was a Severstal Wheeling treasury department

Page 82

1    individual.
2    Q. So let me refer you to the last paragraph on
3    the third page. You can finish taking a look at it.
4    A. I'm sorry.
5         (Witness reviews document.)
6    Q. Before you flip pages there --
7    A. Sure.
8    Q. -- the subject line says, forward "SWI
9    Retirement Plans - Quarterly Investment Performance
10   Reports for" third quarter 2008.
11        Is that something that the committee
12   did, sending out quarterly reports to other
13   individuals in Severstal?
14   A. I can -- I can only say that as a committee
15   member, that the procedure we followed was Mercer
16   would do an evaluation of the quarterly performance,
17   they would send that to Mike. Mike would then kind
18   of add his input to their report. Typically, he
19   would then send that to us, schedule a meeting, and
20   then we would go through a discussion about the
21   performance and the comments that he had on it. If
22   there wasn't a meeting, then he would tell us all to
23   provide input to him.
24   Q. Okay. And was that just within the
25   committee, between you and Mr. DiClemente, or did it

Page 83

1    go out to the -- you know, the employer sponsor?
2    A. I would say that I -- I can't speak to did it
3    go out to them. I just know he sent it to the
4    committee members in preparation for a meeting. Who
5    else he may have sent it to, I don't know.
6    Q. All right. Getting back to before we took
7    that segue, the last paragraph on the third page
8    there, "Transition to Severstal. Following up on
9    prior e-mails regarding the need for a transition to
10   Severstal given the departure of most of the
11   previous Committee members, Mel Baggett, Mike Clarke
12   and I spoke in December about the need to
13   reconstitute the Retirement Committee. We currently
14   have targeted mid-February 2009 for an orientation
15   meeting to provide an overview of the Committee
16   responsibilities and assess the direction of various
17   outstanding projects."
18        Are you familiar with that being an
19   issue, reconstituting the retirement committee?
20   A. We definitely had -- had lost some head count
21   on the retirement committee from where it typically
22   was. So I think we would like to have had, you
23   know, a certain number, but to that point -- I'm
24   going to use a sports analogy, so forgive me -- if
25   I've got Sally King on board and I've got Mike

Page 84

1    DiClemente on board, I've got Steph Curry and Kevin
2    Durant, I have a pretty good team of people. It
3    would be healthy to have a couple more people
4    representing us, but I've got -- I've got some, you
5    know, MVPs representing the ERISA compliance side
6    and the technical committee side. So I felt pretty
7    good.
8    Q. So it says, "Mel Baggett, Mike Clarke and I
9    spoke." Does that mean Mr. DiClemente spoke to
10   Mr. Baggett and Mr. Clarke about joining the
11   committee? Do you have an understanding of that?
12   A. I don't know. I mean, Mel Baggett was the HR
13   guy out of Severstal in Dearborn, and Mike Clarke, I
14   want to say he was the HR VP out of Wheeling. So I
15   don't know if he was asking them to become members
16   or just wanted to discuss with them because they
17   were part of the HR department.
18   Q. Are you aware of any discussions from, I
19   guess, going back to where we started back in June
20   of 2008 when the trusts were being separated, about
21   recruiting or asking other individuals to join the
22   committee? To join you and Mr. DiClemente?
23   A. I would think as members left, I think there
24   was discussions about, you know, replacements that
25   could join the team.

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 24 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 85

1  Q.  Do you recall any, specifically?
2  A.  Mike would typically try to get a team that
3  was HR, legal, finance, what have you.  So typically
4  to build up a -- I would call a balanced team to
5  represent the committee, that would typically be it
6  versus a named person.
7  Q.  So it wasn't a matter of getting people to
8  share the work.  It was a matter of getting people
9  with different "disciplines," for lack of a better
10  word?
11  A.  I think he tried to put a team together with
12  disciplines that could provide a certain value.  You
13  didn't need six linebackers.  I mean, at that point
14  in time, it's like let's get a running back, let's
15  get a quarterback, let's get a good complement.
16  Sorry for the sports analogy again.
17  Q.  Okay.  Let me show you what's Exhibit 27.
18       (Halpin Deposition Exhibit No. 27 was
19  marked for identification.)
20       (Discussion held off the record.)
21  Q.  Mr. Halpin, this is an e-mail that, for a
22  change, has your name on it, from Mr. DiClemente to
23  you, January 15th, 2009.  Take a look at that.
24  A.  Okay.
25       (Witness reviews document.)

Page 86

1  A.  Okay.
2  Q.  All right.  So the body there says, "Dennis,
3  If LaBow balks at the (modified) reset" -- I take
4  that part to mean modified reset as in it can't be a
5  perfect reset, a perfect 10 percent of the
6  pre-November 3rd, 2008, asset mix?
7  A.  I was nodding my head.  Sorry.  I would say
8  that's fair.
9  Q.  And then it goes on, "rather than advise him
10  that he is accountable for the losses."  Had you
11  made a determination at that point, January 15th,
12  that there had been losses to the plans?
13       MR. JOYCE: I'll just object to the
14  extent it's seeking legal opinion or an expert
15  opinion on what losses were or were not incurred.
16  A.  I -- I don't -- I'm not aware that we had
17  actually tried to calculate the loss.  I don't think
18  that, even though I see that in there, that was
19  never really the intent.  The intent was to try to
20  get that fair allocation, if we took a fair share of
21  the loss or the gain, whatever.  Maybe it was a fair
22  share of the allocation.  I can't speak to why
23  that's specifically in there.
24  Q.  It seems to me if you broke it down looking
25  forward versus looking back, that the issue of

Page 87

1  looking back would be whether there were any losses,
2  and the issue going forward would be we want to make
3  sure we have a diversified portfolio that's right
4  for us.  Is that a --
5  A.  I would say that's wrong.  I would say we
6  were always looking for, first, a diversified
7  portfolio.  I mean, if Ron told me last night he bet
8  on the Jets minus three and doubled our money, I
9  would say that's great performance as a pensioner.
10  That's a horrible thing to do for a fiduciary.
11       So performance was -- I'm not going
12  say part of the equation, but clearly the question
13  here was that he had violated our guidelines in
14  terms of diversity, and so we wanted to make sure
15  that, as a fiduciary, that that investment portfolio
16  was an equitable diversified portfolio.
17       But the losses, I'd say, I mean, that
18  wasn't -- it wasn't like if he gained money we were
19  okay with the allocation.
20  Q.  I'll disagree with you to the extent that the
21  conversations in the documents that we've seen
22  aren't what's your plan for a diversified portfolio;
23  it's we want what we had.  Would you agree with
24  that?
25       MR. JOYCE: Object to form.

Page 88

1  A.  We always wanted a diversified portfolio.  If
2  we could get a perfect allocation, that's a
3  diversified portfolio.  If I could get -- if I could
4  play with 70 percent of the fund managers and 70
5  percent of the assets, I would say that's probably
6  was acceptable, but tell us which ones -- and I need
7  to know why I can't participate in some of the
8  others.
9       It's as important to find out why I
10  couldn't participate in them, as opposed to why
11  these ones I could participate in and to the degree
12  that I could, which there clearly were more than
13  Neuberger Berman.  Clearly.  He even admits that
14  several times.  I don't understand why you only gave
15  me one.  That's clearly not acceptable.  Is three
16  acceptable?  Let me see the detail, and then I can
17  tell you.
18       So our thing was that you didn't give
19  us, you know, Neuberger Berman, and it's at 40
20  percent today, this is great, keep going.  It was,
21  what you gave me was unacceptable, and I need, as a
22  fiduciary, to have a diversified fund.
23       So I mean, I'm not saying performance
24  isn't part of that.  I wanted the same performance
25  that I would have had if I had had the original

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 25 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 89

1  reset. That's what I wanted. I don't want more.
2  I'm not trying to get more. I just want the same.
3  Q. It goes on to say, "I'm thinking that an
4  alternative would be to seek recourse with WHX by
5  convincing WHX that they are implicated in this
6  allocation by accepting assets that were inequitably
7  distributed."
8        I take that part of the sentence
9  meaning that WHX got more than their fair share --
10  is probably a better way to say it -- of the assets
11  in a commingled trust?
12  A. I remember distinctly saying, I don't want
13  more than I should get or less than I should get. I
14  just want what I should get. So when they say -- I
15  think the comment that that's making is, if we get
16  them on board and both of us talk to Ron and we both
17  agree that there needs to be a reallocation --
18  Q. Right.
19  A. -- that makes, I think, the resolution a much
20  smoother resolution. WHX had told us numerous times
21  that they were fully on board. So our attitude was,
22  let's get them and us to join together to tell Ron
23  we both agree that there needs to be a reallocation
24  here. Now let's do it.
25  Q. Okay.

Page 90

1  A. I get a little -- it's the caffeine kicking
2  in.
3  Q. Let's mark Exhibit 28.
4        (Halpin Deposition Exhibit No. 28 was
5  marked for identification.)
6  Q. Just for the record, Exhibit 28 is a two-page
7  document. It's titled the "Minutes of Conference
8  Call, Severstal Wheeling, Inc. Retirement Committee,
9  and it's dated January 16th, 2009. Take a look at
10  that, Mr. Halpin.
11  A. Okay, yes.
12        (Witness reviews document.)
13  A. Okay.
14  Q. All right. Have you seen this document
15  before, Mr. Halpin?
16  A. I have.
17  Q. So it looks as if this is notes from a
18  conference call on January 16th with you and
19  Mr. Halpin and Mr. LaBow. Do you recall that --
20  that call?
21  A. I don't recall that specific date, but I
22  would say, again, it's one of the many conversations
23  we had with Ron and/or Mike, Dave Riposo. So I
24  would say, yeah, that seems to represent what this
25  is, January 16th meeting conference call.

Page 91

1  Q. So going down to the third full paragraph it
2  says that, "Mike then advised that the Committee had
3  decided that Ron needs to reset the portfolio using
4  those investments for which there are no transition
5  issues." I take it the ones he could easily split
6  up 90/10. Is that your understanding?
7  A. Yeah. Any one that could have been allocated
8  to us at the time, you know, besides Neuberger
9  Berman, we were looking for him to use those as a
10  blend of how the allocation should have gone.
11  Q. Got you. Then the sentence goes on, "and
12  that Ron should present his recommended plan of
13  reallocation to the Committee for our review."
14        This is, to my understanding, the
15  first time it comes up in the documents that the
16  committee wanted a plan from Mr. LaBow. Do you know
17  when you started to first ask Mr. LaBow for a plan?
18  A. I mean, it seems that gets more formal here.
19  I want to say the first time we had a meeting with
20  him, we clearly said we need to reallocate. I mean,
21  "plan" is may be a more formal word to use. But I
22  would say the first two minutes I spoke to him in
23  January, it was clear that we wanted a reallocation.
24  Q. Okay. What do you take it to mean here in
25  this document, "that Ron should present his

Page 92

1  recommended plan of reallocation to the Committee
2  for our review."
3  A. I believe that we were starting to get some
4  confusion as to what items couldn't be allocated,
5  what kind of restrictions there may be. And instead
6  of getting fragmented comments on each call, why
7  don't you put it in writing, and let's get a formal
8  plan so we can understand this better.
9  Q. Okay. It looks like it went on to discuss
10  individual plans that you could get into and you
11  could not get into. So you got into that level of
12  detail, speaking about the individual funds?
13  A. Again, I would say any time Ron spoke, it was
14  never a complete thought. This happened to be
15  examples of where maybe we could have. I believe
16  there were other ones that were also being -- but
17  again, here's another one of his isolated, you know,
18  pieces of the puzzle examples. So I don't think
19  that this in any way was, you know, all of them. It
20  was just some of them.
21  Q. Sure, I got you. Going to the second page,
22  the fourth paragraph from the bottom of the page
23  there. "He conveyed that he was puzzled as to 'why'
24  we continue down this (reset) path, citing that
25  there would be costs and adding that he would

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 26 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 93

1   'prepare a writing' indicating that 'such action
2   would result in added fees and lower asset values,'
3   and that he would formally advise against such
4   action."
5         Do you recall discussing that with
6   him?
7   A.  I can't say I remember that specific
8   discussion here today, but obviously if it's in the
9   notes here, I would say we did have that discussion.
10  Q.  Do you remember, if not this phone call, any
11  other conversations with Mr. LaBow that doing a
12  reset would harm the plan or raise costs or
13  something like that?
14  A.  Again, I think our focus was compliance with
15  the guidelines.  So if that happened to cost
16  additional amounts or if we participated in an
17  acceptable allocation that the fund may lose a
18  value, again, I go back to the betting on the Jets.
19  It wasn't necessarily that performance dictated
20  acceptance.  It clearly was we want our equitable
21  share.  We don't want to be injured or benefited,
22  nor do we want WHX injured or benefited.  We just
23  want to have an acceptable split that as a fiduciary
24  we could say follows our guideline.  So if there
25  were additional fees, I would assume those fees

Page 94

1   would be borne by both sides.
2   Q.  Now, along the lines of what you testified to
3   earlier, the second-to-last paragraph there starts
4   with, "Ron then strongly reacted to our reset
5   request, stating, 'If I can do it, I will do
6   it...once you tell me to do it, I'm going to do it,'
7   and that we would not have an opportunity to assess
8   it and ask him to re-do it once it's completed."
9         Do you recall that part of the
10  conversation?
11  A.  I'm going to say I don't recall here again
12  today.  Sorry to be repetitive.  I don't recall here
13  again today, but I would say, if it's part of these
14  notes, I would say that that discussion did happen.
15  Q.  Do you recall that, just in general, from any
16  of the conversations with Mr. LaBow?
17  A.  Do I recall --
18  Q.  Him saying that if I can do it, I will do it,
19  but then you may not have the opportunity to undo it
20  once it's completed, or something along those lines?
21  A.  Again, I'll go back.  I can't say I knew back
22  then, but clearly he said he would do it on December
23  30th with Sally King and Michael.  This isn't the
24  first time he's saying I can do it and I will do it.
25  Here we are on January 16th that he's still saying

Page 95

1   he thinks he can do it.
2         Once the redo is completed -- that's
3   the whole purpose of the plan.  Why don't you show
4   us the plan, what you're going to do, and we can say
5   that's acceptable.  I'm just saying does it fit our
6   guidelines?  I'm not going to judge him.  He could
7   have gone out and done it.  I think he were very
8   clear about what we wanted that to be.
9         So to that point, I would say -- if I
10  can do it, I will.  Yeah, he just told us he can do
11  something because he just highlighted three things
12  he could do.  To the point that he says once it's
13  done, I don't know if that's he's trying to threaten
14  us or caution us.  Show us the plan before you do
15  it.  We would appreciate that.  He didn't have to.
16  He could do whatever he wanted at that time.  We
17  would appreciate seeing a plan so that we could all
18  agree it's proper.
19  Q.  Just moving a sentence or two ahead there,
20  next-to-the-last sentence in that paragraph, "Mike
21  had to emphatically reply that he did not want Ron
22  to take any action prior to providing us with his
23  formal allocation plan, specifically stating, "Don't
24  act until you show us the allocation.  Ron paused,
25  seeming to then fully grasp what Mike was asking

Page 96

1   for."
2         It seems to me from reading that that
3   you're clipping Mr. LaBow's wings.  No, you don't
4   have authority to act.  You've got to give us a plan
5   before you act.
6   A.  You know, we could say that.  We could say,
7   we'd like to see this.  He could have still done --
8   he still had the full power to do whatever he
9   wanted.  We can make it a strong, you know,
10  intention of ours to say don't do anything, but he
11  still had the full authority to do prospectively
12  what he wanted to do, currently, back.  I don't
13  think -- I think by us saying that, it doesn't strip
14  him of his authority.  We're strongly saying we
15  would like to see it.
16  Q.  So the retirement committee who is employing
17  Mr. LaBow tells him don't act until you show us the
18  allocation, and he can ignore that and say but the
19  agreement you signed says I can act, so I'm going to
20  do it despite what you told me?
21  A.  We would hope that he wouldn't do that.  I
22  don't think he ever was -- lost his full authority,
23  stripped of his full authority.  He always had full
24  authority.  I could fire him the next day if he did
25  it and didn't tell me.  I have that ability to do

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 97

1 that. I would hope that if he didn't do it again,
2 maybe I would think about, hey, maybe this guy is
3 just not listening to what we're asking for. I
4 certainly have that authority. I don't have the
5 investment authority. That's him.
6 Q. All right. Let me show you the next exhibit,
7 29.
8        (Halpin Deposition Exhibit No. 29 was
9 marked for identification.)
10 Q. This is two pages. The first page looks like
11 the e-mail, and the second page looks look the
12 attachment. Take a look at that, will you,
13 Mr. Halpin.
14        (Witness reviews document.)
15 A. Okay.
16 Q. Okay. So the first -- first page there, the
17 e-mail is from Mr. DiClemente dated January 20th,
18 2009, and it's to Mr. LaBow, CCing Ms. King, you,
19 Mr. Halpin, and Dave Riposo, and the subject line
20 is, "Reallocation of Assets from the WHX Master
21 Trust."
22        "Ron, confirming our discussions on
23 January 16th" -- which is, I guess, the phone call
24 that we were just talking about on Exhibit 28?
25 A. Okay.

Page 98

1 Q. -- "attached is the letter outlining our
2 understanding of how we will proceed with the
3 reallocation of assets from the WHX Master Trust."
4        Mr. Riposo wasn't included on the
5 phone call but you're including him on -- or
6 Mr. DiClemente included him on the letter, in the
7 e-mail here, I guess to include him on what the plan
8 was that you wanted to have going forward?
9 A. I would only be guessing, but I assume since
10 we talked to David previously to that about what we
11 intended to do that it was probably a copy showing
12 David that we're making this request now from Ron,
13 which he would have spoke to him previously.
14 Q. Okay. Looking on the second page there, the
15 letter January 20th, 2009, to Mr. LaBow from
16 Mr. DiClemente and CCing you and Ms. King and
17 Mr. Riposo. Again, the first paragraph talks about
18 the Severstal trust getting its proportionate share
19 of the assets in the WHX trust.
20        The second paragraph, "Please prepare
21 a written plan to reallocate the assets
22 retroactively as of the transition date and provide
23 that plan to both the WHX Pension Investment
24 Committee and the SWI Retirement Committee for our
25 collective review. We will work together with WHX

Page 99

1 and then provide you with any feedback in order to
2 assure that both parties are mutually satisfied with
3 the final allocation."
4        Did you ever get such a plan from
5 Mr. LaBow?
6 A. I don't believe we ever got a formal plan
7 from him. I believe he may have sent an e-mail
8 with, again, some examples or reasons, but I don't
9 believe we ever received a formal plan.
10 Q. Right. And then it goes on to, as to
11 "identify in writing those accounts that cannot or
12 should not be proportionally allocated," and the
13 "reasons for such treatment," and "how you are
14 recommending equitable allocation of those assets
15 among the remaining (or substitute) investments."
16        I guess that goes back to what you
17 were saying about diversifying it and mimicking -- I
18 know that wasn't your word -- the original
19 commingled trust funds?
20 A. Yeah, I think -- again, I think this is --
21 you could almost take this and put it in I can't
22 tell you how many places. I don't think we ever
23 wavered on our instruction. I don't think it was
24 ever ambiguous what our instruction was.
25        While he seemed to have some very

Page 100

1 granular detail why certain things couldn't happen,
2 I don't know why a guy at his level couldn't figure
3 out exactly what all we were asking for. It's a
4 pretty simple request. I thought it was fairly
5 clear what the request was. But it was very
6 difficult to pin him down to give that.
7 Q. You don't have any idea as to why that was
8 the case, that he wasn't more forthcoming to what
9 you were requesting?
10 A. I would be speculating with Ron's
11 personality. If you met Ron, you know his
12 personality. I sometimes equate him to Colonel
13 Jessup in "A Few Good Men." I think he just thought
14 somehow that performance dictates anything,
15 including incorrectness, and if I perform well, then
16 what's the problem. And I think he, at some point
17 in time, must have, in hindsight, missed a key part
18 of our intention.
19        But I would sit here and tell you that
20 this, to me, continues to be extremely clear,
21 extremely simple, extremely consistent, and yet we
22 never really got what I would call an acceptable
23 product out of him. Complete product.
24 Q. I know I'm jumping ahead a little bit, but at
25 what point did it get to the point where you thought

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 28 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 101

1  he wasn't being responsive and you had to replace
2  him or do something else?
3  A. I can't tell how late in the game that was.
4  Again, certainly when WHX was on board with us,
5  which was for quite some time. And Ron said he
6  couldn't perfectly do it, and I'm going to give
7  him -- again, as a pensioner, I thought the guy was
8  fantastic. I mean, he did stellar in good times; he
9  did stellar in bad times.
10  Who would I put in his place because
11  this guy can perform in any type of season and
12  environment. So I'm not going to lose this guy
13  because he fumbled the ball once, if he can recover
14  the ball. And so to the degree that he had the
15  ability to reset, and to the degree that we had
16  WHX's concurrence, I think there was never a time
17  where we thought about replacing him. Let's just --
18  let's just reset this thing and move forward.
19  So I can't tell you when there became
20  a time that we felt that Ron wasn't going to do it.
21  It was very late in the game. There was a time that
22  Glen Kassan, the WHX chairman of their committee,
23  had kind of reversed their opinion, late in the
24  game, which then kind of gave us a different
25  assessment of how that was going to work. Maybe you

Page 103

1  him. I think there's a guy, Louis Finney, and maybe
2  a couple other names that were Mercer that Mike
3  dealt with. So I'd say those roles were, probably
4  for some time best performed by Michael. When I
5  came on board, those were items that he -- I'm not
6  saying was responsible for, but as a practice,
7  that's what he did.
8  Q. And just for the record, this came up before,
9  do you know how to spell Mr. Finney's last name?
10  A. I'm -- this is like the spelling bee; right?
11  I'm going to say F-I-N-N-E-Y, but I can't say for
12  sure. I think that's what it is.
13  MR. JOYCE: That's my understanding.
14  MR. STRAWN: Okay.
15  THE WITNESS: I think that's it. That E
16  I'm not a hundred percent sure. I think it's
17  F-I-N-N-E-Y. Louis, I know that one.
18  Q. Let me show you Exhibit 30.
19  (Halpin Deposition Exhibit No. 30 was
20  marked for identification.)
21  Q. For the record, this is an e-mail from
22  Mr. DiClemente dated January 23rd, 2009, to
23  Jacquelyn Thomas, and you have a CC, and Mr. Bowness
24  has a CC. The subject is "Direction Letter to Ron
25  LaBow Regarding Reallocation of WHX Trust Assets -

Page 102

1  have something here.
2  Q. That's coming up.
3  A. So I'd say -- but for a very long time, if he
4  had said at the beginning, I'm not willing to do
5  this, guys, and WHX would have said, we're unwilling
6  to do this, go pound salt, I think we probably would
7  have had a different strategy.
8  Again, all this time, we are under
9  what I could call counsel, expert ERISA counsel. So
10  it's not like we're, you know, every time we're not
11  asking Sally, what do you think. I don't think I
12  can get into what her comments were, but this wasn't
13  done in a vacuum. This was done with regular
14  consultation of McGuireWoods. It wasn't two finance
15  guys sitting and saying what do you think we should
16  do.
17  Q. What about Mercer; did you have any
18  discussions with Mercer along the way about
19  reallocation, up to this point January 20th, 2009?
20  A. I -- again, I have to defer to Mike's --
21  Mike's background being what it was, he was -- he
22  was the go-to guy for WHX, he was the go-to guy for
23  Ron LaBow, and he was the contact for Mercer. So he
24  would get the information.
25  When Mercer sent it, they sent it to

Page 104

1  Privileged and Confidential," and the attachment
2  says 1-20-09. So it makes me think that the
3  previous exhibit, No. 29, is the one it's referring
4  to. Does that sound right to you?
5  A. I can't say that it's, you know, a derivative
6  of that. I can only say that, again, I think
7  Michael knew that area better than I did. The fact
8  that he's saying this, I think, is just giving a
9  heads-up to the Allegiant Group that there may be --
10  if, in fact -- somebody made the assertion that
11  you're going to have to sign these new investment
12  agreements, et cetera, I think he's just giving them
13  a heads-up that there may be some homework coming.
14  Q. Okay. So the body of the e-mail reads,
15  "Jacquie, Following our discussion (you, Rick, and
16  myself)" -- that would be Mr. Bowness; right? Rick.
17  A. Yeah.
18  Q. -- "today, attached is the letter we sent to
19  Ron LaBow directing that the assets be reallocated
20  between WHX and SWI pension plans" -- and just to
21  interrupt there. WHX had a different trust at that
22  point. They weren't the same -- they didn't have
23  the same trustee that you did; is that correct?
24  A. I would assume that's correct. I can't say I
25  know for sure.

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 29 of 63
R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.
Dennis Halpin
September 27, 2017

Page 105

1  Q. Okay. Back to the sentence -- "that resulted
2  from the trustee transition that pre-dated your
3  involvement. Ron needs to present his plan, SWI and
4  WHX need to agree, and we need to enter into direct
5  investment management agreements with each of the
6  managers that will permit execution of the
7  reallocation. There is a lot of work ahead of us.
8  Thank you for your patience as we work through this
9  process.
10      "As discussed, we'll follow up with
11  another letter regarding the assets that currently
12  reside in our account."
13      What was the purpose of this letter?
14      MR. JOYCE: Objection just to
15  speculation. It wasn't written by this witness.
16  A. I see I'm copied on it, but again, I wasn't
17  in the discussion. I would say I'm not a hundred
18  percent sure. It may be a result of a discussion
19  that they had, but I was not in that discussion.
20  Q. Did you have any discussions with -- you
21  yourself -- Mr. DiClemente or anybody else about
22  directions given to the trustee, Ms. Thomas there?
23  A. I can't recall if there -- if there was a
24  need to or whatever. I'm not sure why he actually
25  wrote that. I would say I had discussions shortly

Page 106

1  before that about the need to do this and who was
2  going to be involved. But as to this particular
3  phone call and/or this follow-up discussion, I'm not
4  sure.
5  Q. While it's not saying it directly in this
6  letter, the -- the inference that I'm making is that
7  don't accept any trade directions from Mr. LaBow.
8  A. Oh, I don't get that at all. I don't see
9  that.
10  Q. So what do you think --
11  A. I think it's a courtesy heads-up that there's
12  stuff that may be coming and don't take a vacation
13  or something. I don't think there's any issue here
14  that's saying do not take any instructions from him.
15  I don't see -- where does it say that?
16  Q. Sure, sure, it doesn't say that, but what --
17  what role would the trustee have in approving
18  Mr. LaBow's plan?
19  A. I can't say -- I don't know what that -- I'm
20  just thinking you're asking me what my opinion of
21  this is. I believe this is a courtesy heads-up that
22  there's work coming. That's all I can make out of
23  it.
24  Q. Okay. Let's go to Exhibit 31.
25      (Halpin Deposition Exhibit No. 31 was

Page 107

1  marked for identification.)
2  Q. Just for the record, it says "Minutes of
3  Conference Call Severstal Wheeling, Inc. Retirement
4  Committee" meeting, and it looks like it says,
5  teleconference, January 26th, 2009. Have you seen
6  this document before?
7  A. I don't recall it, but again, if it's a
8  meeting that happened in January, there were many of
9  them. I see my name on it. I would say I was
10  certainly involved in it.
11  Q. Take a look at it just to be a little
12  familiar with it.
13      (Witness reviews document.)
14  A. Okay. I may need to reread a particular
15  paragraph depending on what your question is.
16  Q. Sure, sure. The second paragraph on the
17  first page says, "This meeting was held pursuant to
18  Ron's request." That just seemed different than
19  some of the other conference call minutes that I've
20  seen, that this one said specifically that it was
21  Mr. LaBow's request. Does that stand out to you at
22  all?
23  A. I would -- I would say that we probably
24  initiated most of them, so if it says Ron wanted to
25  have this one, probably it was Ron. But that

Page 108

1  probably wasn't the typical.
2  Q. And the way I'm kind of reading the notes
3  here, it seems like it's a slightly different issue
4  that's being brought up about lending out
5  securities. So I don't know if that triggers any
6  recollections.
7  A. I mean, I remember there was something back
8  in that time period where Ron was concerned that
9  certain custodians may be lending securities out,
10  maybe he heard it, read it somewhere, and he wanted
11  to make sure that that wasn't happening in our
12  place. So he had just brought up that issue. So
13  that was certainly one of the things that he talked
14  about, just wanted to get confirmation that we were
15  not doing it.
16  Q. Okay. But I guess the third paragraph is
17  kind of long.
18  A. Yeah, it's a long one.
19  Q. About midway down there, there's a sentence,
20  "Mike expressed his surprise and confusion over this
21  (i.e., that Morgan Stanley would have some issue as
22  to the level of any given custodial account based
23  solely on value), but Ron repeated that (sic) Morgan
24  Stanley simply won't do it, adding that Morgan
25  Stanley wouldn't handle an account nowadays below

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 30 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 109

1 $50 million."
2        Do you see that sentence?
3 A. I do.
4 Q. Do you recall that being discussed?
5 A. I can't say today I recall that, but as I
6 read it, to me that goes back to my confidence in
7 what Mike knows about that business. I can't say
8 that I could offer any value to both what they're
9 saying, but I think Mike knew well enough about it
10 that he was confused and so he mentioned it. Ron
11 responded. But again, if it's in the notes, I'm
12 sure it was discussed, but the two of them were
13 talking a little bit foreign to me.
14 Q. Mr. LaBow said at his deposition something to
15 the effect that, I guess at this time period,
16 January 2009, that fund managers were -- didn't want
17 to both new accounts and were raising what minimums
18 were. The import I took from it was that things
19 weren't the same as they were November 3rd, 2008, in
20 terms of being able to open the same accounts.
21 That's not elaborated on here in these notes. Do
22 you recall that at all?
23 A. I don't recall it, but -- if I can just --
24 I'm going to go back to a prior document and say we
25 asked him to specifically cite those exact items.

Page 110

1 So if the climate has changed, just tell us that the
2 climate has changed. I mean, again, here we give
3 him a week before that, give us this, and now he's
4 calling up, giving us examples and not fulfilling
5 what was asked for.
6        I mean, telling us, again, you're
7 giving us a new piece of information. The next day
8 Morgan Stanley couldn't do this, the next day he'll
9 tell us that Procyon couldn't do this. I think it
10 was very clear a week earlier what exactly we asked
11 him to do. I think Mike says it here if I read it
12 right. He said, Ron, give it to us in writing
13 again. Ron, just write it down. I shouldn't have
14 to write it in these notes. I guess I would have to
15 take this table up and put a puzzle together and
16 say, all right, there's where he says Procyon. No,
17 we're just asking you as the investment manager just
18 write it down in a complete, cohesive piece of paper
19 that we could now see why we couldn't do. And to
20 the degree we could, let's do that.
21        I mean, I just -- I just don't
22 understand why that was so difficult to do. He
23 obviously knew things, but they come out -- they
24 come out of the woodwork.
25 Q. Okay. All right. That brings us to

Page 111

1 Exhibit 32, a letter from Mr. LaBow. That's two
2 pages. Take a look at it and see if you recall it.
3        (Halpin Deposition Exhibit No. 32 was
4 marked for identification.)
5        (Witness reviews document.)
6 A. I almost took my pen out and was going to
7 start to highlight one or two things. I don't want
8 to touch the exhibit.
9 Q. Do you want one to write on? I have an
10 extra.
11 A. No, no, it's just instinct.
12        (Witness reviews document.)
13 A. Okay.
14 Q. All right. On the first page there it says,
15 February 4th, 2009. It's a letter from Mr. LaBow,
16 and it's addressed to Mr. DiClemente and you. Did
17 you both have your office in Wheeling?
18 A. Yeah.
19 Q. Okay. And on the second page, I see a CC
20 goes to Glen Kassan. My understanding was he was at
21 WHX.
22 A. He had some big title at WHX, but I know he
23 was the retirement -- the chairman of the retirement
24 committee at WHX.
25 Q. Okay. And another CC to Sally King, your

Page 112

1 attorney. The next CC was to Jim McCabe. Was he
2 also at WHX?
3 A. He was a retirement -- he had a WHX position,
4 and he was a retirement committee member of WHX.
5 Q. The next name -- and I'm going to
6 mispronounce it -- Manes Merrit, Esquire. Do you
7 know who that individual was?
8 A. I don't.
9 Q. I would speculate that that's WHX's attorney,
10 but I'm not sure.
11 A. It wasn't ours, yeah.
12 Q. And the last one, David Riposo, and we
13 already covered that he was from WHX.
14 A. Yeah.
15 Q. All right. So was this -- from looking at
16 the documents we've looked over today, Mr. LaBow's
17 written response to all the requests from you and
18 Mr. DiClemente?
19 A. If it was, it's consistently incomplete. I
20 think he's -- I don't see this as an acceptable
21 response to ours. Once again, to say several prime
22 brokers. I mean, he doesn't identify who the prime
23 brokers are. He then admits that there were other
24 accounts that we could have divided up, but
25 apparently he didn't do that. He then admits that

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 113

1  in the summer of 2008, he recognized that he had
2  roadblocks. I don't think he ever communicated
3  those roadblocks to us. I mean, this thing's got
4  problems all over it.
5          I mean, I could -- I could probably
6  spend a half hour telling you all the problems with
7  this. But to tell me you now realize in the summer
8  of 2008 you came across roadblocks -- I mean, I
9  would suggest that he probably was discussing those
10 roadblocks with his buddies at WHX. But I don't
11 know any conversations that told us about the
12 roadblocks.
13         And to say that Mason and Capital --
14 and I think those were pretty decent sized funds
15 within the portfolio, now you tell me that you could
16 have divided those up. I don't know why you didn't
17 do that, so how could you tell me that you had no
18 other choice. I mean, the thing is so
19 self-conflicting, you could get a headache.
20 Q. When you say he was talking to his buddies at
21 WHX, that's referring to -- to what, just to say it
22 for the record?
23 A. I would have to say -- again, back then I
24 didn't know this, but seeing the documents that have
25 come out over the last time, the conversations that

Page 114

1  were going on between Dave Riposo, Ron LaBow, Glen
2  Kassan, in my mind, my personal opinion is there was
3  definitely some inappropriate conversations going on
4  that were not shared with us.
5  Q. Inappropriate in what way?
6  A. He's telling them what he's going to do.
7  He's not telling us what he's going do. He's
8  instructing them -- there's a conversation in one of
9  these things where I find it amazing that we tell
10 him and Glen Kassan this is what we want. Glen
11 Kassan is a -- let's say a family member to us.
12 We're both in the same fund. So we tell Glen Kassan
13 what we want; we want a proportional share. At some
14 point in time, Ron LaBow decides that he's just
15 going to give us the Neuberger account.
16         Well, clearly the WHX retirement
17 committee chairman knows that's not what we wanted,
18 but he did it anyways. So and then to later tell
19 us -- to admit to us in a conversation that he
20 realized that was a toxic transfer -- and that was
21 his word, "toxic."
22         So you're telling me Mr. Kassan, you
23 knew our instruction, you received and you signed a
24 document that said you knew our instruction, Ron
25 tells you to do this toxic transfer, you admit this

Page 115

1  is a toxic transfer, you recognize that's not an
2  equitable allocation and you do it anyway.
3  Q. So you're referring to something in which
4  Mr. Kassan says that the Neuberger Berman account is
5  toxic?
6  A. Yes. In a conversation he used that word.
7  So he recognized the fact that what he was
8  transferring obviously was an awkward transfer for
9  him to say as a retirement committee of theirs.
10 Q. And when you say in a conversation, in a
11 conversation with you or in a document that you saw?
12 A. I was part of the conversation. I heard the
13 word.
14 Q. Oh, okay.
15 A. I don't know if it's written down. I think
16 it is somewhere in a note. I clearly remember him
17 saying -- personally Glen Kassan saying that it was
18 a toxic transfer.
19 Q. Do you know any limitation on why the
20 Neuberger Berman stock couldn't have been sold and
21 diversified on the day it was transferred to the
22 Severstal trust?
23 A. It could have been sold the day before. Ron
24 could have made it cash and just gave us the cash.
25 Q. But on the date, November 3rd, do you know of

Page 116

1  any impediment to the assets in the Neuberger Berman
2  account from being sold and diversified for the
3  Severstal trust?
4          MR. JOYCE: Object to form and
5  speculation.
6  A. Yeah, I mean, if there was -- if it was going
7  to be moved to cash the day after and there was an
8  impediment -- and Ron's smart enough to know if
9  there's an impediment or not -- I can't say right
10 now. But I can tell you if there could be an
11 impediment, he could have liquidated it on the front
12 side and just moved it over to cash. So if he
13 thought he was going to liquidate on day one, why
14 don't you liquidate it on day zero.
15 Q. I understand your answer. The next-to-last
16 paragraph on the second page, Mr. LaBow says, "I
17 plan on investing the cash and a substantial portion
18 of the Neuberger Berman account with Proxima, Mason
19 Capital, Capital Defense and the macro fund run by
20 Wai Lee. Of course, none of this will be done
21 without your approval. Because of the extremely
22 high transaction costs and fees the two fund of
23 funds owned by WHX are going to be liquidated."
24         Do you know which two fund of funds
25 were going to be liquidated?

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 32 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 117

1   A. I can't say I know which ones those would be.
2   Q. It sounds as if what he's saying is that WHX
3   is being invested differently going forward. It's
4   not at the same static assets that they had in the
5   commingled trust before November 3rd, 2008.
6       MR. JOYCE: Objection to form.
7   Speculation.
8   A. I would say I don't know.
9   Q. Would you think it was possible that in
10  February 2009 there would have been a better asset
11  mix for WHX and for Severstal than existed in
12  November 3rd, 2008?
13      MR. JOYCE: Objection to form.
14  Speculation. To the extent it's seeking an opinion
15  of an expert or a legal conclusion.
16  A. Yeah, again, I wouldn't know. At that time
17  in that environment, I mean, he was our guy.
18      MR. STRAWN: Off the record.
19      (Discussion held off the record.)
20      (A brief recess was taken.)
21  BY MR. STRAWN:
22  Q. Mr. Halpin, let me show you what's
23  Exhibit 33.
24      (Halpin Deposition Exhibit No. 33 was
25  marked for identification.)

Page 118

1       (Witness reviews document.)
2   Q. For the record, this is an e-mail and it's
3   from you, dated February 5th, to Michael DiClemente,
4   and it looks as if you're talking about some of
5   the -- some of the funds. Take a look at that and
6   let me know when you're done. Two pages.
7       (Witness reviews document.)
8   A. Okay.
9   Q. So what was the purpose of this e-mail?
10  A. I'm trying to put it in date reference to the
11  other items. I think it was trying to provide an
12  example of how we could've better diversified the
13  original allocation. And I think that Mason and
14  Capital were, at some point in time, some of the
15  larger funds that Ron had admitted could have been
16  used for the allocation. So this was just a
17  simplistic example of how it could have been better
18  than it was.
19  Q. Okay. Just looking at the -- the bullet
20  points, for lack of a better word, there. Sorry. I
21  got you here. So that the introduction is, "can we
22  satisfactorily 'reset' utilizing just these three
23  'funds'...so long as Mason and Capital:
24      "a) investment strategies and risk
25  profile align with combined WHX trust, and.

Page 119

1       "b) their combined performance during
2   the transition period align with combined WHX trust
3   performance, and.
4       "c) both WHX and SWI committees agree
5   with tentative solution."
6   A. I was just trying to take the information
7   that I had at the time as examples and say, you
8   know, maybe this could be a solution so long as it
9   didn't -- you know, so long as it conformed to the
10  guidelines that were in there and WHX would agree.
11  It was a fairly simplistic one, based specifically
12  on accounts he said could have been used.
13  Q. I got you. So then was there any follow-up
14  from this from Mr. DiClemente?
15  A. I don't know if there was any follow-up. I
16  think it was an example that if Ron says I couldn't,
17  I'm like, no, you could have. Based on what you've
18  told us, here is an example. It really wasn't
19  saying that this was, you know, a strategy. It was
20  to exemplify a possible strategy.
21  Q. Were you -- trying to think, were you poking
22  holes in what Mr. LaBow was saying, or were you
23  proposing a possible solution to the situation? I'm
24  trying to understand here.
25  A. I was trying to at least come up with an

Page 120

1   example solution that maybe could work, maybe.
2   Again, I wouldn't say poking holes in what he said.
3   I was trying to validate that what he said wasn't
4   the only alternative, as he was suggesting. I had
5   no other choice.
6   Q. That makes more sense. Let me show you
7   Exhibit 34. It's a one-page document e-mail from
8   Mr. Riposo to Ron LaBow. And it's with reference to
9   a phone call between Mr. Riposo, you and
10  Mr. DiClemente. So take a look at that.
11  A. Okay.
12      (Halpin Deposition Exhibit No. 34 was
13  marked for identification.)
14      (Witness reviews document.)
15  A. Okay.
16  Q. First question, the signature line down there
17  for -- not signature line, but the address line for
18  Mr. Riposo, it says WHX/Handy & Harman. Do you know
19  what that means?
20  A. I believe Handy & Harman was a company
21  that -- I think that's probably where they worked.
22  Handy & Harman was a company that WHX had acquired.
23  I think that was probably the only company. If it
24  wasn't the only company, it was the largest element
25  of WHX.

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 121

1   Q.  Okay.  All right.  So going back to the body
2   of the e-mail.  There's reference to a phone call
3   this afternoon -- I guess this is on February 6th --
4   that Mr. Riposo said he had with you and
5   Mr. DiClemente.  Do you recall this conversation?
6   A.  I'm going to say I don't recall it here at
7   this moment, but I would say that it was -- again,
8   we had many conversations with David, so I would say
9   that -- I would say it looks like legitimate notes
10  from a meeting or a phone call.
11  Q.  Okay.  And so Mr. Riposo is saying to
12  Mr. LaBow, reviewed your letter of February 4th,
13  2009.  That, presumably, is the same as Exhibit 32.
14      MR. JOYCE:  I'll just object generally
15  on speculation.  I don't think Mr. Halpin is copied
16  on the e-mail or wrote it.
17      MR. STRAWN:  Right, right.
18  A.  Yeah, I mean, I don't know if it's a direct
19  link, but it's possible since the date matches up,
20  but whatever, that's a letter, so --
21  Q.  Sure.  It says in here, "they," being you and
22  Mr. DiClemente -- "frustration centered around two
23  main themes."  First, that you, Mr. LaBow, verbally
24  indicated "that you would be able to retroactively
25  provide a more diversified allocation and the letter

Page 122

1   seems to be contrary" to that.
2      Let me ask you about that.  Did you
3   ever express that to Mr. Riposo, that idea about
4   Mr. LaBow going backward on the ability to
5   retroactively provide a more diversified allocation?
6   A.  Previous to this, I'm sorry, did I express
7   Dave Riposo previous to this that Ron couldn't do it
8   or -- I probably screwed that up.
9   Q.  That you were frustrated that Mr. LaBow was
10  walking back from saying, yes, he could
11  retroactively provide a more diversified allocation?
12  A.  I think the frustration was that he was never
13  saying that he couldn't, that he was always saying
14  that I -- that I can't fully reset, and here's some
15  examples why.  But he never came out and said, I
16  won't -- that I remember, certainly not in this time
17  frame -- or that I couldn't.  He's just saying I
18  can't fully do it.
19      That was, I think, our frustration,
20  that he never really said that I won't or I can't.
21  I can't do it perfectly.  Here's reasons.  So I
22  think our frustration was the fact that we just
23  wanted to get to a closure on it to find out exactly
24  what it was so that we could move forward.
25  Q.  And the second point Mr. Riposo says in this

Page 123

1   e-mail to Mr. LaBow was that they were very
2   concerned -- being you and Mr. DiClemente -- "that
3   accepting such a concentrated portfolio of energy
4   related assets exposes them should participants
5   allege some sort of breach of fiduciary
6   responsibility."
7      Did you ever indicate that to
8   Mr. Riposo?
9   A.  I don't remember saying that.  The only thing
10  I always remember personally myself saying is that
11  he violated the investment guideline, which was a
12  diversified portfolio.
13  Q.  Right.
14  A.  And that's -- that's David's words.  I
15  don't -- I can't say I remember saying that.
16  Q.  Sure.  Okay.  Next exhibit, 35, two pages.
17      (Halpin Deposition Exhibit No. 35 was
18  marked for identification.)
19      (Witness reviews document.)
20  A.  Okay.
21  Q.  Okay.  So the document says, "Minutes of
22  Conference Call, Severstal Wheeling, Inc. Retirement
23  Committee," February 6th, 2009.  It's got the time
24  for the call, 2:45 p.m. to 3:30.  And I'll just say
25  that corresponds with Mr. Riposo's e-mail of

Page 124

1   February 6th at -- looks like 4:45 to Mr. LaBow.
2   A.  Yeah.
3   Q.  But anyway, again, you weren't copied on
4   Exhibit 34.  So Exhibit 35, have you seen this
5   before?
6   A.  I have.
7   Q.  And did you participate in drafting it or
8   putting input in it?
9   A.  I would say I probably had some involvement
10  in drafting all of them, so I would say that's
11  reasonable.
12  Q.  Got you.  Okay.  So it says conference
13  call -- sorry -- teleconference with Dave Riposo
14  with you and Mr. DiClemente, and the focus of the
15  meeting was to confirm that Mr. Riposo received a
16  copy of Mr. LaBow's letter and inquire as to his
17  opinion of the letter and inquire about the status
18  of the Cohn audit.
19      I know you said earlier that you
20  thought the Cohn audit was going to be more than
21  just coming up with the -- the value each of the
22  trusts were entitled to and would go more into what
23  was an equitable allocation of it?
24  A.  Yes.  Again, I'm using -- I think the word,
25  when I see "audit" takes a different connotation

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 34 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 125

1 than a compilation or a review.
2 Q. Okay. So do you recall this conversation
3 with Mr. Riposo?
4 A. I sound like a parrot here, but I would say I
5 don't recall it today, but I do remember we had a
6 number of them, so I would say this seems to be a
7 conversation we did have.
8 Q. Okay. I guess the last paragraph on the
9 first page there it says, "Michael reminded Dave of
10 their previous discussions (from the very start -
11 which began on December 31, 2008 - and on multiple
12 occasions since then), whereby WHX would have to be
13 a part of the resolution of the misallocation of
14 assets, since the assets would have to be
15 retroactively reallocated in order to ensure that
16 the assets were equitably allocated."
17        Do you remember discussing that with
18 Mr. Riposo?
19 A. I think by definition by us saying there has
20 to be a reallocation or a reset, by definition they
21 would have to be part of that reset.
22 Q. Right.
23 A. I mean, that's just repeating something
24 that's been said to him multiple times in different
25 words.

Page 126

1 Q. Okay. And did Mr. Riposo's, I don't know,
2 reaction to that change from any of the previous
3 conversations you had with him?
4 A. I mean, the notes suggest that he seemed to
5 grasp it a little more fully. I don't know why
6 there would be a change in his opinion. But again,
7 if we were going to do a reset or reallocation of a
8 single item by default, by binary default, there
9 would also have to be an adjustment to theirs. So
10 for him in a number of the previous meetings or
11 documents we've seen where he concurred, where he
12 concurred, where he concurred, I would say there's
13 nothing new in here that should change his opinion.
14 But I think there was something at the end where I
15 think there was --
16        (Witness reviews document.)
17 A. I'm not sure if this was the one. I thought
18 there was something in there like he had -- I think
19 he felt that -- or we had suggested, somebody
20 suggested we should have a broader conversation.
21 Q. The only thing I was going to point out was
22 on the second page there, there's some discussion
23 about having the same parties, plus their ERISA
24 counsel on a call. Is that what you're referring
25 to?

Page 127

1 A. Yeah. When he says after realizing -- the
2 notes say, "After realizing our position, he stated
3 that we may want to have a near term discussion."
4 In my mind, slightly different words, but there's
5 nothing new in this document except for the fact
6 about the Cohn report where he said he was surprised
7 to see our need for urgent. Which again, I don't
8 see anything here that should have surprised him.
9 Q. The next document, 36. For the record, I
10 would just say these are also Minutes of Conference
11 Calls, Severstal Wheeling, Inc. Retirement
12 Committee. It says February 10th, 2009. Take a
13 look at that.
14        (Halpin Deposition Exhibit No. 36 was
15 marked for identification.)
16        (Witness reviews document.)
17 A. Okay.
18 Q. Can you tell me this, this is the first time I see
19 Mr. McCabe in these conversations with you and
20 Mr. DiClemente and Mr. Riposo. Do you know the
21 purpose of Mr. McCabe being on this call? And first
22 question, who is Mr. McCabe?
23 A. He is a WHX retirement committee member.
24 Q. Did he have a position with the corporation,
25 too, WHX?

Page 128

1 A. I believe he did.
2 Q. Going back to my previous question. Do you
3 know what the purpose was of having Mr. McCabe on
4 this phone call?
5 A. I don't know. I think he was invited by Dave
6 Riposo.
7 Q. Sure.
8 A. We didn't mention him, but I think that was a
9 Dave Riposo invite.
10 Q. Did Mr. McCabe bring up any issues that you
11 hadn't already discussed with Mr. Riposo?
12 A. The only issue -- again, as I'm reading
13 this --
14 Q. Right.
15 A. -- that I would say the fact that he's
16 suggesting that we had accepted this alternative.
17 Q. Do you recall this conversation or a
18 conversation with Mr. McCabe?
19 A. I do recall a conference with Mr. McCabe.
20 It's likely it's this February 10th one. There was
21 a conversation we had, a phone call with Mr. McCabe.
22 Q. Okay. Was the takeaway from this
23 conversation that Mr. McCabe seemed to be less
24 receptive than Mr. Riposo to a reallocation, or is
25 that reading too much into it?

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 129

1  A. Yeah, I'd say he was there, and I think there
2  was, all right, we'll have another thing.  I don't
3  really think he had a reaction either way.  I'd say
4  that if he was confused that SWI had already
5  accepted an alternative, I don't know how he would
6  ever get that impression.  It certainly can't come
7  from us, and I'm not sure why he would have that
8  impression.
9       If he was talking to Dave Riposo,
10  which I'm sure he was regularly, I don't know how he
11  could have that impression.  Every time we talked to
12  Dave Riposo in all those other meetings, we clearly
13  said we are looking for a reallocation.  I would
14  assume he was talking to Jim about it.
15  Q. Oh, okay.  When I read the first line of the
16  third paragraph on the first page, "Jim seemed a bit
17  confused as he thought we at SWI had already
18  'accepted' this alternative," I thought that was
19  referring to accepting the initial Neuberger Berman
20  account on November 3rd?
21  A. Yeah, that's what I'm thinking.
22  Q. Oh, okay.
23  A. He thought we had accepted the November 3rd
24  transfer.  Why would he think that?  Who told him we
25  would have accepted it?  Dave Riposo is sitting

Page 130

1  there every day talking to him, and we told him
2  every time we didn't accept it.  We're looking for a
3  reallocation.  I'm not sure how there's a disconnect
4  there.
5  Q. Okay.  Right.  I was just thinking the letter
6  from Mr. DiClemente to Ms. Kronenberg that we saw
7  earlier saying we accept this, but I don't know that
8  that had Mr. McCabe CCed on it or anybody from WHX.
9  A. Again, I would say this:  Even if it did, I
10  don't think we ever saw the contents.  We never
11  talked about what was going to be in there.  We
12  never -- it didn't say here's the Neuberger account.
13  Here's the detail.  This was never anything that was
14  delineated what was in there.  I'm not sure what
15  alternative -- that we would have just accepted
16  this -- I mean, I don't understand how their
17  committee guy, would you have accepted this?  So I
18  don't understand why you think we would have itself.
19  Q. Just for the record, that's Exhibit No. 7,
20  and the November 3rd letter from Mr. DiClemente to
21  Ms. Kronenberg, and the CCs are Mr. Assetta,
22  Mr. Bowness, Mr. Halpin, Mr. Rogers, Mr. Sullivan.
23  Those are all Severstal people.
24  A. Yeah, Severstal.
25  Q. Okay.  Now, let me refer you to Exhibit 37.

Page 131

1       (Halpin Deposition Exhibit No. 37 was
2  marked for identification.)
3  Q. Take a look at that.  It's, for the record,
4  Minutes of Conference Call, Severstal Wheeling, Inc.
5  Retirement Committee, February 11th, 2009, the next
6  day.
7       (Witness reviews document.)
8  A. If I have to read that back, I'll see, but
9  okay.
10  Q. Okay.  For the record here, Exhibit 37 is
11  February 11th, and it refers to Mr. DiClemente as a
12  consultant on this one.  And the last exhibit, 36,
13  February 10th, 2009, it refers to Mr. DiClemente as
14  a member of the committee.  Do you know when
15  Mr. DiClemente left Severstal?
16  A. I believe it was sometime in February.
17  February 11th sounded a little bit early.  I believe
18  it was sometime in February 2009.
19  Q. Okay.  The fact that you were calling him at
20  home, that doesn't mean that he was no longer
21  working there at Severstal anymore, does it?
22  A. Did I call him at home?
23  Q. Yeah.  The third bullet point there says, "He
24  said he had not reached Michael today so he was
25  informing me.  I replied I had spoken to Mike today

Page 132

1  and would be willing to conference him in (at home
2  on cell)."
3  A. Again, I'm only saying, because this is at
4  3 p.m., he could have already been on his way home.
5  I don't know.
6  Q. I got you.
7  A. But regardless, I mean, I think this is
8  indicative of Ron.  When Ron wants something, he's
9  going to call you, me, everybody, right how, I'm not
10  waiting.  I just need to get somebody to do what I
11  want to do.  So he was shotgunning all his calls out
12  because he obviously wanted something.
13  Q. Do you remember this call?
14  A. I would say, again, I don't remember it as I
15  speak, but I believe the notes indicate that there
16  was a call with him.  So I would say this -- the
17  call happened, and these notes are probably
18  indicative of the call itself.
19  Q. Again, most of the -- I know we mentioned
20  this earlier.  Most of the calls were at your
21  initiation, the committee calling Mr. LaBow, but
22  this is one of the few where he called you.  And
23  what was the upshot?  What did he want?
24  A. I don't know if he was intending to once
25  again plead his case that he didn't know what more

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 36 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 133

1  he could do.  But by his own admission, when he goes
2  through that paragraph, it's very clear what more he
3  could have done.  I mean, he's so conflicting within
4  his own paragraphs.  I don't know what else I could
5  have done.  Oh, by the way, Mason and Capital
6  Defense, yeah, they could have done something.
7  Well, that's more diversified.  So I mean, he's his
8  own worst enemy.
9          And now we're talking February 11th.
10  I don't know what the date was with that other
11  thing.  But when was the date when we said give us
12  in writing a formal document.  So here we are again,
13  he continues to want to talk to us about it, but he
14  doesn't want to write it down.  How long could that
15  take?
16  Q.  While we're on the subject, so February of
17  2009, Mr. DiClemente left Severstal, left the
18  committee but was retained as a consultant?
19  A.  Yeah, I would say my proficiency was not in
20  committee administration, if you will, not in,
21  necessarily, some of the details where Michael is
22  very proficient.  So, you know, if I was sitting
23  there without a Sally King and a Mike DiClemente as
24  strong guidance, I probably would have said I don't
25  think this is something that I have proficiency to

Page 134

1  do.  He stayed on because he had that background,
2  and he had been there for quite some time.  So not
3  only does he know that background, if you know, he
4  also knows those people.  And so he stayed on as a
5  consultant, as well as Sally was on there -- I can't
6  remember when Sally may have kind of moved off and
7  Steve Kittrell came in -- but with those two people
8  providing me regular guidance -- again, I know I'll
9  throw in the Crosby and Malkin -- I don't know -- I
10  could have had more people, but I don't know if I
11  could have had better people.
12  Q.  Let me -- let me ask you that.  So at some
13  point Sally King, you didn't continue to retain her
14  as your attorney for ERISA?
15  A.  I don't know that she fell off.  I think that
16  maybe she got involved in other items, and Steve
17  Kittrell would appear occasionally.  So in her
18  absence, another individual from McGuireWoods would
19  be part of it.
20  Q.  I got you.
21  A.  I don't know if she ever really, you know,
22  left the building, so to speak, in terms of our
23  counsel.
24  Q.  I got you.  So after Mr. DiClemente left, I
25  take it then you were the last committee member

Page 135

1  standing on the Severstal retirement committee?
2  A.  I was -- yeah, the last official formal
3  committee member, yes.
4  Q.  How did your duties change, you know, as part
5  with Mr. DiClemente not being an official committee
6  member?
7  A.  I would say I may have signed one or two
8  items before that Mike would have typically signed
9  in his capacity, so I may have become more of a
10  mechanical instrument for certain things to get
11  done, whereas Mike would have probably known it
12  better.  I signed it, but certainly I'm getting
13  guidance from him and Sally, even though I may be
14  the signator.
15  Q.  I got you.  The last paragraph on the first
16  page, seems to be a new element in the notes of
17  these conversations where the middle there says,
18  "Ron stated that, while he may not have directly
19  told Michael, Michael should have known much earlier
20  through correspondence from Neuberger and Berman in
21  early November" and -- and then it goes on, "Mike
22  replied that, while he did receive information from
23  Neuberger and Berman (sic) at that time, it never
24  indicated that the entire fund was ours or that this
25  fund was our settlement.  Ron then stated, 'Maybe I

Page 136

1  did something wrong.  I don't think so, but maybe I
2  did something wrong.'"
3          So I've got two questions from that.
4  The first is, it seems to be the first indication
5  that Mr. LaBow was saying, well, you should have
6  known that you just got the Neuberger Berman
7  account.  Do you recall him saying anything like
8  that?
9  A.  I would say today I don't recall him saying
10  that.  Reading this as part of the notes, I would
11  say that probably was something that was said on
12  this phone call.
13  Q.  Was there -- do you recall any upshot from
14  that?  I guess it just goes on to say that, you
15  know, what Mr. DiClemente said about not knowing
16  that the entire fund was Severstal's.  Do you recall
17  that statement?
18  A.  I honestly don't like recall it.  Again, if
19  it's in the documents here, there are notes, so I
20  would say that anything in these documents was
21  probably said.
22  Q.  And the last part there, the quote from
23  Mr. LaBow, "Maybe I did something wrong.  I don't
24  think so, but maybe I did something wrong"; do you
25  remember him saying that?

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 137

1    A.  I can't recall that he said that, other than
2    the fact that it's in quotes.  So if it was in
3    quotes, it's probably verbatim to what he said.  It
4    wouldn't surprise me, as you know, in your documents
5    if we get to it, there's a transcript -- voice mail
6    transcript.
7    Q.  Right.
8    A.  That, once again, like Colonel Jessup, he got
9    the thing back to performance, I will now confess, I
10   should have done something, guess what, we're back
11   to even, so let's move forward.  I should have done
12   this and I should have done that.  So I believe he
13   said it, since it's in quotes, I believe that's
14   exactly what he said, but I can't say that I recall
15   that he said.  I can't say that today.
16   Q.  The last paragraph on the second page there
17   midway down, "Ron then said he was going to
18   liquidate some of the Neuberger Berman account into
19   Capital and Mason some time ago (November) but we
20   never gave him the OK.  Mike quickly replied,
21   "That's the first I'm hearing you say that Ron," to
22   which Ron read from his letter from a week ago dated
23   February 4th."
24       Do you recall that part of the
25   conversation?

Page 138

1    A.  I can't say I do, but I find it to be another
2    typical totally conflicting comment.  I told you
3    some time ago, and then I tell you about a letter on
4    February 4th, which was what, a week ago?  So some
5    time ago and now he's referencing a letter that was
6    a week ago.
7    Q.  I gather, again, what your testimony was
8    earlier, that you weren't involved in the ins and
9    outs of the Neuberger Berman account before December
10   30th.  So you're not aware of any -- before December
11   30th -- discussions with Mr. LaBow where he was
12   saying sell the Neuberger Berman account, liquidate
13   it?
14   A.  Prior to December 30th?
15   Q.  Right.
16   A.  I had no conversations with Ron about selling
17   or not selling.
18   Q.  Right, but are you aware of any, or did
19   Mr. DiClemente say, boy, Ron called today and said
20   sell Neuberger?
21   A.  No, he did not.
22   Q.  Okay.  All right.  Let me show you
23   Exhibit 38.
24       (Halpin Deposition Exhibit No. 38 was
25   marked for identification.)

Page 139

1    A.  Can I just add something?
2    Q.  Yeah, sure.
3    A.  If he did say it, I would believe Mike would
4    have said something to me.  That's my opinion.  I
5    don't think Mike would say, yeah, we're not keeping
6    you in the loop on that type of stuff.  If he made a
7    comment that said we should sell, I think he would
8    have called me and said, Dennis, do you know what
9    Ron said today?  Mike did not tell me, nor did Ron
10   say, that he had intentions prior to December 30th.
11   Q.  That selling the Neuberger Berman account
12   before the 30th would have been something that you
13   think Mr. DiClemente would have elevated to your
14   attention?
15   A.  Yes.
16       (Discussion held off the record.)
17   Q.  Mr. Halpin, I'm showing to you what's marked
18   as Halpin Exhibit 38, and it's an -- looks like an
19   e-mail from Ron LaBow.  It doesn't actually show who
20   it's to.  It's dated February 11th, which is, I
21   guess, the same date as the last notes of a
22   conference call, Exhibit 37.  The subject line is,
23   "Re:  Mike - I assume you are waiting to hear back
24   from."
25       So anyway, taking all that into

Page 140

1    account, the body there reads, "I am not sure what
2    you want me to do about Mason and Capital Defense
3    after our conversation this afternoon.  I again urge
4    you to turn the whole thing into cash since this
5    process seems to take forever."
6       Have you ever seen this or anything
7    like this from Mr. LaBow?
8    A.  I can't say I remember seeing this one.
9    Q.  Do you recall any discussions with Mr. LaBow
10   or e-mails where he said you're taking too long --
11   you being the retirement committee?
12   A.  I can't remember.  Specifically, I can't
13   remember this one, like seeing this one before this,
14   and I can't say that I can recall him ever saying
15   that we're taking too long.
16   Q.  When it says there -- and again, putting all
17   the caveats that you just testified to -- "I am not
18   sure what you want me to do about Mason and Capital
19   Defense after our conversation this afternoon," did
20   you have any discussions with Mr. LaBow that would
21   shed any light on that?  Was he saying that you
22   could get into them or that you --
23   A.  I think he's going right back off what I said
24   here.  You have -- he told us we could have got into
25   them.  I think I proposed something in the back,

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 38 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 141

1 right, where I said, hey, Ron, here's an example;
2 you told us Capital Defense, 22 million, Mason
3 Capital, 91 million, that's a significant amount of
4 the fund. Throw that in with N&B, as an example,
5 and I think you showed me something a couple times
6 ago where I took those three as examples, and just
7 examples, I say there hypothetical, you could
8 have done more. You had three funds to take from,
9 of which one of them was a fairly significant fund.
10 So how do you say you couldn't have done anything
11 more?
12        So I'm assuming he's referencing Mason
13 and Capital because I specifically brought them up
14 in this conversation. He's writing to it Mike. He
15 doesn't write to it me. He's trying to suggest,
16 what more do you want me to do? What we're
17 suggesting is, if we could have participated on
18 November 3rd, then we should have participated with
19 them. Go back, make some sort of a model that would
20 say if we had gotten that cut to some proportion,
21 here's where you guys should be.
22        Again, it's not rocket science. I
23 mean, these are very complicated algorithms to
24 figure out what did you mean by that. You don't
25 need a Cray computer to figure out what that meant.

Page 142

1 How many -- four hours later, what do you want me to
2 do? I don't know.
3 Q. I guess that's shed enough light on that.
4 A. I mean, I mean -- you don't need -- the thing
5 is just frustrating because, what do you want me to
6 do? Sorry. Frustrating.
7 Q. No, no. We're here to get your opinion on
8 everything and try to understand everything.
9        All right. Let me show you what we
10 can mark as Exhibit 39.
11        (Halpin Deposition Exhibit No. 39 was
12 marked for identification.)
13 Q. For the record, this looks like an e-mail
14 from Mr. DiClemente, February 13th, to Ron, and it
15 looks like it's responding to an e-mail further down
16 the page, February 13th. Seems to be a similar but
17 not identical message from Mr. LaBow at the bottom.
18 "I would like to know what you want me to do with
19 Mason and Capital Defense given our last
20 conversation? Please let me know."
21        (Witness reviews document.)
22 A. Yeah, here he says, I don't know what you
23 want me to do; here he's saying let me know what you
24 want me to do.
25 Q. It looks like Mr. DiClemente in his response

Page 143

1 says, "We are evaluating what we want to do," we
2 spoke to WHX, we asked you for investment materials,
3 and references Mason and Capital. Are they
4 forthcoming? And then the last paragraph, "Also,
5 you forwarded e-mails earlier this week that you
6 received from certain managers describing why you
7 could not allocate SWI assets to," and then it
8 rattles off a number of these funds.
9        At this point, February 13th, had your
10 attitude toward Mr. LaBow changed in terms of
11 retaining him as your investment manager?
12 A. It had not.
13 Q. And the second paragraph there about wanting
14 to look at investment materials for Mason and
15 Capital, that sure sounds like Mr. DiClemente, and I
16 don't know if you too, the committee wanted to see
17 information about the investments before giving any
18 opinion to Mr. LaBow, the investment manager, about
19 investing in them. What was your understanding of
20 what the committee wanted at that time?
21 A. We were trying to assess that if they were
22 part of a reallocation effort, that they would
23 conform to the guidelines. So we were just trying
24 to see what was Mason and Capital in terms of their
25 portfolio so that we could at least say that will

Page 144

1 fit the guideline.
2 Q. But weren't these two funds being discussed
3 because they were in the original WHX mix?
4 A. They were in a larger mix.
5 Q. Right.
6 A. If I now single the two of them out and
7 say -- they could have both been in some sort of
8 arbitrage; right? But in the total package, they
9 would fit the guideline. But if you're going to
10 single the two of them out, now we have to say if
11 that's the ones we can participate in, would they
12 actually still conform to a guideline. Now we're
13 really slicing a narrow piece out and just wanted to
14 make sure, if we could see their profiles, that they
15 were still generally in conformance with the
16 guidelines.
17 Q. Right, going forward how they would fit the
18 Severstal's investment.
19 A. Let's just say they were both energy stocks;
20 right? If I'm taking out the two Neuberger ones and
21 these two happen to be in energy stocks and I flip
22 them, what's the difference?
23 Q. Okay. Let me show you Exhibit 40.
24        (Halpin Deposition Exhibit No. 40 was
25 marked for identification.)

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 145

1    Q. Take a look at that. For the record, this is
2    from Glen@steelpartners, and the name at the bottom
3    here is Glen Kassan, WHX Corporation, CEO, and it's
4    to Mr. DiClemente and CC's Ms. King, Mr. Merrit,
5    you, Dave Riposo, Jim McCabe, Peter Gelfman at
6    WHXcorp.com and Mr. LaBow. This looks like this is
7    a three-page document, an e-mail chain.
8    A. Oh, wow, okay.
9        (Witness reviews document.)
10    Q. Okay. So going back to the bottom of the
11    second page is the first e-mail in the chain, and
12    it's from Mr. DiClemente to Mr. Kassan. It CCs
13    Ms. King and you. It says, Glen, Pursuant to our
14    conference call on February 13th -- so let me
15    interrupt it right there. Did you participate in a
16    conference call with Mr. Kassan February 13th?
17    A. I don't know if I participated in one on the
18    13th. I definitely participated in at least one
19    where he was involved. I don't think there were too
20    many with him being involved. I can't say it was
21    the 13th, but I know I did participate in one with
22    him on it.
23    Q. Got you. Mr. DiClemente goes on in the
24    e-mail to say, the retirement committee accepts a
25    proposal made by Glen Kassan on behalf of WHX

Page 146

1    pension committee "to accept a proportional share of
2    the assets held as of this date in the Neuberger
3    Berman account" -- and I take that to be WHX taking
4    back 90 percent or whatever their share would be of
5    the Neuberger Berman account -- "and further agrees
6    to liquidation of those assets, with the concurrence
7    of WPN Corp., and receipt of the proportional share
8    of proceeds as partial settlement of the transfer of
9    SWI pension assets."
10        So that's not referring to the final
11    trueing up payments, the final separation of the two
12    trusts. That was still in the offing; right? This
13    is talking it about the retroactive reallocation.
14    A. Yes, this is talking about the retroactive
15    reallocation.
16    Q. "The SWI Retirement Committee further agrees
17    that the balance after assets attributable to SWI
18    pension plans (based on the October 31th, 2008
19    valuation, as adjusted for gains or losses) will be
20    transferred to National City Bank, as Trustee, as
21    soon as practicable. This transfer will be made
22    in-kind from existing transferrable assets and cash;
23    in the alternative, the transfer will be made
24    entirely in cash."
25        This is the first time I'm hearing

Page 147

1    about cash being like an alternative to getting a
2    proportional share. Were you a part of any
3    discussions about what to -- how to do this
4    retroactive reallocation?
5    A. I believe that there was a cash element
6    that's -- I'm not sure if it transferred at this
7    time, that there was a cash element that needed to
8    be held that needed to come to us. I don't know if
9    it's talking about that cash.
10    Q. Okay.
11    A. This is -- it will take me a half hour to go
12    through this and try to break it down exactly what
13    was being said by Michael in this item. I didn't
14    write it, so I'd have to really -- there's a lot in
15    there.
16        My takeaway from it is that Michael
17    was saying, you know, after our discussion -- and I
18    believe the discussion is when you had referenced
19    toxic -- when we were on the phone with him -- but
20    after that discussion, we believed that he was
21    agreeable to a reset. So we were just saying, hey,
22    we're making a formal acknowledgment that we both
23    now agree that a reallocation should happen.
24        How that's going to happen, the
25    components of that, it would take me a while to sit

Page 148

1    here and try to tell you what -- I can do it if you
2    want me to -- it's going to take me a while to
3    figure out exactly what Michael was saying on each
4    piece. My overview is that we were saying, Glen, it
5    seems like you're in agreement with what we say.
6    Let's get the reset down as quickly as possible.
7    Q. I understand. The next e-mail further up the
8    chain here is from Mr. Kassan, and it's not clear
9    who that's to. But it's from Mr. Kassan, and it
10    says, "I am in receipt of your e-mail as provided
11    below and will review your comments with my group
12    and get back to you as quickly as possible. Please
13    note that I did not make the proposal cited in the
14    first paragraph in your e-mail. However, we are
15    willing to work with your group to try to assist in
16    resolving your problem."
17        Do you recall that Mr. Kassan like --
18    responded that quickly saying, no, I didn't mean to
19    make any proposal to --
20    A. I don't remember how quick he replied. I can
21    say that I do remember him saying that he didn't
22    make that. But again, as I read this here and it
23    says we're willing to work with you, that doesn't
24    mean that he won't do it, it's just meaning that he
25    didn't agree to that in the prior conversation.

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 40 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 149

1  We're willing to work with you and meet sounds like
2  he's still willing to work to do some type of an allocation.
3  **Q. The last few words there, "resolving your**
4  **problem."**
5  A. I got to tell you, Glen, he's a character. I
6  mean, he's very, very -- I think he's seeing three
7  chess moves ahead. That's why I say I think there
8  was something going on between him and Ron that they
9  sat there, we get the bad deal, and they're talking
10  about it. There's so much inequity about what was
11  going on, in my mine, personally, behind the scenes,
12  that he's starting to realize where this is going
13  and he's -- he's queuing it up.
14  **Q. With regard to Mr. Kassan referring to the**
15  **Neuberger Berman account as toxic, can you give me**
16  **any more context about that, how he said it?**
17  A. I just remember the word "toxic." I'm not
18  going to get it exactly right. He recognized that
19  the transfer was a toxic portfolio to some degree,
20  which always, now in hindsight when he sits there
21  saying we had no involvement in the determination,
22  well, you clearly were the one that took the
23  instruction from Ron to give the instruction for the
24  rest of them. Recognizing it's a toxic asset, you
25  can't jettison this toxic piece to your co-owner

Page 150

1  without at least -- I mean, to sit there and say,
2  Ron told us, Ron told us.
3          You mean you didn't have the courtesy
4  when you know that you were going against our
5  instruction, you didn't have the obligation or the
6  courtesy to say I should call these guys and just
7  confirm that they're okay with this, especially
8  since I recognize it's a toxic asset. How
9  convenient for him to say, well, Ron told us that.
10  Really? You didn't place a call? That instruction
11  came in on a Friday, October 31st. That transfer
12  didn't happen until the 3rd. You had all weekend to
13  call us.
14  **Q. When you say --**
15  A. Sorry I'm getting a little loud.
16  **Q. That's okay.**
17  A. It's so frustrating.
18  **Q. Yeah, I'm sure it is. But the point I was**
19  **trying to make was about him saying, Ron told us.**
20  **You mean Mr. Kassan said Ron told us to transfer**
21  **these assets to you?**
22  A. Ron told him to transfer the Neuberger
23  account on October 31 in the afternoon, transfer the
24  Neuberger account to SWI trust. There's an e-mail
25  or a text that specifically he says that, and he

Page 151

1  says, unless it's in violation of ERISA.
2  **Q. Right.**
3  A. It's in violation of our guidelines.
4  **Q. There was some reference to something like**
5  **the world is very difficult right now. Can we just**
6  **leave this alone? And what Mr. LaBow told me last**
7  **week was what he meant by that was that the market**
8  **valuations are fluctuating too much, can we put off**
9  **the separation of the two trusts because it's very**
10  **hard to value what these assets are worth since**
11  **there's so much fluctuation. Did you ever get that**
12  **from Mr. LaBow or anybody else?**
13  A. That it was a turbulent world?
14  **Q. That he didn't want to do the transfer on**
15  **November 3rd because of the market conditions?**
16  A. You mean September 30th. He did the transfer
17  on November 3rd.
18  **Q. On November 3rd. Did you ever get any**
19  **indication from Mr. LaBow that he did not want to do**
20  **it on the 3rd?**
21  A. I never heard that. I've never heard that.
22  **Q. In the letter --**
23  A. And I don't believe that they had to do it;
24  right? I mean, Citibank said we want to be out by
25  December 31st. I don't know why that was such a

Page 152

1  critical date to do it on. We had missed the 30th
2  of September. What is the magic of November 3rd?
3  You still had some time to do something.
4  **Q. And the letter that he, Mr. LaBow, sent on --**
5  **I think it was October 22nd, and that's Exhibit --**
6  **Exhibit 6. No, it's not 6.**
7  A. I don't know if this will help. Will it help
8  you because it's only single pieces here?
9  **Q. No, I'll find it. Thanks, though. Here we**
10  **go, 5. And on the second page of 5, it's an October**
11  **22nd, 2008, letter from Mr. LaBow to Mr. DiClemente.**
12  **It says, basically, that they missed the earlier**
13  **transfer.**
14  A. Oh, okay.
15  **Q. "Please be advised that as a result of the**
16  **market volatility that has continued for the past**
17  **several months, such transfer of assets of the Plans**
18  **did not occur. On November 3rd, 2008, I intend to**
19  **direct the transfer of most of the assets of the**
20  **plans to the WPSC Trust."**
21          **Anyway, so aside from that letter, you**
22  **never heard that Mr. LaBow did not want to go**
23  **through with the transfer on November 3rd, then**
24  **subsequently, because of market conditions?**
25  A. No.

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 41 of 63

Dennis Halpin
September 27, 2017

Page 153

1        (Discussion held off the record.)
2    Q. So going back to where we left off on
3    Exhibit 40. On the second page, Mr. Kassan had
4    replied that he did not make that proposal in
5    Mr. DiClemente's previous.
6        Okay. Going to the first page of the
7    exhibit, which is the February 17th, 2009, e-mail to
8    Mr. DiClemente and CCing you and --
9    A. Host of others.
10   Q. -- host of others. So have you had a chance
11   to look at that first page?
12   A. I did. I have.
13   Q. And what -- what was the import of what
14   Mr. Kassan was saying?
15       MR. JOYCE: Just object to the extent
16   the witness didn't write the document.
17       (Witness reviews document.)
18   A. I'm going to say it sounds like he's very
19   evasive. He's trying to distance himself from the
20   actual transaction. But, again, not that that's the
21   particular question. It's frustrating because he
22   knew exactly what we asked for. So I don't know --
23   I don't understand how -- I just don't understand
24   how we asking for something and somebody tells you
25   something different, you don't call us. It's not

Page 154

1    like you had to do it in ten minutes. You had a
2    whole weekend to make a phone call.
3        There was clearly back and forth, all
4    kinds of good stuff going on with those groups. But
5    nobody -- nobody thought about making a phone call.
6    Especially when he calls it toxic, he doesn't think
7    he's got an obligation to call us to confirm, are
8    you guys okay with this? We just want to make sure.
9    I don't know anybody that wouldn't do that as a
10   fiduciary.
11   Q. Was Mr. Kassan referring to these Neuberger
12   Berman accounts as toxic assets as of November 3rd
13   or February 17th?
14   A. I think he was talking about them in general.
15   They're concentrated energy stocks. By definition,
16   that would have been -- not only is it a violation
17   of the guidelines, he recognized the fact that
18   probably having a concentration in anything at that
19   time, especially energy stocks, is probably toxic.
20       Whatever his definition is, he
21   realizes how bad the portfolio in his mind is, yet
22   he opts not to call us. He takes it for granted
23   that Ron told him, so he's okay with that.
24   Q. So were there any more attempts to get WHX to
25   participate, after this e-mail, February 17th, 2009,

Page 155

1    in a retroactive reallocation where they would have
2    to take some assets back or make some sort of
3    exchange with Severstal?
4    A. I believe this e-mail changes about the --
5    our opinion as to their alignment. But again, I
6    think when you take a look at this in context,
7    everything we're doing here is not just Mike with
8    the mechanics but also with ERISA counsel. There's
9    no doubt in my mind as these things are going on,
10   we're turning to ERISA counsel saying, what's your
11   takeaway on this, all those kinds of steps.
12       It's not like me and Mike are doing
13   and copying Sally. There's definitely, throughout
14   those two months, I would say regular interaction
15   with counsel, and as actions were happening,
16   discussions with those actions and next steps. I
17   can't remember specifically, yeah, we did this when
18   we called Sally, here's what she said.
19   Q. I don't recall seeing any documents after
20   this February 17th e-mail where there were
21   conversations with WHX to take back any of the
22   assets to participate in a retroactive reallocation
23   of the assets of the commingled trust. But there
24   may have been, from what you're saying?
25   A. Like you mean like documents for

Page 156

1    conversations that happened with them?
2    Q. Right. Because I was taking it that this
3    e-mail ended the discussion. The CEO said, no,
4    we're not taking any assets back, but that doesn't
5    seem to be what you're saying?
6    A. No, no, I don't know. I don't know if there
7    was -- I mean, there's no documents. I don't know
8    if there's any other documents that have come from
9    meetings we had with them. But I would say this
10   document from Glen, clearly from my perspective as a
11   retirement committee chair, changed the -- changed
12   their -- our perceived alignment.
13   Q. When you say "alignment," what do you mean by
14   that?
15   A. Well, they -- McCabe didn't say anything like
16   this when he was retirement -- Riposo, he concurred
17   that that needs to be done. We're in full agreement
18   with you guys. We agree with the reset. There was
19   never a time where this kind of opinion says, you're
20   on your own or something that says, hey, guys, we'll
21   help you going forward, but we're not willing to
22   necessarily do something going back.
23       I think this document sort of shifts
24   that direction now to say, okay, we're not perfectly
25   aligned with WHX anymore. What's the strategy from

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF    Document 184-14    Filed 09/25/18    Page 42 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 157

1  there.  That's my opinion.  That kind of a shift
2  would clearly say, call Sally.  Let's see her
3  opinion on this.  Let's get her guidance on this.
4  Q.  So as a result of this interaction with
5  Mr. Kassan, did the committee take a different tact
6  in terms of resolving the problems with the
7  Neuberger Berman account?
8  A.  I'm sure we went back and spoke with Sally
9  about what the next steps are, and I'm sure some of
10  your documents may, going forward, some of the dates
11  demonstrate what those next steps are.  Looking at
12  this document, the only thing I can take away from
13  this is it's a change in WHX's alignment with us.
14  Q.  Got you.  Let me show you what is Exhibit 41.
15      (Halpin Deposition Exhibit No. 41 was
16  marked for identification.)
17      (Witness reviews document.)
18  A.  Okay.
19  Q.  So I'm looking at this, and it says it was
20  sent by e-mail.  It's from you to Mr. Riposo.  I
21  don't see the date on it.  The dates in the body of
22  the letter itself, the second paragraph refers to a
23  proposal reiterated by Glen Kassan's February 17,
24  2009, e-mail correspondence.  And then at the bottom
25  of the last paragraph it says, "Please make the

Page 158

1  transfer on Monday, February 23rd, 2009."  I would
2  assume at some point in the week in between there.
3      Do you recall this letter?
4  A.  I can't say I recall at this time, but that's
5  my signature, so I'd say I signed it.
6  Q.  This is just about the final cash payment --
7  or I shouldn't say the final -- but a cash payment
8  from the commingled trust to further finish the
9  separation of the two trusts, cash that the
10  Severstal trust was owed?
11  A.  I would say, again, when I see -- I thought
12  it said partial or part.  It agrees to a partial
13  settlement.  I think there was an amount that was
14  owed us based on this Cohn report that was going to
15  say how much was still, in their mind, left to
16  settle.
17  Q.  Right.
18  A.  And so when we accepted 6 million, I think it
19  was a rounded number, but I think it was not a
20  complete settlement.  It wasn't a settlement.  It
21  was to sort of more completely settle the transfer.
22  Q.  Right.  It's not settling the dispute.  It's
23  settling the --
24  A.  I don't even know it's settling -- it's
25  partially settling what's owed us.  We'll take this

Page 159

1  as a partial settlement.
2  Q.  In the separation of the two trusts?
3  A.  In what is -- yeah, in still what is
4  outstanding to us.  We're still not saying we know
5  what this number is.  We're still going back to the
6  reset.  We will take this amount because we know
7  we're owed at least this much.
8  Q.  You're still tying what you're owed to
9  wanting to have --
10  A.  A reallocation.
11  Q.  -- a retroactive reallocation, not just
12  taking this as -- that the trueing up of the final
13  amounts of cash?
14  A.  Yeah, yeah.  In my mind, looking at this
15  date.  I would say this is not us saying, okay, we
16  got what we're supposed to get, you owe us this
17  much, wait until -- no, that's not what this was.
18  This was, you know something, we should probably
19  take that money now and still argue the fair
20  settlement issue.
21      But I'm sure -- again, there's no
22  doubt as I write this, this is not Dennis Halpin
23  authoring something, sitting there in some dark room
24  by himself.  This has clearly got fingerprints of
25  Michael and Sally as I did this and listened to

Page 160

1  their guidance in what's the next steps.
2  Q.  Sure.
3  A.  I think this is probably just us saying, hey,
4  here's the next step we should do.  Dennis isn't
5  saying, Sally, I disagree with that.  No, you're
6  telling me something as ERISA counsel, I'm going to
7  follow what you say, unless I'm going straight to
8  hell or something else.  I retained you as my expert
9  counsel.  You tell me what you believe is the next
10  step.  Michael, you tell me the mechanics of it.
11  You want me to draft something.  Let's draft it.
12  I'll sign it.  Why?  I'm the last committee member.
13  So everything you're going to see from February 20th
14  to April 30th is going to have my signature on it if
15  it's a committee issue.
16  Q.  Right.  And let me ask you, after that e-mail
17  from Mr. Kassan on February 17th, was there any
18  discussion that you were involved in, we've got
19  to sell Neuberger Berman now, they're not taking it
20  back?
21  A.  I -- I can't recall if we had a discussion or
22  not.
23  Q.  After Mr. Kassan's e-mail where he seems to
24  say they're not -- he's not taking the Neuberger
25  Berman assets back, or any share thereof, was there

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 43 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 161

1    any change in what the committee's strategy was, the
2    Severstal committee strategy in terms of resolving
3    the assets that the trust held?
4            MR. JOYCE: Just object and remind the
5    witness don't discuss attorney-client
6    communications, but otherwise, you can answer that
7    question.
8    A. I'm going to say that after that discussion
9    with Glen and/or his letter, what have you, there
10   was clearly discussions with counsel. I mean,
11   again, we go back to monitoring. At some point in
12   time, anybody can go back and say, during that
13   period of time, what should you have done?
14           When you take a look at the frequency
15   of the letters, the frequency of the communications
16   from December 31st on, I would say there is a
17   plethora of documentation to show monitoring
18   oversight. I mean, what did you do as -- somebody
19   could go back and say, you know what you should have
20   done? That's a pretty easy thing to say in
21   hindsight. But as you go through this and you're
22   working with expert ERISA counsel and somebody who
23   did this as a practice for some point in time,
24   whether it was three, five, what have you, I think
25   you look at this and you can see almost daily

Page 162

1    conversations going on and reactions based on
2    something else that came on.
3            So as a fiduciary here, you know, with
4    a monitoring responsibility, I think the question
5    is, were we monitoring it? Absolutely, in spades.
6    Somebody could go back and say, you know what you
7    should have done. Yeah, well, that's easy for
8    someone to say eight years later or five years later
9    or even a year later whenever the market kind of
10   comes back, somebody could sit there and say, you
11   guys should have really invested in blank.
12           I mean, there's -- you probably have
13   it in there. At some point we're going to get into
14   I had a conversation with Marvin Schwartz from
15   Neuberger. Ron sends me this guy. Forty-five
16   minutes he's on the phone talking about real estate
17   mortgages. In March of 2009? Do you think a
18   pension committee is going to sit there and all of a
19   sudden put itself in mortgages? I let him go
20   because I'm letting him talk himself out. But
21   here's Ron sending this guy saying, I want you guys
22   to invest in this thing.
23           Now, again, we're not the size of WHX.
24   So they could take a piece of that if they wanted to
25   and still have a healthy distribution. I'm not sure

Page 163

1    what kind of a piece we could take. Here's a guy
2    right off the bat, and he's going to sit there --
3    again, going to performance dictates everything
4    else. They're earning 12 percent; you guys are
5    missing out. Mortgage-backed securities, March
6    2009.
7            Ron, I happen to have friends that
8    live in Long Island, I think I know what's happened
9    to the market on the East Coast. So that seems to
10   be a little risky. But go ahead, let the guy talk.
11           So I'm going back to those comments
12   that say the frequency and the depth of the
13   monitoring, in my mind, was almost overkill. This
14   consumed almost a full part of our jobs. And
15   somebody could sit there and say, here's what you
16   should have done. Yeah, that's Monday-morning
17   quarterback. But somebody can't say to me, wow, you
18   were pretty absent as fiduciaries. I don't know how
19   anybody could say that.
20   Q. When you're talking about what kind of duties
21   you have, is there any percentage you could put on,
22   again, during this period, June of 2008 to April
23   2009, that you spent working on retirement committee
24   duties as opposed to your corporate duties?
25   A. The monitoring role stepped up dramatically

Page 164

1    from December 30th on. I think it was scaleable.
2    To the degree there was -- I don't ever think we
3    said, we just don't have time for that right now, we
4    need to move forward. I think that when you take a
5    look at what we were doing previous to that, I think
6    these monitoring procedures were very sound. We had
7    Mercer reviewing it. The report would come in.
8    Mike would have his input. We would have a
9    schedule. There was a practice. There was a
10   process. It was followed religiously.
11           As of December 30th, somebody fumbles
12   the ball. Okay. They're telling us they can
13   recover the fumble. The guy is a stellar performer.
14   Let's work with that. At some point in time that
15   comment of his is, I can't fully reset, I can only
16   partially reset, I'm not sure if I can reset, it
17   erodes a bit.
18           But the frequency of monitoring, the
19   depth of monitoring from January 1st took on a
20   scaleable -- a percentage because that's what was
21   needed. Again, if you talk about pre-December 30th
22   and post-December 30th, in both cases I would say
23   that the monitoring of the activity and the process
24   in the funds was clearly sufficient, if not better
25   than that.

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 44 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 165

1   Q. Okay.
2   A. It's a long-winded answer, but --
3   Q. No, no. I'm glad to get your view on all of
4   that. I'm going to refer you to the next exhibit,
5   42.
6       (Halpin Deposition Exhibit No. 42 was
7   marked for identification.)
8   Q. That's a letter from Ms. King, CCing you and
9   Mr. DiClemente and Mr. Kittrell. And this is the
10  Mr. Kittrell, the second page, who also is at
11  McGuireWoods?
12  A. Yeah. He, at some point in time -- I'm not
13  sure how they played each other, but if she wasn't
14  available, he was available. There was a time where
15  he did get involved.
16  Q. Okay. Take a look at that just to let me
17  know when you've had a chance to peruse it.
18      (Witness reviews document.)
19  A. Okay.
20  Q. Okay. So in Ms. King's letter here to
21  Mr. LaBow she mentions the Cohn audit. The third
22  paragraph she says, "The Committee believes that it
23  is important to work toward a resolution of the
24  investment of the previously transferred assets and
25  not to wait until the financial materials are

Page 166

1   reviewed and analyzed by the Committee."
2       The next paragraph then says, the
3   committee wants to make sure that all actions are
4   taken -- "The Committee wants to ensure that it has
5   taken all actions to facilitate your fulfilling your
6   duties as investment manager of the SWI pension
7   assets." And then as underneath there she has some
8   bullet points. The first one is the investment
9   management agreement with WPN -- with Mr. LaBow's
10  company, that is -- gives him "complete authority to
11  select and designate other investment managers, for
12  example, Neuberger Berman." And that "the Committee
13  agreed to work with Neuberger Berman to get an
14  agreement in place."
15      The second bullet point says, the
16  committee "negotiated all provisions, except the fee
17  provisions, of the Neuberger Berman agreement," and
18  still wanted Mr. LaBow to get a better deal on the
19  fees.
20      "The Committee has not signed the
21  agreement" and is waiting on the fees before it
22  signs the agreement with Neuberger Berman.
23      So at this point as of February 24th,
24  it's still in the same position, haven't signed an
25  agreement with Neuberger Berman and are still

Page 167

1   waiting for the fees to get reduced?
2   A. I can't say I'm that familiar with that
3   subject. So if that -- if that's how it's stated
4   here, I can't dispute it. But I can't say I'm
5   that -- not that involved. And I'm familiar with
6   the fee adjustment issue but only from the fact that
7   it was the issue -- the issue was a duplication of
8   fees for the same service.
9   Q. Okay. So the fourth bullet point there says,
10  committee expressed concerns "on multiple occasions
11  regarding the lack of diversification." And then
12  "the Committee asked you for additional
13  information."
14      Then the first full paragraph on the
15  second page says, "At this point, the Committee is
16  taking several steps in an effort to move the
17  situation forward. First, the Committee will sign
18  the Neuberger Berman investment management agreement
19  even though" the fee issue hadn't been resolved and,
20  you know, still reserves the issue that the
21  committee doesn't think it should have been
22  allocated the entire Neuberger Berman account.
23      Then the next paragraph says, "The
24  Committee will facilitate transfer of assets and
25  will provide direction for Neuberger Berman or

Page 168

1   National City (as trustee and custodian) to execute
2   your instructions regarding investment management."
3   So that sounds as if now the committee is saying
4   fine, you can go ahead and invest. And there's
5   no -- no statement here about we need to get a plan
6   from you first before we let you exercise your
7   investment management authority.
8       Is that what you take that paragraph
9   to mean?
10      MR. JOYCE: Objection to form. And also
11  speculation. Somebody else's document.
12      You can answer.
13      THE WITNESS: Thanks.
14  A. So yeah, I'm going to say -- Sally is writing
15  this, so I'm not going to be able to precisely
16  interpret what her understandings are. My takeaway
17  from reading this is that we are going -- if you
18  bring up an issue, we are going to try our -- to
19  facilitate that so you can do your job.
20      So I think she's saying, if these
21  things -- if you're telling us these things are
22  hurdles for you, we will take care of it.
23  Q. The next sentence where I left off, "The
24  Committee will not approve or reject investment
25  actions made by you, since you are investment

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 169

1  manager and have full authority regarding investment
2  decisions under the Agreement.''
3           This is the first communication with
4  Mr. LaBow from the committee or the committee's
5  attorney that doesn't say we want a plan from you
6  before you do anything.  That seems to me to be a
7  change.
8           MR. JOYCE: Object to the form.
9  A. I don't think it's a change at all.  I think
10 we've been telling him all along, since I was
11 actively involved in meetings with him, so I'll say
12 January 5th or whatever it was, we've always said
13 you make the decisions.  Here's the decision we
14 make.  You're retained and you're fired.  So we
15 don't make an investment decision.
16          I think when we talked to him before
17 about plans and everything else, that was our strong
18 direction as to what we wanted.  He still could have
19 done what he wanted.  If there's was something
20 blocking him, then he should have clearly said -- I
21 think even in the guidelines of the agreement it
22 says, the investment manager needs to tell us what
23 we need to facilitate him.
24          And Ron's personality is, if something
25 is in his way, he's removing it, and he's removing

Page 170

1  it immediately.  So if he had a hurdle, I don't know
2  whatever he told us before that there was a hurdle.
3  As I look at this thing, the first bullet says, the
4  investment management agreement says "your company
5  has complete authority" of the conversations -- you
6  know, let's go to the second one.  Committee
7  successfully negotiated -- except fee provision.
8  Ron, that's your job.  You were supposed to do the
9  fee provision; right?  The committee is not signing
10 this thing until you do your job.
11          "The Committee expressed its concerns
12 to you on multiple occasions regarding the lack of
13 diversification." Ron, that's you that didn't fill
14 it.
15          So every one of those ideas, Ron, you
16 didn't do your job; Ron, you didn't do your job;
17 Ron, you didn't do your job.  Do your job.
18          This thing here, to me, is nothing
19 more than reiterating something that we said all
20 along.  We don't reject or approve your investment
21 decisions.  That's your job.  I think it's just a
22 repeat and reminder.  It's not saying we've changed
23 the direction.  It's a repeat.
24 Q. All right.  Let me refer you to Exhibit 43.
25          (Halpin Deposition Exhibit No. 43 was

Page 171

1  marked for identification.)
2  Q. For the record, I'll say that's an e-mail
3  from you dated February 20th to Mr. DiClemente.
4  Take a look at that and --
5  A. Okay.
6           (Witness reviews document.)
7  A. Okay.
8  Q. What did you mean to accomplish with this
9  e-mail to Mr. DiClemente?
10 A. As I look back and read it, it looks to me
11 like I was trying to note all the conversations that
12 were had and the times we discussed the Cohn report.
13 Q. Okay.
14 A. I think we initially were told sometime early
15 January it would be very soon.  It looks like it's
16 still sitting out there.
17 Q. Got you.  Do you know when you did receive
18 the Cohn report?
19 A. I want to say it was very late February.
20 Q. Okay.  Do you know what the date was of the
21 Cohn audit?
22 A. You mean the date that they signed off on it?
23 Q. Right.
24 A. I don't know.
25 Q. Was there a lag between the audit being

Page 172

1  finished and published and bound and you receiving
2  it?
3  A. I have to say I don't know because I don't
4  know the date it was signed.  But I think it was
5  definitely a lag between when it was promised it
6  would be given to us and how many times we had to
7  ask for it and when we got it.  In terms of when it
8  was signed and when it was provided to us, I don't
9  know the date it was actually signed off on.
10 Q. I take it from what you were saying earlier
11 that you were disappointed when you read the audit?
12 A. I think it was a compilation.  I think it
13 just tabulated items as opposed to a little more
14 substantive stuff.  I think when we expected an
15 audit, what we got was nothing more than somebody
16 validating end-of-month account balances or
17 something.  For something to take that long for that
18 was a little bit weak.
19 Q. Do you know of any -- what Cohn was
20 contracted to do?
21 A. I do not.
22 Q. And was that the WHX retirement committee
23 that commissioned it or shared that between the two
24 committees?
25 A. I remember somewhere that that -- my understanding

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 46 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 173

1    was Ron -- Ron requested it.  I don't -- I don't
2    know that to be certain, but I do remember something
3    where it was Ron that requested it.
4    Q.  Okay.  Next document, Exhibit 44.
5         (Halpin Deposition Exhibit No. 44 was
6    marked for identification.)
7         (Witness reviews document.)
8    Q.  For the record, this is an e-mail from
9    Mr. DiClemente dated February 27th, 2009, to Russell
10   Khanuk at Neuberger Berman, and it CC's Jacquie
11   Thomas, you, Mr. Halpin, and Rick Bowness.  Let me
12   know when you've had a chance to take a look at
13   that.
14   A.  Okay.
15   Q.  In the last paragraph it says, "You'll also
16   note that I am copying Dennis Halpin, who I
17   mentioned on the phone yesterday will be a party to
18   these documents.  Dennis is a senior member of the
19   team at Severstal Wheeling, Inc., as well as SWI
20   Retirement Committee member."
21        Is this your introduction to Neuberger
22   Berman?  Had you dealt with them before this?
23   A.  I can't say I dealt with them before this.
24   Apparently it's an introduction of Russell and me,
25   but I don't remember some -- any documentation prior

Page 174

1    to that.
2    Q.  Prior to this, had you had any conversations
3    with Neuberger Berman?
4    A.  I can't be certain, but I don't -- I don't
5    believe I had one, a direct conversation, prior to
6    Michael's leaving the company.
7    Q.  Okay.  Leaving the company in February --
8    A.  As an employee.
9    Q.  -- as an employee in February 2009?
10   A.  Yeah.
11   Q.  This looks similar but is not the same.
12   Exhibit 45.  Just for the record, that's another
13   e-mail from Mr. DiClemente also on February 27,
14   2009.  The last one was 2:42, and this one is at 3
15   p.m.?
16   A.  Okay.
17   Q.  Also to Mr. Khanuk at Neuberger Berman and
18   CCing you and Rick Bowness but not Ms. Thomas.
19        (Halpin Deposition Exhibit No. 45 was
20   marked for identification.)
21   Q.  It refers to the investment management
22   agreement with Mr. LaBow.  Let me know when you've
23   had a chance to take a look at that.
24        (Witness reviews document.)
25   A.  Okay.

Page 175

1    Q.  So the e-mail from Mr. DiClemente I guess
2    goes through some of the history of the Severstal
3    plans or trust in Neuberger Berman, and then toward
4    the end of the e-mail it says, "His role with us is
5    what contributed in part to our initial reluctance
6    to enter into the agreement directly with you
7    because we have felt that is Ron's responsibility.
8    As discussed, we are providing an accommodation to
9    Ron."
10        Do you know what this accommodation is
11   that he's referring to?
12   A.  Okay.  I'm sorry.
13        (Witness reviews document.)
14   A.  I would be speculating.  I'm assuming he's
15   meaning that we are going to sign an agreement with
16   you as opposed to Ron signing with you.  We hire
17   Ron.  Ron hires investment managers.  This seems to
18   be now we're going to be -- in my mind, this is a
19   duplicative arrangement.
20   Q.  And there's a few documents back, Mr. Riposo
21   was explaining to you and Mr. DiClemente on the
22   phone that there was a lot of paperwork that you, as
23   the retirement manager, would have to do to have
24   relationships with each of the different funds
25   because that's what he was doing at WHX.

Page 176

1        Is that your understanding of how WHX
2    related to the fund managers?
3        MR. JOYCE:  Objection to form.
4    Speculation.
5    A.  I wouldn't know.  I wouldn't know.
6    Q.  So you don't know necessarily that this
7    accommodation, that signing an agreement with
8    Neuberger Berman is anything different than what WHX
9    did with Neuberger Berman?
10   A.  I don't know what they did.  I mean, my
11   understanding was clearly that Ron was the
12   investment manager, and I think the agreement said,
13   Ron, you are authorized to hire other investment
14   managers as you deem fit.  So I think that the
15   concern or the question was, why do we have to get
16   into -- that's not what we asked you to do.  Maybe
17   this was a cut of the pie.  He didn't want to take
18   out his, so we're paying twice for the same effort.
19        Ron, you're the investment manager.
20   If you want somebody else to be involved, bring them
21   on, but we shouldn't have to sign additional
22   investment agreements.  So there was no real -- I
23   would think that there was no real need to have to
24   sign an agreement with them.  He could have -- he
25   could have set the agreement with Neuberger.

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 177

1    Q. Are you sure of that?
2    A. Under the authority of the investment
3    agreement, he had all authority to do that.
4    Q. But would Neuberger Berman have accepted an
5    agreement signed by Mr. LaBow as opposed to a member
6    of the retirement committee to Severstal?
7        MR. JOYCE: Objection to the form.
8    Speculation.
9    A. I'm sure they would have called him -- Ron
10   came from Neuberger -- or called us, are you guys
11   okay with this setup?
12   Q. My point was, would Neuberger Berman want the
13   retirement committee, you the retirement committee,
14   to sign off on any investment management agreement
15   and not Mr. LaBow?
16       MR. JOYCE: Objection to form.
17   Speculation.
18   A. Yeah, I -- I -- I don't know.  I don't know.
19   Q. Up to this point, February 27th, 2009, had
20   you had any conversations with Neuberger Berman yet
21   as to how -- how you would go about retaining them
22   for the retirement committee?
23   A. I think the only time I probably was part of
24   them was this earlier one.  I would say, no, this
25   was the one that said by way of introduction.

Page 178

1    That's probably the first time I was in contact with
2    them.  Maybe that's two ago, right.
3    Q. I think you're referring to Exhibit 44.  I
4    don't know that either of them used the words "by
5    way of introduction."
6        (Witness reviews document.)
7    A. Well, I think when Mike says, I'm copying
8    Dennis Halpin, who I mentioned on the phone will be
9    this person.
10   Q. Right.
11   A. I would think indirectly that's saying, hey,
12   let me introduce this guy to you.  I'm now moving
13   off.  I'm a consultant, he's a SWI manager, shake
14   hands.  So I don't think at that point in time they
15   probably knew who I was.
16   Q. And the date of those two e-mails, last two
17   exhibits, 44 and 45, were February 27th.  Now, let
18   me show you Exhibit 46.
19       (Discussion held off the record.)
20       (Halpin Deposition Exhibit No. 46 was
21   marked for identification.)
22   Q. Okay.  So Mr. Halpin, Exhibit 46, as I've
23   been told --
24   A. Yeah.
25   Q. -- is in front of you, and it looks like a

Page 179

1    contract with Neuberger Berman.
2    A. Yeah.
3    Q. Okay.  And going to the -- I guess the
4    next-to-the-last page, is that your signature?
5    A. That is my signature.
6    Q. Okay.  And it says, February 25th, 2009.
7    Does that relate to the date of Ms. King's letter?
8    Let me just go back to that exhibit.  42 was dated
9    February 24th where Ms. King said -- that the
10   committee was going to go ahead and sign the
11   agreement with Neuberger Berman, except the fee
12   portion.  So your signature would just be the day
13   after, from looking at the dates on the two?
14   A. Yeah.
15   Q. Okay.  Then the last page has written in "Ron
16   LaBow to discuss fees with NB."  So did you have any
17   discussions with Neuberger Berman before you signed
18   this on February 25th?
19   A. No.  Again, let's go back to what I said
20   before.  I'm now getting into a role of the single
21   Severstal retirement committee member.  I've got two
22   people, one that knows the administrative and one
23   that knows the ERISA counsel side.  At this point in
24   time I'm going to tell you that I become a vehicle
25   for signatures to get processes done.  So if Sally

Page 180

1    and Michael say, Dennis we need to move forward with
2    this Neuberger contract, will you sign it -- when
3    those two people are guiding me to do something, I'm
4    going to say, let me -- I don't know what this
5    actually is, let me talk with them.
6        So again, I would say that if she said
7    at the February 24th meeting she's saying to
8    facilitate or to whatever, accommodate, we're going
9    to do this, and they come back and they say, Dennis,
10   you need to sign this, I'm saying, okay, based on
11   your guidance or instructions, I will do that.  I
12   didn't call up Neuberger or talk to them and say
13   let's talk about this contract.  Because again,
14   that's not my area.
15   Q. Right.
16   A. So I'm deferring to their expertise when I'm
17   doing some of these activities or signatures.
18   Q. Sure, sure.  And from looking at the document
19   then as of the February 25th, 2009, there still
20   wasn't an agreement with Neuberger Berman in place?
21   A. I don't know if there was an agreement.
22   There may have been an understanding or an
23   agreement.  Was there one signed?  Apparently not.
24   But was there an agreement?  That's a different
25   question, and I can't answer that.  I don't know.

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 48 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 181

1   I mean, there's definitely going to be
2   situations here -- let's talk about the investment
3   agreement; right? Was there a -- was there a
4   procedure? Was there a practice? Absolutely. When
5   was it signed? That's a different question,
6   different answer. But was there always a policy in
7   place and guidelines? Absolutely was.
8       So sometimes you look at a signature
9   and you say, what was this doing? This was
10  formalizing an understanding that was already in
11  practice. It's just making it formal.
12  Q. What was a practice that was being made
13  formal?
14  A. That before November 3rd there was a WHX
15  trust agreement, there was a WHX trust guidelines
16  policy, and that was what Ron was to follow on
17  November 1st. He was to follow a mirror image that
18  was an understanding that you will do this same
19  thing until we kind of change these words out --
20  change these names out, and that's what you're going
21  to follow. So was there also a policy, practice in
22  place? Yeah, there was. Was there an
23  understanding? Yeah. When was it signed? That's a
24  different question, but the understanding was it was
25  always in place.

Page 182

1   Q. I got you. With Neuberger Berman was there
2   any understanding or agreement in place?
3   A. I -- I'm going to sound ignorant maybe a bit
4   here. I'm not going to say that I was that familiar
5   with the mechanics of this Neuberger Berman fees and
6   agreement or what have you. I think at this point
7   in time being the sole representative of the
8   committee, I am deferring a heavy amount of
9   influence to what Mike and Sally are talking to me
10  as a committee -- as a representative.
11  Q. Do you know what the purpose of getting
12  Neuberger Berman retained was? February of 2009?
13  A. The purpose of getting them on board, I
14  believe, was to -- again, I have to be careful. I
15  don't even know why they're there. My question is,
16  they don't have to be there.
17  Q. Right.
18  A. Ron can do this. Ron can sign with them.
19  But to facilitate or to remove that excuse of his or
20  whatever he thinks he had, which didn't come up
21  until the tail end, we will sign the Neuberger
22  agreement because he was asking for it.
23  Q. You say it only came up at the tail end, but
24  there were e-mails going back to November 3rd or
25  November 4th.

Page 183

1   A. Again, before December 30th, whatever you say
2   to me, I found out later as I'm reading the
3   documents. I was not party to any of those
4   conversations.
5   Q. Got you.
6   A. From my background.
7   Q. Right. But you recognize that there were
8   documents dealing with Neuberger Berman going back
9   to November 3rd?
10  A. I can't say that there were or there weren't
11  document discussions.
12  Q. We just looked at them earlier this morning.
13  A. If we looked at them -- now, again, you're
14  asking me today do I know that. Today I know that.
15  Back then --
16  Q. Right, that's what I'm asking.
17  A. Today I know it, yeah.
18  Q. Okay.
19  A. But we have to remember, I'm operating not --
20  I don't like some sort of time capsule to say,
21  hey, today, I should have known that. You have to
22  take the timeline that says at that time how were
23  you acting based on you what you knew. Some of that
24  stuff I wasn't aware of. If I know it today and it
25  doesn't all of a sudden retroactively say, well,

Page 184

1   there you go, time capsule, you should have known
2   it. I did not know it.
3       Neuberger Berman is a very, in my
4   mind, mechanical, administrative process. Again,
5   that wasn't my area of expertise. Probably why Mike
6   didn't bring me in, because what benefit he going
7   is serve. There's no need to necessarily get his
8   input. That's his area. No need for two people.
9   It's not like the more the merrier or something like
10  that. If I could have added to it, I'm sure Mike
11  would have included me.
12      MR. JOYCE: Can we take a quick break
13  before the next exhibit?
14      MR. STRAWN: Sure, sure.
15      (A brief recess was taken.)
16  BY MR. STRAWN:
17  Q. Mr. Halpin, let me show you what's marked as
18  Exhibit 47, and take a look at that and let me know
19  if you recognize it.
20      (Halpin Deposition Exhibit No. 47 was
21  marked for identification.)
22      (Witness reviews document.)
23  A. Okay.
24  Q. Okay, yeah. First question, do you recognize
25  this?

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 49 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 185

1   A. I don't recall this document.
2   Q. Okay. The second page there it says, March
3   9th, 2009. And it seems to go through a history of
4   the allocation of assets to the Severstal trust.
5   The title says, "Evaluation of WPN Corporation's
6   Compliance with the WHX Pension Plan Investment
7   Policy as of March 2004 and the Severstal Wheeling,
8   Inc. Pension Plan Investment Policy effective
9   November 1, 2008. March 2009."
10       See it references the Cohn report, the
11   audit, in that second paragraph, February 11th,
12   2009. And it seems in the chart on the bottom of
13   page 1 of cash equivalents, that's an $8.4 million
14   entry.
15       Do you know, just looking at the
16   numbers, if that's the final true up or one of the
17   final true-up payments for the Severstal trust for
18   the final separation from the commingled trust?
19       MR. JOYCE: Objection to form.
20   Speculation.
21   A. Yeah, I don't -- I don't recall, John.
22   Q. Okay. Do you know if about this time, March
23   9, 2009, there was any discussion among the
24   committee or -- not the committee -- that you had
25   with anybody else about taking legal action with

Page 186

1   regard to Mr. LaBow?
2       MR. JOYCE: Objection. Privileged.
3   Could reveal work product with McGuireWoods as well.
4       So to the extent you can answer
5   without going into what you discussed with counsel,
6   you can do that.
7       MR. STRAWN: The counsel for the
8   retirement committee?
9       MR. JOYCE: Yeah, the retirement
10   committee or if you had personal counsel or anything
11   like that.
12       MR. STRAWN: Those are two separate
13   issues, but --
14   A. Yeah, I can't recall.
15   Q. Okay. And let me show you Exhibit 49 (sic).
16       (Halpin Deposition Exhibit No. 48 was
17   marked for identification.)
18   Q. For the record, that's an e-mail from
19   Mr. Khanuk to Mr. DiClemente and to you with a CC to
20   Mr. -- Diccianni?
21   A. I want to say Diccianni.
22   Q. Diccianni.
23   A. That's my Irish background. I don't get
24   these Italian names too good.
25   Q. Let me know when you've had a chance to look

Page 187

1   at that.
2       (Witness reviews document.)
3   A. Okay.
4   Q. So this is dated March 6th, 2009. Do you
5   remember this, recognize this?
6   A. I can't say I remember it.
7   Q. Okay. It seems as if it's indicating that
8   the agreement is still not final with Neuberger
9   Berman to trade the -- or I should say create the
10   account.
11   A. I mean -- I mean, if he's saying something
12   that the attachment should be signed to open a new
13   account, I can't argue that. I don't remember -- I
14   don't remember the e-mail.
15   Q. Do you remember any back and forth with
16   Neuberger Berman to get the account set up?
17   A. I do remember some period of time where there
18   was some volume of interaction with Neuberger
19   Berman.
20   Q. Did you ever speak to Mr. Khanuk?
21   A. I don't remember ever speaking to him, no.
22   Q. Do you remember ever speaking to anybody from
23   Neuberger Berman?
24   A. Marvin Schwartz. That's the only one I can
25   remember speaking to.

Page 188

1   Q. The one you testified to.
2   A. Yeah, I do remember him because it was such a
3   bizarre call, but I can't say I remember anybody
4   else.
5   Q. Do you remember when that call took place?
6   A. Sometime in March, I believe. 2009.
7   Q. Between February and March of 2009, was
8   Mr. DiClemente spending less time or more time with
9   committee work with you?
10   A. I would say he was spending an appropriate
11   amount of time. If something needed to happen, he
12   was available. So I don't think there was a
13   lightness of it. I think he was as available as we
14   needed him.
15   Q. Okay. Show you Exhibit 49.
16       (Halpin Deposition Exhibit No. 49 was
17   marked for identification.)
18   Q. So for the record, that's an e-mail from
19   Mr. DiClemente dated March 11th, 2009, to you and
20   Mr. Khanuk and a CC to Mr. Diccianni. Let me know
21   when you had a chance to take a look at that. It's
22   just the one page.
23       (Witness reviews document.)
24   A. Okay.
25   Q. It seems as if they're still waiting for

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 50 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 189

1  documentation. It says here in the Mr. Khanuk's
2  e-mail, "I am still waiting to receive the SWI
3  Retirement Committee document designating Dennis
4  Halpin as the proper control person."
5  A. I'm sorry, where does it say that?
6  Q. Oh, I'm sorry. It's in --
7  A. Oh, okay.
8  Q. -- Mr. Khanuk's e-mail to you.
9  A. The only thing I, as I'm looking at it here,
10  saying I'm still waiting. I don't know if I've even
11  seen where he said he needed that before that. If
12  he was looking for something, I think I attended to
13  it.
14  Q. There seem to be a lot of back and forth with
15  Neuberger Berman. Do you recall anything about
16  this, about the signature page or anything in
17  particular, what Mr. Khanuk was asking you for?
18  A. I don't. Again, just looking at it, I see
19  that he sent something on 3/10 at 10:17, and it
20  looks like it was pretty quickly provided.
21  Q. On March 11th?
22  A. Yes, he asked for it, he got it. If he's
23  asking for something new -- I'm a little surprised
24  he's still waiting. I'm not sure how that was
25  exactly phrased.

Page 190

1  Q. Right. Just the sentence after that in his
2  e-mail says, "I spoke to Sally King on Friday and
3  was told that the document had been sent over to SWI
4  for signature."
5       Anyway --
6  A. Yeah, I don't know.
7  Q. All right. I'll show you the next exhibit,
8  No. 50.
9       (Halpin Deposition Exhibit No. 50 was
10  marked for identification.)
11  Q. And take a look at that. It's an e-mail
12  dated March 12, 2009, from Mr. Khanuk to you with
13  the CC to Mr. DiClemente.
14       (Witness reviews document.)
15  A. Okay.
16  Q. And he says in there, "I realized that we are
17  still missing two set of docs. Please find attached
18  a copy of the W-9 and ERISA objectivity letter."
19       Do you recall this e-mail?
20  A. I don't recall it.
21  Q. Do you know what a W-9 is?
22  A. It's an information document, a tax
23  documentation, I believe, that has to be provided.
24  Q. An ERISA objectivity letter, do you know what
25  that is?

Page 191

1  A. I can't say I know exactly what that is.
2  Q. Okay. Do you recall any of these
3  interactions with Mr. Khanuk?
4  A. There were a number of them. Again, it seems
5  weird that -- over here he doesn't mention these
6  documents. It just seems like every time -- I have
7  a couple more. But again, my thing is, you asked,
8  you got. You asked for this, we gave it to you. So
9  every time you asked for something, I think we're
10  trying to accommodate as quickly as we can.
11  Q. I see that Mr. Khanuk's title is client
12  associate, so I don't know if that --
13  A. Yeah, I don't know what that is. Everybody
14  is a vice president right now. Vice president of a
15  bank. If you're not a vice president, you're in
16  trouble.
17  Q. All right. And next Exhibit 51.
18       (Halpin Deposition Exhibit No. 51 was
19  marked for identification.)
20  Q. That's a two-page exhibit.
21       (Witness reviews document.)
22  A. Okay.
23  Q. All right. It's from you, and it's to
24  Neuberger Berman, dated March 12th, and the second
25  page it says Acknowledgement and Consent Form. Do

Page 192

1  you know if this is one of the documents that they
2  were asking you for, or is this something new?
3  A. I don't know. Obviously it is a document
4  they were asking for, but --
5  Q. Yeah, this doesn't seem to be the W-9 or an
6  ERISA objectivity letter. Looking at the first page
7  then, you say, "Gentlemen: I hereby instruct you to
8  manage the assets of the above named account for
9  capital appreciation and income." When you say
10  "capital appreciation and income," is that a
11  particular fund, or is that the goal or --
12  A. I see I didn't sign it. There's probably one
13  out there that's signed by me. I can't say I wrote
14  these particular words. I don't know why they're
15  written that way.
16  Q. The second page at least has your signature
17  on it on the form dated March 12th of 2009.
18  A. Yeah, that's me.
19  Q. It also says, "Attached is a copy of our
20  current investment guidelines policy that pertains
21  to these assets."
22       While we're at it, let me show you
23  what we can mark as Exhibit 52 and Exhibit 53.
24       (Halpin Deposition Exhibit Nos. 52 and
25  53 were marked for identification.)

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 193

1          (Witness reviews document.)
2    Q. Let me know when you've had a chance to take
3    a look at those two.
4    A. I'll kind of give them a brief thing.  If
5    there's a question you have, I may just reread that
6    specific section.
7    Q. Sure, sure.
8          (Witness reviews document.)
9    A. Rather than hold it up, I'll let you ask a
10   question, and I'll try to focus on that section.
11   Q. Start peppering you with questions.  So
12   Exhibit 52 says it's a draft dated February 2009 for
13   the two plans, Statement of Investment Policy,
14   Mercer Investment Consulting.  Do you recognize that
15   at all?  Have you ever seen that before?
16   A. I can't say that I have or I haven't.  I
17   don't recall.
18   Q. Okay.  And 53, that says, effective November
19   1st, 2008, "Severstal Wheeling, Inc. Pension Plan
20   Investment Policy."  Do you recognize that document?
21   A. That looks familiar, yeah, that looks -- that
22   one looks familiar.
23   Q. Is this Exhibit 53 based on the WHX
24   investment policy, or is this something that you had
25   created for Severstal?

Page 194

1    A. I want to say this policy is a -- emanated
2    from the WHX policy.  So is it exact?  I don't know
3    if it's exact, but it's probably very similar.
4    Q. Okay.  It references the Severstal Wheeling,
5    Inc. and WPN, so it's at least personalized up until
6    November 1st, I guess.
7    A. Correct.
8    Q. It says, effective November 1st.  Do you know
9    when it was actually created?
10   A. I'm not sure where that date is on there, but
11   I would say that if -- effective November 1st versus
12   pre that.  If it wasn't this one, he was working
13   under the understanding of the WHX one, so I'm not
14   sure exactly the significance of that date on this
15   particular item.
16   Q. And prior to the trust being separated, prior
17   to November 3rd, 2008, to your understanding,
18   Severstal didn't have a direct relationship with
19   Mr. LaBow?  A contract, I should say.
20   A. We -- we had a contract with him.  It was
21   underneath -- we were part of that WHX so that we
22   were under a contract with him at that time based on
23   being part of the WHX trust.
24   Q. But there's no written contract with
25   Mr. LaBow that existed before the one that was

Page 195

1    signed around December 5th, 2008.
2          MR. JOYCE: Just object to the form.
3          If you understand, go ahead.
4    A. Again, I would say, were our funds under the
5    management of guidelines, policies and agreement?
6    Yeah, it was, because we were part of a fund that
7    had an agreement with him.  So maybe I'm not getting
8    it right, but I'm saying we had -- we had a
9    derivative relationship with him because we were
10   part of a fund that he was managing and had policies
11   associated with it.
12   Q. Right.  The relationship between Severstal
13   Wheeling-Pitt and WHX goes back a while and changes
14   form, just the fact that all the retirement plans
15   were commingled even after the employers were
16   separated, that it -- it just gets a little
17   complicated.  I was just asking if -- to confirm my
18   understanding that there wasn't a contract between
19   Severstal and -- and Mr. LaBow in writing, a written
20   physical document before November -- before November
21   1st 2008?
22          MR. JOYCE: Same objection to form.
23   Legal conclusion.
24          If you understand, you can answer.
25   A. Yeah, I'm going to say that you're wrong,

Page 196

1    because there was an agreement and there were policy
2    guidelines, and we were a part of that WHX.  I'm
3    probably not specifically answering.  But there
4    was -- there definitely was -- we were part of the
5    WHX trust.  There was an agreement with that.  So
6    I'm not understanding why you keep saying there
7    isn't a contract.  There is a contract.  We're part
8    of that contract.
9    Q. Right.  That's my understanding.
10   A. So we're -- we're -- do we have a contract?
11   Yeah, we do.
12   Q. And I guess it's going into deeper background
13   than we need to at this point.  So Exhibit 53 looks
14   familiar.  Exhibit 52 you haven't seen before.
15   A. I can't say -- I can't say with certainty I
16   have seen or I haven't.  I know this one looks
17   familiar because I remember this policy and where it
18   sort of emanated from.  This one here (indicating)
19   today, I can't sit here and say, yeah, I remember
20   that one.  I don't know.  Either way I can't say I
21   know it or don't know it.
22   Q. Going back to your letter, Exhibit 51 here,
23   it says, "Attached is a copy of our current
24   investment guidelines policy that pertains to these
25   assets."

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 52 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 197

1          Do you know which policy it was?  I
2    didn't see that.
3    A. I can't say I would be able to tell you what
4    policy, with certainty, it was.
5    Q. And this is the first reference I've seen in
6    the documents to here's our investment guidelines.
7    And I know what you're saying about, well, we had
8    guidelines as far as the WHX trust, but, that aside,
9    I don't remember any reference to a document from
10   Seversal that said this is Severstal's investment
11   guidelines.
12   A. Yeah, and I -- I don't know how to answer
13   that. I don't know. I probably don't understand
14   the question, but I will just say I don't
15   understand.
16          MR. JOYCE: I'll just object to the
17   form. I don't know if there was a question.
18          THE WITNESS: Oh, okay.
19   Q. Do you know -- all right. My assumption
20   is -- let me know if you believe this is correct --
21   that on March 12, 2009, when you sent this letter to
22   Neuberger Berman, you had attached a copy of the
23   current investment guidelines that pertain to these
24   assets. That was a Severstal investment guideline
25   policy as opposed to a previous WHX policy?

Page 198

1    A. I can't -- I can't tell you today what
2    guideline was attached to that.
3    Q. And 52 says it was a -- the Mercer investment
4    policy says it was a draft in February of 2009, and
5    53 says effective November 1st, Severstal Wheeling
6    Pension Plan Investment Policy, but you don't know
7    what was sent out on March 12th?
8    A. I couldn't tell you which one that was
9    attached to that. I can't -- I can't tell you which
10   one it is.
11   Q. Okay. Let me show you what's Exhibit 54.
12          (Halpin Deposition Exhibit No. 54 was
13   marked for identification.)
14   Q. When you see it, it's going to be an
15   e-mail -- it looks like an e-mail from Ron LaBow,
16   but it doesn't say to whom. It has an original
17   message from Lorraine Greco, and it's got an nb.com,
18   so I assume she's from Neuberger.
19   A. I can't say I remember her.
20   Q. Sure. This is just the one page. At the
21   bottom it looks that there's an original message
22   from Ron LaBow to Lorraine Greco. It says, Re line,
23   "Please call Marvin Schwartz." The body says,
24   "Trying to locate Dennis Halpin to be on call with
25   me."

Page 199

1    Did you have a phone call with
2    Mr. LaBow and Mr. Schwartz?
3    A. No. No. I had one phone call with Marvin
4    Schwartz, and it was just me and him.
5    Q. The message from Lorraine Greco. "Dear Ron -
6    Please don't be upset but I too placed a call to
7    Dennis Halpin and left a please return my call on
8    his voice mail." I don't know how that would
9    generate a don't be upset as of this writing. "All
10   of our petroleum sales look good as of this
11   writing." It sounds like they're thinking about
12   selling the Neuberger Berman assets. "I just want
13   Dennis to participate on the liquidation
14   instructions in the highly unlikely event that Exxon
15   decides to buy Anadarko at a huge premium price
16   today." It sounds as if they're talking about
17   selling the assets and the last-minute timing of it.
18          Do you have any understanding of any
19   of these discussions going on about the sale of any
20   of the Neuberger Berman assets around this date?
21          MR. JOYCE: Object to form.
22   A. I don't. I don't remember ever talking to a
23   Lorraine Greco.
24   Q. My understanding is that the sale went
25   through, the Neuberger Berman assets, on March 24th,

Page 200

1    2009. A lot of different stocks in there. I don't
2    know that each one was sold that day, but my
3    understanding is that the account was liquidated on
4    March 24th, 2009. Do you have any recollection as
5    to when the Neuberger Berman account was liquidated?
6    A. I honestly -- I can't tell you what date it
7    was. I don't remember what date that was actually
8    liquidated.
9    Q. Okay. Anything in here sound familiar
10   about -- about the selling of petroleum stocks,
11   Exxon, Anadarko?
12   A. It doesn't.
13   Q. All right. I took that one just out of order
14   date-wise. Let me show you Exhibit 55. This is
15   dated March 20th, so that's back a few days.
16          (Halpin Deposition Exhibit No. 55 was
17   marked for identification.)
18          (Witness reviews document.)
19   A. Okay.
20   Q. All right. So Exhibit 55 is just one page.
21   It looks like an e-mail chain, and the one at the
22   bottom is from you March 20th, 2009, to Russell
23   Khanuk with a CC to Mr. DiClemente and Ms. King. It
24   says, "Russell, Just doing a final check...can you
25   confirm that you now have everything that you

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 53 of 63

Dennis Halpin
September 27, 2017

Page 201

1  needed?"
2       There's an e-mail before that from
3  March 16th from Mr. Khanuk, presumably to you,
4  although that's not clear from the document.  The
5  last paragraph in the e-mail from Mr. Khanuk still
6  brings up again that they're waiting for Mr. LaBow
7  and Mr. Schwartz to agree on the fee schedule prior
8  to any trading.
9       And you asked him on the 20th about
10  whether he needed anything else, and then he
11  responded to you the e-mail on the top of the
12  document, "Hi Dennis, We're all set with the
13  paperwork and the account has been opened and linked
14  to NatCity.  We are waiting for the fee schedule to
15  be worked out prior to any trading."
16       It sounds as though it's still in the
17  same place it was before everything was agreed to
18  but the fee schedule.
19       MR. JOYCE: Objection to form.
20  A. Yeah, I'm going to say when I read this
21  that -- that seems to be how it reads, looking -- I
22  mean, I don't -- I don't have anything to dispute
23  that, but I don't know.
24  Q. Do you recall the e-mail, I guess should have
25  been the first question I asked you.

Page 202

1  A. I don't.
2  Q. Okay.  Let me go to Exhibit 56.
3       (Halpin Deposition Exhibit No. 56 was
4  marked for identification.)
5  Q. That's also a one-page document, for the
6  record.  It's an e-mail, looks like it's sent on
7  March 23rd, 2009 -- sorry for taking it out of
8  order -- from you to -- doesn't seem like there's a
9  To, but there's a BCC LaBow, and I don't see anybody
10  else.  The body says, "Ron, Sounds like you made
11  contact with Nat City late today (Jacquie Thomas).
12  If somehow you need my assistance tomorrow to
13  complete NB trades...call my cell."  Then underneath
14  that there's an e-mail, and it looks like it's from
15  Mr. LaBow to you dated March 19th.  That's
16  referring -- I guess it's easy enough just to say
17  it, including 400,000 "due you we are at roughly $32
18  million so we have to gain 25% from here to get back
19  to $40 million -- will keep you posted."
20       Do you recall these e-mails?
21  A. As I sit here today, John, I do not.
22  Q. It sounds as if the -- the e-mail that you
23  sent there on the top of the page, March 23rd, that
24  there were plans to -- to sell the Neuberger Berman
25  account, just based on what it says, "if somehow you

Page 203

1  need my assistance tomorrow to complete NB trades."
2  You don't have any recollection of that?
3  A. Today, as I sit here, I don't recollect that.
4  Q. Do you recall any communications back and
5  forth with Mr. LaBow to get the Neuberger Berman
6  account liquidated at any time?
7  A. No.  As I read this, I think what I'm
8  continuing to say is if you need something done --
9  sort of a general statement each time.
10  Q. Right.
11  A. Same thing with Neuberger.  If you need
12  something, let us know.  Give us some insight, and
13  we will work on that.  So I think this is just more
14  of a continuing, is there something else we need to
15  do, is this something else you need help on.  But in
16  terms of specifics, in terms of his obligations or
17  dates, I'd say I wouldn't know today exactly when
18  those dates were.
19  Q. Got you.  Let me refer you to the next
20  exhibit then.  Might shed a little more light on it
21  or not.  Exhibit 57.
22       (Halpin Deposition Exhibit No. 57 was
23  marked for identification.)
24  Q. Have you seen this document before,
25  Mr. Halpin?

Page 204

1  A. I don't believe I have.
2       (Witness reviews document.)
3  A. I don't believe I have, John.
4  Q. Okay.  It says, "Transcription of Voice Mail
5  Message," and it looks like it's a message that
6  Mr. LaBow left Sally King.  And in it, third --
7  second or third line, "I have been speaking with
8  Dennis Halpin.  I have tried to call Mike a couple
9  times."
10       Again, do you recall any conversations
11  with Mr. LaBow at this point in March of 2009 to
12  sell the Neuberger Berman account?
13  A. An actual contact, no.  He left me a voice
14  mail around that same time.  And so maybe that's
15  what he's thinking when he said speaking with me,
16  but I don't remember actual direct conversations
17  with Ron.
18  Q. What do you recall from the voice mail that
19  he left you?
20  A. It looks very similar to this.  That he
21  was -- but he didn't catch me.  He didn't reach me
22  on the phone.
23  Q. And what do you recall that he -- that he
24  said on the voice mail message to you?
25  A. I'm paraphrasing but it's very similar to

Dennis Halpin
September 27, 2017

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 205

1  this (indicating). I have -- it's my
2  responsibility. You know, I realize maybe I had
3  done some things wrong. Again, this goes back to
4  the concept of I've almost recovered all the money,
5  so now I'm going to confess my sins. It's my fault,
6  I will make the trades, I will do this. It's my
7  responsibility. It's not yours. We're almost back
8  to where we need to be. I'm not looking for your
9  guidance. I'm just advising you of what I'm going
10 to do. Something along those lines.
11 Q. A little past midway in the transcription
12 here, it says -- let me back up just above the
13 midway point. "I am going to liquidate the account
14 when I think it's appropriate turning the whole
15 thing into cash and go to diversification...and go
16 to the more normal diversification."
17          I guess he's not giving a particular
18 day that he's going to make the trade. Do you have
19 any recollection whether the voice mail message you
20 got from Mr. LaBow was about the time he liquidated
21 the Neuberger Berman account?
22 A. I don't know if -- I wouldn't be able to tell
23 you here --
24 Q. Sure.
25 A. -- when that was in relation, because I don't

Page 206

1  remember when he actually liquidated it. I know the
2  voice mail I got from him was around that same time,
3  end of March, but as to when he did it, I don't
4  know.
5  Q. And you have a transcription that looks
6  somewhat similar to this?
7  A. Yeah, when I first looked at it, I thought it
8  was it. This says Sally. But the contents of it
9  are very similar.
10 Q. Right.
11 A. My responsibility. I screwed up. We're
12 almost back to where we were. I take
13 responsibility. I'm not looking for your approval.
14 I'm just telling you what I'm doing. Something like
15 that.
16 Q. Okay. Let me show you Exhibit 58.
17          (Halpin Deposition Exhibit No. 58 was
18 marked for identification.)
19 Q. For the record, that's an e-mail sent March
20 25, 2009, from you to Mr. LaBow. The last few
21 e-mails haven't had a CC to Ms. King or
22 Mr. DiClemente. Were they still in the mix?
23 A. I believe that Sally was in the mix at all
24 times.
25 Q. Okay. And underneath, actually, I don't know

Page 207

1  if this is a previous e-mail, it says, Michael
2  DiClemente, March 25th, 2009, if that indicates that
3  he was part of some previous trail, not quite clear
4  from the document.
5          Anyway, do you recognize this
6  Exhibit 58?
7  A. I can't as I sit here today, John, tell you
8  that I do remember it.
9  Q. The subject forward Re: Allegiant Money
10 Market Funds. Is Allegiant part of National City or
11 part of the trustee, or is that something different?
12 A. I believe Allegiant and National City were
13 related.
14 Q. Oh, okay. And the e-mail here says, "Ron:
15 Believe this should provide you with all you need.
16 Let me know your decision. If OK with this (govt)
17 fund, I will process the needed paperwork today so
18 that the settlement funds can go directly into this
19 account. Dennis."
20          Doesn't refresh your recollection of
21 any event or what you were doing or communicating
22 with Mr. LaBow about?
23 A. I think it goes to the heart of it. If he
24 needed something for me to do to facilitate his
25 actions, I was willing to accommodate it. So --

Page 208

1  Q. Okay. All right. We're up to Exhibit 59.
2  A. That's my age.
3          (Halpin Deposition Exhibit No. 59 was
4  marked for identification.)
5  Q. Do you recognize that document, Mr. Halpin?
6  A. I can't say I recognize it today, no.
7          (Witness reviews document.)
8  A. Okay.
9  Q. Okay. Let me refer you to the second
10 paragraph there in the first page, "Reconstitute the
11 SWI Retirement Committee." It reads, "Given this
12 critical point in the WHX Master Trust bifurcation
13 process, and the possibility of litigation, coupled
14 with the recent departure of Michael DiClemente,
15 leaving myself as the sole committee member, I
16 restate the urgent need to reconstitute this
17 committee."
18          So that makes me think that you had a
19 hand in drafting this.
20 A. I would say that's fair.
21 Q. Okay. And the title of this document it
22 says, "Severstal Wheeling, Inc. Defined Contribution
23 Pension Plan - Status Update: April 1, 2009."
24 Just, I guess, the date April 1, is that some sort
25 of quarterly report that you would do?

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 209

1  A. I don't think -- I don't think it related to
2  a specific periodic report.
3  **Q. The date April 1, 2009, did you know that you**
4  **were going to be leaving by the end of April?**
5  A. No. No. I was told I was leaving.
6  **Q. Okay.**
7  A. I did not leave. I was severed or whatever
8  you want to call it. I found out at 4:30 on April
9  30th, give or take ten minutes.
10 **Q. So I was going to say -- so you probably**
11 **didn't give a resignation letter to the retirement**
12 **committee at that point?**
13 A. I don't believe I had the opportunity to do
14 so. I was called up to the chairman's office and
15 was let go and escorted out that day.
16 **Q. Wow. Was there a reason for the -- that they**
17 **gave you for your separation?**
18 A. I think at that point in time, it was a
19 unique situation where a lot of people were getting
20 what I'll say termination letters. John, you're
21 going to be let go in three months. You know,
22 there's your date. I was not given a date. I
23 was -- I mean, you could have a number of reasons
24 why you think it would be, but I was unaware that
25 that action was coming that day. It was a surprise.

Page 210

1  **Q. Yeah, it sounds like a hell of a surprise.**
2  A. Yeah.
3  **Q. Did anybody else get the same separation**
4  **treatment that you got?**
5  A. I don't know how many people were maybe at my
6  level, let's say, or the roles that I did, but I
7  would say I didn't even have time to think about it.
8  Because at that point in time when I got called up
9  on a Friday, by the time the meeting was over,
10 Friday afternoon, nobody was back -- left, so I was
11 escorted back to my office, got to pack up and left.
12 So I don't think I had time to really digest any of
13 it.
14 **Q. Right. I can imagine. So going back to**
15 **Paragraph 2, it -- when you say, "I restate the**
16 **urgent need to reconstitute this committee," had you**
17 **indicated to individuals before April 1, 2009, that**
18 **the committee needed to be reconstituted?**
19 A. I think there were a couple of times that we
20 reached out to the Severstal group locally and in
21 Dearborn. I think that this was a little stronger
22 because Mike had recently left and now he was a
23 consultant and so sitting there as a sole
24 employee --
25 **Q. Right.**

Page 211

1  A. -- and people charging us fees, I would
2  think. I think it was time to probably get -- with
3  his departure, I think it was, that strengthened my
4  concern of sitting there as a single person.
5  **Q. Right. It goes on, I guess, along the lines**
6  **you were just testifying. "If this fund/plan is to**
7  **remain at the 'local' level for the foreseeable**
8  **future" -- and I take that to mean former**
9  **Wheeling-Pitt individuals running the plans?**
10 A. Right. If the team, the committee -- if that
11 plan was going to stay down at the Wheeling area,
12 then we should have had representatives from that
13 area.
14 **Q. And then it goes on -- "then I believe its**
15 **committee staffing should remain 'local,' to include**
16 **human resources and finance with possible**
17 **involvement by SNA" -- what is SNA?**
18 A. Severstal North America.
19 **Q. Was that the parent group of all the**
20 **Severstal --**
21 A. That was the parent group of the U.S.
22 ownership.
23 **Q. Got you.**
24 A. Yeah.
25 **Q. And then "(Dearborn) legal." Is that where**

Page 212

1  their headquarters was?
2  A. I don't believe there was a local legal at
3  that point. I can't remember, but -- most of the
4  corporate Severstal North America facilities were
5  there.
6  **Q. Okay.**
7  A. So there may have been some local like HR,
8  but I think the legal was based out of Dearborn.
9  **Q. And then it goes on, "If it is to be combined**
10 **into a larger, more corporate plan/account, then I**
11 **believe its oversight staffing should reflect that."**
12        Was there any discussion at that point
13 about combining or merging plans?
14 A. That was probably me projecting like, hey,
15 guys, we need to do something. That was my personal
16 opinion. I don't think there was any detail behind
17 it. That was just me saying we need to do
18 something. Dearborn wants to get involved local,
19 but we need to do something with Mike's departure.
20 **Q. And going back up to the first numbered**
21 **paragraph that says, "Neuberger Fund Performance."**
22 **It references monthly AON reports from November 2008**
23 **through February 2009 suggests, and it looks as if**
24 **it goes on to comparing the performance of Neuberger**
25 **Berman versus other asset groups.**

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 56 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 213

1     Do you recall looking at any of these
2   documents?
3   A.  I can't say I remember actually looking at
4   those documents.  I can't say that here today.
5   Q.  Do you remember in or around April 2009 you
6   looking or speaking with people about what the, I
7   guess, losses, for lack of a better word, that the
8   plan had suffered by being invested in the Neuberger
9   Berman account?
10       MR. JOYCE:  Just object, speculation and
11   legal conclusion, expert conclusion.
12   A.  Again, I think when you see that the -- the
13   ingredients of this, this is again a very simple
14   analysis that said, here are funds that we could
15   have participated in.  I received a document that
16   shows me the performance of those funds.  So I was
17   simply comparing what we believe at minimum we could
18   have participated in compared to maybe where we were
19   and benchmarking that.  It was not a very, you know,
20   elaborate analysis.  It was just trying to compare
21   funds that we were told that we could have
22   participated in.
23   Q.  Got you.  On the second page there, the
24   number 6 paragraph, it refers to Consulting
25   Services/ National Economic Research Associates,

Page 214

1   Inc.  Do you recall anything about that?
2   A.  I don't.  I don't.  That's probably my --
3   Mike had dealt a lot with them, and I'm sure that he
4   probably was authoring that.  I just added to it.
5   Q.  The number one underneath paragraph 6 there
6   says, "Validate the amount of SWI plans' interest in
7   the WHX Master Trust as of 10/31/08."  Was there any
8   discussion that you had around that time to make
9   sure what the Cohn report said was accurate in terms
10   of what the Severstal trusts were due?
11   A.  I can't say.  I see that on there, but I
12   can't tell you why that's there.
13   Q.  Just scanning this quickly, and I don't see a
14   reference to Mr. LaBow or WPN.  You don't see one,
15   do you?
16   A.  In terms of?
17   Q.  Just a reference to -- I don't see a -- there
18   you go, WPN in the sixth paragraph.  Okay.  At this
19   point Mr. LaBow was still working for the retirement
20   committee; right?
21   A.  I believe Ron was there through my tenure.
22   Q.  Do you know if by this point there had been
23   any, you know, Neuberger Berman account had been
24   liquidated, that there were any discussions about
25   how to invest going forward?

Page 215

1   A.  I can't say I recall any specific
2   discussion -- you mean me talking to Ron, you mean?
3   Q.  Yeah, talking to Ron or anybody about how to
4   invest it going forward.  Guys, now we've got this
5   all liquidated, it's all in cash, we're ready to
6   roll, ready to invest in this, that and the other?
7   A.  I would say Ron was still on board, and so he
8   still had the full authority to invest as he saw
9   fit.
10   Q.  Was there any discussion at this point of
11   taking legal action against Mr. LaBow?
12       MR. JOYCE:  Objection to the extent it
13   would reveal any privileged or otherwise protected
14   information that went back and forth with the
15   committee's attorneys.
16       To the extent you can speak outside of
17   that --
18   A.  Yeah, I mean I thought I had seen something
19   where there was something about legal something, but
20   sitting here today, I can't remember that.
21   Q.  I think --
22   A.  Something I thought I saw a reference to.
23   There was something.  Yeah, I think I saw something
24   about the possibility, but I don't remember that
25   specifically.  It wasn't that long ago.

Page 216

1   Q.  How about Exhibit 47?
2   A.  Maybe it was.
3   Q.  47.
4   A.  This thing?
5   Q.  Yeah, yeah.
6   A.  I don't think.
7   Q.  Okay.  Maybe I've got the wrong one.  I don't
8   see it.
9       Okay.  Let me refer you to Exhibit 60.
10       (Halpin Deposition Exhibit No. 60 was
11   marked for identification.)
12   Q.  Now, I take it you haven't seen this document
13   because it's dated May 5th, 2009?
14   A.  I was unemployed at that time.
15   Q.  And yeah, they weren't copying you on this.
16   A.  Yeah.
17   Q.  From Mr. Assetta to Mr. LaBow.  It did CC
18   Mr. DiClemente and Mr. Kittrell.
19       (Witness reviews document.)
20   A.  Okay.
21   Q.  Now, Mr. Assetta says he had been briefed
22   on -- that second paragraph -- "The new members of
23   the Committee have been briefed on the history since
24   November 2008 of the investment of assets" of the
25   two plans.  Let me ask you this:  Did you brief any

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 217

1  of the new members of the committee?
2  A. I did not.
3  Q. Since this is dated May 5th of 2009, and you
4  say April 30th, 2009, is when you were let go, then
5  a committee was either put together between April
6  30th and May 5th of 2009, or this was in the works
7  already?
8  A. Well, I would have to think that when I was
9  gone, there was nobody left. I think at that point
10 in time there was probably an immediacy to do
11 something with now no committee members. As long as
12 one is left, they probably -- now that there's none,
13 I think they recognized how they had to do
14 something.
15 Q. Okay.
16 A. Who knows. They could have known that I was
17 leaving on April 30th and had other things that they
18 were discussing.
19 Q. Right, right. All right. But other than
20 that, you're not familiar with the contents in that
21 letter; right?
22 A. No, I feel like this is post death, like
23 after -- this is the stuff that was going on.
24 Q. All right. Let me refer you then to some
25 other new life documents.

Page 218

1         (Halpin Deposition Exhibit No. 61 was
2  marked for identification.)
3  Q. So Exhibit 61 is an e-mail from Mel Baggett
4  to Vince Assetta dated May 6th, again, while you
5  were enjoying starting your new life?
6  A. Yeah.
7  Q. The e-mail from Mel to Vince said, "We need
8  an 'investment policy' to guide the work of the
9  Committee and to protect us fiduciarily. This
10 policy should be developed by Mercer or an
11 independent asset consultant. I will call you to
12 discuss."
13        Just as far as background, it's a
14 one-page document. The e-mail at the bottom of the
15 page there is from Mr. Assetta to Drew Landon, James
16 Sullivan, Kathy Bartek, Mel Baggett, Michael Clarke,
17 Michael DiClemente, Michelle Ivey, Rick Bowness, Tim
18 Rogers; CC Steve Kittrell.
19        Mr. Kittrell, that's another
20 McGuireWoods attorney that you referenced before?
21 A. Yeah, Steve is part of McGuireWoods.
22 Q. Do you know if the To line, all those
23 individuals, if they were the new committee, or
24 you're not familiar with who is on the new
25 committee?

Page 219

1  A. I mean, I know the names, but I wouldn't know
2  if they were part of the committee.
3  Q. Got you.
4  A. It's nice to know I'm being talked about
5  after I left; I'm still there. My name is still
6  there.
7  Q. In that e-mail, the attached letter says,
8  "Prior to sending, I received a call from him," Mr.
9  LaBow, "as a result of him trying to reach Dennis
10 Halpin." So at least Mr. LaBow hadn't forgotten
11 you. "During a callback discussion, he suggested
12 that he has been attempting to provide an
13 'investment plan' by presenting a particular
14 mortgage-type investment to Dennis and Mike."
15        From your previous testimony, you
16 never spoke to Mr. LaBow about this investment. It
17 was just Mr. Schwartz from Neuberger?
18 A. Correct.
19 Q. Did you get any e-mail from Mr. LaBow about
20 this mortgage-type investment?
21 A. I never got a follow-up from him. I know
22 that there was an e-mail that Marvin spoke to Ron
23 about thinking that we had a great conversation, but
24 I think I was just, you know, a passive participant
25 to that. I did not speak to Ron subsequent to that

Page 220

1  Marvin Schwartz call.
2  Q. Okay. It goes on further, "He asked" --
3  Mr. LaBow, that is -- "to present it to me and
4  discuss. We agreed on 3pm today. After considering
5  what he presents, I am expecting to inform him that
6  this is not a 'complete investment plan' as we are
7  requesting but at best a specific component of an
8  investment plan, and to emphasize the details of the
9  attached letter."
10        Going back to the -- the e-mail at the
11 top of the page that I read out before, from
12 Mr. Baggett to Mr. Assetta about an investment
13 policy, to your knowledge, was there an investment
14 policy existing at May 6th, 2009?
15        MR. JOYCE: Objection to form.
16 Speculation. I'd just like to put in a standing
17 objection to all documents after May 1st. It's
18 after Mr. Halpin left his employment, the retirement
19 committee, and with Severstal, and also after the
20 representative dates for liability in this case due
21 to the Secretary's settlement with the new
22 retirement committee.
23        But you can answer if you understand.
24 A. I'm looking at the word "policy." Were there
25 investment guidelines? Yes. Was there a management

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 58 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 221

1   agreement?  Yes.  When I see someone say "policy," I
2   don't know what Mel was suggesting in that regard.
3   But as long as I was there, were there investment
4   guidelines?  Absolutely.  Were there investment
5   agreements?  Yes.
6   **Q.  The way I take it, it's the investment**
7   **guidelines policy that we talked before that you**
8   **said were, I guess, using the holdover WHX policy?**
9   A.  Yes.
10  **Q.  See if I have the exhibit number here.  Here**
11  **we go.  It was -- 52 was the draft from Mercer.**
12  **Exhibit 53 was the pension plan investment policy.**
13  **So your understanding, that was in effect on May**
14  **6th, 2009?**
15  A.  I don't know what was in effect May 6th.  In
16  April, it was in effect when I was there.  May 6th,
17  I can't speak to what was in effect and/or what Mel
18  was referencing.
19  **Q.  Okay.  Exhibit 62, another new life document.**
20  A.  Really.
21        (Halpin Deposition Exhibit No. 62 was
22  marked for identification.)
23  **Q.  For the record, that's dated May 20, 2009,**
24  **from Mr. LaBow to Vince Assetta.  Have you ever seen**
25  **that before?**

Page 222

1   A.  I have not.
2   **Q.  Take a look at it and let me know when you're**
3   **done.  Just the one page.**
4        (Witness reviews document.)
5   A.  Okay.
6   **Q.  All right.  In the second paragraph,**
7   **Mr. LaBow says, "For the past 60-90 days I have**
8   **attempted to convince Dennis Halpin to invest the**
9   **cash residing at City National into pass-through**
10  **mortgages yielding between 12-16% annually."**
11       **Aside from the conversation with**
12  **Mr. Schwartz, do you recall any other discussions**
13  **with Mr. LaBow or anybody else about these**
14  **mortgages?**
15  A.  I do not.  And I find it interesting that
16  this is dated May 20th and for the past 60 to 90
17  days, so when did he write the thing -- the
18  transcript?  So the transcript was at the end of
19  March.
20  **Q.  March 23rd.**
21  A.  So at that point in time he's telling me, I'm
22  going to do things, this is what I'm going to do.
23  So I find it odd that he's referencing 60 to 90 days
24  when clearly inside of that window of time he said
25  he knew what he was going to do.

Page 223

1        I mean, it goes to the Ron LaBow
2   style.  I had one conversation with Marvin Schwartz
3   on mortgage- backed securities or mortgages, and
4   that was the extent of discussions with him or Ron.
5   Ron passed me to him.
6   **Q.  Do you know any reason why Mr. LaBow or**
7   **Mr. Schwartz were particularly interested in getting**
8   **in mortgage-backed securities?**
9        MR. JOYCE: Objection to form.
10  Speculation.
11  A.  I have no clue.  But obviously they both
12  seemed to be interested in it.
13  **Q.  Okay.**
14  A.  But if he thought it was that good, he
15  probably could have made the investment.  He said he
16  could.
17  **Q.  All right.  Let me show you Exhibit 63.**
18        (Halpin Deposition Exhibit No. 63 was
19  marked for identification.)
20        (Discussion held off the record.)
21  **Q.  So for the record, it looks like an e-mail**
22  **from Tim Rogers, although it says Posted At --**
23  **Posted To:  Inbox, Posted At:  Friday, June 5th,**
24  **2009.  Subject:  Neuberger Berman.  And it says, To**
25  **the retirement committee, and it references a call**

Page 224

1   **from Charlie Monday, and it attaches an e-mail**
2   **that's a little fuzzy down below from Charlie**
3   **Diccianni, who is at Neuberger.  And in the body of**
4   **that e-mail, it says, "Hi Tim, Thank you very much**
5   **for talking to me today.  As I mentioned, Neuberger**
6   **Berman was an investment manager for WHX.  We had**
7   **begun working with Dennis Halpin to restart as**
8   **investment manager for Severstal with Plan**
9   **documents, IA agreement, etc, when he had departed,**
10  **and I believe there is very little paperwork left to**
11  **open the account."**
12        **Do you know today whether the**
13  **agreement with Neuberger Berman to open up the**
14  **account was ever finalized?**
15        MR. JOYCE: Object to form.
16  Speculation.  And renew my objection regarding
17  post-May 1st documents.
18  A.  And can I just make a personal comment?  I
19  find it offensive to look at something after I was
20  fired.  So I would rather not comment on anything
21  that was done after April 30th, unless I have an
22  obligation to do so.  My attitude is they let me go.
23  I would rather not comment as a personal feeling on
24  anything they did.
25  **Q.  Yeah, that wasn't the question.  The question**

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 225

1    is:  Do you know whether an agreement with Neuberger
2    Berman was ever finalized?
3    A.  I don't know.
4    Q.  And I'm doing that with reference to this
5    document because it appears, as of June 1, 2009, the
6    date of this e-mail, they're saying that they had
7    never finalized it with you.
8    A.  Do they say that?
9    Q.  Yeah.  As I read, the body says -- and this
10   is from Mr. Diccianni to Mr. Rogers -- "As I
11   mentioned, Neuberger Berman was an investment
12   manager for WHX.  We had begun working with Dennis
13   Halpin to restart" an investment manager -- "as an
14   investment manager for Severstal with Plan
15   documents, IA agreement, etc., when he had departed,
16   and I believe there is very little paperwork left to
17   open the account."
18   A.  Wasn't there like two months ago we asked --
19   three months ago -- anything left to do and there
20   was nothing left to do, as my understanding?  Two
21   months later they're coming back and saying there's
22   very little left to do?
23   Q.  Right.
24   A.  I don't even know how to answer that
25   question.

Page 226

1    Q.  I think you did when you say you don't know
2    whether an agreement with Neuberger Berman was ever
3    finalized while you were there.  And let me know if
4    that's accurate.
5    A.  I don't recall if it was finalized or not.
6    Having said that, one of those last correspondences
7    I thought we had several times reached out and said
8    is there anything left that you need?  I don't think
9    it was Diccianni.  It was somebody from Neuberger
10   saying, we need a W-9 and something else, okay, got
11   it; well, there's one other thing we forgot.  That's
12   the last correspondence I had seen.  So to my
13   knowledge, there was nothing else needed several
14   months or a couple months before this.  I don't get
15   this.
16   Q.  It seems to me from looking at the documents
17   that we have today that you never signed -- and let
18   me know if that's accurate -- a fee schedule with
19   Neuberger Berman.
20   A.  I did not sign a fee schedule with Neuberger
21   Berman.
22   Q.  Okay.
23   A.  And I apologize in advance, everything that
24   you bring after April 30th I'm going to take an
25   extreme opposition to talking about.  If he tells me

Page 227

1    I have to answer it, I will, reluctantly.  But other
2    than that, I'm going to make a formal record that I
3    would rather not talk to anything about somebody who
4    let me go.  Period.  Unless you tell me or he tells
5    me.
6          MR. JOYCE:  I'll be the one telling you.
7    A.  It's a very irritating thing to me to talk
8    about something -- 20 years with the place.  I would
9    rather not talk about it.
10   Q.  Let me refer you to Exhibit 64.  This one is
11   dated, on the second page, January 16th, 2009.
12   A.  Okay, Old Testament.
13   Q.  Take a look at that and let me know if you
14   recognize this.
15         (Halpin Deposition Exhibit No. 64 was
16   marked for identification.)
17   A.  I do not.
18   Q.  The bottom of the first page there under the
19   heading "Investment Management," number 1 says,
20   "Address serious breach of fiduciary responsibility
21   by the investment manager of SWI's two defined
22   contribution plans."
23         Do you have any -- any recollection of
24   discussions of that nature about addressing a
25   serious breach of fiduciary responsibility by

Page 228

1    Mr. LaBow?
2          MR. JOYCE:  Objection.  To the extent
3    that it would reveal attorney-client privilege or
4    work product information.
5          But you can answer --
6    A.  I'm not even sure who wrote it.  It says,
7    "Selected Outstanding Treasury Projects," so I'm
8    assuming somebody from treasury wrote it.  It's
9    difficult for me to say who wrote that comment.
10   Q.  Top of the second page it says, "b.
11   Litigation possible; advised Marty in a 40-minute
12   conference call in January 15, 2009."
13         Do you know who Marty is?
14   A.  Yeah, Marty Szymanski is probably who it is.
15   He's a legal counsel up at Dearborn.
16   Q.  Okay.
17   A.  But I don't know what that is.  I was not in
18   the conversation with Marty.
19   Q.  Paragraph 2 says, "Conduct orientation
20   meeting with newly constituted Retirement Committee
21   (once appointed) to advise them of their
22   responsibilities and inform them of multiple
23   outstanding projects outlined below."
24   A.  I mean, I don't even know how to respond to
25   that one.

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 60 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 229

1  Q.  Okay.  It says, "Meeting targeted for mid-
2  February, based on conference call MPD" -- I'm
3  assuming you?
4  A.  Not me, Mike DiClemente.  I'm assuming, if
5  Mike's middle name is P.
6  Q.  I'm starting to get my initials backed --
7  A.  That's okay.
8       (Witness reviews document.)
9  Q.  Under the Projects, 401(k) Plans, it
10  mentions, "Conduct competitive bid process for new
11  401(k) service provider.  Should we replace Wachovia
12  for performance?"
13       What was Wachovia doing with the
14  plans?
15  A.  I'm not sure -- I'm not sure if Wachovia was
16  one of the -- there was a couple of our meetings
17  where we had put some people on a watch, or Mercer
18  had put them on a watch and we were looking to see
19  possible replacements.  Wachovia doesn't ring a bell
20  to me.  But I know we had, as part of our, you know,
21  quarterly oversight process that if Mercer had put
22  somebody on a watch or Michael thought there had
23  been some performance question based on some sort of
24  a trend, that he would put them on a watch, and then
25  there would be some discussions and benchmark off of

Page 230

1  Mercer and say why don't you have them on a watch.
2  We think that their performance has been
3  substandard, and discussions would go on.
4       But Wachovia doesn't sound familiar to
5  me.  There was a John Hancock fund.  There was a
6  couple other funds, but I don't remember that name.
7  It's possible.  Again, I don't even know who wrote
8  this.
9  Q.  Right, right.  Little further down, b.,
10  Defined Contribution Plans, II says, "Develop
11  Investment Policy."  Do you know whether there was
12  work on an investment policy at that time?
13  A.  Again, some of this stuff that's written here
14  I'm a little bit confused at, so I'm going to say as
15  they're writing in stuff, I'm not even sure what it
16  means.
17  Q.  Just looking for your help to understand it.
18  When it says on the first page "treasury projects,"
19  who -- Mr. DiClemente was a treasurer.  Is that
20  correct?  That was his title?
21  A.  He was the treasurer.  There was Drew Landon.
22  He was in the treasury department.
23  Q.  Treasurer and treasury are two separate
24  departments?
25  A.  Mike's treasurer.  I mean, Drew could have

Page 231

1  been assistant treasurer.  I don't know what Drew's
2  title was.  He definitely was in that department.
3  So I would say Michael was certainly in that
4  department, but he was corporate treasurer.  So
5  there were a number of people in the treasury
6  department.
7  Q.  Okay.
8  A.  I mean, I don't know -- I don't know who
9  would have actually authored this.  It doesn't have
10  anything on it.  I've never seen it before.
11  Q.  Okay.
12       THE WITNESS:  Are we down to the last
13  couple?
14       MR. STRAWN:  65 and 66.  The last two.
15       (Halpin Deposition Exhibit No. 65 was
16  marked for identification.)
17       (Witness reviews document.)
18  Q.  So have you ever seen Exhibit 65 before?
19  A.  I don't recall seeing this, no.
20  Q.  Okay.  It's titled, "Chronology of Key
21  Activities Separation of Assets from the WHX Trust
22  to Separate Successor Trusts for WHX and SWI."
23  A.  Yeah, I can't say I remember seeing this.
24  Q.  Okay.
25       (Witness reviews document.)

Page 232

1  Q.  Looking like the last entry there is January
2  26, 2009.
3  A.  Yeah, I see that.
4  Q.  Just looking at the second page, the entry
5  for December 17th, '08, to December 24th, 2008.  It
6  says people, and the second column there, Mercer.
7  "MPD asked Mercer for assistance on 12-17-08.  They
8  estimated that our proportionate share of the NB
9  account was valued at about $5 million; and
10  indicated that the median fee for that size account
11  was about 73 bp."
12       Do you know what "73 bp" is?
13  A.  Basis points.
14  Q.  Oh, right.
15  A.  I don't know if that's high or low, but I
16  know BP is probably basis points.
17  Q.  I got you.  So MPD was Mr. DiClemente?
18       MR. JOYCE:  Just object to form.
19  Speculation.  I think he testified he's never seen
20  this document.
21  A.  Yeah, I've never seen it, and I don't know
22  what Mike's middle initial is.
23  Q.  It sounds like somebody is talking to Mercer
24  about having a disproportionate share of the
25  Neuberger Berman account before December 30th.

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

Page 233

1  A. We would certainly agree that we had a
2  disproportionate share of that account.
3  Q. Right. Further down it says, "MPD received
4  an e-mail from Mercer advising that she spoke with
5  LaBow." So is that not the appropriate pronoun for
6  Mr. DiClemente?
7       MR. JOYCE: Objection to form.
8  Speculation. Again, he hasn't seen it. He doesn't
9  know Mike's middle initial.
10      To the extent you can answer without
11  speculating.
12  A. You mean "she" is Mike? She would be
13  Michael? Is that what you're saying?
14  Q. I'm saying the pronoun doesn't seem to go
15  along with the initials for MPD if it's Michael.
16  A. Yeah, I didn't pick up on that. I see what
17  you're saying. It's odd if it was MPD, then it
18  would have said something different. But she, you
19  think they would identify who she was. I don't
20  know.
21  Q. Yeah. The mystery deepens.
22  A. It's an odd reference, she.
23  Q. All right. Let me show you what we can mark
24  as the last document, 66. That's double sided.
25      (Halpin Deposition Exhibit No. 66 was

Page 234

1  marked for identification.)
2  Q. Take a look at it and let me know if you've
3  ever seen this before.
4       (Witness reviews document.)
5  A. I can't say I recall the document.
6  Q. It says at the top on the first page, "Delta
7  Analysis: SWI Proposed vs. WPN." What's a delta
8  analysis?
9       MR. JOYCE: Objection. Form.
10  Speculation. To the extent it's asking for his
11  expert opinion. I think he also testified he's
12  never seen the document.
13  A. I don't remember. I wouldn't -- delta, I'm
14  not sure exactly what that means. Change, I don't
15  know.
16  Q. Underneath that it's got a little, I don't
17  know, document identification. It says
18  C:\Retirement
19  Committee\Reset_analysis_Sally.xls]$due.
20  A. Yeah, that's weird. I don't know how that
21  works outside of XLS.
22  Q. I guess it doesn't have something identifying
23  McGuireWoods, but when I saw Sally, I was just
24  wondering if that had nothing do with Ms. King.
25  A. I don't know.

Page 235

1  Q. All right. Were you part of any discussions
2  that involved what's on this document? It's got
3  Capital Defense, Mason Capital Management, Neuberger
4  Berman and something else, contribution/distribution
5  (cash), if I'm getting those abbreviations right.
6  A. I mean, again, I can't say I know anything
7  about this particular thing other than the fact that
8  they continued to reference two large accounts, I
9  would think, that were always in the mix of
10  potential allocation opportunities. So when I see
11  those three accounts, I'm assuming that it's some
12  analysis of accounts that we could have participated
13  in. Based on his own words.
14  Q. Got you. "His" being Mr. LaBow?
15  A. Yeah. But I don't know what -- I don't know
16  what their specific intention of this thing was.
17  Q. Toward the bottom of the first page, I see in
18  the block there, "this % thru 2/17." I'm just
19  guessing that that would have been around 2/17/2009,
20  but I don't know.
21  A. Yeah, I don't know what that is.
22  Q. Okay. All right. Let me just do a few
23  questions cleaning up.
24  A. Sure.
25  Q. Do you know if Mr. LaBow was investigated by

Page 236

1  any governmental organization?
2  A. I would not know that. I don't know if he
3  was investigated.
4       THE WITNESS: Can I leave that with you?
5  Q. In this period of time between June 2008
6  through the end of April 2009, were there any things
7  going on with regard to the corporation, merger,
8  spinoff, anything else that was going on for the
9  employer sponsor of the plans?
10  A. Threw me off with that last piece. Can you
11  ask that again.
12  Q. Yeah, from June 2008 when there was first
13  discussion about separating the trusts, until you
14  left April 30th, 2009?
15  A. 30th.
16  Q. Was there a merger going on with regard to
17  Severstal Wheeling-Pitt?
18  A. There was a merger in 2008 sometime -- I
19  can't remember exactly when it was -- where
20  Severstal had acquired us. But I don't know when in
21  2008. It wasn't the fourth quarter, it was sometime
22  before that, but I don't know what month it was.
23  Q. Okay. Just ask you about what service
24  providers you had at the retirement committee. You
25  testified to McGuireWoods, your attorneys; you

Dennis Halpin
September 27, 2017

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 62 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Page 237

1    mentioned Mercer; Mr. LaBow; I guess the trustees,
2    Citibank and National City or Allegiant.  Any other
3    service providers you retained at the -- as the
4    retirement committee?
5    A.  I'm not aware of any.  To the degree that
6    Michael DiClemente as a consultant would be one, I
7    would say that's possible, but I don't know of any
8    other names or firms.
9    Q.  Okay.  At any point in this process, did you
10   ask Mr. LaBow whether he had fiduciary liability
11   insurance?
12   A.  I don't -- I don't specifically remember or
13   recall asking him that question.
14   Q.  Do you know if that was ever discussed at any
15   point in this whole process from June of 2008
16   through April of 2009?
17   A.  I can't say that I recall that conversation.
18        THE WITNESS:  He's better than he
19   thought.
20        (Discussion held off the record.)
21   Q.  Just a couple quickies, Mr. Halpin.  Did the
22   trustee at Citibank or National City ever ask you
23   for a copy of the investment management agreement
24   with Mr. LaBow?
25   A.  Did who ask me?

Page 238

1    Q.  The trustee, Citibank or their successor,
2    National City, Allegiant, did they ever ask you for
3    a copy of the investment management agreement with
4    Mr. LaBow?  You know, what was --
5    A.  I don't recall either one asking.  They
6    didn't ask me.
7    Q.  There was never any discussion about what
8    authorities Mr. LaBow had, from the trustee?
9    A.  I don't recall any discussion about that.
10   Q.  Did Mr. DiClemente ever discuss that with
11   you, the trustee?
12   A.  I don't recall him discussing that issue with
13   me, no.
14   Q.  And I think you made some reference earlier
15   about did Mr. LaBow ever say that he didn't have the
16   authority to carry out what he needed under the
17   agreement?
18   A.  I don't remember saying that specifically.
19   Q.  Just tell me what your understanding is.
20   A.  I think at some point in time Ron said that,
21   you know, there were some sort of hurdles that
22   didn't allow him to do what he thought he could do.
23   I'm like, what are they, Ron?  Tell me what they
24   are.  You tell me what they are and we'll solve
25   them.

Page 239

1    Q.  What did he tell you?
2    A.  I don't remember specifically what they were.
3    I do remember him making a comment about that.  My
4    thing is, you tell us what the hurdle is, we'll
5    solve the hurdle.  If you don't tell us what it is,
6    we don't believe there is a hurdle.
7    Q.  So you don't recall any conversations with
8    Mr. LaBow where he says, you've got to the tell the
9    trustee I've got authority to make trades?
10   A.  I don't remember a conversation with him on
11   that.
12   Q.  Okay.  Did Mr. LaBow ever complain that it
13   took too long to get a decision from the committee
14   on anything in particular?
15   A.  I'm not sure what decision he would have
16   looked for us to give.  I mean, if it was an
17   investment decision -- I mean, he had asked us
18   several times for guidance.  Every time he asked us
19   that, we went back to him and said that's your
20   bailiwick, that's what you do.  So I don't remember
21   him ever saying that he -- we were taking too long
22   on something.
23   Q.  Your drafting the investment management
24   agreement, did that ever come up, or you weren't
25   intimately involved in that?

Page 240

1    A.  I wasn't intimately involved with it before
2    December 30th.  Again, I think that the
3    understanding was that there was an investment
4    management agreement, signing it at that point in
5    time was more of a formality of the understanding of
6    the practice that we had.  I don't remember him ever
7    complaining about the date or the signing of it.
8    Q.  Okay.
9        MR. STRAWN:  Mr. Halpin, I've run out of
10   questions.  Hopefully, Mr. Joyce has a few questions
11   for you.
12        THE WITNESS:  Does he really?
13        MR. JOYCE:  I have no questions.
14        (Discussion held off the record.)
15        THE WITNESS:  I hope I didn't get too
16   intense there, anything after April 30th, it's an
17   issue for me.
18        MR. STRAWN:  Okay.  Thank you very much
19   for your patience, Mr. Halpin, both before and after
20   April 30th, 2009.
21        I assume you want to read and sign.
22        MR. JOYCE:  We'll read, and mini e-mail
23   is perfect.
24        MR. STRAWN:  I'll find out from my
25   procurement officer what I do about the transcript.

Case 2:14-cv-01494-NBF   Document 184-14   Filed 09/25/18   Page 63 of 63

R. Alexander Acosta, et al. vs.
WPN Corporation, and et al.

Dennis Halpin
September 27, 2017

## Page 241

```
1          (Signature not waived.)
2          (Whereupon, the above-entitled matter
3   was concluded at 4:44 p.m.)
4              -----
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 243

```
1              DEPOSITION ERRATA SHEET
2   Page No.___ Line No.___ Change_____
                                To _____
3   Reason for change:_____
4   Page No.___ Line No.___ Change_____
                                To _____
5   Reason for change:_____
6   Page No.___ Line No.___ Change_____
                                To _____
7   Reason for change:_____
8   Page No.___ Line No.___ Change_____
                                To _____
9   Reason for change:_____
10  Page No.___ Line No.___ Change_____
                                To _____
11  Reason for change:_____
12  Page No.___ Line No.___ Change_____
                                To _____
13  Reason for change:_____
14  Page No.___ Line No.___ Change_____
                                To _____
15  Reason for change:_____
16  Page No.___ Line No.___ Change_____
                                To _____
17  Reason for change:_____
18  Page No.___ Line No.___ Change_____
                                To _____
19  Reason for change:_____
20  Page No.___ Line No.___ Change_____
                                To _____
21  Reason for change:_____
22
23  SIGNATURE:_____ DATE:_____
              DENNIS HALPIN
24  NOTARY SIGNATURE:_____ DATE:_____
25  My Commission Expires:_____
```

## Page 242

```
1          DEPOSITION ERRATA SHEET
2   Case Caption:
3   ACOSTA
           vs.
4   WPN CORPORATION, et al.
5   Case No. 2:14-cv-01494-NBF
6       DECLARATION UNDER PENALTY OF PERJURY
7          I declare under penalty of perjury
    that I have read the entire transcript of my
8   deposition taken in the above-captioned matter or
    the same has been read to me, and the same is true
9   and accurate, save and except for changes and/or
    corrections, if any, as indicated by me on the
10  DEPOSITION ERRATA SHEET hereof, with the
    understanding that I offer these changes as if
11  still under oath.
12
    Signed on the _____ day of _____, 2017.
13
14           _____
15              DENNIS HALPIN
16
17
18
19
20
21
22
23
24
25
```

## Page 244

```
1   COMMONWEALTH OF PENNSYLVANIA)
    COUNTY OF ALLEGHENY        )
2
3          I, Constance Lee, Registered
    Professional Reporter and Notary Public in and for
4   the Commonwealth of Pennsylvania, do hereby
    certify that the witness was by me first duly
5   sworn to testify the truth, the whole truth, and
    nothing but the truth; that the foregoing
6   deposition was taken at the time and place stated
    herein; and that the said deposition was recorded
7   stenographically by me and then reduced to
    typewriting under my direction, and constitutes a
8   true record of the testimony given by said
    witness, all to the best of my skill and ability.
9
10         I further certify that the inspection,
    reading and signing of said deposition were not
11  waived by counsel for the respective parties and
    by the witness and if after 30 days the transcript
12  has not been signed by said witness that the
    witness received notification and has failed to
13  respond and the deposition may then be used as
    though signed.
14         I further certify that I am not a
    relative, or employee of either counsel, and that
15  I am in no way interested, directly or indirectly,
    in this action.
16
17         IN WITNESS WHEREOF, I have hereunto set
    my hand and affixed my seal of office this 13th
18  day of October, 2017.
19
20
21
22         Constance Lee, RPR, CSR(IL)
           NCRA Realtime Systems Administrator
23
24
25
```