IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

R. ALEXANDER ACOSTA,　　　　　　　　　　　　No. 2:14-cv-01494-NBF
SECRETARY OF LABOR, UNITED
STATES DEPARTMENT OF LABOR,

　　　　　　Plaintiff,

　　vs.

WPN CORPORATION; RONALD LABOW;
SEVERSTAL WHEELING, INC.
RETIREMENT COMMITTEE; MICHAEL
DICLEMENTE; DENNIS HALPIN;
WHEELING CORRUGATING COMPANY
RETIREMENT SECURITY PLAN; and
SALARIED EMPLOYEES' PENSION PLAN
OF SEVERSTAL WHEELING, INC.,

　　　　　　Defendants.

**MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendants, Severstal Wheeling, Inc. Retirement Committee (the "Committee"), Michael DiClemente ("DiClemente"), and Dennis Halpin ("Halpin") (collectively, "Defendants"), by and through their undersigned counsel, file this opposition to Plaintiff Department of Labor's ("DOL") Motion for Summary Judgment:

**I.　　INTRODUCTION**

The DOL's Motion for Summary Judgment ignores the five-part test laid out by this Court and the DOL's own regulatory guidance, and also abandons its own expert. If the DOL applied this Court's test, and relied on its expert, the DOL would have to do one of two things: (a) withdraw its case; or (b) admit that its expert, applying this Court's test, has conceded the essential legal "truth" of this dispute, *i.e.*, the Committee, Mr. DiClemente, and Mr. Halpin fulfilled their duty to monitor Ronald LaBow and WPN Corp. (collectively, "LaBow") both before and after discovering that LaBow had unilaterally transferred an undiversified portfolio to

the Severstal plans against the settled understanding of the Committee, which was the undisputed "misadventure" in this case.[1]

Rather, with the benefit of a decade of hindsight, the DOL takes a series of swipes at the Committee's monitoring efforts, none of which in isolation, or totality, reflect any wrongdoing, including: (a) the Committee should have checked sooner on what assets LaBow transferred in November 2008, even though, as the DOL admits, the Committee had no reason to believe, or know, LaBow would transfer an undiversified portfolio; (b) the Committee relied on its existing monitoring procedures to identify LaBow's misadventure, which is exactly what DOL regulations require; (c) the Committee did not have a structure in place to ensure LaBow fulfilled his duties, which is false; and (d) the Committee should have removed LaBow, even though the DOL's expert cannot identify when. Equally flawed is the DOL's assertion that judgment should be entered on its damages theory, which makes no attempt to address loss causation.

## II. COUNTERSTATEMENT OF FACTS

### A. Basic Background Facts

The relevant facts for this matter have been set forth at length in Defendants' moving papers. (See Doc. #180-181). Additional facts responding directly to the DOL's summary judgment motion are incorporated below, or in response to the DOL's Statement of Facts.

### B. The Southern District of New York Action

Many facts central to this action have already been litigated in the United States District Court for the Southern District of New York (Swain, J.). The DOL in its summary judgment

---

[1] The DOL also identifies the undisputed "culprits" in this case, Mr. LaBow and WPN who: (a) acted as investment managers; (b) had complete and unlimited investment authority; (c) knew the Committee had asked for and anticipated receiving a proportionate share of the combined trust assets; (d) transferred, nonetheless, the Neuberger Berman account; and (e) admitted "maybe I did something wrong." (See Doc. #186, DOL's Statement of Material Facts in Support of Motion for Summary Judgment against LaBow and WPN, at ¶¶15, 16-19, 21, 24-25, 28).

motions cites Judge Swain's findings in Severstal Wheeling Inc. Retirement Comm. v. WPN Corp., 119 F. Supp. 3d 240 (S.D.N.Y. 2015) ("Severstal I").  (See Doc. #185, DOL Brief against LaBow, generally); (see also Doc. #186, DOL Statement of Facts against LaBow, at ¶¶1, 3-27, 29-33); (Doc. #183, DOL Brief, at 2 n.2, 4-6, 9, 11, 13-14, 18-19).[2]

### III.  ARGUMENT

#### A.  The DOL Failed to Apply the Appropriate Duty to Monitor Test as Stated by the DOL's Own Guidance and This Court's Prior Opinions in This Case.

In its Motion, the DOL does not apply, let alone mention, the five-part monitoring test that this Court articulated in its 2017 opinion in this case, which was based on the DOL's own regulatory guidance.  Instead, the DOL continues to use an ever-shifting standard.

As this Court noted in dismissing parts of the DOL's Amended Complaint[3]:

> The Department of Labor's guidance to appointing authorities on the duty to monitor requires, "under the applicable facts and circumstances," the following:
>
> - the appointing authority must adopt routine monitoring procedures;
> - the appointing authority must adhere to the routine monitoring procedures;
> - the appointing authority must review the results of the monitoring procedures;
> - the monitoring procedures must alert the appointing authorities to possible deficiencies; and
> - the appointing authority must act to take required corrective action.

---

[2] The Southern District of New York's findings should at least stand as persuasive authority.  The law of the case doctrine, for example, is recognized as applying to "closely related" litigation.  See Casey v. Planned Parenthood, 14 F.3d 848, 856 fn. 11 (3d Cir. 1994) ("Other law of the case rules apply to subsequent rulings by the same judge in the same case or a closely related one, to rulings by different judges at the same level").  See also Jersey Dental Laboratories v. Dentsply Intern., Inc., No. 01-267, 2002 WL 2007916, at *1 (D. Del. Aug. 27, 2002), aff'd in part sub nom. Howard Hess Dental Laboratories Inc. v. Dentsply Intern., Inc., 424 F.3d 363 (3d Cir. 2005) ("the court will refrain from redeciding issues that were resolved earlier in the [closely related litigation].").

[3] Making this ruling the law of the case: "[t]he law of the case doctrine limits relitigation of an issue once it has been decided in an earlier stage of the same litigation."  Autoforge, Inc. v. Am. Axle & Mfg., Inc., No. 02-01265, 2008 WL 65603, at *8 n. 7 (W.D. Pa. Jan. 4, 2008) (citing Hamilton v. Leavy, 322 F.3d 776, 786 (3d Cir. 2003)).

(Doc. #144, June 7, 2017 Memo. Opinion, at 27 (citing 29 C.F.R. § 2509.75-8, FR-17)).

While not citing this Court's test (which is derived from the DOL's own guidance), the DOL unwittingly appears to concede that Defendants met this standard. For example, there is no dispute that Defendants had "routine monitoring procedures" in place and followed the same. (See DOL Brief, Doc. #183, at 12, where the DOL actually chides the Committee for relying on its procedures). Moreover, the DOL admits that Defendants hired and retained service providers, such as Mercer Investment Consultants and Sally King (and her colleagues), an expert ERISA lawyer of McGuire Woods LLP, who assisted in creating and implementing Defendants' routine monitoring procedures and corrective actions. (See Doc. #184, DOL Statement of Facts, at ¶15).

The DOL also admits that Defendants discovered LaBow's misadventure during their normal monitoring procedures, (see Doc. #184, at ¶54), which is exactly what is expected of the Committee. (See Doc. #144, at 25, where this Court explains that "An appointing authority is not exposed to liability unless something 'put [them] on notice of possible misadventure by their appointees'" and that "an appointing authority would be notified of a possible misadventure *by implementation of a regular monitoring procedure . . . .*" (emphasis added)).

Finally, the DOL admits that Defendants took corrective action. (See Doc. #184, DOL Statement of Facts, at ¶56); (see also Doc. #181, Defendants' Statement of Facts, at ¶¶58-77).

Therefore, Defendants satisfied the prevailing standard, and the DOL admits the same.

**B.     Defendants Did Not Have a Duty to Check LaBow's Actions Related to the Transfer from the Combined Trust on November 3, 2008.**

The DOL first suggests that Defendants should have reviewed LaBow's transfer of assets on November 3, 2008 at an earlier date. (See Doc. #183, at 8-9). This argument tortures the duty to monitor standard in the first instance, and is a misstatement of the facts in the second.

4

### 1. There Was No Duty to Review LaBow's Actions in Real Time.

As this Court explained: "An appointing authority is not exposed to liability unless something 'put [them] on notice of possible misadventure by their appointees.'" (Doc. #144, June 7, 2017 Memo. Opinion, at 25) (citing Coyne & Delany Co. v. Selman, 98 F.3d 1457, 1466 n.10 (4th Cir. 1996)). The Court found that the duty to monitor standard requires adopting a regular monitoring procedure capable of spotting irregularities, adhering to it, and taking corrective action when required. (See id. at 27).

The DOL concedes: "it will be enough that [fiduciaries] adopt and adhere to routine procedures sufficient to alert them to deficiencies in performance which could require corrective action (*e.g.*, implementation of a system of regular reports on the investment fiduciaries' decisions and performance)." (DOL Amicus Brief, Exhibit 10,[4] at 5). The DOL recognizes fiduciaries "are not charged with directly overseeing the investments and thus duplicating the responsibilities of the investment fiduciaries." (Id. at 8-9). See also Leigh v. Engle, 727 F.2d 113, 135–36 (7th Cir. 1984) (no obligation "to examine every action"); see also Krueger v. Ameriprise Fin., Inc., No. 11-02781, 2014 WL 1117018, at *9 (D. Minn. Mar. 20, 2014) (duty to monitor does not require review of every decision "because that standard would defeat the purpose of having fiduciaries appointed to run a benefits plan in the first place."). Defendants' expert agrees: "it is not standard practice for committees to monitor an investment manager's day-to-day investment decisions or transactions." (Dr. Stangle Suppl. Affidavit, Exhibit 11, at ¶10).

Therefore, the DOL's assumption of a real time review requirement is erroneous.

---

[4] All referenced exhibits have been included with Defendants' Response to the DOL's Concise Statement of Facts, filed contemporaneously with this Memorandum of Law.

**2.      Defendants Had No Reason to Suspect LaBow's Misadventure.**

Even beyond the lack of legal authority to support the DOL's real time monitoring standard, there is no factual support for the same. The Committee had no notice of a misadventure, and there was no reason for Defendants to anticipate such an action by LaBow.

The DOL admits that "[t]here is no dispute that at the time the assets were being transferred . . . [the Committee] had agreed to and expected to receive a different set of investments – ones that represented a diversified share from the WHX Trust." (Doc. #183, at 8). In fact, the DOL explains: "[c]onsistent with this understanding and prior to accepting the assets into the trust, Mr. DiClemente directed [in writing] on September 30, 2008 that the WHX Trust transfer the assets to Citibank 'in the same percentage allocations as existed in the WHX Pension Trust.'" (Id. at 9). Mr. Halpin likewise testified:

> Q.   . . . Did you check to see what the assets were at the time in the Neuberger Berman account?
> A.   I didn't, and I wouldn't see a need to.
> Q.   Okay. And why would you not see a need to?
> A.   I think there was previous documents that told you that we said exactly how we wanted the transfer to be. I would expect that to have been done as we instructed.

(Halpin Depo., Exhibit 8, at 23:7-15). Instead, "[a]t no time prior to December 29, 2008 did Mr. LaBow's performance lead or cause [Mr. DiClemente] to believe WPN or Mr. LaBow was acting in a deficient manner, which needed corrective action of any sort." (9/25/18 DiClemente Affidavit, Exhibit 7, at ¶16); see also Severstal I at 248 ("Committee believed that the new trust would receive a proportional allocation, or a 'slice,' of the Combined Trust portfolio.").

Therefore, there is no dispute that Defendants had an agreement that LaBow was supposed to transfer a diversified portfolio. The Committee had no notice of a problem with Mr. LaBow, and no reason to expect a departure from the agreement or investment policies.

6

### 3. The DOL's Alleged Single "Warning Sign" is Inconsequential.

The DOL suggests that there were "warning signs". (Doc. #183, at 14). Even though LaBow served as investment manager for the combined trust for years, the DOL can only cite to a single instance to purportedly shatter the long-time trust and success forged between the Committee and LaBow: he allegedly failed to separate the trusts on September 30, 2008. (Id.).

LaBow made a decision to delay the transfer of assets within his broad discretionary authority to carry out his investment management functions. In an October 22, 2008 letter from LaBow, he stated to Mr. DiClemente: "As you are aware" (memorializing that the Committee was informed) the transfer of assets did not occur in September "as a result of the market volatility that has continued for the past several months . . . ." (LaBow 10/22/08 Letter, Exhibit 12). This conduct was *not* a red flag, but bolstered the Committee's longstanding trust in LaBow to make prudent investment decisions within his broad, discretionary investment powers.

The DOL cannot point to any facts imparting notice on the Committee, or even facts sufficient to place the Committee on alert. Instead, the DOL again abandons the rule that notice of a misadventure must occur before potential liability can attach. (See 6/7/17 Opinion, Doc. #144, at 25). The evaluation of a fiduciary's decisions cannot be made "from the vantage point of hindsight" because ERISA "requires prudence, not prescience." Harmon v. FMC Corp., No. 16-6073, 2018 WL 1366621, at *5 (E.D. Pa March 16, 2018) (quoting St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Urgent Inc. 712 F.3d 705, 716 (2d. Cir. 2013)).

### 4. The DOL Fails to Identify What Corrective Action Should and Could Have Been Taken by the Committee.

The DOL's criticism also fails because it never identifies what the Committee actually could and should have done—other than undertake the corrective action it did—if LaBow's breach had been discovered earlier. See Nagy v. DeWese, 771 F. Supp. 2d 502, 521 (E.D. Pa.

2011) (citing Silverman v. Mutual Benefit Life Ins. Co., 941 F.Supp. 1327, 1337 (E.D.N.Y.1996) (concluding that "in order to prevail on a motion for summary judgment" under section 405(a)(3), "a plaintiff must also be able to identify a reasonable alternative course of action that the fiduciary might have taken that would have prevented a loss to the plan")).

### 5. The Committee Did Not "Accept" the Neuberger Berman Account.

Despite admitting that the Committee had an agreement with LaBow regarding what would be transferred from the combined trust (*i.e.*, a diversified portfolio), the DOL argues that the Committee "accept[ed]" the Neuberger Berman account. (Doc. #183, at 14). Not so.

Instead, LaBow directed that the entirety of the Neuberger Berman account be transferred, which then occurred (against the expectations of the Committee). The Severstal trust funds were then held by Citibank at that time. See Severstal I at 249-50. Citibank carried out LaBow's transfer instructions on November 3, 2008, and the transaction settled on that date. Id. at 250. Neither the Committee nor any other representatives of Severstal gave Citibank instructions regarding the transfer on or before November 3, 2008. Id. at 250. The DOL's attempt to rely on a letter or communication on November 4, 2008, a day *after* the transfer was settled, is wrong. Further, neither LaBow nor anyone from WHX or Citibank informed any Severstal representatives that the Severstal trust would be receiving the whole of the Neuberger Berman account, nor did any of those parties inform Severstal of the asset composition of the Neuberger Berman account. Severstal I at 250; (see also DiClemente Suppl. Affidavit, Exhibit 4, at ¶¶6-11, 22, confirming these facts). In fact, as LaBow admitted that the decision was always his in a voicemail months later:

> I left a message with Sally King and with Mike DiClemente. We are making a lot of progress . . . I'm going to diversify. Look I'm not sherking [sic] any responsibility, this is my decision. We're not diversified . . . that's my decision, I'm just basically keeping

8

>you informed . . . I'm not saying you told me to do it or you let me do it . . . you didn't . . . I'm doing it.

(Exhibit 13, Transcription of 3/23/09 LaBow Voicemail to Mr. Halpin).

### C. Defendants Monitored LaBow in Compliance With Their Duty to Monitor.

The DOL asserts that the Committee breached its duty to monitor "by passively relying on quarterly reports as they had in the past." (Doc. #183, DOL Brief, at 12). This argument fails. Moreover, Defendants have already detailed their prudent monitoring. (Doc. #180-181).

#### 1. Defendants Appropriately Monitored LaBow.

*First*, the only legal authority the DOL cites concerning the duty to monitor is basic law observing that a duty to monitor exists at reasonable intervals. (See, e.g., Doc. #183, DOL Brief, at 10). Accordingly, there is no active/passive distinction as the DOL now creates.[5]

*Second*, the DOL is wrong on the facts. The Committee: (a) received quarterly reports from Mercer (9/25/18 DiClemente Affidavit, Exhibit 7, at ¶11); (b) discussed investment issues with Mercer (id.).; (c) learned of LaBow's misadventure from Mercer (id. at ¶23); (d) retained ERISA counsel from McGuire Woods to provide monitoring advice (id. at ¶23); and (e) relied on the advice at McGuire Woods with respect to corrective action, immediately and repeatedly demanding Mr. LaBow to diversify or otherwise fix his misadventure. (DiClemente Suppl. Affidavit, Exhibit 4, at ¶¶15-17, 23-24, 27-31). Therefore, the Committee had procedures in place, which alerted it of the problem, and took corrective action, which is what is required.

*Third*, the Committee's monitoring intensified upon notice of LaBow's misadventure. As Judge Swain noted, as of January 2009, the Committee was attempting to impose greater oversight on LaBow. See Severstal I at 255. By referring to a formal allocation plan, the

---

[5] Likewise, the DOL asserts that the Committee should have prepared for "additional monitoring" at the time of transfer of the Severstal assets from the combined trust, but fails to explain the scope of this equally novel requirement or provide citation for the existence of such a standard. (See Doc. #183, DOL Brief, at 15-16).

9

Committee was asking for specific details of the proposed investments that would give them comfort about the diversification of the assets. Id. (See DiClemente Suppl. Affidavit, Exhibit 4, at ¶¶24-25).

Thus, even if there was such a legal fault as "passive" reliance on quarterly investment reports,[6] which the DOL does not cite, the facts do not remotely support that this Committee turned a blind eye. Howell v. Motorola, Inc., 633 F.3d 552, 573 (7th Cir. 2011) (duty exists so that a fiduciary "cannot escape liability by passing the buck to another person or turning a blind eye."). This Committee was *not* passive, but the most active LaBow had ever faced, dogging him daily for reallocation strategies. (See LaBow Depo., Exhibit 1, at 178:1-180:5, 182:12-183:1).

### 2. Defendants Imposed Appropriate Investment Policies and Guidelines.

The DOL has argued only that the Committee failed to put *in writing* an investment policy, investment management agreement, and list of assets to be transferred from the combined trust. (See Doc. #183, at 13). The facts, however, demonstrate that the appropriate policies and understandings between LaBow and the Committee were in place. As such, the DOL merely claims, at most, that there were no formal papers before the transfer. This argument is immaterial to the Committee's ability to fulfill its duties, unsupported by law, and not factual.

*First*, as to the investment policy, at the time of the transfer LaBow was subject to the same investment policies as in effect for the combined trust. (See 9/25/18 DiClemente Affidavit, Exhibit 7, at ¶20); (see also Halpin Depo., Exhibit 8, at 181:14-25). In fact, there was a written investment policy effective November 1, 2008. (Exhibit 7, at ¶21); (see also 11/1/08 Severstal Investment Policy, Exhibit 9). LaBow fully understood the investment policies in place:

---

[6] Both experts agree that such quarterly review is the prevailing norm. (Dr. Stangle Report, Exhibit 14, at ¶32); (Dr. Mangiero Deposition, Exhibit 15, at 54:7-15).

> Q. . . . [Y]ou weren't going to change your investment policies as they had existed with WHX.
>
> A. I wasn't going to change what I was gonna try and do with – with the resources, no, I was not.

(LaBow Depo., Exhibit 1, at 59:18-21); (see also Halpin Depo., Exhibit 8, at 34:19-21, 36:21-23 ("So we were going to retain Ron. We were going to continue the same policies and plans in place.")). As Mr. Halpin stated: "But was there always a policy in place and guidelines [for investments]? Absolutely was." (Exhibit 8, at 181:6-7); see also Severstal I at 259.

*Second*, as to the investment management agreement, the DOL primarily challenges the "backdating" of the latest iteration of the agreement from December 5 to November 1, 2008. This issue was largely settled by the Court on motion to dismiss, (see Doc. #144, at 12, where the Court accepts November 1, 2008 as the effective date), and the DOL has not developed a single fact to establish that LaBow was *not* acting as the investment manager as of November 1, 2008. Instead, the facts are the opposite. (See LaBow Depo., Exhibit 1, at 228:13-22, where LaBow explains that his relationship with the plans was the same after he formally executed the agreement); (see also 9/25/18 DiClemente Affidavit, Exhibit 7, at ¶8). LaBow even demanded management fees (only to waive them later due to his misadventure or market conditions) for November and December 2008, further evincing his status as the manager. (LaBow Depo., Exhibit 1, at 102:24-103:7); (see also DiClemente Suppl. Affidavit, Exhibit 4, at ¶31).

*Third*, as to instructions regarding the transfer of assets from the combined trust, these directives were equally settled. The DOL admits that "[t]here is no dispute that at the time the assets were being transferred to the Plans, Mr. DiClemente and Mr. Halpin had agreed to and expected to receive a different set of investments – ones that represented a diversified share from the WHX Trust." (Doc. #183, at 8). In fact, the DOL explained that "[c]onsistent with this understanding and prior to accepting the assets into the trust, Mr. DiClemente directed [in

11

writing] on September 30, 2008 that the WHX Trust transfer the assets to Citibank 'in the same percentage allocations as existed in the WHX Pension Trust.'" (Id. at 9) (see also Exhibit 2, 9/30/08 DiClemente Instructions Letter); (Exhibit 5, e-mail to LaBow containing the letter). Further, as Judge Swain confirmed in the Southern District of New York, "the Severstal Retirement Committee believed that the new trust would receive a proportional allocation, or a 'slice,' of the Combined Trust portfolio." Severstal I at 248. Once again, there was an understanding, and at least one document, memorializing what was to be transferred by LaBow.

In its argument, the DOL makes the grand pronouncement: "Defendants' abject failure to commit their service provider in writing as to his duties and as to what assets the Severstal Trust would receive in the trust separation is a patent abdication of their monitoring responsibility." (Doc. #183, at 13). The DOL has not, and cannot, cite to a single authority that renders this conduct "patent[ly]" improper. The DOL's primary qualm, albeit misguided factually, is that the Committee failed to swap the references in the governing, written policies and agreements from the "combined trust" to the new, "Severstal trust". This position is untenable. There was never a question regarding LaBow's role as investment manager, the policies he was to follow, or what he was supposed to transfer from the combined trust. Moreover, the same were in writing.

    **3.**    **The Assets Were Not Left Unmanaged.**

The DOL posits that the retirement plan assets were not managed after November 3, 2008 because the Committee did not execute a new agreement with Neuberger Berman. (See Doc. #183, DOL Brief, at 15). The assets, however, were supposed to be managed by LaBow.

It is settled that LaBow always had full, complete, and broad authority to make investment decisions. (See 11/1/08 Investment Management Agreement, Exhibit 6, at ¶2); (see also Sect. III(C)(2), supra). Pursuant to the November 2008 Agreement, LaBow also had the

authority to select other investment managers to work with him. (Exhibit 6, at ¶5). If LaBow believed Neuberger Berman was a necessary addition, he had the power (and, if this was a necessary addition for him to carry-out his role, the duty) to engage Neuberger Berman.

The Committee, however, believed that its assets were always under the care of LaBow, regardless of what downstream investment managers he engaged. (See DiClemente Depo., Exhibit 3, at 56:2-14). As Mr. DiClemente explained: "I had felt that it was – didn't make sense for us to [contract with Neuberger Berman directly], because we had engaged only one investment manager, that was him [LaBow]. If he chose to use the talents of other investment managers to fulfill his overall responsibilities, that would be his direct responsibility to do so." (Id. at 58:25-59:7); (see also DiClemente Suppl. Affidavit, Exhibit 4, at ¶¶4-5, 31). Therefore, negotiations with Neuberger Berman did not and should not have raised a red flag.

### D. **Defendants Took Steps Commensurate With The Transaction In Creating the Standalone Severstal Trust.**

The DOL's assertion that, in creating the standalone Severstal trust, Defendants did not take steps commensurate "to ensure the transaction was prudently executed," is without basis. (Doc. #183, DOL Brief, at 12-13). Once again, this argument abandons the "notice of misadventure" perquisite to stray to "prescience". The DOL argues, in essence, if only the Committee had a created a fool-proof structure to ensure LaBow could never breach his fiduciary duties, none of this would have happened. This position is, in a word, untenable.

The DOL cites not one case or regulation to support such a duty. On this basis alone, the phantom standard should be dispatched. Moreover, it is a standard rooted in perfect hindsight, which neither ERISA nor the DOL regulatory guidance allow a plaintiff to impose on a committee. See Harmon, 2018 WL 1366621, at *5 (evaluation of a fiduciary's decisions cannot be made "from the vantage point of hindsight"; ERISA "requires prudence, not prescience.").

13

Even if such a standard existed (which it does not), the undisputed record reflects that the Committee did act prudently in the months leading up to the separation of the Severstal assets from the combined trust by, as stated above, ensuring that LaBow would remain on-board as investment manager as he had for the combined trust, follow the same investment guidelines (which were prudent and successful), and fully understood that a diversified portfolio should be transferred. See Severstal I at 246. Indeed, Attorney Sally King "testified credibly that the Severstal Retirement Committee had adopted the pre-existing WHX policy, under which Defendants had been operating in connection with the Combined Trust, as an interim measure and had at a minimum implicitly communicated this to LaBow when they instructed him to replicate the WHX portfolio if he could not arrange a retroactive reallocation." Id. at 259.

Therefore, in creating the standalone Severstal trust, Defendants took appropriate steps.

### E. The DOL's Assertion that Defendants Should Have Fired LaBow at Some Undefined Earlier Time is Incorrect.

The DOL criticizes the Committee for "remonstrating" with LaBow, "vacillating" on how to respond to Mr. LaBow's misadventure, and failing to "replace" LaBow. (DOL Brief, Doc. #183, at 17). These assertions fail as a matter of law and fact.

#### 1. The Committee Took Appropriate Corrective Action.

There is no dispute that the Committee took corrective action following the December 30, 2008 revelation that LaBow transferred assets other than those contemplated by the Committee. The DOL, instead, merely disagrees with the *type* of corrective action. Contrary to the DOL's assertions, there was no legal or factual requirement that the Committee terminate LaBow. Termination of an investment manager is one potential corrective action of many, while the corrective action undertaken by the Committee of heightened monitoring, relying on expert

14

ERISA counsel and outside investment consultants, endeavoring to reset LaBow's misadventure, and otherwise acting in the best interests of the retirement plans, were prudent and appropriate.

Importantly, the DOL takes no issue with the Committee's other monitoring of LaBow post-December 30, 2008.  (See DOL Brief, Doc. #183, at 15).  Instead, the DOL's *only* apparent qualm with the Committee's 2009 conduct is that it did not terminate LaBow soon enough.

Corrective action is not necessary in response to every misstep.  Instead, corrective action should only be taken "when required" (in the words of this Court) (Doc. #144, at 27), or when "the problem is considered to be significant enough" (in the words of Dr. Mangiero).  (Dr. Mangiero Depo., Exhibit 15, at 179:5-10).  The corrective action might be no action at all, and there is no "one size fits all" corrective action guidelines.  (Id. at 179:11-17).  There is no law or DOL regulation that *requires* termination of an investment manager, or that even provides any guidance for the same.  Instead, all that is required is "reasonable" corrective action.  Nagy v. DeWese, 771 F. Supp. 2d 502, 521 (E.D. Pa. 2011).  Aside from termination, Dr. Mangiero suggested that appropriate corrective action would include if the Committee had "followed up with LaBow to ask why instructions had not been followed to transfer a proportionate slice and what LaBow was going to do to ensure diversification."  (Rebuttal Report, Exhibit 16, at ¶9).  That is what the Committee did.  (See, e.g., Doc. #181, at ¶¶58-77).  See also Severstal I at 255.

*First*, the Committee's "remonstrating" with LaBow is otherwise known as satisfaction of the duty to monitor.  (See Doc. #181, at ¶¶58-77).  In fact, LaBow described the Committee as one of the most active committees he had ever encountered with respect to monitoring, with almost daily interactions between LaBow and the Committee occurring. (LaBow Depo., Exhibit 1, at 178:1-180:5, 182:12-183:1).  Even Dr. Mangiero agreed that, following discovery of the misadventure, the Committee took action.  (Dr. Mangiero Depo., Exhibit 15, at 201:1-12).  This

corrective action occurred with the assistance of Mercer, an expert investment consultant, and Attorney King, expert ERISA counsel. (DiClemente Suppl. Affidavit, Exhibit 4, at ¶¶16, 29).

*Second*, the Committee did not vacillate—it consistently demanded that LaBow prepare and present investment plans so the Committee could understand LaBow's strategy and have comfort that he would produce a diversified portfolio. (See Doc. #181, DiClemente Statement of Facts, at ¶¶58-77); (9/25/18 DiClemente Affidavit, Exhibit 7, at ¶25); (DiClemente Suppl. Affidavit, Exhibit 4, at ¶¶24-31); (9/25/18 Dr. Stangle Affidavit, Exhibit 17, at ¶¶16-19). One analysis that is important prior to a decision to terminate is whether the misadventure can be fixed. (Dr. Stangle Report, Exhibit 14, at ¶34). The Committee worked with LaBow to attempt to fix the misadventure through constant direction, oversight, and communications (*i.e.*, corrective action). The DOL's censure of these prudent, thoughtful actions remains incorrect.

*Third*, the DOL ignores the Committee's long, successful history with LaBow. LaBow had been the investment manager for the combined trust for years prior to its split. (See Doc. #181, Defendants' Statement of Facts, at ¶¶8-10). LaBow had a "stellar" record, at the very top of the investment manager performance mountain. (DiClemente Depo., Exhibit 3, at 15:3-13); (see also Dr. Stangle Report, Exhibit 14, at ¶48, describing LaBow's past performance as "astonishing"); (Doc. #138, 2/7/17 Hearing Transcript, at 20:8-10, where the Court queried: "How are they [the Committee] supposed to second-guess an investment manager? LaBow was supposed to be top of his game at one point."). Mr. Halpin summarized:

> Who would I put in his place because this guy [LaBow] can perform in any type of season and environment. So I'm not going to lose this guy because he fumbled the ball once, if he can recover the ball. And so to the degree that he had the ability to reset [the portfolio assets], and to the degree that we had WHX's concurrence, I think there was never a time where we thought about replacing him. Let's just – let's just reset this thing and move forward.

(Halpin Depo., Exhibit 8, at 101:10-18).  This single "fumble" did not require a knee-jerk termination by the Committee.  And, in fact, if the Committee fired LaBow too soon or imprudently, liability presumably could have followed as well.

As the Committee's expert and the DOL's expert agree, it is common in the industry to allow an investment manager several quarters to regain his footing after a misadventure.  (Dr. Stangle Suppl. Affidavit, Exhibit 11, at ¶16).  Dr. Stangle explained that industry custom requires "careful deliberation in assessing whether an investment manager should be terminated."  (Dr. Stangle Report, Exhibit 14, at ¶34).  Even Dr. Mangiero agreed that firing LaBow was a "big decision" that "[c]ertainly" should not occur in "haste".  (Dr. Mangiero Depo., Exhibit 15, at 194:17-21).  Therefore, the Committee's deliberate approach to LaBow's misadventure through corrective action, as opposed to a knee-jerk termination, was prudent.

### 2. The DOL Has Consistently Failed to Answer the Threshold Question: When Should LaBow Have Been Terminated?

Neither the DOL nor its expert can answer the pivotal question: when should LaBow have been fired?  Absent such a determination, the DOL cannot establish when a breach occurred or from when damages are supposed to accrue.  The DOL's expert has repeatedly testified:

> Q. In Paragraph 129 [of your report], continuing, "The Severstal committee should have terminated the relationship with LaBow prior to May 2009."
> A. Right.
>
> Q. When should they have terminated him?
> A. I don't know. . . .

(Dr. Mangiero Depo., Exhibit 15, at 196:1-6).  She further reiterated:

> Q. So you can't tell me here today a specific date that LaBow should have been fired?
> A. That's correct.

(Id. at 196:15-17).  Even when pressed on whether communications in late March 2009 (with the

end of the relevant period of liability being May 1, 2009) required the firing of LaBow, Dr. *Mangiero still could not state with any certainty that termination was necessary at that time.* (Id. at 214:6-19; 216:13-15). Instead, she could only guess: "it depends". (Id. at 192:8-11).

### F. Defendants Are Not Liable for the Plans' Losses.

The DOL asserts that Dr. Mangiero has performed a damages analysis that is unchallenged and, in turn, summary judgment should be entered on damages. (Doc. #183, DOL Brief, at 19-20). This assertion is meritless. The DOL assumes, in strict liability fashion, that because losses to the retirement plans allegedly occurred, Defendants are automatically liable.

The DOL sued for relief under Sections 409 and 502 of ERISA, 29 U.S.C. §§1109 and 1132. (DOL Second Amended Complaint, Doc. #148, at ¶1). Section 409 only imposes liability for damages "resulting from" a breach of fiduciary duty, 29 U.S.C. §1109(a), requiring causation between the breach and damages. See In re Unisys Sav. Plan Litig., 74 F.3d 420, 445 (3d Cir. 1996) (citing Brandt v. Grounds, 687 F.2d 895, 898 (7th Cir. 1982) (Section 409 requires "a causal connection . . . between the breach of the fiduciary duty and the losses"); Allison v. Bank One-Denver, 289 F.3d 1223, 1239 (10th Cir. 2002) (accord).

In this case, neither the DOL nor Dr. Mangiero have even addressed a requisite causal link. Instead, Dr. Mangiero's calculation is closer to a simple math exercise. Dr. Mangiero testified that the DOL gave her a time period for damages, which was November 1, 2008 through May 1, 2009 and asked her for a number. (See Daubert Hearing Transcript, Exhibit 18, at 41:12-16); (see also Mangiero Depo., Exhibit 15, at 198:19-199:15). This does not suffice. Defendant's expert, Dr. Stangle, has determined that Dr. Mangiero's purported damages analysis is seriously flawed.

18

*First*, Dr. Stangle concluded that Dr. Mangiero's "analysis" simply consists of calculating the difference between hypothetical portfolios that she constructed, and the value of the new Severstal trust, without establishing that these differences were *caused* by the Committee's alleged failure to monitor LaBow. (Dr. Stangle Suppl. Affidavit, Exhibit 11, at ¶¶11-14). In addition to a legal requirement of causation, it is the custom in the industry, according to Dr. Stangle, for economists to dissect whether an economic loss arises from factors that are unrelated to the alleged misconduct, such as general market trends or other influences,[7] which would be excluded from a damages calculation. (Id. at ¶12 & n.20).

*Second*, Dr. Stangle points out that the only corrective action that Dr. Mangiero suggests that the Committee did not take during its tenure was the termination of LaBow. (Id. at ¶¶14-15). However, Dr. Mangiero could not designate a time *when* LaBow should have been fired. (Id.). Accordingly, in the absence of a defined event of misconduct by the Committee, there can be no fixed date from which damages can be assessed. (Id.). In other words, in failing to define when the Committee should have terminated LaBow (and certainly not opining that the termination should have occurred on November 3 when her damages calculations begin), proof of causation is lacking. Dr. Mangiero simply assumes that damages began on November 3.

*Third*, even if the Committee had turned a "blind eye" to LaBow's misadventure, which it did not, no damages calculation could start before the Committee had both notice of LaBow's misadventure and had demonstrably done nothing (*i.e.*, a failure of corrective action) in the face of it. Again, since the Committee took corrective action and there is no specific act or date that the DOL and Dr. Mangiero can identify as deficient by the Committee in its efforts to exercise and implement corrective action, no damages can lie against the Committee. (Id. at ¶14).

---

[7] The DOL recognizes the otherwise "adverse economic conditions" at the relevant time period. (Doc. #183, DOL Brief, at 12). The DOL, however, does not even consider the economic climate as a potential confounding variable.

Accordingly, even setting aside the DOL's inability to establish a right to summary judgment on liability, the DOL's request for summary judgment on damages is further flawed.

## IV. CONCLUSION

For the reasons set forth above, the DOL's Motion for Summary Judgment must be denied and summary judgment entered in favor of DiClemente, Halpin, and the Committee.

Dated: October 25, 2018

SAUL EWING ARNSTEIN & LEHR LLP

/s/ Michael J. Joyce
Charles Kelly, Esq.
PA ID No. 51942
*Charles.Kelly@saul.com*
Michael J. Joyce, Esq.
PA ID No. 311303
*Michael.Joyce@saul.com*
One PPG Place, 30th Floor
Pittsburgh, PA 15222
Tel.: (412) 209-2500
Fax: (412) 209-2585

*Counsel for Defendants, the Severstal Wheeling, Inc. Retirement Committee, Michael DiClemente, and Dennis Halpin*