UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

---

R. ALEXANDER ACOSTA, SECRETARY OF  :
LABOR, UNITED STATES DEPARTMENT OF
LABOR,                             :

                Plaintiff,              :

                          Case No. 2:14-cv-01494-NBF

      v.                           :

WPN CORPORATION, RONALD LABOW,    :
SEVERSTAL WHEELING, INC. RETIREMENT
COMMITTEE, MICHAEL DICLEMENTE,    :
DENNIS HALPIN, WHEELING
CORRUGATING COMPANY RETIREMENT    :
SECURITY PLAN, and SALARIED
EMPLOYEES' PENSION PLAN OF        :
SEVERSTAL WHEELING, INC.,
                                   :
                Defendants.

---

**SECRETARY'S BRIEF IN SUPPORT OF RESPONSE TO MOTION FOR SUMMARY JUDGMENT CONCERNING DUTY TO MONITOR OF DEFENDANTS SEVERSTAL WHEELING, INC. RETIREMENT COMMITTEE, MICHAEL DICLEMENTE, AND DENNIS HALPIN**

**I.    INTRODUCTION**

Defendants Severstal Wheeling, Inc. Retirement Committee ("Retirement Committee"), Michael DiClemente, and Dennis Halpin ("Defendants") do not contest that the Wheeling Corrugating Company Retirement Security Plan and the Salaried Employees' Pension Plan of Severstal Wheeling, Inc. (collectively "the Plans") are employee retirement plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. *Severstal Wheeling, Inc. Retirement Committee v. WPN Corp*., 119 F. Supp. 3d 240, 243 (S.D.N.Y. 2015) ("*Severstal I*"). Defendants also do not contest that they were the Named Fiduciaries in the Plans' documents with the ultimate responsibility for the Plans. *Severstal I* at

243. Finally, Defendants do not contest that they had a fiduciary duty to monitor their investment manager, Ronald LaBow and WPN Corporation (collectively "LaBow"), and that this duty required them to remove LaBow when he breached his fiduciary duty by failing to prudently invest the assets of the Plans, and required them to take all other actions necessary to fulfill their obligation to prudently invest those assets.  Defendants' Memorandum of Law in Support of Motion for Summary Judgment Concerning Duty to Monitor at p. 7.  ECF No. 180.  Indeed, this Court has already recognized Defendants' duty to monitor LaBow, and to take action if necessary, in its Memorandum Opinion of June 7, 2017 at 27-32.  ECF No. 144.

Defendants largely agree with the Secretary as to the actions they did and did not take regarding the separation of the Severstal Trust from the WHX Trust and their monitoring of LaBow.  Defendants argue simply that by hiring LaBow they are somehow exempt from their ongoing fiduciary responsibilities of prudence under ERISA and that their actions met whatever residual duty they did have.  The undisputed material facts, however, show that Defendants' actions (or more aptly inactions) fell well below the high standard required of ERISA fiduciaries and caused multi-million dollar losses to the participants' retirement savings -- losses that Defendants repeatedly attempt to minimize by referring to them as "misadventures."  The facts also establish that Defendants failed to confirm that appropriate assets had been received into the Plans.  Despite obvious warning signs, Defendants turned a blind eye to their duty to protect the assets of the Plans and allowed them to sit undiversified and unmanaged during the then prevailing financial crisis.  These facts support that Defendants breached their fiduciary duties to the Plans and, therefore, Defendants' motion for summary judgment should be denied, and summary judgment should be granted in the Secretary's favor.

### II.     DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES TO THE PLANS

As stated above, many of the facts in this case are agreed to by the parties. There is no dispute that Defendants were fiduciaries to the Plans. *Severstal I* at 243. There is also no dispute that the independent Severstal Trust was created on November 3, 2008 from assets from the commingled WHX Trust. *Severstal I* at 249-50. There is no dispute that the Plans had nearly $40 million or approximately 10% of the value of the WHX Trust when the trusts were separated. *Severstal I* at 250. There is also no dispute that Defendants were fully aware that the financial markets were in crisis in the Fall of 2008 into 2009 and the value of investments were very volatile. *Severstal I* at 253.

The parties agree, and the Southern District of New York found, that LaBow breached his fiduciary duty to prudently invest the assets of the Plans. *Severstal I* at 267-68. However, LaBow was not the only fiduciary to breach his fiduciary duties as the evidence is clear that Defendants also acted imprudently on their own by accepting the undiversified Neuberger Berman account into the Severstal Trust without understanding what they were accepting. Defendants also breached their duty to monitor LaBow and discover that the Plans' assets were undiversified and unmanaged. Defendants then breached their duty to take appropriate corrective action upon belatedly discovering LaBow's fiduciary breaches. Finally, the evidence supports that Defendants' breaches caused over $6 million in losses to the Plans' participants and beneficiaries.

   A.  Defendants' Acceptance of the Undiversified Neuberger Berman Account into the Severstal Trust Constitutes a Breach of Their Independent Fiduciary Duty to the Plans.

In addition to their duty to monitor Labow's performance of his duties in the trust separation, Defendants had an independent duty to act prudently before accepting undiversified

assets into the new Severstal Trust. On November 4, 2008, Citibank asked Mr. DiClemente (not LaBow) for instructions regarding "how you want these assets to be separated." Michael DiClemente Deposition, September 26, 2017 ("DiClemente") at 53, EX 10, 11; *Severstal I* at 250. In response, Mr. DiClemente drafted a letter directing the receipt of assets from the WHX Trust without checking with LaBow or ever confirming the value or type of assets he was accepting into the Severstal Trust. DiClemente at 53, 88, EX 10, 11. Indeed, Mr. Halpin stated that he saw no need to check if Defendants' instructions had been properly carried out and that the Plans had received the diversified assets he expected. Dennis Halpin Deposition, September 27, 2017 ("Halpin") at 23.

Defendants expected to receive "a proportionate share of the assets that comprised the combined portfolio." DiClemente at 44, 45, EX 7; Halpin at 28. The letter agreement with WHX for the attempted trust separation on September 30, 2008, stated that the WHX Trust would transfer the assets to the Severstal Trust "in the same percentage allocations as existed in the WHX Pension Trust." DiClemente at 44, EX 7. As stated above, however, Defendants acted as mere cyphers, signing a direction to accept the Neuberger Berman account after the fact as they were instructed and did not question why they had been transferred assets other than those they had expected.

Defendants also breached their fiduciary duty by not checking after the transfer to determine if they had received the assets they had expected. Defendants failed to confront LaBow at the time of the transfer to ask why they had not received the assets they expected and to demand what action he would take to diversify the Plans' assets. Dr. Susan Mangiero Report, December 11, 2017 ("Mangiero Report") at 11; Dr. Mangiero Rebuttal Report, February 16, 2018 ("Mangiero Rebuttal Report") at 5, 6, 10. Defendants took no actions despite knowing that

they were subject to liability for their actions.  Mr. DiClemente specifically admitted to WHX on February 6, 2009, that Defendants could be subject to liability by the participants and beneficiaries of the Plans for having accepted the undiversified Neuberger Berman account. DiClemente at 149-50, EX 42.

"In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts."  *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).  The Supreme Court explains that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones.  This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1828 (2015).  As explained in the Law of Trusts and Trustees:

> A trustee taking office immediately owes the beneficiary the duty of examining the trust property, possession of and title to which is tendered to the trustee, for the purpose of ascertaining whether it corresponds in kind and amount with that which ought to be delivered, regardless whether the trustee takes office by receipt of the trust property from the settlor or executor, or upon appointment as the successor of a sole trustee, or upon becoming a co-trustee.

A. Hess, G. Bogert, The Law Of Trusts And Trustees § 684 (duty to examine and review trust investments).  "ERISA clearly assumes that trustees will act to ensure that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries. . . ." *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 571 (1985).

There is no dispute in this case that Defendants took *no action* to confirm that when the Severstal Trust was being funded, it received the assets that they had expected.  Indeed Defendants' breach of their fiduciary duty goes further in that they were the only persons who could authorize the Severstal Trust to accept the Neuberger Berman account -- and they did so

without question -- despite the fact that it contradicted their understanding as to the assets they would receive.

>   B. Defendants Failed to Prudently Monitor Their Investment Manager by Failing to Discover LaBow's Fiduciary Breaches Prior to December 29, 2008.

Defendants breached their duty to monitor LaBow by failing to prepare before the trust separation, failing to monitor during the separation, and by failing to monitor LaBow after the separation. On a fundamental level, because of the significant changes happening to the Plans as a result of the trust separation, common sense in addition to ERISA's duty of prudence dictated that Defendants not hold to their previous level of non-engagement by simply reviewing quarterly reports to monitor LaBow. DiClemente at 184. Department of Labor guidance makes clear that monitoring fiduciaries have to address the facts and circumstances surrounding plans: "No single procedure will be appropriate in all cases; the procedure adopted may vary in accordance with the nature of the plan and other facts and circumstances relevant to the choice of the procedure." 29 C.F.R. § 2509.75–8, at FR–17.

After Citibank announced that it was leaving the trust business and Defendants learned that they had to establish their own independent trust, it was no longer business as usual monitoring the Plans. The separation of the commingled assets in the WHX Trust required Defendants to take affirmative actions to prudently establish and maintain their newly independent trust, but they failed to do so. Mangiero Report at 15. Defendants could not wait for the next quarterly report, to see if the trust separation went well, in order to meet their fiduciary duty. Mangiero Report at 9. More than quarterly monitoring was required in the facts and circumstances then existing in the economy, including bank failures, contraction of credit, and liquidity restrictions. Mangiero Report at 10. In addition, Dr. Mangiero testified that during the Fall of 2008 in the financial crisis, retirement committees were meeting more frequently to

6

address the changing conditions.  Dr. Susan Mangiero Deposition, February 28, 2018 ("Mangiero Deposition") at 47-51.  Defendants had a fiduciary obligation to adapt to the changes occurring to the Plans' trust and to the changes occurring in the broader economy.  Defendants did not adapt their practices and thereby breached their fiduciary duty to the participants and beneficiaries.

First, Defendants failed to prepare adequately for the trust separation.  The trust separation was not a simple matter of swapping numbers on a ledger sheet and Defendants could not continue to rely on their past practice of quarterly monitoring.  Mangiero Report at 11.  Defendants could no longer rest as the junior members of the WHX Trust and allow WHX to control the Plans' assets.  Defendants did not obtain any agreements from LaBow in writing or put their directions to him in writing in advance of the trust separation.  Defendants never had a written agreement from Mr. LaBow as to the assets they would receive from the commingled trust.  DiClemente at 44, 45; Halpin at 23, 24.  Instead, Mr. DiClemente stated that they had an "understanding" and that "they trusted Ron."  DiClemente at 44, 87, 88.  Defendants were negotiating the investment management agreement with LaBow until it was signed and backdated on December 5, 2008, more than a month after the independent Severstal Trust was established.  DiClemente at 63-65, EX 16, 17, 18, 19.  Similarly, Defendants did not give LaBow a clear written investment policy to follow prior to the trust separation so that they could benchmark his performance.  DiClemente at 178-79; EX 51, 52; *Severstal I* at 259; Mangiero Report at 22.  Defendants' casual approach to protecting the nearly $40 million in retirement savings of the Plans' participants and beneficiaries failed to meet their fiduciary duty.

Second, Defendants failed to monitor during the trust separation.  Initially, Defendants ignored warning signs that LaBow was not following their directions and that the trust required

7

closer scrutiny than quarterly monitoring. In particular, Defendants signed a letter with WHX to receive a 10% share of each of the commingled trust's investments. DiClemente at 37, 38, EX 6, 7. Defendants directed that the separation of the Plans' share of the commingled WHX Trust was to occur on September 30, 2008. Had Defendants checked, they would have learned that none of this had happened. Defendants only learned that the separation of the Plans' assets had not occurred in a letter from LaBow dated October 22, 2008, over three weeks after the transaction was to have been consummated. DiClemente 45-47, EX 8.

   Defendants were on notice even earlier that LaBow could not be trusted to carry out their directions. Defendants originally understood that the distribution from the WHX Trust to the Severstal Trust would be in cash, but that had failed to occur, as well. Severstal I at 247, 248; DiClemente at 26, 27, EX 2; David Riposo Deposition, February 2, 2012 ("Riposo") at 52-54, EX 8. Defendants' failure on November 3, 2008 to ask any questions about what assets were in the Neuberger Berman account which they accepted into the Severstal Trust is therefore even more inexplicable. Defendants were charged with protecting nearly $40 million in participants' retirement savings but failed to meet their duty to insure that the Plans were being established and funded in the manner they had agreed upon with LaBow and WHX.

   Despite being on notice that Mr. LaBow could not be trusted to carry out Defendants' directions and despite the absence of a written agreement with Mr. LaBow about the assets the Severstal Trust would receive, Defendants made no effort to determine what assets they had authorized Citibank to accept for the Plans. Mr. DiClemente and Mr. Halpin both acknowledged that they did not know what was in the Neuberger Berman account when they accepted these assets. DiClemente at 90; Halpin at 23. Mr. DiClemente admitted also that he could have discovered what assets the Severstal Trust contained at any time after the transfer. DiClemente

at 81.  Moreover, Defendants expected a proportional share of *every* fund held in the WHX Trust – not just the Neuberger Berman account.  DiClemente at 61.  All Defendants received, however, was a request to accept the Neuberger Berman account into the Severstal Trust.  Mr. DiClemente conceded that he did not check on the assets and stated only that "I don't recall why we didn't check.  All I know is that we—we trusted Ron."  DiClemente at 87-88.

Defendants were on notice that the separation of the Plans' assets from the commingled WHX Trust had not occurred as they had expected, but did not ask a single question of LaBow or Citibank regarding what was in the Neuberger Berman account or when the assets from the other funds they expected were being transferred to the Severstal Trust.  Defendants' failure to monitor the transfer on November 3, 2008 and to ask any questions afterward breached their fiduciary duty.  Mangiero Report at 10; Rebuttal Report at 10.

Finally, Defendants failed to monitor LaBow after the trust separation.  Defendants did not understand their role in retaining the fund managers selected by LaBow, as WHX had done, and did not have management agreements in place prior to the trust separation.  Defendants did not know that WHX had contracted with fund managers directly, rather than through LaBow, in the commingled trust.  DiClemente at 59, 122.  Indeed, the investment management agreement Defendants eventually signed with LaBow, states that the Retirement Committee will pay the individual fund managers which LaBow selects.  DiClemente at 65, 66, EX 19 at 4.  Mr. DiClemente stated that "Our preference would have been for Ron to enter into agreements with any investor manager that he chose to retain in order to fulfill his services to us."  DiClemente at 69.  Defendants were only learning their fiduciary duties after the trust separation had occurred and after the Plans had suffered significant losses.

Defendants did not understand their investment policies to be able to effectively monitor LaBow after the trust separation. First, the 10% slice of the WHX Trust assets they were seeking would have violated Defendants' investment policies by having all of the assets with one manager. Mangiero Report at 10, 23, 24; Rebuttal Report at 6, 10, 11. Most significantly, at no time before or after the trust separation did Defendants discuss how the fact that they were now responsible for small plans -- one tenth the size of the commingled WHX Trust -- affected the level of risk they could assume in their investments. Mangiero Report at 9, 10, 17, 18; Rebuttal Report at 12. Defendants failed to understand their role in setting the parameters as to how the Plans' assets could be invested.

In addition to failing to discover that the Plans' assets were undiversified, Defendants also breached their duty to monitor LaBow by failing to discover that the Plans' assets were not being managed. On November 3, 2008, and thereafter, Defendants were alerted that Neuberger Berman had not been contracted to manage the Plans' assets in the Neuberger Berman account. The trustee Citibank, Neuberger Berman, and Mr. LaBow all contacted Defendants to hire Neuberger Berman to begin managing the Plans' assets. DiClemente at 49, 55-62, EX 9, 11, 12, 13, 14, 15. Defendants then engaged in protracted negotiations with Neuberger Berman but never concluded a contract because of a fee dispute. Halpin at 226. Defendants cannot reasonably have believed that Neuberger Berman was managing the assets while negotiating the terms of their contract. Nonetheless, Defendants expressed surprise to learn on December 12, 2008, that Neuberger Berman was not managing the Plans' assets. DiClemente at 66, 67, EX 20. Again, Defendants did not ask a question and did not demand to know from their investment manager LaBow, how the Plans' assets were being managed. Defendants also did not immediately sign the agreement with Neuberger Berman so that they could begin managing the

Plans' assets.  DiClemente at 69-73.  Defendants thereby knowingly allowed the Plans' assets to remain unmanaged during the highly publicized financial crisis.

Appointing fiduciaries have a duty to the participants and beneficiaries to monitor their service providers prudently.  "Defendants' argument that the duty to monitor is not so broad as to go beyond merely appointing and terminating plan fiduciaries is untenable.  The duty to appoint or remove a plan fiduciary would be rendered meaningless if it did not inherently involve an evaluation of the fiduciary's performance vis-a-vis the statutory prudent man standard of care owed by plan fiduciaries to participants."  *Graden v. Conexant Sys., Inc.*, 574 F. Supp. 2d 456, 467 (D.N.J. 2008) (citing *In re Westar Energy, Inc., ERISA Litig.*, No. 03–4032, 2005 WL 2403832, at *24 (D. Kan. Sept. 29, 2005)).  Under ERISA, the "power to appoint carries with it the power to reasonably monitor the individuals who have been appointed."  *Chao v. Constable*, No. 04-1002, 2006 WL 3759749, at *5 (W.D. Pa. Dec. 19, 2006).

Defendants failed to act prudently in monitoring LaBow and to adapt their standard practice of quarterly monitoring to the facts and circumstances surrounding the Plans.  Defendants were establishing an independent trust in the midst of a financial crisis.  Defendants continued to rely on quarterly reports -- as if there were no changes taking place to the Severstal Trust or to the economy as a whole.  Moreover, Defendants did not heed the warning signs that LaBow could not be trusted to carry out their directions and needed closer monitoring, particularly as to the assets received by the Severstal Trust.  Defendants failed to adequately prepare for the trust separation and obtain a written agreement from LaBow as to the assets they would receive.  Defendants failed to agree to the terms of LaBow's duties as investment manager and to give him an investment policy before the trusts separated.  Finally, Defendants failed to recognize that the Plans' assets were not being managed by Neuberger Berman, LaBow, or

anyone else.  Indeed, Defendants did not pay attention to any of these developments until information from Mercer on December 29, 2008 made clear to them the substantial harm that had been taking place to the Plans for the last two months.  DiClemente at 76-78, EX 24.

> C. Defendants Failed to Prudently Monitor Their Investment Manager by Failing to Take Appropriate Corrective Action When They Belatedly Discovered LaBow's Fiduciary Breaches.

This Court has noted that an appointing fiduciary has a duty "to take corrective action when required" as part of its duty to monitor its service provider.  Slip Op. at 27, ECF No. 144. "Moreover, if an appointing fiduciary is relieved from liability simply by implementing monitoring procedures with regular reporting, even when monitoring reveals a need for corrective action but the appointing fiduciary does not act, the duty to monitor is reduced to a mere procedural implementation." *Id.*, at 28.  The appointing fiduciary must take effective action to meet its duty and cannot simply rely on monitoring its service provider alone.  In this case, Defendants were required to fire LaBow to meet their fiduciary duty.  Mangiero Report at 10, 31.

On December 30, 2008, Defendants called LaBow to say that they had just learned that the only asset in the Severstal Trust was the undiversified Neuberger Berman account. DiClemente at 76-78, EX 24.  From December 30, 2008 until May 1 2009, Defendants vacillated as to what to do with LaBow but for four months did not act to protect the participants' retirement funds.  DiClemente at 163.  Defendants knowingly left the Plans' assets in the unmanaged and undiversified Neuberger Berman account until LaBow sold them for cash on March 24, 2009.  Defendants then let the assets sit uninvested as cash, as long as Mr. DiClemente and Mr. Halpin were on the Retirement Committee.  It was up to the new members,

who joined the Retirement Committee after May 1, 2009, to fire LaBow and to diversify the Plans' investments.

Defendants failed to engage in appropriate corrective action after they belatedly discovered the Plans' assets were undiversified and unmanaged on December 29, 2008. LaBow had already not complied with their directions as to the assets the Plans would receive from the WHX Trust and LaBow had left the Plans' assets unmanaged for two months. It is difficult to imagine how Defendants -- with an undisputed obligation to act prudently and in the best interests of the Plans -- could have continued to trust LaBow with the participants' retirement savings after these devastating fiduciary breaches. However, Defendants did not act to remove LaBow or to direct him to sell the Neuberger Berman account and diversify the Plans' assets.

Defendants equivocated in their approach to LaBow after discovering his fiduciary breaches. Defendants wasted weeks attempting to persuade WHX to take back the Neuberger Berman account and give the Plans a retroactive reallocation of their proportional share of the commingled WHX assets they originally expected. DiClemente at 152, 165-66; Halpin at 50. When WHX refused to take the Neuberger Berman account back, Defendants attempted to have LaBow create a mix of investments, which mimicked the WHX asset mix, with other funds. DiClemente at 144, 161. On January 16, 2009, Defendants, however, told LaBow not to take *any* action without Defendants' approval. DiClemente at 135-36, 142, 144-45, EX 36; Halpin at 95-97, EX 28. Defendants reversed course a few weeks later and told LaBow that all investment decisions were his alone. DiClemente at 176-77.

Mr. DiClemente acknowledged that LaBow during the volatile times at issue was not responsive to Defendants' requests, yet Defendants did not act to remove him. DiClemente at 154. Indeed Mr. Halpin stated that he did not want to remove LaBow in January or February

13

2009. Halpin at 78, 79, 101, 143. Defendants had full knowledge during this period that the Plans' assets remained in the undiversified Neuberger Berman account -- and were not being managed by LaBow or by anyone else -- but chose to allow the situation to continue without taking action to protect the value of the retirement savings of the participants and beneficiaries. After LaBow finally sold the Neuberger Berman account for cash on March 24, 2009, Defendants continued to allow the Plans' assets to remain unmanaged and undiversified. Halpin at 214-15. Not until after new members had replaced Mr. DiClemente and Mr. Halpin did the Retirement Committee take action to remove LaBow and to diversify the Plans' assets. *Severstal I* at 260.

Defendants' duty to the participants and beneficiaries did not allow them to ignore their investment manager's performance and then fail to take action to protect the Plans' assets. The duty to monitor requires a fiduciary to act when she/he discovers that a service provider has failed to comply with its contract, the plan's documents, or the requirements of ERISA. *Coyne & Delany Company v. Selman,* 98 F.3d 1457, 1465-66 (4th Cir. 1996)*; Martin v. Feilen*, 965 F.2d 660, 669-70 (8th Cir. 1992), *cert. denied,* 506 U.S. 1054 (1993); *Atwood v. Burlington Industries Equity, Inc*., No. 2:92CV00716, 1994 WL 698314, *6 (M.D.N.C. Aug. 3, 1994). "The duty [to monitor] exists so that a plan administrator or sponsor cannot escape liability by passing the buck to another person and then turning a blind eye." *Howell v. Motorola, Inc*., 633 F.3d 552, 573 (7th Cir. 2011). Fiduciaries cannot "abdicate their duties under ERISA merely through the device of giving their lieutenants primary responsibility for the day to day management of the trust." *Leigh v. Engle*, 727 F.2d 113, 134–35 (7th Cir. 1984), *cert. den*. 489 U.S. 1078 (1989). Rather a fiduciary that assigns responsibility is "obliged to act with an appropriate prudence and reasonableness in overseeing" the person or entity to whom he assigned that responsibility. *Id*.

Part of an appointing fiduciary's duty to monitor is the duty to replace a service provider who is acting detrimentally to the plan. "The duty to monitor carries with it, of course, the duty to take action upon discovery that the appointed fiduciaries are not performing properly." *Liss v. Smith*, 991 F. Supp. 278, 311 (S.D.N.Y. 1998); *see* Slip Op. at 27, ECF 144. By its failure to take appropriate steps to remove fiduciaries "who it knew were breaching their fiduciary obligations to the Fund, defendant . . . failed to act solely in the interest of the Fund's participants and beneficiaries . . . in violation of ERISA §§ 404(a)(1)(A) and (B)." *Whitfield v. Tomasso*, 682 F.Supp. 1287, 1304-05 (E.D.N.Y. 1988). A failure to monitor appointees and to remove those who do not perform renders the appointing fiduciary jointly and severally liable for the appointed fiduciaries' breaches. *Liss*, 991 F.Supp. at 311.

Defendants plainly failed to take the actions necessary to protect the retirement savings of the Plans' participants and thereby breached their duty to act after discovering LaBow's fiduciary breaches. Defendants did not replace LaBow and allowed the Plans' assets to sit undiversified and unmanaged first in the Neuberger Berman account and later as cash.

    D. Defendants Do Not Contest Dr. Susan Mangiero's Calculations of the Damages Caused to the Plans by Their Fiduciary Breaches.

"[O]nce an ERISA plaintiff has shown a breach of fiduciary duty and a loss to the plan, the burden shifts to the fiduciary to prove that such loss was not caused by its breach, that is, to prove that the resulting investment decision was not objectively prudent." *Brotherston v. Putnam Investments*, LLC, __F.3d__ (No. 17-1711, 1st Cir. October 15, 2018). "[O]nce a fiduciary is shown to have breached his fiduciary duty and a loss is established, he bears the

burden of proof on loss causation." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 363 (4th Cir. 2014)[1].

As discussed above, the evidence adduced in this case demonstrates that Defendants breached their duty to monitor LaBow and their duty of prudence in accepting undiversified assets into the Severstal Trust. Dr. Mangiero determined in her report that the Plans lost between $6,775,243 and $7,823,373 from accepting the Neuberger Berman account on November 3, 2008 through May 1, 2009. Mangiero Report at 34. Defendants have not disputed Dr. Mangiero's calculations or that the Plans suffered a loss. Indeed, Judge Swain in *Severstal I* found that the Plans lost approximately $15 million (*Severstal I* at 270), and the Retirement Committee is currently in the process of collecting on that judgment against LaBow as well. Defendants have only argued in their motion for summary judgment that they met their duty to monitor so, therefore, there is no causation. Defendants have not met their burden on the issue of damages and the evidence produced demonstrates that their fiduciary breaches caused in excess of $6 million in losses to the retirement savings of the Plans' participants and beneficiaries.

---

1 The Third Circuit Court of Appeals has not yet ruled on the burden of proof on causation. The Secretary supports the position taken by the First, Fourth, Fifth, and Eighth Circuits. See discussion including contrary authority at pages 11-20 of the Secretary's Amicus Brief in *Tatum*, Exhibit 14.

### III. CONCLUSION

Based on the above discussion, Defendants' motion for summary judgment should be denied.

        Respectfully submitted,

        KATE S. O'SCANNLAIN
        Solicitor of Labor

        OSCAR L. HAMPTON III
        Regional Solicitor

        JODEEN M. HOBBS
        Regional Counsel for ERISA

        /s/ John M. Strawn
        Attorney, PA ID # 49789

        Office of the Solicitor
        Suite 630 East, The Curtis Center
        170 South Independence Mall West
        Philadelphia, PA 19106-3306
        Telephone No. (215) 861-5145
        Facsimile No. (215) 861-5162
        strawn.john@dol.gov
        zzsol-phi-docket@dol.gov

        U.S. DEPARTMENT OF LABOR

        SCOTT W. BRADY
        United States Attorney

        /s/ Paul E. Skirtich
        Assistant United States Attorney
        PA ID # 30440
        U.S. Department of Justice
        United States Attorney's Office
        700 Grant Street, Suite 400
        Pittsburgh, PA 15219
        paul.skirtich@usdoj.gov

        Attorneys for Plaintiff

        October 25, 2018