# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

EUGENE SCALIA, SECRETARY OF           )
LABOR, UNITED STATES DEPARTMENT       )
OF LABOR,                             )
                                      )
                    Plaintiff,        )      Civil Action No. 14-1494
                                      )      Judge Nora Barry Fischer
        v.                            )
                                      )
WPN CORPORATION; RONALD LABOW;        )
SEVERSTAL WHEELING, INC.              )
RETIREMENT COMMITTEE; MICHAEL         )
DICLEMENTE; DENNIS HALPIN;            )
WHEELING CORRUGATING COMPANY          )
RETIREMENT SECURITY PLAN; and         )
SALARIED EMPLOYEES' PENSION PLAN      )
OF SEVERSTAL WHEELING, INC.,          )
                                      )
                    Defendants.       )

## MEMORANDUM OPINION

## I.      INTRODUCTION

The Secretary of Labor of the United States Department of Labor ("DOL") brings this action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA") alleging that while acting as fiduciaries and investment managers of the Wheeling Corrugating Company Retirement Security Plan and Salaried Employees' Pension Plan of Severstal Wheeling, Inc. (the "Plans"), Defendants Severstal Wheeling, Inc. Retirement Committee ("Retirement Committee"), Michael DiClemente ("DiClemente"), and Dennis Halpin ("Halpin") (collectively "Defendants") violated ERISA causing a loss of approximately $7 million to the Plans. Presently before the Court are cross-motions for summary judgment, (Docket Nos. 179, 182), which are ripe for disposition. The Court having considered the parties' positions and evaluated the evidence in light of the standard governing motions for summary judgment and for

the following reasons, grants Defendants' motion for summary judgment (Docket No. 179), and denies the DOL's cross-motion as moot (Docket No. 182).

## II.     RELEVANT FACTUAL BACKGROUND

This Court must first address Defendants' objections to the DOL's response to their concise statement of material facts (Docket No. 195), the DOL's response to those objections (Docket No. 201), and Defendants' reply (Docket No. 204).  Defendants specifically object to the DOL's responses to Paragraphs 31, 33, 42-43, 47, 50, 86, 89-94, 96-100, and 102-03 and argue that each of the facts in those paragraphs should be deemed admitted.  (Docket No. 195 at 3).

Federal Rule of Civil Procedure 56(e), provides that where a party "fails to properly address another party's assertion of fact" the court may "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it." FED. R. CIV. P. 56(e)(1), (3).  To this end, our Local Civil Rules require a responding party to admit or deny each fact in the moving party's concise statement of material facts using support from the record, LCvR 56(C), and uncontroverted material facts may "*be deemed admitted* unless specifically denied or otherwise controverted by a separate concise statement of the opposing party," LCvR 56.E (emphasis added).[1]  This Chamber's Practices and Procedures provide likewise.  *See Practices & Procedures of Judge Fischer*, § II.E.  While this Court agrees with Defendants that some of the DOL's responses are deficient under our Local Rules and this Chamber's Practices and Procedures, whether or not this Court deems those facts admitted does not change the outcome of this case. Accordingly, the Court will decline to do so and instead, rely on the record as a whole to determine the applicable material facts in Paragraphs 31, 33, 42-43, 47, 50, 86, 89-94, 96-100, and 102-03.

---

[1]      The Court having granted Defendants' motion for summary judgment, denies Defendants' request for further supplemental briefing.  (Docket No. 195 at 6-7).

The Court now summarizes the facts instrumental to its decision.

Prior to November 2008, the Retirement Committee operated as the Wheeling-Pittsburgh Steel Corporation Retirement Committee and was managed as part of the WHX Investment Trust ("WHX Trust"). (Docket Nos. 190 ¶ 16; 192 ¶¶ 3, 5).[2] The WHX Trust was a combined trust that held pension assets for two entities, Wheeling-Pittsburgh Steel Corporation and WHX Corporation. (Docket No. 192 ¶¶ 6, 8). Beginning in 2004, the WHX Trust was managed by Ronald LaBow ("LaBow") and his company, WPN Corporation ("WPN"), who were given "complete, unlimited and unrestricted management authority with respect to the investment of the [WHX Trust]."[3] (Docket Nos. 190 ¶ 20; 192 ¶¶ 6, 8, 10, 11).

In June 2008, Citibank, N.A., which had been operating as the custodial trustee for the WHX Trust, announced that it would be exiting the trust business at the end of the year. (Docket Nos. 190 ¶ 17-18; 192 ¶ 7). As a result of Citibank's decision, the Plans' assets were to be separated from the WHX Trust and deposited into a new independent Severstal Trust. (Docket No. 190 ¶ 18). At that time, the Retirement Committee numbered two members, DiClemente and Halpin, both of whom were named fiduciaries for the Plans. (Docket Nos. 190 ¶¶ 8-13; 192 ¶¶ 1, 4). The Plans consisted of two pension plans, the Wheeling Corrugating Company Retirement Security Plan and the Salaried Employees Pension Plan of Severstal-Wheeling, Inc., both of which were overseen by the Retirement Committee. (Docket Nos. 190 ¶¶ 1, 7; 192 ¶¶ 1-2). DiClemente and Halpin were both members of the Wheeling-Pittsburgh Steel Corporation Retirement Committee prior to becoming members of Severstal's Retirement Committee. (Docket No. 192 ¶ 2).

---

[2] The pension plans were funded by direct employer contributions to provide retirement benefits to employees on a regular and long-term basis. (Docket No. 190 ¶ 2).

[3] This investment agreement was modified thrice thereafter. (Docket No. 192 ¶ 13).

Upon learning that Citibank would be resigning, DiClemente approached LaBow about possibly continuing on as the investment manager for the Plans, and LaBow responded with interest. (Docket No. 192 ¶¶ 34-35). They discussed the Retirement Committee's investment goals including its desire to receive *the same percentage interest of each* of the assets held within the WHX Trust. (*Id.* ¶ 36; Docket No. 190 ¶ 23). On September 30, 2008, DiClemente again reminded LaBow of the Severstal Trust's desire for "the same percentage allocations as existed in the WHX [Trust]." (Docket No. 190 ¶ 25). When asked why three weeks later he still had not separated the WHX Trust's assets, LaBow responded that he had not done so due to the volatility in the market but he would attempt to make the transfer on November 3, 2008. (*Id.* ¶ 26; Docket No. 184-13 at 11).

Thereafter, LaBow and WPN entered into a written agreement, the Third Amendment to the Severstal Wheeling, Inc. Investment Management Agreement, with Severstal Wheeling Inc., successor to Wheeling-Pittsburgh Steel Corporation. (Docket No. 181-6). While LaBow signed the agreement on December 5, 2008, he made November 1, 2008 its effective date. (*Id.* ¶¶ 14, 17; Docket No. 190 ¶ 21). LaBow testified that in signing the agreement, he was simply "memorializing" the already established relationship between the parties and had been fulfilling his investment management duties for the "Plans" since November 1, 2008.[4] (Docket No. 192 ¶ 18). The Third Amendment to the Severstal Wheeling, Inc. Investment Management Agreement incorporated language from LaBow and WPN's original agreement with WHX. (Docket No. 190-7). Specifically incorporated was Paragraph 7, granting WPN the authority

> (a) To invest and reinvest the [WHX Trust] at such time and in such manner as [WPN] in the complete and unlimited exercise of its discretion shall determine;

---

[4] LaBow's and WPN's duties under the Third Amendment to the Severstal Wheeling, Inc. Investment Management Agreement were virtually identical to those in the Second Amendment to the Severstal Wheeling, Inc. Investment Management Agreement. (Docket Nos. 181-5, 190-7).

(b) To purchase and sell securities for the [WHX Trust] in the name of [WHX], for the account of [WHX] and at the sole risk of [WHX];

(c) To arrange for the delivery of and payment for any such investments, including securities, bought and sold for the account of [WHX Corporation];

(d) In effecting any such investments, reinvestments, purchases and sales, to use and obtain the assistance and services of such brokers, dealers, investment bankers, underwriters and other firms, enterprises and services as [WPN] in its discretion shall designate or select[.]

(Docket Nos. 181-3; 190-7).

Despite the fact that LaBow knew that the Severstal Trust wanted a proportionate share of the combined trust's assets, LaBow *unilaterally* decided to acquire the *entire* Neuberger Berman Account ("Account") for the Severstal Trust.[5] (Docket No. 184-8 at 20; 190 ¶ 27). This Account was not diversified. (Docket No. 190 ¶ 28). Indeed, approximately 97% of its $31,446,845 value was invested in eleven large cap energy stocks. (Docket No. 190 ¶¶ 28-29). To effectuate the transfer, LaBow needed DiClemente to send a letter to Citibank requesting that the transfer be made. (Docket Nos. 190-5 ¶¶ 8-9; 197-3 at 4). DiClemente complied believing LaBow had negotiated the transfer of the Account in accordance with the Retirement Committee's instructions. (Docket Nos. 181-9 at 3). He relied on LaBow's representations rather than review the assets being transferred. (*See id.*) Also unbeknownst to DiClemente, per the terms of the transfer, Neuberger Berman would not be responsible for managing the Account. (Docket Nos. 181-9 at 3; 190 ¶ 51).

It was not until December 12, 2008, that the Retirement Committee discovered that Neuberger Berman was not managing the Severstal Trust despite it having managed those very same assets as part of the WHX Trust. (Docket Nos. 184-11 at 53-54; 190 ¶ 54). It then learned

---

[5] LaBow also did not tell the Retirement Committee that Neuberger Berman would not be managing the assets. (Docket No. 184-8 at 20; 190 ¶ 27).

on December 29, 2008, that it had not acquired a proportionate share of the WHX Trust's assets after DiClemente was so notified by Mercer Investment Consulting, Inc. ("Mercer").[6]  (Docket Nos. 181-9 at 3; 190 ¶ 56; 192 ¶ 25).

The next day, DiClemente contacted LaBow concerned that the Account was not diversified and contacted Sally King, the Retirement Committee's ERISA lawyer, to help resolve the issue.[7]  (Docket Nos. 184-10 at 64-65, 72; 192 ¶ 60).  King devised a four-part strategy to proceed: (1) LaBow would negotiate a fee agreement with Neuberger Berman, which DiClemente would execute; (2) LaBow would request the most recent statement from Neuberger Berman; (3) DiClemente would obtain a copy of a recent audit report; and (4) King would draft a memo outlining the guidelines to be implemented between LaBow and DiClemente relating to the "procedural issues" that had arisen under the Third Amendment to the Severstal Wheeling, Inc. Investment Management Agreement.  (Docket No. 184-10 at 72).

A week later, DiClemente repeated to LaBow that the Retirement Committee wanted him to reallocate the Severstal Trust's assets to reflect the same proportionality utilized in the former WHX Trust.  (Docket No. 192 ¶ 62).  LaBow, however, informed King, DiClemente, and Halpin that he was unable to reset the portfolio; consequently, DiClemente, Halpin, and King told him to devise a new plan to diversify the Severstal Trust's portfolio.  (*Id.* ¶ 63; Docket No. 184-10 at 75-76).  They emphasized that WPN needed to preserve as much of the trust's value as possible.  (Docket Nos. 184-10 at 75-76; 192 ¶ 63).  They also instructed LaBow that he should use his discretion in determining when to liquidate the Account.  (Docket No. 184-10 at 76).  It is

---

[6]     Mercer is a nationally known and respected investment consultant firm that performed periodic portfolio reviews for the Retirement Committee.  (Docket Nos. 192 ¶ 29).

[7]     Sally King is a partner at McGuireWoods, a large multi-office law firm.  She has advised over 50 ERISA covered pension plans on ERISA compliance.  *Severstal Wheeling, Inc. Retirement Comm.*, 119 F. Supp. 3d at 250; *see Pa. Dep't of Human Sers. v. United States*, 897 F.3d 497, 514 (3d Cir. 2018) (providing "[a] court may take judicial notice of an adjudicative fact if that fact is not subject to reasonable dispute") (citing FED. R. EVID. 201).

noteworthy that at the time of this meeting, any loss in value the trust had incurred as a result of the transfer of the Account had been almost fully recovered.  (*Id.*)

Just over a week later, on January 16, 2009, the Retirement Committee members, in a teleconference with LaBow, explained that they wanted LaBow to reallocate the assets using funds for which there would be no transition issues.  (Docket No. 190 ¶ 64).  LaBow responded that this request might not be possible but provided a list of funds that he could use to reallocate the assets. (*Id.*)  The Retirement Committee reminded LaBow that it wanted a formal plan in place before he took any action.  (*Id.*)

In a January 20, 2009 letter to LaBow, the Retirement Committee requested that he prepare a written plan to reallocate the assets and share this plan with the WHX Pension Investment Committee.  (Docket Nos. 184-10 at 80; 192 ¶ 65).  Specifically, LaBow was told to "(a) identify in writing those accounts that cannot or should not be proportionally allocated" between the . . . Plans and the WHX Plans, "(b) provide the reason(s) for such treatment, and (c) indicate how [he was] recommending equitable allocation of those assets among the remaining (or substitute) investments."  (Docket Nos. 184-10 at 80).

Six days later, the Retirement Committee convened a meeting at LaBow's request and asked him to identify in writing why it was no longer possible for the Severstal Trust to invest in certain funds he previously stated it could.  (Docket Nos. 192 ¶ 65).  In response, LaBow sent a letter dated February 4, 2009 to the Retirement Committee explaining why he failed to transfer a proportionate share and what his plan was going forward.  (Docket Nos. 181-12; 192 ¶ 67).  A week later, the Retirement Committee convened another call with LaBow and discussed what could be done to diversify the Account.  (Docket Nos. 184-10 at 92; 192 ¶ 68).  At the same time, DiClemente asked LaBow via email for details on any investment strategy, process, discipline,

manager, biographies and tenures, and historical performance for two funds that LaBow recommended, Mason and Capital Defense. (Docket No. 192 ¶ 69). Two days later, DiClemente followed up with LaBow asking for the investment materials the Retirement Committee had requested relating to certain funds in which he recommended they invest. (*Id.* ¶ 70). Thereafter, on February 24, 2009, King, in a letter to LaBow, reminded him that the Retirement Committee wanted to sign a fee agreement with Neuberger Berman and asked LaBow to provide the Committee with regular performance reports. (Docket Nos. 184-10 at 108-09; 192 ¶ 71).

On March 12, 2009, King thanked LaBow for responding to her recent email and stated she was looking forward to the plan on diversification. (Docket No. 192 ¶ 72). About a week later, Halpin and LaBow exchanged emails in which LaBow described the performance of their assets and Halpin expressed that he could assist LaBow, if needed, in liquidating the Account. (*Id.* ¶ 73). Halpin followed by providing LaBow with fund information and noting he could process any necessary paperwork. (*Id.* ¶ 74). As such, the Retirement Committee was in almost daily contact with LaBow. (*Id.* ¶ 76).

Halpin testified that he did not want to remove LaBow in January or February 2009 as the Retirement Committee was still operating under the belief that the trust could be reset. (Docket Nos. 184-14 at 22; 190 ¶ 65). DiClemente testified likewise. (Docket No. 184-14 at 38). Hence, the Plan remained invested in the undiversified Account from November 3, 2008 until March 24, 2009, when LaBow sold the Account for cash. (Docket No. 190 ¶¶ 66-67). LaBow was ultimately fired on or about May 19, 2009, after new members had replaced DiClemente and Halpin on the Retirement Committee.[8] (*Id.* ¶ 70).

---

[8] The evidence the DOL cites in support of this fact is Judge Swain's Opinion and Order. (Docket No. 184 ¶ 70). In her Opinion and Order, Judge Swain further writes that even "[t]he new Severstal Retirement Committee did not immediately step in to reinvest the Severstal Trust's assets because it wanted to give LaBow another chance to provide an investment plan." *Severstal Wheeling, Inc. Ret. Comm. v. WPN Corp.*, 119 F. Supp. 3d 240, 260 (S.D.N.Y.

In advancing its claim, the DOL proffered expert testimony in the person of Dr. Susan Mangiero who received her Ph.D. in finance from the University of Connecticut and is a chartered Financial Analyst. (Docket No. 178-9 at 1, 4).[9] It is her opinion that the Retirement Committee should have communicated a strategy for diversification that complied with ERISA to LaBow prior to the transfer of the assets and that DiClemente or Halpin should have confirmed that the assets received were the correct ones. (Docket No. 181-30 at 6). She believes that LaBow backdating the investment management agreement was a "red flag". (Docket No. 178-9 at 11). Further, once the Retirement Committee learned of this misadventure, she states that the appropriate corrective action was to first contact LaBow to discuss the problem. (Docket No. 181-8 at 27-28). Although typically it is appropriate for committees to provide an investment manager several months or quarters to regain his or her footing after a misadventure, Dr. Mangiero opines that LaBow should have been terminated prior to May 2009 but she could not provide a specific date by which it should have occurred. (Docket Nos. 181-8 at 25; 181-30 at 13). Because the markets were in flux and the Severstal Trust was about to undergo a major change, she stresses that the duty to monitor was especially important. (Docket No. 178-9 at 9-11). She concludes that the Retirement Committee's breach of fiduciary duty resulted in losses between $6,775,243 and $7,823,373. (Docket No. 178-9 at 41).

Dr. Bruce Stangle countered. He has a Ph.D. in Applied Economics from the Sloan School of Management at M.I.T. and is an economist at an international economic consulting firm. (Docket No. 181-7 at 3, 14). Dr. Stangle opines that the Retirement Committee acted in accordance

2015).
9       The Court previously found that Dr. Mangiero was a sufficiently qualified expert. (Docket Nos. 173, 174). The DOL has not challenged Dr. Stangle's qualifications and having reviewed his qualifications, this Court finds he is a sufficiently qualified expert as well. (Docket No. 181-7); *see* FED. R. EVID. 702; *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993); *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *Baker v. Sun Life & Health Ins. Co.*, 767 F. App'x 215, 216-17 (3d Cir. April 25, 2019).

with industry custom fulfilling its duty to monitor when it hired an experienced investment manager and had a practice of holding meetings, making decisions, and documenting decisions. (*Id.* at 6). He praises the Retirement Committee's hiring of a nationally reputable investment firm to provide quarterly reports as well as the hiring of McGuireWoods to provide additional leadership, advice, and monitoring once the Retirement Committee learned of the misadventure. (*Id.* at 7). Furthermore, he disagrees that LaBow should have been terminated sooner explaining that deliberation is necessary before terminating an investor and committees typically afford investment managers several months to regain their footing. (*Id.* at 8, 16). Moreover, Dr. Stangle cautions that given the volatility in the market, research and prudence were necessary to correct LaBow's misstep. (*Id.* at 8-9). According to him, had LaBow invested in a proportional share of the WHX Trust, the performance of the Severstal Trust's portfolio would have outperformed the S&P 500 by over 15%. (Docket No. 192 ¶ 106).

III.    RELEVANT PROCEDURAL HISTORY

The DOL filed its initial complaint on October 31, 2014. (Docket No. 1). On March 27, 2015, after the defendants filed separate motions to dismiss, the DOL filed an Amended Complaint. (Docket No. 28). On April 10, 2015, this Court issued an order staying the proceedings until the issuance of a decision on the merits in a lawsuit filed by the Retirement Committee and its members against LaBow and WPN in the United States District Court for the Southern District of New York. (Docket No. 37; *Severstal Wheeling, Inc. v. WPN Corp.*, No. 1:10-cv-954). Following a bench trial, District Judge Laura Taylor Swain issued a decision dated August 10, 2015, finding that WPN and LaBow breached their fiduciary duties under ERISA and entered judgment for $15,016,327.74. *Severstal Wheeling, Inc. Ret. Comm. v. WPN Corp.*, 119 F. Supp. 3d 240 (S.D.N.Y. 2015). That decision was affirmed by the United States Court of Appeals for

the Second Circuit on August 30, 2016. *Severstal Wheeling, Inc. v. WPN Corp.*, 659 F. App'x 24 (2d Cir. 2016).[10] The stay in the instant case was lifted that same day. (Docket No. 97). From August 18, 2015 until August 30, 2016 this case was referred to mediation with then Chief Magistrate Judge Maureen Kelly.[11] (Docket No. 96)

By order dated September 14, 2016, the DOL's claims against the Retirement Committee based on any breaches, violations, actions, or inactions occurring on or after May 1, 2009 were dismissed with prejudice pursuant to an agreement between the Retirement Committee and the DOL. (Docket No. 104). Six days later, the Wheeling Corrugating Company Retirement Security Plan and the Salaried Employees' Pension Plan of Severstal Wheeling, Inc. were denominated as nominal parties on the docket. (Docket No. 112).

On October 31, 2016, a Motion to Dismiss Amended Complaint or, in the alternative, Motion for Summary Judgment was filed by Defendants. (Docket No. 124). This Court granted the motion as to the DOL's failure to invest and co-fiduciary liability claims but denied it as to the failure to monitor claim. (Docket No. 144). The Court also granted the DOL's request for leave to file a second amended complaint and, specifically, permitted the DOL to reassert and restate its failure to invest claim by pleading that the purpose of backdating the Third Amendment to the Severstal Wheeling, Inc. Investment Management Agreement was to relieve Defendants from liability during a time when they, in fact, retained control over the assets. (Docket Nos. 144 at 12; 145).

On June 28, 2017, the DOL filed its Second Amended Complaint against DiClemente,

---

[10]      Judge Swain provided a detailed recitation of the facts in her Opinion and Order and her findings were affirmed by the Second Circuit. *Severstal Wheeling, Inc. Ret. Comm. v. WPN Corp.*, 119 F. Supp. 3d 240 (S.D.N.Y. 2015), *aff'd*, 659 F. App'x 24 (2d Cir. 2016). The issue in the instant case is whether Defendants breached their duty to monitor, which was not addressed by Judge Swain. The Court recites only those material facts in this Court's record that are necessary to resolve the narrow issue before this Court.

[11]      The Western District of Pennsylvania requires parties to engage in ADR. LCvR 16.2.E.

Halpin, LaBow, the Plans, the Retirement Committee, and WPN. (Docket No. 148). Despite having the opportunity to properly plead a failure to invest claim, the DOL opted not to do so by failing to plead that the backdating of the agreement was done solely for the purpose of relieving DiClemente, Halpin, and the Retirement Committee of liability. (*Id.*) Defendants filed an Answer denying liability and filed a cross-claim against LaBow and WPN.[12] (Docket No. 151). Default Judgment on Defendants' Cross-Claim against LaBow and WPN was entered on September 29, 2017. (Docket No. 159). Discovery ensued over the next year.[13]

The present summary judgment motions and supporting documents were filed in September and October 2018. (Docket Nos. 179-84). The parties filed responses in opposition (Docket Nos. 190-93), replies (Docket Nos. 194-97), and sur-replies. (Docket No. 199-200). As discussed in Section II, Defendants also filed objections to the DOL's responses to their concise statement of material facts (Docket No. 195), the DOL responded (Docket No. 201), and Defendants filed a reply (Docket No. 204).

A hearing was held on January 8, 2019, and a transcript of that hearing was filed on February 8, 2019. (Docket No. 206). On May 6, 2019, this Court ordered supplemental briefing in light of the Court of Appeals for the Third Circuit's decision in *Sweda v. University of*

---

[12] Although the DOL did not request a jury trial in its Second Amended Complaint, Defendants demanded one in their Answer. (Docket Nos. 148, 151). The majority of circuit courts have held that there is no Seventh Amendment right to a jury trial under the ERISA statute. 9 ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2316 (3d ed. Aug. 2019). The Court of Appeals for the Third Circuit has found that "ERISA's applicability . . . determines such entitlements as those to a jury trial," *McCann v. Unum Provident*, 907 F.3d 130, 142 (3d Cir. 2018) (citing *Cox v. Keystone Carbon Co.*, 894 F.2d 647, 650 (3d Cir. 1990)), and that where an ERISA claim is premised on a section of the statute that only affords equitable relief, there is no right to a jury trial, *Cox*, 894 F.2d at 650. The Third Circuit has not addressed whether there is a right to a jury trial under 29 U.S.C. § 1104 (the section at issue in this case); however, two district courts in this circuit, the United States District Court for the Eastern District of Pennsylvania and the United States District Court of New Jersey, have held that there is not. *In re Allergan ERISA Litig.*, Master File No. 17-1554, 2018 WL 8415676, at *7 (D.N.J. July 2, 2018); *Cureton v. Verizon Serv. Corp.*, 2005 WL 1785302, Civil Act. No. 2:05 CV 00213, at *5 (E.D. Pa. July 25, 2005). This Court agrees with its sister courts' rationale in that the damages available under this section of the statute and that the DOL seeks are restitutionary in nature and are premised on the law of trusts, which is equitable in nature. *In re Allergan ERISA Litig.*, 2018 WL 8415676, at *7; *Cureton*, 2005 WL 1785302, at *5.

[13] There were various delays in this case due to LaBow's ill health. (Docket No. 149).

*Pennsylvania*, 923 F.3d 320 (3d Cir. 2019).  On May 29, 2019, the DOL filed its supplemental brief (Docket No. 210), and Defendants filed their supplemental brief on June 4, 2019 (Docket No. 211).  Hence, the issues have been thoroughly vetted.

IV.  LEGAL STANDARD

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine dispute of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  The benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, deposition testimony, admissions, and/or interrogatory answers to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing FED. R. CIV. P. 56(c)(1)(A)).

## V.     DISCUSSION

Both sides maintain that they are entitled to summary judgment on the DOL's remaining claim, the failure to monitor. The DOL argues that Defendants breached their fiduciary obligations to the Severstal Trust in two ways. (Docket Nos. 183, 193). First, they allegedly breached their duty to ensure that the assets they received from the WHX Trust were appropriately diversified. (Docket Nos. 183 at 1-2; 193 at 3-6). This argument is premised on the DOL's contention that there was no contract between WPN and LaBow at the time the Account was transferred. (Docket No. 183). This Court expressly rejected this argument in its June 7, 2017 Memorandum Opinion. (Docket No. 148). Moreover, despite giving the DOL the opportunity to file a Second Amended Complaint properly stating a failure to invest claim, the DOL chose not to do so.[14] (Docket Nos. 144 at 12; 148). Therefore, the DOL's first argument is without merit. Second, the DOL argues that Defendants breached their fiduciary duty by failing to monitor LaBow and WPN and remove them when LaBow failed to properly invest the trust in accordance with their instructions. (Docket

---

[14]     The DOL has not even attempted to show "good cause" under Rule 16 to permit a third amendment. *See McWreath v. Range Resource—Appalachia, LLC*, 81 F. Supp. 3d 448, 47 (W.D. Pa. 2015). Leave to amend at this juncture would be both procedurally and substantively defective. *McWreath*, 81 F. Supp. 3d at 472; *see Graham v. Progressive Direct Ins. Co.*, 271 F.R.D. 112, 118 (W.D. Pa. 2010) (quotation omitted) ("once the pretrial scheduling order's deadline for filing motions to amend the pleadings has passed, a party must, under Rule 16(b) demonstrate 'good cause' for its failure to comply with the scheduling order before the trial court can consider, under Rule 15(a), the party's motion to amend its pleading").

Nos. 183, 193). Defendants respond that they fulfilled their duty to monitor by implementing a routine monitoring procedure, adhering to it, reviewing the reports from Mercer, identifying LaBow's misadventure contained therein, and taking corrective action with the assistance of counsel. (Docket No. 180). As noted above, the Court finds for the Defendants and against the DOL on this issue for the reasons that follow.

The duty to monitor "exists separate and apart from the trustee's duty to exercise prudence in selecting investments." *Tibble v. Edison Intern.*, 135 S.Ct. 1823, 1828 (2015) (*Tibble III*). A failure to monitor claim is derivative in nature and is premised on an earlier breach of a fiduciary duty. *In re Constellation Energy Grp., Inc.*, 738 F. Supp. 2d 602, 614 (D. Md. 2010).[15] Stated another way, for a trustee to be liable for the failure to monitor, there must be an "underlying breach of the duties imposed under ERISA[.]" *In re Allergan ERISA Litig.*, Master File No. 17-1554, 2018 WL 8415676, at *7 (D. N.J. July 2, 2018) (quoting *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 68 (2d Cir. 2016)). By order dated July 16, 2019, this Court granted the DOL's motion for summary judgment finding that LaBow and WPN breached their fiduciary duty to the Severstal Trust. (Docket No. 212). In so holding, this Court applied the doctrine of collateral estoppel finding that (1) whether WPN and LaBow breach their fiduciary duty in violation of § 404(a)(1)(A) and (B) was previously decided by the Southern District of New York and the Second Circuit; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment. (*Id.*) Given the fact that this Court already found that LaBow and WPN breached their fiduciary duty to the trust, the DOL's claim against the remaining defendants can proceed to the merits.

---

[15] Fiduciaries have a duty to exercise "'the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" *Sweda*, 923 F.3d at 328 (quoting 29 U.S.C. § 1104(a)(1)(B)).

The power to appoint and dismiss an investment fiduciary "carries with it a duty 'to monitor appropriately' those subject to removal." *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996) (quoting *Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*, 805 F.2d 732, 736 (7th Cir. 1986); *Leigh v. Engle*, 727 F.2d 113, 135 (7th Cir. 1984)).

> A fiduciary's [monitoring] process must bear the marks of loyalty, skill, and diligence expected of an expert in the field. It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions. '[A] pure heart and an empty head are not enough.'

*Sweda*, 923 F.3d at 329 (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007)) (emphasis added). And, a "failure to 'monitor . . . investments and remove imprudent ones' may constitute a breach." *Sweda*, 923 F.3d at 328 (quoting *Tibble III*, 135 S.Ct. at 1828-29 (2015)). Consequently, a trustee may not assume that because the investments were legal and proper when purchased that they will remain so indefinitely. *Tibble III*, 135 S.Ct. at 1828 (citing A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684, pp. 145–146 (3d ed. 2009) (Bogert 3d)). Rather,

> [a]t reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan.

29 C.F.R. § 2509.75–8; *see Whitfield v. Cohen*, 682 F. Supp. 188, 196 (S.D. N.Y. 1988) (citing G. Bogert, Trusts and Trustees, § 557 at 155 (Rev. 2d ed. 1980)) ("A fiduciary must ascertain within a reasonable time whether an agent to whom he has delegated a trust power is properly carrying out his responsibilities").[16] Fiduciaries are also expected to "understand and monitor plan expenses." *Sweda*, 923 F.3d at 329.

---

[16]  "Furthermore, there may be times when a reasonable fiduciary suspects an imprudent investment, but waits until she engages in a regularly scheduled systematic review to confirm her suspicion and properly reinvest the funds elsewhere." *Tribble v. Edison Int'l*, CV 07-5359 SVW, 2017 WL 3523737, at *12 (C.D. Cal. Aug. 16, 2017).

But, an appointing authority is only personally liable for a loss if something puts that person on notice of a possible misadventure. *Coyne & Delany Co.*, 98 F.3d at 1466 n.10 (citing *Newton v. Van Otterloo*, 756 F. Supp. 1121, 1132 (N.D. Ind. 1991)). To this end, "fiduciaries must give 'appropriate consideration to those facts and circumstances that . . . the fiduciary knows or should know are relevant to the particular investment or investment course of action involved," *id.* (quoting 29 C.F.R. § 2550.404a-1(b)(1)(i)), "[b]ecause the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts", *see Fifth Third Bancorp v. Dudenhoeffer*, __ U.S. __, 134 S. Ct 2459, 2471 (2014) (quoting 29 U.S.C. § 1104(a)(1)(B)). Thus, the standard focuses on "the 'extent to which plan fiduciaries at a given point in time reasonably could have predicted the outcome that followed.'" *In re Lehman Brothers Sec. & ERISA Litig.*, 113 F. Supp. 3d 745, 754 (S.D.N.Y. 2015). It is one of prudence not prescience. *Id.* (citing *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir.1990)); *Schrey v. Lovett*, Civ. Act. No. 09-cv-292, 2011 WL 5837073, at *3 (E.D. Pa. Nov. 21, 2011).

The DOL noted in its Amicus Brief in the United States Court for the Northern District of Oklahoma "in most cases, it will be enough [if appointing fiduciaries] adopt and adhere to routine procedures sufficient to alert them to deficiencies in performance which could require corrective action (e.g., the implementation of a system of regular reports on the investment fiduciaries decisions and performance)." *In re Williams Co. ERISA Lit*., No. 02-153 (DOL Amicus Brief, at 5). Likewise, the DOL's guidance to appointing authorities on the duty to monitor requires, "under the applicable facts and circumstances," the following:

- the appointing authority must adopt routine monitoring procedures;
- the appointing authority must adhere to the routine monitoring procedures;
- the appointing authority must review the results of the monitoring procedures;
- the monitoring procedures must alert the appointing authorities to possible deficiencies; and
- the appointing authority must act to take required corrective action.

(Docket No. 144); 29 C.F.R. § 2509.75-8, FR-17; *In re Williams Co. ERISA Litig.*, No. 02-153 (N.D. Okla. Aug. 22, 2003) (DOL Amicus Brief, at 5, 8-9). Thus, an appointing authority that has instituted proper monitoring procedures has the corresponding duty to review and evaluate what is reported through such procedures and take corrective action when required. *See id.* At least one court has found quarterly monitoring sufficient. *See Sacerdote v. New York Univ.*, 328 F. Supp. 3d 273, 290, 307 (S.D.N.Y. 2018).

The duty to monitor does not carry with it the duty to review an investment fiduciary's every decision. *See Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011); *Lingis v. Motorola, Inc.*, 649 F. Supp. 2d 861, 882-83 (N.D. Ill. 2009). This is the rule even during a financial crisis. *See In re Lehman Brothers Sec. & ERISA Litig.*, 113 F. Supp. 3d at 757. Because to find otherwise would defeat the purpose of hiring investment fiduciaries to run a benefit plan in the first place.[17] *See Howell*, 633 F.3d at 573; *Lingis*, 649 F. Supp. 2d 882-83.

Again, a fiduciary's obligation to act is triggered when it has notice of the appointee's misconduct or has information available to it from which the misconduct would be apparent. *Sec'y of Labor v. Doyle*, 657 F. App'x 117, 127-28 (3d Cir. 2016). An appointing authority is not exposed to liability unless something "'put [them] on notice of possible misadventure by their appointees.'" *Coyne*, 98 F.3d at 1466 n.10 (quoting *Newton v. Van Otterloo*, 756 F. Supp. 1121, 1132 (N.D. Ind. 1991)); *see in re BP P.L.C. Sec. Litig.*, Civ. Act. No. 4:10–cv–4214, 2015 WL 6674576, at *11 (S.D. Tex. Oct. 30, 2015) (citing *In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp.

---

[17]     As explained in the DOL's amicus brief in *In re Williams Co. ERISA Litigation*, "appointing fiduciaries are not charged with directly overseeing the investments [as that would be] duplicating the responsibilities of the investment fiduciaries"; that appointing fiduciaries "are required to have procedures in place so that on an ongoing basis they may review and evaluate whether the investment fiduciaries are doing an adequate job;" and the procedures that are implemented allow the appointing fiduciary "under the applicable circumstances, to assure themselves that" the investment fiduciaries "are properly discharging their responsibilities." DOL Amicus Brief, at 8-9.

2d 861, 902 (S.D. Tex. 2004)). Consequently, the decisive issue in this case is when Defendants had notice of WPN and LaBow's underlying breach.

It bears mentioning that this is not the typical failure to monitor case. Rather than argue that at some point in time the Plans' investments became imprudent and should have been removed, the DOL, instead, argues that the Account should never have been accepted in the first place. (Docket No. 183 at 2). Indeed, the DOL admits that a breach occurred before any monitoring could begin. (Docket No. 196 at 2). Although creatively argued, the DOL appears to be making a failure to invest claim. As this Court explained in its June 17, 2017 decision, the Retirement Committee delegated to LaBow and WPN the power to invest the Plans' assets and under the safe harbor provision of § 405(d)(1), cannot be held liable for their actions. (Docket No. 144). After all, LaBow testified that in signing the investment management agreement, he was simply "memorializing" the already established relationship between the parties and had been fulfilling his investment management duties for the "Plans" since November 1, 2008. (Docket No. 192 ¶ 18).

This Court now turns its attention to the salient issue of when the Defendants knew or should have known that LaBow and WPN defied their explicit instructions to diversify the trust. The DOL has conceded that Defendants did not have actual notice of WPN and LaBow's breach until after the Retirement Committee reviewed a routine quarterly report from Mercer. (Docket Nos. 181-9 at 3; 190 ¶ 56; 192 ¶¶ 25). Specifically, DiClemente learned from Mercer on December 29, 2008, that the funds were not diversified and that LaBow had ignored the Retirement Committee's clear instructions. (Docket Nos. 181-9 at 3; 190 ¶ 56; 192 ¶¶ 25, 29). DiClemente, Halpin, and the Retirement Committee had a right to rely on the Mercer reports. To that end, nothing in the Mercer reports prior to December 29, 2008 would have put the Retirement

Committee on notice that the Severstal Trust was not properly diversified.[18]  Immediately after learning that the funds were not diversified, DiClemente contacted LaBow and the Retirement Committee's ERISA attorney, and together with Halpin proceeded to strategize how to best resolve this situation retaining as much of the value of the trust as possible.[19]  (Docket Nos. 184-10 at 64-65, 72; 192 ¶ 60).  This dialogue continued with King's oversight on almost a daily basis until the Account dissolved.  (Docket No. 192 ¶ 72).  The Account was ultimately sold for cash in March 2009, and as noted, LaBow and WPN were terminated as investment managers on May 19, 2009.  (Docket No. 190 ¶¶ 66-67, 70).  Both experts agree that during this time the market was extremely volatile, it was industry standard to give an investor time to correct a mistake, and there was an inherent danger in leaving the funds unmanaged.[20]  (Docket Nos. 178-9 at 9-11; 181-7 at 8-9, 16; 181-8 at 27-28).  It is pure speculation that had the Retirement Committee acted sooner somehow the outcome would have been different.  Although Dr. Mangiero opines that there were earlier "red flags", these purported red flags occurred prior to the time that Defendants' duty to monitor arose.[21]  (Docket No. 148).  Further, neither the DOL nor its expert, Dr. Mangiero, could provide the Court

---

[18]      The DOL has pointed to other evidence that it believes provided Defendants notice of LaBow and WPN's misadventure.  The Court rejects each of these arguments.  As to LaBow's alleged delay in transferring the assets, LaBow's October 22, 2008 email makes clear that he delayed the transfer due to the volatility in the market and was waiting for a more apt time.  (Docket Nos. 184-13 at 11; 190 ¶ 26).  The DOL likewise argues that the Retirement Committee should have acted sooner because it knew in November 2008 that Neuberger Berman was not managing the Account; yet, at the time it learned of this information, LaBow was still functioning as its investment manager and theoretically managing the Account.  (Docket Nos. 183 at 15; 193 at 10).  Also, of note is the fact that LaBow and WPN were the longtime investment managers of the WHX Trust and had exemplary results prior to managing the Severstal Trust albeit the market conditions in 2008-2009, were unlike those seen in a long time.  (Docket No. 184 ¶ 20; 184-8 at 53).

[19]      Once Defendants learned that the funds were not diversified, they acted immediately to rectify the problem.  (Docket Nos. 184-10 at 64-65, 72; 192 ¶¶ 60, 72).  They did not conceal the misadventure but rather fulfilled their fiduciary obligation to take corrective action.

[20]      Contrary to Dr. Mangiero's suggestion, the duty to monitor does not become heightened during a financial crisis.  *See In re Lehman Brothers Sec. & ERISA Litig.*, 113 F. Supp. 3d at 745.

[21]      It appears that Dr. Mangiero's opinions go more to a breach of the duty to invest.  It is also worth noting that had this case gone to trial, this Court would likely give greater weight to Dr. Stangle's opinion.  *See In re Unisys Savings Plan Litig.*, 173 F.3d 145, 157-58 (3d. Cir. 1999) (explaining that "[w]e would be hard pressed to require a District Court judge sitting in a non-jury case who credibly and with reason found that [s]he could not believe a witness to nevertheless hear the witness's direct examination, cross-examination, and rebuttal examination in an extended trial when [s]he knew that [s]he would only reject it as unbelievable").

with a date on which LaBow should have been terminated. (Docket Nos. 181-8 at 25; 181-30 at 13). Hence, the Court cannot find that Defendants breached the duty to monitor and summary judgment is warranted.

VI.     CONCLUSION

DiClemente, Halpin, and the Retirement Committee's Motion for Summary Judgment is GRANTED and the DOL's cross motion is DENIED, as moot.

An appropriate order follows.


*/s Nora Barry Fischer*
Nora Barry Fischer
Senior United States District Judge

Dated: September 30, 2019

cc/ecf: All counsel of record.